1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

| | |
|---|---|
| STATE OF WASHINGTON, | NO. |
| Plaintiff, | **COMPLAINT FOR** |
| | **PERMANENT INJUNCTION** |
| v. | **AND OTHER RELIEF** |
| FRANCISCAN HEALTH SYSTEM d/b/a CHI FRANCISCAN HEALTH; FRANCISCAN MEDICAL GROUP; THE DOCTORS CLINIC, A PROFESSIONAL CORPORATION; and WESTSOUND ORTHOPAEDICS, P.S., | **[REDACTED PUBLIC VERSION]** |
| Defendants. | |

Plaintiff, the State of Washington (the "State"), petitions this Court, pursuant to Section

16 of the Clayton Act, 15 U.S.C. § 26, and the Washington Consumer Protection Act, RCW

19.86.080, for an injunction against Defendants Franciscan Health System d/b/a CHI

Franciscan Health ("FHS"); Franciscan Medical Group ("FMG," and together with FHS, "CHI

Franciscan"); The Doctors Clinic, A Professional Corporation ("The Doctors Clinic" or

"TDC"); and WestSound Orthopaedics, P.S. ("WestSound" or "WSO") (collectively,

"Defendants"), including their agents, divisions, parents, subsidiaries, affiliates, partnerships,

or joint ventures, permanently rescinding, enjoining, and granting other relief against their

agreement, merger, acquisition, consolidation, or affiliation pursuant to certain agreements

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

1

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

entered on or about July 1, 2016, and September 6, 2016, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; Section 7 of the Clayton Act, 15 U.S.C. § 18; and RCW 19.86.030 and 19.86.060 of the Washington Consumer Protection Act.

In support of this Complaint, the State alleges as follows:

## I.  INTRODUCTION

1.  This lawsuit seeks to undo two transactions that have raised prices and decreased competition for healthcare on the Kitsap Peninsula. In the first transaction, which took effect on or about July 1, 2016, CHI Franciscan acquired the assets of WestSound, a physician practice of seven orthopedists based in Silverdale, Washington (the "WestSound Acquisition").

2.  In the second transaction, which took effect on or about September 3, 2016, CHI Franciscan entered into a set of agreements with The Doctors Clinic, an approximately fifty-four physician multispecialty practice also based in Silverdale. TDC and CHI Franciscan agreed that TDC would receive CHI Franciscan's negotiated reimbursement rates with payers, and CHI Franciscan acquired certain ancillary services from TDC. Unlike the WestSound Acquisition, CHI Franciscan did not acquire TDC's medical practice assets, and CHI Franciscan and TDC remain separate entities (the "TDC Affiliation," and together with the WestSound Acquisition, the "Kitsap Transactions").

3.  In announcing the Kitsap Transactions, Defendants have touted them as "an exciting direction for Kitsap County residents and families" on the purported grounds that they "enhance patient access and efficiency." In private and even public statements, however, Defendants have revealed their true motivation for the deals: to win the ability to charge higher rates for physician services, and to collectively gain negotiating clout over healthcare payers by removing head-to-head competition.

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

2

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

4.      Defendants recognized that TDC's sale of ancillary surgical ("ASC"), imaging, and laboratory services to CHI Franciscan would enable the latter to effectively shut down the facilities providing those services and shift their outpatient procedures to CHI Franciscan's inpatient hospital in Kitsap County, benefiting from higher, hospital-based rates. CHI Franciscan's Chief Financial Officer, Mike Fitzgerald, revealed this goal to a colleague in an internal e-mail: "I am all for taking advantage of hospital based pricing, if we think it is doable in the market and the market can support it. It would be great to drop a couple of million more to our bottom line, if we think we can do it." TDC sold these services even as it acknowledged that Kitsap Peninsula residents would receive inferior, costlier care. TDC's former physician president succinctly summarized these effects to its current medical director: "I can't wait to hear how CHI messages the addition of TDC to FMG. 'You can now get your outpatient care in a complex, relatively unsafe, and vastly more expensive location. You are welcome, Kitsap County…[']"

5.      From its headquarters in Tacoma, CHI Franciscan has spread northward up both sides of Puget Sound through a series of significant acquisitions in approximately the past five years. These acquisitions include Kitsap County's only civilian acute-care hospital, Harrison Medical Center ("Harrison"), with campuses in Bremerton and Silverdale, in 2013; Highline Medical Center and Highline Medical Group in Burien in 2013; and Olympic Radiology and Advanced Medical Imaging in Bremerton and Silverdale, respectively, in 2015. These rapid acquisitions prompted TDC's medical director to suggest, while in negotiations with CHI Franciscan, that the "theme song for the Franciscan Health System" should be Queen's "Another One Bites the Dust." The Kitsap Transactions were the top two priorities in CHI Franciscan's "Peninsula physician strategy," which CHI Franciscan viewed as a way to ensure that lucrative surgical procedures would be referred to its wholly-owned hospital, Harrison, rather than to non-CHI Franciscan hospitals in Seattle and Tacoma. This strategy would also

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

3

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

"[s]tem the loss of portable elective cases going to [TDC's] competitor ASC (now an affiliate)."

6.      Defendants further realized that the Kitsap Transactions would allow them to collectively gain leverage to obtain higher payments in their negotiations with healthcare payers. A CHI Franciscan summary of the transactions listed one of the "Affiliation Synergies" realized through the deals: "Improved reimbursement for" TDC and WSO "through payor contracting." In publicly explaining how the TDC Affiliation worked, FMG's Chief Operating Officer, Dr. Peter O'Connor, acknowledged to the *Tacoma News Tribune* that "[t]he partnership will allow The Doctors Clinic to remain physician-owned," but CHI Franciscan would take over "back-of-house duties such as negotiating with insurance companies for rates." Dr. O'Connor further admitted in a *Kitsap Daily News* article that the purpose of the TDC Affiliation was to enable CHI Franciscan and TDC to obtain higher reimbursements from payers: "If you're bigger, you are able to negotiate better contracts."

7.      Bigger, however, has not been better for healthcare consumers on the Kitsap Peninsula. It has been far worse. As a result of Defendants' *per se* unlawful price fixing through the TDC Affiliation, and their anticompetitive merger via the WestSound Acquisition, commercial healthcare payers on the Kitsap Peninsula were forced overnight to increase the contractual reimbursements they paid to TDC and WestSound physicians, including overall increases for some payers of over ███ percent. The rate increases affected the vast majority of diagnoses and procedures covered by the contracts those payers had in effect with Defendants, and included procedures such as total abdominal hysterectomy (for which one payer saw its allowable charges increase by ██% at TDC), laparoscopic cholecystectomy (i.e., gall bladder removal—a ██% increase at TDC), and arthroscopically aided anterior cruciate ligament ("ACL") repair or replacement (a ██% increase at WSO). The Kitsap Transactions have increased costs for commercial healthcare payers, self-insured employers, and individual

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

4

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

patients who have had to pay higher out-of-pocket costs. Payers can no longer use the presence of multiple independent providers to obtain favorable rates in reimbursement negotiations. Kitsap Peninsula patients have seen increased wait times, difficulty in scheduling procedures, and a reduction in their choice of services and locations.

8.      The Kitsap Transactions reflect a national trend of consolidation and a loss of competition in the healthcare industry, which is continuing to fuel growth in healthcare spending. An April 2017 report co-authored by the Brookings Institution noted that acquisitions of physician practices by hospitals result in substantial increases in price, and "prices for physician services have been shown to be higher in more concentrated markets with fewer potential competitors."

9.      In addition to the TDC Affiliation's *per se* illegality, both Kitsap Transactions have helped Defendants accumulate market power. Because of the WestSound Acquisition and the fact that through the TDC Affiliation, TDC's orthopedic physicians now bill under CHI Franciscan's payer contracts, CHI Franciscan now controls billing for all but a small handful of orthopedists on the Kitsap Peninsula. The TDC Affiliation also means that CHI Franciscan and TDC now possess market power in the provision of adult PCP services on the Kitsap Peninsula. Defendants' market power has harmed competition and raised healthcare prices in Kitsap County and on the greater Kitsap Peninsula, and will continue to harm competition and consumers unless this Court enjoins the Kitsap Transactions.

## II.    JURISDICTION, VENUE, AND INTERSTATE COMMERCE

10.     This Court has subject matter jurisdiction over this action under Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337(a). This Court has supplemental jurisdiction over the State of Washington's state law claims under 28 U.S.C. § 1367.

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

5

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

11.    Defendants each transact business and maintain their principal places of business within the Western District of Washington and are each subject to personal jurisdiction therein. Furthermore, all or a substantial part of the events giving rise to the State's claims occurred within the Western District of Washington. Venue, therefore, is proper in this District under 28 U.S.C. § 1391(b)–(c) and Section 12 of the Clayton Act, 15 U.S.C. § 22.

12.    Defendants are engaged in, and their activities substantially affect, interstate trade and commerce. For example, Defendants contract with and receive payments from national commercial health plans, such as Aetna and UnitedHealthcare (a subsidiary of UnitedHealth Group), that are headquartered and conduct business outside Washington. CHI Franciscan's financial results are reported to and made part of the financial results of its corporate parent, Colorado-based Catholic Health Initiatives ("CHI"), and CHI has input into CHI Franciscan's budget.

### III.    THE PARTIES

13.    The Plaintiff is the State of Washington, a sovereign state within the United States, acting through the Antitrust Division of the Office of Attorney General Robert Ferguson, the chief law enforcement officer of the State. The State has authority to bring this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, and under the Washington Consumer Protection Act, RCW 19.86.080. The State of Washington brings this action in its sovereign capacity and as *parens patriae* on behalf of the citizens, general welfare, and economy of the State. The Antitrust Division of the Office of the Attorney General of the State of Washington is headquartered at 800 Fifth Avenue, Suite 2000, Seattle, Washington 98104.

14.    Defendant Franciscan Health System, doing business as CHI Franciscan Health, is a non-profit corporation organized and existing under the laws of Washington with its headquarters at 1717 South J Street, Tacoma, Washington 98405. FHS's sole voting member is non-defendant CHI, a Colorado non-profit corporation.

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

6

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

15.     Defendant Franciscan Medical Group, also doing business as CHI Franciscan Health, is a non-profit corporation organized and existing under the laws of Washington. FMG's sole member is Defendant FHS. FMG's headquarters are located at 1313 Broadway Plaza, Suite 200, Tacoma, Washington 98201. FMG physicians practice at 22 clinic locations on the Kitsap Peninsula, excluding locations that were acquired or assumed as part of the Kitsap Transactions. Operationally, FMG functions as the wholly-owned subsidiary of Defendant FHS.

16.     Defendant The Doctors Clinic is a professional corporation organized and existing under the laws of Washington with headquarters at 9621 Ridgetop Boulevard NW, Silverdale, Washington 98383. At the time of the TDC Affiliation, TDC maintained seven locations, all within Kitsap County, employing approximately 54 physicians in specialties including family medicine, internal medicine, orthopedics, urology, general surgery, obstetrics and gynecology, and cardiology.

17.     Before the WestSound Acquisition took effect, Defendant WestSound was a professional services corporation organized and existing under the laws of Washington located at 4409 NW Anderson Hill Road, Silverdale, Washington 98383. WestSound offered orthopedic services from its main location in Silverdale and from a satellite office on Bainbridge Island. At the time of the WestSound Acquisition, WestSound employed seven physicians, all of whom specialized in orthopedic care. As a result of the WestSound Acquisition, WestSound became wholly owned by CHI Franciscan on or about July 1, 2016.

18.     Except to the extent competition has been illegally restrained as alleged herein, Defendants FHS and FMG have been, and are now, in competition with Defendant TDC for the provision of at least Adult PCP and Orthopedic Physician Services (defined below at Paragraphs 35 and 36) and other physician services. Furthermore, until the anticompetitive consummation of the WestSound Acquisition as alleged herein, Defendants FHS and FMG

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

7

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

were in competition with Defendant WestSound for the provision of Orthopedic Physician

Services. As described more fully below, healthcare payers have relied on competition between

CHI Franciscan and TDC, and CHI Franciscan and WestSound, to obtain favorable contractual

rates under which they compensate Defendants and others for physician services. In addition,

FMG providers compete and/or competed with TDC and WestSound providers to attract

patients based on location, reputation for quality, provider availability, perceived patient

experience, and other factors.

## IV.    THE MARKET FOR HEALTHCARE SERVICES

### A.    Competition between healthcare providers

19.    Competition between healthcare providers occurs in two stages. In the first

stage, providers compete to be included in provider networks assembled by health plans (or

"payers"). In order to offer a competitive insurance product, health plans must offer provider

networks with sufficient geographic coverage and scope of services to attract employers (who

are the predominant purchasers of commercial insurance), their employees, and independent

purchasers of "non-group" insurance, such as products offered on Washington's health benefit

exchange. Health plans must also offer networks with sufficient geographic coverage and

scope of services to meet network adequacy requirements set by the Washington Office of the

Insurance Commissioner. In-network status gives providers preferential access to a health

plan's members, as it is typically far less costly for a health plan member to receive services

from an in-network provider. All else being equal, an in-network provider is more likely to

attract patients from a given health plan than an out-of-network provider.

20.    Barring an unlawful agreement among competing physician practices on price

or other terms, physician practices decide unilaterally whether to enter into payer contracts to

provide services to payers' members, and what prices they will accept pursuant to those

contracts. Through a process of selective contracting, health plans and providers negotiate the

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

8

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

prices that in-network providers receive when they render services to the health plan's members. During negotiations, the health plan's ability to obtain lower prices from a provider depends in part on the existence of competing healthcare providers. A health plan is able to negotiate lower reimbursement rates when it can credibly threaten to exclude a given provider from its network—that is, when it has a viable outside option. Competition for inclusion in a health plan's network gives providers an incentive to offer lower rates and other favorable terms. On the other hand, when there are few or no meaningful alternatives, a provider will have greater bargaining leverage to demand and obtain higher reimbursement rates and other favorable terms.

21.     Health plans pass on increased reimbursement rates to their individual members in the form of higher premiums, co-pays, co-insurance, and deductibles. There are also significant increases for employers as purchasers of insurance, as they typically pay a large portion of their employees' premiums. Lastly, self-insured employers, which bear the full cost of their employees' claims rather than pool risk with other employers through a health plan, also feel the impact of higher reimbursement rates.

22.     In the second stage of healthcare provider competition, in-network providers compete with one another to attract a health plan's members. Because health plan members typically face similar out-of-pocket costs for all in-network providers, providers in the same network must compete for patient volume on non-price factors, such as location, wait times, convenience, quality of care, and patient satisfaction.

23.     Price competition among healthcare providers therefore occurs in the first stage of healthcare competition. However, when there is a merger of competing providers, as opposed to an affiliation between competing providers for payer contracting alone, second stage non-price competition is also eliminated, and the merged entity's incentive to maintain and improve quality is reduced.

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

9

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**B.      Payment models for physician services**

24.      Major commercial health plans commonly structure payments in their provider contracts around the Medicare Resource Based Relative Value System ("RBRVS"), the primary method that the United States Centers for Medicare and Medicaid Services ("CMS") uses to set physician payment rates under Medicare and Medicaid. In addition to payer contracting, the RBRVS model is often used, at least in part, to structure the compensation formulae in physician employment agreements.

25.      Under the RBRVS system, CMS assigns a work Relative Value Unit ("RVU" or "wRVU") to each distinct physician service, taking into account factors such as the time, skill, and equipment needed to render that service to a patient. For example, a routine office visit for evaluation and management may have a wRVU of 1.50, while a total knee replacement may have a wRVU of 20.72. CMS annually determines the price that physicians are paid for each service by multiplying the wRVU by a set dollar conversion factor (e.g., a 1.50 wRVU for an office visit is multiplied by the 2017 CMS conversion factor of $35, rendering a $52.50 fee for that physician service). Under the RBRVS model, physicians are paid based upon the volume of services they perform as measured by wRVUs. The wRVU system thus represents the volume, but not the quality or efficiency, of services provided by physicians. This wRVU-based system is the model used by many commercial payers, including those on the Kitsap Peninsula, in fee-for-service contracts.

26.      When commercial payers use the RBRVS system to structure their contracts with providers, some payers negotiate the reimbursement rate as a different conversion factor (e.g., a commercial conversion factor of $45 instead of Medicare's conversion factor of $35). Other payers might structure and negotiate the reimbursement rates as a percentage of the Medicare RBRVS fee for a particular year (e.g., 110% of 2017 RBRVS, or 110% of the wRVU multiplied by the conversion factor).

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

10

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

C.     **Healthcare services on the Kitsap Peninsula**

27.     The Kitsap Peninsula lies between Puget Sound and Hood Canal, surrounded almost entirely by water. Kitsap County covers the majority of the peninsula, with parts of Pierce County covering the southern region and parts of Mason County covering the southwestern region. The Kitsap Peninsula's largest population center is Bremerton; other population centers include Bainbridge Island, Silverdale, Port Orchard, Poulsbo, and Gig Harbor. The Kitsap Peninsula is connected to Tacoma to the southeast via the Tacoma Narrows toll bridge, Seattle to the east via ferry, and rural Jefferson and Clallam Counties to the northwest via the Hood Canal Bridge. These geographic barriers create a strong and empirically observable preference by Kitsap Peninsula residents to receive medical care close to their homes on the Kitsap Peninsula.

28.     CHI Franciscan owns the only two civilian general acute-care hospitals on the Kitsap Peninsula: Harrison, the only civilian acute-care hospital in Kitsap County, with campuses in Bremerton and Silverdale; and St. Anthony Hospital, located in Gig Harbor (in Pierce County). CHI Franciscan also has two medical groups that provide primary and specialty care, as well as surgical services, on the Kitsap Peninsula: FMG and Harrison Health Partners ("HHP"). Prior to the Kitsap Transactions, FMG consisted of approximately 428 physicians who provide care in King, Pierce, and Kitsap Counties, and HHP consisted of approximately 89 physicians who primarily serve the Kitsap and Olympic Peninsulas. Effective July 2, 2017, HHP physicians became employed physicians of FMG. Combined, HHP and FMG physicians practice at approximately 22 clinic locations on the Kitsap Peninsula, nine of which offer adult primary care services and four of which offer orthopedic services.

29.     TDC operates seven locations, all located within Kitsap County, including an ambulatory surgery center. Of its 54 physicians, TDC employs 13 adult primary care

11

physicians at four locations in Silverdale, Port Orchard, and Poulsbo, and five orthopedists in Silverdale.

30. WestSound's orthopedists (now employed by FMG) primarily practice at its main Silverdale clinic location. WestSound also has a satellite location in Bainbridge Island.

31. On the Kitsap Peninsula, there are limited offerings for adult primary care services besides CHI Franciscan and The Doctors Clinic. Kaiser Permanente of Washington (formerly Group Health Cooperative) does not contract with competing health plans for its physicians' services, and therefore its physicians' services are, with limited exceptions, accessible only by Kaiser Permanente health plan members. Kaiser Permanente of Washington has three primary care clinics within Kitsap County. Seattle-based Virginia Mason Medical Center and Swedish Medical Center each have a single primary care clinic location in Bainbridge Island. Tacoma-based MultiCare Health System ("MultiCare") offers primary care services at its Gig Harbor medical clinic, located south of Kitsap County. There is also a handful of small, independent primary care practices on the Kitsap Peninsula. These practices typically consist of one or two adult PCPs, and many are structured as "concierge" practices that only accept cash payments and/or a monthly membership fee, instead of contracting with health plans.

32. The Kitsap Peninsula also has limited offerings for orthopedic services beyond what Defendants offer. As a result of the Kitsap Transactions, nearly all orthopedic physicians within the Kitsap Peninsula are either employed by or contracted with CHI Franciscan. Outside of CHI Franciscan, there are approximately two additional orthopedists at MultiCare's Gig Harbor clinic, and one orthopedist at Virginia Mason's Bainbridge Island clinic.

33. CHI Franciscan is also the sole owner of an accountable care organization, Rainier Health Network ("RHN"), that includes patients and providers on the Kitsap Peninsula. An accountable care organization ("ACO") may take many forms, but usually refers to a

12

network of providers that come together for the purpose of taking on responsibility for the total cost of care for a given patient population through value-based contracts with health plans. RHN was originally formed as a Medicare Shared Savings Program ACO, but has since expanded to include contracts with commercial payers. RHN includes FMG, HHP, and Harrison. TDC has participated in RHN since 2014. WestSound also participated in RHN prior to the WestSound Acquisition.

## V.    RELEVANT PRODUCT AND GEOGRAPHIC MARKETS

34.    "Determination of the relevant product and geographic markets is a necessary predicate to deciding whether a merger contravenes the Clayton Act," *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015) (quotation omitted), and is an element of a Section 1 case under the rule of reason, *see Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001). As the State describes below, the TDC Affiliation alleged in Count One is *per se* unlawful and requires no pleading or proof of the relevant product or geographic markets. To the extent that such pleading is required, however, the relevant product markets applicable to the TDC Affiliation are Adult PCP Services and Orthopedic Physician Services. In addition, the relevant product market applicable to the WestSound Acquisition is Orthopedic Physician Services. The relevant geographic market applicable to both the TDC Affiliation and the WestSound Acquisition is an area no larger than the Kitsap Peninsula including Bainbridge and Fox Islands. The State defines each of these markets in the following paragraphs of this Section V.

### A.    Product markets

35.    Adult PCP Services consists of general physician services provided to commercially insured patients aged 18 and older by physicians practicing internal medicine, family practice, and general practice. It excludes obstetricians and gynecologists, as well as

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

13

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

pediatricians, because those physicians are not considered viable substitutes for Adult PCP Services by significant numbers of commercially insured patients aged 18 and older.

36.     Orthopedic Physician Services consists of services, including surgery, provided to commercially insured patients by physicians who specialize as orthopedists to diagnose, treat, and rehabilitate injuries, disorders, and diseases of the musculoskeletal system.

**B.     Geographic market**

37.     An appropriate geographic market is the "area of effective competition where buyers can turn for alternate sources of supply." *St. Luke's*, 778 F.3d at 784 (quotation omitted). A common test to determine the boundaries of the relevant geographic market is to find whether a hypothetical monopolist controlling all services sold in the market could impose a small but significant and nontransitory increase in price ("SSNIP") in the proposed market. If enough consumers respond to the SSNIP by going outside the proposed geographic market to purchase a service, then the proposed boundaries are too narrow. *Id.* If, however, the hypothetical monopolist is able profitably to impose a SSNIP, then the boundaries of the area are an appropriate geographic market.

38.     The geographic market for Counts One (to the extent necessary) and Two is an area no larger than the zip codes that comprise the Kitsap Peninsula including Bainbridge and Fox Islands ("KP/BI").[1] Payer data for claims submitted by providers that contain patients' residence zip codes make clear that KP/BI residents strongly prefer to receive Adult PCP Services and Orthopedic Physician Services close to their homes in KP/BI. Qualitative evidence also indicates that KP/BI residents prefer to receive care in KP/BI, rather than driving a longer distance and incurring a toll to visit providers across the Tacoma Narrows Bridge, or enduring the waiting, sailing time, and expense of a round-trip ferry voyage to visit providers

---

[1] Kitsap Peninsula and Bainbridge and Fox Islands include the zip codes 98110, 98310, 98311, 98312, 98314, 98315, 98329, 98332, 98333, 98335, 98337, 98340, 98342, 98346, 98349, 98351, 98359, 98366, 98367, 98370, 98380, 98383, 98392, 98394, 98524, 98528, and 98588.

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

14

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

in King or Snohomish Counties. Furthermore, quantitative and qualitative evidence, including Defendants' ordinary course of business documents, confirm that KP/BI is the relevant geographic market in which to analyze the effects of the Kitsap Transactions. For these reasons, to be competitively marketable to KP/BI employers and to meet network adequacy requirements, a payer's health insurance plan must include in its physician network a sufficient number of adult primary care physicians, as well as a number of specialists, including orthopedic physicians, who practice in KP/BI. Therefore, a hypothetical monopolist that controlled all providers of Adult PCP Services or Orthopedic Physician Services in KP/BI could profitably impose a SSNIP on payers.

## VI.    DEFENDANTS' UNLAWFUL ACTIVITIES: THE TDC AFFILIATION

39.    In late summer 2015, five primary care physicians at TDC's Bainbridge Island location announced they would leave TDC and sign contracts with Swedish Medical Center to form the Swedish Bainbridge Island Primary Care clinic. This event, combined with other physician departures from TDC, caused TDC's physician shareholders to believe they would experience a sharp decline in their income relative to market averages. TDC therefore began looking for a well-capitalized partner that would infuse the clinic with enough cash to increase its physicians' salaries. At the same time, however, TDC strongly desired to maintain the physician self-governance and independence from other practices that had characterized TDC throughout its existence.

40.    For its part, CHI Franciscan and its subsidiaries had long viewed a transaction with TDC as a strategic opportunity to neutralize a key competitor on the Kitsap Peninsula. At a May 2010 Harrison board of directors strategy meeting, CHI Franciscan's current Senior Vice President and Chief Strategy Officer, Thomas Kruse, advanced several scenarios as part of a "strategic thinking exercise." One such scenario involved entering into "[m]ultiple joint ventures" to "exploit[] a strong shift in the market that favorably biases partnering with

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

15

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

physicians." Mr. Kruse then revealed the endgame of this strategy: "Harrison (through Harrison HealthPartners) and the Doctor's Clinic come together to form the solid foundation of a Kitsap PHO [physician-hospital organization], which is soon joined by the other large medical groups, and eventually even raises question with the DOJ for restraint of trade concerns – the ultimate compliment!" Later, in 2012 or 2013, Harrison's then-President and CEO, Scott Bosch, threatened TDC's leadership with signing away approximately a dozen TDC physicians and driving what remained of TDC's practice into bankruptcy.

41.    TDC and CHI Franciscan believed that their relationship became more cooperative and less adversarial following Franciscan's 2013 acquisition of Harrison and Mr. Bosch's 2014 retirement. Therefore, TDC and Franciscan began exploring the possibility of a closer partnership starting no later than 2015. Those discussions evolved through negotiation into the TDC Affiliation. Three written agreements serve as the primary legal basis for the TDC Affiliation: a Professional Services Agreement, a Management Services Agreement, and an Asset Purchase Agreement.

**A.    TDC and FMG have agreed on prices to charge payers via the Professional Services Agreement.**

**1.    Under the Professional Services Agreement, FMG jointly contracts with payers on behalf of itself and its competitor, TDC.**

42.    At a meeting between CHI Franciscan and TDC on September 8, 2015, the parties' representatives first discussed the contours of what would become the Professional Services Agreement ("PSA") that formed the basis of their affiliation. CHI Franciscan pitched the PSA model as "[a]n option to contract w/group [TDC] as opposed to the individual" physicians. TDC would be compensated using an "RVU rate based on aggregate of the group's RVU production," with TDC then distributing income to its individual physicians. Importantly for TDC, the PSA would include independent "[g]overnance of the practice maintained by" TDC, and "TDC would manage the practice and be paid a management fee" by CHI Franciscan. In fact, "[b]illing/collecting & IT [information technology] were the only

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

16

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

centralized functions" under the PSA proposal. Those in attendance also discussed how to determine compensation based on RVUs, how to handle the ancillary facilities including the ASC, and "[r]etention of the TDC name and brand," among other topics. CHI Franciscan and TDC continued to negotiate the terms of their agreement throughout the rest of 2015 and the first eight months of 2016. At all times, both sides to the negotiations assumed that TDC would be paid using a volume-based, fee-for-service model based on wRVUs.

43.     Under the PSA that TDC and FMG executed, TDC agreed that its providers in all specialties would provide medical services exclusively on behalf of FMG, and TDC's existing patients would become FMG patients. In exchange, CHI Franciscan agreed to compensate TDC based on a fee-for-service formula, with TDC receiving payment for wRVUs performed by TDC physicians at ██% of the amount FMG pays to FMG-employed physicians in the same specialties according to FMG's wRVU-based rates. Specifically, FMG agreed to pay TDC a "draw amount" based on the actual wRVUs performed during the year by TDC's physicians, multiplied by FMG's rate schedule applicable to the "tier" of wRVUs performed by each physician, and further multiplied by ██%. TDC then distributes that draw amount to its physicians based on its internal compensation schedule. In this manner, the more patients TDC sees, the more wRVUs it performs, resulting in a higher draw amount under the PSA's terms.

44.     On the date the PSA took effect, TDC was required to, and did, cancel its then-current contracts with payers and immediately joined the contracts that FMG had in effect with payers, including FMG's contractual reimbursement rates. TDC did not have to renegotiate any payer contracts, but simply joined FMG's payer contracts by becoming credentialed with each payer as an "FMG Provider" and submitting charges to payers under FMG's tax identification number. TDC delegated to FMG "sole responsibility and authority to determine the fees to be charged to patients for" professional services rendered by TDC physicians, and to "maintain,

negotiate and execute contracts with payors that pertain to the Professional Services." The PSA provided that billing and collection for services provided by TDC "will be done under FMG's tax identification number and in FMG's name," and "FMG shall be exclusively entitled to retain all remuneration for the same."

45.     Under the PSA, CHI Franciscan now jointly negotiates payer contracts on behalf of both itself and its competitor, TDC. TDC has no input into FMG's rate negotiations with payers on TDC's behalf. TDC admits that under the PSA, "all of TDC's physicians have begun to contract through FMG's payer contracts" and that it "does not expect to negotiate separately with payers for TDC physicians." And as CHI Franciscan admits, pursuant to the PSA, TDC's physicians "fell within the purview of the existing Payer Contracts previously negotiated by Franciscan."

**2.     Despite jointly negotiating with payers, TDC and FMG remain separate economic entities and compete to attract patients.**

46.     Except for the prices they jointly charge to commercial healthcare payers, FMG and TDC remain independent economic entities. Each is controlled by separate boards of directors with no overlapping directorates. Each is owned by separate actors—FMG by FHS, and TDC by its physician shareholders—with no overlapping ownership. TDC is required by the PSA to maintain separate commercial general liability and professional liability insurance. Each maintains separate clinical protocols, medical directors, and procedures for addressing deviations from standards of care. TDC maintains the control it had before the TDC Affiliation over whether to a hire a particular physician to work at TDC.

47.     TDC's physicians and non-physician employees remain employed by TDC, not by CHI Franciscan. The PSA specifies that TDC acts at all times as an independent contractor of FMG, without forming any type of employment relationship between FMG and TDC. TDC is solely responsible for its physicians' salary, compensation, benefits, workers' compensation

18

insurance, and similar items. TDC must indemnify and hold CHI Franciscan harmless against liability arising from any claim that TDC or its physicians are CHI Franciscan employees.

48.    TDC has also continued to use its own electronic health records ("EHR") system, Intergy, and does not intend to transition to using CHI Franciscan's EHR system, Epic. TDC's ability to continue using Intergy, rather than integrating with Epic, was an essential condition to it signing the PSA. Indeed, it was a significant reason why TDC accepted less than 100% compensation for its physician wRVUs under the PSA's compensation formula. TDC and FMG also continue to use separate EHR systems and clearinghouses for processing bills to payers and patients, with no plans to combine systems in the future.

49.    TDC and FMG viewed each other as close competitors for patients before the TDC Affiliation. TDC and FMG continue to compete for patient volume because the PSA incentivizes them to do so. Under the PSA, TDC is paid based upon the number of wRVUs performed by TDC physicians. Thus, for TDC to increase its revenues, TDC must serve more patients. A patient who is treated by a non-TDC physician will not contribute to TDC's revenues under the PSA. Given that both FMG and TDC must draw from the same, finite pool of patients who seek care from KP/BI providers, it is in TDC's financial interest to attract patients to TDC clinics over FMG clinics.

50.    TDC and FMG have further demonstrated that they continue to compete for patients. A week before the TDC Affiliation took effect, TDC waived a non-compete clause in the employment agreement of one of its primary care physicians who wished to practice for FMG as an urgent care specialist. The waiver, however, specified that the physician could not practice primary care as an FMG physician for one year after Defendants signed the PSA. TDC admitted that it granted this waiver only because, by changing her practice area, the physician "was practicing not in direct competition" with her "same specialty" at TDC.

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF                    19                    ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

51.     TDC admits, in sworn answers to investigative interrogatories, that it "remains [a] separate entity, and TDC's physicians remain under their own physician governance structure." TDC further admits, in sworn investigative testimony, that in conducting the affiliation with CHI Franciscan, it was "absolutely" trying to remain as independent as possible operationally, while still affiliating with a large health organization.

52.     TDC and FMG are therefore competitors. They are separate economic actors, with independent economic incentives, that have come together under the PSA for the exclusive purpose of jointly negotiating reimbursement rates with payers.

**B.     FMG makes further support payments to TDC under the Management Services Agreement.**

53.     As part of the TDC Affiliation, CHI Franciscan purchased certain ancillary services from TDC (discussed below) and also assumed the leases of the medical clinic locations in which TDC offered physician services. The parties desired, however, that TDC staff would continue to perform administrative, "back office" functions in exchange for a management fee. As a result, TDC largely continues to carry out the same administrative and operational duties in running its clinics as it did before the TDC Affiliation, allowing TDC to maintain control over its day-to-day operations.

54.     Under the Management Services Agreement ("MSA"), TDC is required to "provide all services that are necessary and appropriate for the proper and efficient operation" of the medical clinic locations at which TDC practices, including the ambulatory surgery center. The services that TDC provides under the MSA include scheduling, reception, billing health plans and patients, all supply-chain functions, accounting, equipment and facility repair and maintenance, utilities, credentialing of providers with health plans, Medicare enrollment, operation of the ASC, and provision and maintenance of an electronic health records and practice management software system.

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

20

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

55.     Given that FMG collects TDC's payments from health plans and patients, TDC must look to CHI Franciscan for funds to run its medical clinics. The MSA operates off a budget established by TDC and CHI Franciscan before each fiscal year, and "[i]t is the sole and absolute responsibility of TDC to operate within the Budget." If TDC's expenses for operating the medical clinics come in under budget, the MSA limits the amount of savings that TDC can retain. If TDC's expenses for operating the medical clinic go over budget, it must forfeit its management fee and, under certain circumstances, reimburse CHI Franciscan for a portion of the latter's costs in making up the difference.

56.     The centrality of fee-for-service billing to the TDC Affiliation is also reflected in the MSA. The MSA obligates TDC to ensure that it "provides monthly, quarterly and annual reports in a format and level of detail reasonably acceptable to FMG regarding work Relative Value Units ('*wRVUs*') actually performed, billable and under the PSA."

**C.    TDC sells its ancillary services to FMG under the Asset Purchase Agreement and Defendants move services to Harrison.**

57.     CHI Franciscan's payments to TDC under the PSA and MSA represented increased costs to CHI Franciscan. To fund the cost of these agreements, CHI Franciscan needed a new source of revenue. Therefore, a crucial component of the TDC Affiliation was the sale of ancillary services—an ambulatory surgery center, laboratory, and imaging facility—from TDC to CHI Franciscan under the parties' Asset Purchase Agreement ("APA"). CHI Franciscan paid TDC some $██████ for the ancillary services. The parties structured the deal such that CHI Franciscan made an up-front payment of about $██████ while simultaneously obligating itself under a promissory note to pay the approximately $██████ balance, plus interest, in a series of equal annual installments over the next five years. To TDC, this deal structure represented a guaranteed source of cash flow. To CHI Franciscan, it represented a chance for CHI Franciscan to acquire a dedicated source of profitable referrals to

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Harrison, most notably in surgery and imaging, while spreading the acquisition's cost over several years.

58.     When they began negotiating the sale of the ancillary services, CHI Franciscan and TDC contemplated that they would continue to perform most or all of the ancillary procedures at their existing TDC locations, but would apply CHI Franciscan's hospital-based rates in billing for those procedures. An obstacle arose, however, when CMS proposed a rule to implement Section 603 of the Bipartisan Budget Act of 2015 (Pub. L. 114-74). Under this "250 yard rule," a provider's off-campus location must be located within 250 yards of a hospital facility in order to qualify for provider-based status and bill at the hospital's rates.[2] TDC's former ancillary facilities were, and are, all located over 250 yards away from Harrison, CHI Franciscan's only qualifying hospital facility in Kitsap County. TDC summarized this problem in a presentation at a March 2016 shareholders' meeting: the "250 yard rule interferes with the funding of the PSA as originally intended" because it "would NOT allow our ancillaries to be billed at a higher rate." Therefore, the parties decided to move to Harrison the majority of procedures that used to be performed at the ancillary facilities.

59.     Even though Defendants recognized that this "ancillary movement is more complex and disruptive for patients and physicians," they also knew that CHI Franciscan's purchase of the ancillary services would allow them to shift procedures performed at those facilities to Harrison, with its attendant higher rates. The reduction in services performed at those facilities would both hobble TDC as a competitor and guarantee that CHI Franciscan would capture those services' revenue stream through Harrison. CHI Franciscan expected that revenue to outweigh the payments it was obligated to make to TDC under the PSA and MSA. Thus, from CHI Franciscan's perspective, purchasing the ancillary services more than made the PSA and MSA pay for themselves.

---

[2] *See* Medicare Program: Payment to Certain Off-Campus Outpatient Departments of a Provider, 81 Fed. Reg. 45,604, 45,683–84 (Jul. 14, 2016).

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

60.    CHI Franciscan's expectation has come true. In October 2016, the month after the TDC Affiliation took effect, Harrison's imaging center saw a volume increase of 17% over the previous month, which it attributed to the TDC Affiliation. Also in that month, Harrison observed growth of an additional 162 orthopedic surgical cases to that point because of the Kitsap Transactions. The exodus of procedures to CHI Franciscan's hospital facility is continuing. As a consequence, TDC's ambulatory surgery center is currently performing around half the procedures it did before the TDC Affiliation, and what remains are generally low-acuity, low-margin cases such as pain management and orthopedic hand surgeries. Finally, TDC's laboratory is currently performing roughly the same volume of services it did before the TDC Affiliation because TDC's and Harrison's laboratories are not integrated as a result of TDC's use of a separate EHR platform. But Defendants have admitted they intend to eventually close down TDC's laboratory and move those services to Harrison as well.

61.    In addition to the PSA, MSA, and APA described above, as part of the TDC Affiliation, FMG and TDC entered into other contracts and agreements that helped facilitate the anticompetitive TDC Affiliation.

**D.    The TDC Affiliation has harmed payers and patients on the Kitsap Peninsula.**

62.    The TDC Affiliation has eliminated the first, price-based stage of healthcare competition between CHI Franciscan and TDC. On the date the PSA took effect, TDC immediately began receiving higher reimbursement rates from health plans. TDC's reimbursements increased by an average of over ███████ percent for payers across all physician services, and in the case of one payer, █████ percent. As a result of this loss of competition, healthcare payers have lost an important outside option in negotiating reimbursement rates, and Defendants' bargaining leverage has increased.

63.    In addition to these immediate price impacts to TDC physician services, health plans, employers, and patients are paying significantly more, or will likely pay more in the

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

23

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

future, for ancillary imaging, laboratory, and outpatient surgical services as a result of pressure by CHI Franciscan for TDC physicians to direct patients to Harrison for those services. Because TDC is now encouraged to refer within the CHI Franciscan system, and because CHI Franciscan has closed TDC's imaging services, TDC now refers imaging patients almost exclusively to Harrison unless a patient specifically asks to be referred to Kitsap County's only other imaging provider, InHealth Imaging. Similarly, many procedures are no longer performed at TDC's ambulatory surgery center. The shift of these procedures has allowed CHI Franciscan to reap the financial benefits of its higher rates for these services. A TDC orthopedist acknowledged to CHI Franciscan that moving surgeries to Harrison entailed "extra cost for our patients" and lamented that the move was made for "solely financial reasons."

64.    The shift in services has harmed Kitsap Peninsula patients in ways beyond higher prices. Shuttering TDC's imaging service has led to scheduling backlogs as TDC patients are referred to Harrison's overburdened imaging services. Early on in the TDC Affiliation, the backlog in imaging scheduling prompted a TDC physician to e-mail TDC's physician president to complain about an "influx of calls from patients not being called from Harrison regarding their imaging orders," noting delays of up to two weeks. The physician explained: "Sometimes the imaging test is fairly urgent, and cannot wait this long. I am trying not to refer anyone to In Health Imaging anymore as requested by our new relationship with the Franciscans, but I will be forced to for more urgent studies if this scheduling problem continues." TDC's physician president responded, acknowledging:

> It is a major source of dissatisfaction. I also feel your pain. We had a great radiology department and it will take some time and effort to work with CHI to have any chance to match what the TDC radiology department was. Some of our surgeons also have the additional joy of not using our surgical center. Our turn over times are significantly longer.

Several months later, CHI Franciscan's internal reports showed that patient scheduling at Harrison was still taking longer than expected, that scheduling calls to x-ray patients had

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

24

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

ceased entirely with the instruction instead to "rely on patient to walk-in or call," and that patients complained of "excessively long hold times."

65.    Kitsap Peninsula patients have also seen service and choice reductions due to restrictions imposed on TDC physicians' practice by the Ethical and Religious Directives of the Catholic Church ("ERDs"). The PSA obliges TDC to abide by CHI Franciscan's ERDs and prohibits it from performing procedures banned by the ERDs. For TDC, this has meant that, at CHI Franciscan's direction, it has removed from its website all references to vasectomies and other sterilization services. TDC also admits that its physicians who wish to offer death with dignity services, which are lawful in Washington and which they offered before the transaction, may now do so only "as a moonlighting job" outside the scope of the PSA. They may not give the impression that they are associated with CHI Franciscan or TDC in any way, and may not rely on CHI Franciscan's or TDC's medical malpractice insurance policies in performing such services. One of TDC's physicians who provided death with dignity services acknowledged after the TDC Affiliation took effect that, "Due to the number of docs involved with CHI, there's getting to be a community access problem to find willing doctors who don't have this limitation. . . . The malpractice piece is proving problematic."

66.    Lastly, the TDC Transaction undermines an emerging consensus among healthcare experts favoring value- and performance-based contracts that reward physicians for providing quality care, lowering costs, and successfully managing long-term conditions, rather than for fee-for-service, volume-based billing of expensive procedures. Indeed, the operative agreement in the TDC Affiliation expressly rules out the possibility of any quality-based, incentive compensation to TDC. Further, with respect to entering into value-based contracts like bundled payment or capitation-based arrangements in the future, CHI Franciscan admits that any such contracts would be set up through its existing ACO, RHN, and would not be exclusive to TDC or come about as a result of the TDC Affiliation.

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

25

## VII.    FIRST CAUSE OF ACTION (COUNT ONE): THE TDC AFFILIATION

67.    The State hereby repeats and realleges each and every allegation of Paragraphs 1 through 66 as if fully set forth herein.

### A.    *Per se* illegality

68.    Defendants FHS, FMG, and The Doctors Clinic entered into a contract, conspiracy, and agreement to raise prices and eliminate price competition with respect to physician services in Kitsap County. This contract, conspiracy, and agreement constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Washington Consumer Protection Act, RCW 19.86.030. This offense is likely to continue and recur unless the relief requested in Section X is granted.

69.    These Defendants' agreement on and joint negotiation of reimbursement rates and other competitively significant terms has not been, and is not, reasonably related to any efficiency-enhancing integration sufficient to escape *per se* condemnation. With respect to CHI Franciscan's contracts with payers, CHI Franciscan and TDC do not share substantial financial risk and are not clinically or otherwise integrated in ways that would create the potential for increased quality and reduced cost of medical care that physicians provide to patients. As one example, the TDC Affiliation has not increased the number of value-based contracts to which TDC and CHI Franciscan are parties. Furthermore, the TDC Affiliation is not reasonably necessary to achieve efficiencies or other procompetitive justifications that would increase quality and reduce the cost of medical care, or, alternatively, its scope is broader than necessary to achieve any such efficiencies or procompetitive justifications. Even to the extent the TDC Affiliation's restraints may be reasonably necessary, any such efficiencies are not cognizable because they are not verifiable and/or arise from the anticompetitive effects of the TDC Affiliation.

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF                    26                    ATTORNEY GENERAL OF WASHINGTON
                                                                    Antitrust Division
                                                                    800 Fifth Avenue, Suite 2000
                                                                    Seattle, WA  98104-3188
                                                                    (206) 464-7744

**B.    Illegality under the rule of reason**

70.    Where, as here, defendants have engaged in a *per se* violation of the Sherman Act and the Washington Consumer Protection Act, no allegations with respect to product market, geographic market, or market power are required. To the extent such allegations may otherwise be necessary, the product markets for purposes of this Count One are Adult PCP Services and Orthopedic Physician Services, as defined above in Paragraphs 35 and 36. The geographic market for purposes of this Count One is an area no larger than KP/BI, as defined above in Paragraph 38.

71.    CHI Franciscan and The Doctors Clinic have, through the TDC Affiliation, established market power in the KP/BI market for Adult PCP Services. Preliminary diversion analysis, described more fully in Paragraph 85, shows that prior to the affiliation, CHI Franciscan and TDC were each other's closest competitors for Adult PCP Services. Using the service area from which TDC attracts 75% of its patients, CHI Franciscan and TDC now possess a combined market share in excess of 50%, based upon wRVUs for adult PCPs who treat commercially insured patients. In the broader KP/BI market, the combined market share is over 35%.

72.    In addition, via the TDC Affiliation and the WestSound Acquisition described below, Defendants have established market power in the KP/BI market for Orthopedic Physician Services, with a combined market share of over 63% in TDC's 75% service area, and a combined market share of over 55% in KP/BI.

73.    Through the TDC Affiliation, CHI Franciscan and The Doctors Clinic have successfully imposed and sustained an immediate, significant increase in TDC's reimbursement rates for physician services charged to payers, including at least Adult PCP Services and Orthopedic Physician Services.

74.    CHI Franciscan's and TDC's contract, conspiracy, and agreement has resulted in harmful and anticompetitive effects to consumers and healthcare payers, including:

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

27

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

    a.   increasing the reimbursement rates paid by commercial healthcare payers for TDC's provision of physician services;

    b.   curtailing or eliminating competition on reimbursement rates for contracts entered into with commercial healthcare payers;

    c.   increasing the bargaining leverage held by Defendants in negotiations with commercial healthcare payers;

    d.   increasing the costs paid by commercial healthcare payers and patients for services that used to be performed at TDC's ancillary facilities by increasing referrals for those services to Harrison, with its attendant higher rates, and diminishing the quality and choice of those services;

    e.   curtailing or eliminating competition for the referral of procedures to lower-priced hospitals and ancillary facilities;

    f.   eliminating FMG's closest head-to-head competitor for Adult PCP Services in first stage healthcare competition;

    g.   eliminating FMG's close competitor for Orthopedic Physician Services in first stage healthcare competition; and

    h.   curtailing or eliminating physician services that are prohibited by CHI Franciscan's ERDs

such that their contract, conspiracy, and agreement constitutes an unreasonable restraint of trade in violation of 15 U.S.C. § 1 and RCW 19.86.030.

## VIII.   DEFENDANTS' UNLAWFUL ACTIVITIES: THE WESTSOUND ACQUISITION

### A.   The WestSound Acquisition

75.    Effective July 1, 2016, CHI Franciscan acquired the assets of WestSound for $███████. The Asset Purchase Agreement between FMG and WestSound transferred all or substantially all of WestSound's assets, rights, and interests to FMG—including tangible

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

28

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

personal property, intangible rights and assets, inventory and supplies, and permits and licenses—that it used in connection with its medical practice. FMG assumed the lease on WestSound's Silverdale facility. In addition, the Asset Purchase Agreement assigned to FMG WestSound's rights, title, and interest in the contracts it held with healthcare payers, and WestSound's orthopedic physicians signed employment agreements, including compensation formulae, with FMG effective July 1, 2016. As CHI Franciscan admits, the "former WestSound Physicians have become employees of FMG," practicing out of the same Silverdale and Bainbridge Island locations from which they practiced prior to the WestSound Acquisition. CHI Franciscan now contracts with payers on behalf of the WestSound physicians.

**B.      Relevant markets**

76.      The relevant product market in which to analyze the WestSound Acquisition is Orthopedic Physician Services, as defined above in Paragraph 36.

77.      The relevant geographic market in which to analyze the WestSound Acquisition is an area no larger than KP/BI, as defined above in Paragraph 38.

**C.      Market structure and the WestSound Acquisition's presumptive illegality**

78.      Under Section 7 of the Clayton Act, an acquisition is presumed to substantially lessen competition if it will lead to undue concentration in at least one market. The federal antitrust agencies' *Horizontal Merger Guidelines* measure market concentration using the Herfindahl-Hirschman Index ("HHI"), a commonly used metric for determining market concentration by summing the squares of individual firms' market shares. Under the *Horizontal Merger Guidelines*, an acquisition is presumed likely to create or enhance market power, and is thus presumed illegal, when the post-merger HHI exceeds 2,500 points and the merger or acquisition increases the HHI by more than 200 points.

79.      The WestSound Acquisition, along with the TDC Affiliation, combines the three largest providers of Orthopedic Physician Services in KP/BI. CHI Franciscan's post-

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

29

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

acquisition market share in the KP/BI Orthopedic Physician Services market, as measured by share of wRVUs performed, is over 55%. And, as measured by orthopedic physician headcount, CHI Franciscan now controls billing for all but a small handful of orthopedic physicians practicing in KP/BI.

80.     In the Orthopedic Physician Services market, the concentration levels far exceed the *Merger Guidelines* thresholds. The pre-merger HHI was at least 1,368 and both Kitsap Transactions increased the HHI by 2,222 to at least 3,591—that is, by over eleven times the increase in concentration required for the presumption of illegality. The increase in HHI thus moved the market from "unconcentrated" to "highly concentrated" and enhanced Defendants' market power.

81.     The market shares reflected above likely understate the challenges that a health plan would face in attempting to offer a network that did not include the orthopedists contracted through CHI Franciscan. CHI Franciscan, TDC, and WestSound represent the vast majority of Orthopedic Physician Services available within KP/BI. The other providers with meaningful shares are primarily located in either the Seattle or Tacoma areas. A health plan would face a very difficult or impossible task of selling a network to Kitsap County employers and individuals that did not include any of the orthopedists contracted through CHI Franciscan.

82.     The WestSound Acquisition is thus presumptively unlawful under long-established antitrust precedent. *See United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963).

**D.    The WestSound Acquisition has resulted, and is likely to further result, in anticompetitive effects.**

83.     While the above market definition and share calculations are sufficient by themselves to deem the WestSound Acquisition presumptively illegal, as a consummated merger, the WestSound Acquisition has created observable and significant anticompetitive effects that also render it likely to substantially lessen competition.

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

30

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1.    **The WestSound Acquisition has eliminated price competition and increased CHI Franciscan's bargaining leverage over commercial payers.**

84.    The WestSound Acquisition has eliminated WestSound as CHI Franciscan's primary head-to-head competitor. It has thereby increased CHI Franciscan's ability and incentive to demand higher reimbursement rates from commercial payers.

85.    Diversion analysis is a standard econometric tool that uses data on where patients receive healthcare services to determine the extent to which providers are substitutes. Here, preliminary diversion analysis shows that, before the WestSound Acquisition, CHI Franciscan and WestSound were each other's closest competitors for Orthopedic Physician Services. If all CHI Franciscan physicians providing orthopedic services were unavailable to patients, approximately 28% of patients would seek care at WestSound, and approximately 23% of patients would seek care at TDC (now contracted through CHI Franciscan). The next-closest competitor practice would gain only 14.4% of CHI Franciscan's orthopedic patients. Conversely, if all WestSound physicians providing orthopedic services were unavailable to patients, nearly 45% of patients would seek care at TDC (now contracted through CHI Franciscan) and approximately 14% of patients would seek care at CHI Franciscan. In this scenario, the next-closest single competitor practice would gain only 6.7% of WestSound's orthopedic patients. In both scenarios, over half of patients would choose to receive Orthopedic Physician Services from a physician contracted through the other party to the merger. Therefore, CHI Franciscan and WestSound are by far the closest substitutes for each other's orthopedic patients.

86.    In addition to diversion analysis, Defendants' ordinary course documents reflect the close competition that existed between WestSound and CHI Franciscan before their merger. CHI Franciscan tracked WestSound's market share and volume before the WestSound Acquisition took effect. CHI Franciscan's CFO, Mr. Fitzgerald, informed CHI Franciscan's leadership that he viewed the WestSound Acquisition as a key "strategy to grow surgery

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

31

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

cases," which was important because "[i]ncreasing our surgeries is about the fastest way to increase our bottom line." And WestSound acknowledged to FMG's Dr. O'Connor that the merger "expands market share for FMG/CHI."

87.     The loss of competition predicted by diversion analysis and Defendants' ordinary course documents has translated, unsurprisingly, into higher prices charged to commercial healthcare payers for orthopedic procedures. Under one major payer's contract, shortly after the WestSound Acquisition took effect, the WestSound physicians' allowable charges for arthroscopic shoulder surgery with rotator cuff repair increased by nearly ▮%; for arthroscopically aided anterior cruciate ligament ("ACL") repair or replacement, by approximately ▮%; and for arthroscopic knee surgery with meniscectomy, by approximately ▮%. Overall, the WestSound Acquisition resulted in an over ▮% increase in payments for major orthopedic services by the largest payers on the Kitsap Peninsula. These price increases demonstrate that the WestSound Acquisition has already enabled Defendants to exercise market power.

88.     The increased costs that Defendants are able to force commercial health plans to pay as a result of the WestSound Transaction have fallen squarely on Kitsap Peninsula employers and residents, particularly in higher co-insurance and deductible payments. And, in addition to the higher rates that CHI Franciscan is able to extract from payers due to the elimination of competition for payer contracting, patients have borne increased costs due to the shift in facilities the former WestSound physicians use to perform orthopedic surgeries. Procedures performed in an ambulatory surgery center setting are significantly less expensive than those performed in a hospital setting, such as Harrison. Meanwhile, Harrison is one of the more expensive hospitals in the Puget Sound region, further exacerbating the price differential. According to Washington State Hospital Association data, average and median charges for a major joint replacement performed at Harrison in 2016 were higher than three hospitals in

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

32

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

King County: Seattle's Virginia Mason Medical Center and Swedish First Hill hospital, and Bellevue's Overlake Medical Center.

2.      **The WestSound Acquisition has sharply reduced non-price competition on quality and choice.**

89.      The acquisition of WestSound, along with the TDC Affiliation, has dampened incentives for CHI Franciscan to improve or continue offering high-quality orthopedic services. Because CHI Franciscan now contracts on behalf of the vast majority of orthopedic physicians on the Kitsap Peninsula, CHI Franciscan faces minimal competition for KP/BI patients seeking orthopedic care.

90.      Kitsap Peninsula residents have already noticed a decline in quality and choice as a result of the WestSound Acquisition. In publicly-filed comments to CHI Franciscan's application for a Certificate of Need to relocate Harrison's acute-care beds from its Bremerton campus to its Silverdale campus, one commenter expressed his concern over "the deteriorating quality and rising cost of healthcare in our region," due in part to the WestSound Acquisition. He wrote that "CHI Franciscan is on track to become THE dominant healthcare provider in the area. By purchasing all specialty clinics," including WestSound, "the result does not leave patients with cost-effective alternatives to obtaining healthcare services." Another commenter wrote: "In order to decrease their overhead CHI has cut emergency room staffing and nursing coverage causing painful and occasionally dangerous extended waiting times for treatment or hospitalization."

91.      The former WestSound physicians now perform all their surgeries at Harrison. Previously, the WestSound physicians had performed many of their surgeries at two freestanding Kitsap County ambulatory surgery centers. CHI Franciscan's ordinary course business documents show it tracking the increase in outpatient orthopedic surgeries performed at Harrison as a direct result of the WestSound Acquisition, and lauding the positive results for its bottom line. In a memo to CHI Franciscan's executive team and board of directors, Harrison

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF                    33                    ATTORNEY GENERAL OF WASHINGTON
                                                                     Antitrust Division
                                                                     800 Fifth Avenue, Suite 2000
                                                                     Seattle, WA  98104-3188
                                                                     (206) 464-7744

President David Schultz celebrated Harrison's "[h]ighest volume month ever for Ortho!" in October 2016—an eighty percent increase in orthopedic surgical volumes over October 2015.

92.     As with the reduction in services at TDC's ASC, the shift of WestSound's orthopedic surgical procedures to Harrison has led to increased wait times. The shift has also removed a choice for patients who would prefer to have their surgeries performed at an ASC. With more convenient locations, shorter waiting times, and easier scheduling, ASCs generally offer greater convenience to patients than hospital outpatient departments. Across the country, patients have reported high satisfaction rates for the care and services received from ASCs. Meanwhile, CMS's Hospital Compare website reveals that, based on patient survey results, Harrison currently ranks below state and national averages for eight out of eleven patient experience measures, including pain control, receiving timely help from medical staff, and cleanliness. Without competition from WestSound's orthopedic procedures that used to be performed at ASCs, Harrison and CHI Franciscan have diminished incentives to improve their orthopedic service offerings.

**E.      Entry**

93.     De novo entry into the Orthopedic Physician Services market is unlikely to occur in a timely or sufficient manner to counteract the anticompetitive effects of the WestSound Acquisition. Existing competitors are also unlikely to reposition or expand in a manner that is timely or sufficient enough to offset the harm to consumers from the WestSound Acquisition.

94.     New entry is unlikely due to the lack of available orthopedic physicians on the Kitsap Peninsula. Nearly all orthopedic physicians on the Kitsap Peninsula are either employed by or contracted through CHI Franciscan. The former WestSound physicians have non-compete clauses in their employment agreements with FMG, and the TDC physicians are also bound by the PSA's non-compete provisions. Thus, new competition from currently employed

34

or contracted CHI Franciscan physicians who could leave for private, independent practice is unlikely to occur. Even to the extent it did occur, it would not be timely enough to offset the WestSound Acquisition's competitive harm.

95.    In addition, recruiting new physicians to KP/BI to replace the orthopedists lost to the Kitsap Transactions is difficult. Recent medical school graduates who wish to practice in Western Washington are more likely to begin their careers in the Seattle/Tacoma area, rather than KP/BI. FHS's Chief Medical Officer, Dr. Michael Anderson, testified at a public hearing that CHI Franciscan expects a shortage of orthopedists on the Kitsap Peninsula in the near future. In the past five years, only a handful of physicians have entered Kitsap County and set up independent practices in any specialty, let alone orthopedics.

96.    Entry is also unlikely to timely counteract the anticompetitive effects of the WestSound Acquisition because the scope of entry necessary to create a viable substitute for WestSound is a daunting obstacle. CHI Franciscan accounts for over 26% of Orthopedic Physician Services in KP/BI, while WestSound accounts for another over 20%. Thus, before even considering issues of patient loyalty or WestSound's established brand prior to the WestSound Acquisition, a substantial number of orthopedists would have to enter the KP/BI market to replace the volume of orthopedic services that WestSound used to perform as an independent competitor.

97.    Lastly, even to the extent new physicians could enter the market, or existing physicians could reposition to serve as competitors, they would face significant delays in becoming meaningful competitors. The process of recruiting an orthopedist, from initial outreach to start date, usually takes well over a year. Once recruited, the orthopedist must establish a patient base comparable to that of an established physician, which can take several more years. For these reasons, physician entry is unlikely to be timely or sufficient to counteract the substantial anticompetitive effects of the WestSound Acquisition.

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

35

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**F.      Efficiencies**

98.      Defendants' alleged benefits of the WestSound Acquisition do not come close to the substantial, merger-specific, and competition-enhancing efficiencies that would be necessary to outweigh the WestSound Acquisition's significant harm to competition. No court has ever found, without being reversed, that an acquisition's claimed efficiencies were sufficient to rebut an otherwise illegal transaction. *See Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 789 (9th Cir. 2015). Indeed, for acquisitions resulting in high concentration levels such as the WestSound Acquisition, proof of "extraordinary" efficiencies is required to justify the substantial harm to competition. *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 720 (D.C. Cir. 2001).

99.      Defendants' alleged efficiencies are not cognizable because they are speculative, unverifiable, and/or not subject to quantification. Defendants claim the WestSound Acquisition will result in cost savings, but their claims lack evidentiary support. Furthermore, cost savings from a merger are only cognizable to the extent they are passed on to consumers, rather than bolstering the merging parties' profit margins. *See United States v. Anthem, Inc.*, 855 F.3d 345, 362 (D.C. Cir. 2017). Precisely the opposite is true here. Health plans, employers, and patients have faced increased costs in the form of higher physician reimbursement rates and hospital-based charges for procedures previously performed in lower-cost settings.

100.      Furthermore, many of Defendants' alleged efficiencies are not cognizable because they arise directly from anticompetitive reductions in competition and increases in price. CHI Franciscan admits that it has achieved its alleged efficiencies through "elimination of the competitive threat" posed by WestSound (and, for that matter, TDC). CHI Franciscan explained that post-merger, "that same threat would be now mitigated" because, when it comes to surgical referrals, the former WestSound physicians (and the current TDC physicians) can now "keep it in the family" at Harrison.

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

36

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

101.    CHI Franciscan also claims that the WestSound Acquisition was necessary to stabilize the WestSound medical group, prevent WestSound physicians from leaving Kitsap County, and provide greater ability to recruit physicians to the community. CHI Franciscan admits, however, that it has achieved this purported efficiency by taking "the risk out of their compensation model" and compensating the physicians "on a work RVU model," i.e., on a volume basis.

102.    Defendants' alleged efficiencies are also not merger-specific because Defendants could accomplish them without any merger or acquisition. CHI Franciscan has admitted that efforts to achieve many of these claimed efficiencies were underway long before the WestSound Acquisition took effect—including through the Rainier Health Network ACO—or that alternatives to the WestSound Acquisition exist that could accomplish these efficiencies.

### IX.    SECOND CAUSE OF ACTION (COUNT TWO): THE WESTSOUND ACQUISITION

103.    The State hereby repeats and realleges each and every allegation of Paragraphs 1 through 38, and Paragraphs 75 through 102, as if fully set forth herein.

104.    The WestSound Acquisition has substantially lessened, and is likely to continue to substantially lessen, competition in the relevant market in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and the Washington Consumer Protection Act, RCW 19.86.060. This offense is likely to continue and recur unless the following relief is granted.

### X.    PRAYER FOR RELIEF

105.    To remedy these illegal acts, the State requests that the Court:

a.    Adjudge and decree on Count One that Defendants Franciscan Health System, Franciscan Medical Group, and The Doctors Clinic entered into an unlawful contract, conspiracy, or agreement in unreasonable restraint of interstate trade and commerce, in the form of the TDC Affiliation, in

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

37

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Washington Consumer Protection Act, RCW 19.86.030;

b.  Adjudge and decree on Count Two that Defendants Franciscan Health System, Franciscan Medical Group, and WestSound Orthopaedics entered into an acquisition, in the form of the WestSound Acquisition, the effect of which may be substantially to lessen competition or tend to create a monopoly, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and the Washington Consumer Protection Act, RCW 19.86.060;

c.  Permanently enjoin and restrain Defendants from continuing to carry out the Kitsap Transactions;

d.  Rescind and declare null, void, and unenforceable as contrary to public policy the contracts and agreements that Defendants entered into as part of the Kitsap Transactions;

e.  Award to the State, on a joint and several basis, equitable disgorgement or any other equitable monetary relief for the benefit of the State and its consumers as appropriate under federal and state antitrust laws;

f.  Award to the State the maximum civil penalties allowed under RCW 19.86.140, for Franciscan Health System's, Franciscan Medical Group's and TDC's violations of RCW 19.86.030 as to the TDC Affiliation (Count One);

g.  Award to the State its costs and a reasonable attorney's fee; and

h.  Award such other and further relief as may be necessary and as the Court may deem just and proper.

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

38

ATTORNEY GENERAL OF WASHINGTON
Antitrust Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1

DATED this 31st day of August, 2017.

2

ROBERT W. FERGUSON
Attorney General

3

4

JONATHAN A. MARK, WSBA No. 38051
Chief, Antitrust Division

5

6

STEPHEN T. FAIRCHILD, WSBA No. 41214

7

8

ERICA A. KOSCHER, WSBA No. 44281

9

10

Assistant Attorneys General
Antitrust Division
Attorney General of Washington
800 Fifth Ave, Suite 2000
Seattle, WA 98104-3188
(206) 389-2848 (Fairchild)
(206) 326-5484 (Koscher)
stephenf2@atg.wa.gov
ericak@atg.wa.gov

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER RELIEF

39