UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

STATE OF WASHINGTON,

Plaintiff,

v.

FRANCISCAN HEALTH SYSTEM d/b/a CHI
FRANCISCAN HEALTH; FRANCISCAN
MEDICAL GROUP; THE DOCTORS CLINIC,
A PROFESSIONAL CORPORATION; and
WESTSOUND ORTHOPAEDICS, P.S.,

Defendants.

NO. 3:17-cv-05690-BHS

ANSWER AND AFFIRMATIVE
DEFENSES OF WESTSOUND
ORTHOPAEDICS, P.S.

Defendant WestSound Orthopaedics, P.S. ("WestSound" or "WSO") hereby answers the Complaint for Permanent Injunction and Other Relief filed by Plaintiff, the State of Washington ("State").   Any allegation not explicitly admitted is denied.   Moreover, the headings in this Complaint are not substantive allegations to which an answer is required.  To the extent those headings are substantive allegations to which an answer is required, the allegations are denied.  WestSound answers as follows:

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 1
(CASE NO. 3:17-cv-05690)

732838

FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 · f. 253-272-0386

## I.    INTRODUCTION

1.     This lawsuit seeks to undo two transactions that have raised prices and decreased competition for healthcare on the Kitsap Peninsula. In the first transaction, which took effect on or about July 1, 2016, CHI Franciscan acquired the assets of WestSound, a physician practice of seven orthopedists based in Silverdale, Washington (the "WestSound Acquisition").

**ANSWER:** WestSound admits that the first transaction took effect on or about July 1, 2016, and that CHI Franciscan acquired the assets of WestSound, a physician practice of seven orthopedists based in Silverdale, Washington.  WestSound denies all remaining allegations in this paragraph.

2.     In the second transaction, which took effect on or about September 3, 2016, CHI Franciscan entered into a set of agreements with The Doctors Clinic, an approximately fifty-four physician multispecialty practice also based in Silverdale. TDC and CHI Franciscan agreed that TDC would receive CHI Franciscan's negotiated reimbursement rates with payers, and CHI Franciscan acquired certain ancillary services from TDC. Unlike the WestSound Acquisition, CHI Franciscan did not acquire TDC's medical practice assets, and CHI Franciscan and TDC remain separate entities (the "TDC Affiliation," and together with the WestSound Acquisition, the "Kitsap Transactions").

**ANSWER:**  Based upon information and belief, WestSound admits that the second transaction took effect on or about September 3, 2016, that CHI Franciscan entered into a set of agreements with The Doctors Clinic, an approximately fifty-four physician multispecialty practice also based in Silverdale, and that CHI Franciscan acquired certain ancillary services from TDC. WestSound denies all other allegations in this paragraph.

3.     In announcing the Kitsap Transactions, Defendants have touted them as "an exciting direction for Kitsap County residents and families" on the purported grounds that they

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 2
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 · f. 253-272-0386

1  "enhance patient access and efficiency." In private and even public statements, however,

2  Defendants have revealed their true motivation for the deals: to win the ability to charge higher

3  rates for physician services, and to collectively gain negotiating clout over healthcare payers by

4  removing head-to-head competition.

5       **ANSWER:** WestSound admits that in announcing the Kitsap Transactions, Defendants

6  made the statements quoted in this paragraph. WestSound denies all other allegations in this

7  paragraph.

8       4.    Defendants recognized that TDC's sale of ancillary surgical ("ASC"), imaging,

9  and laboratory services to CHI Franciscan would enable the latter to effectively shut down the

10  facilities providing those services and shift their outpatient procedures to CHI Franciscan's

11  inpatient hospital in Kitsap County, benefiting from higher, hospital-based rates. CHI

12  Franciscan's Chief Financial Officer, Mike Fitzgerald, revealed this goal to a colleague in an

13  internal e-mail: "I am all for taking advantage of hospital based pricing, if we think it is doable

14  in the market and the market can support it. It would be great to drop a couple of million more

15  to our bottom line, if we think we can do it." TDC sold these services even as it acknowledged

16  that Kitsap Peninsula residents would receive inferior, costlier care. TDC's former physician

17  president succinctly summarized these effects to its current medical director: "I can't wait to

18  hear how CHI messages the addition of TDC to FMG. 'You can now get your outpatient care

19  in a complex, relatively unsafe, and vastly more expensive location. You are welcome, Kitsap

20  County...[']"

21       **ANSWER:** WestSound lacks sufficient knowledge and information to form a belief as

22  to the truth of the allegations in this paragraph, and therefore denies the allegations of this

23  paragraph.

24       5.    From its headquarters in Tacoma, CHI Franciscan has spread northward up both

25  sides of Puget Sound through a series of significant acquisitions in approximately the past five

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 3
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF**
**ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA 98402
p. 253-328-7800 ・ f. 253-272-0386

years. These acquisitions include Kitsap County's only civilian acute-care hospital, Harrison Medical Center ("Harrison"), with campuses in Bremerton and Silverdale, in 2013; Highline Medical Center and Highline Medical Group in Burien in 2013; and Olympic Radiology and Advanced Medical Imaging in Bremerton and Silverdale, respectively, in 2015. These rapid acquisitions prompted TDC's medical director to suggest, while in negotiations with CHI Franciscan, that the "theme song for the Franciscan Health System" should be Queen's "Another One Bites the Dust." The Kitsap Transactions were the top two priorities in CHI Franciscan's "Peninsula physician strategy," which CHI Franciscan viewed as a way to ensure that lucrative surgical procedures would be referred to its wholly-owned hospital, Harrison, rather than to non-CHI Franciscan hospitals in Seattle and Tacoma. This strategy would also "[s]tem the loss of portable elective cases going to [TDC's] competitor ASC (now an affiliate)."

**ANSWER:** WestSound lacks sufficient knowledge and information to form a belief as to the truth of the allegations in this paragraph, and therefore denies the allegations of this paragraph.

6.      Defendants further realized that the Kitsap Transactions would allow them to collectively gain leverage to obtain higher payments in their negotiations with healthcare payers. A CHI Franciscan summary of the transactions listed one of the "Affiliation Synergies" realized through the deals: "Improved reimbursement for" TDC and WSO "through payor contracting." In publicly explaining how the TDC Affiliation worked, FMG's Chief Operating Officer, Dr. Peter O'Connor, acknowledged to the *Tacoma News Tribune* that "[t]he partnership will allow The Doctors Clinic to remain physician-owned," but CHI Franciscan would take over "back-of-house duties such as negotiating with insurance companies for rates." Dr. O'Connor further admitted in a *Kitsap Daily News* article that the purpose of the

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 4
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA 98402
p. 253-328-7800 · f. 253-272-0386

1   TDC Affiliation was to enable CHI Franciscan and TDC to obtain higher reimbursements from

2   payers: "If you're bigger, you are able to negotiate better contracts."

3       **ANSWER:**  WestSound denies Defendants realized that the Kitsap Transactions would

4   allow them to collectively gain leverage to obtain higher payments in their negotiations with

5   healthcare payers.  WestSound lacks sufficient knowledge and information to form a belief as

6   to the truth of the remaining allegations in this paragraph, and therefore denies the allegations

7   of this paragraph.

8       7.      Bigger, however, has not been better for healthcare consumers on the Kitsap

9   Peninsula. It has been far worse. As a result of Defendants' *per se* unlawful price fixing

10  through the TDC Affiliation, and their anticompetitive merger via the WestSound Acquisition,

11  commercial healthcare payers on the Kitsap Peninsula were forced overnight to increase the

12  contractual reimbursements they paid to TDC and WestSound physicians, including overall

13  increases for some payers of over [REDACTED] percent. The rate increases affected the vast

14  majority of diagnoses and procedures covered by the contracts those payers had in effect with

15  Defendants, and included procedures such as total abdominal hysterectomy (for which one

16  payer saw its allowable charges increase by [REDACTED] at TDC), laparoscopic

17  cholecystectomy (i.e., gall bladder removal—a [REDACTED] increase at TDC), and

18  arthroscopically aided anterior cruciate ligament ("ACL") repair or replacement (a

19  [REDACTED] increase at WSO). The Kitsap Transactions have increased costs for

20  commercial healthcare payers, self-insured employers, and individual patients who have had to

21  pay higher out-of-pocket costs. Payers can no longer use the presence of multiple independent

22  providers to obtain favorable rates in reimbursement negotiations. Kitsap Peninsula patients

23  have seen increased wait times, difficulty in scheduling procedures, and a reduction in their

24  choice of services and locations.

25

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 5
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 • f. 253-272-0386

1    **ANSWER:**  WestSound lacks knowledge or information sufficient to admit or deny the

2    allegations regarding the overall increases for some payers, and the allegations in the fourth

3    sentence of the paragraph.  WestSound denies all remaining allegations in this paragraph.

4    8.    The Kitsap Transactions reflect a national trend of consolidation and a loss of

5    competition in the healthcare industry, which is continuing to fuel growth in healthcare

6    spending.  An April 2017 report co-authored by the Brookings Institution noted that

7    acquisitions of physician practices by hospitals result in substantial increases in price, and

8    "prices for physician services have been shown to be higher in more concentrated markets with

9    fewer potential competitors."

10    **ANSWER:**  WestSound states the April 2017 report co-authored by the Brookings

11    Institution speaks for itself and denies any allegations inconsistent with a reasonable reading of

12    the same.  WestSound denies all remaining allegations in this paragraph.

13    9.    In addition to the TDC Affiliation's *per se* illegality, both Kitsap Transactions

14    have helped Defendants accumulate market power. Because of the WestSound Acquisition and

15    the fact that through the TDC Affiliation, TDC's orthopedic physicians now bill under CHI

16    Franciscan's payer contracts, CHI Franciscan now controls billing for all but a small handful of

17    orthopedists on the Kitsap Peninsula. The TDC Affiliation also means that CHI Franciscan and

18    TDC now possess market power in the provision of adult PCP services on the Kitsap

19    Peninsula. Defendants' market power has harmed competition and raised healthcare prices in

20    Kitsap County and on the greater Kitsap Peninsula, and will continue to harm competition and

21    consumers unless this Court enjoins the Kitsap Transactions.

22    **ANSWER:** WestSound denies the allegations in this paragraph.

23    **II.    JURISDICTION, VENUE, AND INTERSTATE COMMERCE**

24    10.    This Court has subject matter jurisdiction over this action under Sections 4(a)

25    and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337(a). This

---

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 6
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 • f. 253-272-0386

1  Court has supplemental jurisdiction over the State of Washington's state law claims under 28

2  U.S.C. § 1367.

3        **ANSWER:**  WestSound admits the allegations in this paragraph.

4        11.     Defendants each transact business and maintain their principal places of

5  business within the Western District of Washington and are each subject to personal

6  jurisdiction therein. Furthermore, all or a substantial part of the events giving rise to the State's

7  claims occurred within the Western District of Washington. Venue, therefore, is proper in this

8  District under 28 U.S.C. § 1391(b)–(c) and Section 12 of the Clayton Act, 15 U.S.C. § 22.

9        **ANSWER:**  WestSound admits it transacted business and maintained its principal place

10  of business within the Western District of Washington but it no longer conducts business.

11  WestSound admits the remaining allegations in this paragraph.

12        12.     Defendants are engaged in, and their activities substantially affect, interstate

13  trade and commerce. For example, Defendants contract with and receive payments from

14  national commercial health plans, such as Aetna and UnitedHealthcare (a subsidiary of

15  UnitedHealth Group), that are headquartered and conduct business outside Washington. CHI

16  Franciscan's financial results are reported to and made part of the financial results of its

17  corporate parent, Colorado-based Catholic Health Initiatives ("CHI"), and CHI has input into

18  CHI Franciscan's budget.

19        **ANSWER:**  WestSound admits it engaged in interstate trade and commerce but it no

20  longer conducts business.  WestSound admits the remaining allegations in this paragraph.

21            **III.    THE PARTIES**

22        13.     The Plaintiff is the State of Washington, a sovereign state within the United

23  States, acting through the Antitrust Division of the Office of Attorney General Robert

24  Ferguson, the chief law enforcement officer of the State. The State has authority to bring this

25  action under Section 16 of the Clayton Act, 15 U.S.C. § 26, and under the Washington

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 7
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF**
**ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 ∙ f. 253-272-0386

1  Consumer Protection Act, RCW 19.86.080. The State of Washington brings this action in its

2  sovereign capacity and as *parens patriae* on behalf of the citizens, general welfare, and

3  economy of the State. The Antitrust Division of the Office of the Attorney General of the State

4  of Washington is headquartered at 800 Fifth Avenue, Suite 2000, Seattle, Washington 98104.

5      **ANSWER:**  Based upon information and belief, WestSound admits the allegations in

6  this paragraph except that it is without knowledge as to whether the State brings this action as

7  "parens patriae" and therefore denies that specific allegation.

8      14.    Defendant Franciscan Health System, doing business as CHI Franciscan Health,

9  is a non-profit corporation organized and existing under the laws of Washington with its

10  headquarters at 1717 South J Street, Tacoma, Washington 98405. FHS's sole voting member is

11  non-defendant CHI, a Colorado non-profit corporation.

12      **ANSWER:**  Based upon information and belief, WestSound admits the allegations in

13  this paragraph.

14      15.    Defendant Franciscan Medical Group, also doing business as CHI Franciscan

15  Health, is a non-profit corporation organized and existing under the laws of Washington.

16  FMG's sole member is Defendant FHS. FMG's headquarters are located at 1313 Broadway

17  Plaza, Suite 200, Tacoma, Washington 98201. FMG physicians practice at 22 clinic locations

18  on the Kitsap Peninsula, excluding locations that were acquired or assumed as part of the

19  Kitsap Transactions. Operationally, FMG functions as the wholly-owned subsidiary of

20  Defendant FHS.

21      **ANSWER:**  Based upon information and belief, WestSound admits the allegations in

22  this paragraph.

23      16.    Defendant The Doctors Clinic is a professional corporation organized and

24  existing under the laws of Washington with headquarters at 9621 Ridgetop Boulevard NW,

25  Silverdale, Washington 98383. At the time of the TDC Affiliation, TDC maintained seven

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 8
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 • f. 253-272-0386

1    locations, all within Kitsap County, employing approximately 54 physicians in specialties

2    including family medicine, internal medicine, orthopedics, urology, general surgery, obstetrics

3    and gynecology, and cardiology.

4        **ANSWER:**  Based upon information and belief, WestSound admits the allegations in

5    this paragraph.

6        17.    Before the WestSound Acquisition took effect, Defendant WestSound was a

7    professional services corporation organized and existing under the laws of Washington located

8    at 4409 NW Anderson Hill Road, Silverdale, Washington 98383. WestSound offered

9    orthopedic services from its main location in Silverdale and from a satellite office on

10   Bainbridge Island. At the time of the WestSound Acquisition, WestSound employed seven

11   physicians, all of whom specialized in orthopedic care. As a result of the WestSound

12   Acquisition, WestSound became wholly owned by CHI Franciscan on or about July 1, 2016.

13       **ANSWER:**  WestSound denies that WestSound became wholly owned by CHI

14   Franciscan as a result of the WestSound Acquisition.  WestSound admits the remaining

15   allegations in this paragraph.

16       18.    Except to the extent competition has been illegally restrained as alleged herein,

17   Defendants FHS and FMG have been, and are now, in competition with Defendant TDC for

18   the provision of at least Adult PCP and Orthopedic Physician Services (defined below at

19   Paragraphs 35 and 36) and other physician services. Furthermore, until the anticompetitive

20   consummation of the WestSound Acquisition as alleged herein, Defendants FHS and FMG

21   were in competition with Defendant WestSound for the provision of Orthopedic Physician

22   Services. As described more fully below, healthcare payers have relied on competition between

23   CHI Franciscan and TDC, and CHI Franciscan and WestSound, to obtain favorable contractual

24   rates under which they compensate Defendants and others for physician services. In addition,

25   FMG providers compete and/or competed with TDC and WestSound providers to attract

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 9
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 · f. 253-272-0386

1 patients based on location, reputation for quality, provider availability, perceived patient

2 experience, and other factors.

3      **ANSWER:**  WestSound admits prior to the WestSound Acquisition that FMG was in

4 competition with WestSound for the provision of Orthopedic Physician Services.  WestSound

5 admits that prior to the WestSound Acquisition, FMG competed with WestSound to attract

6 patients.  WestSound denies the remaining allegations of this paragraph.

7           **IV.     THE MARKET FOR HEALTHCARE SERVICES**

8 **A.     Competition between healthcare providers**

9      19.     Competition between healthcare providers occurs in two stages. In the first

10 stage, providers compete to be included in provider networks assembled by health plans (or

11 "payers"). In order to offer a competitive insurance product, health plans must offer provider

12 networks with sufficient geographic coverage and scope of services to attract employers (who

13 are the predominant purchasers of commercial insurance), their employees, and independent

14 purchasers of "non-group" insurance, such as products offered on Washington's health benefit

15 exchange. Health plans must also offer networks with sufficient geographic coverage and

16 scope of services to meet network adequacy requirements set by the Washington Office of the

17 Insurance Commissioner. In-network status gives providers preferential access to a health

18 plan's members, as it is typically far less costly for a health plan member to receive services

19 from an in-network provider. All else being equal, an in-network provider is more likely to

20 attract patients from a given health plan than an out-of-network provider.

21      **ANSWER:**  WestSound states that this paragraph oversimplifies and overgeneralizes

22 the facts and issues it purports to describe and therefore denies the allegations of this

23 paragraph.

24      20.     Barring an unlawful agreement among competing physician practices on price

25 or other terms, physician practices decide unilaterally whether to enter into payer contracts to

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 10
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 • f. 253-272-0386

1   provide services to payers' members, and what prices they will accept pursuant to those

2   contracts. Through a process of selective contracting, health plans and providers negotiate the

3   prices that in-network providers receive when they render services to the health plan's

4   members. During negotiations, the health plan's ability to obtain lower prices from a provider

5   depends in part on the existence of competing healthcare providers. A health plan is able to

6   negotiate lower reimbursement rates when it can credibly threaten to exclude a given provider

7   from its network—that is, when it has a viable outside option. Competition for inclusion in a

8   health plan's network gives providers an incentive to offer lower rates and other favorable

9   terms. On the other hand, when there are few or no meaningful alternatives, a provider will

10  have greater bargaining leverage to demand and obtain higher reimbursement rates and other

11  favorable terms.

12      **ANSWER:**  WestSound states that this paragraph oversimplifies and overgeneralizes

13  the facts and issues it purports to describe and therefore denies the allegations of this

14  paragraph.

15      21.    Health plans pass on increased reimbursement rates to their individual members

16  in the form of higher premiums, co-pays, co-insurance, and deductibles. There are also

17  significant increases for employers as purchasers of insurance, as they typically pay a large

18  portion of their employees' premiums. Lastly, self-insured employers, which bear the full cost

19  of their employees' claims rather than pool risk with other employers through a health plan,

20  also feel the impact of higher reimbursement rates.

21      **ANSWER:**  WestSound lacks sufficient knowledge and information to form a belief as

22  to the truth of the allegations in this paragraph, and therefore denies the allegations of this

23  paragraph.

24      22.    In the second stage of healthcare provider competition, in-network providers

25  compete with one another to attract a health plan's members. Because health plan members

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 11
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF**
**ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 · f. 253-272-0386

typically face similar out-of-pocket costs for all in-network providers, providers in the same network must compete for patient volume on non-price factors, such as location, wait times, convenience, quality of care, and patient satisfaction.

**ANSWER:**  WestSound denies that in-network providers within the same health system compete with one another to attract members or to for patient volumes, and denies any remaining allegations in this paragraph.

23.     Price competition among healthcare providers therefore occurs in the first stage of healthcare competition. However, when there is a merger of competing providers, as opposed to an affiliation between competing providers for payer contracting alone, second stage non-price competition is also eliminated, and the merged entity's incentive to maintain and improve quality is reduced.

**ANSWER:**  WestSound states that this paragraph oversimplifies and overgeneralizes the facts and issues it purports to describe and therefore denies the allegations of this paragraph.

**B.     Payment models for physician services**

24.     Major commercial health plans commonly structure payments in their provider contracts around the Medicare Resource Based Relative Value System ("RBRVS"), the primary method that the United States Centers for Medicare and Medicaid Services ("CMS") uses to set physician payment rates under Medicare and Medicaid. In addition to payer contracting, the RBRVS model is often used, at least in part, to structure the compensation formulae in physician employment agreements.

**ANSWER:**  WestSound lacks sufficient knowledge and information to form a belief as to the truth of the allegations in this paragraph, and therefore denies the allegations of this paragraph.

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 12
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 ・ f. 253-272-0386

25.     Under the RBRVS system, CMS assigns a work Relative Value Unit ("RVU" or "wRVU") to each distinct physician service, taking into account factors such as the time, skill, and equipment needed to render that service to a patient. For example, a routine office visit for evaluation and management may have a wRVU of 1.50, while a total knee replacement may have a wRVU of 20.72. CMS annually determines the price that physicians are paid for each service by multiplying the wRVU by a set dollar conversion factor (e.g., a 1.50 wRVU for an office visit is multiplied by the 2017 CMS conversion factor of $35, rendering a $52.50 fee for that physician service). Under the RBRVS model, physicians are paid based upon the volume of services they perform as measured by wRVUs. The wRVU system thus represents the volume, but not the quality or efficiency, of services provided by physicians. This wRVU-based system is the model used by many commercial payers, including those on the Kitsap Peninsula, in fee-for-service contracts.

**ANSWER:** WestSound lacks sufficient knowledge and information to form a belief as to the truth of the allegations in this paragraph, and therefore denies the allegations of this paragraph.

26.     When commercial payers use the RBRVS system to structure their contracts with providers, some payers negotiate the reimbursement rate as a different conversion factor (e.g., a commercial conversion factor of $45 instead of Medicare's conversion factor of $35). Other payers might structure and negotiate the reimbursement rates as a percentage of the Medicare RBRVS fee for a particular year (e.g., 110% of 2017 RBRVS, or 110% of the wRVU multiplied by the conversion factor).

**ANSWER:** WestSound lacks sufficient knowledge and information to form a belief as to the truth of the allegations in this paragraph, and therefore denies the allegations of this paragraph.

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 13
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF**
**ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 · f. 253-272-0386

**C.     Healthcare services on the Kitsap Peninsula**

27.     The Kitsap Peninsula lies between Puget Sound and Hood Canal, surrounded almost entirely by water. Kitsap County covers the majority of the peninsula, with parts of Pierce County covering the southern region and parts of Mason County covering the southwestern region. The Kitsap Peninsula's largest population center is Bremerton; other population centers include Bainbridge Island, Silverdale, Port Orchard, Poulsbo, and Gig Harbor. The Kitsap Peninsula is connected to Tacoma to the southeast via the Tacoma Narrows toll bridge, Seattle to the east via ferry, and rural Jefferson and Clallam Counties to the northwest via the Hood Canal Bridge. These geographic barriers create a strong and empirically observable preference by Kitsap Peninsula residents to receive medical care close to their homes on the Kitsap Peninsula.

**ANSWER:**   WestSound denies that the geographic barriers create a strong and empirically observable preference by Kitsap Peninsula residents to receive medical care close to their homes on the Kitsap Peninsula.  WestSound admits the remaining allegations of this paragraph.

28.     CHI Franciscan owns the only two civilian general acute-care hospitals on the Kitsap Peninsula: Harrison, the only civilian acute-care hospital in Kitsap County, with campuses in Bremerton and Silverdale; and St. Anthony Hospital, located in Gig Harbor (in Pierce County). CHI Franciscan also has two medical groups that provide primary and specialty care, as well as surgical services, on the Kitsap Peninsula: FMG and Harrison Health Partners ("HHP"). Prior to the Kitsap Transactions, FMG consisted of approximately 428 physicians who provide care in King, Pierce, and Kitsap Counties, and HHP consisted of approximately 89 physicians who primarily serve the Kitsap and Olympic Peninsulas. Effective July 2, 2017, HHP physicians became employed physicians of FMG. Combined, HHP and

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 · f. 253-272-0386

1  FMG physicians practice at approximately 22 clinic locations on the Kitsap Peninsula, nine of

2  which offer adult primary care services and four of which offer orthopedic services.

3        **ANSWER:** WestSound lacks sufficient knowledge and information to form a belief as

4  to the truth of the allegations in this paragraph, and therefore denies the allegations of this

5  paragraph.

6        29.     TDC operates seven locations, all located within Kitsap County, including an

7  ambulatory surgery center. Of its 54 physicians, TDC employs 13 adult primary care

8  physicians at four locations in Silverdale, Port Orchard, and Poulsbo, and five orthopedists in

9  Silverdale.

10        **ANSWER:** WestSound lacks sufficient knowledge and information to form a belief as

11  to the truth of the allegations in this paragraph, and therefore denies the allegations of this

12  paragraph.

13        30.     WestSound's orthopedists (now employed by FMG) primarily practice at its

14  main Silverdale clinic location. WestSound also has a satellite location in Bainbridge Island.

15        **ANSWER:** WestSound denies the allegations of this paragraph.

16        31.     On the Kitsap Peninsula, there are limited offerings for adult primary care

17  services besides CHI Franciscan and The Doctors Clinic. Kaiser Permanente of Washington

18  (formerly Group Health Cooperative) does not contract with competing health plans for its

19  physicians' services, and therefore its physicians' services are, with limited exceptions,

20  accessible only by Kaiser Permanente health plan members. Kaiser Permanente of Washington

21  has three primary care clinics within Kitsap County. Seattle-based Virginia Mason Medical

22  Center and Swedish Medical Center each have a single primary care clinic location in

23  Bainbridge Island. Tacoma-based MultiCare Health System ("MultiCare") offers primary care

24  services at its Gig Harbor medical clinic, located south of Kitsap County. There is also a

25  handful of small, independent primary care practices on the Kitsap Peninsula. These practices

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 15
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 · f. 253-272-0386

1 typically consist of one or two adult PCPs, and many are structured as "concierge" practices

2 that only accept cash payments and/or a monthly membership fee, instead of contracting with

3 health plans.

4      **ANSWER:** WestSound lacks sufficient knowledge and information to form a belief as

5 to the truth of the allegations in this paragraph, and therefore denies the allegations of this

6 paragraph.

7      32.     The Kitsap Peninsula also has limited offerings for orthopedic services beyond

8 what Defendants offer. As a result of the Kitsap Transactions, nearly all orthopedic physicians

9 within the Kitsap Peninsula are either employed by or contracted with CHI Franciscan. Outside

10 of CHI Franciscan, there are approximately two additional orthopedists at MultiCare's Gig

11 Harbor clinic, and one orthopedist at Virginia Mason's Bainbridge Island clinic.

12      **ANSWER:** WestSound denies that the Kitsap Peninsula has limited offerings for

13 orthopedic services beyond what Defendants offer and that nearly all orthopedic physicians

14 within the Kitsap Peninsula are either employed by or contracted with CHI Franciscan.

15 WestSound lacks sufficient knowledge and information to form a belief as to the truth of the

16 remaining allegations in this paragraph, and therefore denies the allegations of this paragraph.

17      33.     CHI Franciscan is also the sole owner of an accountable care organization,

18 Rainier Health Network ("RHN"), that includes patients and providers on the Kitsap Peninsula.

19 An accountable care organization ("ACO") may take many forms, but usually refers to a

20 network of providers that come together for the purpose of taking on responsibility for the total

21 cost of care for a given patient population through value-based contracts with health plans.

22 RHN was originally formed as a Medicare Shared Savings Program ACO, but has since

23 expanded to include contracts with commercial payers. RHN includes FMG, HHP, and

24 Harrison. TDC has participated in RHN since 2014. WestSound also participated in RHN prior

25 to the WestSound Acquisition.

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 16
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA 98402
p. 253-328-7800 · f. 253-272-0386

1  **ANSWER:** Based upon information and belief, WestSound admits the allegations of

2  this paragraph.

3  ## V.  RELEVANT PRODUCT AND GEOGRAPHIC MARKETS

4  34.  "Determination of the relevant product and geographic markets is a necessary

5  predicate to deciding whether a merger contravenes the Clayton Act," *Saint Alphonsus Med.*

6  *Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015) (quotation

7  omitted), and is an element of a Section 1 case under the rule of reason, *see Tanaka v. Univ. of*

8  *S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001). As the State describes below, the TDC Affiliation

9  alleged in Count One is *per se* unlawful and requires no pleading or proof of the relevant

10  product or geographic markets. To the extent that such pleading is required, however, the

11  relevant product markets applicable to the TDC Affiliation are Adult PCP Services and

12  Orthopedic Physician Services. In addition, the relevant product market applicable to the

13  WestSound Acquisition is Orthopedic Physician Services. The relevant geographic market

14  applicable to both the TDC Affiliation and the WestSound Acquisition is an area no larger than

15  the Kitsap Peninsula including Bainbridge and Fox Islands. The State defines each of these

16  markets in the following paragraphs of this Section V.

17  **ANSWER:** WestSound states that some of this paragraph states conclusions of law as

18  to which no answer is required.  WestSound lacks sufficient knowledge and information to

19  form a belief as to the truth of the remaining allegations in this paragraph, and therefore denies

20  the allegations of this paragraph.

21  **A.  Product markets**

22  35.  Adult PCP Services consists of general physician services provided to

23  commercially insured patients aged 18 and older by physicians practicing internal medicine,

24  family practice, and general practice. It excludes obstetricians and gynecologists, as well as

25

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 17

(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF**
**ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 · f. 253-272-0386

1  pediatricians, because those physicians are not considered viable substitutes for Adult PCP

2  Services by significant numbers of commercially insured patients aged 18 and older.

3  **ANSWER:**  WestSound lacks sufficient knowledge and information to form a belief as

4  to the truth of the allegations in this paragraph, and therefore denies the allegations of this

5  paragraph.

6  36.  Orthopedic Physician Services consists of services, including surgery, provided

7  to commercially insured patients by physicians who specialize as orthopedists to diagnose,

8  treat, and rehabilitate injuries, disorders, and diseases of the musculoskeletal system.

9  **ANSWER:**  WestSound lacks sufficient knowledge and information to form a belief as

10  to the truth of the allegations in this paragraph, and therefore denies the allegations of this

11  paragraph.

12  **B.   Geographic market**

13  37.  An appropriate geographic market is the "area of effective competition where

14  buyers can turn for alternate sources of supply." *St. Luke's*, 778 F.3d at 784 (quotation

15  omitted). A common test to determine the boundaries of the relevant geographic market is to

16  find whether a hypothetical monopolist controlling all services sold in the market could impose

17  a small but significant and nontransitory increase in price ("SSNIP") in the proposed market. If

18  enough consumers respond to the SSNIP by going outside the proposed geographic market to

19  purchase a service, then the proposed boundaries are too narrow. *Id.* If, however, the

20  hypothetical monopolist is able profitably to impose a SSNIP, then the boundaries of the area

21  are an appropriate geographic market.

22  **ANSWER:**  WestSound states that this paragraph states conclusions of law as to which

23  no answer is required.  To the extent an answer is required, WestSound denies the allegations

24  of the paragraph.

25

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 18
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF**
**ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 · f. 253-272-0386

38.     The geographic market for Counts One (to the extent necessary) and Two is an area no larger than the zip codes that comprise the Kitsap Peninsula including Bainbridge and Fox Islands ("KP/BI").[1] Payer data for claims submitted by providers that contain patients' residence zip codes make clear that KP/BI residents strongly prefer to receive Adult PCP Services and Orthopedic Physician Services close to their homes in KP/BI. Qualitative evidence also indicates that KP/BI residents prefer to receive care in KP/BI, rather than driving a longer distance and incurring a toll to visit providers across the Tacoma Narrows Bridge, or enduring the waiting, sailing time, and expense of a round-trip ferry voyage to visit providers in King or Snohomish Counties. Furthermore, quantitative and qualitative evidence, including Defendants' ordinary course of business documents, confirm that KP/BI is the relevant geographic market in which to analyze the effects of the Kitsap Transactions. For these reasons, to be competitively marketable to KP/BI employers and to meet network adequacy requirements, a payer's health insurance plan must include in its physician network a sufficient number of adult primary care physicians, as well as a number of specialists, including orthopedic physicians, who practice in KP/BI. Therefore, a hypothetical monopolist that controlled all providers of Adult PCP Services or Orthopedic Physician Services in KP/BI could profitably impose a SSNIP on payers.

**ANSWER:**   WestSound denies the allegations of this paragraph, including the footnote.

## VI.     DEFENDANTS' UNLAWFUL ACTIVITIES: THE TDC AFFILIATION

39.     In late summer 2015, five primary care physicians at TDC's Bainbridge Island location announced they would leave TDC and sign contracts with Swedish Medical Center to form the Swedish Bainbridge Island Primary Care clinic. This event, combined with other

---

[1] Kitsap Peninsula and Bainbridge and Fox Islands include the zip codes 98110, 98310, 98311, 98312, 98314, 98315, 98329, 98332, 98333, 98335, 98337, 98340, 98342, 98346, 98349, 98351, 98359, 98366, 98367, 98370, 98380, 98383, 98392, 98394, 98524, 98528, and 98588.

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 19

(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 · f. 253-272-0386

1   physician departures from TDC, caused TDC's physician shareholders to believe they would

2   experience a sharp decline in their income relative to market averages. TDC therefore began

3   looking for a well-capitalized partner that would infuse the clinic with enough cash to increase

4   its physicians' salaries. At the same time, however, TDC strongly desired to maintain the

5   physician self-governance and independence from other practices that had characterized TDC

6   throughout its existence.

7        **ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no

8   answer is required.  To the extent an answer is required to any particular allegation, WestSound

9   lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

10       40.     For its part, CHI Franciscan and its subsidiaries had long viewed a transaction

11  with TDC as a strategic opportunity to neutralize a key competitor on the Kitsap Peninsula. At

12  a May 2010 Harrison board of directors strategy meeting, CHI Franciscan's current Senior

13  Vice President and Chief Strategy Officer, Thomas Kruse, advanced several scenarios as part

14  of a "strategic thinking exercise." One such scenario involved entering into "[m]ultiple joint

15  ventures" to "exploit[] a strong shift in the market that favorably biases partnering with

16  physicians." Mr. Kruse then revealed the endgame of this strategy: "Harrison (through

17  Harrison HealthPartners) and the Doctor's Clinic come together to form the solid foundation of

18  a Kitsap PHO [physician-hospital organization], which is soon joined by the other large

19  medical groups, and eventually even raises question with the DOJ for restraint of trade

20  concerns – the ultimate compliment!" Later, in 2012 or 2013, Harrison's then-President and

21  CEO, Scott Bosch, threatened TDC's leadership with signing away approximately a dozen

22  TDC physicians and driving what remained of TDC's practice into bankruptcy.

23       **ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no

24  answer is required.  To the extent an answer is required to any particular allegation, WestSound

25  lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 20
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 · f. 253-272-0386

41.     TDC and CHI Franciscan believed that their relationship became more cooperative and less adversarial following Franciscan's 2013 acquisition of Harrison and Mr. Bosch's 2014 retirement. Therefore, TDC and Franciscan began exploring the possibility of a closer partnership starting no later than 2015. Those discussions evolved through negotiation into the TDC Affiliation. Three written agreements serve as the primary legal basis for the TDC Affiliation: a Professional Services Agreement, a Management Services Agreement, and an Asset Purchase Agreement.

**ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no answer is required.  To the extent an answer is required to any particular allegation, WestSound lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

**A.     TDC and FMG have agreed on prices to charge payers via the Professional Services Agreement.**

**1.     Under the Professional Services Agreement, FMG jointly contracts with payers on behalf of itself and its competitor, TDC.**

42.     At a meeting between CHI Franciscan and TDC on September 8, 2015, the parties' representatives first discussed the contours of what would become the Professional Services Agreement ("PSA") that formed the basis of their affiliation. CHI Franciscan pitched the PSA model as "[a]n option to contract w/group [TDC] as opposed to the individual" physicians. TDC would be compensated using an "RVU rate based on aggregate of the group's RVU production," with TDC then distributing income to its individual physicians. Importantly for TDC, the PSA would include independent "[g]overnance of the practice maintained by" TDC, and "TDC would manage the practice and be paid a management fee" by CHI Franciscan. In fact, "[b]illing/collecting & IT [information technology] were the only centralized functions" under the PSA proposal. Those in attendance also discussed how to determine compensation based on RVUs, how to handle the ancillary facilities including the

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 21
(CASE NO. 3:17-cv-05690)

732838

FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 · f. 253-272-0386

1  ASC, and "[r]etention of the TDC name and brand," among other topics. CHI Franciscan and

2  TDC continued to negotiate the terms of their agreement throughout the rest of 2015 and the

3  first eight months of 2016. At all times, both sides to the negotiations assumed that TDC would

4  be paid using a volume-based, fee-for-service model based on wRVUs.

5      **ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no

6  answer is required.  To the extent an answer is required to any particular allegation, WestSound

7  lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

8      43.    Under the PSA that TDC and FMG executed, TDC agreed that its providers in

9  all specialties would provide medical services exclusively on behalf of FMG, and TDC's

10  existing patients would become FMG patients. In exchange, CHI Franciscan agreed to

11  compensate TDC based on a fee-for-service formula, with TDC receiving payment for wRVUs

12  performed by TDC physicians at [REDACTED] of the amount FMG pays to FMG-employed

13  physicians in the same specialties according to FMG's wRVU-based rates. Specifically, FMG

14  agreed to pay TDC a "draw amount" based on the actual wRVUs performed during the year by

15  TDC's physicians, multiplied by FMG's rate schedule applicable to the "tier" of wRVUs

16  performed by each physician, and further multiplied by [REDACTED]%. TDC then distributes

17  that draw amount to its physicians based on its internal compensation schedule. In this manner,

18  the more patients TDC sees, the more wRVUs it performs, resulting in a higher draw amount

19  under the PSA's terms.

20      **ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no

21  answer is required.  To the extent an answer is required to any particular allegation, WestSound

22  lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

23      44.    On the date the PSA took effect, TDC was required to, and did, cancel its then-

24  current contracts with payers and immediately joined the contracts that FMG had in effect with

25  payers, including FMG's contractual reimbursement rates. TDC did not have to renegotiate any

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 22
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 · f. 253-272-0386

1  payer contracts, but simply joined FMG's payer contracts by becoming credentialed with each

2  payer as an "FMG Provider" and submitting charges to payers under FMG's tax identification

3  number. TDC delegated to FMG "sole responsibility and authority to determine the fees to be

4  charged to patients for" professional services rendered by TDC physicians, and to "maintain,

5  negotiate and execute contracts with payors that pertain to the Professional Services." The PSA

6  provided that billing and collection for services provided by TDC "will be done under FMG's

7  tax identification number and in FMG's name," and "FMG shall be exclusively entitled to

8  retain all remuneration for the same."

9    **ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no

10  answer is required.  To the extent an answer is required to any particular allegation, WestSound

11  lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

12    45.    Under the PSA, CHI Franciscan now jointly negotiates payer contracts on

13  behalf of both itself and its competitor, TDC. TDC has no input into FMG's rate negotiations

14  with payers on TDC's behalf. TDC admits that under the PSA, "all of TDC's physicians have

15  begun to contract through FMG's payer contracts" and that it "does not expect to negotiate

16  separately with payers for TDC physicians." And as CHI Franciscan admits, pursuant to the

17  PSA, TDC's physicians "fell within the purview of the existing Payer Contracts previously

18  negotiated by Franciscan."

19    **ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no

20  answer is required.  To the extent an answer is required to any particular allegation, WestSound

21  lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

22
23    **2.    Despite jointly negotiating with payers, TDC and FMG remain separate economic entities and compete to attract patients.**

24    46.    Except for the prices they jointly charge to commercial healthcare payers, FMG

25  and TDC remain independent economic entities. Each is controlled by separate boards of

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 23
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF**
**ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 • f. 253-272-0386

1  directors with no overlapping directorates. Each is owned by separate actors—FMG by FHS,

2  and TDC by its physician shareholders—with no overlapping ownership. TDC is required by

3  the PSA to maintain separate commercial general liability and professional liability insurance.

4  Each maintains separate clinical protocols, medical directors, and procedures for addressing

5  deviations from standards of care. TDC maintains the control it had before the TDC Affiliation

6  over whether to a hire a particular physician to work at TDC.

7      **ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no

8  answer is required.  To the extent an answer is required to any particular allegation, WestSound

9  lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

10      47.    TDC's physicians and non-physician employees remain employed by TDC, not

11  by CHI Franciscan. The PSA specifies that TDC acts at all times as an independent contractor

12  of FMG, without forming any type of employment relationship between FMG and TDC. TDC

13  is solely responsible for its physicians' salary, compensation, benefits, workers' compensation

14  insurance, and similar items. TDC must indemnify and hold CHI Franciscan harmless against

15  liability arising from any claim that TDC or its physicians are CHI Franciscan employees.

16      **ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no

17  answer is required.  To the extent an answer is required to any particular allegation, WestSound

18  lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

19      48.    TDC has also continued to use its own electronic health records ("EHR")

20  system, Intergy, and does not intend to transition to using CHI Franciscan's EHR system, Epic.

21  TDC's ability to continue using Intergy, rather than integrating with Epic, was an essential

22  condition to it signing the PSA. Indeed, it was a significant reason why TDC accepted less than

23  100% compensation for its physician wRVUs under the PSA's compensation formula. TDC

24  and FMG also continue to use separate EHR systems and clearinghouses for processing bills to

25  payers and patients, with no plans to combine systems in the future.

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 24
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800  ·  f. 253-272-0386

1

**ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no

2

answer is required.  To the extent an answer is required to any particular allegation, WestSound

3

lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

4

49.     TDC and FMG viewed each other as close competitors for patients before the

5

TDC Affiliation. TDC and FMG continue to compete for patient volume because the PSA

6

incentivizes them to do so. Under the PSA, TDC is paid based upon the number of wRVUs

7

performed by TDC physicians. Thus, for TDC to increase its revenues, TDC must serve more

8

patients. A patient who is treated by a non-TDC physician will not contribute to TDC's

9

revenues under the PSA.

10

**ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no

11

answer is required.  To the extent an answer is required to any particular allegation, WestSound

12

lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

13

50.     TDC and FMG have further demonstrated that they continue to compete for

14

patients. A week before the TDC Affiliation took effect, TDC waived a non-compete clause in

15

the employment agreement of one of its primary care physicians who wished to practice for

16

FMG as an urgent care specialist. The waiver, however, specified that the physician could not

17

practice primary care as an FMG physician for one year after Defendants signed the PSA. TDC

18

admitted that it granted this waiver only because, by changing her practice area, the physician

19

"was practicing not in direct competition" with her "same specialty" at TDC.

20

**ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no

21

answer is required.  To the extent an answer is required to any particular allegation, WestSound

22

lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

23

51.     TDC admits, in sworn answers to investigative interrogatories, that it "remains

24

[a] separate entity, and TDC's physicians remain under their own physician governance

25

structure." TDC further admits, in sworn investigative testimony, that in conducting the

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 · f. 253-272-0386

1   affiliation with CHI Franciscan, it was "absolutely" trying to remain as independent as possible

2   operationally, while still affiliating with a large health organization.

3       **ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no

4   answer is required.  To the extent an answer is required to any particular allegation, WestSound

5   lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

6       52.     TDC and FMG are therefore competitors. They are separate economic actors,

7   with independent economic incentives, that have come together under the PSA for the

8   exclusive purpose of jointly negotiating reimbursement rates with payers.

9       **ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no

10  answer is required.  To the extent an answer is required to any particular allegation, WestSound

11  lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

12  **B.     FMG makes further support payments to TDC under the Management Services
        Agreement.**

13

14      53.     As part of the TDC Affiliation, CHI Franciscan purchased certain ancillary

15  services from TDC (discussed below) and also assumed the leases of the medical clinic

16  locations in which TDC offered physician services. The parties desired, however, that TDC

17  staff would continue to perform administrative, "back office" functions in exchange for a

18  management fee. As a result, TDC largely continues to carry out the same administrative and

19  operational duties in running its clinics as it did before the TDC Affiliation, allowing TDC to

20  maintain control over its day-to-day operations.

21      **ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no

22  answer is required.  To the extent an answer is required to any particular allegation, WestSound

23  lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

24      54.     Under the Management Services Agreement ("MSA"), TDC is required to

25  "provide all services that are necessary and appropriate for the proper and efficient operation"

1   of the medical clinic locations at which TDC practices, including the ambulatory surgery

2   center. The services that TDC provides under the MSA include scheduling, reception, billing

3   health plans and patients, all supply-chain functions, accounting, equipment and facility repair

4   and maintenance, utilities, credentialing of providers with health plans, Medicare enrollment,

5   operation of the ASC, and provision and maintenance of an electronic health records and

6   practice management software system.

7        **ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no

8   answer is required.  To the extent an answer is required to any particular allegation, WestSound

9   lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

10       55.     Given that FMG collects TDC's payments from health plans and patients, TDC

11  must look to CHI Franciscan for funds to run its medical clinics. The MSA operates off a

12  budget established by TDC and CHI Franciscan before each fiscal year, and "[i]t is the sole and

13  absolute responsibility of TDC to operate within the Budget." If TDC's expenses for operating

14  the medical clinics come in under budget, the MSA limits the amount of savings that TDC can

15  retain. If TDC's expenses for operating the medical clinic go over budget, it must forfeit its

16  management fee and, under certain circumstances, reimburse CHI Franciscan for a portion of

17  the latter's costs in making up the difference.

18       **ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no

19  answer is required.  To the extent an answer is required to any particular allegation, WestSound

20  lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

21       56.     The centrality of fee-for-service billing to the TDC Affiliation is also reflected

22  in the MSA. The MSA obligates TDC to ensure that it "provides monthly, quarterly and annual

23  reports in a format and level of detail reasonably acceptable to FMG regarding work Relative

24  Value Units ('**wRVUs**') actually performed, billable and under the PSA."

25

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 27
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 · f. 253-272-0386

1      **ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no

2 answer is required.  To the extent an answer is required to any particular allegation, WestSound

3 lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

4 **C.**     **TDC sells its ancillary services to FMG under the Asset Purchase Agreement and Defendants move services to Harrison.**

5

6      57.     CHI Franciscan's payments to TDC under the PSA and MSA represented

7 increased costs to CHI Franciscan. To fund the cost of these agreements, CHI Franciscan

8 needed a new source of revenue. Therefore, a crucial component of the TDC Affiliation was

9 the sale of ancillary services—an ambulatory surgery center, laboratory, and imaging facility—

10 from TDC to CHI Franciscan under the parties' Asset Purchase Agreement ("APA"). CHI

11 Franciscan paid TDC some [REDACTED] for the ancillary services. The parties structured the

12 deal such that CHI Franciscan made an up-front payment of about $[REDACTED] while

13 simultaneously obligating itself under a promissory note to pay the approximately

14 $[REDACTED] balance, plus interest, in a series of equal annual installments over the next

15 five years. To TDC, this deal structure represented a guaranteed source of cash flow. To CHI

16 Franciscan, it represented a chance for CHI Franciscan to acquire a dedicated source of

17 profitable referrals to Harrison, most notably in surgery and imaging, while spreading the

18 acquisition's cost over several years.

19      **ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no

20 answer is required.  To the extent an answer is required to any particular allegation, WestSound

21 lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

22      58.     When they began negotiating the sale of the ancillary services, CHI Franciscan

23 and TDC contemplated that they would continue to perform most or all of the ancillary

24 procedures at their existing TDC locations, but would apply CHI Franciscan's hospital-based

25 rates in billing for those procedures. An obstacle arose, however, when CMS proposed a rule to

implement Section 603 of the Bipartisan Budget Act of 2015 (Pub. L. 114-74). Under this "250

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 28
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 · f. 253-272-0386

yard rule," a provider's off-campus location must be located within 250 yards of a hospital facility in order to qualify for provider-based status and bill at the hospital's rates.[2] TDC's former ancillary facilities were, and are, all located over 250 yards away from Harrison, CHI Franciscan's only qualifying hospital facility in Kitsap County. TDC summarized this problem in a presentation at a March 2016 shareholders' meeting: the "250 yard rule interferes with the funding of the PSA as originally intended" because it "would NOT allow our ancillaries to be billed at a higher rate." Therefore, the parties decided to move to Harrison the majority of procedures that used to be performed at the ancillary facilities.

**ANSWER:** This paragraph contains no allegations directed at WestSound and thus no answer is required. To the extent an answer is required to any particular allegation, WestSound lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

59.     Even though Defendants recognized that this "ancillary movement is more complex and disruptive for patients and physicians," they also knew that CHI Franciscan's purchase of the ancillary services would allow them to shift procedures performed at those facilities to Harrison, with its attendant higher rates. The reduction in services performed at those facilities would both hobble TDC as a competitor and guarantee that CHI Franciscan would capture those services' revenue stream through Harrison. CHI Franciscan expected that revenue to outweigh the payments it was obligated to make to TDC under the PSA and MSA. Thus, from CHI Franciscan's perspective, purchasing the ancillary services more than made the PSA and MSA pay for themselves.

**ANSWER:** This paragraph contains no allegations directed at WestSound and thus no answer is required. To the extent an answer is required to any particular allegation, WestSound lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

---

[2] See Medicare Program: Payment to Certain Off-Campus Outpatient Departments of a Provider, 81 Fed. Reg. 45,604, 45,683–84 (Jul. 14, 2016).

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 29

(CASE NO. 3:17-cv-05690)

732838

FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC
1301 A Street, Suite 900
Tacoma, WA 98402
p. 253-328-7800 · f. 253-272-0386

60.     CHI Franciscan's expectation has come true. In October 2016, the month after the TDC Affiliation took effect, Harrison's imaging center saw a volume increase of 17% over the previous month, which it attributed to the TDC Affiliation. Also in that month, Harrison observed growth of an additional 162 orthopedic surgical cases to that point because of the Kitsap Transactions. The exodus of procedures to CHI Franciscan's hospital facility is continuing. As a consequence, TDC's ambulatory surgery center is currently performing around half the procedures it did before the TDC Affiliation, and what remains are generally low-acuity, low-margin cases such as pain management and orthopedic hand surgeries. Finally, TDC's laboratory is currently performing roughly the same volume of services it did before the TDC Affiliation because TDC's and Harrison's laboratories are not integrated as a result of TDC's use of a separate EHR platform. But Defendants have admitted they intend to eventually close down TDC's laboratory and move those services to Harrison as well.

**ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no answer is required.  To the extent an answer is required to any particular allegation, WestSound lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

61.     In addition to the PSA, MSA, and APA described above, as part of the TDC Affiliation, FMG and TDC entered into other contracts and agreements that helped facilitate the anticompetitive TDC Affiliation.

**ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no answer is required.  To the extent an answer is required to any particular allegation, WestSound lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

**D.     The TDC Affiliation has harmed payers and patients on the Kitsap Peninsula.**

62.     The TDC Affiliation has eliminated the first, price-based stage of healthcare competition between CHI Franciscan and TDC. On the date the PSA took effect, TDC immediately began receiving higher reimbursement rates from health plans. TDC's

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 30
(CASE NO. 3:17-cv-05690)

732838

FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 ・ f. 253-272-0386

1    reimbursements increased by an average of over [REDACTED] percent for payers across all

2    physician services, and in the case of one payer, [REDACTED] percent. As a result of this loss

3    of competition, healthcare payers have lost an important outside option in negotiating

4    reimbursement rates, and Defendants' bargaining leverage has increased.

5        **ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no

6    answer is required.  To the extent an answer is required to any particular allegation, WestSound

7    lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

8        63.    In addition to these immediate price impacts to TDC physician services, health

9    plans, employers, and patients are paying significantly more, or will likely pay more in the

10   future, for ancillary imaging, laboratory, and outpatient surgical services as a result of pressure

11   by CHI Franciscan for TDC physicians to direct patients to Harrison for those services.

12   Because TDC is now encouraged to refer within the CHI Franciscan system, and because CHI

13   Franciscan has closed TDC's imaging services, TDC now refers imaging patients almost

14   exclusively to Harrison unless a patient specifically asks to be referred to Kitsap County's only

15   other imaging provider, InHealth Imaging. Similarly, many procedures are no longer

16   performed at TDC's ambulatory surgery center. The shift of these procedures has allowed CHI

17   Franciscan to reap the financial benefits of its higher rates for these services. A TDC

18   orthopedist acknowledged to CHI Franciscan that moving surgeries to Harrison entailed "extra

19   cost for our patients" and lamented that the move was made for "solely financial reasons."

20       **ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no

21   answer is required.  To the extent an answer is required to any particular allegation, WestSound

22   lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

23       64.    The shift in services has harmed Kitsap Peninsula patients in ways beyond

24   higher prices. Shuttering TDC's imaging service has led to scheduling backlogs as TDC

25   patients are referred to Harrison's overburdened imaging services. Early on in the TDC

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 31
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 • f. 253-272-0386

Affiliation, the backlog in imaging scheduling prompted a TDC physician to e-mail TDC's physician president to complain about an "influx of calls from patients not being called from Harrison regarding their imaging orders," noting delays of up to two weeks. The physician explained: "Sometimes the imaging test is fairly urgent, and cannot wait this long. I am trying not to refer anyone to In Health Imaging anymore as requested by our new relationship with the Franciscans, but I will be forced to for more urgent studies if this scheduling problem continues." TDC's physician president responded, acknowledging:

> It is a major source of dissatisfaction. I also feel your pain. We had a great radiology department and it will take some time and effort to work with CHI to have any chance to match what the TDC radiology department was. Some of our surgeons also have the additional joy of not using our surgical center. Our turn over times are significantly longer.

Several months later, CHI Franciscan's internal reports showed that patient scheduling at Harrison was still taking longer than expected, that scheduling calls to x-ray patients had ceased entirely with the instruction instead to "rely on patient to walk-in or call," and that patients complained of "excessively long hold times."

     **ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no answer is required.  To the extent an answer is required to any particular allegation, WestSound lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

     65.    Kitsap Peninsula patients have also seen service and choice reductions due to restrictions imposed on TDC physicians' practice by the Ethical and Religious Directives of the Catholic Church ("ERDs"). The PSA obliges TDC to abide by CHI Franciscan's ERDs and prohibits it from performing procedures banned by the ERDs. For TDC, this has meant that, at CHI Franciscan's direction, it has removed from its website all references to vasectomies and other sterilization services. TDC also admits that its physicians who wish to offer death with dignity services, which are lawful in Washington and which they offered before the transaction, may now do so only "as a moonlighting job" outside the scope of the PSA. They

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 32
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800  ·  f. 253-272-0386

1  may not give the impression that they are associated with CHI Franciscan or TDC in any way,

2  and may not rely on CHI Franciscan's or TDC's medical malpractice insurance policies in

3  performing such services. One of TDC's physicians who provided death with dignity services

4  acknowledged after the TDC Affiliation took effect that, "Due to the number of docs involved

5  with CHI, there's getting to be a community access problem to find willing doctors who don't

6  have this limitation. . . . The malpractice piece is proving problematic."

7      **ANSWER:** This paragraph contains no allegations directed at WestSound and thus no

8  answer is required. To the extent an answer is required to any particular allegation, WestSound

9  lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

10      66.    Lastly, the TDC Transaction undermines an emerging consensus among

11  healthcare experts favoring value- and performance-based contracts that reward physicians for

12  providing quality care, lowering costs, and successfully managing long-term conditions, rather

13  than for fee-for-service, volume-based billing of expensive procedures. Indeed, the operative

14  agreement in the TDC Affiliation expressly rules out the possibility of any quality-based,

15  incentive compensation to TDC. Further, with respect to entering into value-based contracts

16  like bundled payment or capitation-based arrangements in the future, CHI Franciscan admits

17  that any such contracts would be set up through its existing ACO, RHN, and would not be

18  exclusive to TDC or come about as a result of the TDC Affiliation.

19      **ANSWER:** This paragraph contains no allegations directed at WestSound and thus no

20  answer is required. To the extent an answer is required to any particular allegation, WestSound

21  lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

22      **VII.   FIRST CAUSE OF ACTION (COUNT ONE): THE TDC AFFILIATION**

23      67.    The State hereby repeats and realleges each and every allegation of Paragraphs

24  1 through 66 as if fully set forth herein.

25

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 33
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF**
**ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA 98402
p. 253-328-7800 • f. 253-272-0386

1    **ANSWER:**   WestSound   incorporates   its   answers   and   responses   to   all   preceding

2    paragraphs as if fully set forth herein.

3    **A.     *Per se* illegality**

4    68.     Defendants FHS, FMG, and The Doctors Clinic entered into a contract,

5    conspiracy,   and   agreement   to   raise   prices   and   eliminate   price   competition   with   respect   to

6    physician services in Kitsap County. This contract, conspiracy, and agreement constitutes a *per*

7    *se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Washington Consumer

8    Protection Act, RCW 19.86.030. This offense is likely to continue and recur unless the relief

9    requested in Section X is granted.

10    **ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no

11    answer is required.  To the extent an answer is required to any particular allegation, WestSound

12    lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

13    69.     These Defendants' agreement on and joint negotiation of reimbursement rates

14    and   other   competitively   significant   terms   has   not   been,   and   is   not,   reasonably   related   to   any

15    efficiency-enhancing integration sufficient to escape *per se* condemnation. With respect to CHI

16    Franciscan's contracts with payers, CHI Franciscan and TDC do not share substantial financial

17    risk and are not clinically or otherwise integrated in ways that would create the potential for

18    increased quality and reduced cost of medical care that physicians provide to patients. As one

19    example, the TDC Affiliation has not increased the number of value-based contracts to which

20    TDC   and   CHI   Franciscan   are   parties.   Furthermore,   the   TDC   Affiliation   is   not   reasonably

21    necessary   to   achieve   efficiencies   or   other   procompetitive   justifications   that   would   increase

22    quality and reduce the cost of medical care, or, alternatively, its scope is broader than necessary

23    to achieve any such efficiencies or procompetitive justifications. Even to the extent the TDC

24    Affiliation's restraints may be reasonably necessary, any such efficiencies are not cognizable

25

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 34
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 ・ f. 253-272-0386

1   because they are not verifiable and/or arise from the anticompetitive effects of the TDC

2   Affiliation.

3       **ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no

4   answer is required.  To the extent an answer is required to any particular allegation, WestSound

5   lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

6   **B.   Illegality under the rule of reason**

7       70.   Where, as here, defendants have engaged in a *per se* violation of the Sherman

8   Act and the Washington Consumer Protection Act, no allegations with respect to product

9   market, geographic market, or market power are required. To the extent such allegations may

10  otherwise be necessary, the product markets for purposes of this Count One are Adult PCP

11  Services and Orthopedic Physician Services, as defined above in Paragraphs 35 and 36. The

12  geographic market for purposes of this Count One is an area no larger than KP/BI, as defined

13  above in Paragraph 38.

14      **ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no

15  answer is required.  To the extent an answer is required to any particular allegation, WestSound

16  lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

17      71.   CHI Franciscan and The Doctors Clinic have, through the TDC Affiliation,

18  established market power in the KP/BI market for Adult PCP Services. Preliminary diversion

19  analysis, described more fully in Paragraph 85, shows that prior to the affiliation, CHI

20  Franciscan and TDC were each other's closest competitors for Adult PCP Services. Using the

21  service area from which TDC attracts 75% of its patients, CHI Franciscan and TDC now

22  possess a combined market share in excess of 50%, based upon wRVUs for adult PCPs who

23  treat commercially insured patients. In the broader KP/BI market, the combined market share is

24  over 35%.

25

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 35
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 · f. 253-272-0386

1    **ANSWER:**  This paragraph contains no allegations directed at WestSound and thus no

2    answer is required.  To the extent an answer is required to any particular allegation, WestSound

3    lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

4    72.    In addition, via the TDC Affiliation and the WestSound Acquisition described

5    below, Defendants have established market power in the KP/BI market for Orthopedic

6    Physician Services, with a combined market share of over 63% in TDC's 75% service area,

7    and a combined market share of over 55% in KP/BI.

8    **ANSWER:**  WestSound denies the allegations of this paragraph.

9    73.    Through the TDC Affiliation, CHI Franciscan and The Doctors Clinic have

10   successfully imposed and sustained an immediate, significant increase in TDC's

11   reimbursement rates for physician services charged to payers, including at least Adult PCP

12   Services and Orthopedic Physician Services.

13   **ANSWER:**  WestSound denies the allegations of this paragraph.

14   74.    CHI Franciscan's and TDC's contract, conspiracy, and agreement has resulted

15   in harmful and anticompetitive effects to consumers and healthcare payers, including:

16   a.    increasing the reimbursement rates paid by commercial healthcare

17          payers for TDC's provision of physician services;

18   b.    curtailing or eliminating competition on reimbursement rates for

19          contracts entered into with commercial healthcare payers;

20   c.    increasing the bargaining leverage held by Defendants in negotiations

21          with commercial healthcare payers;

22   d.    increasing the costs paid by commercial healthcare payers and patients

23          for services that used to be performed at TDC's ancillary facilities by

24          increasing referrals for those services to Harrison, with its attendant

25          higher rates, and diminishing the quality and choice of those services;

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 36
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF**
**ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 • f. 253-272-0386

e.      curtailing or eliminating competition for the referral of procedures to lower-priced hospitals and ancillary facilities;

f.      eliminating FMG's closest head-to-head competitor for Adult PCP Services in first stage healthcare competition;

g.      eliminating FMG's close competitor for Orthopedic Physician Services in first stage healthcare competition; and

h.      curtailing or eliminating physician services that are prohibited by CHI Franciscan's ERDs

such that their contract, conspiracy, and agreement constitutes an unreasonable restraint of trade in violation of 15 U.S.C. § 1 and RCW 19.86.030.

**ANSWER:** This paragraph contains no allegations directed at WestSound and thus no answer is required. To the extent an answer is required to any particular allegation, WestSound lacks sufficient knowledge and information to form a belief as to the truth of that allegation.

## VIII.   DEFENDANTS' UNLAWFUL ACTIVITIES: THE WESTSOUND ACQUISITION

**A.    The WestSound Acquisition**

75.      Effective July 1, 2016, CHI Franciscan acquired the assets of WestSound for $[REDACTED]. The Asset Purchase Agreement between FMG and WestSound transferred all or substantially all of WestSound's assets, rights, and interests to FMG—including tangible personal property, intangible rights and assets, inventory and supplies, and permits and licenses—that it used in connection with its medical practice. FMG assumed the lease on WestSound's Silverdale facility. In addition, the Asset Purchase Agreement assigned to FMG WestSound's rights, title, and interest in the contracts it held with healthcare payers, and WestSound's orthopedic physicians signed employment agreements, including compensation formulae, with FMG effective July 1, 2016. As CHI Franciscan admits, the "former WestSound Physicians have become employees of FMG," practicing out of the same

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 37
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF**
**ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA 98402
p. 253-328-7800 · f. 253-272-0386

1  Silverdale and Bainbridge Island locations from which they practiced prior to the WestSound
2  Acquisition.  CHI Franciscan now contracts with payers on behalf of the WestSound
3  physicians.

4        **ANSWER:**  WestSound admit CHI Franciscan now contracts with payers on behalf of
5  the former WestSound physicians, to the extent it contracts with payers on behalf of all its
6  employed physicians.  WestSound admits the remaining allegations of this paragraph.

7  **B.**    **Relevant markets**

8        76.    The relevant product market in which to analyze the WestSound Acquisition is
9  Orthopedic Physician Services, as defined above in Paragraph 36.

10        **ANSWER:**  WestSound lacks sufficient knowledge and information to form a belief as
11  to the truth of the allegations of this paragraph.

12        77.    The relevant geographic market in which to analyze the WestSound Acquisition
13  is an area no larger than KP/BI, as defined above in Paragraph 38.

14        **ANSWER:**  WestSound denies the allegations of this paragraph.

15  **C.**    **Market structure and the WestSound Acquisition's presumptive illegality**

16        78.    Under Section 7 of the Clayton Act, an acquisition is presumed to substantially
17  lessen competition if it will lead to undue concentration in at least one market. The federal
18  antitrust agencies' *Horizontal Merger Guidelines* measure market concentration using the
19  Herfindahl-Hirschman Index ("HHI"), a commonly used metric for determining market
20  concentration by summing the squares of individual firms' market shares. Under the
21  *Horizontal Merger Guidelines*, an acquisition is presumed likely to create or enhance market
22  power, and is thus presumed illegal, when the post-merger HHI exceeds 2,500 points and the
23  merger or acquisition increases the HHI by more than 200 points.

24

25

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 • f. 253-272-0386

1    **ANSWER:**  WestSound states that this paragraph states conclusions of law as to which

2    no answer is required.  To the extent an answer is required, WestSound denies the allegations

3    of the paragraph.

4    79.    The WestSound Acquisition, along with the TDC Affiliation, combines the

5    three largest providers of Orthopedic Physician Services in KP/BI. CHI Franciscan's post-

6    acquisition market share in the KP/BI Orthopedic Physician Services market, as measured by

7    share of wRVUs performed, is over 55%. And, as measured by orthopedic physician

8    headcount, CHI Franciscan now controls billing for all but a small handful of orthopedic

9    physicians practicing in KP/BI.

10    **ANSWER:**  WestSound denies the allegations of this paragraph.

11    80.    In the Orthopedic Physician Services market, the concentration levels far exceed

12    the *Merger Guidelines* thresholds. The pre-merger HHI was at least 1,368 and both Kitsap

13    Transactions increased the HHI by 2,222 to at least 3,591—that is, by over eleven times the

14    increase in concentration required for the presumption of illegality. The increase in HHI thus

15    moved the market from "unconcentrated" to "highly concentrated" and enhanced Defendants'

16    market power.

17    **ANSWER:**  WestSound denies the allegations of this paragraph.

18    81.    The market shares reflected above likely understate the challenges that a health

19    plan would face in attempting to offer a network that did not include the orthopedists

20    contracted through CHI Franciscan. CHI Franciscan, TDC, and WestSound represent the vast

21    majority of Orthopedic Physician Services available within KP/BI. The other providers with

22    meaningful shares are primarily located in either the Seattle or Tacoma areas. A health plan

23    would face a very difficult or impossible task of selling a network to Kitsap County employers

24    and individuals that did not include any of the orthopedists contracted through CHI Franciscan.

25    **ANSWER:**  WestSound denies the allegations of this paragraph.

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 39
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF**
**ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 · f. 253-272-0386

82.     The WestSound Acquisition is thus presumptively unlawful under long-established antitrust precedent. *See United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963).

**ANSWER:** CHI Franciscan denies the allegations of this paragraph.

**D.     The WestSound Acquisition has resulted, and is likely to further result, in anticompetitive effects.**

83.     While the above market definition and share calculations are sufficient by themselves to deem the WestSound Acquisition presumptively illegal, as a consummated merger, the WestSound Acquisition has created observable and significant anticompetitive effects that also render it likely to substantially lessen competition.

**ANSWER:** WestSound denies the allegations of this paragraph.

**1.     The WestSound Acquisition has eliminated price competition and increased CHI Franciscan's bargaining leverage over commercial payers.**

84.     The WestSound Acquisition has eliminated WestSound as CHI Franciscan's primary head-to-head competitor. It has thereby increased CHI Franciscan's ability and incentive to demand higher reimbursement rates from commercial payers.

**ANSWER:**  WestSound admits after the WestSound Acquisition, it and its former physicians no longer compete with CHI Franciscan but denies the remaining allegations of this paragraph.

85.     Diversion analysis is a standard econometric tool that uses data on where patients receive healthcare services to determine the extent to which providers are substitutes. Here, preliminary diversion analysis shows that, before the WestSound Acquisition, CHI Franciscan and WestSound were each other's closest competitors for Orthopedic Physician Services. If all CHI Franciscan physicians providing orthopedic services were unavailable to patients, approximately 28% of patients would seek care at WestSound, and approximately 23% of patients would seek care at TDC (now contracted through CHI Franciscan). The next-

1   closest competitor practice would gain only 14.4% of CHI Franciscan's orthopedic patients.

2   Conversely, if all WestSound physicians providing orthopedic services were unavailable to

3   patients, nearly 45% of patients would seek care at TDC (now contracted through CHI

4   Franciscan) and approximately 14% of patients would seek care at CHI Franciscan. In this

5   scenario, the next-closest single competitor practice would gain only 6.7% of WestSound's

6   orthopedic patients. In both scenarios, over half of patients would choose to receive Orthopedic

7   Physician Services from a physician contracted through the other party to the merger.

8   Therefore, CHI Franciscan and WestSound are by far the closest substitutes for each other's

9   orthopedic patients.

10        **ANSWER:**  WestSound admits that diversion analysis is an econometric tool that uses

11   data on where patients receive healthcare services to determine the extent to which providers

12   are substitutes, but denies the remaining allegations of this paragraph.

13        86.     In addition to diversion analysis, Defendants' ordinary course documents reflect

14   the close competition that existed between WestSound and CHI Franciscan before their

15   merger. CHI Franciscan tracked WestSound's market share and volume before the WestSound

16   Acquisition took effect. CHI Franciscan's CFO, Mr. Fitzgerald, informed CHI Franciscan's

17   leadership that he viewed the WestSound Acquisition as a key "strategy to grow surgery

18   cases," which was important because "[i]ncreasing our surgeries is about the fastest way to

19   increase our bottom line." And WestSound acknowledged to FMG's Dr. O'Connor that the

20   merger "expands market share for FMG/CHI."

21        **ANSWER:**  WestSound admits that before the WestSound Acquisition, it competed

22   with CHI Franciscan, but denies the remaining allegations of this paragraph.

23        87.     The loss of competition predicted by diversion analysis and Defendants'

24   ordinary course documents has translated, unsurprisingly, into higher prices charged to

25   commercial healthcare payers for orthopedic procedures. Under one major payer's contract,

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 41
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 ⋅ f. 253-272-0386

shortly after the WestSound Acquisition took effect, the WestSound physicians' allowable charges for arthroscopic shoulder surgery with rotator cuff repair increased by nearly [REDACTED]%; for arthroscopically aided anterior cruciate ligament ("ACL") repair or replacement, by approximately [REDACTED]%; and for arthroscopic knee surgery with meniscectomy, by approximately [REDACTED]%. Overall, the WestSound Acquisition resulted in an over [REDACTED] increase in payments for major orthopedic services by the largest payers on the Kitsap Peninsula. These price increases demonstrate that the WestSound Acquisition has already enabled Defendants to exercise market power.

**ANSWER:**  WestSound denies the allegations in the first sentence of this paragraph. WestSound lacks knowledge or information sufficient to admit or deny the remaining allegations of this paragraph.

88.     The increased costs that Defendants are able to force commercial health plans to pay as a result of the WestSound Transaction have fallen squarely on Kitsap Peninsula employers and residents, particularly in higher co-insurance and deductible payments. And, in addition to the higher rates that CHI Franciscan is able to extract from payers due to the elimination of competition for payer contracting, patients have borne increased costs due to the shift in facilities the former WestSound physicians use to perform orthopedic surgeries. Procedures performed in an ambulatory surgery center setting are significantly less expensive than those performed in a hospital setting, such as Harrison. Meanwhile, Harrison is one of the more expensive hospitals in the Puget Sound region, further exacerbating the price differential. According to Washington State Hospital Association data, average and median charges for a major joint replacement performed at Harrison in 2016 were higher than three hospitals in King County: Seattle's Virginia Mason Medical Center and Swedish First Hill hospital, and Bellevue's Overlake Medical Center.

**ANSWER:**  WestSound denies the allegations of this paragraph.

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 42
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 · f. 253-272-0386

1

**2.      The WestSound Acquisition has sharply reduced non-price competition on quality and choice.**

89.      The acquisition of WestSound, along with the TDC Affiliation, has dampened incentives for CHI Franciscan to improve or continue offering high-quality orthopedic services. Because CHI Franciscan now contracts on behalf of the vast majority of orthopedic physicians on the Kitsap Peninsula, CHI Franciscan faces minimal competition for KP/BI patients seeking orthopedic care.

**ANSWER:** WestSound denies the allegations of this paragraph.

90.      Kitsap Peninsula residents have already noticed a decline in quality and choice as a result of the WestSound Acquisition. In publicly-filed comments to CHI Franciscan's application for a Certificate of Need to relocate Harrison's acute-care beds from its Bremerton campus to its Silverdale campus, one commenter expressed his concern over "the deteriorating quality and rising cost of healthcare in our region," due in part to the WestSound Acquisition. He wrote that "CHI Franciscan is on track to become THE dominant healthcare provider in the area. By purchasing all specialty clinics," including WestSound, "the result does not leave patients with cost-effective alternatives to obtaining healthcare services." Another commenter wrote: "In order to decrease their overhead CHI has cut emergency room staffing and nursing coverage causing painful and occasionally dangerous extended waiting times for treatment or hospitalization."

**ANSWER:** WestSound lacks sufficient knowledge and information to form a belief as to the truth of the allegations regarding whether the publicly-filed comments quoted in this paragraph were made.  WestSound denies the remaining allegations of this paragraph.

91.      The former WestSound physicians now perform all their surgeries at Harrison. Previously, the WestSound physicians had performed many of their surgeries at two freestanding Kitsap County ambulatory surgery centers. CHI Franciscan's ordinary course business documents show it tracking the increase in outpatient orthopedic surgeries performed

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 43
(CASE NO. 3:17-cv-05690)

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 • f. 253-272-0386

at Harrison as a direct result of the WestSound Acquisition, and lauding the positive results for its bottom line. In a memo to CHI Franciscan's executive team and board of directors, Harrison President David Schultz celebrated Harrison's "[h]ighest volume month ever for Ortho!" in October 2016—an eighty percent increase in orthopedic surgical volumes over October 2015.

**ANSWER:** WestSound admits the allegations of this paragraph.

92.    As with the reduction in services at TDC's ASC, the shift of WestSound's orthopedic surgical procedures to Harrison has led to increased wait times. The shift has also removed a choice for patients who would prefer to have their surgeries performed at an ASC. With more convenient locations, shorter waiting times, and easier scheduling, ASCs generally offer greater convenience to patients than hospital outpatient departments. Across the country, patients have reported high satisfaction rates for the care and services received from ASCs. Meanwhile, CMS's Hospital Compare website reveals that, based on patient survey results, Harrison currently ranks below state and national averages for eight out of eleven patient experience measures, including pain control, receiving timely help from medical staff, and cleanliness. Without competition from WestSound's orthopedic procedures that used to be performed at ASCs, Harrison and CHI Franciscan have diminished incentives to improve their orthopedic service offerings.

**ANSWER:** WestSound denies the allegations of this paragraph.

**E.    Entry**

93.    De novo entry into the Orthopedic Physician Services market is unlikely to occur in a timely or sufficient manner to counteract the anticompetitive effects of the WestSound Acquisition. Existing competitors are also unlikely to reposition or expand in a manner that is timely or sufficient enough to offset the harm to consumers from the WestSound Acquisition.

**ANSWER:** WestSound denies the allegations of this paragraph.

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 44
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 · f. 253-272-0386

94.     New entry is unlikely due to the lack of available orthopedic physicians on the Kitsap Peninsula. Nearly all orthopedic physicians on the Kitsap Peninsula are either employed by or contracted through CHI Franciscan. The former WestSound physicians have non-compete clauses in their employment agreements with FMG, and the TDC physicians are also bound by the PSA's non-compete provisions. Thus, new competition from currently employed or contracted CHI Franciscan physicians who could leave for private, independent practice is unlikely to occur. Even to the extent it did occur, it would not be timely enough to offset the WestSound Acquisition's competitive harm.

**ANSWER:** WestSound denies the allegations of this paragraph.

95.     In addition, recruiting new physicians to KP/BI to replace the orthopedists lost to the Kitsap Transactions is difficult. Recent medical school graduates who wish to practice in Western Washington are more likely to begin their careers in the Seattle/Tacoma area, rather than KP/BI. FHS's Chief Medical Officer, Dr. Michael Anderson, testified at a public hearing that CHI Franciscan expects a shortage of orthopedists on the Kitsap Peninsula in the near future. In the past five years, only a handful of physicians have entered Kitsap County and set up independent practices in any specialty, let alone orthopedics.

**ANSWER:** WestSound lacks sufficient knowledge and information to form a belief as to the truth of the allegations in the last sentence of the paragraph.  WestSound admits the remaining allegations of this paragraph.

96.     Entry is also unlikely to timely counteract the anticompetitive effects of the WestSound Acquisition because the scope of entry necessary to create a viable substitute for WestSound is a daunting obstacle. CHI Franciscan accounts for over 26% of Orthopedic Physician Services in KP/BI, while WestSound accounts for another over 20%. Thus, before even considering issues of patient loyalty or WestSound's established brand prior to the WestSound Acquisition, a substantial number of orthopedists would have to enter the KP/BI

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 45
(CASE NO. 3:17-cv-05690)

732838

FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 · f. 253-272-0386

1   market to replace the volume of orthopedic services that WestSound used to perform as an

2   independent competitor.

3        **ANSWER:**  WestSound denies the allegations of this paragraph.

4        97.    Lastly, even to the extent new physicians could enter the market, or existing

5   physicians could reposition to serve as competitors, they would face significant delays in

6   becoming meaningful competitors. The process of recruiting an orthopedist, from initial

7   outreach to start date, usually takes well over a year. Once recruited, the orthopedist must

8   establish a patient base comparable to that of an established physician, which can take several

9   more years. For these reasons, physician entry is unlikely to be timely or sufficient to

10  counteract the substantial anticompetitive effects of the WestSound Acquisition.

11       **ANSWER:**  WestSound denies the allegations in the first and last sentences of this

12  paragraph.  WestSound admits the remaining allegations of this paragraph.

13  **F.    Efficiencies**

14       98.    Defendants' alleged benefits of the WestSound Acquisition do not come close

15  to the substantial, merger-specific, and competition-enhancing efficiencies that would be

16  necessary to outweigh the WestSound Acquisition's significant harm to competition. No court

17  has ever found, without being reversed, that an acquisition's claimed efficiencies were

18  sufficient to rebut an otherwise illegal transaction. *See Saint Alphonsus Med. Ctr.-Nampa Inc.*

19  *v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 789 (9th Cir. 2015). Indeed, for acquisitions

20  resulting in high concentration levels such as the WestSound Acquisition, proof of

21  "extraordinary" efficiencies is required to justify the substantial harm to competition. *FTC v.*

22  *H.J. Heinz Co.*, 246 F.3d 708, 720 (D.C. Cir. 2001).

23       **ANSWER:**  WestSound states that this paragraph states conclusions of law as to which

24  no answer is required.  To the extent an answer is required, WestSound denies the allegations

25  of the paragraph.

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 · f. 253-272-0386

99.   Defendants' alleged efficiencies are not cognizable because they are speculative, unverifiable, and/or not subject to quantification. Defendants claim the WestSound Acquisition will result in cost savings, but their claims lack evidentiary support. Furthermore, cost savings from a merger are only cognizable to the extent they are passed on to consumers, rather than bolstering the merging parties' profit margins. *See United States v. Anthem, Inc.*, 855 F.3d 345, 362 (D.C. Cir. 2017). Precisely the opposite is true here. Health plans, employers, and patients have faced increased costs in the form of higher physician reimbursement rates and hospital-based charges for procedures previously performed in lower-cost settings.

**ANSWER:**  WestSound admits that Defendants claim the WestSound Acquisition will result in cost savings, but denies the remaining allegations of this paragraph.

100.   Furthermore, many of Defendants' alleged efficiencies are not cognizable because they arise directly from anticompetitive reductions in competition and increases in price. CHI Franciscan admits that it has achieved its alleged efficiencies through "elimination of the competitive threat" posed by WestSound (and, for that matter, TDC). CHI Franciscan explained that post-merger, "that same threat would be now mitigated" because, when it comes to surgical referrals, the former WestSound physicians (and the current TDC physicians) can now "keep it in the family" at Harrison.

**ANSWER:**  WestSound denies the allegations in this paragraph.

101.   CHI Franciscan also claims that the WestSound Acquisition was necessary to stabilize the WestSound medical group, prevent WestSound physicians from leaving Kitsap County, and provide greater ability to recruit physicians to the community. CHI Franciscan admits, however, that it has achieved this purported efficiency by taking "the risk out of their compensation model" and compensating the physicians "on a work RVU model," i.e., on a volume basis.

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 47
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 · f. 253-272-0386

1       **ANSWER:** WestSound admits the allegations of this paragraph.

2       102.    Defendants' alleged efficiencies are also not merger-specific because

3   Defendants could accomplish them without any merger or acquisition. CHI Franciscan has

4   admitted that efforts to achieve many of these claimed efficiencies were underway long before

5   the WestSound Acquisition took effect—including through the Rainier Health Network

6   ACO—or that alternatives to the WestSound Acquisition exist that could accomplish these

7   efficiencies.

8       **ANSWER:** WestSound denies the allegations of this paragraph.

9   **IX.    SECOND CAUSE OF ACTION (COUNT TWO): THE WESTSOUND
            ACQUISITION**

10

11      103.    The State hereby repeats and realleges each and every allegation of Paragraphs

12  1 through 38, and Paragraphs 75 through 102, as if fully set forth herein.

13      **ANSWER:**   WestSound incorporates its answers and responses to all preceding

14  paragraphs as if fully set forth herein.

15      104.    The WestSound Acquisition has substantially lessened, and is likely to continue

16  to substantially lessen, competition in the relevant market in violation of Section 7 of the

17  Clayton Act, as amended, 15 U.S.C. § 18, and the Washington Consumer Protection Act, RCW

18  19.86.060. This offense is likely to continue and recur unless the following relief is granted.

19      **ANSWER:** WestSound denies the allegations of this paragraph.

20  **X.      PRAYER FOR RELIEF**

21      105.    To remedy these illegal acts, the State requests that the Court:

22          a.      Adjudge and decree on Count One that Defendants Franciscan Health

23                  System, Franciscan Medical Group, and The Doctors Clinic entered into

24                  an unlawful contract, conspiracy, or agreement in unreasonable restraint

25                  of interstate trade and commerce, in the form of the TDC Affiliation, in

---

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 48
(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA 98402
p. 253-328-7800 · f. 253-272-0386

1    violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the

2    Washington Consumer Protection Act, RCW 19.86.030;

3    b.    Adjudge and decree on Count Two that Defendants Franciscan Health

4    System, Franciscan Medical Group, and WestSound Orthopaedics

5    entered into an acquisition, in the form of the WestSound Acquisition,

6    the effect of which may be substantially to lessen competition or tend to

7    create a monopoly, in violation of Section 7 of the Clayton Act, 15

8    U.S.C. § 18, and the Washington Consumer Protection Act, RCW

9    19.86.060;

10   c.    Permanently enjoin and restrain Defendants from continuing to carry out

11   the Kitsap Transactions;

12   d.    Rescind and declare null, void, and unenforceable as contrary to public

13   policy the contracts and agreements that Defendants entered into as part

14   of the Kitsap Transactions;

15   e.    Award to the State, on a joint and several basis, equitable disgorgement

16   or any other equitable monetary relief for the benefit of the State and its

17   consumers as appropriate under federal and state antitrust laws;

18   f.    Award to the State the maximum civil penalties allowed under RCW

19   19.86.140, for Franciscan Health System's, Franciscan Medical Group's

20   and TDC's violations of RCW 19.86.030 as to the TDC Affiliation

21   (Count One);

22   g.    Award to the State its costs and a reasonable attorney's fee; and

23   h.    Award such other and further relief as may be necessary and as the

24   Court may deem just and proper.

25

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 49

(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 • f. 253-272-0386

1
2
3
4
5

**ANSWER:**  WestSound admits the State seeks relief.  WestSound denies that the Complaint states a claim and that the State is entitled to any relief.  WestSound further denies that rescinding and declaring the Kitsap Transactions null, void, and unenforceable is an appropriate or even possible remedy, in that WestSound can neither reconstitute its former business operations or refund the consideration paid in the WestSound Transaction.

6

## AFFIRMATIVE DEFENSES

7
8
9
10
11

WestSound hereby reserves the right to present additional defenses as this matter proceeds, particularly with respect to those defenses presently unknown to WestSound. WestSound hereby asserts the following defenses, without assuming any burden of proof on any issue or relieving the State of its burden to establish each element of its alleged claims.

12

### FIRST DEFENSE

13

The Complaint fails to state a claim upon which relief can be granted.

14

### SECOND DEFENSE

15
16

The WSO Transaction has not and will not substantially lessen competition in the relevant markets in violation of Section 7 of the Clayton Act as amended, 15 U.S.C. § 18.

17

### THIRD DEFENSE

18
19
20

The WSO Transaction will result in substantial merger-specific efficiencies that far outweigh any alleged anticompetitive effects and, as a result of will benefit consumers.

21

### FOURTH DEFENSE

22

The alleged market definitions fail as a matter of law.

23

### FIFTH DEFENSE

24
25

New entry and expansion by competitors can be timely, likely, and sufficient, such that it will ensure that there will be no harm to competition, or consumer welfare.

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 · f. 253-272-0386

1

## SIXTH DEFENSE

2

At the time of the transaction, WestSound would have been unable to meet its financial

3

obligations in the near future, and would not be able to successfully reorganize under Chapter

4

11 of the Bankruptcy Act. WestSound had no reasonable alternatives to the Transaction with

5

CHI Franciscan that would have keep its business operating and its physicians from leaving the

6

market. Without the WestSound Transaction, the assets and physicians of WestSound would

7

have left the relevant market. Accordingly the WestSound Transaction has not and will not

8

substantially lessen competition in the relevant markets.

9

DATED this 30th day of October, 2017.

10

11                                         FAIN ANDERSON VANDERHOEF
                                           ROSENDAHL O'HALLORAN SPILLANE, PLLC
12

13                                         By: s/ Scott M. O'Halloran
                                               Scott M. O'Halloran, WSBA #25236
14                                             Deanna R. White, WSBA #45348
                                               scott@favros.com
15                                             deanna@favros.com

16

17                                         Mitchell D. Raup (pro hac vice)
                                           Herbert F. Allen (pro hac vice)
18                                         Polsinelli PC
                                           1401 I ("Eye") Street, N.W., Suite 800
19                                         Washington, D.C.  20005
                                           Tel: 202-783-3300
20                                         mraup@polsinelli.com
                                           hallen@polsinelli.com
21

22                                         Matthew C. Hans (pro hac vice)
                                           Polsinelli PC
23                                         100 South Fourth Street, Suite 1000
                                           St. Louis, MO  63102
24                                         Tel: 314-889-8000
                                           mhans@polsinelli.com
25

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 51

(CASE NO. 3:17-cv-05690)

732838

FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800 · f. 253-272-0386

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Thomas M. Triplett (*pro hac vice*)
Schwabe, Williamson & Wyatt, P.C.
360 SW Bond Street, Suite 500
Bend, OR 97702
Tel:  541-749-4044
ttriplett@schwabe.com

Matthew Turetsky, WSBA #23611
Schwabe, Williamson & Wyatt, P.C.
1420 Fifth Avenue, Suite 3400
Seattle, WA 98101
Tel: 260-689-1222
mturetsky@schwabe.com

Attorneys for Defendant WestSound
Orthopaedics, P.S.

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 52

(CASE NO. 3:17-cv-05690)

732838

1

**CERTIFICATE OF SERVICE**

2

3

     I hereby certify that on the date below, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

4

5

6

***Counsel for Plaintiff:***
Stephen T. Fairchild
Erica A. Koscher
Assistant Attorneys General
Antitrust Division
Attorney General of Washington
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
stephenf2@atg.wa.gov
ericak@atg.wa.gov

***Pro Hac Vice Counsel for FHS, FMG & WSO:***
Mitchell D. Raup
Herbert F. Allen
Polsinelli PC
1401 I Street NW, Suite 800
Washington, DC  20005
mraup@polsinelli.com
hallen@polsinelli.com

7

8

9

10

11

***Pro Hac Vice Counsel for FHS, FMG & WSO:***
Matthew C. Hans
Polsinelli PC
100 South Fourth Street, Suite 1000
St. Louis, MO  63102
mhans@polsinelli.com

***Counsel for The Doctors Clinic:***
Douglas C. Ross
Davis Wright Tremaine LLP
1201 Third Avenue, Suite 2200
Seattle, WA  98101-3045
douglasross@dwt.com

12

13

14

15

***Counsel for Defendant WestSound Orthopaedics:***
Matthew Turetsky
Schwabe, Williamson & Wyatt, P.C.
1420 Fifth Avenue, Suite 3400
Seattle, WA  98101
mturetsky@schwabe.com

***Pro Hac Vice Counsel for WestSound Orthopaedics:***
Thomas M. Triplett
Schwabe, Williamson & Wyatt, P.C.
360 SW Bond Street, Suite 500
Bend, OR  97702
ttriplett@schwabe.com

16

17

18

19

20

     Signed at Tacoma, Washington this 30th day of October, 2017.

21

22

                  *s/ Deidre M. Turnbull*

23

                  Deidre M. Turnbull
                  Legal Assistant

24

25

ANSWER AND AFFIRMATIVE DEFENSES OF
WESTSOUND ORTHOPAEDICS, P.S. - 53

(CASE NO. 3:17-cv-05690)

732838

**FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE, PLLC**
1301 A Street, Suite 900
Tacoma, WA  98402
p. 253-328-7800  ·  f. 253-272-0386