UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Plaintiff,<br><br>v.<br><br>FRANCISCAN HEALTH SYSTEM, et al.,<br><br>Defendants. | CASE NO. C17-5690 BHS<br><br>ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO STRIKE PLEADINGS |

This matter comes before the Court on the State of Washington's (the "State") motion for partial summary judgment (Dkts. 48, 49) and its motion to strike certain affirmative defenses from Defendants' pleadings (Dkt. 105). The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the file and hereby (1) denies the State's motion for partial summary judgment and (2) grants in part and denies in part the State's motion to strike pleadings.

## I. BACKGROUND

In early September 2016, Defendants Franciscan Health System, Franciscan Medical Group (collectively "Franciscan"), and The Doctors Clinic ("TDC") entered into

a series of agreements. The State claims that Defendants are separate economic entities that entered into an agreement to jointly negotiate the prices for the services they provide to the public. The State asserts that these agreements establish a horizontal price fixing agreement that is *per se* illegal or otherwise constitutes an unreasonable restraint on trade in violation of 15 U.S.C. § 1.

## II. DISCUSSION

**A.    Motion for Partial Summary Judgment**

The State has moved for partial summary judgment on a single element of its claim under 15 U.S.C. § 1. Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the

truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

The issue presently before the Court on summary judgment is whether the State is entitled to a finding as a matter of law that Franciscan and TDC are capable of engaging in a "concerted action" to negotiate reimbursement rates as to qualify as a contract, combination, or conspiracy subject to 15 U.S.C. § 1, or whether they might constitute a single economic unit shielded from scrutiny under § 1. The Court concludes that there remain genuine issues of material fact in this case—whether TDC and Franciscan are separate decision-makers whose conduct is subject to analysis under 15 U.S.C. § 1 is an issue that must be decided at trial.

Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010). In order to state a claim, plaintiff must allege that the defendant (1) engaged in a contract, combination, or conspiracy (2) that unreasonably restrained trade under either a *per se* or rule of reason analysis (3) in a particular market. *American Ad Management, Inc. v. GTE Corp.*, 92 F.3d 781, 784 (9th Cir. 1996).

> The meaning of the term "contract, combination . . . or conspiracy" is informed by the "'basic distinction'" in the Sherman Act "'between concerted and independent action'" that distinguishes § 1 of the Sherman Act from § 2. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 767 (1984) (quoting *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 761 (1984)). Section 1 applies only to concerted action that restrains trade.

*Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010). Therefore, in assessing the first element of a valid 15 U.S.C. § 1 claim, "[t]he key is whether the alleged 'contract, combination . . . , or conspiracy' is concerted action—that is, whether it joins together separate decisionmakers." *Id.* at 195. "Section 1, like the tango, requires multiplicity: A company cannot conspire with itself." *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1147 (9th Cir. 2003) (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984)). Accordingly, "[i]f two erstwhile competitors combine to become a single economic entity—by merger or acquisition, for example— the act of combination may violate the antitrust laws, but their subsequent relations are generally immune from section 1." *Id*. This requirement of multiplicity for the purposes

of finding a §1 contract, combination or conspiracy is sometimes referred to as the "single-entity rule." *See Freeman*, 322 F.3d at 1147.

"Whether corporate entities are sufficiently independent requires an examination of the particular facts of each case." *Williams v. I.B. Fischer Nevada*, 999 F.2d 445, 447 (9th Cir. 1993). The Ninth Circuit has recognized several scenarios in which the single-entity rule precludes liability under 15 U.S.C. § 1:

> It applies to a company and its officers, employees and wholly owned subsidiaries. It also applies to subsidiaries controlled by a common parent, firms owned by the same person, and a firm owned by a subset of the owners of another. It applies to principal-agent relationships and to partnerships or other joint arrangements in which persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit. *The theme in these cases is economic unity.* Where there is substantial common ownership, a fiduciary obligation to act for another entity's economic benefit or an agreement to divide profits and losses, individual firms function as an economic unit and are generally treated as a single entity.

*Freeman*, 322 F.3d at 1147–48 (emphasis added). "The relevant inquiry, therefore, is whether . . . [an] agreement deprives the marketplace of independent centers of decisionmaking, and therefore of diversity of entrepreneurial interests, and thus of actual or potential competition." *Am. Needle, Inc*, 560 U.S. at 195 (citations and quotation marks omitted).

The State argues that TDC's and Franciscan's lack of common ownership alone establishes that they are subject to 15 U.S.C. § 1. Dkt. 49 at 20–22. This is plainly not the case as it ignores the functional analysis to which the Court is obligated to adhere. It has long been established that wholly common ownership results in a "single center of decisionmaking" not subject to 15 U.S.C. § 1. *See Am. Needle, Inc.*, 560 U.S. at 194

(citing *Copperweld Corp.*, 467 U.S. at 769). However, the inverse is not true, as there is no precedent stating that lack of common-ownership per se deprives two legally separate entities of economic unity. Instead, the Supreme Court has expressly stated:

> [C]oncerted action under § 1 does not turn simply on whether the parties involved are legally distinct entities. Instead, we have eschewed such formalistic distinctions in favor of a functional consideration of how the parties involved in the alleged anticompetitive conduct *actually operate*.

*Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 191 (2010) (emphasis added). Emphasizing this functional type of analysis, the Sixth Circuit has recognized that "[t]he question cannot be answered in the abstract as to whether a joint venture [between hospitals] constitutes a single entity incapable of conspiring with itself in an anticompetitive manner, or whether, instead, it becomes a vehicle to facilitate separate entities to conspire illegally to restrain trade." *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 817 F.3d 934, 937 (6th Cir. 2016). Accordingly, the Sixth Circuit in *Med. Ctr. at Elizabeth Place* held that, read in the light most favorable to the plaintiff, the functional relationship between defendant hospitals and the unity of their economic interests was a genuine dispute of material fact. *Id.* at 945 ("[A] reasonable juror might conclude that, aside from a business relationship pursuant to the joint operating agreement, defendant hospitals maintained separate identities and acted more like competitors than one unit.").

Similarly, the unity of TDC's and Franciscan's economic interests and centers of decisionmaking remain a question of fact in this case. Competing testimony has been submitted regarding the extent to which Franciscan is authorized to or actually does exert

control over the operations of TDC through the implementation and enforcement of Franciscan policies and standards. Unlike in *American Needle*, in which professional football teams retained relatively exclusive control over the majority of their regular competitive operations and participated with an even level of control in the joint venture, this case presents a more asymmetrical relationship in which a larger competitor appears to gain a stake in and significant control over a smaller competitor, potentially unifying their economic interest into a single center of financial decisionmaking.

Under the Asset Lease Agreement between TDC and Franciscan, Franciscan is leasing all of TDC's assets with the exception of a few specific exclusions, such as corporate seals, minute books, charter documents, accounts receivable prior to the effective date of employee benefit plans, personal property of the physicians and employees, etc. *See* Dkt. 40-1 at 3–4. At the termination or expiration of the agreement, the lease appears to convert to a purchase, and Franciscan will own all tangible assets under the lease at the time of the effective date, and may purchase any other subsequently obtained tangible assets for their original cost less depreciation. *Id.* at 12. Intellectual property will remain the property of TDC. *Id.* at 12–13. Additionally, under an Asset Purchase Agreement, Franciscan outright purchased TDC's ambulatory surgical facility and imaging and laboratory services. *See* Dkt. 108-3 at 10. The Management Services Agreement then charges TDC with providing all of the management services necessary to operate the medical clinics in accordance with industry standards, the annual budget, and numerous Franciscan policies and standards. Those standards include (1) "CHI's Standards and Guidelines pertaining to third party collections procedures;" (2) using the

most cost effective resources for supply-chain functions; (3) providing regular accountings of "work Relative Value Unit" ("wRVU") amounts in a format and level of detail reasonably acceptable to Franciscan; (4) enrollment of medical clinics with Medicare; (5) ensuring that all equipment and the facilities are well-maintained; (6) "[a]dministration of [Franciscan] policies and recommending policies for adoption by [Franciscan]; (7) managing health information in accordance with Franciscan policies and processes; (8) implementing Franciscan corporate responsibility policies; (9) participating in Franciscan business development; (10) "support[ing] Franciscan enterprise-wide development and growth;" and (11) participating in Franciscan quality and risk management initiatives. Dkt. 50-17 at 25–26. Under the Management Services Agreement, TDC, including any shareholder, partner, or member, is barred from providing similar services to a competitor of Franciscan within a geographic region of competition absent Franciscan's express consent. Dkt. 50-17 at 15–16.

The Professional Services Agreement provides that TDC must satisfy the following types of requirements in delivering professional medical services: (1) TDC must be legally qualified to provide the professional services required by the agreement and ensure that its physicians enter into a joinder agreement; (2) TDC's medical providers must be qualified, properly licensed, and possess the necessary privileges to perform their professional services; (3) TDC must provide services in accordance with "Franciscan policies, procedures and expectations, including but not limited to, those pertaining to quality of care, patient satisfaction, provider engagement and provider collegiality;" (4) TDC must ensure its physicians perform "Medical Director Services"

and "Additional Services" according to "applicable Franciscan policies and procedures"; (5) TDC and its providers must provide services exclusively on behalf of Franciscan, with the exception that providers may perform outside of the Franciscan "system" that are prohibited at Franciscan facilities under the Ethical and Religious Directives of the Catholic Church; and (6) TDC must refrain from soliciting any of Franciscan's patients or employees. Dkt. 50-16 at 5–9.

The Professional Services Agreement gives control to Franciscan over whether TDC may hire any new healthcare providers, including physicians or "advanced practice clinicians," by requiring Franciscan's written consent. Dkt. 50-16 at 7. Also, Franciscan may unilaterally determine that an additional provider in a given specialty is needed within the applicable hospital's service area and extend TDC financial assistance for recruitment. *Id.* On the other hand, the Management Services Agreement states that TDC will "recruit, hire, discharge, establish the terms of employment, train, orient, supervise and manage, or otherwise retain the services of all non-clinical and clinical personnel working at the Medical Clinics, other than physicians or other applicable individuals under the PSA." Dkt. 50-17 at 6.

In return for the professional services provided by TDC and its providers, Franciscan is obligated to compensate TDC. Dkt. 50-16 at 11–12. Under the compensation structure, Franciscan pays TDC for professional services at a rate equal to 86.5% of the rate Franciscan would pay its own care providers in corresponding specialties for completed wRVUs. *Id.* at 28–29. This rate is subject to annual reconciliation to the extent that the rate results in actual compensation to TDC that

exceeds or falls short of 90% of the amounts earned by comparable Franciscan providers in the aggregate. *Id.* Additionally, Franciscan pays TDC the full sum of TDC's employer share under the Federal Insurance Contributions Act for social security and Medicare deductions, as well as 90% percent of the amount that Franciscan would provide its own employees in comparable positions for health and retirement benefits. *Id.* at 29–30. In turn, TDC is singly responsible for compensating its providers. *Id.* at 13–14. While Franciscan compensates TDC for healthcare professional services at approximately 90% the rate it would pay its own physicians, Franciscan is exclusively in control of setting all billing and fee amounts and negotiating contracts with payors. Dkt. 50-16 at 12.

Additionally, under the Management Services Agreement, Franciscan provides TDC with funds pursuant to an annual budget for operating costs negotiated between the parties. Dkt. 50-17 at 11. "[Franciscan] shall have final authority to approve any items on the annual budget to the extent such items are not included [in the agreed budget parameters]." *Id.* "It is the sole and absolute responsibility of TDC to operate within the Budget . . . . [Franciscan] and TDC management shall meet monthly to review operations, adherence to the Budget, and other matter as deemed necessary by either Party." *Id.* Franciscan is also required to compensate TDC each month with a "management fee" equal to 3% of the monthly budget. Dkt. 50-17 at 10, 28. However, if TDC exceeds the budget in an amount greater than the management fee, TDC must forfeit the management fee and then reimburse Franciscan for half of all additional excess costs. Dkt. 50-17 at 28.

Beginning in the third year of the parties' contractual relationship, with one year's notice, the agreement between Franciscan and TDC is terminable without cause. Dkt. 50-16 at 14. The parties may terminate the agreements immediately for cause. *Id.* at 14–15. If the agreements are terminated, noncompete provisions prohibit the group or any of its physicians from "directly or indirectly participat[ing] in the provision of professional medical services or related administrative services" for a practice with greater than five physicians within the restricted geographic area of competition. Dkt. 50-16 at 8–9. These noncompete conditions do not apply if TDC terminates the agreements for cause. *Id.* at 9.

Considering these agreements alone, there is a legitimate argument to be made that TDC and Franciscan are a single economic unit for the purposes of 15 U.S.C. § 1. TDC retains much control over the details of its day-to-day operations, but almost all of TDC's business appears to generate greater revenues for Franciscan. While TDC retains much control of its day-to-day decisions, the agreements require that the management and professional services delivered by TDC satisfy standards established by Franciscan that bring TDC into conformance with expectations associated with the Franciscan brand. Moreover, some important decisions that involve "big picture" type concerns are reserved for Franciscan, such as whether an additional healthcare provider is needed in any particular specialty or whether any additional providers may be hired. Essentially, while TDC retains wide latitude in controlling the logistics behind how it delivers services on behalf of Franciscan, Franciscan appears to possess the authority to control the standards surrounding the patients' experience and provides TDC with all of its budget and income. If TDC fails to operate within the established budget, the Management Services

Agreement indicates that TDC and Franciscan share any risk associated with TDC's operating failures beyond the forfeiture of TDC's management fee.

The Professional and Management Services Agreements also prohibit TDC or its healthcare providers from competing with Franciscan for patients or employees, or from providing any services to competitors, with the exception of services or procedures that Franciscan does not provide in light of its ethical directives. TDC and its providers are to work exclusively on behalf of Franciscan, with the exception of a few specific carve-outs for individual health care providers and services that do not compete with those offered by Franciscan. Furthermore, construing this evidence in the light most favorable to Defendants, under the terms of the contracts, it could appear to a reasonable person that Franciscan has contracted for all of TDC's healthcare services to be packaged and offered under Franciscan's name, as well as ultimate control and decisionmaking of the standards involved with such services.

Nonetheless, there is also evidence that TDC and Franciscan continue to compete for patients. It appears that if a patient receives services from TDC, Franciscan will not see the same revenue as if the patient went to a provider employed by Franciscan. There is also substantial evidence that there remains a potential for future competition if TDC and Franciscan end their agreement. While the noncompete provision of TDC's and Franciscan's agreements by default prohibit TDC or its providers from providing health services within the geographic region for a full year after the agreements' expiration or termination, the provision also allows that Franciscan may nonetheless authorize TDC or any physician to continue providing of medical services. Nothing in the agreement

appears to prohibit TDC from again competing with Franciscan after that year expires. Further, the Asset Lease Agreement uses permissive rather than mandatory language to describe Franciscan's right to purchase TDC's tangible assets at the termination or expiration of the lease, with the only exception being an obligation to purchase leasehold improvements, which indicates that all assets may revert to TDC after the expiration or termination of the agreements. Dkt. 40-1 at 12.

TDC's and Franciscan's agreements could also be construed to indicate that they remain independent financial decisionmakers. The Management Services Agreement expressly describes TDC as an independent contractor, not as an employee or agent. Dkt. 50-17 at 19. While TDC's increased revenues appear to directly increase the revenues of Franciscan, TDC and Franciscan retain separate corporate books and records (*see* Dkt. 40-1 at 4) and, at the end of the day, their respective profits "don't all wind up under the same corporate mattress." *Freeman*, 322 F.3d at 1149. Also, the Management Services Agreement states: "It is the expectation of [Franciscan] as expressed in this agreement, that TDC will continue to maintain oversight and ongoing operations for its office, clinics and other service locations as mutually agreed upon by TDC and [Franciscan]." Dkt. 50-17 at 26. This indicates that TDC retains significant control over its business and practices—although even under this provision, TDC's oversight of its own operations as an independent contractor appears subject to mutual agreement by Franciscan.

Additionally, the agreements are designed to divide and assign certain risks between TDC and FMG rather than to share them. For instance, Franciscan has shifted the risk that payors will not reimburse TDC for a particular procedure by stating that

Franciscan must only compensate TDC for "reimbursable" services. *See* Dkt. 50-16 at 28 ("[Franciscan] will compensate [TDC] for posted, Reimbursable Professional Services personally performed by the Providers . . . ."). Similarly the parties are separately liable for the negligence or misconduct of their agents or employees. *Id.* at 19. Of course, even in the context of a wholly owned subsidiary, which is unequivocally not subject to the analysis of 15 U.S.C. § 1, the entity's legally separate status can appropriately be invoked to shield the parent from tort liability.

Numerous statements in depositions and discovery responses signal contrary views on the functional relationship between Franciscan and TDC. On one hand, Franciscan officers indicate that Franciscan exercises ultimate control over TDC's budget, Dkt. 109 at 2, and that Franciscan can exert control over all of TDC's significant business decisions, *see* Dkt. 110. On the other hand, some evidence paints the image of a relationship that "allow[s] [TDC providers] to maintain [their] identity as TDC, choose who [they] want to join [their] group, and take care of [their] patients the way that [they] would like. The only concrete downside is that care that [they] deliver is going to cost [their] patients and their insurance companies more." Dkt. 50-12 at 2.

The Court finds that the functional relationship and economic unity between TDC and Franciscan remains a disputed question of fact that must be resolved at trial. Regardless of the demonstrated strength of the State's argument, its motion for summary judgment must be denied in light of the competing evidence described above.

## B. Motion to Strike Expert Testimony

The State has moved to strike testimony provided by Kevin M. Kennedy. Mr. Kennedy's testimony was cited by TDC and Franciscan to argue that a genuine dispute of material fact exists to prelude summary judgment on the legal issue discussed above. To the extent the testimony of Mr. Kennedy is offered as an expert opinion that Franciscan and TDC are a single economic unit, the Court agrees with the State that the testimony fails to satisfy the admissibility requirements of Fed. R. Evid. 702.

Whether "CHI [Franciscan] and TDC operate as a single economic entity" is a question to be assessed by examining the underlying facts surrounding the entities' financial and functional relationship. Mr. Kennedy may be qualified to testify as to the typicality of the type of agreement between Franciscan and TDC in the healthcare industry at large. However, while his factual analysis of the relationship between TDC and Franciscan as it relates to industry standards may be admissible, Mr. Kennedy's opinion on the legal interpretation of whether that relationship constitutes a principal-agent relationship, a single economic unit, or a "contract, combination . . . or conspiracy" for the purposes of 15 U.S.C. § 1 is unhelpful to the trier of fact. As it is presented in his report, Mr. Kennedy's assertions appear to be mere legal conclusions based on a one-sided interpretation of Defendants' relationship. The existence of a principal-agent relationship is generally a question of law. Because such opinions would fail to offer any help to the trier of fact beyond suggesting an interpretation of the law, they are inadmissible. *See Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996) (stating that "[e]xpert testimony is not proper for issues of law" because the role of

experts is to interpret and analyze factual evidence and not to testify about the law); *Maffei v. Northern Ins. Co. of New York*, 12 F.3d 892, 898–99 (9th Cir. 1993) (holding that an insurance expert's declaration that sulphur dioxide cloud constituted a "hostile fire" as described in insured's policies was improper expert testimony); *Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992) ("[M]atters of law . . . [a]re inappropriate subjects for expert testimony").

While proffered expert testimony is not inadmissible simply because it "embraces" an ultimate issue, *see* Fed. R. Evid. 704, "an expert cannot testify to a matter of law amounting to a legal conclusion." *United States v. Tamman*, 782 F.3d 543, 552 (9th Cir. 2015). Accordingly, the Court has considered the testimony of Kevin Kennedy only to the extent that it discusses the use of agreements such as those between Franciscan and TDC in the healthcare industry at large. Insofar as his testimony opines on the legal classification of Franciscan's and TDC's affiliation, such testimony has not been considered.

**C.     Motion to Strike Affirmative Defenses**

The State has also moved to strike numerous affirmative defenses from Defendants' answer. "The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Under this rule, a court may grant a motion to strike if a defense "is insufficient as a matter of law." *FDIC v. Crosby*, 774 F. Supp. 584, 585 (W.D. Wash. 1991). "An affirmative defense is insufficient if as a matter of law it cannot succeed under any circumstances." Id. at 586. Rule 12(f) exists to help "avoid the expenditure of time and money that must

arise from litigating spurious issues by dispensing with those issues prior to trial." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010).

First, the State moves to strike Franciscan's first and fifth affirmative defenses, as well as TDC's first, fourth, and sixth affirmative defenses. Dkt. 105 at 2–6. In response, Franciscan and TDC concede that these are not true affirmative defenses, and voluntarily withdraw them. Dkt. 115 at 1–2. However, TDC and Franciscan contest the State's motion to strike their tenth affirmative defense, which asserts:

> TDC was as of the date of the transaction with CHI Franciscan a failing company. But for the transaction, TDC would have gone out of business, and its productive assets (including its physicians) would have left the market. Alternatively, even if TDC, or some of its physicians, could have stayed in the market without the transaction, its competitive significance would have been far less than it was before the transactions.

Dkt. 89 at 48. *See also* Dkt. 88 at 49. The State argues that the first two sentences of this defense constitute an affirmative "failing-company defense" that is inapplicable to claims under 15 U.S.C. § 1 while TDC and Franciscan argue that the defense is available for claims under 15 U.S.C. § 1. The Court agrees with the State and strikes this affirmative defense.

The failing-company defense "applies only if the resources of the acquired corporation are so depleted and the prospect of rehabilitation so remote that it faces the grave probability of a business failure." 58 C.J.S. *Monopolies* § 115. *See also Citizen Pub. Co. v. United States*, 394 U.S. 131, 138 (1969). "The burden of proving that the conditions of the failing company doctrine have been satisfied is on those who seek refuge under it." *Citizen Pub. Co.*, 394 U.S. at 138–39. The failing-company doctrine has

been applied successfully only in the context of 15 U.S.C. § 18. Indeed, its mention is often accompanied in the same breath by its qualification as an exception to 15 U.S.C. § 18. *See, e.g.*, *United States v. Greater Buffalo Press, Inc.*, 402 U.S. 549, 555 (1971) ("We also disagree with the District Court that the acquisition of International by Greater Buffalo was within the 'failing company' exception to § 7 of the Clayton Act.").

The judicially created affirmative defense is appropriate in the context of 15 U.S.C. § 18 because such claims are focused on a test of whether the effect of an acquisition "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18; *See Int'l Shoe Co. v. Fed. Trade Comm'n*, 280 U.S. 291, 302–03 (1930). "[T]he rationale of the failing-company defense is the lack of anticompetitive consequence if one of the combining companies was about to disappear from the market at any rate . . . ." *U. S. v. Gen. Dynamics Corp.*, 415 U.S. 486, 523 (1974). In contrast, the test of 15 U.S.C. § 1 examines the existence of an "unreasonable restraint on trade" under either the rule of reason or per se test, a different concern than the substantial lessening of competition presented under the Clayton Act. An alleged scheme of horizontal price-fixing, as alleged by the State, falls into the narrow category of arrangements that are per se illegal—"they are not evaluated in terms of their purpose, aim or effect in the elimination of so-called competitive evils." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 228 (1940); *see also Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). While an acquisition subject to analysis under the Clayton Act might be justified to keep the resources of a failing company from leaving the market altogether by reorganizing them under the control of a successful business, "the Sherman Act does not permit a failing

enterprise to be buoyed up with an illegal agreement to restrain trade." *Linseman v. World Hockey Ass'n*, 439 F. Supp. 1315, 1322 (D. Conn. 1977). If an entity is indeed faced with imminent and certain failure, then some form of acquisition by a successful former competitor may be an appropriate solution to preserve the failing company's resources in the relevant market; but that does not justify allowing the failing business continue operating through a price-fixing restraint on trade.

Finally, the Court notes that the State raises the issue of striking Defendants' "weakened competitor" defense in its reply brief, but offered no substantive basis for striking that defense in its motion. *See* Dkt. 105; Dkt. 121 at 7. At first it blush, it seems apparent that such a defense is irrelevant in this case for the same reason as the failing-company defense. However, the Court will not consider issues raised for the first time in a reply brief. To the extent the State presently seeks to strike Defendant's "weakened competitor" defense, the request is denied without prejudice.

### III.  ORDER

Therefore, it is hereby **ORDERED** that the State's motion for summary judgment (Dkts. 48, 49) is **DENIED**; its initial motion to strike certain affirmative defenses from Defendants' pleadings (Dkt. 105) is **GRANTED;** and its request to strike Defendant's "weakened competitor" defense (Dkt. 121 at 7) is **DENIED**.

Dated this 24th day of July, 2018.

BENJAMIN H. SETTLE
United States District Judge