The Honorable Benjamin H. Settle

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

STATE OF WASHINGTON,

                              Plaintiff,

        v.

FRANCISCAN HEALTH SYSTEM d/b/a CHI
FRANCISCAN HEALTH; FRANCISCAN
MEDICAL GROUP; THE DOCTORS CLINIC,
a Professional Corporation; and WESTSOUND
ORTHOPAEDICS, P.S.,

                              Defendants.

No. 3:17-cv-05690-BHS

**DECLARATION OF DAVID MASS
IN SUPPORT OF DEFENDANTS'
MOTION TO EXCLUDE
TESTIMONY OF PLAINTIFF'S
EXPERT DANIEL KESSLER**

**NOTE ON MOTION CALENDAR:
January 18, 2019**

1.      I, David A. Mass, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.      I am one of the attorneys representing The Doctors Clinic ("TDC") in this action.  I have personal knowledge of the facts set forth in this declaration.

3.      Attached as Exhibit 1 is a copy of the initial Complaint filed in *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.,* Case No. 1:12-cv-00560-CWD [Dkt. 1].

4.      Attached as Exhibit 2 is the Third Amended Complaint filed in *Omni Healthcare, Inc. v. Health First, Inc.*, Case No. 13-CV-1509, [Dkt. 57].

MAAS DECL. ISO MOT. TO EXCLUDE KESSLER TETIMONY
(3:17-cv-05690-BHS) - 1
4834-6977-3956v.1 0090560-000003

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

5.      Attached as Exhibit 3 are true and correct copies of the initial Expert Report of expert witness for Plaintiff, Daniel Kessler.

6.      Attached as Exhibit 4 are true and correct copies of the Reply Report of expert witness for Plaintiff, Daniel Kessler.

7.      Attached as Exhibit 5 is a true and correct copy of excerpts of Dr. Daniel Kessler deposition taken December 9, 2018.

8.      Attached as Exhibit 6 is a true and correct copy of excerpts of Dr. Corey Capps deposition taken December 4, 2018.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 21st day of December, 2018.

*/s/ David A. Maas*
Davis A. Mass, WSBA# 50694

MAAS DECL. ISO MOT. TO EXCLUDE KESSLER TETIMONY
(3:17-cv-05690-BHS) - 2
4834-6977-3956v.1 0090560-000003

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

# Exhibit 1

Keely E. Duke
ISB 6044;ked@dukescanlan.com
Kevin J. Scanlan
ISB 5521; kjs@dukesanlan.com
Duke Scanlan & Hall, PLLC
1087 W. River Street, Suite 300
Boise, ID 83707
Telephone: (208) 342-3310
Facsimile:(208) 342-3299

David Ettinger *(pro hac application pending)*
Peter E. Boivin *(pro hac application pending)*
dettinger@honigman.com;
pboivin@honigman.com
Honigman Miller Schwartz and Cohn LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
Telephone (313) 465-7368
Facsimile (313) 465-7397

*Attorneys for Saint Alphonsus Medical Center-Nampa, Inc., Saint Alphonsus Health System, Inc., and Saint Alphonsus Regional Medical Center, Inc.*

Jason S. Risch
ISB 6655; jrisch@rischpisca.com
Risch Pisca, PLLC
407 W. Jefferson
Boise, ID 83702
Telephone (208) 345-9929
Facsimile (208) 345-9928
*Attorneys for Treasure Valley Hospital*

## UNITED STATES DISTRICT COURT

## IN THE DISTRICT OF IDAHO

| | |
|---|---|
| SAINT ALPHONSUS MEDICAL CENTER - NAMPA, INC., TREASURE VALLEY HOSPITAL LIMITED PARTNERSHIP, SAINT ALPHONSUS HEALTH SYSTEM, INC., AND SAINT ALPHONSUS REGIONAL MEDICAL CENTER, INC. <br><br> Plaintiffs, <br> v. <br><br> ST. LUKE'S HEALTH SYSTEM, LTD. <br><br> Defendant. | Case No. _____ <br><br> **COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES** |

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-1

## INTRODUCTION

1.     This case is being filed to preliminarily and permanently enjoin the latest, and most significant, in an unprecedented wave of acquisitions by St. Luke's Health System, Ltd. ("St. Luke's"). St. Luke's actions threaten to monopolize a broad series of markets in Idaho, further increase health care costs and reduce health care quality.

2.     St. Luke's has acquired more than 20 physician practices, 5 hospitals and 4 outpatient surgery centers in the last several years, gaining a dominant position in a series of health care markets. St. Luke's is now poised to acquire Saltzer Medical Group ("Saltzer"), the largest and oldest physician practice in Idaho. If St. Luke's is permitted to successfully acquire Saltzer, the public, Plaintiffs Saint Alphonsus Medical Center - Nampa, Inc. ("Saint Alphonsus Nampa"), Treasure Valley Hospital Limited Partnership ("Treasure Valley Hospital"), Saint Alphonsus Health System, Inc. and Saint Alphonsus Regional Medical Center, Inc., (together "Saint Alphonsus") (together "Plaintiffs"), and health care competition in Idaho and eastern Oregon, will be seriously and irreparably injured, in, among others, the following ways:

    a.     St. Luke's will gain a near monopoly share in the Nampa, Idaho market for adult primary care physician services market. It will continue its practice of foreclosing virtually all competition for the hospital admissions of the physician practices it acquires.

    b.     St. Luke's will possess an irreplaceable network of hospitals and physicians, that will allow it to raise prices beyond competitive levels.

    c.     Most urgently and irreparably, St. Luke's acquisition of Saltzer will deal a crippling financial blow to Saint Alphonsus Nampa hospital, which depends on

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-2

the admissions from the Saltzer physicians.  The acquisition will likely cause the loss of more than 140 jobs and the reduction or termination of key services.  Since Saint Alphonsus Nampa is a critical "safety net" hospital for the poor, uninsured and underserved of Nampa, such actions will create devastating consequences for the Nampa community.

d.     The acquisition will also irreparably harm Treasure Valley Hospital, which provides high quality, low cost care to the Boise area community.  More than 40% of Treasure Valley Hospital's inpatient and outpatient cases are performed by Saltzer physicians.  If St. Luke's acquires Saltzer, Treasure Valley Hospital would likely need to lay off 10% of its staff and cancel, or delay, planned capital improvements.  These planned improvements include an increase in the number of operating rooms, a new CT scanner, and improvements in its electronic medical records system.  These layoffs, delays and cancellations would have serious negative consequences on the quality of health care in the area.

e.     The transaction will irreparably harm all the Plaintiffs, because it will provide St. Luke's with a greater ability to obtain exclusive or preferential treatment from payors and employers, disrupt Plaintiffs' provider networks offered to managed care and employers, and thereby interfere with the relationships between Plaintiffs on the one hand and payors and employers on the other.  This anticompetitive interference will obstruct the ability of consumers and patients to benefit from competition for the highest quality product at the best price.

3.     St. Luke's actions, including the pending Saltzer acquisition, are the subject of a pending antitrust investigation by the Federal Trade Commission and Idaho Attorney General.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-3

The Idaho Attorney General has repeatedly requested that St. Luke's hold its transaction in abeyance so that the investigation can continue. In a letter dated November 8, 2012, Deputy Attorney General of Idaho stated to St. Luke's counsel that St. Luke's actions are "counter-productive" and "would appear designed to invite litigation":

> "As you know, the Attorney General earlier wrote St. Luke's and asked that it hold off on closing its purchase of Saltzer pending his review of this acquisition. He later sent a similar letter to Saltzer. In August, our office served your client and Saltzer with CIDs to obtain relevant information regarding the transaction. The present incomplete status of the production greatly hampers our ability to review this transaction and determine whether it complies with the Idaho Competition Act. To proceed to close under such circumstances is not constructive and counter-productive. Indeed, such a strategy would appear designed to invite litigation."

See Ex. A.

On November 6, 2012, an attorney for the Federal Trade Commission who has been investigating St. Luke's activities stated that the FTC is "focusing on the Saltzer investigation," because "there has been some indication … in the press, that the parties intend to close this transaction soon; and therefore the FTC is accelerating its investigation of that particular transaction." Nevertheless, St. Luke's is preparing to defy antitrust authorities and to imminently complete the transaction before the FTC or Attorney General act. Plaintiffs are forced to proceed in order to prevent immediate and irreparable injury.

4.      This injury can only be avoided by the issuance of an injunction temporarily prohibiting this transaction pending a trial on the merits.

## THE PARTIES

5.      Plaintiff Saint Alphonsus Medical Center – Nampa, Inc. ("Saint Alphonsus Nampa") is a not-for-profit corporation organized under and by virtue of the laws of Idaho.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-4

Saint Alphonsus Nampa is headquartered in Nampa, Idaho. Saint Alphonsus Nampa is part of the Saint Alphonsus Health System.

6.     Saint Alphonsus Nampa has operated in Nampa (under this and other names) since 1917. It is a critical "safety net" hospital for the Nampa community. Twenty-five percent of its emergency room patients are uninsured. Half of Saint Alphonsus Nampa births are delivered by physicians at the Terry Reilly Clinic, which is devoted to serving the poor and uninsured. The hospital's percentage of bad debt and charity care is twice the national average and twice as high as any other hospital in the Treasure Valley.

7.     Saint Alphonsus Nampa (formerly Mercy Medical Center) was acquired by Saint Alphonsus Health System in 2010. Saint Alphonsus has invested many millions of dollars to improve the Nampa hospital's services and facilities. This effort has been very successful, and Saint Alphonsus Nampa has continually improved its quality and efficiency. For example, Saint Alphonsus Nampa has won many recent awards for its quality. It has been ranked number one in Idaho for coronary interventional procedures, gastrointestinal services and medical treatment. It has also been ranked among the top five hospitals in Idaho for critical care and joint replacement. The hospital has received five-star ratings for coronary interventional procedures, treatment of heart attack, total hip replacement, treatment of gastrointestinal bleeding, sepsis and pulmonary embolisms. In 2012, it won a HealthGrades patient safety excellence award. Saint Alphonsus Nampa has also improved its service to patients and physicians by substantially reducing waiting time in the emergency room, by reducing operating room turnaround time, and by improving information systems.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-5

8.     Saint Alphonsus Nampa currently has plans to expand the hospital at a new location on the I-84 freeway, with a new emergency department, heart care center and obstetrics unit.  It is also planning significant renovation and facility enhancement to its main campus.

9.     Plaintiff Treasure Valley Hospital Limited Partnership, doing business as Treasure Valley Hospital, ("TVH") is a 9-bed physician-owned, short–term care, non-emergency hospital in Boise, Idaho.  TVH offers both inpatient and outpatient services.  It also offers a full-service laboratory and imaging services, including high field MRI, Multi-Slice CT scanning, Ultrasound, and X-Ray services.

10.    TVH provides high quality, low cost health care.  By nationally recognized measures of quality gathered by the federal government at www.hospitalcompare.hhs.gov, TVH has the best quality measures of all of the hospitals in the Treasure Valley.  TVH is first among the local hospitals in each of the 10 categories listed by the government on that site.  TVH's percentage score in each of these 10 categories is 15 or more percentage points higher than that of the next closest hospital.

11.    Plaintiff Saint Alphonsus Regional Medical Center, Inc. ("Saint Alphonsus Boise") is a not-for-profit corporation, organized under and by virtue of the laws of Idaho, and headquartered in Boise, Idaho.  It operates a licensed medical-surgical/acute care 381-bed facility that serves as the center for advanced medicine in its community.

12.    Saint Alphonsus Boise is Idaho's only nationally-ranked Trauma, Chest Pain and Primary Stroke Center, and is a 4-time HealthGrades Distinguished Hospital for Clinical Excellence recipient, ranking it among the top 5% of hospitals nationwide.

13.    Plaintiff Saint Alphonsus Health System, Inc. ("Saint Alphonsus") is a not-for-profit corporation organized under and by virtue of the laws of Idaho.  Saint Alphonsus is

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-6

headquartered in Boise, Idaho. Saint Alphonsus owns and operates medical centers serving the full range of the health and wellness needs of the people in southwestern Idaho, eastern Oregon and northern Nevada. Saint Alphonsus owns four hospitals located in Idaho and Oregon: Saint Alphonsus Regional Medical Center – Boise; Saint Alphonsus Medical Center – Nampa; Saint Alphonsus Medical Center – Ontario; and Saint Alphonsus Medical Center – Baker City.

14.     Defendant St. Luke's Health System, Ltd. ("St. Luke's") is a not-for-profit health system organized under and by virtue of the laws of Idaho. St. Luke's, which is headquartered in Boise, Idaho, owns and operates six hospitals: St. Luke's Boise, a 399-bed hospital in Boise; St. Luke's Meridian, a 167-bed hospital in Meridian; St. Luke's Magic Valley, a 228-bed hospital in Twin Falls; St. Luke's Wood River, a 25-bed hospital in Ketchum; St. Luke's Jerome, a 25 bed hospital in Jerome; St. Luke's McCall, a 15 bed hospital in McCall, and more than 100 outpatient centers and clinics throughout central and southwest Idaho and eastern Oregon. St. Luke's also has a "joint partnership" with North Canyon Medical Center in Gooding, Idaho.

15.     The Boise metropolitan area or "Treasure Valley" consists of two counties, Ada (containing the city of Boise, and the towns of Meridian, Kuna, Star, and Eagle) and Canyon (containing the towns of Nampa, Middleton, and Caldwell). There are three hospitals in Ada County, SARMC and TVH in Boise, and St. Luke's with campuses in Boise and Meridian. There are also two hospitals in Canyon County, Saint Alphonsus Nampa and West Valley Medical Center ("West Valley") in Caldwell. St. Luke's share of hospital inpatient hospital services in Ada and Canyon counties combined is approximately 58%. Saint Alphonsus and TVH have an approximate 34.7% share and 0.5% share, respectively. West Valley's share is approximately 6.8%.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-7

## SALTZER MEDICAL GROUP

16.     Saltzer is a physician-owned multispecialty group with its principal place of business located in Nampa, Idaho.  Saltzer is the largest, physician-owned, multispecialty group in Idaho with physicians in at least 12 specialties.  Saltzer employs all of the internists in Nampa, all but one of the pediatricians, and all of the rheumatologists.  Most of these physicians are primarily based at Saltzer's main facility in Nampa, Idaho.  Saltzer provides outstanding medical care, and has a leading reputation in the Nampa community.  Saltzer prides itself on the loyalty of its patients, many of whom are in the third generation of families treated by Saltzer.  Past studies commissioned by Saltzer indicate that it is at the 90th percentile or higher among physicians in terms of patient satisfaction.

17.     Saltzer faces very little competition in the Nampa area, where it is based, and where most of its physicians practice.  More than three-quarters of Saltzer's patients come from the city of Nampa.

18.     Saltzer's dominance in Nampa is even greater than its number of physicians would suggest.  Its physicians tend to see significantly more patients than the typical physician per doctor in the area.

19.     Patients in the Nampa area have always demanded Saltzer in their payor network.  For example, when Saint Alphonsus acquired what was then Mercy Hospital in Nampa, its employees became self-insured under the Saint Alphonsus network.  That network did not include Saltzer because Saint Alphonsus did not previously have employees in the Nampa area.  The employees immediately demanded that Saltzer physicians be added to their network.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-8

20. Similarly, when the St. Luke's network sought to provide coverage for JR Simplot, which has a significant number of employees in the Nampa area, Simplot demanded that the network include Saltzer.

21. The Saltzer primary care physicians refer almost all of their specialty cases to Saltzer specialists, where Saltzer has a specialist in the relevant field. The Saltzer specialists receive the vast majority of their cases from Saltzer primary care physicians.

22. Saltzer's main office is located across the street from the Saint Alphonsus Nampa campus. Saint Alphonsus Nampa has always depended very heavily on admissions from Saltzer physicians and from the Saltzer patients not technically admitted by Saltzer physicians, but referred to hospitalists at Saint Alphonsus Nampa. Saltzer patients are critical to the financial viability of Saint Alphonsus Nampa, both because of their volume and the fact that they are more heavily weighted to (more lucrative) commercially insured patients than the hospital's overall patient base. Saint Alphonsus Nampa is able to afford to treat the poor, uninsured and Medicaid population (on whom it loses money) because of more profitable commercially insured admissions through physicians such as Saltzer.

23. TVH also relies heavily on Saltzer for its cases. More than 40% of its inpatient and outpatient cases have been performed historically by Saltzer physicians.

## JURISDICTION AND VENUE

24. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-9

25.     St. Luke's transacts business in the District of Idaho and is subject to personal jurisdiction therein.  The actions complained of herein took place in this district.  Venue is proper in this district pursuant to 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391.

### TRADE AND COMMERCE

26.     St. Luke's is engaged in interstate commerce and in activities substantially affecting interstate commerce.  Hundreds of millions of dollars (and close to a majority) of St. Luke's, Saint Alphonsus' and TVH's revenues come from sources located outside of Idaho, including payments from the federal government through such programs as Medicare and payments from out of state commercial payors such as Coventry, Aetna and United Healthcare. This includes payments for both hospital and physicians' services.  St. Luke's and Saint Alphonsus borrow at least tens of millions of dollars from lenders in interstate commerce, through their bond offerings.  Moreover, St. Luke's sells medical services in interstate commerce, and its conduct has an effect on the citizens of several states.  St. Luke's activities at issue include activities in Oregon, where it owns and operates medical facilities.  Both St. Luke's and Saint Alphonsus treat a substantial number of patients from other states, including in particular eastern Oregon.  The parties hereto expend millions of dollars on the purchase of supplies in interstate commerce.

27.     As a result of the fact that much of St. Luke's, Saint Alphonsus' and TVH's revenues come from sources located outside of Idaho, including payments from out of state commercial payors, the increases in the market power of St. Luke's, and weakening of Saint Alphonsus and TVH, described herein, will substantially affect the prices and rates negotiated with the commercial payors and, therefore, substantially affect the parties' revenues in interstate

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-10

commerce. Such actions will also substantially affect the flow of patients across state lines and purchase of supplies in interstate commerce, substantially increasing St. Luke's volume of patients and interstate purchases and decreasing the volumes of the plaintiffs.

## FACTUAL ALLEGATIONS

### St. Luke's Acquisition of Physician Practices in the Boise Area

28.    Over the course of the last four years, St. Luke's has engaged in a series of acquisitions in the Boise, Idaho area that are unprecedented in their magnitude, scope and rapidity. St. Luke's has acquired 22 physician practices, adding more than 200 employed physicians. These acquisitions have occurred across 11 different specialties and include, most significantly, acquisitions of 11 separate groups of primary care physicians.

29.    The physician practices that St. Luke's has acquired include some of the most prominent and popular physician groups in the Treasure Valley area, including Capital City Family Medicine, Idaho Family Physicians, Mountain View Medical, Boise Surgical, Intermountain Orthopedics and Boise Orthopedics. The first three groups were among the leading primary care groups in the Boise area. Boise Surgical and Boise Orthopedics were, respectively, the most prominent general surgery group and most prominent orthopedic surgery group in the area before they were acquired.

30.    St. Luke's acquisitions over the last two years have given it a dominant position in primary care services and several physician specialty markets, including general surgery, cardiology, pulmonology and orthopedic surgery in the Boise area.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-11

## St. Luke's Acquisition of Surgery Facilities

31.     St. Luke's has also acquired a number of independent competitive facilities that provided (or would have provided) surgery and/or cardiac catheterizations.  In some cases, St. Luke's paid substantial sums simply to eliminate the competition provided by these facilities, without even operating them.  This has further reduced competition and increased St. Luke's dominance.

32.     When St. Luke's acquired the Intermountain Orthopedic group, it also acquired plans, and the land that was purchased, to build an independent neurosurgical-orthopedic hospital.  The planned hospital was abandoned by St. Luke's.  St. Luke's also acquired another surgery center (previously owned by Intermountain) when it acquired Intermountain.

33.     St. Luke's also acquired Orthopedic Surgery Center on River Street.  After the acquisition, many prices at the facility doubled or tripled.

34.     When St. Luke's acquired Idaho Cardiology Associates, the major cardiology group in Boise in late 2007, it also acquired an outpatient catheterization lab (performing diagnostic heart catheterizations) that the doctors operated.  Prior to the acquisition, the cardiologists were located on the Saint Alphonsus Boise campus.  After the acquisition, the group (except for a few physicians who left the group) moved to the St. Luke's campus.  St. Luke's, however, shut down the cath lab, and never operated it.

35.     These acquisitions have resulted in the possession by St. Luke's of a dominant share of surgery rooms in the Treasure Valley.

**St. Luke's has Exploited its Monopoly Power in the Magic Valley**

36. Since the late 1990's St. Luke's has been systematically acquiring virtually all of the hospitals and physician practices in the Magic Valley.  For example:

- In the late 1990s, St. Luke's acquired the hospitals in Ketchum, Idaho and in 2000, St. Luke's replaced them with St. Luke's Wood River.  St. Luke's now employs virtually all the primary care physicians in Hailey and Ketchum.

- In 2006, St. Luke's acquired the Magic Valley Regional Medical Center located in Twin Falls, Idaho.  St. Luke's has acquired and now employs the vast majority of the physician practices in the Twin Falls area.

- In 2008, St. Luke's entered into a management agreement with Gooding County Memorial Hospital ("Gooding Memorial") in Gooding, Idaho.  In 2010, the 40-year old Gooding Memorial was replaced by the North Canyon Medical Center ("North Canyon"), which is owned by a "joint partnership" including St. Luke's.

- In 2011, St. Luke's acquired St. Benedict's in Jerome, Idaho.

- St. Luke's managed Elmore Medical Center ("EMC") located in Mountain Home, Idaho for ten years, and in May 2012 St. Luke's acquired EMC.

37. As a result of these acquisitions, St. Luke's currently controls (through employment or professional services agreements) upwards of 70% of all physicians and over 80% of the primary care physicians in the Twin Falls-Jerome area.  St. Luke's also controls 100% of the specialists in pediatrics, urology and neurology in that area.  In Wood River, St. Luke's controls 80% of the primary care physicians, 67% of OB/GYNs and 47% of all physicians.

38. A September 2011 editorial in the Twin Falls Times-News characterized St. Luke's as a "near monopoly" and added that "St. Luke's is the only health care option for most

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-13

Magic Valley residents. While a small number of physicians – and even fewer hospitals – remain unaffiliated, most have signed on with St. Luke's."

39.     As a result of St. Luke's consolidation of power in the Magic Valley, it has been able to charge prices far above competitive levels. The cost for services doubled the first year St. Luke's Wood River Medical Center opened and the price increases in the Magic Valley have only continued to increase from there. For example, the price for colonoscopies at St. Luke's Magic Valley Regional Medical Center has quadrupled over the last few years. St. Luke's charges approximately two to three times more than local independent surgical centers for endoscopies. St. Luke's charges approximately three times as much for laboratory work than the independent labs in the Magic Valley. The prices for CT Scans at St. Luke's are approximately 60% higher and X-Rays are twice as expensive as they are elsewhere in the Magic Valley. As a result of these supracompetitive prices, physicians in Twin Falls often send patients to medical centers in Burley (40 miles away) or Rupert (48 miles away) for CT Scans and X-Rays because they can save their patients anywhere from $400-$500. St. Luke's has also successfully succeeded in demanding higher reimbursement rates from one or more health plans.

40.     St. Luke's gradually increasing control over the Magic Valley has also resulted over time in an almost 50% decline in admissions from the Magic Valley to Saint Alphonsus.

### The Proposed Acquisition of the Saltzer Medical Group

41.     St. Luke's and Saltzer began discussing a possible acquisition in 2009. At that time, Ed Castledine of St. Luke's told Saltzer that if Saltzer did not join with St. Luke's, St. Luke's would bring physicians into the Nampa area to compete with Saltzer.

42.     St. Luke's personnel described their motivations in undertaking the Saltzer transaction as arising from two factors. First, St. Luke's wanted to secure Saltzer's primary care

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-14

referrals. Second, St. Luke's wanted additional market share. Both these points were made by St. Luke's personnel, including, in particular, John Kee, St. Luke's Vice President of Physician Services.

43. St. Luke's personnel also described their overall goals with respect to the market. St. Luke's wanted control over the patient from beginning to end. St. Luke's desired a system in which patients saw St. Luke's primary care physicians, had their surgeries performed by St. Luke's specialists at St. Luke's facilities and received all of their ancillary services at St. Luke's facilities.

44. John Kee also told Saltzer personnel that Saltzer had more negotiating power with managed care than it realized. He said that St. Luke's received better rates than Saltzer in the Twin Falls area because of the strength of its network.

45. After St. Luke's made its bid to acquire Saltzer, Saltzer requested that Saint Alphonsus offer a competing bid. While Saint Alphonsus complied with Saltzer's request and placed a bid that was ultimately unsuccessful, it was always Saint Alphonsus' desire that Saltzer remain as an independent entity within Nampa.

46. In early 2012, St. Luke's and Saltzer agreed in principle to an acquisition. Pursuant to the currently contemplated transaction, St. Luke's will acquire Saltzer's intangible assets, personal property and equipment, take over the lease on Saltzer's real estate, and employ all of Saltzer's non-physician employees. Saltzer's physicians will then enter into professional services agreements with St. Luke's, and St. Luke's will conduct all managed care contracting and billing for the Saltzer physicians and their employees and services.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-15

**FTC and Attorney General Actions**

47.     In late 2011, both the Federal Trade Commission and the Idaho Attorney General begin investigating St. Luke's actions under the federal antitrust laws and Idaho's Competition Act, respectively.  These investigations are ongoing.

48.     On February 24, 2012, shortly after being made aware of St. Luke's intention to acquire Saltzer, the Idaho Attorney General, Lawrence Wasden, wrote a letter to Christine Neuhoff, Vice President and General Counsel, informing St. Luke's that "if consummated," its acquisition of Saltzer "directly affects our current antitrust review."  The letter also stated that "[h]aving one more large acquisition in the mix complicates matters and would result in additional cost and expense for all parties involved."  Attorney General Wasden further noted that it was his "hope … that St. Luke's will delay closing on its acquisition of the Saltzer Medical Group, and any other medical practice group it is considering acquiring, until our investigation is complete."  See Ex. B.

49.     In an August 16, 2012, statement to the press, St. Luke's spokesperson Ken Dey confirmed St. Luke's intent to move forward with the acquisition of Saltzer.  Dey added that St. Luke's acquisition of Saltzer is "pretty much a 'when' and not an 'if.'"  St. Luke's stated that it would provide the antitrust authorities with 30 days notice of any closing on the Saltzer transaction.

50.     In response to St. Luke's statements in August that it intended to move forward with its acquisition of Saltzer, the Idaho Attorney General wrote a letter to Saltzer dated August 29, 2012, asking it to not merge with St. Luke's while the hospital system was under investigation for possible antitrust violations.  See Ex. C.  The Attorney General informed Saltzer that:

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-16

"The acquisition [of Saltzer], if consummated, directly affects our current antitrust review. While there are various remedies available to address acquisitions that substantially lessen competition, including divestiture, I would hope that upon conclusion of our investigation … we could work to address [concerns] amicably and informally without the need for litigation and court participation. … My hope is that St. Luke's and the Saltzer Medical Group will delay closing on this acquisition until our investigation is complete."

51.     On or before October 23, 2012, in a "President's Update," St. Luke's president, David Pate, announced that "SLHS has provided notice to the FTC and state AG of our intent to proceed to closing with the Saltzer Medical Group." Ex. D. Thus, given the earlier announcement that any notice would provide 30 days, the transaction can be expected to close imminently.

52.     As described above, on November 8, 2012, Idaho's Deputy Attorney General, Brett T. DeLange wrote a letter to St. Luke's counsel reiterating the Attorney General's stance that St. Luke's not close this transaction, informing St. Luke's that the Attorney General's investigation was not complete and stating that proceeding to close the transaction was "counterproductive" and "appear[ed] designed to invite litigation." See Ex. A.

### St. Luke's Activities In Nampa

53.     St. Luke's acquisition of Saltzer would be a further step in its attempt to gain dominance in the Nampa area. St. Luke's consistent pattern in its physician practice acquisitions has been to acquire the physicians, and then cause them to shift all or virtually all their admissions and other business away from competing facilities, thereby foreclosing competition and securing referrals and admissions for St. Luke's.

54.     For example, in 2011, St. Luke's employed 7 physicians who had been employed by Saint Alphonsus Medical Group. After their employment, these physicians virtually ceased admitting inpatients to Saint Alphonsus Nampa, and dramatically reduced their outpatient

utilization of Saint Alphonsus Nampa. This is consistent with the pattern after St. Luke's acquisitions of physician practices in Boise, where the physicians whose practices were acquired reduced their admissions at Saint Alphonsus by more than 90% after the acquisitions.

55. Another example relates to St. Luke's employed oncologists, who work in a facility across the street from Saint Alphonsus Nampa. Before Saint Alphonsus acquired this hospital from Catholic Health Initiatives in 2009, those oncologists had been regularly practicing at the hospital. Immediately after the acquisition, they ceased doing so and resigned from the Saint Alphonsus Nampa medical staff.

56. When St. Luke's acquired the Boise Orthopedic Group, those physicians were partners in TVH and performed approximately 300 cases per year at the hospital. After the group was acquired by St. Luke's, those surgeons did not perform any procedures at TVH.

57. St. Luke's and Saltzer's statements make clear that the same pattern will follow a Saltzer acquisition by St. Luke's. Saltzer's CEO, John Kaiser, has recently told Saltzer physicians that any patients taken to Saint Alphonsus or Treasure Valley would not be supportive of the group's overall goals.

### The Relevant Product Markets

### Primary Care Physician Services

58. One relevant product market in this case is the market for adult primary care physician services sold to commercial third party payers ("primary care physician services"). This market encompasses services offered by physicians practicing internal medicine, family practice, and general practice. Primary care physicians provide both the first contact for a person with an undiagnosed health concern as well as continuing care of varied medical conditions, not limited by cause, organ system, or diagnosis.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-18

59.     Other physicians cannot and will not provide adult primary care services to most adult patients, because they are not trained to provide these services.  Some OB/GYN specialists provide primary care to adult female patients, but they do not do so for adult males.  Health plans would not be able to sell an insurance product without a broad selection of adult primary care physicians within that product's physician panel.  Likewise, patients generally would not, and do not, seek primary care services from physicians who are not primary care physicians.  If faced with a price increase by a hypothetical monopolist for adult primary care services, health plans would be forced to agree to the price increase because access to adult primary care physicians is essential to successfully market a health insurance product.  As a result, other types of physicians are not reasonably interchangeable or substitutes for adult primary care physicians.

60.     As a result of the nature of the practice, many patients establish strong loyalties to their primary care physicians.   One recent survey found that 87% of commercially-insured patients have a regular employed primary care physician, and 74% of these said that they are satisfied with their care.  The survey also found that fewer than 15% switch primary care physicians in a year.

61.     As the first point of entry into the health care system and the physician that is likely to have the most contact and most long-lasting relationship with a patient, primary care physicians can hold great influence over which hospital or specialist a patient will seek additional care with if necessary.  In a study published by the Center for Studying Health System Change, it was reported that almost 70 percent of patients chose a specialist because of their primary care physician's referral.

62.     The relevant market does not include adult primary care physician services paid for by Medicare or Medicaid, because these government programs fix their fees and therefore do

not compete for these services. A hospital, physician group or physician offering adult primary care physician services could not increase its volume or revenue by persuading patients to sign up for Medicare or Medicaid, because enrollment in these programs is limited to the elderly, disabled or underprivileged. Medicare and Medicaid typically pay significantly lower rates than do commercial insurers and, therefore, are not an alternative to them.

### General Acute-Care Inpatient Services Market

63.     Another relevant market is the market for general acute-care inpatient hospital services sold to commercial third party payers ("general acute-care services"). General acute-care services encompass a broad cluster of medical and surgical diagnostic and treatment services that include an overnight hospital stay, including, but not limited to, many emergency services, internal medicine services, and surgical procedures.

64.     The general acute-care services market does not include outpatient services (those not requiring an overnight hospital stay) because such services are offered by a different set of competitors under different competitive conditions. Outpatient hospital services are not reasonably interchangeable with inpatient hospital services, and health plans and patients could not substitute outpatient services for inpatient services in response to a small but significant price increase. The treatment that requires an inpatient hospital stay cannot be effectively treated on an outpatient basis. Similarly, the most complex and specialized tertiary and quaternary services, such as certain major surgeries and organ transplants, also are not part of the relevant cluster of services because they generally are not available in the Boise area, are offered by a different set of suppliers under different competitive circumstances, and are not substitutes for general acute-care services.

65.     The relevant market does not include general acute-care services paid for by Medicare or Medicaid, because these government programs fix their fees and therefore do not compete for these services.  A hospital offering general acute-care services could not increase its volume or revenue by persuading patients to sign up for Medicare or Medicaid, because enrollment in these programs is limited to the elderly, disabled or underprivileged.  Medicare and Medicaid typically pay significantly lower rates than do commercial insurers and, therefore, are not an alternative to them.

### General Pediatric Physician Services

66.     Another relevant market is the market for general pediatric physician services sold to commercial third party payers ("general pediatric physician services").  The medical specialty of general pediatrics focuses on the medical care of infants, children, and adolescents. The services provided by pediatricians require specific expertise about infants and children. Most adult primary care physicians lack this expertise.

67.     Many patients would not, and do not, seek general pediatric services from physicians who are not general pediatricians.  As a result, Treasure Valley area health plans would not be able to sell an insurance product without a broad selection of general pediatricians within that product's physician panel.  Each health plan operating in the Treasure Valley has general pediatricians on its panel of providers.  If faced with a price increase by a hypothetical monopolist for general pediatric services, health plans would be forced to agree to the price increase, because access to general pediatricians is essential to successfully market a health insurance product.   For these reasons, other types of physicians are not reasonably interchangeable or substitutes for general pediatricians.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-21

68.     The relevant market does not include pediatric subspecialists, who treat specialty conditions such as pediatric cardiology, pediatric oncology or pediatric surgery.  Subspecialists do not provide the day to day routine care of children that is provided by general pediatricians, and are therefore not substitutes for general pediatricians.

69.     The relevant market also does not include general pediatric services paid for by Medicaid, because this government program fixes its fees and therefore does not compete for these services.  A hospital, physician group or physician offering general pediatric services could not increase its volume or revenue by persuading patients to sign up for Medicaid, because enrollment in these programs is limited to the disabled or underprivileged.  Medicaid typically pays significantly lower rates than do commercial insurers and, therefore, is not an alternative to them.  Of course, Medicare is not available to children.

**Outpatient Surgery Services**

70.     St. Luke's acquisitions also threaten substantial competitive harm in the market for outpatient surgery services sold to commercial third party payers ("outpatient surgery services").  Outpatient surgery, also known as ambulatory surgery, is surgery that does not require an overnight hospital stay.  The outpatient surgery services market does not include general acute-care inpatient hospital services (those requiring an overnight hospital stay) because such services are offered by a different set of competitors under different competitive conditions. Patients receiving general acute care services, including inpatient surgery, rather than outpatient surgery, do so because either they are too sick to receive surgery on an outpatient basis or because the surgery they require is sufficiently serious that an inpatient stay is necessary after the surgery.  As a result, general acute-care inpatient hospital services are not reasonable substitutes for outpatient surgery services, and health plans and patients could not substitute outpatient

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-22

surgery services for inpatient surgery services in response to a small but significant price increase.

71.     The relevant market does not include outpatient surgery services paid for by Medicare or Medicaid, because these government programs fix their fees and therefore do not compete for these services.  A hospital or surgery center offering outpatient surgery services could not increase its volume or revenue by persuading patients to sign up for Medicare or Medicaid, because enrollment in these programs is limited to the elderly, disabled or underprivileged.  Medicare and Medicaid typically pay significantly lower rates than do commercial insurers and, therefore, are not an alternative to them.

## The Relevant Geographic Markets

### Primary Care and General Pediatric Physician Services

72.     The relevant geographic market with respect to primary care and general pediatric physician services is no broader than Nampa, Idaho.  Nampa residents strongly prefer to obtain primary care and pediatric physician services in Nampa.  Because patients generally obtain primary care and pediatric services frequently and often require immediate treatment, such as when they, or their children, have a cold or the flu, they are unwilling to travel long distances to seek primary care or pediatric physician services, and their preference for access to local providers is strong.

73.     More than 75% of Saltzer's patients come from Nampa, where its main clinic is located.  About 80% of Saint Alphonsus Medical Group primary care patients seen in Nampa come from Nampa, and about 80% of the Nampa patients who see a Saint Alphonsus Medical Group physician do so in Nampa.  Most patients in Nampa utilizing the Saint Alphonsus Medical Group primary care physicians travel, on average, less than 10 miles for their care.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-23

74.     It is very important to Nampa patients that their primary care doctors are conveniently located (*e.g.*, "close to home") and readily accessible.  For example, Saint Alphonsus Medical Group advertises its clinics as being "close to home," being open on weekends and holidays and being committed to seeing patients the very same day they feel sick with its "Sick Today/Seen Today" program.  The tagline for its clinics is:  "Convenient Care. Close to Home."

75.     Because of the desire of patients to have easy access to a nearby primary care doctor, primary care providers develop a network of multiple small primary care offices in local communities very near their patients.  For example, Saint Alphonsus Medical Group has a series of small, local offices in Nampa, with separate clinics in Caldwell and Meridian.  Similarly, Primary Health has eleven different clinics in the Treasure Valley.  Saltzer has additional offices in Meridian and Caldwell.

76.     While Caldwell and Nampa are only about 12 miles apart, their medical communities are quite distinct.  Physicians in Caldwell predominantly focus their practices on Caldwell.  For example, the employed Saint Alphonsus primary care physicians at the Saint Alphonsus Medical Group clinic in Caldwell admit few or no inpatients at Saint Alphonsus Nampa.

77.     As a result, health plans must include primary care physicians and pediatricians from Nampa in order to meet their members' needs, and all area health plans do so.  Thus, a hypothetical monopolist that controlled all of the primary care physicians or pediatricians in Nampa could profitably increase rates by at least a small but significant price.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-24

### General Acute-Care Inpatient Services

78.     The relevant geographic market in which to analyze the effects of the Saltzer acquisition on general acute-care services is no broader than Boise City-Nampa Metropolitan Statistical Area ("Boise Area").  (The Boise area includes hospitals owned by St. Luke's, Saint Alphonsus, TVH, West Valley Medical Center and Walter Knox Memorial Hospital, a small critical access hospital in Emmett, Idaho.)  Unlike for primary care or general pediatric services, patients seeking general-acute services tend to have more serious medical conditions and seek these services much less frequently.  As a result, they are willing to travel greater distances for care, but still not willing to travel substantial distances beyond Canyon or Ada counties.  In fact, there are no competitive alternatives for general-acute care services outsides of the Boise Area (other than those owned by St. Luke's or Saint Alphonsus Health System) within any reasonable distance from those counties.  The closest comparable hospitals to Saint Alphonsus and St. Luke's outside of the Boise Area are more than 200 miles away from the Treasure Valley.  As a result, hospitals outside of the relevant market do not meaningfully compete for general acute care services with the hospitals in the area.

### Outpatient Surgery Services

79.     The relevant geographic market in which to analyze the effects of the Saltzer acquisition on outpatient surgery services is no broader than the Boise Area.  There are no competitive alternatives for outpatient surgery services which are outside of the Boise Area within any reasonable distance from this area.  The closest comparable providers of outpatient surgery services are more than 100 miles from Boise.  Hospitals or surgery centers outside of Ada and Canyon counties do not meaningfully compete with outpatient surgery centers in this area.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-25

## ANTICOMPETITIVE EFFECTS

### Primary Care Physician Services

80.     If St. Luke's completes its acquisition of Saltzer, it will possess a near-monopoly position in the relevant Nampa area primary care physician services market.  The Saltzer acquisition will result in a concentrated primary care physician services market with only two significant competitors.  St. Luke's post-acquisition market share in the relevant primary care physician services market in Nampa will exceed 67%.

81.     Under the Merger Guidelines HHI test, a merger is presumed likely to create or enhance market power (and presumed illegal) when the post-merger HHI exceeds 2500 points and the merger or acquisition increases the HHI by more than 200 points.  The market concentration levels here exceed these thresholds by a wide margin.  The post-acquisition HHI in the primary care physician services market in Nampa will increase by over 1,800 points to approximately 4,800.

82.     With the addition of the Saltzer physicians to its physician network, St. Luke's will become a "must-have" system for health plans seeking to serve companies with employees in Nampa, because health plans will no longer be able to offer a commercially viable provider network to those companies without including St. Luke's.  Like the employees of Simplot and Mercy Medical Center, those employees will demand including the Saltzer physicians (as well as the St. Luke's physicians).  Health plans will no longer have the ability to drop St. Luke's from their networks, or even credibly threaten to do so.  Thus, health plans in the area now must either reach agreement with St. Luke's, likely at substantially higher rates, offer a commercially unattractive health care network to their members, or be forced to exit Nampa altogether.

83.     This significant change in the negotiating dynamic will give St. Luke's much-enhanced bargaining clout in contract negotiations and the ability to extract higher rates for inpatient services at all of its hospitals.

84.     Price increases resulting from the acquisition will be passed on to local employers and their employees.  Self-insured employers pay the full cost of their employees' health care claims and, as a result, they will immediately and directly bear the full burden of higher rates charged by hospitals or physicians.  Fully-insured employers will also inevitably be harmed by higher rates, because health plans will be forced to pass on at least a portion of hospital rate increases to these customers.

85.     Employers, in turn, will pass on their increased health care costs to their employees, in whole or in part.  Employees will bear these costs in the form of higher premiums, higher co-pays, reduced coverage, and/or restricted services.  Some Nampa area residents will forego or delay necessary health care services because of the higher costs, and others may drop their insurance coverage altogether.

86.     This enhancement of St. Luke's market power will also be used to exclude competition by rivals, including all of the Plaintiffs.  St. Luke's has already shown that it intends to use its market power resulting from the acquisition of numerous physician practices to demand that employers and payors take business from other providers and channel it, sometimes exclusively, to St. Luke's.  For example, St. Luke's recently demanded that Micron add St. Luke's to the Micron network where the St. Alphonsus hospitals and physicians have been the preferred choice for Micron employees because of the lower price and high quality Saint Alphonsus provides to Micron.  St. Luke's was able to do so because of its recent acquisition of many popular physician groups desired by Micron employees.  Micron was prepared to

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-27

acquiesce to St. Luke's demands, even at higher prices, in order to satisfy its employees' desire to utilize these popular doctors acquired by St. Luke's until it determined that those demands would likely require a 30% increase in Micron's overall health care costs. Similarly, St. Luke's has demanded that other payors provide it with an exclusive or preferred status.

87.     Past actions by St. Luke's and recent statements by Saltzer, provide further evidence that these effects are highly likely. Four years ago, when Saint Alphonsus was awarded the preferred position in the Micron network, the development of the network also required a "backup" PPO network of non-Saint Alphonsus providers. St. Luke's attempted to sabotage that network by threatening two different PPOs that it would no longer participate with them if they provided a backup network for Micron. As a result, both PPOs backed out of the Micron transaction and alternatives had to be sought.

88.     Recently, Saltzer has indicated that it no longer desires to participate with Saint Alphonsus Nampa in providing a network for the "True Blue" Medicaid Advantage product offered by Blue Cross. This would substantially reduce the attractiveness of a Saint Alphonsus Nampa network to Medicare Advantage patients. The decision by Saltzer was undoubtedly motivated by the pending St. Luke's transaction.

89.     If St. Luke's acquires Saltzer, its ability to demand that employers and payors set aside their procompetitive decisions to utilize lower price providers, and to require them to prefer St. Luke's, will be substantially enhanced.

### General Pediatric Physician Services

90.     If St. Luke's completes its acquisition of Saltzer, it will possess a near-monopoly position in the relevant Nampa area general pediatric services market. Currently, Saltzer employs all but one of the general pediatricians in Nampa. The acquisition of Saltzer by St.

Luke's would transfer this market share from Saltzer to St. Luke's and would further enhance St. Luke's market power by strengthening its "must-have" provider status, described above. Since health plans seeking to serve companies with employees in Nampa need to offer general pediatricians who are convenient to those employees, the control of virtually all the pediatricians in Nampa by St. Luke's will further enhance its market power, and make it even more difficult for health plans to negotiate reasonable rates with St. Luke's. Similarly, this additional power will give St. Luke's an even greater ability to demand a preferential position with employers and health plans, and to stymie procompetitive offers by competitors such as Saint Alphonsus and TVH.

### General Acute-Care Inpatient and Outpatient Surgery Services

91.     The Saltzer acquisition will also increase St. Luke's dominance in the general acute-care services and outpatient surgery services markets in the Boise Area. St. Luke's market share (as measured by total discharges) is currently 58% in Ada and Canyon counties combined resulting in a similar HHI. The pre-acquisition HHI for this market is upwards of 4,000, indicating a "highly concentrated" market for general acute care inpatient hospital services. With respect to outpatient surgery services, St. Luke's market share (as measured by surgery rooms) is currently 54% in Ada and Canyon counties combined, resulting in a similar HHI. St. Luke's acquisition of Saltzer will increase St. Luke's market share and lessen competition in the markets for acute-care inpatient hospital services and outpatient surgery.

92.     St. Luke's acquisition of Saltzer will result in the foreclosure of a critical source of patients (and admissions) — the Saltzer physicians. Saltzer physicians currently provide a significant number of Saint Alphonsus Nampa's inpatients, a substantial amount of the hospital's

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-29

revenues, and an even higher percentage of their higher paying commercially insured patients. Saltzer is critical to the economic well-being of that hospital.

93.     The acquisition will also foreclose a significant source of volume for TVH. More than 40% of its inpatient and outpatient cases are performed by Saltzer physicians.

94.     The evidence is overwhelming that the acquisition of Saltzer by St. Luke's will substantially foreclose competition for the admissions of the Saltzer physicians. The behavior of St. Luke's leaves no doubt that these admissions will cease – almost as quickly as a spigot can be turned off – after the acquisition. For example:

- When St. Luke's has acquired physician groups in the past, their inpatient admissions at Saint Alphonsus Boise have declined by more than **90%**, in several cases by **100%**.

- When St. Luke's acquired seven physicians employed by SAMG in Nampa, their admissions at Saint Alphonsus Nampa declined to virtually **zero**.

- When Saint Alphonsus acquired Mercy Medical Center, the St. Luke's oncologist located *across the street* from Saint Alphonsus Nampa nevertheless ceased practicing at that hospital.

- Since St. Luke's acquired the Boise Orthopedic Group, those surgeons went from performing 10-15% of all surgeries at TVH, to not performing any procedures at all at TVH.

- In internal conversations, Saltzer's leadership has confirmed that this pattern will follow this acquisition. Indeed, Saltzer's president recently said that "any patients taken to Saint Al's or Treasure Valley is not supportive of [Saltzer's] overall goals."

95.     As a result, this foreclosure of competition will very likely increase St. Luke's dominance in the general acute-care services and outpatient surgery services markets. The foreclosure of competition for the referrals and admissions of Saltzer physicians will shift even

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-30

more market share from Saint Alphonsus and TVH to St. Luke's, strengthening St. Luke's while weakening its competitors.

96.     St. Luke's will not acquire the orthopedic surgeons, general surgeon and ear, nose and throat specialists employed by Saltzer; those physicians have decided to obtain employment with Saint Alphonsus.  Those physicians chose not to go to St. Luke's both because they received less attractive offers than the Saltzer primary care physicians and because St. Luke's conditioned significant payments on their agreement to no longer send patients to TVH, but to exclusively admit to St. Luke's.  Such agreements would have harmed TVH, which provides surgical care at prices 40% less than St. Luke's.

97.     However, a Saltzer transaction will nevertheless seriously harm these physicians, TVH, and their patients.  These physicians depend critically on Saltzer primary care physician referrals for their patients.  After this transaction, those referrals will go to St. Luke's surgeons. On November 1, 2012, Saltzer sent a letter to its patients informing them of the departure of the five orthopedic surgeons, and told its patients that it was in the process of recruiting new orthopedic surgeons, that it was "currently working close[ly] with the St. Luke's orthopedic department" and that patients should call St. Luke's to schedule an appointment for surgery.  See Ex. E.

98.     The harm to Saint Alphonsus Nampa and TVH, will also result in substantial harm to competition.  The only hospital alternatives a payor has to St. Luke's in a Treasure Valley network are Saint Alphonsus, TVH and West Valley Medical Center (which focuses on the Caldwell area).

99.     The foreclosure of patients from Saltzer will significantly weaken Saint Alphonsus Nampa and TVH.  This will make it much more difficult for a health plan to rely on a

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-31

network that does not include St. Luke's if St. Luke's makes exorbitant price demands, as it has (successfully) in the Magic Valley. This will further enhance St. Luke's dominant market power.

### Entry Barriers

#### Primary Care and General Pediatric Physician Services

100. Neither primary care or general pediatric physician entry or expansion by any existing physician practice group or hospital will be sufficient, timely or likely to offset the anticompetitive effects described above. There is no prospect that such entry will materially reduce the harm to competition from St. Luke's primary care and pediatrician acquisitions.

101. Recruitment of new primary care physicians or pediatricians into the Treasure Valley is difficult, because there is no medical school in Idaho that could provide a group of medical school graduates who are familiar with, and would like to stay in, the area. There is a family practice residency program in Boise, but the program is focused on rural medicine, and very few residents from the program practice in the Treasure Valley. Moreover, recruitment is especially difficult to a working class community such as Nampa.

102. An additional problem exists relating to recruitment of general internal medicine physicians, desired by many patients. Very few new general internists are beginning practice. In the entire United States, only about 200 new internal medicine physicians complete their residency and go into general ambulatory/clinic internal medicine practice every year. The vast majority of physicians participating in internal medicine residencies go on to specialize in a particular field. As a result, it is extremely difficult to recruit any general internists. Saltzer employs all general internists in Nampa.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-32

103.    Another substantial barrier to entry is that any new primary care physicians or pediatricians will have great difficulty attracting patients in a market where the patients already have loyalties to existing primary care physicians and pediatricians.  Nationally 87% of insured consumers have a regular employed physician, and 74% of these say they are satisfied with their care.  Fewer than 15% switch doctors in a year.  Such loyalty is especially present with regard to patients of the very popular and successful Saltzer group.

104.    Even when Saint Alphonsus is successful in recruiting physicians, and they ultimately are able to attract a substantial patient load, this involves very substantial delays.  It typically takes a year or longer to recruit a primary care physician or pediatrician from the date recruitment begins to the date the primary care physician starts on the job.  It takes another two years or more for that physician to develop his or her practice, when even that is possible.  Therefore, entry will not be sufficiently timely to offset the effect of St. Luke's anticompetitive practices.  In fact, there is no possibility that entry could occur in any period of time that would be sufficient to offset the competitive impact of the acquisition of the large Saltzer group by St. Luke's.

## General Acute-Care Inpatient Services

105.    Neither hospital entry nor expansion by any hospital will deter or counteract St. Luke's prior or proposed acquisitions' likely harm to competition in the relevant markets.

106.    New hospital entry or significant expansion in the Boise area would not be timely.  Construction of a new general acute-care hospital would take more than two years from the initial planning stages to opening doors to patients.  Entry and expansion are also unlikely due to very high construction costs, operating costs, and financial risk.  St. Luke's has stated that if it constructs a new hospital in Nampa construction alone will take 24-30 months.  No new hospital

facility has been constructed in the Treasure Valley since TVH in 1996 and St. Luke's Meridian in 2001.

107.    Construction and operation of an independent competitive hospital is likely to be especially difficult, given the large number of physicians employed by St. Luke's, since these physicians are unlikely to admit patients at a competitive hospital. Such a hospital would have a very difficult time attracting admissions and operating successfully.

### Outpatient Surgery Services

108.    Neither outpatient surgery services entry nor expansion by any hospital or physician group will deter or counteract the likely harm to competition in the relevant markets due to St. Luke's price or proposed acquisitions.

109.    New outpatient entry or significant expansion in the Boise area would not be timely. Construction of a new outpatient facility would take more than two years from the initial planning stages to opening doors to patients. Entry and expansion are also unlikely due to very high construction costs, operating costs, and financial risk, along with significant outpatient facility overcapacity in the Boise area.

110.    Construction and operation of an independent outpatient surgery facility is also likely to be very difficult given the large number of surgeons employed by St. Luke's, since these surgeons are unlikely to admit patients at a competitive hospital. Such a hospital would have a very difficult time attracting admissions and operating successfully. Certainly, facilities will not be constructed with sufficient capacity to offset the effect of St. Luke's anticompetitive activities.

**Absence of Procompetitive Justifications**

111.    St. Luke's acquisition of Saltzer would not improve physician efficiency, productivity or quality.  Saltzer already operates very efficiently, has lean staffing and a very effective billing office.  There is no evidence in the economic literature that physician groups become more efficient at a size greater than the Saltzer group.  Moreover, Saltzer's financial model, in which the physicians share in overhead to the extent of the patient revenue they generate, has created a culture which strongly encourages hard work.  The same financial model will not apply when St. Luke's owns the practices.

112.    This conclusion is consistent with the statements of St. Luke's own personnel to Saltzer.  St. Luke's officials indicated that Saltzer's structure would remain the same after an acquisition and that "all that would change was the sign on the door."  St. Luke's representative Peter LaFleur told Saltzer that it was difficult to justify the high payments to Saltzer physicians as part of the transaction, because Saltzer was already very efficient, and there were not significant opportunities for additional efficiencies that would create more profits after an acquisition.

113.    St. Luke's will be unable to show that the acquisition will lead to any merger-specific efficiencies, i.e. efficiencies that are reasonably likely only after a merger or acquisition.  In fact, St. Luke's has effectively admitted that any efficiencies resulting from its acquisition would not be merger-specific.  For example, St. Luke's Health System Vice President of Payor and Provider Relations stated that "St. Luke's Health System is spending tens of millions of dollars and committing other valuable resources to implement an electronic medical record across *all our providers*" and that "a clinically integrated network is *not* necessarily a network of providers under common financial ownership..."  Thus, St. Luke's has effectively admitted that

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-35

the efficiencies that it hopes to obtain with its physicians can be obtained whether or not the physicians remain independent.

## Irreparable Injury As A Result of Saltzer Acquisition

### Saint Alphonsus Nampa

114.    St. Luke's acquisition of Saltzer would be virtually certain to cause substantial irreparable injury to St. Luke's most significant competitor in the general acute-care services market, Saint Alphonsus.  If St. Luke's were to acquire Saltzer, the effect on Saint Alphonsus Nampa would be particularly devastating.

115.    A significant number of all inpatient admissions at Saint Alphonsus Nampa come from Saltzer physicians.  Saltzer physicians are even more important to Saint Alphonsus Nampa than their share of admissions would indicate.  Saltzer physicians tend to treat commercially insured patients who provide more revenues to the hospital.

116.    Like most institutions, Saint Alphonsus Nampa has very substantial fixed costs. The gain or loss of incremental patients can therefore have a significantly more than proportional impact on Saint Alphonsus Nampa's bottom line and margins.  As a result of the loss of the patients at Saint Alphonsus Nampa attributable to Saltzer Medical Group, the hospital will face a multimillion dollar loss and will be several million dollars "in the red."  Therefore, in order to cut its losses and to maintain a 2% net margin (the minimum necessary to fund future capital improvements), the hospital would need to reduce its staff by more than 140 full-time-equivalents ("FTEs").

117.    The effect on Saint Alphonsus Nampa, its employees, its services and programs, and the Nampa community would be devastating;

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-36

- The job cuts would reduce Saint Alphonsus Nampa's staff by more than 25%.

- Such cuts would entail the substantial reduction or elimination of many programs and services.

- In particular, this could substantially affect Saint Alphonsus Nampa's ability to serve the poor and uninsured.

**Treasure Valley Hospital**

118.    The transaction will also irreparably harm TVH.  Cases performed by Saltzer Medical Group physicians are critical to the volume at, and success of, TVH.   More than 40% of TVH's inpatient and outpatient cases are performed by Saltzer physicians.

119.    If St. Luke's acquires Saltzer, and that results in a reduction of cases to be performed at TVH, this will have a dramatic negative effect on TVH, simply because of the great volume of business at TVH that is dependent on Saltzer.  If TVH were to lose all its cases from Saltzer, it would need to lay off 10% of its staff.  Even a loss of half these cases would have a very significant impact.

120.    TVH has planned significant capital improvements for its facility, including an increase in the number of operating rooms from four to six, a new CT scanner, and improvements to its electronic medical records system.  These improvements will benefit its patients and allow TVH to provide more low cost, high quality care to the community.

121.    If St. Luke's acquires Saltzer, and that causes a significant reduction in Saltzer cases performed at TVH (as is anticipated), TVH will be forced to cancel or delay its improvements.  This will be very harmful to both TVH and to the Nampa community.

122.    The transaction will also cause patients to lose the benefit of lower cost surgeries at TVH.  Those patients will be referred to St. Luke's surgeons who do their work at the higher cost St. Luke's facilities.

**All Plaintiffs**

123.    The Saltzer transaction, if consummated, will also irreparably injure all the Plaintiffs, because it will increase the power of St. Luke's to (a) demand exclusivity and/or preferential treatment from payors and employers, (b) deny the Plaintiffs' competing networks access to the Saltzer physicians and thereby impede their effectiveness (as in the "True Blue" example described above), and (c) disrupt other arrangements which Plaintiffs have obtained through competitive pricing and quality care.  Such actions threaten to substantially harm the market position of all of the Plaintiffs on an ongoing basis into the indefinite future.

124.    Such actions will likely affect Plaintiffs' relationships with every significant payor and employer in the Treasure Valley.  Because of the scope of this potential harm, its likely recurring nature in the future, and the impossibility of predicting precisely the consequences of St. Luke's further anticompetitive actions, this harm cannot reasonably be fully compensated through money damages.  The only remedy that will prevent this significant and anticompetitive change in the market is a preliminary and then permanent injunction against the Saltzer transaction.

## COUNT I

## THREATENED VIOLATION OF SECTION 7 OF THE CLAYTON ACT

125.    Saint Alphonsus and TVH restate and reallege the allegations of paragraphs 1 – 124 above hereof, as if fully restated herein.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-38

126.    The effect of the proposed acquisition of Saltzer by St. Luke's would be to lessen competition substantially in interstate trade and commerce in violation of Section 7 of the Clayton Act, 15 U.S.C. §18.

127.    The transaction would likely have the following effects, among others:

      a.    Competition in the primary care physician services market in Nampa, and the general acute-care services and outpatient surgery services markets in the Boise Area would be substantially lessened;

      b.    Prices in those markets would likely increase to levels above those that would prevail absent the merger;

      c.    Patient choice would be substantially reduced; and

      d.    Saint Alphonsus Nampa, TVH, Saint Alphonsus Boise and Saint Alphonsus would suffer irreparable injury.

128.    This violation, the anticompetitive effects and irreparable harm will continue unless enjoined.

## COUNT II

## THREATENED VIOLATION OF SECTION 1 OF THE SHERMAN ACT

129.    Saint Alphonsus and TVH restate and reallege the allegations of paragraphs 1 – 128 above hereof, as if fully restated herein.

130.    St. Luke's intends to acquire Saltzer.

131.    This acquisition is to be effectuated by contracts, combinations and conspiracies that are unlawful under Section 1 of the Sherman Act (15 U.S.C. § 1).

132.    This acquisition will cause substantial anticompetitive effects as described above.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-39

133.    This acquisition will unreasonably restrain trade in violation of Section 1 of the Sherman Act.

134.    As a direct and proximate result of St. Luke's violations of Section 1 of the Sherman Act, Saint Alphonsus Nampa, TVH, Saint Alphonsus Boise and Saint Alphonsus will suffer irreparable harm.

135.    This violation, the anticompetitive effects and irreparable harm will continue unless enjoined.

## COUNT III

## THREATENED VIOLATION OF SECTION 48-106 OF THE IDAHO CODE

136.    Saint Alphonsus and TVH restate and reallege the allegations of paragraphs 1 – 135 above hereof, as if fully restated herein.

137.    The effect of the proposed acquisition of Saltzer by St. Luke's would be to lessen competition substantially in Idaho in violation of Section 48-106 of the Idaho Code.

138.    The transaction would likely have the following effects, among others:

  a.    Competition in the primary care physician services market in Nampa, and the general acute-care services and outpatient surgery services markets in the Boise Area would be substantially lessened;

  b.    Prices in those markets would likely increase to levels above those that would prevail absent the merger;

  c.    Patient choice would be substantially reduced; and

  d.    Saint Alphonsus Nampa, TVH, Saint Alphonsus Boise and Saint Alphonsus would suffer irreparable injury.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-40

139.    This violation, the anticompetitive effects and irreparable harm will continue unless enjoined.

## COUNT IV

## THREATENED VIOLATION OF SECTION 48-104 OF THE IDAHO CODE

140.    Saint Alphonsus and TVH restate and reallege the allegations of paragraphs 1 – 139 above hereof, as if fully restated herein.

141.    St. Luke's intends to acquire Saltzer.

142.    This acquisition is to be effectuated by contracts, combinations and conspiracies that are unlawful under Section 48-104 of the Idaho Code.

143.    This acquisition will cause substantial anticompetitive effects.

144.    This acquisition will unreasonably restrain trade in violation of Section 48-104 of the Idaho Code.

145.    As a direct and proximate result of St. Luke's violations of Section 48-104 of the Idaho Code, Saint Alphonsus Nampa, TVH, Saint Alphonsus Boise and Saint Alphonsus will suffer irreparable harm.

146.    This violation, the anticompetitive effects and irreparable harm will continue unless enjoined.

## RELIEF REQUESTED

147.    WHEREFORE, Saint Alphonsus Health System, Inc., Saint Alphonsus Regional Medical Center, Inc., Saint Alphonsus Medical Center - Nampa, Inc. and Treasure Valley Hospital Limited Partnership pray this Court to grant the following relief:

    A.    Preliminarily and permanently enjoin St. Luke's from acquiring Saltzer;

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-41

      B.     Award Saint Alphonsus, TVH, Saint Alphonsus Boise and Saint Alphonsus three times their damages and their reasonable attorneys' fees against St. Luke's; and

      C.     Award such other relief as this Court finds just.

November 12, 2012.

> By:   /s/ Keely E. Duke
> Keely E. Duke
> Kevin J. Scanlan
> Duke Scanlan Hall PLLC
> 1087 W. River Street, Suite 300
> Boise, ID 83707
> (208) 342-3310 (p)
> (208) 342-3299 (f)
> ked@dukescanlan.com
> kjs@dukescanlan.com
>
> AND
>
> David A. Ettinger (P26537)
> Peter E. Boivin (P62043)
> Honigman Miller Schwartz & Cohn LLP
> 2290 First National Building
> 660 Woodward Avenue
> Detroit, MI 48226
> (313) 465-7368 (p)
> (313) 465-7369 (f)
> dettinger@honigman.com
> pboivin@honigman.com
>
> *Attorneys for Saint Alphonsus Health System, Inc.,*
> *Saint Alphonsus Regional Medical Center, Inc.,*
> *Saint Alphonsus Medical Center - Nampa, Inc.*
>
> By:/s/Jason S. Risch
> Jason S. Risch
> Risch Pisca PLLC
> 407 W. Jefferson
> Boise, Idaho 83702
> (208) 345-9929 (p)
> (208) 345-9928 (f)
> jrisch@rischpisca.com
>
> *Attorneys for Treasure Valley Hospital Limited*
> *Partnership*

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND DAMAGES-42

JS 44 (Rev. 09/11)

# CIVIL COVER SHEET

The JS 44 civil coversheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States inSeptember 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Saint Alphonsus Medical Center - Nampa, Inc., Treasure Valley Hospital Limited Partnership, Saint Alphonsus Health System, Inc., and Saint Alphonsus Regional Medical Center, Inc. | St. Luke's Health System, Ltd. |

**(b)** County of Residence of First Listed Plaintiff    Ada County, Idaho
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Ada County, Idaho
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Keely E. Duke Kevin J. Scanlan, Duke Scanlan Hall PLLC, 1087 W.
River Street, Suite 300 Boise, ID 83707 (208) 342-3310

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government
    Plaintiff

☒ 3 Federal Question
    *(U.S. Government Not a Party)*

☐ 2 U.S. Government
    Defendant

☐ 4 Diversity
    *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)*     *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☒ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Med. Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | | | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | **Habeas Corpus:** | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition) | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district *(specify)*    ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*
15 U.S.C. Sections 1, 15, 18, 26

Brief description of cause:
Acquisition of a physician practice by defendant which will lead to a substantial lessening of competition

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE           DOCKET NUMBER

DATE           SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #      AMOUNT      APPLYING IFP      JUDGE      MAG. JUDGE

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

<table>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td><i>Plaintiff(s)</i></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>Civil Action No.</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td><i>Defendant(s)</i></td><td>)</td><td></td></tr>
</table>

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*

_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# EXHIBIT A



**STATE OF IDAHO**
OFFICE OF THE ATTORNEY GENERAL
LAWRENCE G. WASDEN

**VIA EMAIL**

November 8, 2012

Jack R. Bierig
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603

*Re:   St. Luke's*

Dear Jack:

Jack R. Bierig
November 8, 2012
Page 2 of 2

As you know, the Attorney General earlier wrote St. Luke's and asked that it hold off on closing its purchase of Saltzer pending his review of this acquisition. He later sent a similar letter to Saltzer. In August, our office served your client and Saltzer with CIDs to obtain relevant information regarding the transaction. The present incomplete status of the production greatly hampers our ability to review this transaction and determine whether it complies with the Idaho Competition Act. To proceed to close under such circumstances is not constructive and counter-productive. Indeed, such a strategy would appear designed to invite litigation.

We look forward to continued productive discussions regarding this matter.

Very truly yours,

BRETT T. DELANGE
Deputy Attorney General
Consumer Protection Division

BTD/tt
cc: Brian Julian

# EXHIBIT B



### STATE OF IDAHO

#### OFFICE OF THE ATTORNEY GENERAL

LAWRENCE G. WASDEN

February 24, 2012

**VIA E-MAIL TRANSMISSION neuhoffc@slhs.org
and US POSTAL SERVICE**

Christine Neuhoff
Vice President & General Counsel
St. Luke's Health System
190 E. Bannock Street
Boise, ID 83712

      *Re: Investigation of St. Luke's Acquisitions*

Dear Christine:

As we discussed at our meeting earlier this week on Wednesday, the Federal Trade Commission is investigating certain acquisitions of St. Luke's under federal antitrust law. My office is also looking at these acquisitions under Idaho's Competition Act.

It has come to my attention that St. Luke's is presently involved in the purchase of the Saltzer Medical Group. This acquisition, if consummated, directly affects our current antitrust review. While there are various remedies available to address those acquisitions that substantially lessen competition, including divestiture, I would hope that upon conclusion of our investigation there would be an opportunity to share with you concerns we have, if any, and work to address them amicably and informally without the need for litigation and court participation. Having one more large acquisition in the mix complicates matters and would result in additional cost and expense for all parties involved. My hope is that St. Luke's will delay closing on its acquisition of the Saltzer Medical Group, and any other medical practice group it is considering acquiring, until our investigation is complete.

My senior staff and I remain willing to meet with you for further discussion.

Sincerely,

LAWRENCE G. WASDEN
Attorney General

LGW/btd:jc

# EXHIBIT C



**STATE OF IDAHO**

OFFICE OF THE ATTORNEY GENERAL

LAWRENCE G. WASDEN

August 29, 2012

SENT VIA E-MAIL TRANSMISSION bjulian@ajhlaw.com
and US POSTAL SERVICE

Brian Julian
Anderson, Julian & Hull
250 S 5th Street, Ste 700
P.O. Box 7426
Boise, ID 83707-7426

   *Re: Investigation of St. Luke's Acquisitions*

Dear Mr. Julian:

I understand you are counsel for the Saltzer Medical Group and that you are aware the Federal Trade Commission is investigating certain acquisitions of St. Luke's under federal antitrust law. As you know, my office is also looking at these acquisitions under Idaho's Competition Act.

It has come to my attention that St. Luke's is presently involved in the purchase of the Saltzer Medical Group and reports in the media, at least, indicate the parties intend to proceed to close on the acquisition. This acquisition, if consummated, directly affects our current antitrust review. While there are various remedies available to address acquisitions that substantially lessen competition, including divestiture, I would hope that upon conclusion of our investigation, there would be an opportunity to share with you concerns we have, if any, and we could work to address them amicably and informally without the need for litigation and court participation. Having one more large acquisition in the mix complicates matters and would result in additional cost and expense for all parties involved. My hope is that St. Luke's and the Saltzer Medical Group will delay closing on this acquisition until our investigation is complete.

My senior staff and I remain willing to meet with you for further discussion.

Sincerely,

LAWRENCE G. WASDEN
Attorney General

LGW/btd

# EXHIBIT D



# President's Update
## David C. Pate, MD, JD

October, 2012
Page 1 of 3

<u>Healthcare and Politics</u>

Well, not much of the uncertainty has been resolved since my last update to you. On the federal level, the President and Congress have made no public progress in dealing with the fiscal cliff that awaits us in January. Sequestration is still set to occur with across the board cuts in Medicare reimbursement to providers of 2%, but we remain hopeful that Congress will act to avert this. Additionally, the physician fee schedule fix (SGR- sustainable growth rate formula) has repeatedly been postponed by acts of Congress and will be due to be implemented once again next year with an impact approaching a 30% reimbursement cut for physicians, and so too, we remain optimistic that Congress will deal with this as part of the steps to be taken to avert the fiscal cliff and trigger of sequestration.

We are getting more clarity in the Presidential candidates' positions with respect to Medicare and Medicaid. President Obama will push forward with the reforms imposed by the Patient Protection and Affordable Care Act ("PPACA"). Governor Romney would move forward with a choice of traditional Medicare or private plans (so-called "voucher" plan) for those under the age of 55. Governor Romney likens the choice for a private plan to Medicare Part C (Advantage) plans that are in existence and fairly popular today; while others analogize this to the movement employers have made from defined benefit to defined contribution plans that will increase the amount of cost-sharing on the part of seniors.

As far as Medicaid, President Obama's healthcare reform law calls for expansion of Medicaid programs, but the Supreme Court has clarified that the expansion cannot be coercive, so the states have the choice whether to expand their programs and receive the additional federal funding; but if a state decides against expansion, the federal government cannot terminate current funding. Governor Romney has supported block grants to states for Medicaid, which would change the current program from a federal matching program to a fixed per capita allowance with an adjustment for inflation. Most projections indicate that this would significantly reduce federal funding of Medicaid in an amount of about $100 billion per year.

Meanwhile, we have no clarity from our state either. While the Governor has appointed work groups to examine whether Idaho should create a state health insurance exchange and whether Idaho should expand its Medicaid program, neither group will report out their findings and recommendation until next month. It is thus too late for Idaho to pursue a state-run insurance exchange in 2014, the first year in which exchanges are required to be in operation. However, the work group is now exploring the possibility of the state creating a nonprofit entity and designating it as the state health insurance exchange, which could be implemented in time to avoid implementation of a federal exchange in Idaho. The healthcare subcommittee of IACI recently voted to support this model and to further support a structure for the nonprofit entity consistent with the health insurance exchange principles adopted by IACI last year. If the state does not create a nonprofit entity for the exchange, but instead chooses to operate an exchange through a state-federal partnership, we could look in a subsequent year at the potential of converting it to a state-run exchange, however, the federal funding that exists to support this now will not be available then. We do anticipate a recommendation from the work group and from Director Armstrong that the state expand its Medicaid program, however, we expect significant resistance to this recommendation in the legislature. St. Luke's has taken positions supporting a state-run insurance exchange and an expansion of Medicaid.



Boise     Jerome     Magic Valley     McCall     Meridian     Wood River



## President's Update
### David C. Pate, MD, JD

October, 2012
Page 2 or 3

Despite the uncertainties, St. Luke's is remaining focused on implementing our strategy and realizing our vision. We have submitted our application for the Medicare Shared Savings Program and we are awaiting word from CMS as to whether we will be accepted to begin participation in this program in January. If so, we will join 154 other organizations who currently participate in the program, plus however many other organizations are selected in this wave of applications. Though we don't expect this to be a significant financial boon for us, we do expect to gain the competencies and capabilities to manage the health, outcomes, and costs for a complex population of patients that should advance our organization greatly and prepare us for what is coming down the road, while we still have time to prepare for it. Additionally, though it is very early, SelectHealth is reporting better than expected interest from our community and now has received all the necessary approvals to issue insurance products in all commercial lines including individual, small group and large group segments as well as offerings for federal employees and Medicare Advantage. We will have a more detailed report at our next board meeting.

Financials

As you know, we did not make our cash flow target for the fiscal year just ended. While I won't have final numbers until Monday, Jeff and Pete have indicated that all signs so far indicate that we will not come in nearly as low as we had forecasted. As a result, we will far exceed the revised plan we submitted earlier in the year after a rough first quarter, and while we will not make the original plan, we may come reasonably close (perhaps within 5%).

Saltzer Medical Group ("Saltzer")

SLHS has provided notice to the FTC and state AG of our intent to proceed to closing with the Saltzer Medical Group ("SMG"). Of note, seven of the surgical specialists (1 General Surgeon, 1 ENT and 5 Orthopedic Surgeons) will be leaving SMG and joining Saint Alphonsus. Christy will provide another update at our next board meeting.

Fruitland

We had a marvelous ground breaking ceremony at Fruitland on October 17. Chris Roth did a great job and we had a wonderful speech from Jeff Sayer, Director of Commerce for Idaho. There was a very large turn-out including members of the Community Council that has been very engaged and helpful in developing our plans.



Boise          Jerome          Magic Valley          McCall          Meridian          Wood River



# President's Update
## David C. Pate, MD, JD

October, 2012
Page 3 of 3

Saint Alphonsus' parent merger with Catholic Health East

Trinity Health, the parent organization for Saint Alphonsus Health System, has announced its intention to merge with Catholic Health East. Below is summary information about each health system:

|  | Trinity Health | Catholic Health East |
|---|---|---|
| # of hospitals | 47 (35 owned, 12 managed) | 35 |
| Total/Net Revenues | $16 billion/$9 billion | $14.7 billion/$4.4 billion |
| # of states | 10 states | 11 states |
| Ratings - S&P | AA stable | A stable |
| Ratings - Moody's | Aa2 | A2 (downgrade)[1] |
| Ratings - Fitch | AA | A+ stable |
| Long-term debt (net) | $1.5 billion | $1.5 billion |

What does this mean for St. Luke's? It is hard to know, however, this combination will create the nation's second largest non-profit health system. My guess – in the short term, the consolidation will be a distraction. It is very hard to merge two huge organizations. This gives us an advantage in nimbleness. Alternatively, with the demands on Trinity leadership, perhaps they will give the regional CEOs more authority and this could increase their flexibility. Nevertheless, Saint Alphonsus will now be part of an even larger national health system with greater purchasing power and access to resources. We will now be competing against one of the largest national non-profit hospital chains and one of the largest national for-profit hospital chains. We will keep you posted on future developments.

Thank you all, once again, for all you do for St. Luke's. I look forward to seeing you at the November board meeting where we will have Bob Lokken provide our deep dive on the enterprise decision support work his company, WhiteCloud, has been doing with us.

---

[1] Due to 0.8% operating margin and 6.4% operating cash flow in FY10, plus large unbudgeted losses at two rural health clinics amounting to $36.3 million, plus system-wide admission decline of 4.1% in FY10 over FY09.



Boise        Jerome        Magic Valley        McCall        Meridian        Wood River

# EXHIBIT E



215 E. Hawaii Ave. • Nampa, Idaho 83686 • (208) 463-3000

November 1, 2012

Dear Patient:

As of November 12, 2012, Dr. Shane Andrew, Dr. Andrew Curran, Dr. Keith Holley, Dr. Miers Johnson and Dr. Clark Robinson as well as their physician assistants Patrick McCabe, Todd Otstot and David Clements will no longer be affiliated with Saltzer Medical Group.

We are currently in the process of recruiting orthopedic surgeons and expect to have someone on board soon. We are currently working closely with the St. Luke's orthopedic department, To schedule an appointment call 489-4355, and identify yourself as a Saltzer Patient.

If your preference is to stay with one of the above named providers they are taking phone calls at 288-4700. Their addresses will be 4400 E. Flamingo Ave, Nampa and 3025 W. Cherry Lane, Meridian.

If you have any questions, please contact Saltzer at 463-3067.

Sincerely,

John Kaiser, MD
President

9850 W. St. Luke's Dr.        8950 W. Emerald, Ste. 168     7272 W. Potomac Dr.      3277 E. Louise Dr., Ste. 200    1818 S. 10th Ave., Ste. 220
Nampa, Idaho 83687            Boise, Idaho 83704            Boise, Idaho 83704        Meridian, Idaho 83642          Caldwell, Idaho 83605
(208) 288-4970               (208) 323-6273                (208) 884-2922            (208) 884-2920                 Ophth (208) 455-2355
                                                                                                                    FP (208) 468-5959

# Exhibit 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

OMNI HEALTHCARE INC., INTERVENTIONAL
SPINE INSTITUTE OF FLORIDA, CRAIG
DELIGDISH, MD, C. HAMILTON BOONE, PA,
BRIAN DOWDELL, MD, RICHARD GAYLES, MD,
STAN GOLOVAC, MD, LANCE GRENEVICKI, MD,
ALEKSANDER KOMAR, MD, SCOTT SEMINER,
MD, INSTITUTE OF FACIAL SURGERY INC., THE
PAIN INSTITUTE INC. d/b/a/ FLORIDA PAIN, and
PHYSICIAN ASSISTANT SERVICES OF FLORIDA,
L.L.C.,

                          Plaintiffs,

vs.

HEALTH FIRST, INC., HOLMES REGIONAL
MEDICAL CENTER, INC., HEALTH FIRST
PHYSICIANS INC., HEALTH FIRST HEALTH
PLANS, INC., MICHAEL D. MEANS, and JERRY
SENNE

                          Defendants.

CASE NO.
6:13-CV-01509-RBD-DAB

**THIRD AMENDED
COMPLAINT**

**JURY TRIAL
DEMANDED**

**INJUNCTIVE RELIEF
SOUGHT**

Plaintiffs bring this action for treble damages and injunctive relief under the antitrust

laws of the United States and under Florida state law against defendants Health First, Inc.

("Health First Inc."), Holmes Regional Medical Center, Inc. ("Holmes RMC"), Health First

Physicians Inc. (now doing business as Health First Medical Group; referred to herein as "HF

Physicians"), Health First Health Plans, Inc. ("HF Health Plans"), Michael D. Means

("Defendant Means"), and Jerry Senne ("Defendant Senne") (collectively, "Health First" or

"Defendants"), based upon personal knowledge as to facts pertaining to themselves, and upon

information and belief as to all other matters, and hereby allege as follows:

## INTRODUCTION

1.     Health First has a monopoly in acute care inpatient hospital services in Southern Brevard County, Florida (the "Hospital Monopoly").  At its inception in 1995, Health First owned and operated the only two inpatient hospitals in that geographic area—Holmes RMC and Palm Bay Hospital, Inc. (formerly known as Palm Bay Community Hospital; referred to herein as "Palm Bay Hospital").  Competitor Wuesthoff Medical Center, Melbourne ("Wuesthoff-Melbourne") entered the market in 2002.

2.     Health First maintains and strengthens its Hospital Monopoly by, *inter alia*, intimidating physicians or otherwise obstructing their ability to practice medicine in Southern Brevard County if they do not "play ball" with Health First and refer their patients exclusively to Health First's hospitals and physician specialists.  These referrals are valuable as Health First can capture incremental margins associated with acute care inpatient hospital services (that might otherwise go to a rival hospital) and ancillary care such as x-rays and other diagnostic services (that might otherwise be performed at the facilities of an independent physician group).  The most efficient way to control a doctor's referral is to employ the doctor directly; the next best way is to use a stick.  Physicians who refuse to obey Health First's mandates have their provider contracts terminated by HF Health Plans, lose their medical privileges at Health First's hospitals, or are otherwise retaliated against so as to curtail their practice and significantly impair competition among physicians in Southern Brevard County.

3.     To perfect its control over the referral process, Health First recently acquired Melbourne Internal Medicine Associates ("MIMA"), the largest independent physicians group in the area.  The MIMA acquisition substantially lessened competition in the market for physician services in Southern Brevard County by placing more physicians under a single roof (*i.e.*, a horizontal effect) and by inducing affiliated physicians to charge insurers more than they

otherwise would as an independent physician (*i.e.*, a vertical effect). This also augments Health First's Hospital Monopoly via the referral process and ensures that it can continue charging supra-competitive prices for acute care inpatient hospital services, while delivering healthcare at very low quality.

4. Moreover, the MIMA acquisition permits Health First to control the referrals of MIMA's physicians relating to acute care inpatient hospital services and ancillary services (*i.e.*, auxiliary or supplemental services used to support diagnosis and treatment of a patient's condition; *see* ¶ 63, *infra*). Allowing this merger to take further root and expand will significantly affect the ability of physicians to enter this market, and will significantly restrain competition in the market for physicians services and the market for acute care inpatient hospital services in Southern Brevard County, leading to higher prices for rival insurance companies and, ultimately, consumers.

5. Health First is not just content with monopolizing the market for acute care inpatient hospital services; it wants to capitalize on its illegally-maintained dominant position by extending that power into adjacent markets. In particular, Health First is leveraging its Hospital Monopoly into other healthcare-related markets—including those for ancillary services, physicians' services, commercial health insurance, and Medicare Advantage Plans. In turn, Health First can leverage its market power in those markets to help maintain its Hospital Monopoly. By leveraging its market power in each of these inter-related product markets, Health First damages competition in these markets and increases revenue by creating a vertically integrated, self-reinforcing, illegally maintained healthcare monopoly in Southern Brevard County.

6.     In addition to its Hospital Monopoly, Health First now owns and controls the largest multi-specialty physicians group and the largest private health insurance company in Southern Brevard County.  It is thus impossible to meaningfully participate in any healthcare-related market in Southern Brevard County without doing business with Health First and, more importantly, on Health First's terms.  Those terms are specifically designed with the purpose and effect of maintaining and/or enhancing Health First's market dominance and to further hinder economic competition in the healthcare-related markets in Southern Brevard County.

7.     Independent physician groups generally require certain inputs in their practice to compete effectively, namely: (1) access to patients enrolled in health plans; and (2) access to hospitals.  Health First controls both.  By threatening to deny physician groups access to these vital inputs, Health First could extract certain concessions, including *de facto* agreements by physicians to refer exclusively or nearly exclusively to Health First's hospitals and physician specialists, and to perform ancillary services at Health First's premises.  This requirement to refer on an exclusive basis foreclosed rival hospitals in Southern Brevard County from competing in acute care inpatient hospital services, as hospitals need access to physicians and their referrals to thrive.  The freedom for a physician to refer a patient to the best facility is an important aspect of providing quality healthcare; however Health First's penalty regime made it economically unwise for physicians to exercise this freedom.  Physician groups failing to abide by Health First's exclusivity requirement were impaired in their ability to compete in the market for physician services, as they were foreclosed from insured patients and Health First's facilities.  Their competitive impairment caused them to lose physicians to rival groups that abided by Health First's restrictions.

8.     As a result of the anticompetitive scheme described in this Complaint, Health First has unlawfully maintained its Hospital Monopoly while obtaining market power (or conditions under which there is a dangerous probability that it will obtain market power) in various interconnected, healthcare-related secondary markets.   Moreover, this conduct has injured Plaintiffs while, simultaneously, resulting in supra-competitive prices and lower quality of care for consumers.   Indeed, one of Health First's newest high-level executives has recently conceded that the quality of care provided to patients by Health First is so shockingly low that the new management team, which recently replaced the management team identified in this Complaint as individual defendants, may not be able to improve that level, even if they try.

9.     Defendants' conduct, as set forth herein, also constitutes unfair, deceptive, or unconscionable acts and practices.   Along with maintaining and increasing their monopoly power in violation of the Sherman Act (which is a *per se* violation of Florida's Deceptive and Unfair Trade Practices Act), Defendants' business practices were meant to destroy competition and damage not only the doctors and other participants in healthcare-related markets in Southern Brevard County, but the community and patients they serve as well.

10.    This case is being filed to reinstate competition on the merits for acute care inpatient hospital services, physician services, and health insurance in Southern Brevard County, Florida, and to recover injuries sustained by Plaintiffs both as a result of Health First's anticompetitive conduct and its unfair, deceptive, and/or unconscionable conduct.

## PARTIES

### I.    Plaintiffs

#### A.    Individual Plaintiffs

11.    Plaintiff Craig Deligdish, M.D. is a board-certified hematologist, oncologist, and internal medicine practitioner practicing in Southern Brevard County, Florida.   Dr. Deligdish is

the President of OMNI Healthcare, Inc. ("OMNI").  He was Chairman of the subsection of Hematology and Medical Oncology, Chairman of the Neoplastic Disease Committee, Editor in Chief of Value-Based Cancer Care and a faculty member at the University of Texas Southwestern Medical School, Harvard Medical School, Associate Chief of Staff of Ambulatory Care at Dallas Veteran's Administration Medical Center, and Chief of the Medicine Section at the Dallas Veteran's Administration Medicine Center.

12.    Plaintiff Scott Seminer, M.D. is a physician licensed to practice medicine in the State of Florida.  He is board certified in internal medicine and gastroenterology.

13.    Plaintiff Brian Dowdell, M.D., M.S. is licensed to practice medicine in the State of Florida, and is a member of the medical staff of Holmes RMC.  Dr. Dowdell was formerly President of the Medical Society of Brevard County.  In addition, he is a member of the American Board of Physical Medicine and Rehabilitation, the American Academy of Pain Medicine, North American Spine Society, the Physiatric Association of Spine, Sports and Occupational Rehabilitation, and he is the owner of a clinic which provides pain management services.

14.    Plaintiff Richard Gayles, M.D. is an anesthesiologist licensed to practice medicine in the State of Florida.  He is board certified by the American Board of Anesthesiology, and is a Diplomat of the American Academy of Pain Management.  Dr. Gayles is also certified by the American Board of Pain Medicine, National Board of Medical Examiners, and by the American Heart Association in Basic and Advanced Cardiac Life Support.

15.    Plaintiff Stan Golovac, M.D. is an anesthesiologist licensed to practice medicine in the State of Florida.  He is board certified by the American Board of Anesthesiology, and certified by the American Board of Pain Medicine, by the National Board of Medical Examiners,

and by the American Heart Association in Basic and Advanced Cardiac Life Support. He is also a Diplomat of the American Academy of Pain Management.

16.     Plaintiff Lance Grenevicki, D.D.S., M.D., FACS is a medical doctor and a dentist licensed to practice medicine in the State of Florida and was previously the Chief of the Department of Surgery at Holmes RMC. He was a member of the MEC of Holmes RMC. He was also the Vice President and President of the Medical Society of Brevard County.

17.     Plaintiff Aleksander Komar, M.D. is a board-certified general surgeon licensed to practice medicine in the State of Florida, and is a member of the medical staff of Holmes RMC.

18.     Plaintiff C. Hamilton Boone, P.A. is a physician assistant licensed to practice in the State of Florida, and is a member of the medical staff of Holmes RMC. He is a current or former member of the following associations: the American Academy of Physician Assistants, the Association of Family Practice Physician Assistants, the Florida Association of Physician Assistants, the Georgia Association of Physician Assistants, the North Carolina Association of Physician Assistants, and the National Commission on Certification of Physician Assistants.

19.     Plaintiffs Deligdish, Seminer, Dowdell, Gayles, Golovac, Grenevicki, Komar, and Boone are collectively referred to herein as the "Individual Plaintiffs."

**B.      Medical Practice Plaintiffs**

20.     Plaintiff OMNI is a multi-specialty group practice organized and existing under the laws of the State of Florida. It was founded in 1994 as the Melbourne Medical Group, P.A. OMNI's physicians practice in Southern Brevard County and admit patients to both Health First's and Wuesthoff-Melbourne's medical facilities. OMNI also offers ancillary services at its facilities including, *inter alia*, x-rays/radiology, outpatient surgery, nuclear medicine, audiology, sleep studies, and physical therapy.

21.     Plaintiff Interventional Spine Institute of Florida, doing business as Spine, Orthopedics and Rehabilitation ("S.O.A.R."), is a group practice founded in 2003 with its main office in Melbourne.  S.O.A.R. provides pain management services through the application of advanced interventional pain therapy.  Its physicians practice in Southern Brevard County.  S.O.A.R. also offers ancillary services at its facilities including, *inter alia*, x-rays/radiology, outpatient surgery suites, and physical therapy.

22.     Plaintiff Institute of Facial Surgery, Inc. ("Institute of Facial Surgery") is a practice founded in 2001 by Lance Grenevicki, D.D.S., M.D., FACS, with its main office in Melbourne. The Institute of Facial Surgery team is dedicated to the highest quality of care for dental implant surgery, corrective, cosmetic, and reconstructive jaw surgery and the specialty of oral & maxillofacial surgery.  Its physicians practice in Southern Brevard County.  Institute of Facial Surgery also offer ancillary services at its facilities including, *inter alia*, x-rays/radiology, electrocardiograms, oral microscopy, and laboratory/blood sugar analysis.

23.     Plaintiff The Pain Institute, Inc. d/b/a Florida Pain ("Florida Pain") is a group practice founded in 2005 with its offices in Melbourne, Merritt Island, and Jupiter.  The Pain Institute, Inc. d/b/a Florida Pain is a multi-service facility specializing in neck, back and cancer pain and offers pain management consultation and management services for acute and chronic pain.  Its physicians practice in Southern Brevard County.  In addition to physician services, Florida Pain also offers ancillary services at its facilities including, *inter alia*, laboratory (*e.g.*, drug testing), durable medical equipment (*e.g.*, orthotics), and outpatient surgery (through its in-house surgery suite and ambulatory surgery center).

24.     Plaintiff Physician Assistant Services of Florida, LLC ("PAS"), is a practice founded in 1999 with its main office in Melbourne.  PAS provides surgical physician assistants

8

as first assistants in multiple surgical specialties, saving the surgeon valuable time while reducing costs.

25.    Plaintiffs OMNI, S.O.A.R., Institute of Facial Surgery, Florida Pain, and PAS are collectively referred to herein as the "Medical Practice Plaintiffs."  Where appropriate, the Individual Plaintiffs and Medical Practice Plaintiffs are collectively referred to herein as "Plaintiffs."

## II.    <u>Defendants</u>

26.    Defendant Health First Inc. is a not-for-profit corporation organized and existing since 1995 under the laws of the State of Florida, with its principal place of business in Southern Brevard County.  Health First Inc. is the parent corporation of four affiliated hospitals located in Brevard County Florida: Holmes RMC, Cape Canaveral Hospital Inc. ("Cape Canaveral Hospital"), Palm Bay Hospital, and Viera Hospital, Inc. ("Viera Hospital").  Health First Inc. is also the parent corporation of HF Physicians and HF Health Plans.  Health First Inc. bills itself as "Central Florida's only fully integrated health system."

27.    Holmes RMC, a non-profit corporation organized and existing under the laws of the State of Florida, is a 514-bed acute care inpatient hospital located in Melbourne, Florida, which is in Southern Brevard County.  Holmes RMC is owned and controlled by Health First Inc.

28.    HF Health Plans is a for-profit corporation organized and existing under the laws of the State of Florida, with its principal place of business in Rockledge, Florida.  HF Health Plans opened in late-1995 and operates both health maintenance organization ("HMO") and point-of-service ("POS") health benefit plans; it is, when including Medicare Advantage plan enrollees, the largest health insurance company in terms of covered persons in Southern Brevard County.  HF Health Plans is owned and controlled by Health First Inc.

29.     HF Physicians is a for-profit corporation organized and existing under the laws of the State of Florida, with its principal place of business in Rockledge, Florida.  HF Physicians is the managing member of Health First Medical Group, LLC ("HF Medical") which, after the MIMA acquisition, is Brevard County's largest multi-specialty physicians group with approximately 250 physicians.  The physicians which comprise HF Physicians admit exclusively or almost exclusively to Health First hospitals, and refer exclusively or almost exclusively to other HF Physicians.  HF Physicians is owned and controlled by Health First Inc.

30.     Michael D. Means ("Defendant Means") is an individual residing in Marco Island, Florida.  Defendant Means, along with Defendant Senne, is a co-founder of Health First and formerly its President and Chief Executive Officer.

31.     Jerry Senne ("Defendant Senne") is an individual residing in Winter Park, Florida.  Defendant Senne is the former President and CEO of Holmes RMC.

32.     Defendants Means and Senne will be referred to herein as the "Individual Defendants."

33.     The term "Health First" is used herein to refer to all Health First-related entities, as well as the individual Defendants insofar as they were acting on behalf and for the benefit of Health First.  Where necessary, however, Defendants will be referred to individually.

## CO-CONSPIRATORS

34.     Various other physicians, individuals, firms, and corporations, not named as defendants herein, may have participated as co-conspirators with Defendants and performed acts and made statements in furtherance of the conspiracy.  Plaintiff reserves the right to name subsequently some or all of these persons as defendants.

35.     Whenever in this Complaint reference is made to any act, deed, or transaction of any business entity, the allegation means that the business entity engaged in the act, deed, or

transaction by or through its officers, directors, agents, employees, or representatives while actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

## JURISDICTION AND VENUE

36.    This action is brought pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 14 and 26). Plaintiff seeks statutory damages and injunctive relief from ongoing violations of the antitrust laws of the United States, specifically, Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 & 2), and Section 7 of the Clayton Act (15 U.S.C. §18).

37.    This Court has subject matter jurisdiction over the First, Second, Third, and Fourth Causes of Action pursuant to 28 U.S.C. § 1331 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26; it has supplemental jurisdiction over the Fifth and Sixth Causes of Action pursuant to 28 U.S.C. § 1367 since those claims form part of the same case or controversy and derive from a common nucleus of operative facts.

38.    This Court has personal jurisdiction over each Defendant, because each Defendant: resides in this District; transacted business in this District; and/or committed over acts in furtherance of the illegal scheme and conspiracy alleged herein in this District.

39.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants resided, transacted business, were found, or had agents in this District; most or all of the events giving rise to these claims occurred in this District; and/or a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

## INTERSTATE TRADE AND COMMERCE

40.    The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate commerce.

41.     During the relevant period, a large percentage of the Defendants' revenues come from sources located outside of Florida, including the federal government (through the Medicare and Medicaid programs).

42.     The Defendants purchase a substantial portion of their medicine and supplies from sellers located outside of Florida.

43.     Many employers that have made payments to the Defendants (either directly or through health insurers) sell products or services in interstate commerce.

## MARKET DEFINITION

44.     Defining a relevant market is unnecessary where, as here, there is direct evidence of Health First's monopoly power—*i.e.*, its ability to exclude competitors, raise prices to supra-competitive levels, or restrict output.  Insofar as the Court requires a defined market for purposes of analyzing the claims made herein, for the reasons discussed below, the relevant market in this action is that for acute care inpatient hospital services in Southern Brevard County (the "Relevant Market").

45.     In addition to the Relevant Market, however, there are several healthcare-related markets ("Secondary Product Markets") which are also negatively impacted by Defendants' conduct and which assist Health First in unlawfully maintaining its monopoly in the Relevant Market.  Accordingly, these Secondary Product Markets are also discussed below.

**I.      Relevant Product Markets**

**A.      Primary Relevant Product Market—Acute Care Inpatient Hospital Services**

46.     The primary relevant product market involves acute care inpatient hospital services. There is extremely low cross elasticity of demand between acute care inpatient hospital services and other services, such as outpatient services.

47. A small but significant price increase in the price of acute care inpatient hospital services will not cause patients to switch to outpatient services. The choice of inpatient, as opposed to outpatient, services is largely determined by physicians, and is based on the medical needs of the patient, not on the relative cost of the services.

48. Within the relevant geographic market of Southern Brevard County, Health First has more than a 70% market share of the acute care inpatient hospital services market as measured by patient admissions.

49. Health First's market dominance and anticompetitive conduct in the market for acute care inpatient hospital services has required managed care plans to include all the Health First hospitals in their managed care contracts.

50. Health First's prices for acute care inpatient hospital services are above competitive levels and, more specifically, are above the prices of its only competitor in Southern Brevard County, Wuesthoff-Melbourne.

51. Barriers to entry exist in the acute-care inpatient hospital service market in Southern Brevard County making *de novo* entry difficult, costly, unlikely, and untimely. Building an acute care inpatient hospital is expensive and time-consuming.

52. Other than Health First and Wuesthoff-Melbourne, no new firm has proposed building an acute care inpatient hospital in Southern Brevard County in at least ten (10) years. Health First built Viera Hospital in that time but, since Viera Hospital is owned by Health First, that hospital is only an additional Health First point of access, not a *de novo* entrant.

## B. Secondary Relevant Product Markets

53.    In addition to the primary relevant product market, there are several secondary product markets at issue in this action, including: (i) the market for physician services[1]; (ii) the market for ancillary services; (iii) the market for private health insurance plans; and (iv) the market for Medicare Advantage plans.

### i. Physician Services

54.    The physician services market comprises those services provided by an individual licensed under state law to practice medicine or osteopathy.

55.    There is low cross-elasticity of demand between physician services and other healthcare services rendered by non-physician providers. A small but significant price increase in the price of physician services will not cause patients or managed care plans to switch to non-physician healthcare providers.

56.    Physicians are typically paid on a fee-for-service basis according to prices determined either by the Medicare Fee Schedule (for those patients covered by Medicare) or by provider contracts between the physician/medical practice and health insurance providers (for those patients covered by private health insurance).

57.    The same Medicare Fee Schedule is used for all physicians, regardless of specialty. Similarly, health insurance providers traditionally contract with an entire medical practice, as opposed to separately contracting with each individual provider in a particular practice.

---

[1] In the alternative, Plaintiffs contend that there are individual product markets for the following medical specialties: general practice; surgery; anesthesiology; cardiology/ pulmonology; oncology; urology; internal medicine/gastroenterology; pediatrics; obstetrics/ gynecology; podiatry; pulmonology; orthopedics/physical medicine; otolaryngology/ENT; urgent care/emergency medicine, and neurology.

58.     While patients may have some limited financial responsibility (*e.g.*, a copay amount) associated with a doctor visit, physician services are typically paid for by health insurers and other third-party payors.  Moreover, a patient's utilization of a particular physician's services are generally guided by a single purchase decision—*i.e.*, where to receive treatment.   Once a patient has decided to check into a hospital or visit her primary care physician, many of her subsequent healthcare-related choices (*e.g.*, selecting a specialist) will flow from that original decision.

59.     In recent years, analysts have observed a trend towards consolidation in the physician services industry.  Larger medical practices have increased bargaining power vis-à-vis health insurers and are able to negotiate higher fee-for-service rates as compared to smaller medical practices.

60.     There are high barriers to entry in the physician services market, including *inter alia*, licensure, medical education, and training requirements.

61.     Plaintiffs each participate in the physician services market both as competitors and as suppliers, insofar as they are a source of referrals.

62.     Health First, through HF Physicians, participates in the physician services market both as competitors and as suppliers, insofar as they are a source of referrals.   Since its acquisition of MIMA, Health First (through its wholly owned and controlled subsidiary HF Physicians) has a dominant share of the physician services market in Southern Brevard County.

### ii.        Ancillary Services

63.     The ancillary services market comprises those auxiliary or supplemental services provided by a licensed physician or medical practice to support diagnosis and treatment of a patient's condition.   These services include diagnostic services (*e.g.*, x-rays and laboratory testing), durable medical equipment and medical devices (*e.g.*, crutches and orthotics), therapies

(*e.g.*, radiation therapy and dialysis), and outpatient surgeries (*e.g.*, in-house surgery suites and ambulatory surgery centers).

64.     Ancillary services account for approximately 20% of total healthcare dollars spent and represent one of healthcare's fastest growing components.

65.     There is low cross-elasticity of demand between ancillary services and other types of services.  A small but significant price increase in the price of ancillary services will not cause patients or managed care plans to switch to other types of service providers.

66.     Ancillary services are purchased in conjunction with medical or hospital care. Most commonly, ancillary services are covered and paid for by the patient's insurance, not the patient.  Moreover, patients are often directed to a particular ancillary service provider by their doctors or health plan.  Indeed, patients' health plans (including Health First) typically will only reimburse for services performed by approved ancillary service providers.

67.     The prices for ancillary services are typically set by ancillary service agreements negotiated between physicians or their medical practices and Medicare or private health plans, depending on the patient's type of health insurance coverage.  Thus, price elasticity in the ancillary services market is not informed by patient choices in response to changes in relative prices.

68.     There are high barriers to entry in the ancillary services market, including state licensing requirements, extremely high initial and ongoing capital investment costs, and access to customers/patients, whom are typically controlled by pre-existing relationships between those customers/patients and their doctors and health plan providers.

69. The Medical Practice Plaintiffs participate in the ancillary services as they provide these services at their facilities. The particular ancillary services provided by each Medical Practice Plaintiff are discussed *infra*.

70. Health First participates in the ancillary services market through various wholly owned and controlled subsidiaries, including, *inter alia*: Holmes RMC, Palm Bay Hospital, HF Physicians, Health First Outpatient Diagnostics LLC, Health First Physical Therapy Services LLC. It also participates in this market through certain stand-alone facilities, including, *inter alia*: Health First Diagnostic Center, Health First Medical Rehabilitation, Health First Medical Equipment, Health First Home Care, and Hospice of Health First. Through its ownership and control over these entities, Health First has a dominant share of the ancillary services market in Southern Brevard County.

### iii. Private Health Insurance

71. The private health insurance market comprises all health insurance coverage other than that provided by the government.

72. Private health insurer providers compete with one another to attract enrollees. Three primary characteristics differentiate health plans from the perspectives of the enrollee: (1) size of provider network; (2) restrictions on patient choice; and (3) price of the insurance contract. Enrollees typically prefer a large choice of providers, less restrictions, and lower prices.

73. There is low cross-elasticity of demand between private health insurance and other ways to insure against the risk of incurring medical expenses. A small but significant price increase in the price of private health insurance will not cause enrollees to switch to alternative forms of insurance.

74.     There are high barriers to entry in the private health insurance market, including state and federal licensing requirements, extremely high initial and ongoing capital investment costs, and access to enrollees.  In fact, a *de novo* entrant in the private health insurance market would have particular difficulty entering as it would have less negotiating clout with doctors and hospitals (thus causing them to pay higher prices for their services), while simultaneously needing to charge lower premiums to attract enrollees from incumbent firms in order to gain a foothold.

75.     According to some analysts, it is precisely these barriers to entry which have driven the trend toward consolidation in the health insurance markets as companies have found it easier to simply buy another company rather than enter a new geographic market.

76.     Plaintiffs participate in the private health insurance industry as suppliers of physician services.  This participation is generally dictated by provider contracts between the physician/practice and the health insurance provider.

77.     Health First, through its wholly owned and controlled subsidiary HF Health Plans, participates in the private health insurance industry as a competitor.  Through its ownership of HF Health Plans, Health First has a dominant share of the private health insurance market in Southern Brevard County.

### iv.     Medicare Advantage Plans

78.     The Medicare Advantage Plan market is a distinct sub-segment of the larger private health insurance market.  It comprises those enrollees who have opted to receive their Medicare benefits through private health plans instead of the federally administered traditional Medicare program.

79.     The Medicare Advantage market is a highly regulated industry.  The term itself comes from the Medicare Modernization Act of 2003; it was previously referred to as

"Medicare+Choice" by the Balanced Budget Act of 1997. According to one recent study, 2014 spending on Medicare Advantage plans is expected to be $156 billion nationally with 15.7 million persons enrolled.

80. There is low cross-elasticity of demand between Medicare Advantage plans and other types of health insurance plans. A small but significant increase in the price of Medicare Advantage Plans would not be expected to cause consumers to switch to substitute products.

81. The Medicare Advantage market has high barriers to entry similar to those in the private health insurance market, including state and federal licensing requirements, extremely high initial and ongoing capital investment costs, and access to enrollees.

82. Health First, through its wholly owned and controlled subsidiary HF Health Plans, participates in the Medicare Care Advantage plans market as a competitor. Through its ownership of HF Health Plans, Health First has a dominant share of the Medicare Advantage plans market in Southern Brevard County.

83. Plaintiffs participate in the Medicare Advantage plans market as suppliers of physician services. This participation is generally dictated by provider contracts between the physician/practice and the Medicare Advantage plan provider.

## II.   Relevant Geographic Market

84. The relevant geographic market in this action is no larger than Southern Brevard County. The hospital facilities located in that geographic market would have the economic power, if acting collectively, to increase prices above competitive levels.

85. The outflow rate—*i.e.*, those Southern Brevard County residents who receive acute care inpatient hospital services at hospitals outside of Southern Brevard County—is low and has not varied significantly year-to-year, despite supra-competitive prices and less-than-competitive quality. Similarly, the inflow rate—*i.e.*, those residents outside of Southern Brevard

County who receive acute care inpatient hospital services inside Southern Brevard County—is also low and has not varied significantly year-to-year despite changes in relative prices.

86.     The low outflow and inflow rates for the primary relevant product support a conclusion that acute care inpatient hospitals located outside of Southern Brevard County do not provide sufficient competitive discipline to those within Southern Brevard County to warrant their inclusion in the relevant geographic market.  There is extremely low cross-elasticity of demand between acute care inpatient hospitals located inside and outside of Southern Brevard County.

87.     Only physicians can admit patients to hospitals and there is little overlap between the physicians who admit to acute care inpatient hospitals located within Southern Brevard County, and those who admit to hospitals outside of Southern Brevard County.

88.     Acute care inpatient hospitals located within Southern Brevard County offer prices to managed care plans without regard to prices charged to those plans by non-affiliated acute care inpatient hospitals located outside Southern Brevard County.

89.     Acute care inpatient hospitals located outside Southern Brevard County offer prices to managed care plans without regard to prices charged to those plans by non-affiliated acute care inpatient hospitals located within Southern Brevard County.

90.     If all of the acute care inpatient hospitals located within Southern Brevard County were to raise prices at least 5%, they would not lose enough volume to make such a price increase unprofitable to those hospitals.

91.     There is also low cross elasticity of demand between acute care inpatient hospitals located in Southern Brevard County, and acute care inpatient hospital facilities located outside of Southern Brevard County.

92.     Similarly, there is relatively little physician overlap between the physicians who admit to acute care inpatient hospitals located within Southern Brevard County, and physicians who admit to acute care inpatient hospitals located outside of Southern Brevard County.

93.     Managed care plans cannot substitute acute care inpatient hospitals, or physicians, located outside Southern Brevard County for hospitals and physicians located within that area.

94.     Patients located within Southern Brevard County typically do not utilize acute care inpatient hospitals, or physicians, located outside Southern Brevard County for acute care inpatient hospital or physician services available within Southern Brevard County.

95.     Indeed, Defendants themselves have argued that South Brevard County is a separate geographic market for antitrust purposes.  This assertion was made in a 1995 Submission to the Federal Trade Commission ("FTC") in support of the then-proposed affiliation of Cape Canaveral Hospital and Holmes RMC.  In that submission, Health First argued that the combination of the two facilities would not reduce competition because the two hospitals were in different geographic markets.  Health First's argument to the FTC was successful and, as a consequence, the FTC elected not to challenge the transaction.  There has been no material difference between hospital usage patterns over time.

96.     The same relevant geographic market for the Relevant Market applies for each of the Secondary Product Markets.  Although one might expect some minor variation between products, this is due to the same reasons that caused Health First to conclude that Southern Brevard was its own relevant geographic market in analyzing acute care inpatient hospital services.

97.     As described by Holmes RMC in a Certificate of Need Application filed in April 2004, "Brevard County [is] divided into three natural market areas – North Brevard, Central

Brevard, and South Brevard."  It further stated that these "three sub-regions . . . generally correspond to local trade areas."  This is attributable, at least in part, to the unique geography, as well as the population dynamics, of Brevard County.

## FACTUAL ALLEGATIONS

**III.**  **Background: The Healthcare Industry, Health First, And Southern Brevard County**

    **A.**  **The United States Healthcare Industry**

98.  In the United States as of 2010, about 84% of the population has some form of health insurance.  Health insurance coverage is typically divided into two basic categories: public (which includes Medicare, Medicaid, and military health benefits) and private (which includes employer-sponsored, individual, and college-sponsored plans).

99.  According to the United States Census Bureau in 2010, of those persons with health insurance coverage, approximately 55% of Americans obtain it through an employer, 10% purchase it directly, 14.5% are enrolled in Medicare, 15.9% are enrolled in Medicaid, and 4.2% have military health insurance.

100.  Most persons with private insurance, approximately 90%, utilize some form of managed care plan that contracts with health care providers and medical facilities to provide healthcare for its members at reduced costs.  Those contracts cover a wide range of healthcare-related products and services, including, *inter alia*, physician services, laboratory tests, non-physician provider servicers, inpatient and outpatient hospital services, and (sometimes) prescription drugs.  Providers and facilities which have negotiated contracts with the managed care plan are commonly referred to as being "in-network."

101.  Some managed care plans are "fully insured" plans whereby the managed care organization accepts the insurance risk for healthcare-related expenditures.  For other plans, the employer will accept the insurance risk itself, but will use the managed care plan to provide its

employees with access to the managed care plan's network of providers and facilities, as well as handle administration (*e.g.*, processing and paying claims).  Such plans are called "self-funded plans."

102.    The three most common types of managed care plans are Health Maintenance Organizations ("HMOs"), Preferred Provider Organizations ("PPOs"), and Point of Service ("POS") plans.  Typically, an HMO requires patients to select a primary care provider who coordinates most of the patients' care and the HMO only covers care provided by in-network providers and facilities.  In a PPO plan, patients do not choose a primary care physician but must still choose from the plan's network of contracted physicians.  POS plans are like a hybrid between an HMO and PPO plan.  In a POS plan, patients must select a primary care physician but may still see a physician out of network; however, they will pay more to see out-of-network physicians unless they were referred to that particular provider by their primary care physician.

103.    In addition, some managed care plans are permitted by the federal Medicare program to offer their services on a "risk basis" to Medicare beneficiaries as an alternative to the traditional Medicare program.  Such plans, called Medicare Advantage Plans, offer Medicare beneficiaries incentives in the form of benefits not available under the traditional Medicare plan in order to encourage participation.  Most Medicare Advantage Plans have an out-of-pocket maximum that, once reached, will pay 100% of Medicare-approved services for the remainder of the calendar year so long as the individuals utilize in-network providers.

104.    The core element underlying each of the plans discussed above is the managed care organization's network—*i.e.*, its ability to selectively contract with providers and facilities to obtain discounted pricing in exchange for access to the organizations' members.  Accordingly,

the importance of provider networks and selective contracting in the delivery of affordable healthcare coverage to consumers is widely recognized.

105.    If a medical provider or facility refuses to negotiate with a managed care plan, it runs the risk of losing patient volume to competing providers or facilities.  Thus, in a competitive market, selective contracting encourages medical providers and facilities to accept discounted contractual prices for the services they render in exchange for being a preferred provider in the managed care plan's network.  The result of this competitive pressure is the lowering of net prices to managed care plans and, ultimately, for their members.

106.    Studies suggest that patients are passive consumers of healthcare-related services. A patient's utilization of healthcare services are generally guided by a single purchase decision— *i.e.*, where to receive treatment.   Once a patient has decided to check into a hospital or visit her primary care physician, many of her subsequent choices (such as where to receive ancillary services or which specialist to see) will be guided by the hospital or primary care physician, as well as her health plan's network of approved physicians and ancillary service providers.

107.    Physicians are typically paid on a fee-for-service basis according to prices determined either by the Medicare Fee Schedule (for those patients covered by Medicare) or by provider contracts between the physician/medical practice and health insurance providers (for those patients covered by private health insurance).  Oftentimes, provider contracts are based on some formula which incorporates the values contained in the Medicare Fee Schedule.

108.    The same Medicare Fee Schedule is used for all physicians, regardless of specialty.  Similarly, health insurance providers traditionally contract with an entire medical practice, as opposed to separately contracting with each individual provider in a particular practice.

109.    In recent years, analysts have observed a trend towards consolidation in the physician services industry. Larger medical practices have increased bargaining power and, thus, are able to negotiate higher fee-for-service rates with health insurance providers as compared to smaller medical practices.

110.    While patients may have some limited financial responsibility (*e.g.*, a copay amount) associated with a doctor visit, physician services are typically paid for by the government, private health insurers, and other third-party payors.

111.    Accordingly, decisions regarding price and utilization of healthcare-related services are not typically made by or negotiated with patients.  These decisions are made for the patients by physicians, health plans, and the federal government.

**B.      The Formation of Health First**

112.    Health First was formed in 1995 by the joining of three hospitals: Holmes RMC and Palm Bay Hospital (which are located in Southern Brevard County), and Cape Canaveral Hospital (which is located in Central Brevard County).  This affiliation granted Health First an instant monopoly in Southern Brevard County as it owned and controlled the only two acute care inpatient hospitals in that geographic area.

113.    Soon afterwards, Health First vertically integrated into the physician services and health insurance markets.  In 1995, it formed its own physicians group, HF Physicians.  In 1996, Health First created HF Health Plans to offer HMO plans in Brevard County.

114.    Health First has long recognized its monopoly power and has publicly (and flippantly) acknowledged its existence.  For example, when the head of the Central Brevard Health Care Coalition urged Defendant Means, then President of Health First, to obtain an improved health information system he responded that he did not have to because "he was a monopolist."

25

115.    Holmes RMC (formerly known as Brevard Hospital) began in 1937, and is the largest hospital in Brevard County.  It is also the only hospital in Southern Brevard County with a Level II Trauma Center, Level II Neonatal Intensive Care Unit, and air ambulance (First Flight helicopter).

116.    Due to its size and unique offerings, Holmes RMC is considered what healthcare experts refer to as a "must-have" hospital.  In other words, any managed care plans which intend to market their products in Brevard County have little choice but to include Holmes RMC in their network.  Wuesthoff-Melbourne, Health First's only hospital competitor in Southern Brevard County, is currently too small to provide the same range of services that Holmes RMC provides and is only a limited competitor to Holmes RMC.

**C.      Health First Leverages its Market Power in Various Markets to Create a Vertically Integrated Healthcare Monopoly**

117.    Health First openly bills itself as "Central Florida's only fully integrated healthcare system."  In this context, the term "fully integrated" means controlling the markets for acute care inpatient hospitals, physician services, ancillary services, private health insurance, and Medicare Advantage plans in Southern Brevard County.  This can best be described as a vertically-integrated or fully-integrated healthcare monopoly.

118.    To that end, Health First has leveraged its Hospital Monopoly to gain market power in other healthcare-related markets, including those for physicians' services, ancillary services, private health insurance, and Medicare Advantage plans.  At the same time, Health First also augments its Hospital Monopoly by leveraging its dominance in those same related markets.

119.    Once Health First secured its Hospital Monopoly through acquisition, it was able to leverage that monopoly power into an adjacent market, private health insurance.  It accomplishes this by exploiting Holmes RMC's "must have" status and requiring rival health

insurance plans to include *all* Health First hospitals in their network as a precondition to including Holmes RMC. By forcing its private health insurance competitors to contract all of its hospitals together as a group, Health First can require them to pay its other hospitals supra-competitive prices as a condition for inclusion of its must-have hospital, Holmes RMC, in their network. Health First can also price discriminate—*i.e.*, charge its affiliated health plan, HF Health Plans, less for acute care inpatient services than it charges rivals such as Blue Cross Blue Shield, Aetna, etc. This effect is supported by the fact that, according to representatives of some private health insurers, the fees charged by Health First's hospitals in Southern Brevard County are among the highest, if not *the* highest, in the State of Florida.

120. Next, after Health First had gained a dominant share in the private health insurance market, it can leverage that market power into the physician and ancillary services markets by denying rival providers access to the patients enrolled in Health First's health plans. This, in turn, is done to induce physicians to either join Health First's physician group (bolstering Health First's market power in physician services) or refer their patients exclusively to Health First's hospitals and ancillary providers (bolstering Health First's market power in acute care inpatient hospital services and ancillary services).

121. Once inside the Health First family, those physicians can charge rival health plans higher rates for both horizontal and vertical reasons: if those rates are not accepted, patients enrolled in rival insurance plans might switch to a Health First plan in order to keep their preferred physician; if those higher rates are accepted, Health First has successfully raised its insurance rivals' costs. It's a win-win situation for Health First.

122. Thus, by being "fully integrated," Health First's market power reinforces itself across each of the inter-related healthcare markets in which it participates. This "fully

integrated" model was created with the specific intent to use its market power to exclude competition in the Relevant Market and other healthcare-related markets in which Health First competes (including the physician services, ancillary services, private health insurance, and Medicare Advantage markets). As described throughout this Complaint, that model has achieved its intended effect—*i.e.*, Health First has successfully excluded or restrained its competitors, including Plaintiffs, and Health First has been able to charge supra-competitive prices while lowering the quality of care received at its facilities.

123. Health First's use of its vertically or fully integrated healthcare monopoly severely hinders competition at all market levels, resulting in both higher prices and lower quality of care. There is no valid business justification for Health First's actions, including the restrictions it imposes on independent physicians, as they were undertaken specifically to exclude competition and not to create cost savings or increase quality of care.

## IV. **Defendants' Common Scheme**

124. Since at least March 2004[2], Defendants and their co-conspirators have participated in a common scheme that has unfairly and unreasonably restrained competition in multiple healthcare-related markets in Southern Brevard County, while simultaneously harming Plaintiffs. This common scheme is complex and involves multiple types of exclusionary conduct, each of which is addressed individually below.

125. Even prior to acquiring MIMA (then the largest remaining independent physician group), Health First was able to induce MIMA's physicians into admitting exclusively or nearly exclusively to Health First hospitals. This was accomplished by offering MIMA financial perks

---

[2] In March 2004, Defendant Senne invited Dr. Seminer and OMNI to join the conspiracy by offering to include OMNI in the Health Plan provider network if it agreed to admit its patients exclusively to Health First's hospitals. [*See* ¶ 207, *infra*.]

and other preferential treatment in exchange for exclusivity. By agreeing to receive these perks and preferential treatment, MIMA shared in the monopoly profits generated by Health First.

126. One such perk was to grant MIMA an exclusive right to provide radiation therapy services to Health First's members, with Health First shutting down its competing radiation therapy department and selling its equipment to MIMA. That radiation oncology program became the most profitable of all of MIMA's ancillary services.

127. Another example of preferential treatment is when the federal government required MIMA to pay $12,000,000 for Medicare fraud relating to its oncology program, neither Health First nor its subsidiaries did anything to hold MIMA accountable for its over-utilization of those same services provided to HF Health Plans' patients.

128. Health First also conspired with the physicians practicing at its hospitals to facilitate the election of MIMA physicians to positions on the hospitals' Medical Executive Committees ("MECs"). This not only rewarded MIMA for its participation in the conspiracy, but reinforced Health First's ability to influence medical decisions that could maximize revenue and ensure maintenance of its monopoly.

129. In exchange for these and other benefits, MIMA providers referred less than 1% of their patients to rival Wuesthoff-Melbourne even prior to its acquisition by Health First. MIMA's reasons for not using Wuesthoff-Melbourne are pretextual. They claimed that Wuesthoff-Melbourne was too far, but MIMA built a newer building closer to Wuesthoff-Melbourne than Holmes RMC, and admission patterns never changed. They also claimed that physicians did not want to have to be on two staffs. However, MIMA physicians were on the staffs of both Palm Bay and Holmes RMC, even though the distance between these hospitals is greater than the distance between Holmes RMC and Wuestoff-Melbourne, making it more

inconvenient being on the staff of those two Health First hospitals. Additionally, being on staff at two hospitals is not problematic for medical groups as they routinely split their staffing requirements so that physicians who staff one hospital primarily take all of the on call responsibilities at that particular hospital for their group.

130. Existence of the contractual and/or *de facto* exclusivity agreements with providers is further evidenced by MIMA's conduct after one insurer tried to exclude Health First's hospitals from its network. In or around 2006, after Aetna Life Insurance Co. ("Aetna") determined that Health First's hospitals were considerably more expensive than other hospitals in and around Brevard County, Aetna decided to try and exclude Health First's hospitals from its network.

131. After Aetna announced its intention to exclude Health First from its network, MIMA promptly terminated its relationship with Aetna, thus refusing to accept Aetna's paying patients because MIMA would have to see those patients at Wuesthoff-Melbourne. But for the benefits it received from Health First (*i.e.*, sharing in Health First's monopoly profits), such a decision would be against MIMA's unilateral economic self-interest. Yet MIMA refused to re-contract with Aetna until after Health First's hospitals re-contracted with Aetna.

132. In essence, by threatening to terminate physicians from its health plans, Health First has the power to control the market for physicians in Southern Brevard County. Failure by any physician to accede to the demands of Health First–*e.g.*, by refusing to exclusively admit patients to their facilities or refer to their physicians—resulted in termination from the health plan and, thus, exclusion from the largest source of patients in Southern Brevard County.

133. This power to exclude is demonstrated by the fact that physicians who participate in HF Health Plans only send 15% of their non-HF Health Plans patients (which they could send

anywhere) to Wuesthoff-Melbourne.  In contrast, physicians who do not participate in HF Health Plans utilize Wuesthoff-Melbourne 45% of the time.

134.    Thus, performing services at Health First hospitals, gaining access to patients enrolled in HF Health Plans, and obtaining referrals from Health First's hospitals and/or primary care providers is preconditioned on the understanding that physicians demonstrate sufficient loyalty to Health First, including only using Health First hospitals and referring only to other Health First physicians.

135.    For these reasons, on information and belief, Plaintiffs believe that there are numerous unidentified co-conspirators beyond MIMA which have agreed to Health First's exclusive dealing arrangements.

     **A.**     **Types of Exclusionary Conduct**

         **i.**    **Health First Coerces Physicians Into Entering Exclusive Dealing Arrangements**

136.    If a physician practicing in Southern Brevard County wants to be included in Health First's provider network, he or she must agree to refer all or nearly all patients to Health First's hospitals, ancillary providers, and physician specialists.  Those that agree to Health First's terms have entered into *de facto* exclusive dealing arrangements with Health First.

137.    These exclusive dealing arrangements enable Health First to strengthen its already dominant positions in the acute care inpatient hospital, ancillary, and physician services markets in Southern Brevard County.

138.    The exclusive dealing arrangements were obtained through coercion, including the threat of being excluded from a significant portion of the physician services market in Southern Brevard County.  They are indefinite in duration and physicians are not free to terminate them unless they wish to also be blacklisted.

139.    Health First and the doctors who have agreed to the exclusive dealing arrangements collectively control a dominant share of all patient admissions and referrals in Southern Brevard County—*i.e.*, where their patients receive medical treatment, where they receive ancillary services, and to which specialists they are referred.  Thus, these exclusive dealing arrangements have unreasonably deprived other physicians, ancillary service providers, and hospitals of a market for their goods and services.

140.    Not only are competing suppliers in those markets harmed by this conduct, but patients, health insurers, and third-party payors in those markets are similarly injured as they have been deprived of the benefits afforded by the ambit of free competition.  As a result, prices are higher, quality is lower, and consumer choice is lessened as new market entrants are prevented from entering those markets.

141.    There are no obvious pro-competitive effects which justify imposition of these exclusive dealing arrangements.  They are not necessary to assure supply or price stability, nor do they enable long-term planning on the basis of known costs.

### ii.    Health First Ties Access to its Health Plan Members to the Use of Its Medical Facilities, Ancillary Providers, and Physician Specialists

142.    Those physicians, like Plaintiffs, who refuse to be bound by Health First's exclusivity agreements are denied the opportunity to provide healthcare-related services to Health First's members or patients.  Accordingly, Health First has tied access to its health plan members to utilization of its hospital, ancillary, and physician services, thus restraining free competition in those markets in an appreciable and unreasonable manner.

143.    This type of exclusionary conduct, referred to as "tying," is particularly effective (*i.e.*, anticompetitive) since Health First, through its wholly owned and controlled subsidiary HF Health plans, covers more insured persons in Southern Brevard County than any other private

health insurance company. But for its market power in private health insurance, Health First would not be able to coerce physicians into exclusively utilizing its hospitals, ancillary providers, and physician specialists.

144. This conduct not only harms those physicians who are denied access to Health First's members, it also harms patients and Health First's competitors in those leveraged product markets. As a result of these restraints on free competition, prices are higher, quality is lower, and consumer choice is lessened as new market entrants are prevented from entering those markets.

145. There are no obvious pro-competitive effects which justify this conduct.

### iii. Health First and Its Co-Conspirators Boycott and Refuse to Deal with Plaintiffs

146. Those physicians who refuse to enter into exclusive dealing arrangements with Health First are not only denied access to Health First's members and patients, they are also blacklisted by all physicians who have agreed to the exclusive dealing arrangement (*i.e.*, Health First's co-conspirators). Moreover, this blacklisting is not limited to patients covered by Health First insurance plans; it also extends to the conspiring physicians' patients who are covered by other insurance providers. Such conduct constitutes a group boycott or concerted refusal to deal.

147. Prior to the group boycott, Plaintiffs received referrals from MIMA, HF Physicians and inpatient referrals from physicians at Holmes RMC and Palm Bay Hospital. Afterwards, they received few if any referrals from these sources.

148. HF Physicians is the largest multispecialty practice in Southern Brevard County. Together with MIMA and the other co-conspirators, these physicians have market power in the physician services market in Southern Brevard County. Accordingly, those physicians who, like

Plaintiffs, are subjected to the group boycott are foreclosed from a substantial part of the physician services market.

149. In addition to harming physicians, this group boycott negatively affects acute care inpatient hospitals and ancillary service providers. Those physicians who agree to Health First's exclusive dealing arrangement are further prohibited from utilizing the acute care inpatient hospitals and ancillary services of Health First's competitors.

150. Thus, the exclusive dealing arrangements have also resulted in a concerted refusal to deal with Wuesthoff-Melbourne, Health First's only acute care inpatient hospital competitor in Southern Brevard County, as well as a substantial percentage of ancillary service providers in Southern Brevard County. This effect is compounded by the fact that patients often receive ancillary services at the facilities where they receive their medical treatment.

151. But the group boycott and the concerted refusal to deal not only harms those physicians, ancillary service providers, and hospitals that are blacklisted; it also harms the patients, private health insurers, and third-party payors who are paying for services in those product markets in Southern Brevard County. As a result of these restraints on free competition, prices are higher, quality is lower, and consumer choice is lessened as new market entrants are prevented from entering those markets.

152. There are no pro-competitive justifications for imposition of this group boycott or concerted refusal to deal. Instead, Defendants have engaged in the group boycott with the intent of maintaining or extending its market power in the acute care inpatient hospital, physician, and ancillary services markets in Southern Brevard County.

### iv.    Health First Actively Lures Physicians Away from Plaintiffs' Medical Practices and Limits Their Ability to Grow

153.    The Medical Practice Plaintiffs have been further injured by having their physicians actively lured away from their practices, and by creating conditions which artificially prevented them from achieving growth.

154.    After terminating the practice's provider contract, Health First would systematically approach physicians in those practices and inform them that they could regain access to Health First's patients and referrals *if* they left their practice and joined HF Physicians or an independent group more loyal to Health First (*i.e.*, one in which the physicians had agreed to enter into exclusivity arrangements).

155.    These conversations were often initiated by Defendants Mean and Senne, where they would further insist that the physicians' current practices were going to fail or be driven out of business.

156.    For example, S.O.A.R. lost four physicians after it was terminated from the Health First network.  Dr. Dowdell was specifically told by a HF Health Plans employee that the only way he and other S.O.A.R. physicians would be permitted back into the Health First network was if they joined a practice group that was "friendly" to Health First, such as MIMA.  Dr. Dowdell was further told that, if S.O.A.R. hired a new physician that was already in the Health First network, that physician would be removed from the network as soon as he or she joined S.O.A.R.

157.    Similarly, after OMNI lost its provider contract with Health First, it was told that Health First would only renew its provider contracts with former OMNI physicians on an individual basis and, even then, only if they left OMNI and agreed to admit their patients exclusively to Health First's hospitals/providers and *not* to OMNI or its providers.  Health first then went on a campaign to convince OMNI physicians to leave the practice and join "Health

First friendly" practices. As a result of these efforts, OMNI shrank from a group of approximately seventy (70) providers to a group of approximately twenty (20) providers. OMNI was also forced to sell its pharmacy operations, close certain offices, and divest itself of ownership in an ambulatory surgery center (all product markets in which Health First also competed).

158. Because of Health First's anticompetitive scheme, many physicians left the Medical Practice Plaintiffs and joined other medical practices, including HF Physicians and MIMA. The scheme also prevented the Medical Practice Plaintiffs from growing their business as it limited their access to insured patients. This, in turn, resulted in loss of income to the Medical Practice Plaintiffs.

### v. Health First Threatens to Revoke Hospital Privileges of the Doctors Who Refuse to Support its Scheme

159. Besides boycotting, Health First also can punish physicians who refuse to abide by its exclusive dealing arrangements by unjustifiably revoking their hospital privileges. Without hospital privileges, a physician cannot perform services at that facility.

160. This threat is particularly powerful due to Health First's Hospital Monopoly in Southern Brevard County and, in particular, Holmes RMC's status as a "must have" hospital in that geographic area. Thus, losing medical privileges at Holmes RMC severely limits a physician's ability to effectively compete in Southern Brevard County.

161. In 2010, after OMNI already had its provider contract terminated by Health First, Holmes RMC—the hospital that had previously awarded Dr. Deligdish with an award for "Doctor With the Biggest Heart"—revoked Dr. Deligdish's hospital privileges without cause or justification.

36

162. Dr. Deligdish's hospital privileges were revoked because he refused to agree to Health First's exclusive dealing arrangement and was too vocal in opposing Health First's anticompetitive scheme.

163. As a result, Dr. Deligdish has been unable to effectively compete in the physician services market in Southern Brevard County and has lost significant income.

### vi. Health First Has Leveraged its Market Power in Each of the Product Markets to Maintain and Strengthen its Stranglehold on All Healthcare in Southern Brevard County

164. Health First, through its various wholly owned and controlled subsidiaries, has a dominant share in each of the relevant product markets at issue in this case:

- Through its ownership and control of Holmes RMC and Palm Bay Hospital, Health First has a dominant share of the acute care inpatient hospital services market in Southern Brevard County;

- Through its ownership and control of HF Physicians, Health First has a dominant share of the physician services market in Southern Brevard County;

- Through its ownership and control of HF Health Plans, Health First has a dominant share of both the private health insurance market (non-Medicare Advantage) and Medicare Advantage plan market in Southern Brevard County; and

- Through its ownership and control over Holmes RMC, Palm Bay Hospital, HF Physicians, Health First Outpatient Diagnostics LLC, Health First Physical Therapy Services LLC, as well as certain stand-alone facilities such as Health First Diagnostic Center, Health First Medical Rehabilitation, Health First Medical Equipment, Health First Home Care, and Hospice of Health First, Health First has a dominant share of the ancillary services market in Southern Brevard County.

165. Through use of exclusive dealing arrangements, tying, group boycott/concerted refusals to deal, and other restraints on competition, Health First is able to leverage its market power in these various healthcare-related markets to maintain or extend its market power in adjacent markets.

166. For example, the exclusive dealing arrangements discussed *supra* are used to leverage Health First's market power in the private health insurance market to maintain or grow market share in the acute care inpatient hospital, physician, and ancillary service markets in Southern Brevard County.

167. Similarly, the group boycott discussed *supra* is used to leverage Health First's market power in physician services to maintain or grow market share in the acute care inpatient hospital, physician, and ancillary service markets in Southern Brevard County.

168. As a result, competition in the acute care inpatient hospital, physician, and ancillary service markets in Southern Brevard County has been unreasonably restrained and, therefore, prices in those markets are higher, quality is lower, and consumer choice is limited.

**B.      Each Defendant Had a Role in the Scheme**

**i.      Health First Inc.**

169. Health First Inc. is the parent company of all of the other Health First-related entities. Health First and its various wholly owned subsidiaries have a complete unity of interest, and their actions are guided by one corporate consciousness.

170. Consistent therewith, Health First and its subsidiaries hold themselves out to the public as a single entity. In fact, Health First openly bills itself as "Central Florida's only fully integrated health system." Similarly, when negotiating rates/prices for hospital and physician services, Health First negotiates as a single economic entity, Health First Inc., as opposed to separately negotiating as Holmes RMC, Palm Bay Hospital, and HF Physicians.

171. Management at Health First Inc. exerts day-to-day control over all things "Health First." Not surprisingly, there is substantial overlap between the board of directors of the Health First parent entity and the boards of all its subsidiaries, further supporting the conclusion that there is but one centralized organization.

172.     The terms of these board members tend to be long and self-perpetuating, thus permitting individual board members to benefit by hundreds of thousands of dollars while management is permitted to control the corporation without serious oversight.

173.     The common scheme complained of herein was designed and implemented by Health First Inc.'s board of directors.  Each of the Health First-related entities is used merely as an agency or instrumentality of Health First Inc. in achieving its monopolistic agenda.

     **ii.**     **Holmes RMC**

174.     Health First attempts to monopolize the acute care inpatient hospital services market in Southern Brevard County through its hospitals.  Health First's largest hospital in Southern Brevard County is Holmes RMC, which is considered a "must have" hospital with a dominant share in this geographic market.

175.     Moreover, Holmes RMC actively assists Health First in leveraging its Hospital Monopoly into other markets by, *inter alia*, refusing to make inpatient referrals to blacklisted physicians and, in some cases, revoking their hospital privileges.  Such actions establish Holmes RMC's role in the group boycott described *supra*.

176.     For example, a substantial portion of Dr. Dowdell's practice (as many as ten to fifteen patients a day) previously consisted of inpatient referrals from Holmes RMC.  As soon as Dr. Dowdell refused to participate in Health First's exclusive dealing arrangements, Dr. Dowdell stopped receiving such referrals.  This includes patients covered by insurance providers other than Health First.

177.     As yet another example, Holmes RMC revoked Dr. Deligdish's hospital privileges in 2010, without cause or justification, in response to Dr. Deligdish voicing his concerns over

Health First's exclusionary practices. Holmes RMC had previously awarded Dr. Deligdish with an award for being the "Doctor With the Biggest Heart."

178. As these examples demonstrate, Holmes RMC is not a passive, third-party beneficiary of its parent company's monopolistic practices. Rather, Holmes RMC affirmatively participates in the common scheme described herein in order to further its shared goal with the other Health First entities—*i.e.*, monopolizing all healthcare-related markets in Southern Brevard County.

### iii. HF Physicians

179. Health First attempts to monopolize the physician services market in Southern Brevard County through its multispecialty physician practice, HF Physicians. Following Health First's acquisition of MIMA, HF Physicians (now d/b/a Health First Medical Group) has a dominant share in the physician services market in Southern Brevard County.

180. Furthermore, in order to effectuate Health First's group boycott, the physicians employed by HF Physicians (including those formerly associated with MIMA) were required to boycott those physicians who refused to enter into Health First's exclusive dealing arrangement by refusing to refer patients.

181. As soon as Plaintiffs had their provider contracts terminated or were otherwise blacklisted by Health First, each of them stopped receiving referrals from the physicians employed by HF Physicians and MIMA. This group boycott extended not only to patients covered by Health First plans, but also those covered by Health First's insurance company competitors (*e.g.*, Blue Cross Blue Shield, Aetna).

182. For these reasons, HF Physicians played an integral part in Health First's anticompetitive scheme.

### iv. HF Health Plans

183.   Health First attempts to monopolize the private health insurance market in Southern Brevard County through its wholly owned and controlled subsidiary, HF Health Plans. HF Health Plans has a dominant share in the private health insurance market in Southern Brevard County, and it covers more insured patients in that geographic area than any other private health insurance company.

184.   HF Health Plans plays a central role in the common scheme described herein.  It is HF Health Plans that refuses to deal with Plaintiffs since they rejected Health First's exclusive dealing arrangements.  Moreover, but for HF Health Plan's market power in private health insurance, Health First would not be able to coerce other physicians into exclusively utilizing its hospitals, ancillary providers, and physician specialists (the tied products).

185.   HF Health Plans' role is not limited to refusing to deal with Plaintiffs.  It is also actively involved in convincing physicians that they must refer all patients to Health First's medical facilities, ancillary service providers, and physician specialists.

186.   For example, it was Peter Weiss, Medical Director of HF Health Plans, who visited Dr. Dowdell's facilities and upon learning about the surgical procedures and x-rays that were being performed at his office, demanded Dr. Dowdell cease performing these procedures. Further, he instructed Dr. Dowdell that he could only perform these procedures at Health First's ancillary facilities.  When Dr. Dowdell refused (because performing those ancillary services on site was less expensive and more efficient), Dr. Dowdell received a letter from HF Health Plans terminating his provider contract and removing him from Health First's provider network.

187.   For these reasons, HF Health Plans is a primary participant in the common scheme devised by Health First.

### v.　Michael Means

188.　Defendant Means is one of the co-founders of Health First.  He served as Chief Executive Officer and President of Health First Inc. from 1995 to December 2011, and he also served as President and Chief Executive Officer of Holmes RMC and Palm Bay Hospital since 1989.  Defendant Means further served as a member of the board of HF Health Plans, and as a Director of Health First Inc. until December 2011.

189.　In these positions, Defendant Means authorized, participated in, directed, approved, and/or ratified the unlawful acts described in this Complaint.  His role in the anticompetitive scheme can be inferred not only from the positions he held at Health First, but from various actions and statements he made in furtherance and/or support of the scheme.

190.　For example, Defendant Means reportedly instructed the CEO of Wuesthoff-Melbourne to "stay out of South [Brevard] County."  Subsequently, he reportedly told the physicians at a Medical Staff meeting at Holmes RMC, "If you sign letters of support for Wuesthoff, we will know who you are."

191.　These affirmative acts demonstrate that Defendant Means actively and knowingly engaged in a scheme designed to achieve anticompetitive ends—*i.e.*, to unlawfully maintain Health First's Hospital Monopoly and to attempt to monopolize several other healthcare-related markets—and exerted his influence so as to shape Health First's corporate intentions.

### vi.　Jerry Senne

192.　Defendant Senne is the former President and Chief Executive Officer at Holmes RMC, as well as the founding President and Chief Executive Officer of HF Health Plans.  He was also the Executive Vice President and Chief Strategy Officer of Health First Inc.

193.    In these positions, Defendant Senne authorized, participated in, directed, approved, and/or ratified the unlawful acts described in this Complaint.  His role in the anticompetitive scheme can be inferred not only from the positions he held at Health First, but from various actions and statements he made in furtherance and/or support of the scheme.

194.    For example, when OMNI first approached Health First in 1997 in order to participate in the HF Health Plans plan, Defendant Senne told OMNI that only physicians employed by HF Physicians and MIMA would be permitted to participate in the HF Health Plans.  Later, Defendant Senne explicitly instructed OMNI that it could participate in the HF Health Plans' network if it agreed to admit its patients exclusively to Health First's hospitals.

195.    These affirmative acts demonstrate that Defendant Senne actively and knowingly engaged in a scheme designed to achieve anticompetitive ends—*i.e.*, to unlawfully maintain Health First's Hospital Monopoly and to attempt to monopolize several other healthcare-related markets—and exerted his influence so as to shape Health First's corporate intentions.

### C.    The Common Scheme Has Harmed Competition

196.    The common scheme described above not only harms those physicians, ancillary service providers, and hospitals that have been blacklisted, it also injures the patients, private health insurers, and third-party payors who are paying for services in those product markets in Southern Brevard County.

197.    As a result of the restraints on free competition imposed by Health First and its co-conspirators, prices are higher, quality is lower, and the number of suppliers is fewer.  New market entrants are prevented from entering the market, while existing competitors are kept from effectively competing in those product markets in Southern Brevard County.

198.    There are no pro-competitive justifications for these restraints sufficient to overcome their anticompetitive effects.  This is evidenced by the fact that prices are higher and

the quality of care lower in each of these product markets in Southern Brevard County when compared to surrounding areas.

### D. The Common Scheme Has Harmed Plaintiffs

#### i. OMNI Healthcare, Dr. Deligdish, and Dr. Seminer

199. Unlike HF Physicians, MIMA, and other co-conspirators with contractual and/or *de facto* exclusivity agreements with Health First, OMNI and its physicians admit patients to both Health First and non-Health First hospitals, depending on the medical needs and circumstances of their patients.

200. OMNI first approached Health First in 1997 to participate in the HF Health Plans plan so that its physicians could provide care to HF Health Plans' members. At that time, OMNI was told by Defendant Senne that only physicians employed by HF Physicians and MIMA would be permitted to participate in the HF Health Plans.

201. Between 1997 and 1999, OMNI again approached Health First on multiple occasions seeking to participate in the HF Health Plans. Each of those requests was also denied.

202. In 2000, OMNI was finally permitted to participate in the HF Health Plans. That participation, however, was limited to OMNI primary care physicians; OMNI physician specialists and ancillaries were not permitted to participate. HF Physicians and MIMA were the only physician groups whose specialists were permitted to provide specialty care. This exclusivity cemented Health First's dominance in the supply of these services and ensured that Health First's patients continued to be admitted exclusively to Health First's hospitals.

203. In May 2002, OMNI specialty physicians were finally offered an agreement to provide specialty care to HF Health Plans' members, but at a significantly discounted rate compared to MIMA specialists.

204.    Not coincidentally, also in 2002, Wuesthoff-Melbourne opened after Health First had lost its hard-fought battle to prevent it from opening.  Wuesthoff-Melbourne is smaller than Holmes RMC, but nonetheless has 115 private rooms and offers a wide range of services (including interventional cardiac care, full-service emergency department, surgery suites, family birth place, diagnostic and rehabilitation services) and ancillary services (including reference laboratory, homecare, nursing facility, assisted living facility, hospice, home medical equipment, wound care and hyperbaric center).

205.    Despite repeated requests from Health First, OMNI refused to agree to admit its patients exclusively to Health First's hospitals.  In response, Health First threatened to retaliate by recruiting physicians to compete with OMNI and to offer them higher rates and compensation.  Health First made good on its threats, eventually hiring both additional primary care physicians and specialists. Health First further retaliated by, among other things, transferring OMNI's Health First patients to its own physicians, terminating a contractual program whereby OMNI provided unassigned call coverage at Health First's Palm Bay Hospital, and commissioning chart audits on OMNI's physicians.

206.    During this time period, Health First explicitly refused to increase OMNI's provider rates (which were lower than the rates for HF Physicians and MIMA providers) unless OMNI agreed to admit its patients exclusively to Health First's hospitals.

207.    In March 2004, Defendant Senne met with Plaintiff and OMNI physician Dr. Seminer and offered to allow OMNI to remain a participating member of HF Health Plans in exchange for an agreement by OMNI to admit its patients exclusively to Health First's hospitals.

208.    Ultimately, after its repeated attempts to coerce OMNI into admitting exclusively to Health First's hospitals, Health First refused to renew OMNI's contract with HF Health Plans.

Instead, Health First demanded that OMNI's physicians contract individually with HF Health Plans as opposed to contracting as a group.

209.   OMNI again refused to admit exclusively to Health First's hospitals but did agree in good faith (albeit under duress) to "support" Health First's Palm Bay Hospital without agreeing to exclusively admit to Health First's hospitals.  A Letter of Intent to that effect was executed in January 2005, which also included a provision that Health First agreed to stop discriminating against OMNI and pay its physicians no less than other providers within HF Health Plans' network.

210.   In 2007, OMNI learned that Health First was paying other physicians with whom they contracted (*i.e.*, those admitting exclusively or nearly exclusively to Health First's hospitals) higher rates than what OMNI's physicians were receiving.  When OMNI brought this to Health First's attention, Health First demanded that OMNI retroactively amend its provider agreement to eliminate the contractual provision agreeing to pay OMNI physicians no less than other providers within HF Health Plan's network, again threatening retaliation.

211.   Health First made good on its threats of retaliation, this time by cancelling OMNI's self-funded health insurance plan covering its 500+ employees and dependents, which had been contractually administered by HF Health Plans.  Health First further refused, contrary to Florida law, to provide OMNI with its claims experience file so that OMNI could obtain alternate health insurance for its employees and their dependents.

212.   Health First retaliated against OMNI for its refusal to admit exclusively to Health First's hospitals in other ways, including but not limited to:

- Terminating OMNI's pharmacy contract as a provider in Health First's Medicare Part D Plan, despite the fact that it met the plan's terms and conditions for participation;

46

- Fabricating a $1 million alleged overpayment for fees and services rendered over a two-year period by OMNI;

- Refusing to reimburse for digital mammograms provided by OMNI and requiring its patients to receive preauthorization for digital mammography on the false grounds that the technology was unproven, that is until several months later when Health First was able to purchase its own digital mammography equipment, after which it struck the requirement for preauthorization;

- Initiating a sham audit of OMNI and requesting more than 1,000 of OMNI's charts; and

- Failing to compensate OMNI physicians at the same rate that they compensated other physicians, and litigated this payment issue with OMNI through binding arbitration.

213.    Then in 2007, Health First's refused to re-credential OMNI's physicians and terminated OMNI's participation in HF Health Plans.  For several years after terminating OMNI, Health First actively encouraged OMNI's physicians to leave OMNI by promising the physicians that, if they left OMNI and joined another physician group (*i.e.*, a group which admitted patients exclusively to Health First's hospitals and referred exclusively to Health First's physician and ancillary service providers) that they would be permitted to participate in HF Health Plans.  In addition, physicians who left OMNI for other physician groups were only allowed to participate in Health First's health plans if they agreed not to refer any patients to OMNI.

214.    Thus, Health First not only refused to deal with OMNI (one of its most significant competitors in the physician services market), it refused to deal with those physicians who dealt with OMNI.  This conduct constitutes an attempt by Health First to use its market power in the private health insurance market to distort competition in the market for physician services in Southern Brevard County.

215.    Up until the time that MIMA was acquired by Health First, MIMA conspired with Health First to exclude and foreclose OMNI's participation in the physician and ancillary services markets.  MIMA along with Health First did not refer OMNI any patients nor did they

refer patients to OMNI's ancillary services.  Because of the conspiracy, MIMA engaged in an anticompetitive conduct that damaged competition.  The goal of the conspiracy was clear— Health First was to maintain its monopoly, or become a monopolist in those markets in which it did not have market power.

216.    As a result, OMNI eventually shrank from a group of approximately 70 providers to a group of approximately 20 providers.  OMNI was also forced to sell its pharmacy operation, close certain offices, and divest itself of ownership in an ambulatory surgery center (all product markets in which, again, Health First also competed).

217.    Periodically since Health First terminated OMNI's participation in HF Health Plans in 2007, OMNI has reapplied for inclusion in HF Health Plans' network.  As of the date of this Complaint, OMNI has not been accepted in HF Health Plans' network despite its continued attempts to reapply.

218.    Drs. Deligdish and Seminer, as partners at OMNI, were both formerly contracted with Health First as participating providers.

219.    As described above, both Drs. Deligdish and Seminer (as partners at OMNI) were terminated from the HF Health Plans network as a result of their refusal to submit to Health First's anticompetitive scheme.  Dr. Deligdish also had his hospital privileges taken away at Holmes RMC in 2010.  As part of its retaliation, Health First has further tried to exclude OMNI and Drs. Deligdish and Seminer from the market by threatening to terminate other providers from the network if they referred patients to OMNI and/or Drs. Deligdish and Seminer.

220.    As a result of these efforts by Health First to exclude them from the market, OMNI and Drs. Deligdish and Seminer have lost significant income and OMNI's growth has been restrained.

### ii. S.O.A.R. and Dr. Dowdell

221. Dr. Dowdell M.D., M.S. is licensed to practice medicine in the State of Florida, and is a member of the medical staff of Holmes RMC.

222. In spring of 2006, Peter Weiss, Medical Director of HF Health Plans, demanded that Dr. Dowdell stop doing onsite outpatient surgeries, and instead to do them at Health First's Palm Bay facility. Dr. Dowdell refused because performing those services on site was less expensive and more efficient than what Health First was proposing.

223. Dr. Dowdell received a letter terminating him from the Health First provider network on November 3, 2006. Since that time, Dr. Dowdell has repeatedly tried through both letters and in-person meetings to convince Health First to reinstate his participation in the HF Health Plans network. All of these efforts have failed, including his last application on or about September 2, 2011.

224. At one meeting in April 2008, Dr. Dowdell was further told that all doctors joining his group would similarly be terminated from the Health First network, and that any doctors who left his group would be reinstated. Thus, Health First's intent—*i.e.*, excluding those physicians who refused to support its anticompetitive scheme—was made apparent.

225. During one meeting, in which he was inquiring about being allowed back into the HF Health Plans network, Dr. Dowdell was told by Health First that if he joined a physician group that was more in-line with Health First's interests, such as MIMA, he would be allowed back into the network.

226. Like all physicians terminated from the HF Health Plans network, not only did fewer HF Health Plans members come to Dr. Dowdell, but he also stopped receiving any referrals from doctors employed by HF Physicians and/or MIMA. S.O.A.R. previously received

as many as fifty (50) referrals a week from MIMA physicians. After it was blacklisted, this number dropped to nearly zero (0). This blacklisting not only involves ensuring that Dr. Dowdell and S.O.A.R. receive no referrals from other physicians and practice groups, it also includes misrepresentations by Health First employees to patients stating that Dr. Dowdell and S.O.A.R. are no longer on staff at Health First's hospitals.

227. Similarly, S.O.A.R. previously received ten (10) to fifteen (15) inpatient referrals a day from Holmes RMC. After it was blacklisted, this number also dropped to nearly zero (0).

228. As a result of these efforts by Health First to exclude them from the market, Dr. Dowdell has lost significant income.

229. In addition, Dr. Dowdell is the sole owner of S.O.A.R. Many of S.O.A.R.'s physicians were also terminated from the HF Health Plans network and blacklisted by HF Physicians and their co-conspirators, including MIMA, as a result of their association with S.O.A.R. Due to this exclusionary conduct, S.O.A.R. lost significant revenue and its growth was restrained. Moreover, several of its physicians were ultimately lured away to other physician groups so that they could contract again with HF Health Plans.

### iii. Florida Pain, Dr. Gayles, and Dr. Golovac

230. Drs. Gayles and Golovac are former HF Health Plans participants and partners in Florida Pain, a multi-service facility that specializes in the treatment of neck, back and cancer pain with multiple locations in Brevard County. In spring of 2009, they also opened Space Coast Surgery Center, an outpatient surgical and procedure facility.

231. Originally, Space Coast Surgery Center was intended to be a joint venture with Health First. Later, Health First expressed concerns that "Surgi-centers make less money than a hospital," and backed out of the joint venture. Ultimately, Drs. Gayles and Golovac decided to

open the center on their own.  Afterwards, they were warned that Health First would view the opening of Space Coast Surgery Center as disloyal and as unwelcomed competition.

232.   Florida Pain was terminated from the Health First provider network effective November 30, 2009, several months after opening Space Coast Surgery Center.  No official reason was provided for their termination.  Despite multiple attempts to get reinstated as participants in Health First's provider network, most recently in July 2012, all attempts have been rebuffed.

233.   At the time its provider contract was terminated, approximately twenty-five percent (25%) of Florida Pain's patients were Health First members.  Today, that figure is essentially zero percent (0%).

234.   Immediately following their termination from the Health First provider network, Drs. Gayles and Golovac also stopped receiving referrals from HF Physicians and MIMA.  Today, no physician employed by HF Physicians (which now includes MIMA's physicians), and few if any physicians within Health First's provider network, refer patients to Drs. Gayles and Golovac on a regular basis.

235.   Moreover, the hospitalists at Holmes RMC (who, coincidentally, have recently all been terminated and replaced by hospitalists employed directly by Health First) refer all pain management cases exclusively to HF Physicians.  Not only do all of these cases go to providers within Health First's provider network, most if not all of them are referred to a HF Physician.

236.   Despite being excluded from Health First's provider network, Dr. Gayles continued taking call at Cape Canaveral Hospital for some period of time after Florida Pain's contract was terminated.  While on call, however, the hospital would not refer any HF Health Plans members to Dr. Gayles, and only a minimal number of other insured patients.  Instead,

those referrals were all given to HF Physicians, even if that meant that patients would have to wait a significant amount of time for the HF Physician to become available. Dr. Gayles, on the other hand, was left with only uninsured, Medicaid, and other patients with low reimbursement rates. Because of this, Dr. Gayles has since stopped taking call at Cape Canaveral Hospital.

237.    As a result of these efforts by Health First to exclude them from the market, Drs. Gayles and Golovac have lost significant income.

238.    In addition, Drs. Gayles and Golovac are co-owners in Florida Pain. Many of Florida Pain's physicians were also terminated from the HF Health Plans network and blacklisted by HF Physicians and their co-conspirators, including MIMA. Due to this exclusionary conduct, Florida Pain lost significant revenue and its growth has been restrained.

### iv.    Institute of Facial Surgery and Dr. Grenevicki

239.    Lance Grenevicki, D.D.S., M.D., FACS is a medical doctor and a dentist licensed to practice medicine in the State of Florida and was previously the Chief of the Department of Surgery at Holmes RMC. He was a member of the MEC of Holmes RMC. He was also formerly the Vice President and President of the Medical Society of Brevard County.

240.    As Chairman of the Department of Surgery and a member of the MEC at Holmes RMC, Dr. Grenevicki supported the suspension of trauma surgeons hired by Health First when it became apparent that those surgeons lacked the requisite experience for the procedures they were performing, thus putting patients' safety at risk. In retaliation, Health First brought a baseless legal action against Dr. Grenevicki and the other physicians involved. On May 5, 2014, Judge Moxley of the Eighteenth Judicial Circuit of Florida ruled in Dr. Grenevicki's favor, and awarded him costs and attorney fees as the prevailing party.

241.    Dr. Grenevicki has never been allowed to participate as a provider in the HF Health Plans network.  Although he has repeatedly tried to contract with Health First to become a participating provider, Health First has either denied the request outright or offered a contract under objectively unreasonable terms clearly designed to dissuade a meeting of the minds.

242.    Nonetheless, a large portion of Dr. Grenevicki's practice was previously composed of oral and maxillofacial trauma surgeries referred to him while serving as the on-call trauma surgeon at Holmes RMC, where all or nearly all trauma patients in Southern Brevard County are diverted.  Historically, Holmes RMC's trauma surgery needs were met this same way—*i.e.*, by contracting with surgeons to take call and referring incoming patients to those surgeons—until Health First terminated its contracts with non-HF Physicians and replaced them with Health First-employed surgeons.  For oral and maxillofacial surgeries in particular, Health First even referred its patients to a surgeon located well-outside the geographic area until it was able to hire its own oral and maxillofacial surgeon.  Until he was blacklisted, Dr. Grenevicki received three (3) to eight (8) inpatient referrals a day from Health First and its subsidiaries.

243.    Similarly, many of Dr. Grenevicki's referrals previously came from MIMA.  However, once Health First began to exclude Dr. Grenevicki, MIMA did as well and referrals from MIMA began to taper off.  Finally, when MIMA was acquired by Health First, he stopped receiving any referrals from MIMA physicians, who instead referred exclusively or nearly exclusively to Health First's surgeons.

244.    As a result of these efforts by Health First to exclude him from the market, Dr. Grenevicki has lost significant income.

245.    In addition, Dr. Grenevicki is an owner in the Institute of Facial Surgery.  Many of the Institute of Facial Surgery's physicians were also terminated from the HF Health Plans'

network and blacklisted by HF Physicians and its co-conspirators, including MIMA. As a result of Health First's exclusionary conduct, the Institute of Facial Surgery had to reduce its staff by almost twenty-five percent (25%). Thus, the Institute of Facial Surgery lost significant revenue and its growth was restrained.

### v.   Dr. Komar

246.    Dr. Komar is board certified in surgery and surgical critical care by the American Board of Surgery. After practicing with the University of Florida Jacksonville ("UFJ"), he was assigned to the university's Melbourne satellite in 2002. At that time, UFJ was running Holmes RMC's Level II Trauma Center and Dr. Komar was assigned there as an attending surgeon.

247.    In September 2003, Dr. Komar resigned from the trauma service and joined an independent physician group, Medical Associates of Brevard. One of the primary reasons for his resignation was the threats he received from the administration at Holmes RMC about dissolving the trauma program. Nonetheless, Dr. Komar continued to support the trauma program at Holmes RMC through a part-time employment contract with UFJ. Eventually, despite concerns about quality of care voiced by the MEC, Health First and Holmes RMC terminated the trauma program contract with UFJ.

248.    After the UFJ contract was terminated, Health First offered Dr. Komar a provider contract, though at terms considerably inferior to those offered to HF Physicians. In addition, Dr. Komar was also employed as a contractor at Health First's electronic intensive care unit ("eICU").

249.    During this period, Dr. Komar saw HF Health Plans' patients and was repeatedly ordered to change the admission status of his patients. On two separate occasions, after refusing to comply with Health First's demands regarding how to provide care for his patients, Dr. Komar

was threatened by a director at HF Health Plans that he would be denied payment for his services and the patient would be made responsible for his bill if he did not concede to their demands.

250.    Health First has also refused payment for patients because Dr. Komar treated them at Wuesthoff-Melbourne.  In one instance, a patient required emergency surgery and, after denying Dr. Komar payment, he was reprimanded and told that he was supposed to transfer the patient in the middle of the night to Holmes RMC despite the fact that Holmes RMC had trouble even accommodating admitted patients.  In fact, at around the same time, Dr. Komar was forced to transfer two patients to Wuesthoff-Melbourne for emergency surgery when Holmes RMC could not accommodate them.

251.    In February 2009, after Health First determined that Dr. Komar was not going to support its anticompetitive scheme, Health First terminated his contract with the eICU.  In particular, after Dr. Komar signed a letter of support for Wuesthoff-Melbourne, he was threatened that if he did something like that again he would be terminated.  Despite these threats, Dr. Komar continued to advocate in favor of patient care and—after standing up at an MEC meeting and criticizing Health First's anticompetitive practices as detrimental to the provision of affordable, high-quality healthcare—he was terminated.  At that time, the Director of the eICU, Dr. James P. Schaffer, MD, informed Dr. Komar that he was not being terminated for performance reasons, but rather because someone "very high in the HF hierarchy" demanded it. Dr. Schaffer further told Dr. Komar that his termination would put Dr. Schaffer "in a crunch" because there were already problems covering all of the eICU shifts.

252.    While some patients come directly to surgeons that are in their health insurance provider's network, most are referred to a surgeon by another physician.  Although Health First has not terminated his provider contract, Dr. Komar has effectively been boycotted by Health

First and, as a result, receives no referrals from HF Physicians and/or MIMA physicians despite being in the HF Health Plans network. Furthermore, Health First actively diverts patients away from Dr. Komar by intentionally providing patients misinformation regarding Dr. Komar being out of town or otherwise unavailable. Instead, patients are forced to see a surgeon employed by HF Physicians (*i.e.*, someone not only in the HF Health Plans network, but employed by Health First's physician group).

253.    As a result of these efforts by Health First to exclude him from the market, Dr. Komar has lost significant income.

### vi.    PAS and Mr. Boone

254.    C. Hamilton Boone, P.A., is a physician assistant licensed to practice in the State of Florida, and is a member of the medical staff of Holmes RMC. He is a current or former member of the following associations: the American Academy of Physician Assistants, the Association of Family Practice Physician Assistants, the Florida Association of Physician Assistants, the Georgia Association of Physician Assistants, the North Carolina Association of Physician Assistants, and the National Commission on Certification of Physician Assistants.

255.    Mr. Boone was punished because he objected to the poor quality of medical care provided to patients at Holmes RMC, and because he wanted Health First to compete aggressively and deliver competitive healthcare rather than engage in exclusionary conduct to the detriment of patients.

256.    After Mr. Boone joined Dr. Hynes in voicing concerns over the quality of medical care provided at Holmes RMC, Health First decided that Mr. Boone was insufficiently supportive of its anticompetitive scheme and took affirmative steps to retaliate against him and exclude him from the market. Specifically, Mr. Boone complained to the Operating Room

Committee about a preventable death in the O.R.  The very next day, Mr. Boone started suffering harassment from Health First.

257.    In fact, one HF Physician employee sent Mr. Boone a letter to that effect on or about March 12, 2010, informing him that he was effectively blacklisted by Health First. Moreover, Dr. Joe Gurri, a former MIMA physician now employed by HF Physicians, specifically instructed all MIMA surgeons not to utilize Mr. Boone's services.  From that point on, all doctors employed by HF Physician and/or MIMA were instructed not to use Mr. Boone as a Physician Assistant.  Health First has further prevented Mr. Boone from gaining access to surgery schedules so that he can seek consults with surgeons performing procedures at Holmes RMC, which is one of the primary sources for referrals for PAs who assist with surgeries.

258.    Prior to Mr. Boone's being blacklisted by Health First, PAS employed six (6) physician assistants.  Today, as a result of his and PAS' foreclosure from the market, Mr. Boone is the only physician assistant that remains at PAS.  Moreover, the number of cases Mr. Boone has assisted on has dropped to less than half of his pre-blacklisting total.

259.    As a result of these efforts by Health First to exclude them from the market, Mr. Boone and his practice, PAS, have lost significant income.

**V.      The MIMA Acquisition**

260.    In November 2012, Health First announced that it would be acquiring MIMA, then the second largest physician group in Brevard County behind HF Physicians (the "MIMA Acquisition").   The MIMA Acquisition substantially added to Health First's power and dominance in the physicians' services market in Southern Brevard County.

261.    Large, desirable physician groups are better able to negotiate favorable rates with health insurers.   Thus, the MIMA Acquisition gave HF Physicians additional leverage in negotiating rates with HF Health Plans' rivals—*i.e.*, other private health insurers.   Moreover,

affiliated physician groups can drive a harder bargain with rival health plans than independent physician groups. If a the rival health plan declines the rate hike, there is a chance that some members will switch to HF Health Plans to follow their preferred physicians; if the rival health plan accept the rate hike, Health First has successfully raised the costs of HF Health Plans' competitors. This externality is not available to independent physician groups and, thus, leads to higher prices by the vertically integrated entity.

262. In fact, shortly after the MIMA Acquisition, Health First approached other private health insurers doing business in Southern Brevard County and demanded to renegotiate their contracts, seeking higher rates for hospital and physician services. By charging these private health insurers higher rates, Health First was able to increase the costs of its competitors in the market for private health insurance in Southern Brevard County.

263. After the MIMA Acquisition, former MIMA physicians stopped accepting Medicare Advantage plans offered by Health First's competitors, thereby reducing their own revenues. Instead, they now only accept Medicare Advantage plans offered by Health First. The vertical affiliation induced these doctors to incur losses that only make economic sense in light of the fact that these losses would be more than recouped by Health First's other subsidiary, HF Health Plans. Therefore, patients who wished to maintain relationships with their physicians were forced to switch to Health First's Medicare Advantage plans.

264. Additionally, by controlling physicians, Health First controls patient referrals, as well as the treatments and ancillary services those physicians elect to utilize. The MIMA Acquisition augments Health First's power to control physicians. This control enables Health First to maintain and strengthen its monopoly and reduce the quality of care—effectively failing to pass on any cost benefits to its members.

265.    HF Physicians, including now the former-MIMA physicians, admit exclusively or nearly exclusively to Health First medical facilities as a contractual and/or *de facto* condition of their employment.  Thus, it is easier for Health First to monitor and police that the former-MIMA physicians abide by the terms of the exclusive dealing arrangements.

266.    Accordingly, the MIMA Acquisition has perfected Health First's control over the majority of admissions and specialty referrals in Southern Brevard County, thus restraining competition in the markets for hospitals, physician services, ancillary services, and Medicare Advantage plans, and augmenting and maintaining Health First's overall market power.

267.    The MIMA Acquisition was investigated by the Office of the Florida Attorney General (the "Florida AG") and the Federal Trade Commission ("FTC").  During the course of the investigation, Health First falsely denied the existence of any actual and/or *de facto* exclusivity agreements and, relying on this misrepresentation, the Florida AG and FTC decided not to bring enforcement actions at that time.

268.    In its letter informing Health First that it was not bringing an enforcement action, a representative of the Florida AG stated, "[I]t is our understanding, based on our discussions with you, that Health First will continue to permit employed physicians, including former MIMA physicians, to admit and/or refer patients to the hospital of their choosing, including non-Health First hospitals.  Additionally, it is our understanding that former MIMA physicians will not be required to sign exclusive agreements with HF Plans.  If either of these facts should change, or if you should acquire any additional physician practices in Florida, please notify me."

269.    In reality, as discussed herein, HF Physicians (including MIMA) rarely if ever refer patients to non-Health First hospitals as they are bound by actual and/or *de facto* exclusivity agreements that prevent them from doing so.  Indeed, even before the completion of the MIMA

transaction, both MIMA and Health First physicians referred less than 1% of their patients to Wuesthoff-Melbourne.

270.     Additionally, immediately following the merger with Health First, the physicians formerly with MIMA began: (1) significantly increasing the prices for certain services to rival health insurance plans (some as much as doubled); (2) terminating business relationships with other health plans and ancillary service providers; and (3) directing all ancillary services to Health First's own higher-priced providers.

271.     Therefore, the MIMA Acquisition resulted in a substantial lessening of competition and reinforced/augmented Health First's market power in the Relevant Market and related Secondary Product Markets.

272.     Moreover, the MIMA Acquisition and the expansion of Health First's market power in the physician services market in Southern Brevard County is part of a larger effort to systematically terminate non-Health First physicians within Health First's provider networks and replace them with physicians employed directly by Health First.

273.     For example, within the past several years, Health First has systematically forced independent hospitalists out of its hospitals, either by terminating and/or refusing to extend their provider contracts or, in some instances, by terminating their hospital privileges without justification.  Afterwards, Health First replaces these hospitalists with physicians employed by Health First.  Since hospitalists are responsible for making inpatient referrals for patients admitted at a hospital, this allows Health First to ensure that all referrals are being made to physicians employed by Health First.

274.    These actions are not undertaken for valid business reasons such as lowering costs or ensuring quality of care, but rather they represent further efforts by Health First to maintain and enhance its super-monopoly.

## ANTICOMPETITIVE EFFECTS

275.    Defendants acted with the purpose and effect of unreasonably restraining and injuring competition in the Relevant Market, as well as the related Secondary Product Markets.

276.    But for the exclusionary conduct described herein: (1) Health First's market power in the Relevant Market and the Secondary Product Markets would be reduced; (2) there would be increased competition in the Relevant Market and the Secondary Product Markets; (3) Health First would be unable to coerce providers into the exclusive dealing arrangements described above; (4) independent providers would not be subject to the same intimidation and retaliation techniques currently imposed upon them by Health First; and (5) prices would be lower or the quality of care would be higher in the Relevant Market and Secondary Product Markets.

277.    As a result, prices are higher and the quality of patient care (*i.e.*, quality of services) lower in these product markets in Southern Brevard County than in most, if not all, of Florida.

## ANTITRUST IMPACT

278.    As a direct result of the anticompetitive course of conduct described herein, competition in the Relevant Market and in the Secondary Product Markets was unreasonably restrained, and OMNI HealthCare Inc., Interventional Spine Institute of Florida, Craig Deligdish, MD, Brian Dowdell, MD, Richard Gayles, MD, Stan Golovac, MD, Lance Grenevicki, MD, Aleksander Komar, MD, Scott Seminer, MD, Institute of Facial Surgery, Inc., and The Pain Institutes Inc. (collectively, the "Antitrust Plaintiffs") have been substantially limited in their

ability to effectively compete in the related markets for physician services and ancillary services in Southern Brevard County.

279. In furtherance of the common scheme described herein, Health First (through its wholly owned and controlled subsidiary, HF Health Plans) terminated or otherwise refused to enter into provider contracts with the Antitrust Plaintiffs, thus barring them from providing medical services to Health First's members. Health First further instructed its physicians and co-conspirators not to refer any patients to Antitrust Plaintiffs, including those patients insured by other private health insurers.

280. These actions were particularly harmful to Antitrust Plaintiffs as Health First controls the health plan with the greatest number of covered persons and the physicians group with the greatest number of physicians in Southern Brevard County.

281. Moreover, as part of this common scheme Defendants actively lured physicians away from the Antitrust Plaintiffs' medical practices, and prevented those practices from achieving the level of growth they would have achieved absent Defendants' anticompetitive conduct.

282. Additionally, the common scheme described herein resulted in some physicians, including Dr. Deligdish, unjustifiably losing their medical privileges at Holmes RMC.

283. Thus, any provider wanting to effectively practice in Southern Brevard County has been forced to comply with Health First's anticompetitive demands or practice in another geographic area.

284. Antitrust Plaintiffs have experienced loss of income due to the foreclosure of competition in the Relevant Market and related Secondary Product Markets, and suffered harm to their business and property.

285.    These injuries were a direct and foreseeable result of Defendants' anticompetitive course of conduct, as described herein.  Further, these actions have deprived Plaintiffs of the benefits of open competition, and represent precisely the type of conduct the antitrust laws were designed to protect against.

286.    Health First, directly or through its wholly owned and controlled subsidiaries, participates in the Relevant Market and each of the Secondary Product Markets (*i.e.*, physician services, ancillary services, private health insurance, and Medicare Advantage plan markets in Southern Brevard County) either as a competitor or supplier or both.

287.    Each of the Antitrust Plaintiffs participates in the Relevant Market as suppliers, insofar as they decide where their patients receive medical treatment.

288.    Each of the Antitrust Plaintiffs participates in the physician services market in Southern Brevard County as competitors and suppliers, insofar as they offer physician services and make referrals to other physicians.

289.    Except for Drs. Grenevicki and Komar, each of the Antitrust Plaintiffs, either individually or through their medical practices, competes in the ancillary services market in Southern Brevard County as competitors and suppliers, insofar as they offer ancillary services or refer their patients to other ancillary service providers.

290.    Each of the Antitrust Plaintiffs, either individually or through their medical practices, competes in the private health insurance and Medicare Advantage markets in Southern Brevard County as suppliers, insofar as they offer their services to be included in the health insurance provider's managed care network in order to provide healthcare to the health insurer's enrollees.

## FIRST CLAIM FOR RELIEF

### Impermissible Merger In Restraint of Trade
### In Violation of Section 7 of the Clayton Act

**(Asserted by Antitrust Plaintiffs Against Defendants Health First Inc. and HF Physicians)**

291.    Health First Inc. acquired MIMA in November 2012, and subsequently merged MIMA's assets and physicians with HF Physicians.

292.    By acquiring MIMA, the largest independent physicians group in Southern Brevard County, Health First has further solidified its control over hospital admissions, physician referrals, and choice of ancillary service providers in Southern Brevard County.  (*See* ¶¶ 260 - 274, *supra*.)

293.    This control was sought for the anticompetitive purpose of reinforcing Health First's market power in the acute care inpatient hospital, physician, and ancillary service markets in Southern Brevard County by, *inter alia*, enabling it to police the conspiracy and ensure that all employed physicians refer exclusively to Health First's hospitals, physicians, and ancillary service providers.

294.    It further enabled Health First to maintain and strengthen its market power in the private health insurance and Medicare Advantage markets in Southern Brevard County.  The MIMA Acquisition afforded Health First greater bargaining leverage (owing to both horizontal and vertical effects), thus allowing it to negotiate higher rates for its acute care inpatient hospital and physician services, and raising the costs of its rivals in the private health insurance market. Following the acquisition, former MIMA physicians no longer accepted Medicare Advantage plans other than those offered by Health First, a clear profit sacrifice.  As a result, the patients of those former MIMA physicians who wanted to keep their doctor had to switch to Health First's Medicare Advantage plan.

295.    Thus, the MIMA Acquisition constitutes a merger and acquisition which has the tendency to reduce, and in fact has reduced, competition in the Relevant Market and related Secondary Product Markets (*i.e.*, those for physician services, ancillary services, private health insurance plans, and Medicare Advantage plans in Southern Brevard County).

296.    As a result, prices are higher (and will continue to climb) in the Relevant Market and Secondary Product Markets, and there are fewer alternatives for health insurers doing business in Southern Brevard County, thereby causing injury to competition, consumers, and the Antitrust Plaintiffs.  (*See* ¶¶ 275 - 277, *supra*.)

297.    As discussed in paragraphs 278 - 290, *supra*, this reduction in competition has also substantially limited Antitrust Plaintiffs' ability to effectively compete in the inter-related markets for physician and ancillary services in Southern Brevard County.  Plaintiffs have thus been injured in their business and property as a result of this reduction in competition.  These injuries are of the type the federal antitrust laws were designed to prevent and flow directly from the exclusionary practices which makes Defendants' conduct unlawful.

298.    OMNI, S.O.A.R., Institute of Facial Surgery, and Florida Pain were and will continue to be harmed by the MIMA Acquisition as it has perfected Health First's control over physician and ancillary service referrals in Southern Brevard County, thus maintaining and enhancing Health First's ability to exclude these practices and their providers from those markets.  As a result, these entities have lost significant income and have suffered harm to their business and property.

299.    Drs. Deligdish, Seminer, Dowdell, Gayles, Golovac, Grenevick, and Komar were and will continue to be harmed by the MIMA Acquisition as it has perfected Health First's control over physician referrals in Southern Brevard County, thus maintaining and enhancing

65

Health First's ability to subject them to a group boycott or concerted refusal to deal.  As a result, these doctors have lost significant income and have suffered harm to their business and property.

### SECOND CLAIM FOR RELIEF

**Monopolization of the Acute Care Inpatient Hospital Services Market
In Violation of Section 2 of the Sherman Act**

**(Asserted by Antitrust Plaintiffs Against Defendants Health First Inc. and Holmes RMC)**

300.    Holmes RMC is a wholly owned subsidiary of Health First Inc.  Health First exerts substantial control over the day-to-day operations of its subsidiaries, using them as agencies or instrumentalities of the parent company.  In fact, when Health First negotiates with private health insurers regarding hospital rates at Holmes RMC, it does so as "Health First Inc." and not Holmes RMC.

301.    Health First, through its ownership and control of Holmes RMC and Palm Bay Hospital, has monopoly power in the Relevant Market—*i.e.*, acute care inpatient hospital services in Southern Brevard County.  (*See* ¶¶ 112 - 116, *supra.*)

302.    Direct evidence of Health First's monopoly power is demonstrated by Health First's ability to exclude rival providers of inpatient hospital services and raise prices to private health insurers and other third-party payors to supra-competitive levels.  Indirect evidence of Health First's monopoly power includes, *inter alia*, its 70% market share in the Relevant Market.

303.    Alternatively, in the absence of a finding of monopoly power in the Relevant Market, Health First has attempted to monopolize this market by acting with the specific intent of obtaining monopoly power and, because of the affirmative acts described *supra*, poses a dangerous probability of achieving monopoly power in the market for acute care inpatient hospital services in Southern Brevard County.

304.    Health First's monopoly in the Relevant Market was not lawfully obtained through superior business acumen; rather it was willfully acquired through a merger-to-monopoly.

305.    Health First has exercised, maintained, and exploited its monopoly power in the Relevant Market through the exclusionary and anticompetitive devices described above, including, *inter alia*, exclusive dealing arrangements (*see* ¶¶ 136 - 141, *supra*); tying (*see* ¶¶ 142 - 145, *supra*); group boycott/concerted refusal to deal (*see* ¶¶ 146 - 152, *supra*); and monopoly leveraging (*see* ¶¶ 164 - 168, *supra*).

306.    As a result, prices are higher and there are fewer alternatives for participants in the Relevant Market, thereby causing injury to competition, consumers, and the Antitrust Plaintiffs. (*See* ¶¶275 - 277, *supra*.)

307.    The Antitrust Plaintiffs participate in the Relevant Market as suppliers, insofar as they are primarily responsible for deciding where their patients receive medical treatment. (*See* ¶ 287, *supra*.)

308.    Health First's exercise and maintenance of monopoly power in the Relevant Market, including the exclusionary course of conduct designed towards that end, has substantially limited the Antitrust Plaintiffs' ability to effectively compete in the inter-related markets for physician and ancillary services in Southern Brevard County. (*See* ¶¶ 199 - 253 *supra*)

309.    Antitrust Plaintiffs have been injured in their business and property as a result of Defendants' anticompetitive scheme. These injuries are of the type the federal antitrust laws were designed to prevent and flow directly from the exclusionary practices which makes Defendants' conduct unlawful. (*See* ¶¶ 278 - 290, *supra*.)

310.   OMNI is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's members/patients; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County. As a result, OMNI has lost significant income and has suffered harm to its business and property.

311.   S.O.A.R. is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, S.O.A.R. has lost significant income and has suffered harm to its business and property.

312.   Institute of Facial Surgery is harmed by the various exclusionary practices described herein because: (a) it has been denied access to the Health First network for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped

receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County. As a result, Institute of Facial Surgery has lost significant income and has suffered harm to its business and property.

313.    Florida Pain is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County. As a result, Florida Pain has lost significant income and has suffered harm to its business and property.

314.    Drs. Deligdish, Seminer, Dowdell, Gayles, Golovac, Grenevicki, and Komar are harmed by the various exclusionary practices described herein because they have been: (a) denied access to Health First's members; and (b) blacklisted by Health First and, thus, receive no patient referrals, regardless of the patient's insurance provider, from HF Physicians or its co-conspirators. In addition, Dr. Deligdish has had his hospital privileges revoked from Holmes RMC in retaliation for voicing concerns over Health First's anticompetitive practices. As a result, these doctors have lost significant income and have suffered harm to their business and property.

## THIRD CLAIM FOR RELIEF

**Attempted Monopolization of the Physician Services Market
In Violation of Section 2 of the Sherman Act**

**(Asserted by Antitrust Plaintiffs Against Defendants Health First Inc. and HF Physicians)**

315.    HF Physicians is a wholly owned subsidiary of Health First Inc.  Health First exerts substantial control over the day-to-day operations of its subsidiaries, using them as agencies or instrumentalities of the parent company.  In fact, when Health First negotiates with private health insurers regarding rates for hospital and physician services performed by its subsidiaries, it does so as a single entity "Health First Inc."

316.    Health First, through its ownership and control of HF Physicians, has a dominant share in the physician services market in Southern Brevard County.  (*See* ¶¶ 183 - 187, *supra.*)

317.    Health First has attempted to monopolize this market by acting with the specific intent of obtaining monopoly power and, because of the affirmative acts described *supra*, poses a dangerous probability of achieving monopoly power in the market for physician services in Southern Brevard County.

318.    Health First has enhanced and abused its market power in the physician services market in Southern Brevard County through the exclusionary and anticompetitive devices described above, including, *inter alia*, exclusive dealing arrangements (*see* ¶¶ 136 - 141, *supra*); tying (*see* ¶¶ 142 - 145, *supra*); group boycott/concerted refusal to deal (*see* ¶¶ 146 - 152, *supra*); and monopoly leveraging (*see* ¶¶ 164 - 168, *supra*).

319.    As a result, prices are higher and there are fewer alternatives for participants in the physician services market in Southern Brevard County, thereby causing injury to competition, consumers, and the Antitrust Plaintiffs.  (*See* ¶¶ 275 - 277, *supra.*)

320.     The Antitrust Plaintiffs participate in the physician services market in Southern Brevard County as both competitors and suppliers, insofar as they offer physician services and refer patients to other physicians.  (*See* ¶ 61, *supra*.)

321.     Health First's exercise and maintenance of market power in the physician services market in Southern Brevard County, including the exclusionary course of conduct designed towards that end, has substantially limited the Antitrust Plaintiffs' ability to effectively compete in the inter-related markets for physician and ancillary services in Southern Brevard County. (*See* ¶¶ 199 - 253, *supra*)

322.     Antitrust Plaintiffs have been injured in their business and property as a result of Defendants' anticompetitive scheme.  These injuries are of the type the federal antitrust laws were designed to prevent and flow directly from the exclusionary practices which makes Defendants' conduct unlawful.  (*See* ¶¶ 278 - 290, *supra*.)

323.     OMNI is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, OMNI has lost significant income and has suffered harm to its business and property.

324.     S.O.A.R. is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing

arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County. As a result, S.O.A.R. has lost significant income and has suffered harm to its business and property.

325. Institute of Facial Surgery is harmed by the various exclusionary practices described herein because: (a) it has been denied access to the Health First network for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County. As a result, Institute of Facial Surgery has lost significant income and has suffered harm to its business and property.

326. Florida Pain is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in

Southern Brevard County.  As a result, Florida Pain has lost significant income and has suffered harm to its business and property.

327.    Drs. Deligdish, Seminer, Dowdell, Gayles, Golovac, Grenevicki, and Komar are harmed by the various exclusionary practices described herein because they have been: (a) denied access to Health First's members; and (b) blacklisted by Health First and, thus, receive no patient referrals, regardless of the patient's insurance provider, from HF Physicians or its co-conspirators.  In addition, Dr. Deligdish had his hospital privileges at Holmes RMC revoked by, or at the direction of, Health First in retaliation for voicing concerns over Health First's anticompetitive practices.  As a result, these doctors lost significant income and have suffered harm to their business and property.

### FOURTH CLAIM FOR RELIEF

**Attempted Monopolization of the Ancillary Services Market
In Violation of Section 2 of the Sherman Act**

**(Asserted by Antitrust Plaintiffs Against
Defendants Health First Inc., Holmes RMC, and HF Physicians)**

328.    Holmes RMC and HF Physicians are wholly owned subsidiaries of Health First Inc.  Health First exerts substantial control over the day-to-day operations of its subsidiaries, using them as agencies or instrumentalities of the parent company.  In fact, when Health First negotiates with private health insurers regarding rates for hospital and physician services performed by Holmes RMC and HF Physicians, it does so as a single entity "Health First Inc."

329.    Health First participates in the ancillary services market through various wholly owned and controlled subsidiaries, including, *inter alia*: Holmes RMC, Palm Bay Hospital, HF Physicians, Health First Outpatient Diagnostics LLC, Health First Physical Therapy Services LLC.  It also participates in this market through certain stand-alone Health First facilities, including, *inter alia*: Health First Diagnostic Center, Health First Medical Rehabilitation, Health

73

First Medical Equipment, Health First Home Care, and Hospice of Health First. Through its ownership and control of these entities, Health First has a dominant share of the ancillary services market in Southern Brevard County. (*See* ¶ 270, *supra.*)

330. Health First has attempted to monopolize this market by acting with the specific intent of obtaining monopoly power and, because of the affirmative acts described *supra*, poses a dangerous probability of achieving monopoly power in the market for ancillary services in Southern Brevard County.

331. Health First has enhanced and abused its market power in the ancillary services market in Southern Brevard County through the exclusionary and anticompetitive devices described above, including, *inter alia*, exclusive dealing arrangements (*see* ¶¶ 136 - 141, *supra*); tying (*see* ¶¶ 142 - 145, *supra*); group boycott/concerted refusal to deal (*see* ¶¶ 146 - 152, *supra*); and monopoly leveraging (*see* ¶¶ 164 - 168, *supra*).

332. As a result, prices are higher and there are fewer alternatives for participants in the ancillary services market in Southern Brevard County, thereby causing injury to competition, consumers, and the Antitrust Plaintiffs. (*See* ¶¶ 275 - 277, *supra*.)

333. The Antitrust Plaintiffs participate in the ancillary services market in Southern Brevard County as both competitors and suppliers, insofar as they are offer ancillary services and refer patients to other physicians/practices who offer ancillary services. (*See* ¶ 69, *supra*.)

334. Health First's exercise and maintenance of market power in the ancillary services market in Southern Brevard County, including the exclusionary course of conduct designed towards that end, has substantially limited the Antitrust Plaintiffs' ability to effectively compete in the inter-related markets for physician and ancillary services in Southern Brevard County. (*See* ¶¶ 199 - 253, *supra*)

335.    Antitrust Plaintiffs have been injured in their business and property as a result of Defendants' anticompetitive scheme.  These injuries are of the type the federal antitrust laws were designed to prevent and flow directly from the exclusionary practices which makes Defendants' conduct unlawful.  (*See* ¶¶ 278 - 290, *supra*.)

336.    OMNI is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, OMNI has lost significant income and has suffered harm to its business and property.

337.    S.O.A.R. is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, S.O.A.R. has lost significant income and has suffered harm to its business and property.

338.    Institute of Facial Surgery is harmed by the various exclusionary practices described herein because: (a) it has been denied access to the Health First network for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, Institute of Facial Surgery has lost significant income and has suffered harm to its business and property.

339.    Florida Pain is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, Florida Pain has lost significant income and has suffered harm to its business and property.

340.    Drs. Deligdish, Seminer, Dowdell, Gayles, Golovac, Grenevicki, and Komar are harmed by the various exclusionary practices described herein because they have been: (a) denied access to Health First's members; and (b) blacklisted by Health First and, thus, receive no patient referrals, regardless of the patient's insurance provider, from HF Physicians or its co-conspirators.  In addition, Dr. Deligdish had his hospital privileges at Holmes RMC revoked by,

or at the direction of, Health First in retaliation for voicing concerns over Health First's anticompetitive practices. As a result, these doctors lost significant income and have suffered harm to their business and property.

### FIFTH CLAIM FOR RELIEF

**Attempted Monopolization of the Private Health Insurance Market
In Violation of Section 2 of the Sherman Act**

**(Asserted by Antitrust Plaintiffs Against
Defendants Health First Inc. and HF Health Plans)**

341.    HF Health Plans is a wholly owned subsidiary of Health First Inc. Health First exerts substantial control over the day-to-day operations of its subsidiaries, using them as agencies or instrumentalities of the parent company. In fact, Health First holds itself out as "Central Florida's only fully integrated health system."

342.    Health First, through its ownership and control of HF Health Plans, has a dominant share in the private health insurance market in Southern Brevard County. (*See* ¶ 77, *supra.*)

343.    Health First has attempted to monopolize this market by acting with the specific intent of obtaining monopoly power and, because of the affirmative acts described *supra*, poses a dangerous probability of achieving monopoly power in the market for physician services in Southern Brevard County.

344.    Health First has enhanced and abused its market power in the physician services market in Southern Brevard County through the exclusionary and anticompetitive devices described above, including, *inter alia*, exclusive dealing arrangements (*see* ¶¶ 136 - 141, *supra*); tying (*see* ¶¶ 142 - 145, *supra*); group boycott/concerted refusal to deal (*see* ¶¶ 146 - 152, *supra*); and monopoly leveraging (*see* ¶¶ 164 - 168, *supra*).

345.    As a result, prices are higher and there are fewer alternatives for participants in the physician services market in Southern Brevard County, thereby causing injury to competition, consumers, and the Antitrust Plaintiffs.  (*See* ¶¶ 275 - 277, *supra*.)

346.    The Antitrust Plaintiffs participate in the private health insurance market in Southern Brevard County as suppliers, insofar as they contract with private health insurers to offer services as part of their provider networks.  Furthermore, private health insurers pay the Antitrust Plaintiffs for services rendered to their enrollees.  (*See* ¶ 76, *supra*.)

347.    Health First's exercise and maintenance of market power in the private health insurance market in Southern Brevard County, including the exclusionary course of conduct designed towards that end, has substantially limited the Antitrust Plaintiffs' ability to effectively compete in the inter-related markets for physician and ancillary services in Southern Brevard County.  (*See* ¶¶ 199 - 253, *supra*)

348.    Antitrust Plaintiffs have been injured in their business and property as a result of Defendants' anticompetitive scheme.  These injuries are of the type the federal antitrust laws were designed to prevent and flow directly from the exclusionary practices which makes Defendants' conduct unlawful.  (*See* ¶¶ 278 - 290, *supra*.)

349.    OMNI is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and

the inability to access a substantial segment of insured persons in Southern Brevard County. As a result, OMNI has lost significant income and has suffered harm to its business and property.

350. S.O.A.R. is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County. As a result, S.O.A.R. has lost significant income and has suffered harm to its business and property.

351. Institute of Facial Surgery is harmed by the various exclusionary practices described herein because: (a) it has been denied access to the Health First network for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County. As a result, Institute of Facial Surgery has lost significant income and has suffered harm to its business and property.

352. Florida Pain is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to

the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County. As a result, Florida Pain has lost significant income and has suffered harm to its business and property.

353.    Drs. Deligdish, Seminer, Dowdell, Gayles, Golovac, Grenevicki, and Komar are harmed by the various exclusionary practices described herein because they have been: (a) denied access to Health First's members; and (b) blacklisted by Health First and, thus, receive no patient referrals, regardless of the patient's insurance provider, from HF Physicians or its co-conspirators. In addition, Dr. Deligdish had his hospital privileges at Holmes RMC revoked by, or at the direction of, Health First in retaliation for voicing concerns over Health First's anticompetitive practices. As a result, these doctors lost significant income and have suffered harm to their business and property.

### SIXTH CLAIM FOR RELIEF

**Attempted Monopolization of the Medicare Advantage Market
In Violation of Section 2 of the Sherman Act**

**(Asserted by Antitrust Plaintiffs Against
Defendants Health First Inc. and HF Health Plans)**

354.    HF Health Plans is a wholly owned subsidiary of Health First Inc. Health First exerts substantial control over the day-to-day operations of its subsidiaries, using them as agencies or instrumentalities of the parent company. In fact, Health First holds itself out as "Central Florida's only fully integrated health system."

355.    Health First, through its ownership and control of HF Physicians, has a dominant share in the Medicare Advantage market in Southern Brevard County. (*See* ¶ 82, *supra.*)

356.     Health First has attempted to monopolize this market by acting with the specific intent of obtaining monopoly power and, because of the affirmative acts described *supra*, poses a dangerous probability of achieving monopoly power in the Medicare Advantage market in Southern Brevard County.

357.     Health First has enhanced and abused its market power in the Medicare Advantage market in Southern Brevard County through the exclusionary and anticompetitive devices described above, including, *inter alia*, exclusive dealing arrangements (*see* ¶¶ 136 - 141, *supra*); tying (*see* ¶¶ 142 - 145, *supra*); group boycott/concerted refusal to deal (*see* ¶¶ 146 - 152, *supra*); and monopoly leveraging (*see* ¶¶ 164 - 168, *supra*).

358.     As a result, prices are higher and there are fewer alternatives for participants in the Medicare Advantage market in Southern Brevard County, thereby causing injury to competition, consumers, and the Antitrust Plaintiffs.  The injury from this monopoly is felt by buyers in the form of higher premiums, and suppliers in the form of reduced payments for services.  (*See* ¶¶ 275 - 277, *supra*.)

359.     The Antitrust Plaintiffs participate in the Medicare Advantage market in Southern Brevard County as suppliers, insofar as they contract with private health insurers to offer services as part of their provider networks.  Furthermore, insurers offering Medicare Advantage plans pay the Antitrust Plaintiffs for services rendered to their Medicare Advantage enrollees.  (*See* ¶ 83, *supra*.)

360.     Health First's exercise and maintenance of market power in the Medicare Advantage market in Southern Brevard County, including the exclusionary course of conduct designed towards that end, has substantially limited the Antitrust Plaintiffs' ability to effectively

compete in the inter-related markets for physician and ancillary services in Southern Brevard County.  (*See* ¶¶ 199 - 253, *supra*)

361.    Antitrust Plaintiffs have been injured in their business and property as a result of Defendants' anticompetitive scheme.  These injuries are of the type the federal antitrust laws were designed to prevent and flow directly from the exclusionary practices which makes Defendants' conduct unlawful.  (*See* ¶¶ 278 - 290, *supra*.)

362.    OMNI is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, OMNI has lost significant income and has suffered harm to its business and property.

363.    S.O.A.R. is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and

the inability to access a substantial segment of insured persons in Southern Brevard County. As a result, S.O.A.R. has lost significant income and has suffered harm to its business and property.

364.    Institute of Facial Surgery is harmed by the various exclusionary practices described herein because: (a) it has been denied access to the Health First network for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County. As a result, Institute of Facial Surgery has lost significant income and has suffered harm to its business and property.

365.    Florida Pain is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County. As a result, Florida Pain has lost significant income and has suffered harm to its business and property.

366.    Drs. Deligdish, Seminer, Dowdell, Gayles, Golovac, Grenevicki, and Komar are harmed by the various exclusionary practices described herein because they have been: (a) denied access to Health First's members; and (b) blacklisted by Health First and, thus, receive no

patient referrals, regardless of the patient's insurance provider, from HF Physicians or its co-conspirators. In addition, Dr. Deligdish had his hospital privileges at Holmes RMC revoked by, or at the direction of, Health First in retaliation for voicing concerns over Health First's anticompetitive practices. As a result, these doctors lost significant income and have suffered harm to their business and property.

### SEVENTH CLAIM FOR RELIEF

**Contract, Combination, or Conspiracy In Restraint of Trade
In Violation of Section 1 of the Sherman Act**

**(Asserted by Antitrust Plaintiffs Against All Defendants)**

367. Defendants have participated in a common scheme designed to leverage Health First's market power in the Relevant Market and Secondary Product Markets and, ultimately, create a vertically-integrated healthcare monopoly in Southern Brevard County. This common scheme constitutes a continuing agreement, understanding, combination, and/or conspiracy to restrain trade and exclude competition those markets. (*See* ¶¶ 124 - 168, *supra*.)

368. All of those physicians and medical practices which agreed to Health First's exclusive dealing arrangements, including MIMA and its physicians prior to the acquisition by Health First, are co-conspirators of the Defendants.

369. The common scheme involves multiple forms of exclusionary conduct, including, *inter alia*, exclusive dealing arrangements, tying, and group boycott/concerted refusal to deal. Each of these forms of conduct individually constitutes an unreasonable restraint of trade:

- The exclusive dealing arrangements violate the Sherman Act under the rule of reason as it forecloses competition in a substantial share of the Relevant Market and Secondary Product Markets so as to adversely affect competition (*see* ¶¶ 136 - 141, *supra*);

- The tying arrangement is a *per se* violation of the Sherman Act as it involves distinct services (*i.e.*, private health insurance and hospital, physician, and ancillary services), Health First has market power in the tying product (*i.e.*,

private health insurance), and the amount of commerce in the tied markets (hospital, physician, and ancillary services) is not insubstantial (*see* ¶¶ 142 - 145, *supra*); and

- The group boycott/concerted refusal to deal is a *per se* violation of the Sherman Act § 1 as it involves a horizontal agreement amongst direct competitors (*see* ¶¶ 146 - 152, *supra*).

370. As discussed *supra*, each of the Defendants actively participated in, and gained a competitive advantage from, this anticompetitive course of conduct:

- Health First Inc., through its officers and board of directors, designed and implemented the common scheme described herein. It exerts day-to-day control over all things "Health First," and uses its subsidiaries as merely agents or instrumentalities to achieve its anticompetitive ends (*see* ¶¶ 169 - 173, *supra*);

- Holmes RMC actively assists Health First in leveraging its monopoly power in the Relevant Market to maintain and enhance its market power in adjacent markets by, *inter alia*, refusing to make inpatient referrals to blacklisted physicians and, in some cases, revoking their hospital privileges (*see* ¶¶ 174 - 178, *supra*);

- HF Physicians actively assists Health First in leveraging its market power in the physician services market in Southern Brevard County to maintain and enhance its market power in adjacent markets by, *inter alia*, boycotting physicians who have refused to enter into exclusive dealing arrangements with Health First (*see* ¶¶ 179 - 182, *supra*);

- HF Health Plans actively assists Health First in leveraging its market power in the private health insurance and Medicare Advantage markets in Southern Brevard County to maintain and enhance its market power in adjacent markets by, *inter alia*, refusing to deal with those physicians/practices that have refused to enter into exclusive dealing arrangements with Health First (*see* ¶¶ 183 - 187, *supra*); and

- Michael Means and Jerry Senne, as members of the Health First board of directors, designed and implemented the common scheme. They also directly participated in the common scheme by, *inter alia*, inviting physicians to enter exclusive dealing arrangements Health First and convincing physicians to leave those practices which refused to join the conspiracy (*see* ¶¶ 188 - 195, *supra*).

371. As a result of the common scheme, prices are higher and there are fewer alternatives for participants in the Relevant Market and Secondary Product Markets, thereby causing injury to competition, consumers, and Plaintiffs. (*See* ¶¶ 275 - 277, *supra*.)

372. Defendants and Antitrust Plaintiffs participate in each of these markets in Southern Brevard County. (*See* ¶¶ 61, 69, 76, 83, and 287, *supra*.)

373. The exclusionary course of conduct underlying the common scheme has substantially limited the Antitrust Plaintiffs' ability to effectively compete in the inter-related markets for physician and ancillary services in Southern Brevard County. (*See* ¶¶ 199 - 253, *supra*)

374. Antitrust Plaintiffs have been injured in their business and property as a result of Defendants' anticompetitive scheme. These injuries are of the type the federal antitrust laws were designed to prevent and flow directly from the exclusionary practices which makes Defendants' conduct unlawful. (*See* ¶¶ 278 - 290, *supra*.)

375. OMNI is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County. As a result, OMNI has lost significant income and has suffered harm to its business and property.

376. S.O.A.R. is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal;

86

(c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, S.O.A.R. has lost significant income and has suffered harm to its business and property.

377.    Institute of Facial Surgery is harmed by the various exclusionary practices described herein because: (a) it has been denied access to the Health First network for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, Institute of Facial Surgery has lost significant income and has suffered harm to its business and property.

378.    Florida Pain is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, Florida Pain has lost significant income and has suffered harm to its business and property.

379.    Drs. Deligdish, Seminer, Dowdell, Gayles, Golovac, Grenevicki, and Komar are harmed by the various exclusionary practices described herein because they have been: (a) denied access to Health First's members; and (b) blacklisted by Health First and, thus, receive no patient referrals, regardless of the patient's insurance provider, from HF Physicians or its co-conspirators.  In addition, Dr. Deligdish had his hospital privileges at Holmes RMC revoked by, or at the direction of, Health First in retaliation for voicing concerns over Health First's anticompetitive practices.  As a result, these doctors lost significant income and have suffered harm to their business and property.

### EIGHTH CLAIM FOR RELIEF

**Conspiracy to Monopolize the Relevant Market and Secondary Product Markets
In Violation of Section 2 of the Sherman Act**

**(Asserted by Antitrust Plaintiffs Against All Defendants)**

380.    Defendants have participated in a common scheme designed to leverage Health First's market power in the Relevant Market and Secondary Product Markets and, ultimately, create a vertically-integrated healthcare monopoly in Southern Brevard County.  This constitutes concerted action deliberately aimed at achieving or maintaining a monopoly in the Relevant Market, as well as each of the Secondary Product Markets.

381.    The common scheme involves multiple forms of exclusionary conduct, including, *inter alia*, exclusive dealing arrangements (*see* ¶¶ 136 - 141, *supra*); tying (*see* ¶¶ 142 - 145, *supra*); group boycott/concerted refusal to deal (*see* ¶¶ 146 - 152, *supra*); and monopoly leveraging (*see* ¶¶ 164 - 168, *supra*).

382.    All of those physicians and medical practices which agreed to Health First's exclusive dealing arrangements, including MIMA and its physicians prior to the acquisition by Health First, are co-conspirators of the Defendants.

383.    As discussed *supra*, each of the Defendants actively participated in, and gained a competitive advantage from, this anticompetitive course of conduct:

- Health First Inc., through its officers and board of directors, designed and implemented the common scheme described herein.  It exerts day-to-day control over all things "Health First," and uses its subsidiaries as merely agents or instrumentalities to achieve its anticompetitive ends (*see* ¶¶ 169 - 173, *supra*);

- Holmes RMC actively assists Health First in leveraging its monopoly power in the Relevant Market to maintain and enhance its market power in adjacent markets by, *inter alia*, refusing to make inpatient referrals to blacklisted physicians and, in some cases, revoking their hospital privileges (*see* ¶¶ 174 - 178, *supra*);

- HF Physicians actively assists Health First in leveraging its market power in the physician services market in Southern Brevard County to maintain and enhance its market power in adjacent markets by, *inter alia*, boycotting physicians who have refused to enter into exclusive dealing arrangements with Health First (*see* ¶¶ 179 - 182, *supra*);

- HF Health Plans actively assists Health First in leveraging its market power in the private health insurance and Medicare Advantage markets in Southern Brevard County to maintain and enhance its market power in adjacent markets by, *inter alia*, refusing to deal with those physicians/practices that have refused to enter into exclusive dealing arrangements with Health First (*see* ¶¶ 183 - 187, *supra*); and

- Michael Means and Jerry Senne, as members of the Health First board of directors, designed and implemented the common scheme.  They also directly participated in the common scheme by, *inter alia*, inviting physicians to enter exclusive dealing arrangements Health First and convincing physicians to leave those practices which refused to join the conspiracy (*see* ¶¶ 188 - 195, *supra*).

384.    Defendants' participation in the common scheme constitutes overt acts in furtherance of the conspiracy.

385.    As a result of the common scheme, prices are higher and there are fewer alternatives for participants in the Relevant Market and Secondary Product Markets, thereby causing injury to competition, consumers, and the Antitrust Plaintiffs.  Defendants and Antitrust Plaintiffs participate in each of these markets in Southern Brevard County.  (*See* ¶¶ 275 - 277, *supra*.)

386.    The exclusionary course of conduct underlying the common scheme has substantially limited the Antitrust Plaintiffs' ability to effectively compete in the inter-related markets for physician and ancillary services in Southern Brevard County.  (*See* ¶¶199 - 253, *supra*)

387.    Antitrust Plaintiffs have been injured in their business and property as a result of Defendants' anticompetitive scheme.  These injuries are of the type the federal antitrust laws were designed to prevent and flow directly from the exclusionary practices which makes Defendants' conduct unlawful.  (*See* ¶¶ 278 - 290, *supra*.)

388.    OMNI is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, OMNI has lost significant income and has suffered harm to its business and property.

389.    S.O.A.R. is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the

exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County. As a result, S.O.A.R. has lost significant income and has suffered harm to its business and property.

390. Institute of Facial Surgery is harmed by the various exclusionary practices described herein because: (a) it has been denied access to the Health First network for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County. As a result, Institute of Facial Surgery has lost significant income and has suffered harm to its business and property.

391. Florida Pain is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County. As a result, Florida Pain has lost significant income and has suffered harm to its business and property.

392. Drs. Deligdish, Seminer, Dowdell, Gayles, Golovac, Grenevicki, and Komar are harmed by the various exclusionary practices described herein because they have been: (a)

denied access to Health First's members; and (b) blacklisted by Health First and, thus, receive no patient referrals, regardless of the patient's insurance provider, from HF Physicians or its co-conspirators. In addition, Dr. Deligdish had his hospital privileges at Holmes RMC revoked by, or at the direction of, Health First in retaliation for voicing concerns over Health First's anticompetitive practices. As a result, these doctors lost significant income and have suffered harm to their business and property.

## NINTH CLAIM FOR RELIEF

### Unfair Methods of Competition
### In Violation of Florida Deceptive and Unfair Trade Practices Act

### (Asserted by All Plaintiffs Against All Defendants)

393.    This is an action for damages, for declaratory injunctive relief and for attorney's fees pursuant to § 501.203 Fla. Stat. *et seq.* §§ 501.204, 501.2105 and § 501.211 (2013).

394.    During all relevant times, the Defendants were engaged in trade or commerce with a thing of value and Plaintiffs were consumers as set forth in § 501.203, Fla. Stat. (2013).

395.    The acts engaged in by Defendants violate the Sherman Act, and therefore are violations of § 501.204 (2013). (*See* ¶¶ 291 - 392, *supra.*)

396.    Moreover, the conduct described herein is deceptive or unfair in that it offends established public policy, is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers in violation of § 501.204 Fla. Stat. (2013).

397.    As discussed *supra*, each of the Defendants actively participated in this unfair and anticompetitive course of conduct by means of a conspiracy:

- Health First Inc., through its officers and board of directors, designed and implemented the common scheme described herein. It exerts day-to-day control over all things "Health First," and uses its subsidiaries as merely agents or instrumentalities to achieve its anticompetitive ends (*see* ¶¶ 169 - 173, *supra*);

- Holmes RMC actively assists Health First in leveraging its monopoly power in the Relevant Market to maintain and enhance its market power in adjacent markets by, *inter alia*, refusing to make inpatient referrals to blacklisted physicians and, in some cases, revoking their hospital privileges (*see* ¶¶ 174 - 178, *supra*);

- HF Physicians actively assists Health First in leveraging its market power in the physician services market in Southern Brevard County to maintain and enhance its market power in adjacent markets by, *inter alia*, boycotting physicians who have refused to enter into exclusive dealing arrangements with Health First (*see* ¶¶ 179 - 182, *supra*);

- HF Health Plans actively assists Health First in leveraging its market power in the private health insurance and Medicare Advantage markets in Southern Brevard County to maintain and enhance its market power in adjacent markets by, *inter alia*, refusing to deal with those physicians/practices that have refused to enter into exclusive dealing arrangements with Health First (*see* ¶¶ 183 - 187, *supra*); and

- Michael Means and Jerry Senne, as members of the Health First board of directors, designed and implemented the common scheme.  They also directly participated in the common scheme by, *inter alia*, inviting physicians to enter exclusive dealing arrangements Health First and convincing physicians to leave those practices which refused to join the conspiracy (*see* ¶¶ 188 - 195, *supra*).

398.    As a result of Defendants' unfair, unconscionable, or anticompetitive conduct stemming from this conspiracy, Plaintiffs have each been aggrieved.  (*See* ¶¶ 199 - 253, *supra*.)

399.    OMNI is aggrieved by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, OMNI has lost significant income and has suffered harm to its business and property.

400.    S.O.A.R. is aggrieved by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, S.O.A.R. has lost significant income and has suffered harm to its business and property.

401.    Institute of Facial Surgery is aggrieved by the various exclusionary practices described herein because: (a) it has been denied access to the Health First network for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, Institute of Facial Surgery has lost significant income and has suffered harm to its business and property.

402.    Florida Pain is aggrieved by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from

Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, Florida Pain has lost significant income and has suffered harm to its business and property.

403.    Drs. Deligdish, Seminer, Dowdell, Gayles, Golovac, Grenevicki, and Komar are harmed by the various exclusionary practices described herein because they have been: (a) denied access to Health First's members; and (b) blacklisted by Health First and, thus, receive no patient referrals, regardless of the patient's insurance provider, from HF Physicians or its co-conspirators.  In addition, Dr. Deligdish had his hospital privileges at Holmes RMC revoked by, or at the direction of, Health First in retaliation for voicing concerns over Health First's anticompetitive practices.  As a result, these doctors lost significant income and have suffered harm to their business and property.

404.    Drs. Deligdish, Seminer, Dowdell, Gayles, Golovac, Grenevicki, and Komar have been aggrieved by the various exclusionary practices described herein because they have been: (a) denied access to Health First's members; and (b) blacklisted by Health First and, thus, receive no patient referrals, regardless of the patient's insurance provider, from HF Physicians or its co-conspirators.  In addition, Dr. Deligdish had his hospital privileges at Holmes RMC revoked by, or at the direction of, Health First in retaliation for voicing concerns over Health First's anticompetitive practices.  As a result, these doctors lost significant income and have suffered harm to their business and property.

405.    Mr. Boone and PAS have been aggrieved as they were blacklisted by Health First, which instructed physicians not to utilize their services.  As a result, Mr. Boone and Physician Assistant Services have lost significant income in the form of lost sales, lost business

opportunities, and lost reputation and, accordingly, have suffered harm to their respective businesses and property.

## TENTH CLAIM FOR RELIEF

### Tortious Interference
### In Violation of Florida State Law

### (Asserted by All Plaintiffs Against All Defendants)

406.    The common scheme described herein (*see* ¶¶ 124 to 168, *supra*) tortiously interfered with three different types of business relationships: (1) all Plaintiffs except for Dr. Grenevicki, Mr. Boone, Institute of Facial Surgery, and PAS had an ongoing, preexisting relationship with certain patients insured by HF Health Plans; (2) all Plaintiffs had an ongoing, preexisting relationship with those doctors that previously referred patients or, in the case of Mr. Boone and PAS, otherwise utilized their services; and (3) the Medical Practice Plaintiffs, except for Florida Pain, each had ongoing, preexisting relationships with certain physicians who were lured away by Health First to join other practices.

407.    Each of these relationships afforded Plaintiffs existing or prospective legal rights, including the reasonable expectation of continued business vis-à-vis the ongoing patient-provider relationship, provider-to-provider referral relationship, or employment relationship.

408.    Defendants, with knowledge of these business relationships, undertook affirmative acts with the explicit purpose and effect of furthering the alleged conspiracy and interfering with such relationships.  (*See* ¶¶ 169 - 195, *supra*.)

409.    OMNI's business relationships with its patients, the physicians who previously referred it patients, and its own physicians were interfered with when Defendants' common scheme resulted in: (a) the termination of OMNI's provider contracts; (b) the blacklisting of its

physicians; (c) the persuading of OMNI's patients to switch to alternative medical providers; and (d) the active luring away of OMNI's providers to other medical practices.

410. S.O.A.R.'s business relationships with its patients, the physicians who previously referred it patients, and its own physicians were interfered with when Defendants' common scheme resulted in: (a) the termination of S.O.A.R.'s provider contracts; (b) the blacklisting of its physicians; (c) the persuading of S.O.A.R.'s patients to switch to alternative medical providers; and (d) the active luring away of S.O.A.R.'s providers to other medical practices.

411. Institute of Facial Surgery's business relationships with the physicians who previously referred it patients were interfered with when Defendants' common scheme resulted in the blacklisting of its physicians.

412. Florida Pain's business relationships with its patients, the physicians who previously referred it patients, and its own physicians were interfered with when Defendants' common scheme resulted in: (a) the termination of Florida Pain's provider contracts; (b) the blacklisting of its physicians; and (c) the persuading of Florida Pain's patients to switch to alternative medical providers.

413. Dr. Deligdish's business relationships with his patients and the physicians who previously referred him patients were interfered with when Defendants' common scheme resulted in: (a) the termination of OMNI's provider contracts; (b) the blacklisting of OMNI and Dr. Deligdish; and (c) the persuading of Dr. Deligdish's patients to switch to alternative medical providers.

414. Dr. Seminer's business relationships with his patients and the physicians who previously referred him patients were interfered with when Defendants' common scheme resulted in: (a) the termination of OMNI's provider contracts; (b) the blacklisting of OMNI and

Dr. Seminer; and (c) the persuading of Dr. Seminer's patients to switch to alternative medical providers.

415.    Dr. Dowdell's business relationships with his patients and the physicians who previously referred him patients were interfered with when Defendants' common scheme resulted in: (a) the termination of S.O.A.R.'s provider contracts; (b) the blacklisting of S.O.A.R. and Dr. Dowdell; and (c) the persuading of Dr. Dowdell's patients to switch to alternative medical providers.

416.    Dr. Gayles' business relationships with his patients and the physicians who previously referred him patients were interfered with when Defendants' common scheme resulted in: (a) the termination of the Florida Pain's provider contracts; (b) the blacklisting of Florida Pain and Dr. Gayles; and (c) the persuading of Dr. Gayles' patients to switch to alternative medical providers.

417.    Dr. Golovac's business relationships with his patients and the physicians who previously referred him patients were interfered with when Defendants' common scheme resulted in: (a) the termination of the Florida Pain's provider contracts; (b) the blacklisting of Florida Pain and Dr. Golovac; and (c) the persuading of Dr. Golovac's patients to switch to alternative medical providers.

418.    Dr. Grenevicki's business relationships with the physicians who previously referred him patients were interfered with when Defendants' common scheme resulted in the blacklisting of the Institute of Facial Surgery and Dr. Grenevicki.

419.    Dr. Komar's business relationships with his patients and the physicians who previously referred him patients were interfered with when Defendants' common scheme

resulted in: (a) his blacklisting; and (b) the persuading of his patients to switch to alternative medical providers.

420.  Mr. Boone and PAS's business relationships with the doctors who previously utilized their services were interfered with when Defendants' common scheme resulted in their being blacklisted by Health First.

421.  These affirmative acts were undertaken for the specific purpose of interfering with Plaintiffs' business relationships with its patients.  These actions were also unjustified as they were undertaken to injure Plaintiffs and further an unlawful, anticompetitive scheme as opposed to the legitimate acquisition of business.  (*See* ¶¶ 291 - 392, *supra*.)

422.  As a result of the interferences described herein, Plaintiffs were damaged in the form of lost income and, in the case of the Medical Practice Plaintiffs, the diminished value of their businesses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully demand a trial by jury on all matters so triable under law, and respectfully request that, based on the verdict of the jury, the Court enter a judgment against Defendants which:

a)  Adjudges and decrees that Defendants unlawfully violated Section 7 of the Clayton Act, and exercised and maintained monopoly power in the market for acute care inpatient hospital services in Southern Brevard County, or, in the alternative;

b)  Adjudges and decrees that Defendants have attempted to monopolize the market for acute care inpatient hospital services in Southern Brevard County;

c)  Adjudges and decrees that Defendants have engaged in an unlawful agreement in violation of Section 1 of the Sherman Act;

Case 8:17-cv-05690-BHS Document 184 Filed 12/21/18 Page 162 of 277

    d)      Orders the divestiture of MIMA, HF Physicians, and HF Health Plans from Health First;

    e)      Invalidates any arrangements between any of the Heath First entities and any physician and/or medical group conspiring with any of the Defendants, including but not limited to HF Physicians, to utilize Health First hospital facilities exclusively or nearly exclusively;

    f)      Awards Plaintiffs threefold damages caused by Defendants' conduct, as required by statute;

    g)      Awards Plaintiffs their reasonable attorney's fees and costs incurred in pursuing this action in accordance with the federal antitrust laws; and

    h)      Grants Plaintiffs such other and further relief as may be equitable and just under the circumstances.

Plaintiffs hereby reserve the right to assert a claim for punitive damages upon a proper proffer to the Court.

May 22, 2014

Respectfully submitted,

/s/ Manuel J. Dominguez
Manuel J. Dominguez (FL Bar 54798)
Cohen Milstein Sellers & Toll PLLC
2925 PGA Boulevard
Suite 200
Palm Beach Gardens, FL 33410
Telephone:  (561) 833-6575
Facsimile: (212) 838-7745
jdominguez@cohenmilstein.com

Tucker H. Byrd (FL Bar 381632)
Morgan & Morgan, P.A.
20 North Orange Ave.
Suite 1600
Orlando, FL 32802-4979
Telephone: (800) 896-3062
Facsimile: (407) 418-2048
tbyrd@forthepeople.com

William G. Kopit
Epstein Becker & Green
1227 25th Street, NW
Suite 700
Washington, D.C. 20037-1156
Telephone: (202) 861-1803
Facsimile: (202) 861-3551
wkpit@ebglaw.com

*Attorneys for Plaintiffs*

# Exhibit 3

*State of Washington v. Franciscan Health System d/b/a CHI Franciscan Health; Franciscan Medical Group; The Doctors Clinic, A Professional Corporation; and WestSound Orthopaedics, P.S.*

Civil Action No. 3:17-cv-05690

Expert Report of Daniel P. Kessler, Ph.D

October 26, 2018

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Table of Contents

I.      Qualifications ...................................................................................................1

II.     Assignment .....................................................................................................2

III.    Summary of Opinions ......................................................................................2

IV.     Background .....................................................................................................5

        A.      The TDC Affiliation ............................................................................ 5

        B.      The WSO Transaction.......................................................................... 8

V.      Economic Analysis of Competition and Integration in Markets for Health Services....9

        A.      Competition in Markets for Health Services Occurs in Two Stages ..................... 9

        B.      Different Types of Integration Have Different Competitive Effects ................... 10

                1.      Horizontal versus Vertical Integration........................................ 10

                2.      Strategic, Financial, and Operational Integration ....................... 11

VI.     Application of Economic Analysis of Competition and Integration to the TDC
        Affiliation.....................................................................................................14

        A.      By Eliminating Independent Price Negotiation With Health Plans of TDC and
                FMG, the TDC Affiliation Creates the Same Anticompetitive Harm As Would
                Any Price-Fixing Agreement ............................................................... 14

        B.      The TDC Affiliation Does Not Financially or Operationally Integrate TDC
                with FMG ........................................................................................ 16

        C.      From An Economic Perspective, the TDC Affiliation's Elimination of
                Independent Price Negotiation, Without Financial or Operational Integration,
                Qualifies It for Per Se or Quick-Look Rule of Reason Analysis ......................... 17

        D.      From An Economic Perspective, the Lack of Financial and Operational
                Integration of TDC With FMG Is Inconsistent With Treating TDC and FMG
                as a Single Firm .............................................................................. 19

VII.    Empirical Economic Research on the Effects of Competition and Integration in
        Markets for Health Services....................................................................................21

        A.      Horizontal Integration........................................................................ 21

        B.      Vertical Integration of Physician Groups with Hospitals .................................... 24

        C.      Who Pays for Reduced Competition in Markets for Health Services?................. 26

VIII.   Application of Empirical Economic Research to the TDC Affiliation and the WSO
        Transaction...................................................................................................29

        A.      Empirical Economic Research Predicts that the Integration Undertaken By the
                TDC Affiliation and WSO Transaction Will Cause Anticompetitive Harm ........ 29

                1.      Anticompetitive Harm from Strategic Horizontal Integration of TDC
                        and WSO with FMG .................................................................. 29

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

        2.      Anticompetitive Harm from Strategic Vertical Integration of TDC and
                WSO with CHI Franciscan ..................................................................... 32

    B.      Empirical Economic Research Does Not Predict that the Integration
            Undertaken By the TDC Affiliation and WSO Transaction Will Create
            Procompetitive Benefits ........................................................................... 35

IX.     Conclusion .............................................................................................................37

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## I.    Qualifications

1.    I am a tenured professor at Stanford Law School and the Stanford Graduate School of Business; a professor (by courtesy) at the Stanford School of Medicine; a Senior Fellow at Stanford's Hoover Institution and its Institute for Economic Policy Research; and a Research Associate at the National Bureau of Economic Research, the country's leading nonprofit, nonpartisan economic research organization.  I teach a University-wide course in health care finance and regulation at Stanford.  I have also taught courses in health policy at the Wharton School of the University of Pennsylvania and Harvard Law School.  I have served as a consultant to the U.S. Federal Trade Commission, hospitals, health systems, and insurers.  I currently serve on Stanford's Committee on Faculty and Staff Human Resources, which oversees the University's health insurance plans and reports to its Chief Financial Officer.  I obtained a J.D. from Stanford Law School in 1993 and a Ph.D. in economics from MIT in 1994, specializing in law-and-economics and health economics.

2.    I study the empirical effects of health policy.  I have published numerous books and papers in peer-reviewed journals on health economics, health insurance, and regulation.  Several topics that have been a focus of my recent research are directly relevant to this case.  In particular, I have written eight peer-reviewed research papers on the effects of competition in hospital markets, the effects of hospital-physician integration, and the role of public policy in promoting competition among hospitals and physicians.  I served as the principal investigator for a grant from the U.S. National Institutes of Health to study how Medicare reimbursement policy should account for hospital integration.  I am currently an investigator for a grant from the U.S. Agency for Healthcare Research and Quality to study how physician organizational choices affect the cost and quality of care.  I have also received grant support from the U.S. National Science Foundation, The California Health Care Foundation, and the American Cancer Society. My full curriculum vitae is attached as Appendix A.  It includes references to publications over the last ten years, and summarizes my expert testimony over the last four years.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

3.      My compensation for work on this matter is $850 per hour and is not contingent or based in any way on the content of my opinion or the outcome of this matter.

## II.      Assignment

4.      At the request of counsel, I considered the following four questions:

    a.   How do economists analyze the effects of competition and integration in markets for health services?

    b.   Based on economic analysis, how should the allegations in the State's Complaint be evaluated?

    c.   What are the findings of empirical economic research on the effects of competition and integration in markets for health services?

    d.   Based on the findings of empirical economic research, what will be the competitive effects of the TDC Affiliation (as defined in ¶¶ 10 - 12 below) and the FMG/WSO Transaction (as defined in ¶ 13 below)?

5.      To undertake my analysis, I specifically considered case documents; deposition testimony; excerpts from the expert reports of Dr. Cory Capps and Professor Lawton Burns; and the studies listed in Appendix B.  As additional discovery occurs in this case, I may consider additional information and may supplement this report accordingly.

## III.      Summary of Opinions

6.      In response to the questions above, I reached the following conclusions:

    a.   Economists understand competition in markets for health services as a two-stage process.  In the first stage, providers compete to be included in health plans' networks.  In the second stage, in-network providers compete for patients primarily with each other, and in certain plans, secondarily with out-of-network providers.

        i.   Both "horizontal" and "vertical" integration may affect provider competition.  Horizontal integration occurs between producers of

2

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

substitutes (i.e., otherwise independent physician groups); vertical integration occurs between producers of complements (i.e., an otherwise independent physician group and a hospital).  Any particular relationship may involve elements of either horizontal integration, vertical integration, or both.

ii.  Integration of either type can take three forms:  "strategic" integration, which combines the bargaining or market power of the parties; "financial" integration, which pools responsibility for the risk of the cost of care; or "operational" (sometimes described as "clinical") integration, which combines the control rights held or management functions undertaken by the parties.

iii.  Financial and operational integration can result in procompetitive benefits; strategic integration can result in anticompetitive harms.

b.  Based on economic analysis and the facts of this case, I conclude the following:

i.  TDC and FMG are horizontally related, and TDC agreed not to negotiate prices separately from FMG with health plans.  Thus, the TDC Affiliation creates the same anticompetitive harm as would any price-fixing agreement.

ii.  From an economic perspective, the TDC Affiliation is not an output contract.  Output contracts are by definition between parties that are only (or predominantly) vertically related, but TDC and FMG are horizontally related.  If TDC and FMG could enter into what Defendants describe as an output contract, then every price-fixing agreement could be recharacterized as an output contract, which makes no economic sense.

iii.  The TDC Affiliation neither financially nor operationally integrates TDC with FMG.  From an economic perspective, the TDC Affiliation's elimination of independent price negotiation, without financial or operational integration, qualifies it for per se or quick-look rule of reason analysis.

3

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

     iv.  From an economic perspective, the lack of financial and operational integration of TDC with FMG is inconsistent with treating TDC and FMG as a single firm.

c.  Empirical economic research reports three findings that are relevant to this case:

     i.  In health care markets, horizontal competition leads to better outcomes for consumers, including lower prices and higher quality.

     ii.  Vertical integration between hospitals and physicians is associated with higher prices but not with better quality.  Some of this research also shows that hospital-physician integration has additional negative effects on price and quality when it is undertaken by the largest hospital in a market.

     iii.  Even though most individuals obtain health insurance through an employer, the individuals themselves bear the burden from reduced competition in health care markets – through paying higher premiums, losing their employer-sponsored insurance coverage, and earning lower take-home wages and salaries.

d.  Based on the facts of this case, I conclude that empirical economic research predicts the following:

     i.  The TDC Affiliation will increase permanently the prices of TDC and FMG, and increase permanently the overall prices, for adult primary care physician services on the Kitsap Peninsula.  The WSO Transaction will also increase permanently the prices of WSO (now FMG-employed) physicians, TDC, and FMG, and increase permanently the overall prices, for orthopedic physician services on the Kitsap Peninsula.

     ii.  The TDC Affiliation and the WSO Transaction will increase permanently the prices for outpatient and inpatient hospital services, and decrease permanently the quality of inpatient hospital services, on the Kitsap Peninsula.

     iii.  Individuals will ultimately bear the burden of these price increases.

4

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## IV.     Background

7.     This case involves a series of transactions between health care providers in the State of Washington, on the Kitsap Peninsula.  The Kitsap Peninsula is west of Seattle, surrounded almost entirely by water.  It is connected to Seattle by ferry; at its southern end, to Tacoma by the Tacoma Narrows Bridge; and at its northwestern end, to a rural area that abuts Olympic National Park.

8.     CHI Franciscan is a large health system.  It owns the only two civilian general acute-care hospitals on the Kitsap Peninsula, Harrison (in Bremerton and Silverdale) and St. Anthony (in Gig Harbor).  It also owns five other hospitals in the Tacoma area:  St. Joseph (in Tacoma), St. Claire (in Lakewood, south of Tacoma), St. Elizabeth (in Enumclaw, east of Tacoma), St. Francis (in Federal Way, northeast of Tacoma), and Highline (in Burien, between Tacoma and Seattle).  Notwithstanding the transactions at issue in this case, CHI Franciscan also owns a multispecialty physician group, Franciscan Medical Group (FMG).  FMG employs, among other specialties, adult primary care and orthopedic physicians.

9.     CHI Franciscan views itself as the dominant provider of inpatient hospital services on the Kitsap Peninsula.   According to David Schultz, President of the Peninsula region for CHI Franciscan, CHI Franciscan's inpatient facilities in 2017 had a collective market share of 77 percent in Harrison's Primary Service Area, which includes all of the Kitsap Peninsula and part of Mason County not on the Peninsula.[1]

### A.     The TDC Affiliation

10.     The Doctors' Clinic (TDC) is a 54-physician multispecialty group on the Kitsap Peninsula.  In September 2016, TDC and FMG signed four contracts relevant to my analysis:  a Professional Services Agreement (PSA), a Management Services Agreement (MSA), an Asset Purchase Agreement (APA), and an Asset Lease Agreement (ALA).  Taken together, I describe

---

[1] FHS - State v. -032698–2737 at 2702 (CHI Presentation, "Harrison Medical Center Master Facility Plan," 7/27/17).

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

these four contracts as the "TDC Affiliation."  The key economic features of the PSA are as follows:

    a.  TDC will provide "Professional Services" and other related services exclusively to FMG patients,[2] with some limited exceptions.[3]  Professional services include physician and non-physician advanced-practice clinician services.[4]

    b.  All patients treated by a TDC physician during the TDC Affiliation, including patients who were TDC patients before the TDC Affiliation, will become FMG patients.[5]

    c.  

    d.  FMG will have the sole responsibility and authority to determine the price of TDC's Professional and other related services and will maintain and execute contracts with health plans.[7]  TDC agrees that it will not execute any contracts with health plans for the longer of three years after the adoption of the TDC Affiliation, or one year after the expiration or termination of the TDC Affiliation, whichever is longer.[8]

    e.  FMG will pay TDC for Professional services at ▮▮▮▮▮▮▮▮▮▮

---

[2] TDC000121–0156 at 0126–0127 (TDC Contract, "Professional Services Agreement By and Between Franciscan Medical Group and The Doctors Clinic, a Professional Corporation," 9/6/16; Deposition of Brian Chandler, June 27, 2017 ("Chandler Deposition 6/27/17"), Exhibit 5).

[3] TDC000121–0156 at 0127–0128, 0156 (TDC Contract, "Professional Services Agreement By and Between Franciscan Medical Group and The Doctors Clinic, a Professional Corporation," 9/6/16; Chandler Deposition 6/27/17, Exhibit 5).

[4] TDC000121–0156 at 0123 (TDC Contract, "Professional Services Agreement By and Between Franciscan Medical Group and The Doctors Clinic, a Professional Corporation," 9/6/16; Chandler Deposition 6/27/17, Exhibit 5).

[5] TDC000121–0156 at 0128 (TDC Contract, "Professional Services Agreement By and Between Franciscan Medical Group and The Doctors Clinic, a Professional Corporation," 9/6/16; Chandler Deposition 6/27/17, Exhibit 5).  See also Deposition of Peter O'Connor, July 20, 2017 ("O'Connor Deposition 7/20/17"), 198:5–16.  Dr. O'Connor is the COO of FMG.

[6] TDC000121–0156 at 0127 (TDC Contract, "Professional Services Agreement By and Between Franciscan Medical Group and The Doctors Clinic, a Professional Corporation," 9/6/16; Chandler Deposition 6/27/17, Exhibit 5).

[7] TDC000121–0156 at 0131 (TDC Contract, "Professional Services Agreement By and Between Franciscan Medical Group and The Doctors Clinic, a Professional Corporation," 9/6/16; Chandler Deposition 6/27/17, Exhibit 5).

[8] O'Connor Deposition 7/27/17, 199:1–6.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

████████████████████████████████████████████[9]  However, TDC is solely responsible for determining the compensation of its individual physicians.[10]

11.    The key economic features of the MSA are as follows:

a.    TDC will provide all of the "Management Services" necessary to operate the TDC clinics.  The Management Services are detailed in an extensive list,[11] including employment, hiring, and firing of support staff.[12]

b.    FMG will provide the cash flow necessary to operate the TDC clinics based on an agreed-upon budget. ██████████████████████████[13]

c.    

---

[9] TDC000121–0156 at 0147–148 (TDC Contract, "Professional Services Agreement By and Between Franciscan Medical Group and The Doctors Clinic, a Professional Corporation," 9/6/16; Chandler Deposition 6/27/17, Exhibit 5).

[10] TDC000121–0156 at 0132–0133 (TDC Contract, "Professional Services Agreement By and Between Franciscan Medical Group and The Doctors Clinic, a Professional Corporation," 9/6/16; Chandler Deposition 6/27/17, Exhibit 5).

[11] TDC000157–0188 at 0179–0181 (TDC Contract, "Management Services Agreement," 9/6/16; Chandler Deposition 6/27/17, Exhibit 6).

[12] Chandler Deposition 6/27/17, 67:9–15; 103:16–24.  Mr. Chandler is the CFO of TDC.

[13] TDC000157–0188 at 0183 (TDC Contract, "Management Services Agreement," 9/6/16; Chandler Deposition 6/27/17, Exhibit 6).

[14] FMG has been paying TDCs actual costs rather than its budgeted costs.  See Chandler Deposition 6/27/17, 62:24–63:1; 64:11–14.  According to Chandler Deposition 6/27/17, 62:24–63:1, FMG has been paying TDCs actual costs rather than its budgeted costs (as specified in Exhibit C). ████████████████████████ Chandler Deposition 6/27/17, 64:7–8.

[15] TDC000157–0188 at 0183 (TDC Contract, "Management Services Agreement," 9/6/16; Chandler Deposition 6/27/17, Exhibit 6).

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

12.     The APA sells to FMG the ambulatory surgery center (ASC), imaging, and laboratory services owned by TDC; these assets are described in the TDC Affiliation as the "Ancillary Business."[16]  The ALA leases to FMG the other assets used in the operation of the TDC clinics; these assets are described in the TDC Affiliation as the "Practice Assets."[17]

### B.     The WSO Transaction

13.     WestSound Orthopedics (WSO) was a seven-physician orthopedic practice on the Kitsap Peninsula.  In July 2016, FMG acquired substantially all of the assets of WSO with an Asset Purchase Agreement (APA).[18]  As a condition of the APA, all seven WSO physicians signed Physician Employment Agreements (PEAs) with FMG.[19]  Taken together, I describe the APA, the PEAs, and other associated materials in WSO-000001 as the "WSO Transaction."  The key economic features of the WSO Transaction are as follows:

> a.  WSO (now FMG-employed) physicians will be employees of FMG, paid individually according to FMG's compensation policies.[20]  They will not contract independently with health plans.[21]  They will report to the Medical Director at FMG assigned to the clinic, the FMG Division Chief, and the FMG Chief Medical Officer.[22]

---

[16] TDC000002–0068 at 0007–0008 (TDC Contract, "Asset Purchase Agreement By and Between Franciscan Medical Group and The Doctors Clinic, a Professional Corporation," 9/6/16; Chandler Deposition 6/27/17, Exhibit 7).

[17] TDC000323–0405 at 0324–0325 (TDC Contract, "Asset Lease Agreement," 9/6/16; Chandler Deposition 6/27/17, Exhibit 11).

[18] WSO-000001–0469 at 0023–0136 (WSO Contract, "Acquisition of WestSound Orthopaedics, P.S. by Franciscan Medical Group," 7/1/16).

[19] WSO-000001–0469 at 0026 (WSO Contract, "Acquisition of WestSound Orthopaedics, P.S. by Franciscan Medical Group," 7/1/16).

[20] WSO-000001–0469 at 0026, 0054–0079 (WSO Contract, "Acquisition of WestSound Orthopaedics, P.S. by Franciscan Medical Group," 7/1/16).

[21] WSO-000001–0469 at 0057 (WSO Contract, "Acquisition of WestSound Orthopaedics, P.S. by Franciscan Medical Group," 7/1/16).

[22] WSO-000001–0469 at 0063 (WSO Contract, "Acquisition of WestSound Orthopaedics, P.S. by Franciscan Medical Group," 7/1/16).

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

    b.   WSO physicians will provide services exclusively to FMG patients,[23] with some limited exceptions.[24]

    c.   WSO support staff will be terminated and replaced with FMG employees.[25]

    d.   All patients of WSO (now FMG-employed) physicians will become FMG patients.[26]



    f.   FMG will pay for the operation of WSO's clinic.[29]

## V.    Economic Analysis of Competition and Integration in Markets for Health Services

### A.    Competition in Markets for Health Services Occurs in Two Stages

14.    Economists understand competition in markets for health services as a two-stage process. In the first stage, providers compete to be included in health plans' networks. In the second stage, in-network providers compete for patients primarily with each other, and in certain plans, secondarily with out-of-network providers. Competition in the first stage focuses on price, while second-stage competition focuses on quality and service.[30]

---

[23] WSO-000001–0469 at 0056 (WSO Contract, "Acquisition of WestSound Orthopaedics, P.S. by Franciscan Medical Group," 7/1/16).

[24] WSO-000001–0469 at 0074 (WSO Contract, "Acquisition of WestSound Orthopaedics, P.S. by Franciscan Medical Group," 7/1/16).

[25] WSO-000001–0469 at 0026 (WSO Contract, "Acquisition of WestSound Orthopaedics, P.S. by Franciscan Medical Group," 7/1/16).

[26] WSO-000001–0469 at 0037 (WSO Contract, "Acquisition of WestSound Orthopaedics, P.S. by Franciscan Medical Group," 7/1/16).

[27] WSO-000001–0469 at 0036–0037 (WSO Contract, "Acquisition of WestSound Orthopaedics, P.S. by Franciscan Medical Group," 7/1/16).

[28] WSO-000001–0469 at 0074 (WSO Contract, "Acquisition of WestSound Orthopaedics, P.S. by Franciscan Medical Group," 7/1/16).

[29] Deposition of David Butcherite, July 17, 2018 ("Butcherite Deposition 7/17/18"), 52:11–18. Mr. Butcherite is the vice president for finance of CHI Franciscan.

[30] Vistnes G, Hospitals, Mergers, and Two-Stage Competition, Antitrust Law Journal 1999-2000;67:671-92.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

15.     A provider's negotiating power with a health plan depends on the extent to which the plan needs the provider to build a network that employers and individuals will want.  A study of the hospital networks offered by health plans in 43 different metropolitan areas shows that the size and scope of a plan's network is an important determinant of consumers' plan choice.[31]  As a result, plans market themselves to individuals and employers based on the attractiveness of their networks, as well as their premiums, deductible and coinsurance levels, and non-price factors like service.[32]

16.     As the number of alternatives to a provider declines, or the alternatives become less-attractive substitutes, the provider faces less competition, and enjoys greater negotiating power. Providers with greater negotiating power can demand higher prices from health plans in the first stage of competition.[33]

### B.     Different Types of Integration Have Different Competitive Effects

#### 1.     Horizontal versus Vertical Integration

17.     Both "horizontal" and "vertical" integration may affect provider competition. [34] [35] "Horizontal" integration occurs when providers who produce *substitute* services (i.e., who are competitors) bargain together with plans over prices, unite under common ownership, or otherwise combine their activity. An example of horizontal consolidation is a merger between two neighboring physician groups. "Vertical" integration occurs when providers who produce *complementary* services bargain together with plans over prices, unite under common ownership, or otherwise combine their activity.  An example of vertical integration is the purchase of a physician group by a neighboring hospital that owns no competing physician groups.

---

[31] Ho K, The Welfare Effects of Restricted Hospital Choice in the US Medical Care Market, Journal of Applied Econometrics 2006;21:1039-79.

[32] Scanlon DP, Chernew M, McLaughlin C, Solon G, The Impact of Health Plan Report Cares on Managed Care Enrollment, Journal of Health Economics 2002;21:19-41.

[33] Vistnes G, Hospitals, Mergers, and Two-Stage Competition, Antitrust Law Journal 1999-2000;67:671-92,677.

[34] Post B, Buchmueller T, Ryan AM, Vertical Integration of Hospitals and Physicians: Economic Theory and Empirical Evidence on Spending and Quality, Medical Care Research and Review 2018;75(4):399-433.

[35] Baxter WF, Kessler DP, Toward a Consistent Theory of the Welfare Analysis of Agreements, Stanford Law Review 1995;47:616-631.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

18.     Antitrust law generally treats horizontal integration more harshly than vertical integration.[36]  For example, only horizontal integration is eligible for per se treatment.  This is because coordinated activity has greater potential for anticompetitive harm when it occurs among producers of substitutes.

19.     Any particular relationship may involve elements of either horizontal integration, vertical integration, or both.  For example, the purchase of a physician practice by a health system that owns both physician practices and hospitals would result in both horizontal integration (of the acquired physician practice with the acquiring system's physician practice) and vertical integration (of the acquired physician practice with the acquiring system's hospitals).   The fact that a relationship may involve elements of vertical integration does not obviate any anticompetitive horizontal effects that it may have.  As an analysis of the decision in the recent *St. Luke's* case[37] observes, "neither the district court nor the court of appeals decided the vertical claim in light of the decisions to condemn the acquisition under the horizontal theory."[38]

## 2.     Strategic, Financial, and Operational Integration

20.     In this section, I introduce the concepts of "strategic," "financial," and "operational" (sometimes described as "clinical") integration in markets for health services.  Both horizontal and vertical integration can take these three forms.  I understand that another of the State's experts, Professor Lawton Burns, assesses the extent of financial and operational integration of TDC with FMG.  Therefore, except as necessary to support my opinions, I primarily assess the extent of "strategic" integration of TDC and WSO with FMG, as defined below.

---

[36] Areeda P, Hovenkamp H, Antitrust Law: An Analysis of Antitrust Principles and Their Application, ¶ 1902.

[37] Saint Alphonsus Medical Center -Nampa, Inc. v. St. Luke's Health System  Nos. 12-cv-00560-BLW, 13-cv-00116-BLW, 2014 WL 407446 (D. Idaho Jan. 24, 2014), *aff'd*, 778 F.3d 775 (9th Cir. 2015).

[38] Greaney TL, Ross D, Navigating Through the Fog of Vertical Merger Law:  A Guide to Counselling Hospital-Physician Consolidation Under the Clayton Act, Washington Law Review 2016;91:199-251.

11

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

21.     "Strategic" integration combines the bargaining or market power of the parties in their relationships with their customers, competitors, employees, or suppliers.[39]  Examples of strategic horizontal integration include otherwise independent physician groups jointly bargaining with health plans, contracting with suppliers, or setting terms for employment of nurses or support staff.  If these joint activities were undertaken by a physician group and an otherwise independent hospital, then the joint activities would constitute strategic vertical integration.  If these joint activities were undertaken by a physician group and an otherwise independent health system that owned physician groups and hospitals, then the joint activities would constitute both strategic horizontal and strategic vertical integration.

22.     "Financial" integration pools responsibility for the risk of the cost of care among the parties.  Examples of financial integration include a hospital's agreement to pay for the operation of an otherwise independent physician group's clinic (financial vertical integration), or the joint agreement to a risk-bearing contract with a health plan for physician services of two otherwise independent physician groups (financial horizontal integration).

23.     "Operational" integration combines the control rights held or management functions undertaken by the parties.  An example of operational horizontal integration would be the sharing of electronic medical records by two otherwise independent physician groups.  Such sharing would constitute operational vertical integration if it were between a physician group and an otherwise independent hospital.

24.     Financial and operational integration can, but do not necessarily, result in procompetitive benefits.  For example, financial horizontal integration of two physician groups could enable them to obtain risk-sharing contracts with health plans, which could in turn enhance each group's incentives to contain costs.  Operational horizontal integration of two small physician groups could enable them to take advantage of economies of scale or other cost-saving measures that they could not otherwise achieve.

---

[39] Post B, Buchmueller T, Ryan AM, Vertical Integration of Hospitals and Physicians:  Economic Theory and Empirical Evidence on Spending and Quality, Medical Care Research and Review 2018;75(4):399-433, 403.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

25.     Financial and operational integration of the vertical type can also, but do not necessarily, benefit consumers.   Closer ties between doctors and hospitals can align the parties' incentives to improve value (through financial vertical integration) and encourage them to coordinate patient care (through operational vertical integration).  Examples of possible improved coordination include better communication across care settings and less wasteful duplication of diagnostic tests.

26.     Strategic integration – especially strategic horizontal integration – can result in anticompetitive harms.  In health care markets, strategic horizontal integration allows providers to raise their prices because it reduces the ability of health plans to force providers to compete with one another.  By enabling providers to refuse jointly to contract, strategic horizontal integration can also reduce the alternatives available to health plans seeking to construct a network that employers or individuals will want.   This occurs when a sufficient number of individuals would rather switch among the providers than to an alternative.[40]

27.     Strategic vertical integration can also sometimes cause anticompetitive harm if it reduces horizontal competition.  Vertically-integrated providers are more likely to channel referrals to one another,[41] which can have two effects.  First, it increases either or both of their market shares, which can make either or both more valuable to health plans seeking to construct an attractive network.  Second, it can deprive their horizontal rivals of a source of referrals, thereby making their rivals less effective competitors.

28.     To the extent that it is necessary to achieve financial or operational integration, strategic integration can also sometimes result in net procompetitive benefits.  For example, joint bargaining with plans may enable otherwise separate physician groups to capture some of the

---

[40] U.S. Federal Trade Commission, Competitive Effects, available at https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/mergers/competitive-effects, accessed October 23, 2018.
[41] Baker LC, Bundorf MK, Kessler DP, The Effect of Hospital/Physician Integration on Hospital Choice, Journal of Health Economics 2016;50:1-8.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

procompetitive benefits from financial or operational integration, thereby enhancing their incentive to undertake it.

29.    For these reasons, whether strategic horizontal or vertical integration is good for consumers or society is an empirical question – both in general, and in any particular case.[42]  In order to evaluate the likely competitive effects of any relationship, economists seek to determine the following:

   a.   Whether the parties are horizontally related, vertically related, or both;

   b.   The extent of procompetitive financial or operational, as opposed to anticompetitive strategic, integration in the relationship; and

   c.   If there is procompetitive financial or operational integration, the extent to which anticompetitive strategic integration is reasonably necessary to achieve it.

## VI.    Application of Economic Analysis of Competition and Integration to the TDC Affiliation

### A.    By Eliminating Independent Price Negotiation With Health Plans of TDC and FMG, the TDC Affiliation Creates the Same Anticompetitive Harm As Would Any Price-Fixing Agreement

30.    As discussed in ¶ 29 above, determining whether TDC and FMG are horizontally or vertically related is the first step in evaluating the likely competitive effects of the Affiliation. TDC and FMG are both multispecialty physician groups serving the Kitsap Peninsula.  Among other things, they both supply adult primary care physician services.  Thus, they are horizontally related.

31.    TDC agreed not to negotiate prices with health plans separately from FMG.  From an economic perspective, this is the hallmark of price fixing.  In doing so, TDC and FMG combined and thereby enhanced their bargaining power.  Thus, the TDC Affiliation undertakes strategic horizontal integration.   Such strategic horizontal integration will allow TDC and FMG to thwart the first stage of (price) competition in markets for physician services and raise prices.

---

[42] Baker LC, Bundorf MK, Kessler DP, Vertical Integration: Hospital Ownership of Physician Practices Is Associated With Higher Prices and Spending, Health Affairs 2014;33(5):756-63.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

32.     Defendants' arguments that the TDC Affiliation does not involve price fixing are incorrect as a matter of basic economics:

    a.  Price-fixing agreements need neither to specify a particular price[43] nor to grant either party control over the other's prices.[44]  The fact that the TDC Affiliation may not include either of these terms does not preclude it from creating the anticompetitive harm that arises whenever horizontally-related parties refuse to bargain independently.

    b.  The fact that the TDC may have "sold" its services to FMG for terms that are not a specified function of FMG's prices also does not preclude the TDC Affiliation from being a price-fixing agreement.  The terms on which TDC sold services to FMG determine only the division of profits from the TDC Affiliation, not whether the TDC Affiliation constitutes price fixing.  In any event, TDC knows exactly how good of a deal it is getting, relative both to FMG's physicians and to what it was being paid prior to the TDC Affiliation.

    c.  From an economic perspective, the TDC Affiliation is not an output contract. Output contracts are by definition between parties that are only (or predominantly) vertically related, but TDC and FMG are horizontally related. The fact that FMG "bought" services that TDC "sold" to it does not transform their horizontal relationship into a vertical one.  Defendants would be correct in arguing that the TDC Affiliation were an output contract if it were between a physician group and a hospital that did not own any competing physician groups,[45] but that does not describe the relationship between TDC and FMG.  If TDC and FMG could enter into what Defendants describe as an output contract,

---

[43] Motion to Strike and Reply in Support of Certain Defendants' Motion to Dismiss Plaintiff's per se Claim, December 8, 2017, 10:12–15.

[44] Defendants Franciscan Health System, Franciscan Medical Group, and The Doctors Clinic's Motion to Dismiss Plaintiff's per se Claim, dated October 30, 2017 ("Motion to Dismiss"), 10:13–15.

[45] *See*, for example, Motion to Dismiss, 11:3–5.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

then every price-fixing agreement could be recharacterized as an output contract, which makes no economic sense.

**B.      The TDC Affiliation Does Not Financially or Operationally Integrate TDC with FMG**

33.      There are two ways in which the TDC Affiliation could financially integrate TDC with FMG: it could financially integrate their provision of Professional Services, or it could financially integrate their provision of support services, such as patient scheduling, office management, and billing.  Because Professor Burns assesses the extent of financial integration of TDC's provision of Professional Services with FMG, I focus on the extent of financial integration of TDC's  provision of support services with FMG.  Financial integration of TDC's provision of support services with FMG would involve TDC and FMG sharing materially in the costs of operating TDC's clinics.  For example, in the WSO Transaction, FMG assumed all financial responsibility for the operation of WSO's clinics (¶ 13.f).

34.      The TDC Affiliation does not do this.  After the TDC Affiliation, ███████████████

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

35.      ████████████████████████████████████████████████████████
██████████████████████████████████████████ since FMG explicitly allocated to TDC the right to provide all of the Management Services necessary to operate its clinics, FMG has no ability to contain TDC's costs relative to the agreed-upon budget.  Thus the ███████████
███████████████████████████ does not constitute material financial integration.[46]

36.      I understand from Professor Burns' expert report that the TDC Affiliation does not financially integrate TDC with FMG for the provision of Professional Services.  I understand that Professor Burns concludes that TDC's physicians are not involved in risk-sharing

_____

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

arrangements with FMG, and that TDC is paid based on the number of wRVUs performed by its physicians, rather than on the basis of the overall cost or quality of care that its patients receive.

37.     I also understand from Professor Burns' expert report that the TDC Affiliation does not operationally (in his terms, "clinically") integrate TDC with FMG.  I understand that Professor Burns concludes that TDC and FMG have engaged jointly in none of the following aspects of operational integration:

    a.  the provision of physician report cards;

    b.  the development of a physician performance improvement program;

    c.  the monitoring of utilization, cost, or quality of care, or of the efficiency of support services;

    d.  the application of clinical performance criteria;

    e.  the conduct of clinical practice audits;

    f.  the collection of data for quality measurement;

    g.  the conduct of physician training; or

    h.  the involvement of physicians in meetings.

### C.     From An Economic Perspective, the TDC Affiliation's Elimination of Independent Price Negotiation, Without Financial or Operational Integration, Qualifies It for Per Se or Quick-Look Rule of Reason Analysis

38.     Legal scholars have recognized that economic analysis can be a valuable input to the process of deciding which procedural rules should apply to different types of cases.  In a recent article in the peer-reviewed *Economic Journal*, Justice Stephen Breyer highlighted "the need to provide economic information and insight in a form that incorporates basic legal considerations likely of interest to the judge – in particular considerations of the administrability of a legal rule."[47]  Professor Herbert Hovenkamp has applied this principle in the antitrust context to argue that "selection of the appropriate rule should consider when a robust literature exists showing that the challenged practice can be beneficial as well as harmful."[48]

---

[47] Breyer S, Economic Reasoning and Judicial Review, Economic Journal 2009;119: F123-35.
[48] Hovenkamp H, The Rule of Reason, Florida Law Review 2018;81-167, 97.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

39.     From an economic perspective, procedural rules (in antitrust, as in other areas of law) should minimize the sum of two costs:  the costs of erroneous judicial decisions and the costs of operating the legal system.[49]   In antitrust, the costs of erroneous judicial decisions are themselves the sum of two costs:  costs due to failure to deter behavior that is, on net, anticompetitive (a "false negative"); and costs due to deterrence of behavior that is, on net, procompetitive (a "false positive").[50]   The costs of operating the legal system are also the sum of two costs:  costs borne by the government, and costs borne by private parties.  Costs of operating the legal system include both the direct costs (of litigation, to the government of investigation, and to private parties of compliance) and the indirect costs (in terms of uncertainty created by the choice of legal rule).

40.     As discussed in ¶ 31 above, by eliminating independent price negotiation with health plans, the TDC Affiliation creates the same anticompetitive harm as would any price-fixing agreement.  As discussed in ¶¶ 33 - 37 above, there is no evidence of financial or operational integration that would create any procompetitive benefit.  From an economic perspective, this qualifies the TDC Affiliation for per se or quick-look rule-of-reason analysis.[51]   The reasoning behind my opinion is as follows:

      a.  The TDC Affiliation is highly likely to cause anticompetitive harm and highly unlikely to create procompetitive benefit.

      b.  Evaluation of the TDC Affiliation under a standard other than the full rule of reason is therefore unlikely to deter future behavior that is, on net, procompetitive; conversely, evaluation of the TDC Affiliation under the full rule of reason has the potential to fail to deter future behavior that is, on net, anticompetitive.  In other words, applying the per se or quick-look rule runs a low risk of returning a false positive; apply the full rule of reason runs a risk of returning a false negative.

---

[49] Posner R, The Economic Analysis of Law 3d ed. 1986, 517.
[50] Kwak J, Optimal Antitrust Enforcement: Information Cost and Deterrent Effect, European Journal of Law and Economics 2016;41:371-91.
[51] I offer no opinion whether the Affiliation should be evaluated under per se or quick-look rule of reason standard as a matter of law.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

c. The incremental investigation into the TDC Affiliation that would be accomplished by a full rule of reason analysis would be highly unlikely to change any evaluation of its economic effects.  Thus the benefit to society, in terms of the accuracy of the decision, would be highly unlikely to outweigh the costs of full rule of reason analysis.

**D. From An Economic Perspective, the Lack of Financial and Operational Integration of TDC With FMG Is Inconsistent With Treating TDC and FMG as a Single Firm**

41.    Economists have developed many "theories of the firm."  These theories specify the forms of integration that otherwise independent parties undertake when they combine for procompetitive reasons.[52]  These theories therefore flag what an external observer can expect to see when otherwise independent parties seek to unify their economic objectives to enhance competition.  These theories all point to financial or operational integration as the determinants of firms' boundaries under competition.

42.    One study, published in the peer-reviewed *Journal of Political Economy*, is particularly relevant and applicable to the allegations in the State's Complaint.[53]  This study concludes that when workers (rather than non-human assets) are a key source of value (as in a physician group), a crucial determinant of the extent of integration is whether the parties share (or transfer) the right to exclude a particular worker without forgoing all of the surplus from the relationship.  Without this right, one party can only fire the other in its entirety – the combination of the other's workers and non-human assets.  This limits the extent to which the joint relationship will unify the parties' objectives in a way that enhances competition.

43.    According to the terms of the TDC Affiliation, FMG cannot fire anyone at TDC – neither physicians nor support staff, despite Defendants' claims to the contrary.[54]  According to the

---

[52] Gibbons R, Four Formal(izable) Theories of the Firm?, Journal of Economic Behavior and Organization 2005;58:200-45, 233-4.
[53] Hart O, Moore J, Property Rights and the Nature of the Firm, Journal of Political Economy 1990;98(6):1119-58.
[54] Motion to Dismiss, 6:6–8.

19

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

PSA, FMG may "request" that TDC undertake remedial action with a physician, up to and including termination; but in the event TDC declines to accept FMG's request, FMG only has the right to terminate the TDC Affiliation – not to override TDC's decision.[55]  Indeed, as discussed above, FMG does not even have the right to cut (or increase) any physician's salary; it pays TDC ██████████████████████████████████, delegating to TDC all discretion over individual compensation.  For the reasons explained above, this distinction is another important indication of the lack of financial and operational integration between TDC and FMG.

44.     Because (as discussed above) TDC and FMG undertake essentially no financial or operational integration, I conclude that they have not reorganized into a single economic unit.[56]

45.     Because TDC and FMG have not reorganized into a single economic unit, the economic rationale for the single entity defense does not apply in this case.  The economic rationale for the defense is to reserve to the single entity the ability to conduct its own internal operations without the interference of antitrust laws meant to police joint activity.  As an economist from the Department of Justice concludes in the peer-reviewed *Journal of Competition Law and Economics*, the single entity defense "provides a safe harbor against the courts marching in and abrogating established control rights."[57]  Such a safe harbor, however, is not necessary if there are no joint control rights to abrogate.[58]

---

[55] TDC000121–0156 at 0126 (TDC Contract, "Professional Services Agreement By and Between Franciscan Medical Group and The Doctors Clinic, A Professional Corporation," 9/6/16).

[56] I offer no opinion whether TDC and FMG should be considered a single or multiple legal entities.

[57] Williamson DV, Organization, Control, and the Single Entity Defense in Antitrust, Journal of Competition Law and Economics 2009;5(4):723-45, 741.

[58] Other work (such as Klein B, Single Entity Analysis of Joint Ventures After American Needle:  An Economic Perspective, Antitrust Law Journal 2013;78:669-88) has argued that ownership should be necessary, as a matter of law, for the single entity defense to apply.  This too is consistent with economic theories of the firm -- insofar as ownership is a practical, available proxy for payoff and control rights – and is consistent with my opinion.

20

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**VII.   Empirical Economic Research on the Effects of Competition and Integration in Markets for Health Services**

   **A.   Horizontal Integration**

46.     Virtually all empirical economic research concludes that more horizontal competition, on net, leads to lower prices and higher quality in markets for health services.  Conversely, markets with more horizontal integration tend to have higher prices and lower quality.  Evidence of the effects of competition and integration comes from two types of studies:  those that measure competition directly (by comparing outcomes in markets with mergers against markets without mergers) and those that measure competition indirectly (by comparing outcomes in markets with varying degrees of concentration).[59]

47.     The *Handbook of Health Economics* reviewed research on the price effects of hospital mergers and hospital market concentration.[60]  All but one of the nine studies identified in the *Handbook* on the effects of hospital mergers found that prices increased for hospitals that merged relative to those that did not.  All but one of the eight studies identified in the *Handbook* on the effects of hospital market concentration found a positive relationship between price and concentration**.**

48.     The *Journal of Economic Literature*, published by the American Economic Association, is the profession's premier peer-reviewed source for surveys of economic research.  According to a 2015 review of research on the effects of hospital concentration in the *Journal*, "[b]y 2006, most health insurers had to negotiate with hospital systems in highly concentrated markets, which likely reduced their bargaining leverage."[61]  This review also found that "it is clear that concentration affects hospital quality."[62]

---

[59] Markets with high levels of concentration have fewer competitors with higher market shares.  Thus, in these studies, indices of concentration of patient encounters, hospital admissions, or spending are proxies for the extent of horizontal competition in a market.

[60] Gaynor M and Town R, Competition in Health Care Markets, in Pauly MV, McGuire TG, and Barros PP, eds., Handbook of Health Economics 2012;2: 501-637.

[61] Gaynor M, Ho K, Town RJ, The Industrial Organization of Health Care Markets, Journal of Economic Literature 2015;53(2):235-84,260,239.

[62] Id. at 247.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

49.      Mark McClellan and I conducted one of the first studies on this topic, published in the peer-reviewed *Quarterly Journal of Economics*, investigating the impact of concentration on the spending for and quality of inpatient hospital care.[63]  We analyzed data on hospital spending and mortality for all non-rural Medicare beneficiaries who suffered a heart attack in selected years from 1985-1994.  We found that patients in the most concentrated hospital markets, as measured by the Herfindahl-Hirschman index (HHI),[64] had not only higher spending but also higher mortality, holding other factors constant**.**  Patients from areas that became highly concentrated also had statistically significantly higher rates of readmission to the hospital, suggesting that patients who survived in areas that became concentrated were less healthy.

50.      Since both mortality and spending were higher in areas that became highly concentrated (without any accompanying decrease in hospital readmissions), there was no evidence that the lower quality of care in areas that became concentrated was counterbalanced by any monetary savings.  We therefore concluded that hospital market concentration reduces both consumers' and overall social welfare.

51.      More recent studies address two important limitations of my early research.  First, like most of the studies of its vintage, my early research did not examine the actual market prices (i.e., managed care rates) paid by health plans to hospitals.  In particular, it analyzed Medicare spending, which is based on Medicare's administrative reimbursement system, so it could not draw any conclusions about the effects of hospital competition on market-determined prices.

---

[63] Kessler DP, McClellan MB, Is Hospital Competition Socially Wasteful? Quarterly Journal of Economics 2000;115:577-615.

[64] The HHI is calculated by summing the squares of the shares of the market (in terms of patient encounters, hospital admissions, or visits) of individual providers. A market served by a very large number of equally-sized competitors has an HHI approaching 0; a market served by a single monopolist has an HHI of 10,000.  Most physician and hospital markets are neither perfectly competitive nor monopolized and so have an HHI between 0 and 10,000.  The HHI increases both as the number of competitors decreases, and as the disparity in their size increases.  Thus it captures both the number and the average effectiveness of competitors in limiting the power of any one provider in a market.  For example, a market with four firms each with a market share of 25% would have an HHI of 2500 ($25^2 + 25^2 + 25^2 + 25^2 = 2500$) whereas a market with one firm with a market share of 70% and three firms with market shares of 10% would have an HHI of 5200 ($70^2 + 10^2 + 10^2 + 10^2 = 5200$).  U.S. Department of Justice and Federal Trade Commission, Horizontal Merger Guidelines 2010, § 5.3.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Second, it examined spending for inpatient hospital services only, so it could not draw any conclusions about the effects of competition in other relevant markets.

52.      One set of recent studies examines the effect of horizontal competition in markets for physician services.  These studies analyze data on the actual market prices paid for physician services on behalf of individuals enrolled in employer-sponsored health insurance plans, including any deductibles or coinsurance payments made by the individuals themselves, and so are not subject to concerns about the validity of their measure of prices.  These studies show that increases in the market share or concentration of physicians in a geographic area (such as a county), as measured by the HHI, are associated with increases in physician prices. [65] [66] [67] [68] [69]

53.      Another set of recent studies examines the effect of horizontal competition in markets for hospital services.   Like the studies of the determinants of physician prices discussed above, these studies also analyze data on the actual market prices paid for hospital services on behalf of individuals enrolled in employer-sponsored health insurance plans.  These studies show that increases in the concentration of hospital services, as measured by the HHI, are associated with increases in inpatient and outpatient hospital prices. [70] [71] [72] [73] [74]

---

[65] Roberts ET, Chernew ME, McWilliams JM, Market Share Matters:  Evidence of Insurer and Provider Bargaining Over Prices, Health Affairs 2017;36(1):141-8.

[66] Austin DR, Baker LC, Less Physician Practice Competition Is Associated With Higher Prices Paid For Common Procedures, Health Affairs 2015;34(10):1753-60.

[67] Sun E, Baker LC, Concentration in Orthopedic Markets Was Associated With a 7 Percent Increase in Physician Fees For Total Knee Replacements, Health Affairs 2015;34(6):916-21.

[68] Baker LC, Bundorf MK, Royalty AB, Levin Z, Physician Practice Competition and Prices Paid by Private Insurers for Office Visits, JAMA 2014;213(16):1653-62.

[69] Dunn A, Shapiro AH, Do Physicians Possess Market Power?, Journal of Law and Economics 2014;57:159-93.

[70] Baker LC, Bundorf MK, Kessler DP, Competition in Outpatient Procedure Markets, forthcoming, Medical Care.

[71] Dauda S, Hospital and Health Insurance Market Concentration and Inpatient Hospital Transaction Prices in the U.S. Health Care Market, Health Services Research 2018;53(2):1203-26.

[72] Baker LC, Bundorf MK, Kessler DP, Vertical Integration: Hospital Ownership of Physician Practices Is Associated With Higher Prices and Spending, Health Affairs 2014;33(5):756-63.

[73] Robinson JC, Hospital Market Concentration, Pricing, and Profitability in Orthopedic Surgery and Interventional Cardiology, American Journal of Managed Care 2011;17(6):e241-8.

[74] Cooper Z, Craig SV, Gaynor M, Van Reenen J, The Price Ain't Right?  Hospital Prices and Health Spending on the Privately Insured, forthcoming, Quarterly Journal of Economics.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

### B.      Vertical Integration of Physician Groups with Hospitals

54.      Although early studies of the effects of vertical integration reported mixed results,[75] [76] recent research uniformly finds that vertical integration, on net, is associated with higher prices but not with better quality.  Recent research also shows that vertical integration has additional negative effects on price and quality when it is undertaken by the largest hospital in a relevant market.  A 2018 review of the literature summarizes the findings of empirical economic research on the effects of vertical integration of physician groups with hospitals as follows: "vertical integration poses a threat to the affordability of health services."[77]  The review examines four different consequences of vertical integration:  inpatient hospital prices and spending; inpatient hospital quality; outpatient spending; and inpatient hospital referrals.

55.      In a study published in the peer-reviewed journal *Health Affairs*, Laurence Baker, M. Kate Bundorf, and I investigated the impact of vertical integration on inpatient hospital prices, rates of admission, and spending.[78]  We compared trends in prices from 2001-2007 for counties with increases in vertical integration to trends for counties without increases, holding constant other market characteristics such as overall hospital market competitiveness.  We found that increases in the market share of hospitals that were vertically integrated with physicians were associated with higher growth rates in inpatient hospital prices.  In particular, a one standard deviation increase in the market share of vertically-integrated hospitals – which is approximately what would result from one hospital in a four-hospital market becoming vertically integrated[79] – is associated with an increase in inpatient prices of 3.2 percent.

---

[75] Cuellar AE, Gertler PJ, Strategic Integration of Hospitals and Physicians, Journal of Health Economics 2006;25:1-28.
[76] Ciliberto F, Dranove D, The Effect of Physician-Hospital Affiliations on Hospital Prices in California, Journal of Health Economics 2006;25:29-38.
[77] Post B, Buchmueller T, Ryan AM, Vertical Integration of Hospitals and Physicians:  Economic Theory and Empirical Evidence on Spending and Quality, Medical Care Research and Review 2018;75(4):399-433.
[78] Baker LC, Bundorf MK, Kessler DP, Vertical Integration: Hospital Ownership of Physician Practices Is Associated With Higher Prices and Spending, Health Affairs 2014;33(5):756-63.
[79] Id.  Based on the standard deviation of the fully-integrated share of 0.235, see Appendix Table 1 of the cited paper.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

56.     A study published in the peer-reviewed *Annals of Internal Medicine* shows that hospitals that are vertically integrated with physicians do not have higher quality than similar hospitals that are not vertically integrated.[80]  This study calculates three hospital-level measures of clinical quality – mortality, readmission rates, and length of stay -- using data on elderly Medicare beneficiaries, adjusted for their health status on admission.  It links these data with information on patient satisfaction from the Hospital Consumer Assessment of Health Care Providers and Systems (HCAHPS) survey.  It compares trends in quality from 2003-2012 for 803 hospitals that became vertically integrated during the period to the trends for 2,085 hospitals that did not, controlling for location and other hospital characteristics.  Up to two years after vertical integration, it finds no association between integration and quality, as measured above.  It concludes that vertical integration alone is probably not a sufficient tool for improving hospital care.

57.     Three studies examine the impact of vertical integration on prices for outpatient services.  One study, published in the peer-reviewed journal *JAMA Internal Medicine*, shows that increases in the market share of hospitals that are vertically integrated with physicians are associated with higher growth rates in outpatient prices, holding constant other market characteristics including physician market competitiveness.[81]  A second study, published in the peer-reviewed *Journal of Health Economics*, shows that vertical integration of a physician's practice with a hospital is associated with price increases for the integrated physician group of 14 percent on average, holding constant other market characteristics.[82]  This study also finds that vertical integration increases prices for physician services by more when it is undertaken by a larger hospital.  A third study, published in the peer-reviewed journal *Health Economics*, finds that acquisition of a

---

[80] Scott KW, Orav J, Cutler DM, Jha AK, Changes in Hospital-Physician Affiliations in U.S. Hospitals and Their Effect on Quality of Care, Annals of Internal Medicine 2016 (Web Only).

[81] Neprash HT, Chernew ME, Hicks AL, Gibson T, McWilliams M, Association of Financial Integration Between Physicians and Hospitals With Commercial Health Care Prices, JAMA Internal Medicine 2015;175(12):1932-9.

[82] Capps C, Dranove D, Ody C, The Effect of Hospital Acquisitions of Physician Practices on Prices and Spending, Journal of Health Economics 2018;59:139-52.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

multispecialty group by a health system is associated with increases in prices at both the acquired and acquiring groups.[83]

58.    In a study published in the *Journal of Health Economics*, Laurence Baker, M. Kate Bundorf, and I investigated the impact of vertical integration on physician referral patterns.[84] We linked data on the hospital admissions of Medicare beneficiaries, including the identity of their physician, with data on the identity of the hospital with which the physician's practice was Integrated.  We found that physicians in practices that were vertically integrated with hospitals were much more likely to refer patients to the integrating hospital than to other, competing hospitals.  We also found that patients were more likely to choose a high-cost, low-quality hospital when their physician was in a practice that was integrated with the hospital.

59.    If the vertically-integrating hospital is the largest hospital in the market, then redirecting referrals to that hospital would increase its market share of inpatient services at the expense of the other hospitals.  In turn, this arithmetically increases the extent of concentration in the market and the HHI, which is associated with increases in the price and reductions in the quality of inpatient care according to the studies discussed in ¶¶ 46 - 51 and ¶ 53.

### C.    Who Pays for Reduced Competition in Markets for Health Services?

60.    Individuals not eligible for public insurance such as Medicare or Medicaid can obtain coverage in two ways.  They can buy insurance on their own, either through a Marketplace established by the Affordable Care Act or through an insurance agent.  But most of them obtain insurance through their or a family member's employer.[85]

---

[83] Carlin CS, Feldman R, Dowd B, The Impact of Provider Consolidation on Physician Prices, Health Economics 2017;26:1789-1806.  The effects reported in this paper are a combination of the vertical and horizontal effects of the acquisition.

[84] Baker LC, Bundorf MK, Kessler DP, The Effect of Hospital/Physician Integration on Hospital Choice, Journal of Health Economics 2016;50:1-8.

[85] Fronstin P, Sources of Health Insurance Coverage: A Look at Changes Between 2013 and 2014 from the March 2014 and 2015 Current Population Survey, 2015, Employee Benefit Research Institute Issue Brief 419, available at https://www.ebri.org/pdf/briefspdf/EBRI_IB_419.Oct15.Sources.pdf, accessed October 23, 2018.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

61.     Employers sponsor insurance for their workers in one of two ways.  Some employers purchase it, just as individuals do.  In this situation, the employer contracts with an insurance company to assemble a network of providers and assume responsibility for plan participants' medical claims and administrative costs in exchange for a fixed, upfront payment.  These employers and their health plans are known as "fully insured."  Other employers, especially large employers, directly assume financial responsibility for employees' medical claims and administrative costs.  These employers and their health plans are known as "self insured."  Most self-insured employers hire a third-party administrator to assemble a network of hospitals, doctors and other providers and handle medical claims processing.  Although third-party administrators of self-insured plans are often insurance companies, third-party administrators do not assume financial responsibility for participants' medical claims, as they do with fully-insured plans.[86]

62.     In self-insured plans, because employers pay for claims directly, higher prices from doctors and hospitals translate dollar-for-dollar into higher expenditures by employers.  In fully-insured plans, higher prices lead to higher premiums for individuals and employers.  As Figure 1 shows, the cost of medical services accounts for 88¢ of every dollar of premiums.

---

[86] Self-Insured Plan, https://www.healthcare.gov/glossary/self-insured-plan, accessed October 23, 2018.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Figure 1:  The Health Insurance Premium Dollar in 2014[87]



63.     Ultimately, individual consumers bear the burden of reduced competition in health care markets.  A recent study in the peer-reviewed *Journal of Health Economics* compares premiums from 2006-2011 for health plans in geographic areas with increasing hospital market concentration to premiums for plans in areas with stable or decreasing concentration, holding constant other trends in market characteristics.[88]  It finds that premiums increased more in markets with increasing hospital market concentration.

64.     Individuals who buy insurance on their own pay these higher premiums directly.  Some individuals who obtain insurance through their employer also pay higher premiums directly, if their employer requires them to contribute to premiums or plan costs through a payroll deduction.  But even when an employer nominally pays for health coverage, the employee ultimately bears the burden of higher prices for health services.

---

[87] Centers for Medicare and Medicaid Services, National Health Expenditures by Source of Funds and Type of Expeditures, Table 4, 2014, available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/NationalHealthAccountsHistorical.html; Kahn JG et al., The Cost of Health Insurance Administration in California:  Estimates for Insurers, Physicians, and Hospitals, Health Affairs 2005;24(6):1629-39.

[88] Trish EE, Herring BJ, How do health insurer market concentration and bargaining power with hospitals affect health insurance premiums?  Journal of Health Economics 2015;43:104-14.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

65.     Employees may bear the burden of higher prices in two ways.  First, some employers will stop offering insurance to their employees entirely.[89]  Second, those employers who do continue to offer insurance will offset the increased cost through lower wages.  Several studies show that increases in the cost of health insurance are passed through to workers.[90]  One study in the peer-reviewed *American Economic Review* analyzes the effect on wages of mandated comprehensive health insurance coverage for childbirth.[91]  Before the mid-1970s, coverage for childbirth was less generous than coverage of other services, but a series of state laws (and, in 1978, federal law) outlawed this practice.  These laws increased the cost of insuring women of childbearing age.  This study finds that wages for married women aged 20-40 (whose insurance costs rose the most) declined relative to the wages for other demographic groups when these mandates took effect, and that the wage declines were approximately equal to the increase in insurance costs.

## VIII.   Application of Empirical Economic Research to the TDC Affiliation and the WSO Transaction

### A.     Empirical Economic Research Predicts that the Integration Undertaken By the TDC Affiliation and WSO Transaction Will Cause Anticompetitive Harm

#### 1.     Anticompetitive Harm from Strategic Horizontal Integration of TDC and WSO with FMG

66.     Empirical economic research quantifying anticompetitive harm from horizontal integration in markets for physician services is relevant to the TDC Affiliation whether or not the TDC Affiliation financially or operationally integrates TDC with FMG.  The TDC Affiliation undertakes strategic horizontal integration (¶ 31), and strategic horizontal integration is the source of anticompetitive effects of increases in market shares and HHIs.

---

[89] Gaynor M, Ho K, Town RJ, The Industrial Organization of Health Care Markets, Journal of Economic Literature 2015;53(2):235-84,236.

[90] Gruber J, Health Insurance and the Labor Market, Chapter 12 in Culyer AJ and Newhouse JP, eds., Handbook of Health Economics 2000, Elsevier, 694.

[91] Gruber J, The Incidence of Mandated Maternity Benefits, American Economic Review 1994;84:622-41.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

67.      This body of research is also relevant to the WSO Transaction.  WSO and FMG are horizontally related, as are WSO and TDC, because they all provide orthopedic physician services.  Whether or not the WSO Transaction financially or operationally integrates WSO with FMG, it strategically integrates them, and in turn strategically integrates WSO with TDC as well. FMG will have the sole responsibility and authority to determine the price of WSO physicians' services (¶ 13.a), just as FMG will with TDC (¶ 10.d).   Thus, the WSO Transaction undertakes strategic horizontal integration, just as the TDC Affiliation does.

68.      I understand from Dr. Capps' expert report that the TDC Affiliation increased the shares of both TDC and FMG in the relevant market for adult primary care physician services.  Prior to the TDC Affiliation, Dr. Capps conservatively measured their shares in this market at 18.8 and 16.4 percent, respectively; after the TDC Affiliation, Dr. Capps conservatively measured their collective market share at 33.9 percent.  I also understand from Dr. Capps that the TDC Affiliation increased the HHI of the market for adult primary care physician services.  Prior to the TDC Affiliation, the HHI was no lower than 947; but after the TDC Affiliation, the HHI was at least 1,563.

69.      I also understand from Dr. Capps that the TDC Affiliation and the WSO Transaction together increased the shares of WSO, TDC, and FMG in the relevant market for orthopedic physician services.  Prior to the TDC Affiliation and the WSO Transaction, Dr. Capps conservatively measured their shares in the market at 18.6, 11.1, and 16.8 percent, respectively; after the TDC Affiliation and the WSO Transaction, Dr. Capps conservatively measured their collective market share at 46.2 percent.  I also understand from Dr. Capps that the TDC Affiliation and the WSO Transaction increased the HHI of the market for orthopedic physician services.  Prior to the TDC Affiliation and the WSO Transaction, the HHI was no lower than 1,797; but after the TDC Affiliation and the WSO Transaction, the HHI was at least 3,210.

70.      Empirical economic research predicts that the TDC Affiliation will increase permanently the prices of TDC and FMG, and increase permanently the overall prices, for adult primary care physician services on the Kitsap Peninsula.  Empirical economic research also predicts that the

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

TDC Affiliation and the WSO Transaction together will increase permanently the prices of WSO (now FMG-employed) physicians, TDC, and FMG, and increase permanently the overall prices, for orthopedic physician services on the Kitsap Peninsula.  My reasoning is as follows:

  a.  the TDC Affiliation and the WSO Transaction undertake strategic horizontal integration, and strategic horizontal integration is the source of anticompetitive effects of increases in market shares and HHIs;

  b.  Dr. Capps calculates that the TDC Affiliation and the WSO Transaction increased the market shares of TDC, WSO, and FMG, and the HHIs of the markets for adult primary care and orthopedic physician services; and

  c.  empirical economic research shows that increases in shares in and the HHIs of markets for physician services are associated with increased prices.

71.     Two of the studies referenced in ¶ 52 are particularly relevant and applicable to my evaluation of the horizontal effects of the TDC Affiliation and the WSO Transaction on markets for physician services:

  a.  In one study, a 10-percentage-point increase in the market share of a physician group is associated with an approximately 4 percent increase in the price of physician office visit.[92]  Thus, this study predicts that the TDC Affiliation will lead to an increase in the price charged by the integrated entity for adult primary care physician office visits of 6 - 7 percent,[93] and the TDC Affiliation and WSO Transaction together will lead to an increase in the price charged by the integrated entity for orthopedic physician office visits of 11 - 14 percent.[94]

  b.  In a second study, a 10 percent increase in concentration in markets for physician orthopedic services is associated with an approximately 0.5 – 0.8 percent increase in orthopedic physician fees.[95]  Thus, this study predicts that the TDC Affiliation

---

[92] Roberts ET, Chernew ME, McWilliams JM, Market Share Matters:  Evidence of Insurer and Provider Bargaining Over Prices, Health Affairs 2017;36(1):141-8, Exhibit 4 (0.04 ≈ $3.16 / $78.80 ≈ $5.12 / $115.83 ≈ $6.23 / $167.63).

[93] $0.06 \approx 0.04 \times (33.9 - 18.8) / 10; 0.07 \approx 0.04 \times (33.9 - 16.4) / 10.$

[94] $0.11 \approx 0.04 \times (46.2 - 18.6) / 10; 0.14 \approx 0.04 \times (46.2 - 11.1) / 10.$

[95] Dunn A, Shapiro AH, Do Physicians Possess Market Power?, Journal of Law and Economics 2014;57:159-93, Table 4.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

and WSO Transaction together will lead to an increase in the overall prices of orthopedic physician services on the Kitsap Peninsula of 2.9 - 4.6 percent.[96]

### 2. Anticompetitive Harm from Strategic Vertical Integration of TDC and WSO with CHI Franciscan

72.    Empirical economic research quantifying anticompetitive harm from vertical integration is also relevant to the TDC Affiliation and the WSO Transaction.  Because FMG is owned by CHI Franciscan, the TDC Affiliation and the WSO Transaction undertake vertical as well as horizontal integration.  As discussed in ¶¶ 66 - 67, whether or not the WSO Transaction financially or operationally integrates TDC or WSO with FMG, it strategically integrates TDC and WSO with FMG, and therefore with FMG's owner, CHI Franciscan.  Empirical economic research predicts that the strategic vertical integration undertaken by the TDC Affiliation and the WSO Transaction will increase outpatient hospital, inpatient hospital, and physician prices.

### a) Anticompetitive Harm to Outpatient Hospital Services

73.    First, empirical economic research predicts that the strategic vertical integration undertaken by the parties in this case will increase outpatient hospital prices.  As discussed in ¶ 27, one way that strategic vertical integration can cause anticompetitive harm is by depriving one or both of the parties' horizontal rivals of a source of referrals, thereby making their rivals less effective competitors.  In a forthcoming study in the peer-reviewed journal *Medical Care* that is particularly relevant and applicable to this case, Laurence Baker, M. Kate Bundorf, and I find that competition from ambulatory surgery centers (ASCs) is associated with decreases in overall outpatient procedure prices, mostly due to reductions in the prices paid to hospital outpatient departments.   Conversely, our study predicts that weakening the ability of ASCs to compete with hospital outpatient departments is associated with increases in overall outpatient procedure prices.

---

[96] $0.029 \approx [\ln(0.3210) - \ln(0.1797)] \times 0.05$; $0.046 \approx [\ln(0.3210) - \ln(0.1797)] \times 0.08$.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

74.     There is evidence in the record that CHI Franciscan sought to and actually did relocate physician referrals from independent ASCs to its own hospital outpatient department,[97] thereby weakening the ASCs as a source of competition, and enabling Harrison to increase its prices:

   a. Mr. Chandler testified that TDC and CHI Franciscan agreed that patients who had been treated at TDC's ASC would be referred to Harrison, with some exceptions.[98]  He estimated that this had ████████████████████ ████████████████.[99]

   b. Mr. Fitzgerald testified that it was also CHI Franciscan's intention that TDC's ASC patients would be referred to Harrison.[100]

   c. Dr. Pierce testified that she relocated surgeries from TDC's ASC to Harrison as part of the PSA with FMG.[101]

   d. Dr. Duff testified that FMG would not permit him to operate at the Surgery Center of Silverdale, a Kitsap-area ASC.[102]

   e. Mr. Fitzgerald testified that he wanted to ensure that WSO's physicians would refer to Harrison patients previously treated at the Surgery Center of Silverdale, in part to discourage Proliance from building an ASC that would compete with CHI Franciscan.[103]

   f. ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

---

[97] Dr. Capps' calculations also show that this relocation occurred.

[98] Chandler Deposition 6/27/17, 137:8–10, 154:11–24.

[99] Chandler Deposition 6/27/17, 155:8–15.

[100] Deposition of Michael Fitzgerald, August 24, 2018 ("Fitzgerald Deposition 8/24/18"), 70:8–17and FHS - State v. -067520–7523 at 7520 (email from Mike Fitzgerald to Jay Burghart, "FW: Message from "NMFCADMR01","" 3/5/16; Fitzgerald Deposition 8/24/18, Exhibit 537).  Mr. Fitzgerald is the CFO of CHI Franciscan.

[101] Deposition of Wendy Pierce, August 2, 2018, 21:23 – 22:1.  Dr. Pierce is an orthopedic surgeon at TDC.

[102] Deposition of Gregory Duff, June 28, 2018 ("Duff Deposition 6/28/18"), 206:9–23, 204:4–10.  See also SCH_00000578–0580 (email from Gregory Duff to Kitsap Orthopedics partnership, "Re: Medical Executive Committee," July 2, 2016; Duff Deposition 6/28/18, Exhibit 173).  Dr. Duff was the managing partner of WSO from April 2015 through the Transaction.

[103] Fitzgerald Deposition 8/24/18, 92:25–97:3.  See also FHS - State v. -017444–7446 at 7444 (email chain from Michael Fitzgerald to Thomas Kruse et al., "WestSound Ortho," July 28, 2015; Fitzgerald Deposition 8/24/18, Exhibit 540).

[104] Deposition of John Partin, September 27, 2018, 246:22 – 247:8.  Mr. Partin is the Vice Present of Network Management for Regence BlueShield in the State of Washington.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

b)      **Anticompetitive Harm to Inpatient Hospital Services**

75.      Second, empirical economic research predicts that the strategic vertical integration undertaken by the parties in this case will increase inpatient hospital prices and decrease quality. As discussed in ¶ 58, physicians in groups that are vertically integrated with hospitals are much more likely to refer patients to the integrating hospital for inpatient services than to other, competing hospitals.   In this case, redirection of inpatient referrals to CHI Franciscan will have the following consequences:

      a.      It will increase CHI Franciscan's market share at the expense of other hospitals; and

      b.      Because CHI Franciscan is the largest provider of inpatient services in its Primary Service Area (¶ 9), it will arithmetically increase the extent of concentration in the market and the HHI, which will lead to increases in the price and reductions in the quality of inpatient care according to the studies discussed in ¶¶ 46 - 51 and ¶ 53.

76.      There is evidence in the record that CHI Franciscan sought to and actually did relocate physician referrals from other hospitals to its own hospital inpatient department:

      a.      Mr. Chandler testified that TDC believes it is obligated to refer more patients to Harrison as a result of the Affiliation, and that it has a "fiduciary responsibility to keep those services within the system."[105]

      b.      Dr. Lo testified that TDC's referral patterns for maternal fetal medicine have changed and that they are "pretty much exclusively Franciscan" unless there is a patient request.[106]

c)      **Anticompetitive Harm to Physician Services**

77.      Third, empirical economic research predicts that the strategic vertical integration undertaken by the parties in this case will increase physician prices.  Having enabled hospitals to obtain higher prices in markets for outpatient and inpatient hospital services through the

---

[105] Chandler Deposition 6/27/17, 137:24 – 138:9.

[106] Deposition of Melissa Lo, July 31, 2018, 32:17–33:7.  Dr. Lo is the medical director of TDC.  Maternal fetal medicine is an OB/Gyn subspecialty that treats women with complex pregnancies before, during, and after childbirth.  See, for example, the Society for Maternal Fetal Medicine, https://www.smfm.org/members/what-is-a-mfm, accessed October 23, 2018.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

mechanisms outlined in ¶ 73 and ¶ 75, physicians may seek to share in hospitals' additional profits. Hospitals may share these profits by exerting their bargaining power on behalf of their integrated physicians. Two studies referenced in ¶ 57 are particularly relevant and applicable to my evaluation of the vertical effects of the TDC Affiliation and the WSO Transaction on markets for physician services:

    a.  In one study, integration of a physician group with a hospital is associated with an approximately 10 percent increase in the price of primary care physician services.[107] The effects of vertical integration are larger for hospital systems that were more dominant in their market, indicating that hospital market power was the likely source of the physician price increase.

    b.  In a second, acquisition of a multispecialty group (like TDC) by an health system (like CHI Franciscan) that already owned a medical group (like FMG) is associated with increases in prices at both the acquired and acquiring groups.[108] Four years after the acquisition, average physician prices in the acquired groups were 32-47 percent higher than would have been expected in the absence of the acquisitions, and average physician prices in the preexisting system-owned groups were 14-20 percent higher than expected.

### B. Empirical Economic Research Does Not Predict that the Integration Undertaken By the TDC Affiliation and WSO Transaction Will Create Procompetitive Benefits

78. Empirical economic research has rejected the general proposition that integration (either horizontal integration of physicians or hospital-physician integration) leads to procompetitive benefits. Research on physician organizations finds that physicians who practice in groups are more productive than solo practitioners, but that small groups are more productive than large groups. In particular, economies of scale or scope from physician group practice occur at modest

---

[107] Capps C, Dranove D, Ody C, The Effect of Hospital Acquisitions of Physician Practices on Prices and Spending, Journal of Health Economics 2018;59:139-52, Fig. 3A, prices measured relative to actual Medicare price in order to isolate the competitive effects of integration from the site-of-service effects (p. 142).

[108] Carlin CS, Feldman R, Dowd B, The impact of provider consolidation on physician prices, Health Economics 2017;26:1789-1806. The effects reported in this paper are a combination of the vertical and horizontal effects of the acquisition.

35

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

levels of aggregation (approximately 5 -10 physicians), after which point diseconomies of scale or scope (from increased management costs) dominate.[109] [110]  Consistent with this, a survey of leaders of the largest physician groups cited increased bargaining leverage with health plans as a benefit of large group practice much more frequently than economies of scale or improved quality.[111]  Thus empirical economic research does not support the claim that strategically integrating either TDC or WSO with FMG would make TDC or WSO more productive, even notwithstanding the lack of evidence of financial or operational integration of TDC with FMG.

79.     In theory, as discussed in ¶ 25, closer ties between doctors and hospitals can align the parties' incentives to improve value and encourage them to coordinate patient care.  However, a recent review of the literature concludes that the evidence does not support the claim that such ties produce societal benefits.[112]  As discussed in ¶ 56, a recent peer-reviewed study finds that, in practice, vertically-integrated hospitals do not have higher quality than similar hospitals that are not vertically integrated.

80.     If anything, recent research suggests the opposite:  that vertical integration is associated with *lower* quality and *higher* cost.  As discussed in ¶ 58, physicians in vertically-integrated groups are much more likely to refer patients to the integrating hospital for inpatient care than to other, competing hospitals.  This affects quality and price by foreclosing competition.  Ownership of a physician's group also affects quality and cost directly.  By referring patients to the hospital that owns their group, physicians in vertically integrated groups admit patients to hospitals that are lower quality and higher cost, on average, than physicians not in hospital-owned groups.

---

[109] Pope GC, Burge RT, Economies of Scale in Physician Practice, Medical Care Research and Review 1996;53:417-40.
[110] Burns LR, Goldsmith JC, Sen A, Horizontal and Vertical Integration of Physicians: A Tale of Two Tails, Advances in Health Care Management 2013;15:39-119, 58, 64.
[111] Casalino LP, Devers KJ, Lake TK, Reed M, Stoddard JJ, Benefits of and Barriers to Large Medical Group Practice in the United States, Archives of Internal Medicine 2003;163:1958-64.
[112] Greaney TL, Ross D, Navigating Through the Fog of Vertical Merger Law:  A Guide to Counselling Hospital-Physician Consolidation Under the Clayton Act, Washington Law Review 2016;91:199-251.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

81.     There is also evidence that vertical integration leads to increases in overall spending, in part due to the relocation of outpatient services to higher-priced sites such as hospital outpatient departments.[113] [114]  This is consistent with the testimony of Mr. Fitzgerald, CHI Franciscan's Chief Financial Officer, who described the referral of patients to Harrison for services that had been provided by TDC's ASC as a ███████████████."[115]

## IX.     Conclusion

82.     Economic analysis and empirical economic research predict that the TDC Affiliation and the WSO Transaction will cause anticompetitive harm.  TDC, WSO, and FMG are horizontally related because they compete with one another in various markets for physician services.   Both TDC and WSO agreed not to negotiate prices separately from FMG with health plans.  The TDC Affiliation and the WSO Transaction thus combine and enhance the market power of TDC, WSO, and FMG.  I describe this as "strategic horizontal integration."

83.     The TDC Affiliation does not integrate TDC with FMG either financially or operationally – the two channels through which the TDC Affiliation could have procompetitive effects.  From an economic perspective, this qualifies the TDC Affiliation for per se or quick-look rule of reason analysis.  In addition, it is inconsistent with treating TDC and FMG as a single firm.

84.     Empirical economic research predicts that the TDC Affiliation and the WSO Transaction will have vertical as well as horizontal anticompetitive effects.  Several peer-reviewed studies find that horizontal integration in markets for physician services, such as that undertaken by the TDC Affiliation and the WSO Transaction, is associated with higher prices in those markets.  TDC and WSO are also vertically related to CHI Franciscan, the parent of FMG.  Peer-reviewed

---

[113] Neprash HT, Chernew ME, Hicks AL, Gibson T, McWilliams M, Association of Financial Integration Between Physicians and Hospitals With Commercial Health Care Prices, JAMA Internal Medicine 2015;175(12):1932-9.
[114] Capps C, Dranove D, Ody C, The Effect of Hospital Acquisitions of Physician Practices on Prices and Spending, Journal of Health Economics 2018;59:139-52.
[115] FHS - State v. -028915–8918 at 8917 (email from Jay Burghart to Mike Fitzgerald, "PSA proposal concerns," 2/24/16).

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

studies find that vertical integration of physician groups with hospitals, such as that undertaken by the TDC Affiliation and the WSO Transaction, is associated with higher prices for outpatient hospital, inpatient hospital, and physician services.

85.    Empirical economic research does not predict that the integration undertaken by the TDC Affiliation and the WSO Transaction will create procompetitive benefits.  In general, economies of scale or scope from horizontal integration of physician practices occur at levels of aggregation achieved by TDC and WSO prior to the Affiliation and the Transaction.  In addition, although closer (vertical) ties between doctors and hospitals can in theory reduce spending and enhance quality, recent research shows that such procompetitive effects do not generally occur in practice.

38

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Executed this 26th of October, 2018,

Daniel P. Kessler

# Appendix A

**Daniel P. Kessler**

Law School, Graduate School of Business, Hoover Institution,
and Stanford Institute for Economic Policy Research
Stanford University
Stanford, CA 94305
(650) 725-1519
Email: fkessler@stanford.edu

**Education:**

Ph.D.          Economics, Massachusetts Institute of Technology, 1994
J.D.           Stanford Law School, 1993
B.A.           Economics, Harvard University, 1988

**Academic Positions:**

Senior Fellow, Stanford Institute for Economic Policy Research, 2016-
Professor, Stanford Law School, 2009-
Professor, by courtesy, Stanford School of Medicine, Department of Health Research and Policy,
     2008-
David S. and Ann M. Barlow Professor in Management, Graduate School of Business,
     Stanford University, 2007-10
Visiting Professor, Harvard Law School, 2007
Senior Fellow, Hoover Institution, Stanford University, 2006-
Professor, by courtesy, Stanford Law School, 2004-2009
Professor, Graduate School of Business, Stanford University, 2003-
Visiting Associate Professor, Wharton School, University of Pennsylvania, 2002-03
Associate Professor, Graduate School of Business, Stanford University, 1998-2003
Assistant Professor, Graduate School of Business, Stanford University, 1994-98

**Awards and Fellowships:**

Affiliate, Stanford Center on Longevity, 2008-
Health Care Research Award, National Institute for Health Care Management Foundation, 2003
Fellow, Center for Advanced Study in the Behavioral Sciences, 2003-04
Graduate School of Business Trust Faculty Fellow, 2000-01
Affiliate, Center for Social Innovation, Stanford Graduate School of Business, 2000-
Research Associate, National Bureau of Economic Research, 1999-
Public Policy Advising Award, Stanford University, 1998
Kenneth J. Arrow Award for Best Paper in Health Economics, International Health Economics
     Association, 1997
Affiliate, Center for Health Policy, Stanford University, 1997-
Class of 1969 Faculty Scholar, Stanford Graduate School of Business, 1997-98
National Fellow, Hoover Institution, 1997-98
John M. Olin Faculty Fellow, 1996-97
Faculty Research Fellow, National Bureau of Economic Research, 1994-99

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Appendix A

**Academic Publications:**

"Competition in Outpatient Procedure Markets," with Laurence C. Baker and M. Kate Bundorf, forthcoming, *Medical Care*.

"Why Don't Commercial Health Plans Use Prospective Payment?" with Laurence C. Baker, M. Kate Bundorf, and Aileen M. Devlin, forthcoming, *American Journal of Health Economics*.

"Neurophysiological monitoring during cervical spine surgeries: Longitudinal costs and outcomes," with John P. Ney, *Clinical Neurophysiology* 129: 2245-51 (2018).

"ACA Marketplace Premiums and Competition Among Hospitals and Physician Practices," with Maria Polyakova, M. Kate Bundorf, and Laurence C. Baker, *American Journal of Managed Care* 24(2): 85-90 (2018).

"The Effect of Medicare Advantage on Hospital Admissions and Mortality" with Christopher Afendulis and Michael Chernew, *American Journal of Health Economics* 3(2): 254-79 (2017).

"Hospital Ownership of Physicians: Hospital Versus Physician Perspectives" with Laurence C. Baker, Aileen M. Devlin, and M. Kate Bundorf, *Medical Care Research and Review*: 1-12 (2016).

"The Effect of Hospital/Physician Integration on Hospital Choice" with Laurence C. Baker and M. Kate Bundorf, *Journal of Health Economics* 50: 1-8 (2016).

"Medicare Advantage Plans Pay Hospitals Less Than Traditional Medicare Pays" with Laurence C. Baker and M. Kate Bundorf, *Health Affairs* 35: 1444-51 (2016).

"Does Health Plan Generosity Enhance Hospital Market Power?" with Laurence C. Baker and M. Kate Bundorf, *Journal of Health Economics* 44: 54-62 (2015).

"Designing Antitrust Policy for Accountable Care Organizations," with Laurence C. Baker and M. Kate Bundorf, *Journal of Competition Law & Economics* 11: 317-29 (2015).

"Expanding Patients' Property Rights in Their Medical Records," with Laurence C. Baker and M. Kate Bundorf, *American Journal of Health Economics* 1: 82-100 (2015).

"Patient Preferences Explain a Small But Significant Share of Regional Variation in Medicare Spending," with Laurence C. Baker and M. Kate Bundorf, *Health Affairs* 33: 957-63 (2014).

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Appendix A

"Vertical Integration:  Hospital Ownership of Physician Practices Is Associated With Higher
Prices and Spending," with Laurence C. Baker and M. Kate Bundorf, *Health Affairs* 33:
756-76 (2014).

"Medical Malpractice, Defensive Medicine, and Physician Supply," in the *Encyclopedia
of Health Economics*, Volume 2, ed. Anthony J. Culyer, Elsevier (2014).

"Why Are Medicare and Commercial Insurance Spending Weakly Correlated?" with Laurence
C. Baker and M. Kate Bundorf, *American Journal of Managed Care* 20: e8-e14 (2014).

"Regulatory Neutrality Is Essential To Establishing A Level Playing Field For Accountable Care
Organizations" with Gary E. Bacher, Michael E. Chernew, and Stephen M. Weiner,
*Health Affairs* 32: 1426-32 (2013).

"Reforming Medicare," *Tax Law Review* 65 (2012): 811-833.

"How Should Risk Adjustment Data Be Collected?" *Inquiry* 49 (Summer 2012): 127-140.

"Reforming the Tax Preference for Employer Health Insurance," with Joseph Bankman, John F.
Cogan, and R. Glenn Hubbard, in *Tax Policy and the Economy, Volume 26*, ed. Jeffrey
Brown, MIT Press (2011).

"Vertical Integration and Optimal Reimbursement Policy," with Christopher C. Afendulis,
*International Journal of Health Care Finance and Economics* 11 (2011):  165-179.

"The Effect of Tax Preferences on Health Spending," with John F. Cogan and R. Glenn
Hubbard, *National Tax Journal* 64 (September 2011):  795-816.

"The Effect of Bivalirudin on Costs and Outcomes of Treatment of ST-segment Elevation
Myocardial Infarction," with Eugene Kroch and Mark A. Hlatky, *American Heart
Journal* 162 (2011):  494-500.

"Evaluating the Medical Malpractice System and Options for Reform," *Journal of Economic
Perspectives* 25 (2011): 93-110.

"Does Patient Satisfaction Affect Patient Loyalty?" with Deirdre Mylod, *International Journal
of Health Care Quality Assurance* 24 (2011): 266-73.

*Regulation versus Litigation:  Perspectives from Economics and Law*, ed., University of Chicago
Press (2011).

"The Persuasive Effects of Direct Mail: A Regression Discontinuity Approach," with Alan
Gerber and Marc Meredith, *Journal of Politics* 73 (January 2011): 140-55.

"HMO Coverage Reduces Variations in the Use of Health Care Among Patients Under Age
Sixty-five" with Laurence Baker and M. Kate Bundorf, *Health Affairs* 29 (November

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Appendix A

2010): 2068-74.

"The Effect of Massachusetts Health Reform on Employer-sponsored Insurance Premiums," with John F. Cogan and R. Glenn Hubbard, *Forum for Health Economics and Policy* 13 (2010): article 5.

"The Effect of Medicare Coverage for the Disabled on the Market for Private Insurance," with John F. Cogan and R. Glenn Hubbard, *Journal of Health Economics* 29 (May 2010):  pp. 418-25.

"Why Is Health Reform So Difficult?" with David Brady, *Journal of Health Politics, Policy, and Law* 35 (April 2010): 161-75.

"Who Supports Health Reform?" with David Brady, *PS: Political Science and Politics* 43 (January 2010): 1-6.

"Putting the Public's Money Where Its Mouth Is," with David Brady, *Health Affairs* 28 (September/October 2009): w917-w925.

"Do Markets Respond to Quality Information?  The Case of Fertility Clinics," with M. Kate Bundorf, Natalie Chun, and Gopi Shah Goda, *Journal of Health Economics* 28 (2009): 718-27.

"Empirical Study of the Civil Justice System," with Daniel L. Rubinfeld, in the *Handbook of Law and Economics*, eds. A. Mitchell Polinsky and Steven Shavell, North-Holland (2007).

"Tradeoffs from Integrating Diagnosis and Treatment in Markets for Health Care," with Christopher Afendulis, *American Economic Review* 97 (June 2007): 1013-20.

"Evaluating Effects of Tax Preferences on Health Care Spending and Federal Revenues," with John F. Cogan and R. Glenn Hubbard, in *Tax Policy and the Economy, Volume 21*, ed. James Poterba, MIT Press (2007).

"The Effects of the Medical Liability System in Australia, the UK, and the US," with Nicholas Summerton and John R. Graham, *Lancet* 368 (2006): 240-46.

"The Effect of Cardiac Specialty Hospitals on the Cost and Quality of Care," with Jason Barro and Robert Huckman, *Journal of Health Economics* 25 (2006): 702-21.

"The Effects of the US Malpractice System on the Cost and Quality of Care," with David Becker, in *Medical Malpractice and the US Health Care System: New Century, Different Issues*, eds. William Sage and Rogan Kirsch, Cambridge University Press (2006).

"Making Markets Work: Five Steps to a Better Health Care System," with John F. Cogan and R. Glenn Hubbard, *Health Affairs* 24 (November/December 2005): 1447-57.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Appendix A

*Healthy, Wealthy, and Wise: Five Steps to a Better Health Care System*, with John F. Cogan and
R. Glenn Hubbard, Hoover Institution/AEI Press (1st. ed., 2005; 2nd. ed., 2011).

"The Effects of Competition on Variation in the Quality and Cost of Medical Care," with Jeffrey
Geppert, *Journal of Economics and Management Strategy* 14 (2005): 575-89.

"Impact of Malpractice Reforms on the Supply of Physician Services," with David Becker and
William Sage, *JAMA* 293 (6/1/05): 2618-25.

"Detecting Medicare Abuse," with David Becker and Mark McClellan, *Journal of Health
Economics* 24 (2005): 189-210.

"The Medical Liability System: Current Debates," in *Power to the Patient: Selected Health Care
Issues and Policy Solutions*, ed. Scott W. Atlas, Hoover Institution Press (2005).

"Toward Better Drugs for Less (book review)," *Science* 306 (12/24/04): 2192-3.

"Advance Directives and Medical Treatment at the End of Life," with Mark McClellan, *Journal
of Health Economics* 23 (2004): 111-27.

"Is More Information Better?  The Effects of 'Report Cards' on Health Care Providers," with
David Dranove, Mark McClellan, and Mark Satterthwaite, *Journal of Political Economy*
111 (2003), pp. 555-88.

"Ownership Form and Trapped Capital in the Hospital Industry," with Henry Hansmann and
Mark McClellan, in *The Governance of Not-for-Profit Firms*, Edward L. Glaeser ed.,
University of Chicago Press (2003).

"How Liability Law Affects Medical Productivity," with Mark McClellan, *Journal of Health
Economics* 21 (2002), pp. 931-55.

"The Effects of Hospital Ownership on Medical Productivity," with Mark McClellan, *RAND
Journal of Economics* 33 (Autumn 2002), pp. 488-506.

*A Global Analysis of Technological Change in Health Care: Heart Attack*, ed., with Mark
McClellan, University of Michigan Press (2002).

"Technological Change in Heart Attack Care in the United States: Causes and Consequences,"
with Mark McClellan, Nathan Every, Alan Garber, Paul Heidenreich, Mark Hlatky,
Joseph Newhouse, and Olga Saynina, in  *A Global Analysis of Technological Change in
Health Care: Heart Attack*, ed., with Mark McClellan, University of Michigan Press
(2002).

"Malpractice Pressure, Managed Care, and Physician Behavior," with Mark McClellan, in
*Regulation Through Litigation*, W. Kip Viscusi ed., Brookings Institution Press (2002).

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Appendix A

"Does Party Matter in Senators' Voting Behavior?  An Historical Test Using Tariff Votes," with David Brady and Judith Goldstein,  *Journal of Law, Economics, and Organization* 18 (April 2002), pp. 140-54.

"Malpractice Law and Health Care Reform: Optimal Liability Policy in an Era of Managed Care," with Mark McClellan, *Journal of Public Economics* 84 (2002), pp. 175-197.

"Technological Change Around the World: Evidence from Heart Attack Care," authored as the TECH Research Network, *Health Affairs* 20 (May/June 2001), pp. 25-42.

"Prevailing Wage Laws and Construction Labor Markets," with Lawrence Katz, *Industrial and Labor Relations Review* 54 (January 2001), pp. 259-74.

"What Do Prosecutors Maximize? An Analysis of the Federalization of Drug Crimes," with Anne Morrison Piehl and Edward Glaeser, *American Law and Economics Review* 2 (2000), pp. 259-90.

Review of *Measuring the Prices of Medical Treatments* (Jack E. Triplett, ed.), *Journal of Economic Literature* XXXVIII (September 2000), pp. 664-6.

"Is Hospital Competition Socially Wasteful?" with Mark McClellan, *Quarterly Journal of Economics* 115 (May 2000), pp. 577-615.

"Designing Hospital Antitrust Policy to Promote Social Welfare," with Mark McClellan, in *Frontiers in Health Policy Research: Volume 2*, ed. Alan Garber, MIT Press (1999).

"A Global Analysis of Technological Change in Health Care: The Case of Heart Attacks," with Mark McClellan for the TECH Investigators, *Health Affairs* 18 (May/June 1999), pp. 250-55.

"Using Sentence Enhancements to Distinguish Between Deterrence and Incapacitation," with Steven Levitt, *Journal of Law and Economics* 42 (April 1999), pp. 343-365.

"The Link Between Liability Reforms and Productivity: Some Empirical Evidence," with Thomas Campbell and George Shepherd, *Brookings Papers on Economic Activity: Microeconomics* (1998).

"The Role of Discretion in the Criminal Justice System," with Anne Morrison Piehl, *Journal of Law, Economics, and Organization* 14 (Winter 1998), pp. 256-276.

"The Law and Economics of Tying Arrangements: Lessons for Competition Policy Treatment of Intellectual Property," with William Baxter, in *Competition Policy and Intellectual Property Rights in the Knowledge-Based Economy*, eds. Robert Anderson and Nancy Gallini, Industry Canada Research Series, University of Calgary Press (1998).

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Appendix A

"The Effects of Malpractice Pressure and Liability Reforms on Physicians' Perceptions of Medical Care," with Mark McClellan, *Law and Contemporary Problems* 60 (Winter 1997), pp. 81-106.

"Institutional Causes of Delay in the Settlement of Legal Disputes," *Journal of Law, Economics, and Organization* 12 (Winter 1996), pp. 432-460.

"Dynamics of Cosponsorship," with Keith Krehbiel, *American Political Science Review* 90 (September 1996), pp. 555-566.

"Do Doctors Practice Defensive Medicine?" with Mark McClellan, *Quarterly Journal of Economics* 111 (May 1996), pp. 353-390.

"Explaining Deviations from the Fifty Percent Rule: A Multimodal Approach to the Selection of Cases for Litigation," with Thomas Meites and Geoffrey Miller, *Journal of Legal Studies* 35 (January 1996), pp. 233-261.

"Liability Reforms and Economic Performance," with Thomas Campbell and George Shepherd, in *The Mosaic of Economic Growth*, eds. Ralph Landau, Timothy Taylor, and Gavin Wright, Stanford University Press (1996).

"Fault, Settlement, and Negligence Law," *RAND Journal of Economics* 26 (Summer 1995), pp. 296-313.

"Toward a Consistent Theory of the Welfare Analysis of Agreements," with William Baxter, *Stanford Law Review* 47 (April 1995), pp. 301-317.

"Birth Order, Family Size, and Achievement: Family Structure and Wage Determination," *Journal of Labor Economics* 9 (October 1991), pp. 413-426.

**Academic Manuscripts in Progress:**

"Can Ranking Hospitals on the Basis of Patients' Travel Distances Improve Quality of Care?" NBER Working Paper 11419.

"Does Multispecialty Practice Enhance Physician Market Power?" with Laurence C. Baker and M. Kate Bundorf, NBER Working Paper 23871.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Appendix A

Kessler CV, October 2018, page 8

**Nonacademic publications:**

"The Health of Obamacare," *Wall Street Journal*, December 11, 2015, p. C3.

"By Reducing Competition, ObamaCare Raises Costs," *Investor's Business Daily*, June 11, 2014, p. A13.

"ObamaCare is Raising Insurance Costs," *Wall Street Journal*, June 4, 2013, p. A13.

"The Coming ObamaCare Shock," *Wall Street Journal*, April 30, 2013, p. A17.

"ObamaCare's Broken Promises," *Wall Street Journal*, February 1, 2013, p. A13.

"Real Medicare Reform," *National Affairs*, Fall 2012.

"The Wrong Remedy for Health Care," *Wall Street Journal*, June 29, 2012, p. A13.

"ObamaCare's Bogus Cost Savings," *Wall Street Journal*, March 14, 2012, p. A12.

"Medicare Reform:  Obama vs. Ryan," with John Taylor, *Wall Street Journal*, August 17, 2011, p. A15.

"How Health Reform Punishes Work," *Wall Street Journal*, April 25, 2011, p. A15.

"ObamaCare and the Truth About Cost Shifting," with John F. Cogan and R. Glenn Hubbard, *Wall Street Journal*, March 11, 2011, p. A15.

"Voters on Obamacare:  Informed and Opposed," with David W. Brady and Douglas Rivers, *Wall Street Journal*, October 15, 2010, p. A17.

"Health Care: The Prognosis," with John F. Cogan, *Hoover Digest* (2010).

"A Better Way to Reform Health Care," with John F. Cogan and R. Glenn Hubbard, *Wall Street Journal*, February 25, 2010, p. A13.

"Health Care Is Hurting Democrats," with David W. Brady and Douglas Rivers, *Wall Street Journal*, January 19, 2010, p. A17.

"Public Opinion and Health Reform," with David W. Brady, *Wall Street Journal*, October 22, 2009, p. A15.

"Doubling Down on a Flawed Insurance Model," with John F. Cogan and R. Glenn Hubbard, *Wall Street Journal*, September 25, 2009, p. A15.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Appendix A

"The Uninsured's Hidden Tax on Health Insurance Premiums in California: How Reliable is the Evidence?" with John F. Cogan, Matthew Gunn, and Evan J. Lodes, *Hoover Essays in Public Policy* (2007).

"Not a Panacea..." with John F. Cogan and R. Glenn Hubbard, *Wall Street Journal*, February 9, 2006, p. A12.

"Keep Government Out," with John F. Cogan and R. Glenn Hubbard, *Wall Street Journal*, January 13, 2006, p. A12.

"Reforming Health Care," *Hoover Digest* (2005).

"Reforming Malpractice Liability," *Hoover Digest* (2005).

"Brilliant Deduction" with John F. Cogan and R. Glenn Hubbard, *Wall Street Journal*, December 8, 2004, p. A12.

"Healthy, Wealthy, and Wise," with John F. Cogan and R. Glenn Hubbard, *Wall Street Journal*, May 4, 2004, p. A20.

"Want to Sue HMOs?  It'll Cost You," *Wall Street Journal*, July 25, 2001, p. A16.

"The Economic Effects of the Liability System," *Hoover Essays in Public Policy* (1998).

"Robbing Smokers to Pay Lawyers," with Jeremy Bulow, *Wall Street Journal*, April 7, 1998, p. A16.

"If You Smoke, Florida Wants to Tax You," with Jeremy Bulow, *Wall Street Journal*, November 26, 1997, p. A16.


**Case Studies:**

"Asian Neighborhood Design," with Lauren Dutton and Melinda Tuan, Stanford GSB (1998) (updated in 2003 by Rick Aubry and Susan Mackenzie).

"The Roberts Enterprise Development Fund," with Lauren Dutton, Jed Emerson, and Melinda Tuan, Stanford GSB (1998).

"Echelon and the Home Automation Standard," with David Baron, Keith Krehbiel, Erik Johnson, and Michael Ting, Stanford GSB (1997).

"The European Union Carbon Tax," with David Baron and Daniel Diermeier, Stanford GSB (1996).

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Appendix A

**Unpublished reports:**

"Cost Shifting in California Hospitals: What is the Effect on Private Payers?" for the California
   Foundation for Commerce and Education (2007).

"The Determinants of the Cost of Medical Liability Insurance," for Physician Insurers
   Association of America (2006).

"The Effects of Behavioral Health Interventions on Health Care Costs," for the Foundation for
   Better Health (2005).

"The Effects of Pharmaceutical Price Controls on the Cost and Quality of Medical Care: A
   Review of the Empirical Literature," for Pharmaceutical Research and Manufacturers of
   America (2004).

"The Impact of the Balanced Budget Act of 1997 on Skilled Nursing Care in California," with
   Chris Afendulis, Jeffrey Geppert, and Owen Kearney, for the California Health Care
   Foundation (2003).

**Referee/reviewer:**

American Cancer Society; *American Journal of Health Economics; American Economic Review;
Health Affairs;  Journal of Health Economics; Journal of Health Politics, Policy, and Law;
Journal of Law, Economics, and Organization; Journal of Law and Economics; Journal of Legal
Studies; Journal of Political Economy;* National Science Foundation; National Institutes of
Health; *RAND Journal of Economics; Quarterly Journal of Economics*

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Appendix B

**Expert Report of Daniel Kessler**
**Documents Considered**

## Deposition Testimony

- The Doctors Clinic Corporate Investigative Deposition (Randall J. Moeller, M.D., 6/27/2017) and Exhibits 14-17 thereto
- The Doctors Clinic Corporate Investigative Deposition (Brian C. Chandler, 6/27/2017) and Exhibits 1 - 13 thereto
- Franciscan Corporate Investigative Deposition (Peter O'Connor, 7/20/2017) and Exhibits 8 - 17 thereto
- Franciscan Corporate Investigative Deposition (David Schultz, 7/21/2017) and Exhibits 18 - 20 thereto
- Deposition of Joan Ballough (6/14/2018) and Exhibits 88 - 107 thereto
- Deposition of Megan McDermaid (6/15/2018) and Exhibits 108 - 134 thereto
- Deposition of Dawson Brown, M.D. (6/26/2018) and Exhibits 151 - 158 thereto
- Deposition of Gregory P. Duff, M.D. (6/28/2018) and Exhibits 151 - 174 thereto
- Deposition of Bradley J. Watters, M.D. (6/29/2018) and Exhibits 175 - 182 thereto
- Deposition of Michele Sauer (7/11/2018) and Exhibits 198 - 207 thereto
- Deposition of David Butcherite (7/17/2018) and Exhibits 238 - 257 thereto
- Deposition of Robert Cross (7/18/2018) and Exhibits 258 - 273 thereto
- Deposition of Peter O'Connor, Ph.D. (7/25/2018) and Exhibits 274 - 290 thereto
- Deposition of Wendie Johnson (7/27/2018) and Exhibits 303 - 318 thereto
- Deposition of Tracy Bradfield (7/30/2018) and Exhibits 322 - 337 thereto
- Deposition of Melissa Lo (7/31/2018) and Exhibits 338 - 342 thereto
- Deposition of Wendy Pierce, M.D. (8/2/2018) and Exhibits 343 - 344 thereto
- Deposition of Greg Hoisington (8/14/2018) and Exhibits 406 - 419 thereto
- Deposition of Randall Moeller (8/15/2018) and Exhibits 420 - 442 thereto
- Deposition of Michael Marshall, M.D. (8/16/2018) and Exhibits 443 - 461 thereto
- Deposition of Michael Fitzgerald (8/24/2018) and Exhibits 534 - 546 thereto
- Deposition of Dhyan Lal (8/30/2018) and Exhibits 547 - 572 thereto
- Deposition of Mindy Markley (8/30/2018) and Exhibits 573 - 585 thereto
- Deposition of Brian Chandler (9/6/2018) and Exhibits 586 - 621 thereto
- Deposition of David Schultz (9/13/2018) and Exhibits 627 - 652 thereto
- Deposition of Jay Burghart (9/24/2018) and Exhibits 653 - 665 thereto
- Deposition of John Partin (9/27/2018)
- Deposition of Brennan Dobbins (10/2/2018) and Exhibits 697 - 710 thereto
- Deposition of Jonathan Mendelsohn, M.D. (10/2/2018) and Exhibits 711 - 723 thereto
- Premera Blue Cross Deposition (Dennis Hagemann, 10/5/2018) and Exhibits 742 - 757 thereto
- Multicare Deposition (Theresa Boyle, 10/16/2018) and Exhibits 787 - 794 thereto

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Appendix B

**Expert Report of Daniel Kessler**
**Documents Considered**


## Pleadings and Court Filings

- Docket 3 - Complaint For Permanent Injunction And Other Relief [Unredacted Version Filed Under Seal], USDC No. 17-05690-BHS (8/31/2017)
- Docket 32 - Answer And Affirmative Defenses Of Westsound Orthopaedics, P.S., USDC No. 17-05690-BHS (10/30/2017)
- Docket 39 - Defendants Franciscan Health System, Franciscan Medical Group, And The Doctors Clinic's Motion To Dismiss Plaintiff's Per Se Claim, USDC No. 17-05690-BHS (10/30/2017)
- Docket 58 - Motion to Strike and Reply in Support of Certain Defendants' Motion to Dismiss Plaintiff's Per Se Claim, USDC No. 17-05690-BHS (12/8/2017)
- Docket 88 - Answer And Affirmative Defenses Of Franciscan Health System And Franciscan Medical Group, USDC No. 17-05690-BHS (3/26/2018)


## Other Materials

- Amended Response to Civil Investigative Demand (Franciscan Health System d/b/a CHI Franciscan Health) (3/23/2017)
- Amended Response to Civil Investigative Demand (Franciscan Health System d/b/a CHI Franciscan Health) (3/23/2017)
- Defendant The Doctors Clinic's Responses To Plaintiff State Of Washington's Third Set Of Interrogatories And Fourth Set Of Requests For Production To Defendants
- Franciscan's Responses To Plaintiff State Of Washington's Amended Third Set Of Interrogatories And Fourth Set Of Requests For Production (9/17/2018)
- Defendant The Doctors' Clinic, P.C.'S Response To Plaintiff State Of Washington's Amended Third Set Of Interrogatories And Fourth Set Of Requests For Production To Defendants (9/17/2018)
- Westsound Orthopaedics' Responses To Plaintiff State Of Washington's Amended Third Set Of Interrogatories And Fourth Set Of Requests For Production To Defendants (9/17/2018)
- Antitrust Guidelines for Collaborations Among Competitors, Issued by the Federal Trade Commission and the U.S. Department of Justice (2000)
- Alignment of Interests and the Governance of Joint Ventures, Patrick Rey and Jean Tirole (2/8/2001)
- Judgment, Société Coopérative de Production SeaFrance SA (Respondent) v The Competition and Markets Authority and another (Appellants), UKSC 75 (12/16/2015), https://www.supremecourt.uk/cases/docs/uksc-2015-0127-judgment.pdf.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Appendix B**

**Expert Report of Daniel Kessler**
**Documents Considered**

- Ownership and Control in Joint Ventures, Robert Hauswald, American University (February 2009), http://www1.american.edu/academic.depts/ksb/finance_realestate/rhauswald/papers/Ownership%20and%20Control%20in%20JVs.pdf.
- Washington State Department of Health, Hospital Inpatient Discharge Database Reports 2013-2017, https://www.doh.wa.gov/DataandStatisticalReports/HealthcareinWashington/HospitalandPatientData/HospitalDischargeDataCHARS/CHARSReports#2017.
- Expert Report of Dr. Lawton Robert Burns
- Excerpts of Expert Report of Dr. Cory Capps
- *Saint Alphonsus Medical Center -Nampa, Inc. v. St. Luke's Health System,* Nos. 12-cv-00560-BLW, 13-cv-00116-BLW, 2014 WL 407446 (D. Idaho Jan. 24, 2014), aff'd, 778 F.3d 775 (9th Cir. 2015)
- Centers for Medicare and Medicaid Services, National Health Expenditures by Source of Funds and Type of Expeditures, Table 4, 2014, available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/NationalHealthAccountsHistorical.html.
- Fronstin P, Sources of Health Insurance Coverage: A Look at Changes Between 2013 and 2014 from the March 2014 and 2015 Current Population Survey, 2015, Employee Benefit Research Institute Issue Brief 419, available at https://www.ebri.org/pdf/briefspdf/EBRI_IB_419.Oct15.Sources.pdf, accessed October 23, 2018
- Society for Maternal Fetal Medicine, https://www.smfm.org/members/what-is-a-mfm, accessed October 23, 2018
- U.S. Department of Justice and Federal Trade Commission, Horizontal Merger Guidelines 2010
- U.S. Federal Trade Commission, Competitive Effects, available at https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/mergers/competitive-effects, accessed October 23, 2018
- Areeda P, Hovenkamp H, Antitrust Law: An Analysis of Antitrust Principles and Their Application, ¶ 1902
- Austin DR, Baker LC, Less Physician Practice Competition Is Associated With Higher Prices Paid For Common Procedures, Health Affairs 2015;34(10):1753-60
- Baker LC, Bundorf MK, Kessler DP, Competition in Outpatient Procedure Markets, forthcoming, Medical Care
- Baker LC, Bundorf MK, Kessler DP, The Effect of Hospital/Physician Integration on Hospital Choice, Journal of Health Economics 2016;50:1-8

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Appendix B**

**Expert Report of Daniel Kessler**
**Documents Considered**

- Baker LC, Bundorf MK, Kessler DP, Vertical Integration: Hospital Ownership of Physician Practices Is Associated With Higher Prices and Spending, Health Affairs 2014;33(5):756-63
- Baker LC, Bundorf MK, Royalty AB, Levin Z, Physician Practice Competition and Prices Paid by Private Insurers for Office Visits, JAMA 2014;213(16):1653-62
- Baxter WF, Kessler DP, Toward a Consistent Theory of the Welfare Analysis of Agreements, Stanford Law Review 1995;47:616-631
- Breyer S, Economic Reasoning and Judicial Review, Economic Journal 2009;119:F123-35
- Burns LR, Goldsmith JC, Sen A, Horizontal and Vertical Integration of Physicians: A Tale of Two Tails, Advances in Health Care Management 2013;15:39-119
- Capps C, Dranove D, Ody C, The Effect of Hospital Acquisitions of Physician Practices on Prices and Spending, Journal of Health Economics 2018;59:139-52
- Carlin CS, Feldman R, Dowd B, The Impact of Provider Consolidation on Physician Prices, Health Economics 2017;26:1789-1806
- Casalino LP, Devers KJ, Lake TK, Reed M, Stoddard JJ, Benefits of and Barriers to Large Medical Group Practice in the United States, Archives of Internal Medicine 2003;163:1958-64
- Ciliberto F, Dranove D, The Effect of Physician-Hospital Affiliations on Hospital Prices in California, Journal of Health Economics 2006;25:29-38
- Cooper Z, Craig SV, Gaynor M, Van Reenen J, The Price Ain't Right?  Hospital Prices and Health Spending on the Privately Insured, forthcoming, Quarterly Journal of Economics
- Cuellar AE, Gertler PJ, Strategic Integration of Hospitals and Physicians, Journal of Health Economics 2006;25:1-28
- Dauda S, Hospital and Health Insurance Market Concentration and Inpatient Hospital Transaction Prices in the U.S. Health Care Market, Health Services Research 2018;53(2):1203-26
- Dunn A, Shapiro AH, Do Physicians Possess Market Power?, Journal of Law and Economics 2014;57:159-93
- Gaynor M and Town R, Competition in Health Care Markets, in Pauly MV, McGuire TG, and Barros PP, eds., Handbook of Health Economics 2012;2:501-637
- Gaynor M, Ho K, Town RJ, The Industrial Organization of Health Care Markets, Journal of Economic Literature 2015;53(2):235-84
- Gibbons R, Four Formal(izable) Theories of the Firm?, Journal of Economic Behavior and Organization 2005;58:200-45
- Greaney TL, Ross D, Navigating Through the Fog of Vertical Merger Law: A Guide to Counselling Hospital-Physician Consolidation Under the Clayton Act, Washington Law Review 2016;91:199-251

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Appendix B

**Expert Report of Daniel Kessler**
**Documents Considered**

- Gruber J, Health Insurance and the Labor Market, Chapter 12 in Culyer AJ and Newhouse JP, eds., Handbook of Health Economics 2000, Elsevier, 694
- Gruber J, The Incidence of Mandated Maternity Benefits, American Economic Review 1994;84:622-41
- Hart O, Moore J, Property Rights and the Nature of the Firm, Journal of Political Economy 1990;98(6):1119-58
- Ho K, The Welfare Effects of Restricted Hospital Choice in the US Medical Care Market, Journal of Applied Econometrics 2006;21:1039-79
- Hovenkamp H, The Rule of Reason, Florida Law Review 2018;81-167
- Kahn JG et al., The Cost of Health Insurance Administration in California: Estimates for Insurers, Physicians, and Hospitals, Health Affairs 2005;24(6):1629-39
- Kessler DP, McClellan MB, Is Hospital Competition Socially Wasteful? Quarterly Journal of Economics 2000;115:577-615
- Klein B, Single Entity Analysis of Joint Ventures After American Needle: An Economic Perspective, Antitrust Law Journal 2013;78:669-88
- Kwak J, Optimal Antitrust Enforcement: Information Cost and Deterrent Effect, European Journal of Law and Economics 2016;41:371-91
- Neprash HT, Chernew ME, Hicks AL, Gibson T, McWilliams M, Association of Financial Integration Between Physicians and Hospitals With Commercial Health Care Prices, JAMA Internal Medicine 2015;175(12):1932-9
- Pope GC, Burge RT, Economies of Scale in Physician Practice, Medical Care Research and Review 1996;53:417-40
- Posner R, The Economic Analysis of Law 3d ed. 1986, 517
- Post B, Buchmueller T, Ryan AM, Vertical Integration of Hospitals and Physicians: Economic Theory and Empirical Evidence on Spending and Quality, Medical Care Research and Review 2018;75(4):399-433
- Roberts ET, Chernew ME, McWilliams JM, Market Share Matters: Evidence of Insurer and Provider Bargaining Over Prices, Health Affairs 2017;36(1):141-8
- Robinson JC, Hospital Market Concentration, Pricing, and Profitability in Orthopedic Surgery and Interventional Cardiology, American Journal of Managed Care 2011;17(6):e241-8
- Scanlon DP, Chernew M, McLaughlin C, Solon G, The Impact of Health Plan Report Cares on Managed Care Enrollment, Journal of Health Economics 2002;21:19-41
- Scott KW, Orav J, Cutler DM, Jha AK, Changes in Hospital-Physician Affiliations in U.S. Hospitals and Their Effect on Quality of Care, Annals of Internal Medicine 2016 (Web Only)
- Sun E, Baker LC, Concentration in Orthopedic Markets Was Associated With a 7 Percent Increase in Physician Fees For Total Knee Replacements, Health Affairs 2015;34(6):916-21

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Appendix B**

**Expert Report of Daniel Kessler**
**Documents Considered**

- Trish EE, Herring BJ, How do health insurer market concentration and bargaining power with hospitals affect health insurance premiums?, Journal of Health Economics 2015;43:104-14
- Vistnes G, Hospitals, Mergers, and Two-Stage Competition, Antitrust Law Journal 1999-2000;67:671-92
- Williamson DV, Organization, Control, and the Single Entity Defense in Antitrust, Journal of Competition Law and Economics 2009;5(4):723–45

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Appendix B

**Expert Report of Daniel Kessler**
**Documents Considered**

## Documents

| | | |
|---|---|---|
| AET-WA-00000017 | FHS - State v. -000167 | FHS - State v. -010859 |
| AET-WA-00000019 | FHS - State v. -000182 | FHS - State v. -011262 |
| AET-WA-00000022 | FHS - State v. -000205 | FHS - State v. -011263 |
| BALLOUGH000155 | FHS - STATE V. -002153 | FHS - State v. -011266 |
| BALLOUGH000196 | FHS - STATE V. -002154 | FHS - State v. -011267 |
| BALLOUGH000197 | FHS - STATE V. -002155 | FHS - State v. -011268 |
| BALLOUGH000205 | FHS - STATE V. -002156 | FHS - State v. -011269 |
| BALLOUGH000241 | FHS - STATE V. -002159 | FHS - State v. -011493 |
| CAMBIA_CHI_00003492 | FHS - STATE V. -002162 | FHS - State v. -011494 |
| CAM-WA-00000005 | FHS - STATE V. -002169 | FHS - State v. -013577 |
| CHIFranciscan-AG-000001 | FHS - STATE V. -002170 | FHS - State v. -015361 |
| CHIFranciscan-AG-001179 | FHS - STATE V. -002171 | FHS - State v. -016891 |
| CHIFranciscan-AG-001963 | FHS - STATE V. -002172 | FHS - State v. -017161 |
| CHIFranciscan-AG-002166 | FHS - STATE V. -002173 | FHS - State v. -023493 |
| CHIFranciscan-AG-003108 | FHS - STATE V. -002174 | FHS - State v. -024525 |
| CHIFranciscan-AG-003536 | FHS - STATE V. -002175 | FHS - State v. -025425 |
| CHIFranciscan-AG-003673 | FHS - STATE V. -002176 | FHS - State v. -026781 |
| CHIFranciscan-AG-005003 | FHS - STATE V. -002177 | FHS - State v. -027742 |
| CHIFranciscan-AG-005542 | FHS - STATE V. -002178 | FHS - State v. -028826 |
| CHIFranciscan-AG-005630 | FHS – State v. -003044 | FHS - State v. -028827 |
| CHIFranciscan-AG-005731 | FHS – State v. -003708 | FHS - State v. -028915 |
| CHIFranciscan-AG-007170 | FHS - State v. -003859 | FHS - State v. -028969 |
| CHIFranciscan-AG-008094 | FHS - State v. -003860 | FHS - State v. -028977 |
| CHIPRE000001 | FHS - State v. -003893 | FHS - State v. -031815 |
| FHS - State v. - 011277 | FHS - State v. -005147 | FHS - State v. -032698 |
| FHS – State v. – 025425 | FHS - State v. -005150 | FHS - State v. -032922 |
| FHS - State v. -000115 | FHS - State v. -005646 | FHS - State v. -033143 |
| FHS - State v. -000159 | FHS - State v. -005795 | FHS - State v. -034931 |
| FHS - State v. -000162 | FHS - State v. -005796 | FHS - State v. -036058 |

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Appendix B**

**Expert Report of Daniel Kessler**
**Documents Considered**

| | | |
|---|---|---|
| FHS - State v. -036059 | FHS - State v. -051404 | FHS - State v. -120709 |
| FHS - State v. -039151 | FHS - State v. -051406 | FHS - State v. -120820 |
| FHS - State v. -039204 | FHS - State v. -051650 | FHS - State v. -127557 |
| FHS - State v. -039260 | FHS - State v. -062549 | FHS - State v. -141319 |
| FHS - State v. -039263 | FHS - State v. -065966 | FHS - State v. -141333 |
| FHS - State v. -039269 | FHS - State v. -065967 | FHS - State v. -141406 |
| FHS - State v. -039429 | FHS - State v. -065968 | HURLEY000030 |
| FHS - State v. -039495 | FHS - State v. -065969 | HURLEY000035 |
| FHS - State v. -039562 | FHS - State v. -065973 | HURLEY000040 |
| FHS - State v. -039580 | FHS - State v. -065975 | HURLEY000046 |
| FHS - State v. -039582 | FHS - State v. -066096 | HURLEY000121 |
| FHS - State v. -039618 | FHS - State v. -066194 | HURLEY000166 |
| FHS - State v. -039903 | FHS - State v. -066198 | HURLEY000400 |
| FHS - State v. -040195 | FHS - State v. -066270 | HURLEY000503 |
| FHS - State v. -041008 | FHS - State v. -066718 | HURLEY000890 |
| FHS - State v. -041010 | FHS - State v. -066724 | HURLEY001127 |
| FHS - State v. -041029 | FHS - State v. -067003 | HURLEY001291 |
| FHS - State v. -041041 | FHS - State v. -067392 | HURLEY001293 |
| FHS - State v. -041188 | FHS - State v. -067393 | HURLEY001433 |
| FHS - State v. -043162 | FHS - State v. -067394 | HURLEY001688 |
| FHS - State v. -043164 | FHS - State v. -067665 | HURLEY001746 |
| FHS - State v. -043186 | FHS - State v. -083428 | HURLEY001860 |
| FHS - State v. -044682 | FHS - State v. -095132 | HURLEY002047 |
| FHS - State v. -047181 | FHS - State v. -095133 | HURLEY002768 |
| FHS - State v. -048207 | FHS - State v. -096348 | HURLEY003258 |
| FHS - State v. -048221 | FHS - State v. -098834 | HURLEY003374 |
| FHS - State v. -048223 | FHS - State v. -098875 | HURLEY004015 |
| FHS - State v. -048224 | FHS - State v. -098877 | HURLEY004016 |
| FHS - State v. -048226 | FHS - State v. -101523 | HURLEY004462 |
| FHS - State v. -048886 | FHS - State v. -101531 | HURLEY004933 |
| FHS - State v. -048889 | FHS - State v. -120346 | HURLEY004963 |

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Appendix B**

**Expert Report of Daniel Kessler**
**Documents Considered**

| | | |
|---|---|---|
| HURLEY005558 | HURLEY010762 | TDC000597 |
| HURLEY005659 | HURLEY010763 | TDC000606 |
| HURLEY005749 | HURLEY010879 | TDC000608 |
| HURLEY005782 | HURLEY010890 | TDC000617 |
| HURLEY005901 | HURLEY011046 | TDC000620 |
| HURLEY005924 | HURLEY011048 | TDC000630 |
| HURLEY005965 | HURLEY011090 | TDC000696 |
| HURLEY006101 | HURLEY011317 | TDC000748 |
| HURLEY007450 | HURLEY011319 | TDC000838 |
| HURLEY007490 | HURLEY011801 | TDC000841 |
| HURLEY007507 | HURLEY011859 | TDC000903 |
| HURLEY007551 | HURLEY011940 | TDC000906 |
| HURLEY007969 | MULTICARE_000354 | TDC001955 |
| HURLEY008090 | MULTICARE_000435 | TDC003244 |
| HURLEY008092 | NAK_00000473 | TDC008547 |
| HURLEY008144 | TDC000518 | TDC008772 |
| HURLEY008221 | TDC000522 | TDC009123 |
| HURLEY008280 | TDC000525 | TDC009456 |
| HURLEY008879 | TDC000531 | TDC009770 |
| HURLEY008939 | TDC000533 | TDC009774 |
| HURLEY009229 | TDC000537 | TDC009775 |
| HURLEY009521 | TDC000540 | TDC009967 |
| HURLEY009533 | TDC000541 | TDC010326 |
| HURLEY009535 | TDC000553 | TDC010350 |
| HURLEY009749 | TDC000556 | TDC010374 |
| HURLEY009785 | TDC000559 | TDC010420 |
| HURLEY009883 | TDC000562 | TDC010421 |
| HURLEY009886 | TDC000574 | TDC010422 |
| HURLEY009927 | TDC000578 | TDC010425 |
| HURLEY009963 | TDC000581 | TDC010427 |
| HURLEY009964 | TDC000595 | TDC010429 |

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Appendix B**

**Expert Report of Daniel Kessler**
**Documents Considered**

| | | |
|---|---|---|
| TDC010437 | TDC0408924 | TDC174313 |
| TDC010438 | TDC0415840 | TDC174314 |
| TDC010439 | TDC0415915 | TDC179373 |
| TDC010448 | TDC0415916 | TDC181205 |
| TDC010451 | TDC0415926 | TDC181206 |
| TDC010452 | TDC089377 | TDC183551 |
| TDC013311 | TDC104965 | TDC183552 |
| TDC015804 | TDC122611 | TDC184622 |
| TDC015951 | TDC122612 | TDC186168 |
| TDC016034 | TDC122613 | TDC186169 |
| TDC016087 | TDC126156 | TDC186170 |
| TDC016243 | TDC129737 | TDC186171 |
| TDC016396 | TDC129738 | TDC189646 |
| TDC016662 | TDC132436 | TDC190089 |
| TDC017079 | TDC132437 | TDC190345 |
| TDC017103 | TDC132621 | TDC197784 |
| TDC017128 | TDC135775 | TDC198165 |
| TDC017152 | TDC152245 | TDC200694 |
| TDC017176 | TDC152246 | TDC200695 |
| TDC032528 | TDC152252 | TDC202993 |
| TDC032530 | TDC152253 | TDC204023 |
| TDC0392626 | TDC153407 | TDC204024 |
| TDC0392627 | TDC154135 | TDC204172 |
| TDC0394677 | TDC154136 | TDC204607 |
| TDC0394797 | TDC154510 | TDC204638 |
| TDC0394798 | TDC154511 | TDC207985 |
| TDC0394962 | TDC165713 | TDC211944 |
| TDC0394970 | TDC165714 | TDC215614 |
| TDC0396340 | TDC170814 | TDC215615 |
| TDC0396341 | TDC170815 | TDC216674 |
| TDC0397481 | TDC174307 | TDC216675 |

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Appendix B**

**Expert Report of Daniel Kessler**
**Documents Considered**

| | | |
|---|---|---|
| TDC216723 | TDC334393 | TDC384108 |
| TDC217693 | TDC352110 | TDC384109 |
| TDC218629 | TDC383436 | TDC384110 |
| TDC218886 | TDC383440 | TDC384111 |
| TDC218887 | TDC383444 | TDC384112 |
| TDC227038 | TDC383448 | TDC384120 |
| TDC227039 | TDC383451 | TDC384277 |
| TDC229842 | TDC383455 | TDC384278 |
| TDC229963 | TDC383459 | TDC384279 |
| TDC229964 | TDC383463 | TDC384284 |
| TDC231268 | TDC383467 | TDC384367 |
| TDC233262 | TDC383472 | TDC384397 |
| TDC235789 | TDC383476 | TDC384398 |
| TDC237243 | TDC383480 | TDC384530 |
| TDC241633 | TDC383484 | TDC384549 |
| TDC241634 | TDC383488 | TDC384681 |
| TDC249057 | TDC383493 | TDC384737 |
| TDC249058 | TDC383498 | TDC386652 |
| TDC249060 | TDC383503 | TDC386669 |
| TDC249062 | TDC383507 | TDC386686 |
| TDC249064 | TDC383512 | TDC386703 |
| TDC249066 | TDC383516 | TDC386720 |
| TDC251482 | TDC383521 | TDC386737 |
| TDC251483 | TDC383525 | TDC386754 |
| TDC251484 | TDC383529 | TDC386771 |
| TDC251488 | TDC383534 | TDC386787 |
| TDC251493 | TDC383543 | TDC386791 |
| TDC251497 | TDC384098 | TDC386799 |
| TDC314431 | TDC384105 | TDC386812 |
| TDC315956 | TDC384106 | TDC386829 |
| TDC316278 | TDC384107 | TDC386848 |

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Appendix B

**Expert Report of Daniel Kessler**
**Documents Considered**

| | | |
|---|---|---|
| TDC386861 | TDC387299 | TDC387998 |
| TDC386865 | TDC387312 | TDC388004 |
| TDC386885 | TDC387327 | TDC388034 |
| TDC386907 | TDC387338 | TDC388064 |
| TDC386915 | TDC387350 | TDC388094 |
| TDC386927 | TDC387361 | TDC388123 |
| TDC386943 | TDC387375 | TDC388152 |
| TDC386951 | TDC387388 | TDC388180 |
| TDC386971 | TDC387404 | TDC388186 |
| TDC386988 | TDC387420 | TDC388192 |
| TDC387006 | TDC387431 | TDC388221 |
| TDC387024 | TDC387444 | TDC388225 |
| TDC387042 | TDC387459 | TDC388232 |
| TDC387060 | TDC387475 | TDC388242 |
| TDC387073 | TDC387488 | TDC388253 |
| TDC387087 | TDC387503 | TDC388264 |
| TDC387105 | TDC387519 | TDC388275 |
| TDC387118 | TDC387533 | TDC388286 |
| TDC387132 | TDC387610 | TDC388297 |
| TDC387151 | TDC387642 | TDC388308 |
| TDC387164 | TDC387671 | TDC388319 |
| TDC387173 | TDC387700 | TDC388330 |
| TDC387187 | TDC387729 | WSO-000001 |
| TDC387201 | TDC387758 | WSO-000474 |
| TDC387210 | TDC387788 | WSO-000480 |
| TDC387223 | TDC387818 | WSO-000482 |
| TDC387236 | TDC387848 | WSO-000490 |
| TDC387248 | TDC387878 | WSO-000492 |
| TDC387260 | TDC387908 | WSO-000502 |
| TDC387275 | TDC387938 | WSO-000509 |
| TDC387287 | TDC387968 | WSO-000520 |

Document Considered - Page 12 of 13

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Appendix B**

**Expert Report of Daniel Kessler**
**Documents Considered**

WSO-000522

WSO-000533

WSO-000543

WSO-000553

WSO-000555

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Appendix C

# TDC Difference Between Budgeted and Actual Costs as a Percentage of Total Budget
## January 2017–March 2018

Percent of [1]



002172; FHS - State v. -002173; FHS - State v. -002174; FHS - State v. -002175; FHS - State v. -002176; FHS - State v. -002177; FHS - State v. -002178; FHS - State v. -033143; TDC0415915

Note:
[1] The difference between budgeted costs and actual costs as a percent of total budget is calculated as (Budgeted Costs - Actual Costs) / Budgeted Costs.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Exhibit 4

# Rebuttal Report of Daniel P. Kessler, J.D., Ph.D.

# November 20, 2018

Highly Confidential — Subject to Protective Order

# Table of Contents

I.    Assignment ...........................................................................................................4

II.   Dr. Wu's Report....................................................................................................5

    A.    The Bottom Line Is That Consumers Got Less and Paid More After the TDC
       Affiliation and the WSO Transaction ................................................................ 5

         1.    Output Went Down ................................................................................. 6

         2.    Prices Went Up ...................................................................................... 9

         3.    The Increase In Prices Was Not Counterbalanced By Cost Savings .......... 9

    B.    Dr. Wu's Attempts To Explain Away the Bottom Line Are Not Successful ....... 10

         1.    Dr. Wu's Opinion That The "Contract Conversion" Effect on Prices Is
             Not Anticompetitive Is Incorrect ......................................................... 10

         2.    Dr. Wu's Opinion That There Is No "System Bargaining" Effect on
             Prices Does Not Rebut Evidence That the TDC Affiliation and WSO
             Transaction Were Anticompetitive ........................................................ 14

III.  Mr. Kennedy's Report ........................................................................................15

    A.    Mr. Kennedy Fails To Consider The Possibility That Integration May Have
       Anticompetitive Effects (§ IV) ...................................................................... 16

    B.    Mr. Kennedy's Integration Analysis Is Inaccurate and Irrelevant For Antitrust
       Analysis (§ V) ............................................................................................. 17

         1.    Mr. Kennedy's Integration Analysis Does Not Provide a Basis for
             Evaluating the Competitive Effects of the TDC Affiliation .................... 17

         2.    From an Economic Perspective, Mr. Kennedy's Integration Analysis
             Does Not Provide a Basis for Deciding Which Procedural Rules
             Should Apply to the TDC Affiliation ..................................................... 18

         3.    Mr. Kennedy's Analysis Overstates the Extent of Procompetitive
             Integration Documented in the Record .................................................. 20

         4.    Mr. Kennedy's Analysis Mischaracterizes the Dignity and IHC
             Arrangements As Similar to the TDC Affiliation.................................... 22

    C.    Mr. Kennedy's Efficiencies Analysis Is Inaccurate and Irrelevant For Antitrust
       Analysis (§ VI)............................................................................................ 26

         1.    Although It May Be a Valid Social Goal, Increasing the Share of
             Services to Government-Insured Patients Is Not An Increase In
             Efficiency ............................................................................................ 27

Highly Confidential — Subject to Protective Order

2.  Even If Increases in the Share of Services Did Represent An Increase In Volume to Government-insured Patients, Antitrust Analysis Would Reject It As An Offsetting Benefit In a Second Market ........................... 30

3.  Mr. Kennedy's Estimate of Cost Savings Necessarily Overstates True Cost Savings............................................................................................. 31

4.  Mr. Kennedy's Assessment of the Quality Effects of the TDC Affiliation and WSO Transaction Are Inconsistent With Empirical Economic Research................................................................................. 31

IV.  Conclusion .................................................................................................................32

Highly Confidential — Subject to Protective Order

## I.      Assignment

1.      I previously submitted an expert report in this matter on October 26, 2018, which I incorporate here by reference.  I have reviewed the October 26, 2018 expert reports of Mr. Leonard Henzke, Mr. Kevin Kennedy, and Dr. Lawrence Wu.

2.      Counsel asked me to evaluate and respond to the opinions in the expert reports of Dr. Wu and Mr. Kennedy.  I understand that Dr. Eastman will evaluate and respond to Mr. Henzke's opinions and portions of Mr. Kennedy's opinions; Dr. Capps will evaluate and respond to portions of Dr. Wu's and Mr. Kennedy's opinions; and Professor Burns will evaluate and respond to portions of Mr. Kennedy's opinions.

3.      In addition to the reports of Mr. Henzke, Mr. Kennedy, and Dr. Wu, I reviewed the materials cited in these reports; my initial report; and other documents, depositions, and data produced in this matter.  The documents, depositions, and data on which I relied are listed in Appendix A.

4.       I reserve the right to supplement or modify this report, including my opinions and the bases for my opinions, for any of the following reasons:

      a.   to provide rebuttal;

      b.   to respond to new or additional information;

      c.   to incorporate information from additional discovery or trial materials, including deposition transcripts, evidence, and exhibits; or

      d.   to take into account resolution of any or all of the allegations.

I also may use as exhibits any statements, records, documents, evidence or other exhibits made, used, or introduced by any party.

Highly Confidential — Subject to Protective Order

## II.    Dr. Wu's Report

5.      Dr. Wu offered three sets of opinions in his report.  First, he opined about the relevant product and geographic markets affected by the TDC Affiliation and the WSO Transaction; calculated market shares of TDC, WSO, and FMG; and computed the levels of and changes in HHI concentration indices that occurred in the relevant markets concurrent with the TDC Affiliation and the WSO Transaction.  Second, he opined about the competitive effects of the TDC Affiliation and the WSO Transaction based on the market shares and HHIs that he calculated.  Third, he opined about the competitive effects of the TDC Affiliation and the WSO Transaction based on evidence other than the market shares and HHIs that he calculated.  I focus my reply on the third set of Dr. Wu's opinions.

6.      Dr. Wu concluded that there is no empirical evidence, even accepting the State's alleged geographic markets, that either the TDC Affiliation or the WSO Transaction harmed competition.[1]  Dr. Wu's conclusion is incorrect.  In what follows, I explain why evidence other than the market shares and HHIs that he calculated provide substantial empirical evidence that both the TDC Affiliation and the WSO Transaction harmed competition.

### A.    The Bottom Line Is That Consumers Got Less and Paid More After the TDC Affiliation and the WSO Transaction

7.      At its most basic level, economic analysis uses output to measure the extent of competition in a market:  a market becomes more competitive when its output increases.[2]  Thus, economic analysis generally concludes that agreements or mergers harm competition when they reduce output.  Typically, the actual output effects of an agreement or merger are not observable in antitrust litigation, because the litigation precedes the implementation of the agreement or merger.  Instead, parties to antitrust litigation predict what the output effects will be using proxies such as market shares, HHIs, and other indicia of market structure.

---

[1] Dr. Wu report, ¶ 19.

[2] Areeda PE, Hovenkamp H, Antitrust Law:  An Analysis of Antitrust Principles and Their Application ¶ 1901a.

Highly Confidential — Subject to Protective Order

8.      In this case, however, the TDC Affiliation and WSO Transaction have occurred, and data from TDC and WSO are available for a full year both before (2015) and after (2017) the TDC Affiliation and WSO Transaction.  This case thus offers an unusual opportunity to estimate the actual effects of these agreements.  Below, I show the following:

    a.  From 2015 to 2017, according to data from Mr. Henzke, TDC and WSO physicians' output went down.

    b.  From 2015 to 2017, according to data from Dr. Wu, prices paid by commercial insurers for Adult PCP and orthopedic physician services at TDC and WSO went up.

    c.  Even accepting defendants' estimate of the cost savings achieved by the TDC Affiliation – an estimate which, as I explain below, necessarily overstates the true amount of cost savings – the magnitude of cost savings was much less than the increase in prices from 2015 to 2017.

The bottom line:  consumers got less and paid more after the TDC Affiliation and WSO Transaction, and the extra amount that consumers paid was not counterbalanced by cost savings.

## 1.      Output Went Down

9.      Dr. Wu opined that the TDC Affiliation and the WSO Transaction either increased, or did not reduce, output.[3]  His opinion is incorrect.  In fact, it is contrary to the facts produced by another of Defendants' experts, Mr. Henzke.  Mr. Henzke tabulated the output of each physician in TDC and WSO, in terms of wRVUs.  As a practical matter, the wRVU metric has been used by the parties throughout this case to measure output;[4] as a theoretical matter, the wRVU metric

---

[3] Dr. Wu report ¶ 110, ¶ 175, ¶ 194.

[4] Dr. Wu uses the total allowed amount paid to a provider as a measure of "output" (¶ 69).  This definition of output does not correspond to the definition used in economic and antitrust analysis.  As Dr. Wu himself observes, the allowed amount per wRVU is the "price" of service.   Thus, the number of wRVUs is the quantity of service, or the amount of output.  The total allowed amount, which is the product of the allowed amount per wRVU and the number of wRVUs, is actually the *value* rather than the *volume* of the output.  This distinction is important in antitrust analysis.  If output were to be measured by value, then "output" would increase mechanically when prices

is close to ideal, in that it captures the volume of care that a physician provides in terms of a single number that is comparable across types of service.

10.     Exhibit 1 shows the number of wRVUs in 2015 (the last full year before the TDC Affiliation and WSO Transaction) and 2017 (the first full year after the TDC Affiliation and WSO Transaction).  Exhibit 1 shows that the output of TDC physicians in the markets for Adult PCP and orthopedic services decreased by 44,468 wRVUs (39.2%) and 5,529 wRVUs (19.5%), respectively, from 2015 to 2017.  The decrease in output in markets for Adult PCP and orthopedic services was not counterbalanced by an increase in output in other physician services markets:  the overall output of TDC physicians decreased by 103,858 wRVUs (23.9%).  The output of WSO physicians, all of whom supply orthopedic physician services, also decreased by 2,598 wRVUs (4.5%).   Exhibit 1 shows that consumers received fewer medical services from TDC and WSO physicians after their agreements with FMG.[5]  In antitrust analysis, this is the hallmark of a reduction in competition.

Exhibit 1:  Output of TDC and WSO Physicians, 2015 and 2017 (in wRVUs)

|  | 2015 | 2017 | 2015-2017 change | 2015-2017 % change |
|---|---|---|---|---|
| TDC |  |  |  |  |
| Adult PCP* | 113,558 | 69,090 | (44,468) | (39.2%) |
| Orthopedics | 28,397 | 22,868 | (5,529) | (19.5%) |
| All specialties | 434,034 | 330,176 | (103,858) | (23.9%) |
| WSO |  |  |  |  |
| Orthopedics | 57,172 | 54,574 | (2,598) | (4.5%) |

Source:  Dr. Wu report; Henzke Backup Materials: Source_TDC Multiple Benchmark Model - National_467020, "Benchmark Assessment" and Source_WSO Multiple Benchmark Model - National_467022, "Benchmark Assessment"

*  includes family medicine, internal medicine, general practice, geriatrics - Dr. Wu report, ¶116.

---

increased, even if no patient received any more services.  In this case, analysis of the total allowed amount would indicate that price increases made patients better off, simply because they had to pay more per wRVU.

[5] The decrease in the volume of medical services supplied to commercially-insured patients is even larger.  This is because a) the volume of services supplied to commercially-insured patients is the product of the volume of services supplied to all patients and the share of services supplied to commercially-insured patients and b) according to Mr. Kennedy, the share of services supplied to commercially-insured patients decreased from 2015 to 2017.  Mr. Kennedy report, Charts 5-6.

11.     It is possible that some part of the decrease in output that occurred contemporaneously with the TDC Affiliation and WSO Transaction was due to determinants of physician labor supply other than reduced competition.  To address this potential concern, I also examined whether output per full-time-equivalent (FTE) physician changed from 2015 to 2017.  As a measure of the change in competition, output per FTE physician is conservative:  it excludes decreases in output attributable to decreases in the number of FTE physicians.  In particular, it attributes to factors other than competition several voluntary decisions by TDC, FMG, and their physicians that may be due to reduced competition, including decisions to leave practice, to reduce work hours, and not to hire.

12.     Exhibit 2 shows that the output per FTE TDC physician in the markets for Adult PCP and orthopedic services decreased by 67 wRVUs (1.2%) and 712 wRVUs (9.4%), respectively, from 2015 to 2017.  The decrease in output in markets for Adult PCP and orthopedic services was not counterbalanced by an increase in output in other physician services markets:  the overall output per FTE TDC physician decreased by 73 wRVUs (1.0%).  The output per FTE WSO physician, all of whom supply orthopedic physician services, also decreased by 371 wRVUs (4.5%).  Even by this conservative measure, TDC and WSO physicians' output decreased.

Exhibit 2:  Output of TDC and WSO Physicians, 2015 and 2017 (in wRVUs per FTE)

|  | 2015 | 2017 | 2015-2017 change | 2015-2017 % change |
|---|---|---|---|---|
| TDC |  |  |  |  |
| Adult PCP* | 5,594 | 5,527 | (67) | (1.2%) |
| Orthopedics | 7,572 | 6,860 | (712) | (9.4%) |
| All specialties | 7,041 | 6,968 | (73) | (1.0%) |
| WSO |  |  |  |  |
| Orthopedics | 8,167 | 7,796 | (371) | (4.5%) |

Source:  Dr. Wu report; Henzke Backup Materials: Source_TDC Multiple Benchmark Model - National_467020, "Benchmark Assessment" and Source_WSO Multiple Benchmark Model - National_467022, "Benchmark Assessment"

*  includes family medicine, internal medicine, general practice, geriatrics - Dr. Wu report, ¶116.

Highly Confidential — Subject to Protective Order                    8

## 2.      Prices Went Up

13.      Exhibit 3 shows the price per wRVU paid by commercial insurers, as reported by Dr. Wu, for TDC and WSO physicians in 2015 and 2017.[6]   Exhibit 3 shows that the price per wRVU of TDC physicians in the markets for Adult PCP and orthopedic services increased by ▆ (27.2%) and ▆ (21.4%), respectively, from 2015 to 2017.  The price per wRVU of WSO physicians, all of whom supply orthopedic physician services, increased by ▆ (30.8%).  Consumers paid higher prices for the fewer medical services they received from TDC and WSO physicians after their agreements with FMG.

Exhibit 3: Price per wRVU of TDC and WSO Physicians, 2015 and 2017



| | 2015 | 2017 | 2015-2017 change | 2015-2017 % change |
|---|---|---|---|---|
| TDC | | | | |
| Adult PCP* | | | | |
| Orthopedics | | | | |
| WSO | | | | |
| Orthopedics | | | | |

Source:  Dr. Wu report
\*  includes family medicine, internal medicine, general practice, geriatrics - Dr. Wu report, ¶116.

## 3.      The Increase In Prices Was Not Counterbalanced By Cost Savings

14.      Both Dr. Wu[7] and Mr. Kennedy[8] opined that the TDC Affiliation and the WSO Transaction reduced costs, although only Mr. Kennedy sought to quantify the magnitude of the cost reductions, and he only sought to quantify the magnitude of the cost reductions from the TDC Affiliation.  Mr. Kennedy opined that the TDC Affiliation created cost reductions that the parties could not independently obtain in the amount of $150,000 in one-time savings, plus $2.7 million in recurring annual savings.

---

[6] Dr. Wu report, Exh 14A-14C.

[7] Dr. Wu report ¶ 109, ¶ 110, ¶¶ 172-175.

[8] Mr. Kennedy report, ¶¶ 103-106.

Highly Confidential — Subject to Protective Order                    9

15.     Even if Mr. Kennedy's estimate of cost savings is correct – which, as I explain in ¶ 56 and ¶ 57, it is not – it is too small to counterbalance the increase in prices documented by Dr. Wu.  According to Mr. Kennedy's (incorrect) estimate, the TDC Affiliation created cost savings of $8.63 per wRVU (= $2,850,000 / 330,176 wRVUs from Exhibit 1),[9] ███████████████████ ████████████████████████████████████████████████████████.  Thus, even if the TDC Affiliation actually resulted in $2.85 million in cost savings in 2017 (which it did not),  the TDC Affiliation did not create gains that exceeded the extra amount consumers paid – according to Defendants' own estimates.

### B.     Dr. Wu's Attempts To Explain Away the Bottom Line Are Not Successful

16.     The fact that consumers got less and paid more after the TDC Affiliation and the WSO Transaction is substantial empirical evidence that both the TDC Affiliation and the WSO Transaction harmed competition.  Dr. Wu attempted to explain how these basic facts are consistent with an absence of anticompetitive effects.  Below, I explain why Dr. Wu's attempts are not successful.

### 1.     Dr. Wu's Opinion That The "Contract Conversion" Effect on Prices Is Not Anticompetitive Is Incorrect

17.      As I show in Exhibit 3, Dr. Wu opined that the prices paid by commercial insurers to TDC and WSO increased from 2015 to 2017.  Dr. Wu decomposed this increase in prices into two components:  a "Contract Conversion" component and a "System Bargaining" component.  Dr. Wu offers no reference to, and I am not aware of, the use of this decomposition anywhere in previous research.  I understand Dr. Wu's Contract Conversion component to be the difference between the average reimbursement rates for physicians employed by a health system and the average reimbursement rates for independent physicians.[10]

---

[9] Mr. Kennedy report, ¶ 18.

[10] Dr. Wu report, ¶ 156.

18.     Dr. Wu estimates a positive Contract Conversion effect on prices for orthopedic and adult primary care physician services in Western Washington, including for the TDC Affiliation and the WSO Transaction.[11]  In his words, "both exhibits show that independent physicians receive lower reimbursement rates compared to the rates paid to physicians who are part of a healthcare system."[12]

19.     Dr. Wu opines that the Contract Conversion effect on prices "should not be viewed as an exercise of market power, nor is it likely to be a *significant and sustained* price increase [italics in original], because it is merely a move from WSO's and TDC's pre-transaction contracted reimbursement rates to Franciscan's pre-transaction contracted reimbursement rates."[13]  As I explain below, his opinion is incorrect.  According to empirical economic research, a positive Contract Conversion effect (as he defines it) is evidence of the exercise of market power, and such effects are in practice significant and sustained.

20.     As I explain in ¶ 77 of my original report, empirical economic research shows that, in practice, the market power of physician groups (like FMG) that are owned by health systems (like CHI Franciscan) arises in part from the market power of their health systems' hospitals.  As a recent review of this research observes, hospital ownership of physician practices enhances hospitals' bargaining power by giving them extra control over referrals.[14]  The extra profits that hospitals can earn from owning physician practices, in turn, give health systems the incentives to share these profits with physicians by exerting their hospitals' market power on their physicians' behalf.  A positive Contract Conversion effect – the difference between the average

---

[11] Dr. Wu report, Exhibits 15A-B.

[12] Dr. Wu report, ¶ 156.

[13] Dr. Wu report, heading to § VI.C.2; ¶ 155.  Although this heading is in a Section that is titled as applying to the TDC Affiliation, Dr. Wu discusses price changes for both TDC and WSO physicians in the paragraphs that follow, including ¶ 155.

[14] Greaney TL, Ross D, Navigating Through the Fog of Vertical Merger Law:  A Guide to Counselling Hospital-Physician Consolidation Under the Clayton Act, Washington Law Review 2016;91:199-251, 215.

reimbursement rates for physicians employed by a health system and the average reimbursement rates for independent physicians – is precisely the mechanism through which this sharing of anticompetitive profits occurs.

21.     The fact that TDC or WSO received a higher price as a result of a contract that FMG had negotiated before the TDC Affiliation or the WSO transaction, rather than as a result of a new rate negotiation, does not imply that the higher price was not due to market power.  In particular, if Harrison's market power enabled FMG to negotiate a higher price for its physicians and the contract term that allowed FMG to extend that higher price to acquired physician groups, then the higher prices that TDC and WSO received as a result of the TDC Affiliation and WSO Transaction could have also been due to market power.

22.     Empirical economic research shows that Dr. Wu's Contract Conversion effect may be due to market power for another reason:  differences in the shares of the market for *physician* services between physicians employed by a health system and independent physicians.  If physicians employed by a health system have larger market shares, on average, than independent physicians, then the average reimbursement rates for physicians employed by a health system could be greater than the average reimbursement rates for independent physicians due to *physician* market power, independent of the health systems' hospitals' market power.[15]

23.     Recent cases – including this one – show this is not just a theoretical possibility.  Like the St. Luke's case,[16] the TDC Affiliation and the WSO Transaction had horizontal as well as vertical effects.  Any purchase of a physician practice by a health system will increase shares and concentration in markets for physician services, as long as the health system employed physicians (before the purchase occurred) in the same markets as the purchased practices.

---

[15] See, for example, the studies discussed in ¶ 52 of my original report.

[16] Greaney TL, Ross D, Navigating Through the Fog of Vertical Merger Law:  A Guide to Counselling Hospital-Physician Consolidation Under the Clayton Act, Washington Law Review 2016;91:199-251.

24.     In addition, empirical economic research shows that the higher prices obtained by physician practices that are hospital-owned are significant and sustained.  In one study conducted over a six-year period, integration of a physician group with a hospital is associated with an approximately 10 percent increase in the price of primary care physician services.[17]  In another study, acquisition of a multispecialty group (like TDC) by a health system (like CHI Franciscan) that already owned a medical group (like FMG) is associated four years after the acquisition with substantial increases in prices at both the acquired and acquiring groups.[18]

25.     Dr. Wu presents both quantitative and qualitative evidence that the findings from the empirical economic research explained above apply directly to this case.  Although he interprets this as evidence that the TDC Affiliation and the WSO Transaction are not anticompetitive, his analysis actually shows just the opposite.

26.     First, as discussed above, Dr. Wu estimates a positive Contract Conversion effect on prices for orthopedic and adult primary care physician services in Western Washington.  In doing so, he shows that the findings from research based on national data and data from other geographic areas are replicated in Western Washington.

27.     Second, Dr. Wu acknowledges that the market power of CHI Franciscan's hospitals is a concern of health plans that serve the Kitsap Peninsula.[19]  He attempts to explain this concern away with his opinion that "the importance of hospitals like HMC [Harrison Medical Center,

---

[17] Capps C, Dranove D, Ody C, The Effect of Hospital Acquisitions of Physician Practices on Prices and Spending, Journal of Health Economics 2018;59:139-52, Fig. 3A, prices measured relative to actual Medicare price in order to isolate the competitive effects of integration from the site-of-service effects (p. 142).

[18] Carlin CS, Feldman R, Dowd B, The impact of provider consolidation on physician prices, Health Economics 2017;26:1789-1806.  The effects reported in this paper are a combination of the vertical and horizontal effects of the acquisition.

[19] Dr. Wu report, ¶ 145.

Highly Confidential — Subject to Protective Order                              13

owned by CHI Franciscan] is unaffected by the either the WSO acquisition or the TDC transaction" and therefore immaterial to the incentives that CHI Franciscan has to exert its hospitals' bargaining power on behalf of TDC and WSO.[20]  But for the reasons discussed above, this opinion is incorrect.  Empirical economic research shows that importance of hospitals (like HMC) to health plans is, in general, affected by the hospitals' acquisition of physician groups. His discussion of health plans' concerns about CHI Franciscan's hospitals' market power only emphasizes further that the TDC Affiliation and WSO Transaction are textbook examples of agreements that empirical economic research has found to be anticompetitive.

> **2.      Dr. Wu's Opinion That There Is No "System Bargaining" Effect on Prices Does Not Rebut Evidence That the TDC Affiliation and WSO Transaction Were Anticompetitive**

28.      According to Dr. Wu, the System Bargaining component is the second component of the price increase due to the TDC Affiliation and WSO Transaction.  I understand his System Bargaining component to be the difference between the reimbursement rates for FMG and the average reimbursement rates for physicians employed by a health system other than FMG.[21]  Dr. Wu opines that "the potential anticompetitive effect of the transactions, if any, would appear in the system negotiation [System Bargaining] component."[22]  Because he estimates a null System Bargaining effect of the TDC Affiliation and WSO Transaction on prices for orthopedic and adult primary care physician services, he opines that the TDC Affiliation and WSO were not anticompetitive.  His opinion is incorrect.  Whether or not his estimates of null System Bargaining effects are correct, his estimates of null System Bargaining effects do not rebut evidence that the TDC Affiliation and WSO Transaction were anticompetitive.

29.      As I explain above and in my original report, empirical economic research shows that physician groups (like FMG) that are owned by health systems (like CHI Franciscan) have

---

[20] Dr. Wu report, ¶ 145.

[21] Dr. Wu report, ¶¶ 167-170.

[22] Dr. Wu report, ¶ 151.

Highly Confidential — Subject to Protective Order                    14

market power that is derived, at least in part, from the market power of their systems' hospitals. Dr. Wu's opinion that FMG and CHI Franciscan do not have *more* market power than other health systems (by virtue of the similarity between the reimbursement rates for FMG and the average reimbursement rates for physicians employed by a health system other than FMG) does not mean that FMG and CHI Franciscan do not have market power.  If other health systems have market power, then the fact that the prices charged by TDC and WSO after the TDC Affiliation and the WSO Transaction are not higher than the prices charged by other health systems is not evidence that the TDC Affiliation and WSO Transaction had no anticompetitive effects.

### III.    Mr. Kennedy's Report

30.    Mr. Kennedy offered three sets of opinions in his report.[23]  First, he opined that the TDC Affiliation creates a highly-integrated relationship between TDC and CHI Franciscan.[24]  Second, he opined that the TDC Affiliation creates efficiencies that TDC and CHI Franciscan could not independently obtain, including improved access to care for government-insured patients, cost savings, and quality improvements.  Third, he opined that the WSO Transaction creates efficiencies that WSO and CHI Franciscan could not independently obtain through the same channels as the TDC Affiliation.  All three sets of Mr. Kennedy's opinions are incorrect.  In addition, Mr. Kennedy's opinions about the extent of integration between TDC and CHI Franciscan, and improved access to care for government-insured patients created by the TDC Affiliation and the WSO Transaction, are not relevant to this case.  I understand that Professor Burns will also respond to Mr. Kennedy's opinions.

---

[23] Mr. Kennedy report, ¶¶ 17-19.

[24] In his report, Mr. Kennedy refers to the TDC Affiliation as a relationship between TDC and CHI Franciscan. Strictly speaking, Mr. Kennedy is incorrect.  As I explain in my original report, the TDC Affiliation consists of four agreements between TDC and FMG (not TDC and CHI Franciscan):  a Professional Services Agreement, a Management Services Agreement, an Asset Purchase Agreement, and an Asset Lease Agreement.  When referring to Mr. Kennedy's report, I describe the TDC Affiliation as he did, in order to identify Mr. Kennedy's other errors as plainly as possible.

Highly Confidential — Subject to Protective Order                    15

### A.    Mr. Kennedy Fails To Consider The Possibility That Integration May Have Anticompetitive Effects (§ IV)

31.    I agree with Mr. Kennedy that there are many types of relationships between physicians and health systems, and that these relationships have the potential to generate efficiencies, and on net, be procompetitive.   However, based on my training, research, and professional experience, I also understand that integration between physicians and health systems has the potential to generate anticompetitive harms that, in some cases, will outweigh any procompetitive benefits. Nowhere in his report does Mr. Kennedy consider this possibility.

32.    Mr. Kennedy's failure to consider the possibility of anticompetitive effects leads him to overstate the net social benefits of integration between physicians and health systems.  For example, in § 4.C. of his report, Mr. Kennedy purports to provide "background around the merits" of what he describes as "PSA Arrangements" such as the TDC Affiliation.  According to his analysis, one of the merits of PSA Arrangements is the fact that "as one party succeeds, so does the other."[25]  Although this may be a merit of PSA Arrangements from the perspective of the parties, it is not necessarily a merit from the perspective of society overall.  In particular, parties to a PSA Arrangement can succeed jointly by combining their market power, raising prices, and exploiting consumers.  Indeed, as Mr. Kennedy observes, parties to PSA Arrangements do not function as full competitors.  It is exactly this reduction in price competition, as compared to what would have occurred in the absence of a PSA Arrangement, that raises concern among economists.  As I discuss in detail below, Mr. Kennedy's failure to consider the possibility of anticompetitive effects directly limits the relevance and applicability of his "Integration Analysis" to this case.

---

[25] Mr. Kennedy report, ¶ 39.

**B.      Mr. Kennedy's Integration Analysis Is Inaccurate and Irrelevant For Antitrust Analysis (§ V)**

**1.      Mr. Kennedy's Integration Analysis Does Not Provide a Basis for Evaluating the Competitive Effects of the TDC Affiliation**

33.     Mr. Kennedy's Integration Analysis divides integration between TDC and CHI Franciscan into four types:  financial, operational, clinical, and governance.[26]  His Integration Analysis differs from mine in two ways.  First, he separates what I describe as "Operational" integration into operational, clinical, and governance integration.  Second, he declines to separate what I describe as "Strategic" integration from what I describe as "Financial" or "Operational" integration (in his terms, financial, operational, clinical, and governance integration).[27]

34.     Following the economic literature, I define Strategic integration to include combinations of the bargaining or market power of the parties in their relationships with their customers, competitors, employees, or suppliers.[28] As I explain in my original report, the literature and I distinguish Strategic integration from Financial and Operational integration because of characteristic differences in the competitive effects of Strategic as compared to Financial and Operational integration.   Strategic integration can result in anticompetitive harms, whereas Financial and Operational integration can result in procompetitive benefits.

35.     By failing to separate Strategic integration from Financial and Operational integration, Mr. Kennedy's Integration Analysis conflates the anticompetitive with the procompetitive aspects of the TDC Affiliation (to the extent there are procompetitive aspects of the TDC Affiliation, which in my opinion there are not).  In particular, Mr. Kennedy classifies a) the TDC

---

[26] Mr. Kennedy report, ¶ 47.

[27] In what follows, I use the capitalized terms Strategic, Financial, and Operational to refer to the definitions of these forms of integration in my original report, not Mr. Kennedy's definitions.

[28] Post B, Buchmueller T, Ryan AM, Vertical Integration of Hospitals and Physicians:  Economic Theory and Empirical Evidence on Spending and Quality, Medical Care Research and Review 2018;75(4):399-433, 403.

Highly Confidential — Subject to Protective Order                                17

Affiliation's ban on TDC's contracting with health plans separately from FMG and b) the TDC Affiliation's ban on TDC physicians' provision of clinical services to FMG's competitors as aspects of financial, operational, and clinical integration (in his terms).[29]  In contrast, I would classify the bans as aspects of Strategic integration.  Either ban could be on net procompetitive, if it were reasonably necessary to achieve separately-identifiable aspects of Financial or Operational integration.  But even if this were the case (which in my opinion it is not), either ban would never be itself procompetitive.  The bans are therefore characteristically different from (potentially procompetitive) Financial or Operational integration.

36.     Because Mr. Kennedy's Integration Analysis conflates the anticompetitive with the procompetitive aspects of the TDC Affiliation, his Analysis does not provide a basis for evaluating the TDC Affiliation's competitive effects.  To do so would require balancing the anticompetitive harm from the TDC Affiliation's Strategic integration with the procompetitive benefit from its Financial and Operational integration (to the extent there is any, which in my opinion there is not).  By construction, however, his Integration Analysis cannot accomplish this goal.  By lumping together Strategic with Financial and Operational integration, his Integration Analysis only identifies whether TDC and CHI Franciscan are integrated in *any* way, not whether they are integrated in a way that enhances competition.  For this reason, Mr. Kennedy's opinion that TDC and CHI Franciscan are "integrated" does not rebut my conclusion that the TDC Affiliation is highly likely to cause anticompetitive harm and highly unlikely to create competitive benefit.

        **2.**      **From an Economic Perspective, Mr. Kennedy's Integration Analysis Does Not Provide a Basis for Deciding Which Procedural Rules Should Apply to the TDC Affiliation**

37.     As I explain in my original report, legal scholars have recognized that economic analysis can be a valuable input to the process of deciding which procedural rules in antitrust should

---

[29] Mr. Kennedy report, ¶¶ 49, 68, 80.

Highly Confidential — Subject to Protective Order

apply to different types of agreements.[30]  Economic analysis highlights the tradeoffs of different rules, in terms of deterring anticompetitive behavior, encouraging procompetitive behavior, and minimizing the costs of operating the legal system.  To accomplish this goal, economic analysis begins by classifying agreements based on their likely competitive effects.  However, as I explain above, because Mr. Kennedy's Integration Analysis does not provide a basis for evaluating the competitive effects of the TDC Affiliation, his Integration Analysis does not provide an economic basis for deciding which procedural rules should apply to the TDC Affiliation.

38.     In particular, because Mr. Kennedy's Integration Analysis does not distinguish anticompetitive (Strategic) from procompetitive (Financial or Operational) integration, his Integration Analysis does not provide an economic rationale for the single entity defense.  His opinion that TDC and CHI Franciscan are "integrated" relies, in part, on the fact that the TDC Affiliation bans independent price negotiation with health plans of TDC and FMG.  But if agreements not to negotiate prices independently were an economic rationale for the single entity defense, then every price-fixing agreement would be eligible for the single entity defense, which makes no economic sense.

39.     For the same reason, Mr. Kennedy's Integration Analysis does not provide an economic rationale for a full rule-of-reason analysis (as opposed to per se or quick-look rule of reason analysis).  If agreements not to negotiate prices independently were an economic rationale for a full rule-of-reason analysis, then every price-fixing agreement would be eligible for full rule-of-reason analysis, which makes no economic sense.

---

[30] Professor Kessler report, ¶ 38.

Highly Confidential — Subject to Protective Order                                              19

### 3. Mr. Kennedy's Analysis Overstates the Extent of Procompetitive Integration Documented in the Record

40.    Because Mr. Kennedy's Integration Analysis does not distinguish Strategic from Financial and Operational integration, it lumps together procompetitive and anticompetitive aspects of integration.  Thus his concept of "integration" overstates both the extent of Financial and Operational integration of FMG with TDC and the procompetitive potential of the TDC Affiliation.

41.    Mr. Kennedy's Integration Analysis also overstates the extent of procompetitive integration documented in the record in at least two other ways:

> a. It overstates the extent of Financial and Operational integration with FMG of TDC's provision of support services, such as patient scheduling, office management, and billing; and
>
> b. It overstates the extent of Financial and Operational integration with FMG of TDC's hiring and firing of its physicians.

42.    Mr. Kennedy inaccurately characterizes several aspects of the TDC Affiliation as evidence of integration with CHI Franciscan of TDC's provision of support services, in particular:

> a. He claims that CHI Franciscan provides of all the funding for support staff and the management team.[31]  However, as I explain in my original report, although FMG provides the *cash flow* necessary to operate the TDC clinics, TDC is obligated to pay for any cost overruns that exceed the budget.[32] ██████████ ███████████████████████████████████████████████████████.[33]

---

[31] Mr. Kennedy report, ¶ 53.

[32] Professor Kessler report, ¶ 11.

[33] Chandler deposition 6/27/17, 64:7-8; Chandler deposition 9/6/18, 149:9-14.

Highly Confidential — Subject to Protective Order



    b.  He claims CHI Franciscan pays TDC ███████████████ ████████,
████████████████████████████████████████.[34]  However, as I
explain in my original report, ████████████████████████████
█████████████████████████,[35] ████████████████████████████
████████████. Thus the apportionment of cost underruns does not align
materially the interests of FMG (or CHI Franciscan) and TDC.

    c.  He claims CHI Franciscan and TDC share downside risk for TDC's ability to
meet its budget.[36] █████████████████████████████████████████
█████████████████████████.

43.     Mr. Kennedy also inaccurately characterizes the extent of CHI Franciscan's authority
over TDC's hiring and firing of physicians, other clinical staff, and support staff.  He claims that
CHI Franciscan maintains ultimate authority over hiring.[37]  Even if CHI Franciscan has authority
over the number or type of physicians or staff that TDC can hire (through FMG's development
of a budget), CHI Franciscan does not have authority over the hiring or firing of any particular
physician or staff member.[38]  As I explain in my original report, this distinction is important.[39]
When workers (rather than non-human assets) are a key source of value (as in a physician
group), a crucial determinant of the extent of integration is whether the parties share the right to
exclude a particular worker without forgoing all of the surplus from the relationship.  Without
this right, one party can only fire the other in its entirety – all of the other's workers together, and

---

[34] Mr. Kennedy report, ¶ 53, ¶ 65.

[35] Professor Kessler report ¶ 35.  According to Exh C to the MSA, "████████████████████████
██████████████████████████████████████████████████████████████████████████
████████████.

[36] Mr. Kennedy report, ¶ 65.

[37] Mr. Kennedy report, ¶ 81.

[38] Professor Kessler report, ¶ 43.

[39] Professor Kessler report, ¶ 42.

its non-human assets.  This limits the extent to which the joint relationship will unify the parties' objectives in a way that enhances competition.  In particular:

    a.   Dr. Moeller testified that the decision of whether to hire an individual for a specific position is solely up to TDC.[40]

    b.   Dr. Moeller testified that neither CHI Franciscan nor FMG was involved in any instance in which TDC took disciplinary action against one of its physicians.[41]

    c.   Dr. Hoisington testified that FMG has no involvement with physician discipline at TDC, including firing.[42]

    d.   Mr. Chandler testified that the decision to hire a particular physician is solely up to TDC.[43]

    e.   Mr. Chandler testified that neither CHI Franciscan nor FMG has any input as to whether a TDC physician has failed to meet the standard of care.[44]

    f.   Mr. Chandler testified that neither CHI Franciscan nor FMG has any input into the hiring and firing of TDC's non-physician clinical staff.[45]

### 4.    Mr. Kennedy's Analysis Mischaracterizes the Dignity and IHC Arrangements As Similar to the TDC Affiliation

44.    Mr. Kennedy opined that the TDC Affiliation is "not materially different than other PSAs…[that] create tight integration between a health system and a physician group."[46]  To support his opinion, he compares the TDC Affiliation to two other arrangements – one between Dignity Health and Integrated Medical Services (the "Dignity Arrangement") and one between

---

[40] Moeller deposition 8/15/18, 56:20-23.  Dr. Moeller was the president of TDC from 2011-2017.

[41] Moeller deposition 8/15/18, 17:10-24.

[42] Hoisington deposition 8/14/18, 65:18-66:14.  Dr. Hoisington was the medical director of TDC from 2000-2017.

[43] Chandler deposition 6/27/17, 97:7-9. Mr. Chandler is the chief financial officer of TDC.

[44] Chandler deposition 6/27/17, 12:22-25, 102:20-103:3.

[45] Chandler deposition 6/27/17, 12:22-25, 103:16-19; Chandler deposition 9/6/18, 31:17-32:4.

[46] Mr. Kennedy report, ¶ 90.

IHC Health and the Central Utah Clinic (CUC and the "IHC Arrangement").[47]  He concludes that the TDC Affiliation is similar to these Arrangements.   However, Mr. Kennedy fails to acknowledge several important differences between the TDC Affiliation and these Arrangements.

45.     First, Mr. Kennedy's analysis mischaracterizes the Dignity Arrangement as similar to the TDC Affiliation.  Mr. Kennedy fails to acknowledge several aspects of the Dignity Arrangement that Financially and Operationally integrate Dignity with Integrated Medical Services far more than the TDC Affiliation integrates FMG with TDC:

   a.   The Dignity Arrangement assigns to Dignity ultimate authority and control over clinic operations;[48] there is no such statement in the TDC Affiliation, which assigns to TDC the responsibility for all services that are necessary and appropriate for the operations of the clinics,[49] including the responsibility to operate within the budget.[50]

   b.   The Dignity Arrangement creates a Joint Operating Committee;[51] the TDC Affiliation creates no such committee.

   c.   The Dignity Arrangement assigns to Dignity the right to approve specific individual hires at the physician group;[52] as discussed ¶ 43 above and in my original report, the TDC Affiliation does not assign any such right to CHI Franciscan or FMG.

---

[47] Mr. Kennedy describes the Dignity and IHC Arrangements as "PSAs" in § 5.E of his report even though both Arrangements include a Professional Services Agreement and a Management Services Agreement.

[48] TDC 416414, § 2.3(b)(ii); TDC 416449, Ex. 4.1 § 4.

[49] TDC000158, § 1.1.

[50] TDC000166, § 5.2(b)

[51] TDC416421, § 4.1.

[52] TDC416413, § 2.2(c)(ii).

Highly Confidential — Subject to Protective Order                    23

46.     Second, Mr. Kennedy's analysis mischaracterizes the IHC Arrangement as similar to the TDC Affiliation.  As I understand his analysis, there is no way that it could support his opinion that the IHC Arrangement was similar to the TDC Affiliation.

47.     I understand from Counsel that Mr. Kennedy did not rely on the Management Services Agreement component of the IHC Arrangement in his analysis.  The document that Mr. Kennedy produced describing the IHC Arrangement refers to a Management Services Agreement,[53] which appears to apportion responsibilities for various administrative and management functions between the parties.[54]  If Mr. Kennedy failed to consider the IHC Management Services Agreement component, it would not have been possible for him to have compared the IHC Arrangement to the TDC Affiliation along at least three of the dimensions listed in his Chart 3, including who employs clinic staff and managers, the extent of system control over the operational budget, and the extent of shared strategic planning.[55]  To do so would have required knowledge about the apportionment of responsibility for administrative and management functions between IHC and CUC, which I understand Mr. Kennedy did not have.  Thus the most Mr. Kennedy's analysis could support would have been an opinion about the similarity of the part of the IHC Arrangement that he considered, rather than the IHC Arrangement as a whole.

48.     Mr. Kennedy's failure to consider the Management Services Agreement component of the IHC Arrangement is also inconsistent with his description of his own work.  In ¶ 6 of his report, he defined the term PSA "for the purpose of this analysis" as including both the Professional Services and the Management Service Agreement components of arrangements between health systems and physician groups.  According to his definition, his opinion that the TDC Affiliation was "not materially different than other PSAs" would therefore require him to

---

[53] TDC 416358 – 416407 is the document produced.  It refers to a Management Services Agreement at 416360, 416364, 416370, 416371, 416394, 416395, 416396, 416397, and 416398.

[54] TDC416394.

[55] Mr. Kennedy report, ¶ 89.

Highly Confidential — Subject to Protective Order                    24

opine both that the Professional Services Agreement component of the IHC Arrangement was similar to the Professional Services Agreement component of the TDC Affiliation and that the Management Services Agreement component of the IHC Arrangement was similar to the Management Service Agreement component of the TDC Affiliation.

49.     In any event, whether or not Mr. Kennedy considered the Management Services Agreement component of the IHC Arrangement in his analysis, he did not produce it, so I am unable to evaluate fully the validity of his comparison of the IHC Arrangement to the TDC Affiliation.  Nonetheless, based on the documents Mr. Kennedy did produce, I was able to determine that he failed to acknowledge several aspects of the IHC Arrangement that Financially and Operationally integrate IHC with CUC far more than the TDC Affiliation integrates FMG with TDC:

      a.  The IHC Arrangement creates a Joint Operating Counsel[56] that, among other things, oversees the staffing and management of the clinics, including the recruitment and retention of CUC providers[57] and the right to terminate[58] CUC providers' participation in the Arrangement; the TDC Affiliation creates no such Counsel.

      b.  The IHC Arrangement assigns to the Joint Operating Counsel the right to terminate CUC providers' participation in the Arrangement;[59] as discussed ¶ 43 above and in my original report, the TDC Affiliation assigns such rights exclusively to TDC.

      c.  The IHC Arrangement establishes a Value Recognition Program (with a Value Recognition Program Payment to CUC equal to up to 11% of the compensation

---

[56] TDC416362, § 1.16.

[57] TDC416395, Exh. C, § 1.4(a).

[58] TDC416368, § 3.8.

[59] TDC416368-9, § 3.8.

Highly Confidential — Subject to Protective Order

paid under the Arrangement) in order to Financially integrate IHC with CUC;[60] the TDC Affiliation creates no such Program.

### C.   Mr. Kennedy's Efficiencies Analysis Is Inaccurate and Irrelevant For Antitrust Analysis (§ VI)

50.    Mr. Kennedy devotes most of his efficiencies analysis to what he describes as increased access to care for government-insured patients.[61]  He defines increased access to care for government-insured patients as an increase in the share of wRVUs, total (gross) charges, or visits supplied to government-insured patients.  Whether or not his calculations are correct, they do not represent an increase in efficiency and are not relevant to this case:[62]

a.   Even though increasing the share of services supplied to government-insured patients may be a valid social goal, it is not an increase in efficiency, as that term is used in economic analysis.  Increases in the *share* of services supplied to government-insured patients does not necessarily represent an increase in the *volume* of services supplied to government-insured patients, and an increase in the *volume* of services supplied to government-insured patients is necessary for an efficiency increase.

b.   Even if increases in the share of services supplied to government-insured patients did represent an increase in the volume of services supplied to government-

---

[60] TDC416363, § 1.19.

[61] Mr. Kennedy report, ¶¶ 92-102.

[62] Dr. Wu also opines that increased access to care for government-insured patients (¶ 110, ¶ 172) is a "cost savings and improvement in the delivery of care."  The evidence cited by Dr. Wu does not support his opinion.  Unlike Mr. Kennedy, Dr. Wu provides no quantitative evidence whatsoever to support his opinion.  In ¶ 110, Dr. Wu cites to a deposition by Dr. Brown (a WSO physician) to support Dr. Wu's opinion that the WSO acquisition has expanded output, in particular "more care to the underserved population."  Dr. Brown's testimony does not support Dr. Wu's opinion.  Dr. Brown testified that "almost certainly our – our *percentage* of Medicaid or uninsured patient population has increased" (italics added, 120:3-5), but provided no evidence about the *volume* of Medicaid or uninsured patients.  As I explain below, even though increasing the share of services supplied to government-insured patients may be a valid social goal, it is not an increase in output (or an increase efficiency, as that term is used in economic analysis).  In ¶ 172, Dr. Wu cites to a deposition by Mr. Chandler (September 6, 2018) in which Mr. Chandler testified that "the *percentage* of Medicaid, and obviously Tricare [i]s significantly different" (italics added, 213:8-10).  For the same reason as above, this is also not an increase in output or efficiency.

Highly Confidential — Subject to Protective Order

insured patients in this case, it would have occurred in a market other than the market in which competition allegedly had been harmed – the market for services supplied to commercially-insured patients.  From an economic perspective, antitrust analysis generally rejects claims of offsetting efficiency benefits in second markets.

1.      **Although It May Be a Valid Social Goal, Increasing the Share of Services to Government-Insured Patients Is Not An Increase In Efficiency**

51.     Economists describe a market as "efficient" if there is no way to make one consumer in the market better off without making another worse off.[63]  According to this standard, economists define one market as more efficient than another if at least one consumer is better off and no participants are worse off.[64]

52.     Even though increasing the share of services supplied to government-insured patients may be a valid social goal, it is not an increase in efficiency as that term is used in economic analysis.  If an increase in the *share* of services supplied to government-insured patients reflected a reallocation of the same (or a smaller) overall *volume* of services from commercially- to government-insured patients, then it would make commercially-insured patients worse off, and fail to qualify as an increase in efficiency.[65]  An increase in the share of services supplied to government-insured patients could even be consistent with a decrease in the volume of services supplied to government-insured patients.  In this case, an increase in the share of services

---

[63] Layard PRG, Walters AA, Microeconomic Theory, 2015, McGraw Hill, 7.

[64] Viscusi WK, Harrington JE, Vernon JM, Economics of Regulation and Antitrust, 4th ed.2005, MIT Press, 80.

[65] Economic analysis sometimes uses the "Kaldor criterion" to rank alternative resource allocations in terms of their *potential* efficiency improvements.  Under the Kaldor criterion, an alternative allocation is more potentially efficient than an original allocation if those who gain from the alternative would remain better off, even if they had to compensate those who lost.  But with a constant or shrinking overall volume of services, increasing the share to government-insured patients would not enable them to compensate commercially-insured patients, and still remain better off.  See Layard PRG, Walters AA, Microeconomic Theory, 2015, McGraw Hill, 32.

Highly Confidential — Subject to Protective Order

supplied to government-insured patients would not even make government-insured patients better off.

53.      Exhibits 4 and 5 show the output (in terms of wRVUs) and payor mix in 2015 and 2017 of TDC and WSO physicians, respectively, based on data from Mr. Henzke and Mr. Kennedy.[66] Assuming that Mr. Kennedy's payor-mix calculations are correct, the data show that government-insured patients got a bigger piece, but of a *smaller* pie.  In fact, the size of the TDC pie decreased so much that the volume of services from TDC to government-insured patients actually *decreased* despite the increase in their share.  But even if the volume of services to government-insured TDC patients (by some measure) or government-insured WSO patients did increase, that would have come at the expense of commercially-insured patients – who got a *smaller* piece of a smaller pie.   This is not an increase in efficiency.

Exhibit 4:  TDC Output and Payor Mix



Source:  Kennedy Report: "Chart 5: TDC Payor Mix"; Henzke Backup Materials: Source_TDC Multiple Benchmark Model - National_467020, "Benchmark Assessment"

---

[66] Exhibit 4 shows the output of TDC physicians in all specialties.  Mr. Kennedy did not calculate the payor mix of Adult PCP or orthopedic physicians separately.

Highly Confidential — Subject to Protective Order

Exhibit 5:  WSO Output and Payor Mix, 2015 and 2017



Source:  Kennedy Report: "Chart 6: WSO Payor Mix"; Henzke Backup Materials:
Source_WSO Multiple Benchmark Model - National_467022, "Benchmark
Assessment"

Highly Confidential — Subject to Protective Order

> 2. **Even If Increases in the Share of Services Did Represent An Increase In Volume to Government-insured Patients, Antitrust Analysis Would Reject It As An Offsetting Benefit In a Second Market**

54.     As a general proposition, antitrust analysis generally rejects claims of benefits in a market other than the market in which competition has been harmed.  According to the Horizontal Merger Guidelines, for example, "the Agencies normally assess competition in each relevant market affected by a merger independently and normally will challenge the merger if it is likely to be anticompetitive in *any* relevant market [italics added]."[67]  From an economic perspective, there are two reasons not to consider such claims:

> a. Denominating gains and losses to different groups of consumers in common terms is administratively impractical;[68] and

> b. Even if gains and losses to different groups could be denominated in common terms, the gains would only represent a *potential* efficiency improvement, unless those who gained actually compensated those who lost.

55.     This general proposition applies in the current case, even if an increase in the share of services to government-insured patients did represent an increase in volume to government-insured patients.  The Horizontal Merger Guidelines acknowledge that the Agencies will sometimes consider efficiencies not strictly in the relevant market, but that such efficiencies are "most likely to make a difference when they are greater and the likely anticompetitive effect in the relevant market(s) is small so the merger is likely to benefit customers overall."[69]  However, for the reasons explained in ¶ 10, this exception does not apply in the current case.  Overall, TDC's and WSO's output of medical services went down.  By this fundamental measure, both the TDC Affiliation and the WSO Transaction harmed customers overall.

---

[67] Horizontal Merger Guidelines, § 10 fn. 14.

[68] Areeda PE, Hovenkamp H, Antitrust Law:  An Analysis of Antitrust Principles and Their Application ¶ 972.

[69] Horizontal Merger Guidelines, § 10 fn. 14.

Highly Confidential — Subject to Protective Order

### 3. Mr. Kennedy's Estimate of Cost Savings Necessarily Overstates True Cost Savings

56.     Mr. Kennedy's estimate of $2.7 million in recurrent cost savings as a result of the TDC Affiliation is incorrect.  Most of his estimated recurrent cost savings comes from the consolidation of laboratory services to Harrison.  Mr. Kennedy estimates the cost savings from the consolidation of laboratory services at $1.9 million, which is the amount that TDC spent on lab-related operating expenses in 2015.[70]

57.     Mr. Kennedy's estimate of $1.9 million in savings from laboratory consolidation, however, implicitly assumes that the laboratory services previously provided by TDC in-house could be provided by Harrison for free.  It is theoretically possible that that Harrison could provide the consolidated laboratory services for less than it cost TDC – although Mr. Kennedy presents no evidence that it actually did, or even could, accomplish this.  It is not possible that Harrison could provide all of these laboratory services without some expenditure of real resources.[71]

### 4. Mr. Kennedy's Assessment of the Quality Effects of the TDC Affiliation and WSO Transaction Are Inconsistent With Empirical Economic Research

58.      Mr. Kennedy opined that the TDC Affiliation creates a highly-integrated relationship between TDC and CHI Franciscan, and that the integration with CHI Franciscan of TDC and WSO will enable the TDC and WSO physicians to improve quality through at least two channels:

      a.   The facilitation of value- or risk-based contracting, which will enhance the incentives of the TDC and WSO physicians to improve quality; and

---

[70] Mr. Kennedy report, ¶ 106.

[71] Testimony from Ms. Bradfield, the division director for CHI Franciscan for laboratory services, confirms that the Harrison laboratory could not have absorbed all of the TDC work without increased staffing.  Deposition of Ms. Bradfield, July 30, 2018, 65:24-66:5.

Highly Confidential — Subject to Protective Order

b.  The sharing of quality measurement tools and other infrastructure, which will enhance the ability of TDC and WSO physicians to improve quality.

59.   Even if the TDC Affiliation did create a highly-integrated relationship between TDC and CHI Franciscan or FMG (which, as both Professor Burns and I explain in our original reports, it did not), empirical economic research shows that integration has not on average improved quality through the channels suggested by Mr. Kennedy:

a.  As I explain in my original report, a study published in the peer-reviewed *Annals of Internal Medicine* shows that hospitals that are vertically integrated with physicians do not have higher quality than similar hospitals that are not vertically integrated;[72]

b.  A study published in the peer-reviewed journal *Health Affairs* concludes that little evidence exists to support claims by providers that they are consolidating primarily to engage in risk contracts and achieve efficiencies;[73]

c.  Another study published in *Health Affairs* concludes that even forms of integration generally thought to be procompetitive do not necessarily translate in practice into care that patients perceive as integrated.[74]

## IV.   Conclusion

60.   In most antitrust litigation, the actual output and price effects of an agreement or merger are not observable, because the litigation precedes the implementation of the agreement or merger.  In this case, however, the TDC Affiliation and WSO Transaction have occurred, and data from TDC and WSO are available for a full year both before (2015) and after (2017) the

---

[72] Scott KW, Orav J, Cutler DM, Jha AK, Changes in Hospital-Physician Affiliations in U.S. Hospitals and Their Effect on Quality of Care, Annals of Internal Medicine 2016 (Web Only).

[73] Neprash HT, Chernew ME, McWilliams JM, Little Evidence Exists to Support the Expectation That Providers Would Consolidate To Enter New Payment Models, Health Affairs 2017;36(2):346-54, 354.

[74] Kerrissey MJ, Clark JR, Friedberg MW, Jiang W, Fryer AK, et al., Medical Group Structural Integration May Not Ensure That Care Is Integrated, From the Patient's Perspective, Health Affairs 2017;36(5):885-91.

TDC Affiliation and WSO Transaction.  This case thus offers an unusual opportunity to estimate the actual effects of these agreements.

61.     Data produced by Defendants' own experts showed the following:

    a.   From 2015 to 2017, the output of TDC and WSO physicians in markets for Adult PCP and orthopedic services (as well as TDC physicians' output in all specialties together) went down.  Output went down both in aggregate and on a per-physician-FTE basis.

    b.   From 2015 to 2017, the prices paid by commercial insurers to TDC and WSO for Adult PCP and orthopedic services went up.

    c.   The transaction-specific cost reductions obtained as a result of the TDC Affiliation were too small to counterbalance the 2015-2017 increase in prices paid by commercial insurers.

Thus, according to Defendants' own experts' data, there is substantial empirical evidence that both the TDC Affiliation and the WSO Transaction reduced competition and harmed consumers.

62.     Defendants' experts attempt to explain away these basic facts in several ways.  These attempts are unsuccessful.  First, Dr. Wu opines the following:

    a.   That the price increases he documents are due to forces other than a reduction in competition.

    b.   That the price increases he documents will abate in the future.

    c.   That output would have declined by even more than it actually did, had the TDC Affiliation and WSO Transaction not occurred (according to TDC and WSO physicians).[75]

According to empirical economic research, Dr. Wu's opinions a. and b. are incorrect.  Although it is not possible to show that Dr. Wu's opinion c. is incorrect, it is fundamentally unpersuasive because it relies on statements by the TDC and WSO physicians – who have a financial interest

_____

[75] Dr. Wu report, ¶¶ 181-189.

in continuing to enjoy the high prices resulting from the TDC Affiliation and the WSO Transaction.

63.　　Second, Dr. Wu and Mr. Kennedy opine that there are numerous efficiencies, other than the cost reductions that either of them quantified.  The only one that either of them did quantify is increased access to care for government-insured patients, which Mr. Kennedy quantifies as an increase in the share of wRVUs, total (gross) charges, or visits.  This is not an increase in efficiency, as that term is used in economic analysis, although it may be a valid social goal.

64.　　Economists define one market as more efficient than another if at least one participant is better off and no participants are worse off; that is not the case here.  In this case, the *volume* of services to patients overall decreased, so any *volume* gains to government-insured patients (associated with an increase in their *share*) were more than counterbalanced by *volume* losses to other patients.  Antitrust analysis generally rejects this sort of "efficiency."  From an economic perspective, it violates the efficiency criterion above for both markets taken as a whole, and requires the denomination of gains and losses to different groups of consumers in common terms.

65.　　Third, Mr. Kennedy opines that the TDC Affiliation tightly integrates TDC with CHI Franciscan.  Whether or not his opinion is correct – and, as I explain in ¶¶ 40 - 49, it is not – it is irrelevant to any issue in this case that requires evaluation of the TDC Affiliation's competitive effects.  Mr. Kennedy's definition of "integration" includes not only procompetitive but also anticompetitive joint activity; more integration, as Mr. Kennedy defines it, is not necessarily good for consumers.  From an economic perspective, his Integration Analysis therefore cannot provide a basis for either a single-entity defense or full rule-of-reason analysis in this case.

Highly Confidential — Subject to Protective Order                                  34

Executed this 20th of November, 2018,

_____
Daniel P. Kessler

**Appendix A**

Rebuttal Report of Daniel Kessler
Documents Considered

<u>Expert Reports</u>

- Expert Report of Daniel Kessler, October 26, 2018, Exhibits, Appendices, and Materials Relied Upon
- Expert Report of Leonard Henzke, October 26, 2018, Exhibits, Appendices, and Materials Relied Upon
  - o Backup Data for this report:
    - Notes for TDC Physicians.pdf
    - Notes for WSO Physicians.pdf
    - Source_Industry Trends_467017.xlsx
    - Source_TDC Multiple Benchmark Model - National_467020.xlsx
    - Source_WSO Multiple Benchmark Model - National_467022.xlsx
- Expert Report of Kevin Kennedy, October 26, 2018, Exhibits, and Materials Relied Upon
  - o Backup Data for this report:
    - Payor Mix and Visits.xlsx
    - TDC416358-408 Cardio - PSA 2015-02-12-kpf comments.pdf
    - TDC416409-459 DH-WestGate PSA.pdf
- Expert Report of Lawrence Wu, October 26, 2018, Exhibits, Appendices, and Materials Relied Upon

<u>Deposition Testimony</u>

- Deposition of Christopher Rankin, M.D. (8/2/2018)
- Deposition of James Bates, M.D. (6/18/2018) and Exhibits
- Deposition of Jay Bohreer (7/26/2018) and Exhibits
- Deposition of Matt Wheelus (8/23/2018) and Exhibits
- Deposition of Megan McDermaid (6/15/2018) and Exhibits

<u>Other Materials</u>

- Kerrissey MJ, Clark JR, Friedberg MW, Jiang W, Fryer AK, et al., Medical Group Structural Integration May Not Ensure That Care Is Integrated, From the Patient's Perspective, Health Affairs 2017;36(5):885-91
- Layard PRG, Walters AA, Microeconomic Theory, 2015, McGraw Hill, 7
- Neprash HT, Chernew ME, McWilliams JM, Little Evidence Exists to Support the Expectation That Providers Would Consolidate To Enter New Payment Models, Health Affairs 2017;36(2):346-54
- Viscusi WK, Harrington JE, Vernon JM, Economics of Regulation and Antitrust, 4th ed. 2005, MIT Press, 80

# Appendix A

**Rebuttal Report of Daniel Kessler**
**Documents Considered**

### Documents

| | | |
|---|---|---|
| FHS - State v. -035093 | HURLEY002204 | WSO payer mix-c-c-c.xlsx |
| FHS - State v. -041064 | HURLEY005576 | wRVU-c-c-c.pdf |
| FHS - State v. -154023 | HURLEY005578 | |
| FHS - State v. -154039 | HURLEY005579 | |
| FHS - State v. -154043 | HURLEY005580 | |
| FHS - State v. -154050 | HURLEY005581 | |
| FHS - State v. -154054 | HURLEY005601 | |
| FHS - State v. -154058 | HURLEY005859 | |
| FHS - State v. -154063 | HURLEY006100 | |
| FHS - State v. -154064 | HURLEY006106 | |
| FHS - State v. -154065 | HURLEY006107 | |
| FHS - State v. -154067 | HURLEY006631 | |
| FHS - State v. -154068 | PSI001022 | |
| FHS - State v. -154071 | PSI001041 | |
| FHS - State v. -154074 | PSI001056 | |
| FHS - State v. -154077 | PSI001059 | |
| FHS - State v. -154079 | PSI001076 | |
| FHS - State v. -154081 | PSI001093 | |
| FHS - State v. -154082 | PSI001175 | |
| FHS - State v. -154084 | TDC000001 | |
| FHS - State v. -154085 | TDC000510 | |
| FHS - State v. -154087 | TDC000594 | |
| FHS - State v. -154090 | TDC385916 | |
| FHS - State v. -154091 | TDC416358 | |
| FHS - State v. -154092 | TDC416409 | |
| FHS - State v. -154093 | Copy of Projected-FY17-FY18 | |
| FHS - State v. -154094 | Actual (2)-c-c-c.xlsx | |
| FHS - State v. -154095 | PayorMix-c-c-c.pdf | |
| FHS - State v. -154112 | Polsinelli_request-c-c-c.xls | |

Exhibit 5

Daniel P. Kessler, JD, Ph.D.                    December 9, 2018

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

- - - - - - - - - - - - - - - - - -

STATE OF WASHINGTON,              )    CASE NO.

               Plaintiff,     )    3:17-cv-05690

V.                                )

FRANCISCAN HEALTH SYSTEM d/b/a    )

CHI FRANCISCAN HEALTH;            )

FRANCISCAN MEDICAL GROUP; THE     )

DOCTORS CLINIC,  a Professional   )

Corporation; and WESTSOUND        )

ORTHOPAEDICS, P.S.,               )

              Defendants.      )

- - - - - - - - - - - - - - - - -


VIDEOTAPED DEPOSITION OF DANIEL P. KESSLER, JD, PhD

SUNDAY, DECEMBER 9, 2018



BY:  LUCY CARRILLO-GRUBBS, CSR #6766

RPR, CRR, RMR

160 SPEAR STREET, SUITE 300

SAN FRANCISCO, CALIFORNIA  94105

(415) 597-5600

Daniel P. Kessler, JD, Ph.D.                    December 9, 2018

Page 75

1    the heading C on page 17.  You say:  "From an economic

2    perspective, the TDC affiliation's elimination of

3    independent price negotiation, without financial or

4    operational integration, qualifies it for per se or

5    quick-look rule of reason analysis."

6              I read that right; is that correct?

7    A.   Yes.

8    Q.   Okay.

9              So you are testifying here that from an economic

10   perspective the behavior -- the conduct at issue in this

11   case should be judged either under the per se rule or

12   the quick-look and not the full rule of reason; is that

13   correct?

14   A.   Yes, from an economic perspective the

15   affiliation is qualified for per se or quick-look rule

16   of reason analysis, yes.

17   Q.   Have you ever given similar testimony in any

18   other case?

19   A.   No, I have not -- this issue has not arisen as

20   yet in any of these cases that I've -- the antitrust

21   cases that I've worked on.

22   Q.   Are you aware of any Federal trial court that

23   has accepted testimony from an economist as to what the

24   appropriate rule of decision is, per se, quick-look or

25   full rule of reason?

Daniel P. Kessler, JD, Ph.D.                    December 9, 2018

Page 76

1      A.   I don't -- again, I guess I don't -- again, I'm

2   not sure what appropriate means.   Am I aware of a

3   Federal court that's accepted testimony from an -- from

4   an economist based on the economic rationale, I guess

5   I'm not aware of any -- I don't know.

6      Q.   And you -- my use of the word "appropriate"

7   seems to bother you.

8           You're giving testimony in this case that the

9   per se rule or quick-look is the appropriate rule to be

10   used, isn't that a fair summary of what you're saying?

11   And if not, tell me why not, because I want to be sure

12   that I summarize your testimony appropriately.

13      A.   Well, I'm saying that from an economic

14   perspective, the characteristics of the TDC affiliation

15   qualify it for per se or quick-look rule of reason

16   analysis.

17           I -- I'm -- I'm not sure what the word

18   "appropriate" means, but I'm not offering the opinion

19   that as a matter of law a Federal court should reach

20   finding A or finding B.

21           I think economic analysis is one input, but the

22   court may make a decision based on -- on other factors.

23      Q.   Your understanding is that the court will make a

24   decision as to the rule of decision, per se, quick-look

25   or rule of reason based on legal precedent, right?

Daniel P. Kessler, JD, Ph.D.                    December 9, 2018

Page 246

1   STATE OF CALIFORNIA  )

2   COUNTY OF SAN MATEO  )

3           I hereby certify that the witness in the

4   foregoing deposition, DANIEL P. KESSLER, JD, PhD,

5   was by me duly sworn to testify to the truth, the

6   whole truth, and nothing but the truth, in the

7   within-entitled cause; that said deposition was

8   taken at the time and place herein named; that the

9   deposition is a true record of the witness'

10  testimony as reported by me, a duly certified

11  shorthand reporter and a disinterested person, and

12  was thereafter transcribed into typewriting by

13  computer.

14          I further certify that I am not interested

15  in the outcome of the said action, nor connected

16  with, nor related to any of the parties in said

17  action, nor to their respective counsel.

18          IN WITNESS WHEREOF, I have hereunto set my

19  hand this 17th day of December, 2018.

20

21

22

23          _____

24                          LUCY CARRILLO-GRUBBS, RPR

25                          CSR No. 6766

# Exhibit 6

Cory Stephen Capps, Ph.D.                    December 4, 2018

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

- - - - - - - - - - - - - - x

STATE OF WASHINGTON,          :

       Plaintiff          :

       VS.                :   NO. 3:17-CV-05690

FRANCISCAN HEALTH SYSTEM    :
d/b/a CHI FRANCISCAN HEALTH;
FRANCISCAN MEDICAL GROUP;    :
THE DOCTORS CLINIC, a
Professional Corporation;    :
and WESTSOUND ORTHOPAEDICS,
P.S.,                        :

       Defendants      :   Pages 1-308

- - - - - - - - - - - - - - x

Washington, DC

Tuesday, December 4, 2018


Videotaped Deposition of CORY STEPHEN
CAPPS, PH.D., A witness herein, called for
examination by counsel for the Defendants in the
above-entitled matter, pursuant to notice, the
witness being duly sworn by SHERRY L. BROOKS,
Certified LiveNote Reporter and a Notary Public, in
and for the District of Columbia, taken at Bates
White, LLC, 2001 K Street, NW, North Building, Suite
500, Washington, DC, 20006, at 9:46 a.m., when were
present on behalf of the respective parties:

Cory Stephen Capps, Ph.D.                    December 4, 2018

Page 61

1    will agree it's on the low end.

2              BY MR. RAUP:

3        Q.    Alright.  In fact, it's at the low end,

4    isn't it?

5        A.    I just gave you a potential

6    counterexample, so I cannot definitively state that

7    it's at the low end.  I also cannot rule that out.

8        Q.    Have you ever provided an economist's

9    opinion on whether a court should apply the Per Se

10   Rule or the Rule of Reason?

11       A.    The reason I'm pausing is that sounds like

12   an amicus brief type of thing, and I'm trying to

13   remember if I signed any that would have spoke to

14   that issue.

15             The answer, I believe, is no without

16   seeing them.  It's possible that I've signed an

17   amicus brief that addressed that issue.  But as a

18   sort of testifying expert role saying is Rule of

19   Reason or Per Se appropriate because I mostly focus

20   on mergers, this being a bit of an unusual case, I

21   think the answer is no.

22       Q.    Are you aware of any other economists,

23   other than Dr. Kessler in this case, who has provided

24   such an opinion in testimony?

25             MS. KOSCHER:  Outside the scope of the

Cory Stephen Capps, Ph.D.                    December 4, 2018

Page 307

1                    CERTIFICATE OF REPORTER

2

3    UNITED STATES OF AMERICA ) ss:

4    DISTRICT OF COLUMBIA      )

5

6        I, SHERRY L. BROOKS, CLR, the officer before

7    whom the foregoing proceedings were taken, do hereby

8    certify that the foregoing transcript is a true and

9    correct record of the proceedings; that said

10   proceedings were taken by me stenographically to the

11   best of my ability and thereafter reduced to

12   typewriting under my supervision; and that I am

13   neither counsel for, related to, nor employed by any

14   parties to this case and have no interest, financial

15   or otherwise, in its outcome.

16

17

18

19                      _____

20                          SHERRY L. BROOKS

21                      Notary Public in and for the

22                         District of Columbia

23

24   My Commission Expires:  November 14, 2020

25

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com      206.622.6661 * 800.657.1110  FAX: 206.622.6236