The Honorable Benjamin H. Settle

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT TACOMA

| | |
|---|---|
| STATE OF WASHINGTON, | |
| Plaintiff, | No. 3:17-cv-05690-BHS |
| v. | **DEFENDANTS' PRE-TRIAL MEMORANDUM** |
| FRANCISCAN HEALTH SYSTEM d/b/a CHI FRANCISCAN HEALTH; FRANCISCAN MEDICAL GROUP; THE DOCTORS CLINIC, a Professional Corporation; and WESTSOUND ORTHOPAEDICS, P.S., | |
| Defendants. | |

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .................................................................................... III

I.      Introduction ............................................................................................. 1

II.     Facts to be Shown at Trial ...................................................................... 5

        A.      Parties ......................................................................................... 5

        B.      The Kitsap Transactions ............................................................. 6

        C.      Procedural History ...................................................................... 8

III.    Argument ............................................................................................... 10

        A.      The TDC Transaction Didn't Violate Section 1 ...................... 10

                1.      Plaintiff Won't Satisfy Its *Prima Facie* Burden ................... 11

                        a.      The Evidence Will Show Franciscan and TDC Are a Single
                                Entity Incapable of a Section 1 Violation .................................. 11

                        b.      The Rule of Reason Governs Plaintiff's Section 1 Claim .......... 15

                        c.      A Joint Venture Can Lawfully Set Its Prices ............................. 20

                        d.      Plaintiff Won't Prove Properly Defined Relevant Antitrust
                                Markets ...................................................................................... 20

                        e.      Alleged Price Increases Alone Are Insufficient to Show
                                Anticompetitive Harm ............................................................... 24

                        f.      Plaintiff Won't Show by Indirect Evidence That the TDC
                                Transaction Harmed Competition .............................................. 26

                2.      Defendants Will Present Evidence That Rebuts Any Potential
                        Showing of Anticompetitive Effects ........................................ 29

                        a.      TDC Would Have Dissolved Absent the TDC Transaction ....... 29

                        b.      The Transaction Produced Transaction-Specific Efficiencies That
                                Outweigh Any Purported Anticompetitive Harm ..................... 31

        B.      The WSO Transaction Doesn't Violate Section 7 ..................... 33

                1.      Plaintiff Can't Satisfy Its *Prima Facie* Burden ..................... 34

DEFENDANTS' PRE-TRIAL MEMORANDUM (3:17-cv-05690-BHS) - i

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

| | | | | | |
|---|---|---|---|---|---|
| | | a. | The Court Should Analyze the Incremental Effect of the WSO Transaction | ..................... | 34 |
| | | b. | Plaintiff Can't Prove Undue Concentration in a Properly Defined Relevant Market | ..................... | 36 |
| | | c. | Plaintiff Can't Prove Anticompetitive Harm | ..................... | 38 |
| | 2. | | Defendants Will Successfully Rebut Plaintiff's *Prima Facie* Case | ..................... | 39 |
| | | a. | WSO Was a Failing Firm | ..................... | 39 |
| | | b. | WSO Was a Weakened Future Competitor | ..................... | 42 |
| | | c. | The WSO Transaction Produced Transaction-Specific Benefits | | 43 |
| C. | | | Divestiture Isn't an Appropriate Remedy | ..................... | 44 |
| | 1. | | Divestiture Wouldn't Effectively Restore Competition | ..................... | 45 |
| | | a. | The Kitsap Transactions Integrated the Firms Irrevocably | ..................... | 45 |
| | | b. | TDC and WSO Can't Survive as Independent Firms | ..................... | 46 |
| | | c. | There Is No White Knight | ..................... | 47 |
| | 2. | | Plaintiff's Proposed Divestiture Remedy for the TDC Transaction Is Too Broad | ..................... | 47 |
| | 3. | | Other Remedies Are Better Suited to Prevent Anticompetitive Harm | ..................... | 49 |
| D. | | | Plaintiff Isn't Entitled to Disgorgement or Other "Equitable Monetary Relief" | ..................... | 51 |
| | | a. | Disgorgement Is Appropriate Only Where No Other Remedy Is Available and the Violation Is Clear | ..................... | 51 |
| | | b. | Disgorgement Is Unavailable Without a "Reasonable Approximation" of Defendants' Gains | ..................... | 52 |
| | | c. | Disgorgement Isn't Warranted Under Washington Law | ..................... | 54 |
| | | d. | Disgorgement Isn't Available Under Federal Law | ..................... | 54 |
| E. | | | Fee shifting in Defendants' Favor Is Appropriate. | ..................... | 55 |
| IV. | | | Conclusion | ..................... | 57 |

**Davis Wright Tremaine LLP**
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Abex Corp. v. FTC*,
   420 F.2d 928 (6th Cir. 1970)..................................................................................48

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
   4 F. Supp. 3d 1123 (D. Ariz. 2014), *aff'd*, 836 F.3d 1171 (9th Cir. 2016) ..........................26

*Am. Needle, Inc. v. Nat'l Football League*,
   560 U.S. 183 (2010) ...............................................................................................11, 12

*Arizona v. Maricopa Cty. Med. Soc.*,
   457 U.S. 332 (1982) .....................................................................................................16

*Bd. of Trade of City of Chi. v. United States*,
   246 U.S. 231 (1918) .....................................................................................................16

*Bhan v. NME Hosps., Inc.*,
   929 F.2d 1404 (9th Cir. 1991) .....................................................................................31

*Brantley v. NBC Universal, Inc.*,
   675 F.3d 1192 (9th Cir. 2012)......................................................................................24

*Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*,
   441 U.S. 1 (1979) ...........................................................................................15, 16, 31, 33

*Brooke Grp. Ltd v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) .....................................................................................................24

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962) .....................................................................................................33

*California v. Am. Stores Co.*, 495 U.S. 271 (1990) ....................................................................49

*California v. Sutter Health Sys.*,
   84 F. Supp. 2d 1057 (N.D. Cal.), *aff'd,* 217 F.3d 846 (9th Cir. 2000), and
   *amended*, 130 F. Supp. 2d 1109 (N.D. Cal. 2001) ............................................21, 22, 40, 41

*Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 113 (1986) .......................................49

*Chateau De Ville Prods., Inc. v. Tams-Witmark Music Library*, 24 Fed. R. Serv.
   2d 623 (S.D.N.Y. 1977) ...............................................................................................35

*Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*,
   79 F.3d 182 (1st Cir. 1996) ..........................................................................................21

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

*Copperweld Corp. v. Indep. Tube Corp.*,
    467 U.S. 752 (1984) ..................................................................................11, 14, 17

*County of Tuolumne v. Sonora Cmty. Hosp.*,
    236 F.3d 1148 (9th Cir. 2001) ...............................................................................32

*Dr. Pepper/Seven-Up Companies, Inc. v. FTC*,
    991 F.2d 859 (D.C. Cir. 1993) ...............................................................................42

*Elder-Beerman Stores Corp. v. Federated Dep't Stores, Inc.*,
    459 F.2d 138 (6th Cir. 1972) .................................................................................18

*Freeman v. San Diego Ass'n of Realtors*,
    322 F.3d 1133 (9th Cir. 2003) ..................................................................11, 12, 32, 38

*FTC v. Butterworth Health Corp.*,
    121. F.3d 708 (6th Cir. 1997) .....................................................................32, 38, 49

*FTC v. Freeman Hospital*,
    69 F.3d 260 (8th Cir. 1995) .......................................................................32, 38, 45

*FTC v. Advocate Health Care*,
    2017 WL 1022015 (N.D. Ill. Mar. 16, 2017) .............................................37, 38

*FTC v. AMG Capital Mangement, LLC*,
    910 F.3d 417 (9th Cir. 2018) .................................................................................54

*FTC v. Arch Coal, Inc.*,
    329 F. Supp. 2d 109 (D.D.C. 2004) ......................................................................43

*FTC v. Butterworth Health Corp.*,
    946 F. Supp. 1285 (W.D. Mich. 1996) ..................................................................49

*FTC v. Commerce Planet, Inc.*,
    815 F.3d 593 (9th Cir. 2016) .................................................................................52

*FTC v. Mylan Labs., Inc.*,
    62 F. Supp. 2d 25 (D.D.C. 1999) ..........................................................................54

*FTC v. Nat'l Tea Co.*,
    603 F.2d 694 (8th Cir. 1979) .................................................................................43

*FTC v. Penn State Hershey Med. Ctr.*,
    838 F.3d 327 (3d Cir. 2016) ........................................................................37, 38

*FTC v. Pepsi Co., Inc.*,
    477 F.2d 224 (2d Cir. 1973) .................................................................................45

**Davis Wright Tremaine LLP**
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

*FTC v. ProMedica Health Sys., Inc.*,
  2011 WL 1219281 (N.D. Ohio Mar. 29, 2011) ........................................43

*FTC v. Sanford Health, Sanford Bismarck*,
  2017 WL 10810016 (D.N.D. Dec. 15, 2017) ..............................37, 38

*FTC v. Tenet Health Care Corp.*,
  186 F.3d 1045 (8th Cir. 1999) ..............................................44

*FTC v. Univ. Health, Inc.*,
  938 F.2d 1206 (11th Cir. 1991) ..............................................43

*Ginsburg v. InBev NV/SA*,
  623 F.3d 1229 (8th Cir. 2010) ..............................................45

*Grove Labs. v. FT C*,
  418 F.2d 489 (5th Cir. 1969) ..............................................48

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) ..........................................26, 27

*In re ATM Fee Antitrust Litig.*,
  554 F. Supp. 2d 1003 (N.D. Cal. 2008) ..............................17

*In re: Cathode Ray Tube (Crt) Antitrust Litig.*,
  2016 WL 3648478 (N.D. Cal. July 7, 2016) ..............................54

*In re Evanston*,
  2007 WL 2286195 (F.T.C. Aug. 6, 2007) ..................24, 38, 49

*In re First Alliance Mortg. Co.*,
  471 F.3d 977 (9th Cir. 2006) ..............................................53

*In re Multidistrict Vehicle Air Pollution*,
  538 F.2d 231 (9th Cir. 1976) ..............................................55

*In re The Raymond Lee Org.*,
  942 F.T.C 489, 1978 WL 206103 (F.T.C. Nov. 1, 1978) ....................47

*In re Sulfuric Acid Litigation*,
  703 F.3d 1004 (7th Cir. 2012) ..............................17, 18, 20

*Int'l Shoe Co. v. FTC*,
  280 U.S. 291 (1930) ..............................................40

*Jack Russell Terrier Network of N. Ca. v. Am. Kennel Club, Inc.*,
  407 F.3d 1027 (9th Cir. 2005) ..............................................11

**Davis Wright Tremaine LLP**
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

Jacob Siegel Co. v. FTC,
    327 U.S. 608 (1946) ................................................................47

Jefferson Parish Hosp. Dist. No. 2 v. Hyde,
    466 U.S. 2 (1984) ...................................................................26

Kendall v. Visa U.S.A., Inc.,
    518 F.3d 1042 (9th Cir. 2008) ................................................10

Kokesh v. SEC,
    137 S. Ct. 1635 (2017) ......................................................50, 54

Leegin Creative Leather Prod., Inc. v. PSKS, Inc.,
    551 U.S. 877 (2007) ................................................................10

Maris Distrib. Co. v. Anheuser-Busch, Inc.,
    302 F.3d 1207 (11th Cir. 2002) ..............................................18

Matter of Warner-Lambert Co.,
    88 F.T.C. 503, 1976 WL 180015 (1976) ................................48

Med. Ctr. at Elizabeth Place, LLC v. Premier Health Partners,
    2017 WL 3433131 (S.D. Ohio Aug. 9, 2017) ........................17

Med. Ctr. at Elizabeth Place v. Atrium Health Sys.,
    817 F.3d 934 (6th Cir. 2016) ..................................................15

Morgan, Strand, Wheller & Biggs v. Radiology Ltd.
    924 F.2d 1484 (9th Cir. 1991) ................................................23

N. Tex. Specialty Physicians v. FTC,
    528 F.3d 346 (5th Cir. 2008) ..................................................47

Nat'l Soc. of Prof'l Eng'rs v. United States,
    435 U.S. 679 (1978) ..........................................................15, 16

NCAA v. Bd. of Regents of Univ. of Okla.,
    468 U.S. 85 (1984) .................................................................33

New York v. Microsoft Corp., 209 F. Supp. 2d 132 (S.D.N.Y. 2002) .......................................49

Newcal Indus., Inc. v. Ikon Office Sol.,
    513 F.3d 1038 (9th Cir. 2008) ...........................................10, 20

Northrop Corp. v. McDonnell Douglas Corp.,
    705 F.2d 1030 (9th Cir. 1983) ................................................16

O'Bannon v. Nat'l Collegiate Athletic Ass'n,
    802 F.3d 1049 (9th Cir. 2015) ...........................................16, 29

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

*Out of the Box Enterprises, LLC v. El Paseo Jewelry Exchange, Inc.*,
   732 F. App'x 532 (9th Cir. 2018) .................................................................53

*Paladin Assoc., Inc. v. Mont. Power Co.*,
   328 F.3d 1145 (9th Cir. 2003) .......................................................................31

*Polygram Holding, Inc. v. FTC*,
   416 F.3d 29 (D.C. Cir. 2005) ........................................................................15

*ProMedica Health Sys., Inc. v. FTC*,
   749 F.3d 559 (6th Cir. 2014) ..................................................................37, 38

*R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*
   890 F.2d 139 (9th Cir. 1989) .........................................................................23

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ............................................................24, 25, 26

*Rick-Mik Enter., Inc. v. Equilon Enter. LLC*,
   532 F.3d 963 (9th Cir. 2008) .........................................................................25

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
   778 F.3d 775 (9th Cir. 2015) ................................................................. *passim*

*SEC v. Cavanagh*,
   445 F.3d 105 (2d Cir. 2006) ..........................................................................50

*SEC v. First City Fin. Corp.*,
   890 F.2d 1215 (D.C. Cir. 1989) .....................................................................52

*SEC v. Wills*,
   472 F. Supp. 1250 (D.D.C. 1978) ..................................................................51

*Seeburg Corp. v. FTC*,
   425 F.2d 124 (6th Cir. 1970) .........................................................................48

*State Oil Co v. Khan*,
   522 U.S. 3 (1997) ...........................................................................................16

*Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors*,
   786 F.2d 1400 (9th Cir. 1986) .......................................................................31

*Taleff v. Sw. Airlines Co.*,
   554 F. App'x 598 (9th Cir. 2014) ...................................................................45

*Texaco Inc. v. Dagher*,
   547 U.S. 1 (2006) ..........................................................................15, 17, 20

**Davis Wright Tremaine LLP**
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

*Thomsen v. W. Elec. Co.*,
   680 F.2d 1263 (9th Cir. 1982) ......................................................................15

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
   875 F.2d 1369 (9th Cir. 1989) ...............................................................10, 20

*Tull v. United States*,
   481 U.S. 412 (1987) ....................................................................................54

*United States v. Archer-Daniels-Midland Co.*,
   781 F. Supp. 1400 (S.D. Iowa 1991) .........................................................35

*United States v. Baker Hughes Inc.*,
   908 F.2d 981 (D.C. Cir. 1990) ............................................................ *passim*

*United States v. Black & Decker Mfg. Co.*,
   430 F. Supp. 729 (D. Md. 1976) .................................................................41

*United States v. E.I. du Pont de Nemours & Co.*,
   366 U.S. 316 (1961) ......................................................................45, 46, 50

*United States v. General Dynamics Corp.*,
   415 U.S. 486 (1974) ............................................................................ *passim*

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966) ....................................................................................20

*United States v. H & R Block*,
   833 F. Supp. 2d. 36 (D.D.C. 2011) ...............................................21, 32, 44

*United States v. Int'l Harvester Co.*,
   564 F.2d 769 (7th Cir. 1977) ...............................................................41, 43

*United States v. Joyce*,
   895 F.3d 673 (9th Cir. 2018) ......................................................................16

*United States v. Keyspan Corp.*,
   763 F. Supp. 2d 633 (S.D.N.Y. 2011) .................................................51, 54

*United States v. LTV Corp.*, No. CIV. A. 84-884, 1984 WL 21973 (D.D.C. Aug.
   2, 1984) .......................................................................................................46

*United States v. Long Island Jewish Med. Ctr.*,
   983 F. Supp. 121 (E.D.N.Y. 1997) ............................................................45

*United States v. M. P. M., Inc.*,
   397 F. Supp. 78 (D. Colo. 1975) .........................................................40, 42

**Davis Wright Tremaine LLP**
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

*United States v. Marine Bancorporation,*
    418 U.S. 602 (1974) .................................................................................37

*United States v. Phila. Nat'l Bank,*
    374 U.S. 321 (1963) .................................................................................36

*United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172 (D.D.C. 2001) ........................21

*Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens,*
    529 U.S. 765 (2000) .................................................................................54

*Vesta Corp. v. Amdocs Mgmt. Ltd.,*
    129 F. Supp. 3d 1012 (D. Or. 2015) .........................................................26

**State Cases**

*Golob & Sons, Inc. v. Schaake Packing Co.,*
    93 Wn.2d 257 444 (1980) ...........................................................................9

*State v. Am. Tobacco Co.,*
    1996 WL 931316 (Wash. Super. Ct. Nov. 19, 1996) ...............................54

*State v. Black,*
    676 P.2d 963 (Wash. 1984) .......................................................................55

*State v. LG Elecs., Inc.,*
    340 P.3d 915 (Wash. 2014) .......................................................................53

*State v. Ralph Williams' Nw. Chrysler Plymouth, Inc.,*
    553 P.2d 423 (Wash. 1976) .......................................................................54

*State v. State Credit Ass'n, Inc.,*
    657 P.2d 327 (Wash. 1983) .......................................................................55

**Federal Statutes**

15 U.S.C. § 1 ............................................................................................. passim

15 U.S.C. § 15 .................................................................................................51

15 U.S.C. § 18 ........................................................................................... passim

15 U.S.C. § 26 .................................................................................................54

**State Statutes**

Wash. Rev. Code 19.86.080(1) .......................................................................55

Wash. Rev. Code § 19.86.080(2) ....................................................................52

DEFENDANTS' PRE-TRIAL MEMORANDUM (3:17-cv-05690-BHS) - ix

**Davis Wright Tremaine LLP**
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

**Administrative Materials**

2   1996 Statements of Antitrust Enforcement Policy in Health Care, available at
        https://www.justice.gov/sites/default/files/atr/legacy/2007/08/15/1791.pdf ........................19
3

4   *CentraCare Health System*; Analysis To Aid Public Comment, 81 FR 71095-04,
        2016 WL 5941990 (Oct. 14, 2016) ......................................................................50

5   Deborah L. Feinstein, Dir., Bureau of Competition, FTC, *Antitrust Enforcement*
        *in Health Care: Proscription, not Prescription* (June 19, 2014).,
6       https://www.ftc.gov/system/files/documents/public_statements/409481/1406
7       19_aco_speech.pdf ......................................................................................................40

8   Fed. Trade Comm'n, *Healthcare Provider in St. Cloud, MN Settles FTC*
        *Charges That Its Acquisition of Rival Provider Would Likely Lessen*
9       *Competition for Certain Physician Services* (Oct. 6, 2016), *available at*
        https://www.ftc.gov/news-events/press-releases/2016/10/healthcare-
10      provider-st-cloud-mn-settles-ftc-charges-its ..........................................................40

11  FTC and DOJ Statement of Antitrust Enforcement Policy Regarding
        Accountable Care Organizations Participating in the Medicare Shared
12      Savings Program at 7 (F.T.C. Oct. 20, 2011) available at
13      https://www.justice.gov/sites/default/files/atr/legacy/2011/10/20/276458.pdf ...................26

14  FTC's *Policy Statement on Monetary Equitable Remedies*, July 31, 2003.,
        https://www.ftc.gov/public-statements/2003/07/policy-statement-monetary-
15      equitable-remedies-including-particular ...........................................................51, 52

16  *FTC v. Cephalon, Inc.*
        (May 28, 2015) .............................................................................................................52
17

18  Horizontal Merger Guidelines of the United States Department of Justice and
        the Federal Trade Commission (Aug. 19, 2010) available at
19      https://www.ftc.gov/sites/default/files/attachments/merger-
        review/100819hmg.pdf .........................................................................21, 23, 44
20

21  https://www.ftc.gov/system/files/documents/public_statements/645501/150528c
        ephalonohlhausenwright1.pdf .......................................................................52
22

23  *In re: Cabell Huntington Hosp.*,
        15-c-542 (Cir. Ct. of Cabell Cty., W.V. July 30, 2015) ..........................................49

24  *Pennsylvania v. Geisinger Health System Foundation*,
        No.1:13-cv-02647-YK, Doc. No. 7 .........................................................................49
25

26

27

**Davis Wright Tremaine LLP**
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

*Statement of FTC Concerning Vote to Close the Investigation of a Proposed Transaction Combining Massachusetts Healthcare Providers* (Nov. 29, 2018) available at https://www.ftc.gov/news-events/press-releases/2018/11/statement-federal-trade-commission-concerning-its-vote-close ........................................................................................................49

**Other Authorities**

1 Callmann on Unfair Comp., Tr. & Mono. § 4:46 (4th ed.) ................................45, 48

10A Fletcher Cyc. Corp. § 5046.05 ...........................................................................45

*A.G. Schneiderman Announces Settlement With Utica Hospitals To Address Competitive Concerns* (Dec. 11, 2013) available at https://ag.ny.gov/press-release/ag-schneiderman-announces-settlement-utica-hospitals-address-competitive-concerns .......................................................................................49

Philip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles & Their Application (3d ed. 2007), ¶ 2100(a).....................18, 21, 26, 40

Cory Capps, et. al, *Physician Practice Consolidation Driven By Small Acquisitions, So Antitrust Agencies Have Few Tools to Intervene*, Health Affairs, 1558-59 (Sept. 2017)........................................................................26

Carl Shapiro, Department of Justice, Competition Policy in Distressed Industries, 2009 WL 1371415, at *10 (May 13, 2009) .........................................40

Restatement (Third) of Restitution & Unjust Enrichment § 51(d) (2011) ................52

**Davis Wright Tremaine LLP**
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

Defendants Franciscan Health System ("Franciscan Health"), Franciscan Medical Group ("FMG") (collectively, "Franciscan"), The Doctor's Clinic ("TDC"), and WestSound Orthopaedics ("WSO") submit this Pre-Trial Memorandum to preview its trial defense of Plaintiff's lawsuit filed on August 31, 2017, challenging the legality of Defendants' transactions and related conduct under the antitrust laws. Defendants will show at trial that Franciscan's separate transactions with WSO and TDC (collectively, the "Kitsap Transactions") didn't violate any antitrust law. The Court should thereafter enter judgment for Defendants on all claims, deny Plaintiff's request for relief, and award Defendants' attorneys' fees.

## I.    INTRODUCTION

The Kitsap Transactions saved two struggling physician groups from the brink of dissolution, preserving critical access to physician services for thousands of patients living on the Kitsap Peninsula and beyond. TDC and WSO struggled financially in the years leading up to their separate transactions with Franciscan. They couldn't pay their physicians adequate income, so physicians left for higher paying opportunities elsewhere. These departures made the remaining physicians worse off: the groups had less revenue but the same or even higher expenses, leading to lower physician compensation. Both groups treaded water for a few years, reducing physician compensation to cover their operational losses. TDC reached its tipping point in 2015 when its physicians at the Bainbridge Island Clinic—a profitable primary care clinic that represented a major referral source for the group's specialists—announced they were joining Swedish Health System for more pay. WSO also hit a tipping point in 2015 when it began to experience significant cash flow problems. It violated several debt loan covenants, accumulated over $770,000 in debt secured with personal guarantees from WSO physicians, and couldn't pay its rent. WSO had to further decrease physician compensation and lay off non-physician staff to avoid bankruptcy. Both groups had one lifeline to avoid imminent dissolution: joining Franciscan. So, they independently approached Franciscan about affiliations. In June 2016, at WSO's request, Franciscan acquired WSO's assets and agreed to

**Davis Wright Tremaine LLP**
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1   employ its physicians (the "WSO Transaction").  Three months later (in a separate transaction),

2   Franciscan acquired TDC's assets, assumed TDC's facility leases, purchased its clinical

3   services through a professional services agreement, and hired TDC to manage its day-to-day

4   administrative operations for Franciscan under a management services agreement (the "TDC

5   Transaction").  The Kitsap Transactions immediately boosted the TDC and WSO physicians'

6   incomes to sustainable levels, saving the groups and ensuring that their physicians would

7   remain practicing medicine on the Kitsap Peninsula.

8        But no good deed goes unpunished.  More than a year later, after a lengthy and

9   expensive investigation, Plaintiff filed a complex—and novel—antitrust lawsuit seeking to

10  unwind the Kitsap Transactions and impose millions in civil penalties and equitable relief on all

11  Defendants.  Plaintiff claims the TDC Transaction is an agreement between competitors to fix

12  prices that is *per se* illegal under Sherman Act Section 1.  If its *per se* claim fails—which it

13  will—Plaintiff alleges Franciscan's and TDC's joint conduct violates Section 1 under the rule

14  of reason.  Plaintiff won't prevail on its Section 1 claim because the TDC Transaction

15  combined Franciscan and TDC into a single economic entity.  Franciscan acquired all of TDC's

16  services, equipment, and facility leases.  Franciscan also controls TDC's operations.  TDC

17  physicians now work full time for Franciscan, and Franciscan sells their services to insurers

18  and Franciscan's patients.  Franciscan compensates TDC regardless of whether Franciscan gets

19  paid.  Franciscan has consolidated TDC's laboratory, imaging, and supply-chain services with

20  its own.  It sets TDC's budget, coordinates and approves its recruitment efforts, and oversees

21  TDC's clinical operations to ensure TDC physicians meet Franciscan's standards of care.  TDC

22  acts in effect as Franciscan's subsidiary.  So Plaintiff won't prove at trial that Franciscan and

23  TDC remained separate decision makers after September 2016, capable of conspiracy under

24  Section 1.

25       Even if the Court finds that TDC and Franciscan remained separate entities, the *per se*

26  rule doesn't govern their joint conduct under Section 1.  At minimum, Franciscan and TDC

27  entered into a joint venture to provide physician services on the Kitsap Peninsula.  The rule of

**Davis Wright Tremaine LLP**
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1  reason governs the formation of a joint venture and its later conduct.  And the Supreme Court

2  has held that a joint venture can lawfully set the prices for the products it sells.  So, Plaintiff's

3  challenge fails to the extent it challenges Franciscan reselling TDC services to insurers and

4  patients.  But to keep its claim alive, Plaintiff has argued that the TDC Transaction isn't a

5  legitimate joint venture, ignoring that courts find joint ventures are legitimate if they integrate

6  some business activities or have a genuine business purpose.  The TDC Transaction has done

7  both.  Defendants, therefore, have moved for summary judgment in their favor on the *per se*

8  claim, which remains pending before the Court.

9        The TDC Transaction doesn't violate Section 1 under the rule of reason.  Plaintiff can't

10  show that the TDC Transaction produced anticompetitive harm in any relevant market.  It has

11  no direct evidence of harm flowing from a loss of competition.  Plaintiff will introduce

12  evidence showing the price of TDC's services went up immediately after the TDC Transaction,

13  but the antitrust laws only condemn higher prices that arise from the exercise of market power.

14  Rates increased after the TDC Transaction simply because TDC physicians were added to

15  Franciscan's pre-existing contracts.  Such a change in rates occurs anytime a health system

16  adds even a single physician, and is totally unrelated to a system's market power.  Plaintiff also

17  will fall short of meeting its Section 1 *prima facie* burden with indirect evidence because:

18  • Plaintiff defines an improper adult PCP relevant market because it excludes Kaiser,
   Defendants' largest competitor, from the relevant market;

19

20  • It also defines an improper orthopedic market because it improperly restricts the
   relevant market to the Kitsap Peninsula including Bainbridge Island, even though

21   60% of patients leave the Peninsula to obtain those services elsewhere;

22  • The market shares Defendants held as a result of the Transaction were well below
   thresholds for an inference of market power; and

23

24  • The evidence will fail to show the TDC Transaction increased Franciscan's
   bargaining power with insurers.

25

26  Plaintiff thus can't prove a *prima facie* case against Defendants.  But Defendants also will show

27  the procompetitive effects of the TDC Transaction by establishing that TDC wouldn't have

**Davis Wright Tremaine LLP**
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

overcome its financial difficulties to remain a viable future competitor to Franciscan and that the TDC Transaction produced significant benefits to consumers.  It preserved access to physician services for commercial patients, expanded access to care for non-commercial patients, generated millions in cost savings, and improved the quality of care.  These benefits alone justify the TDC Transaction's legality, especially in light of lacking evidence of anticompetitive harm.

In Count 2, Plaintiff creates a convoluted and inconsistent challenge to the legality of the WSO Transaction.  It alleges that the addition of WSO to a merged Franciscan and TDC was unlawful under Section 7 of the Clayton Act.  But this claim makes no sense: Franciscan acquired WSO three months *before* the TDC Transaction.  And Plaintiff's claim that Franciscan and TDC are a single entity for purposes of Count 2 directly contradicts its claim under Count 1 that the two are separate entities.  Plaintiff can't prevail on both claims under the same set of facts.

The plain language of Section 7 requires the Court to consider the two transactions separately and determine each one's effect on competition.  If Plaintiff did this, it wouldn't have a colorable argument that the WSO Transaction violates Section 7.  Plaintiff must show the WSO Transaction substantially lessened competition in a relevant market.  But Plaintiff has *no* evidence to offer of the WSO Transaction's impact on competition.  Its experts have never even considered the matter.  Instead, in an argument that resembles nothing so much as three-card Monte, Plaintiff asks the Court to assume the later TDC Transaction happened before the WSO Transaction (which it didn't), that the TDC Transaction was a merger (which it says it wasn't), and that "therefore" the WSO Transaction is unlawful—which it isn't.[1]

Under a proper legal analysis, Plaintiff falls well short of satisfying its Section 7 *prima facie* burden.  The shortcomings include:

- Plaintiff has gerrymandered a relevant market that excludes Kaiser and doesn't include Seattle and Tacoma orthopedists;

---

[1] Defendants have filed a motion for summary judgment on Count 2, which remains pending before the Court.

DEFENDANTS' PRE-TRIAL MEMORANDUM (3:17-cv-05690-BHS) - 4

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

- The HHI concentration levels are below the 2500 threshold (even in Plaintiff's putative markets) and thus don't qualify for a presumption of market power; and

- Plaintiff can't prove Franciscan gained bargaining power with insurers to obtain higher rates for orthopedic services.

Defendants also will show that the WSO Transaction preserved access to orthopedic care and expanded options for underserved patients without commercial insurance.

In addition, WSO was a failing firm—an absolute defense to a Section 7 claim. Defendants will show that WSO faced imminent danger of dissolution before the WSO Transaction and had no reasonable options to avoid failure other than the WSO Transaction. This evidence also will show that Defendants can easily rebut Plaintiff's *prima facie* case because WSO would have had *zero* future competitive significance absent the WSO Transaction. It would have dissolved.

Should the Court find any merit to Plaintiff's claims, divestiture is not an appropriate remedy. The Court has broad discretion to fashion a remedy that is effective to redress the antitrust violation proved. Defendants will show at trial that a divestiture of TDC or WSO would not restore competition but would, in fact, lessen it and jeopardize access to care on the Kitsap Peninsula. Defendants' expert Leonard Henzke will show that neither group can survive as an independent entity if the Court unwinds either (or both) Kitsap Transactions. He also will explain why other area systems are unlikely to purchase these groups. So, in the event the Court finds any liability, it should order relief that (1) only applies to the markets in which the Plaintiff claims an anticompetitive effect (adult PCP and orthopedic services), and (2) doesn't force the physicians to do the impossible and reconstitute their failed independent groups.

## II.    FACTS TO BE SHOWN AT TRIAL

### A.    Parties

Franciscan is a non-profit Catholic health system that operates hospitals and medical clinics in the Puget Sound area. It also owns and controls a large physician group in the area, Franciscan Medical Group, or "FMG." TDC is a multispecialty physician group serving

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1  patients across Kitsap County, with over 196,000 patient visits in 2017.  It opened in 1949 as

2  the Jackson Clinic in downtown Bremerton and now has eight active practice locations on the

3  Kitsap Peninsula.

4      By early 2016, TDC was in poor financial condition.  It lacked sufficient revenue to pay

5  its physicians competitive incomes.  On average in 2015, TDC paid its physicians at the 21st

6  percentile, while they produced at the 68th percentile of national physician compensation

7  benchmarks.  This wide disparity between compensation and work effort suggests TDC

8  significantly underpaid its physicians.  In early 2016, TDC lost several critically important

9  primary care physicians at its Bainbridge Island and Poulsbo clinics because of inadequate

10 compensation.  As a result of these departures, TDC lost the significant revenue from these

11 physicians, but more importantly, it also lost the "downstream" referrals from these providers

12 to TDC's specialists and profitable ancillary services.  TDC struggled to recruit new physicians

13 and expected more physician departures, due to non-competitive compensation.  So, TDC

14 determined it couldn't survive as an independent group.

15     WSO is an orthopedic group consisting of seven physicians (six of whom were partners

16 in 2016).  The group has provided specialty orthopedic services from its Silverdale clinic since

17 2007.  In 2015, WSO was on the brink of dissolution.  The group had more than $770,000 in

18 debt, had violated its bank loan covenant, and had significantly underpaid its physicians for

19 their work.  In the months before the WSO Transaction, WSO took desperate measures to

20 salvage its financial position.  It laid off significant numbers of staff and asked its junior

21 physician partners, many of whom still had outstanding student loans, to contribute money to

22 the practice.  In early 2016, WSO's under-compensated junior partners sent their colleagues

23 emails indicating that they would leave the community if the transaction with Franciscan did

24 not go forward.

25     **B.      The Kitsap Transactions**

26     On July 1, 2016, FMG bought WSO's assets and assumed the lease on WSO's

27 Silverdale clinic.  WSO's six orthopedic physicians signed employment agreements with FMG

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

effective July 1, 2016.  Since the WSO Transaction, and pursuant to Franciscan's payer contracts, the former WSO physicians have been covered by Franciscan's contracts with payers, like all other Franciscan-employed physicians.  After joining Franciscan, the former WSO physicians' pay increased 82%, on average, from 2015 to 2017.

In early September 2016, Franciscan and TDC entered into the entirely separate TDC Transaction, which consisted of four agreements:

1. An Asset Purchase Agreement ("APA") by which Franciscan acquired certain assets TDC used to provide medical services to patients.

2. An Asset Lease Agreement ("ALA"), by which Franciscan leased certain assets TDC uses to provide medical services to patients. Franciscan will acquire those assets, without further consideration, at the expiration of the lease.

3. A Professional Services Agreement ("PSA") by which TDC agreed to perform medical services exclusively for Franciscan's patients and Franciscan agreed to pay for these services and provide the equipment and facilities needed to provide the services.

4. A Management Services Agreement ("MSA") by which Franciscan engaged TDC to manage the non-clinical services provided at the former TDC facilities on Franciscan's behalf.

These four agreements brought TDC's operations under Franciscan's control. Franciscan purchased all of TDC's professional services and now sells these services—along with Franciscan's full array of healthcare services—to insurers and patients.  Insurers pay Franciscan for services their members receive from Franciscan providers, including TDC, based on rates negotiated by Franciscan.  TDC doesn't negotiate separately with insurers because Franciscan owns and sells all of TDC's services, and TDC doesn't collaborate or otherwise provide input into Franciscan's payer contract negotiations.

Franciscan compensates TDC, like Franciscan's other physicians, based on their productivity as measured by work-relative value units ("wRVU"s).  Physician compensation doesn't depend on the amount of reimbursement Franciscan receives from insurers or patients for the physicians' work.  Franciscan pays TDC the same amount for an office visit, regardless of whether the patient is covered by commercial insurance, Medicare, Medicaid, or is uninsured

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

and receiving uncompensated care under Franciscan's charity care policies.  TDC is obligated

to provide medical care to patients with government insurance and charity patients in

accordance with Franciscan's charitable mission.  Franciscan also pays TDC's expenses and

controls TDC's budget.  It has final authority to approve all items in TDC's proposed budget. If

TDC's actual expenses exceed the budget Franciscan approved, TDC is fully responsible for

the initial 3% above budget—the "Cost Ceiling"—and then splits responsibility with

Franciscan on a 50/50 basis for all costs above the Cost Ceiling.  So Franciscan and TDC have

a common interest in controlling expenses.

Franciscan and TDC have begun integrating their operations and plan to continue

integrating in the future.  So far, they have consolidated laboratory, imaging, and supply-chain

services.  They collaborate on physician recruitment and quality initiatives.  FMG and TDC use

the same patient satisfaction survey vendor, report on the same metrics under the MACRA[2]

program with the Center for Medicare and Medicaid Services, and are developing benchmarks

on patient access, designed to improve patient experience and wait times.  TDC physicians

participate in Franciscan's quality improvement programs, and Franciscan rates them in

accordance with its internal "report card," the "Living Our Mission Measures."

## C.    Procedural History

In early 2017, Plaintiff began investigating the Kitsap Transactions' legality under the

antitrust laws.  It served civil investigative demands ("CIDs") on Defendants for possible

violations of RCW 19.86.020, .030, .040, and .060, 15 U.S.C. §§ 1 and 2, and 15 U.S.C. § 18.

Defendants fully cooperated with Plaintiff's investigation.  They quickly responded to the

CIDs, producing thousands of documents and providing written responses to the

interrogatories.  Plaintiff also deposed six of Defendants' corporate representatives:  TDC CFO

Brian Chandler, Former TDC President Dr. Randy Moeller, and Franciscan representatives

---

[2] The Medicare Access and CHIP Reauthorization Act (MACRA), passed by Congress in 2015, established new physician payment mechanisms for services provided to Medicare beneficiaries.  The payments are tied to actual services provided, but can be increased (or decreased) by up to 9 percent based on the quality of care patients receive.  Participation in the program requires physicians to build a reporting infrastructure that is administratively complicated and can be time-consuming and expensive, especially for small independent physician groups.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

Michael Fitzgerald, Dr. Peter O'Connor, Dhyan Lal, and David Schultz.  Plaintiff didn't depose any former WSO physicians before filing this lawsuit.

On August 31, 2017, nearly a year after the TDC Transaction closed, Plaintiff filed a two-count complaint challenging the TDC Transaction as an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (Count 1), and the WSO Transaction as a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18 (Count 2).  Both counts include pendent claims under RCW § 19.86, which courts interpret consistently with the federal antitrust laws.  *See Golob & Sons, Inc. v. Schaake Packing Co.,* 93 Wn.2d 257, 259-60, 609 P.2d 444 (1980).

In Count 1, Plaintiff specifically alleges that Franciscan and TDC are separate economic entities that entered into a horizontal agreement to fix prices, a *per se* violation of Section 1.  It also alleges, in the event the *per se* claim fails, that the same joint conduct violates Section 1 under the rule of reason.  Plaintiff doesn't challenge the TDC Transaction itself as an illegal merger under Section 1.  *See* Dkt. 239.  Plaintiff must therefore prove Franciscan and TDC remain separate entities *after* the TDC Transaction to prevail on its Count 1 claim.

In Count 2, Plaintiff alleges that the WSO Transaction violates Section 7 of the Clayton Act.  Its Count 2 claim treats Franciscan and TDC as a merged entity—in conflict with its Count 1 claim.  Count 2 specifically alleges an illegal merger between WSO and Franciscan— including TDC as part of Franciscan.  But the WSO Transaction happened months *before* the TDC Transaction, so TDC wasn't part of Franciscan when the WSO Transaction closed. Plaintiff couldn't plead a plausible Section 7 claim challenging Franciscan's combination with WSO, without challenging both transactions as a simultaneous merger.  It therefore gerrymandered its Section 7 claim based on allegations that contradict its Count 1 claim and the actual sequencing of the Kitsap Transactions.

On October 30, 2017, Defendants moved to dismiss Plaintiff's *per se* claim.  The Court denied Defendants' motion, ruling it was premature as discovery had not begun.  Dkt. 81.  The

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1  Court suggested it would be proper (and more efficient) to decide what rule (per se or rule of

2  reason) applies to the Section 1 claim on a summary judgment motion before trial.

3      Separately, on November 29, 2017, Plaintiff moved for partial summary judgment on its

4  Count 1 claim, arguing that Franciscan and TDC are separate entities capable of a Section 1

5  violation.  The Court denied Plaintiff's motion, finding this "is an issue that must be decided at

6  trial."  Dkt. 132 at 3.

7      On December 21, 2018, Defendants moved for partial summary judgment on Count 1A

8  and Count 2.  They argued that the *per se* rule (Count 1A) doesn't apply to the TDC

9  Transaction because Franciscan controls TDC or, in the alternative, the Transaction created a

10 joint venture to which the rule of reason applies.  Defendants also showed that Plaintiff can't

11 satisfy its *prima facie* burden on Count 2 because it has no evidence that the WSO Transaction

12 violated Section 7.  Dkt. 180.  This motion remains pending before the Court.

### III.   ARGUMENT

#### A.   The TDC Transaction Didn't Violate Section 1

15 Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or

16 conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.  But

17 "the [Supreme] Court has never taken a literal approach to its language."  *Leegin Creative*

18 *Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (citation and quotations omitted).

19 Instead, Section 1 only prohibits unreasonable restraints.  *Id.*  To prevail on a Section 1 claim, a

20 plaintiff must prove "(1) a contract, combination or conspiracy among two or more persons or

21 distinct business entities; (2) by which the persons or entities intended to harm or restrain trade

22 or commerce . . . ; (3) which actually injures competition."  *Kendall v. Visa U.S.A., Inc.*, 518

23 F.3d 1042, 1047 (9th Cir. 2008).  As the Ninth Circuit repeatedly has made clear, "[p]roving

24 injury to competition ordinarily requires the claimant to prove the relevant geographic and

25 product markets and to demonstrate the effects of the restraint within those markets."  *Thurman*

26 *Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373 (9th Cir. 1989).  *See also Newcal*

27 *Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 & n.4 (9th Cir. 2008).

DEFENDANTS' PRE-TRIAL MEMORANDUM (3:17-cv-05690-BHS) - 10

1.   **Plaintiff Won't Satisfy Its *Prima Facie* Burden**

a.   **The Evidence Will Show Franciscan and TDC Are a Single Entity Incapable of a Section 1 Violation**

Section 1 requires concerted action between multiple entities. *Jack Russell Terrier Network of N. Ca. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1033 (9th Cir. 2005). In the Ninth Circuit's words, "Section 1, like the tango, requires multiplicity: A company cannot conspire with itself." *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1147 (9th Cir. 2003). A plaintiff, therefore, must prove concerted action between two or more separate entities to prevail on a Section 1 claim. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768, 770 (1984). Here, Plaintiff doesn't challenge the agreements between TDC and Franciscan—i.e., the TDC Transaction—that combined them into a single entity. Instead, Plaintiff's Section 1 claim alleges that Franciscan and TDC remain separate entities *after* the TDC Transaction and thus have engaged in allegedly illegal joint negotiations with insurers. Because Plaintiff isn't challenging the TDC Transaction itself, the Court ruled that Defendants' affirmative merger defenses didn't apply to Plaintiff's Section 1 claim. *See* Dkts. 89, 239. So, Plaintiff must prove that TDC and Franciscan aren't a "single entity" after the TDC Transaction to prevail on its Section 1 claim under either the *per se* rule or the rule of reason.

Courts use a fact-dependent inquiry to determine whether the relationship between two firms forms a single entity. *Jack Russell Terrier Network*, 407 F.3d at 1034. A single entity doesn't require that two firms have the same legal identity. *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 191 (2010). Instead, a single entity is formed if the firms act as a "single-economic unit." *Freeman*, 322 F.3d at 1148. The Ninth Circuit specifically has recognized single entity status for a multitude of corporate arrangements, including:

- a company and its officers, employees and wholly owned subsidiaries;
- subsidiaries controlled by a common parent;
- firms owned by the same person;
- a firm owned by a subset of the owners of another;
- principal-agent relationships; and

DEFENDANTS' PRE-TRIAL MEMORANDUM (3:17-cv-05690-BHS) - 11

- partnerships or other joint arrangements in which competitors share risk, profits, and resources.

*See id.* at 1147-48 (collecting cases); *Am. Needle*, 560 U.S. at 192-93.  All of these relationships show "economic unity" between the firms, meaning they have formed a relationship that aligns their respective financial interests.  *Freeman*, 322 F.3d at 1148.

A PSA between a physician or physicians and a health system is among the most common arrangements in healthcare.  A PSA can create economic unity between the contracting physicians and health system, eliminating any pre-existing competition between them.  Unsurprisingly, the federal antitrust enforcement agencies and courts have treated exclusive PSAs as the "functional equivalent of an employment agreement."  *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.* ("*St. Luke's*"), 778 F.3d 775, 782 n.3 (9th Cir. 2015).  In *St. Luke's*, Saltzer Medical Group—a multi-specialty physician group—entered into a PSA with St. Luke's Health System—a health system that employed competing physicians.  *Id.*  Neither the private plaintiffs, the FTC, nor the Idaho Attorney General challenged the PSA under Section 1.  *Id.*  There, Plaintiffs recognized a PSA combined the defendants into a single economic entity.  Defendants will show at trial that the TDC Transaction had the same effect.

TDC and Franciscan have economic unity based on their financial integration.  Franciscan exclusively sells TDC's services to patients and insurers, and it unilaterally sets the fees that it charges for TDC's services.  All fees for TDC's services are billed and collected under Franciscan's name and tax identification number.  Franciscan, in turn, pays TDC for the services it provides, using a formula based on TDC's production.  Under this payment structure, Franciscan and TDC both benefit from the revenue earned through TDC providers.  Put simply, the more TDC providers work, the more both TDC and Franciscan make, showing that TDC and Franciscan share revenue and their financial performance "rise and fall" together in the same manner as Franciscan and its employed physicians.  *See Am. Needle*, 560 U.S. at 196.  Franciscan and TDC witnesses will testify to this economic reality.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1   TDC and Franciscan also share financial and operational risk.  Defendants will show

2   that TDC and Franciscan share financial risk related to TDC's services.  TDC bears "volume"

3   risk because its income from Franciscan depends entirely on volume of services.  Franciscan

4   bears the "collection" risk because it pays TDC for services regardless of whether it collects

5   fees from insurers and patients for those services.  And they share operational risk because

6   TDC's expenses impact their collective financial performance.  Franciscan approves TDC's

7   budget and pays TDC's budgeted expenses on a monthly basis by transferring funds to TDC,

8   adding a 3% management fee.  But, at the end of each year, Franciscan performs a

9   reconciliation comparing actual to budgeted costs.  If TDC's actual expenses exceed the budget

10  Franciscan approved, TDC is fully responsible for the initial 3% above budget—the "Cost

11  Ceiling"—and then splits responsibility with Franciscan on a 50/50 basis for all costs above the

12  Cost Ceiling.  In other words, Franciscan and TDC *share* operational risk with aligned financial

13  interests.  They both financially benefit if TDC controls its expenses, and they both lose money

14  if TDC doesn't control its expenses.

15      They have unified their clinical practices, too.  The PSA requires TDC to operate its

16  practice in accordance with Franciscan's policies and procedures.  TDC physicians will testify

17  that they now:

18  • participate in Franciscan's quality improvement and peer review activities,

19  • accept a proportionate share of Franciscan's after-hours emergency department call
       coverage,

20
21  • use Franciscan's "mission metrics" and "quality dashboard" to track quality metrics
       such as numbers of falls, pressure ulcers, and punctures, among others,

22
23  • participate in and cooperate with community service activities consistent with and in
       furtherance of the charitable mission of Franciscan,

24  • prepare medical records, charts, and other clinical data consistent with Franciscan's
       policies, and

25  • actively promote Franciscan in the community by participating in marketing,
       speaking, and community activities as recommended or requested by Franciscan.

26

27

DEFENDANTS' PRE-TRIAL MEMORANDUM (3:17-cv-05690-BHS) - 13

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1  Franciscan and TDC leadership have formed a Joint Compliance Committee to ensure TDC's

2  compliance with Franciscan policies and performance standards.  Franciscan has final

3  discretion to determine the remedial action for any non-compliance.  It also reviews TDC

4  physician's annual performance and tracks their quality performance—as Franciscan does for

5  its employed physicians.

6      Plaintiff will likely argue that Defendants don't have a unified clinical practice because

7  TDC physicians' personal approach to clinical practice remains unchanged.  Even if so, the

8  physicians' subjective perception doesn't speak to the reality of Franciscan's legal and practical

9  control of TDC as an organization, nor to the extensive administrative integration already in

10  place or the future clinical integration that's planned.  As the Supreme Court explained in

11  *Copperweld*, the key to unity is one firm's ability to control the other, regardless of how it

12  exercises that power.  *See* 467 U.S. at 771-72.  There, the Court noted that a parent and

13  subsidiary "share a common purpose whether or not the parent keeps a tight rein over the

14  subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the

15  parent's best interests."  *Id.*  So too here.  Regardless of whether Franciscan exercises its

16  control over individual physicians' practices in a way that is visible to them, it's undeniable

17  that Franciscan has that power under the terms of the PSA and MSA.

18      Plaintiff also will likely argue that TDC and Franciscan compete with one another

19  because individual physicians compete for patients.  Plaintiff will claim that TDC physicians

20  earn more money if a patient choses one of them rather than a FMG physician.  This is correct

21  but beside the point.  The *same* purported "competition" exists among FMG's employed

22  physicians.  That is, a FMG physician will earn less income if a patient decides to see a

23  different FMG physician within the same specialty.  Companies routinely create intra-

24  organization rivalry to encourage employees to generate more sales for the organization.  While

25  these employees compete with each other for sales (or, as here, to provide physician services),

26  that doesn't divide the organization into separate entities for Section 1 purposes.  If it did, a

27

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

single company *could* conspire with itself in direct conflict with the Supreme Court's ruling in *Copperweld* anytime it pays employees based on their individual productivity.

TDC and Franciscan aren't competitors at the entity level.  Both parties' economic experts will testify that healthcare provider firms in general compete in two ways:  (1) to become in-network providers for insurers; (2) for patients who are members of the insurance networks that they participate in.  After the TDC Transaction, Franciscan and TDC don't compete in either of these ways.  Franciscan negotiates insurance contracts that cover TDC's services, and patients and insurers view TDC as part of Franciscan.  Franciscan earns revenue regardless of whether a patient sees a TDC or FMG physician.  In fact, Franciscan earns *more* revenue if a patient sees a TDC physician because it pays TDC slightly less per physician slightly less than it pays an FMG employed physician.  Unsurprisingly, Franciscan and TDC don't "hold themselves out as competitors."  *See Thomsen v. W. Elec. Co.*, 680 F.2d 1263, 1266 (9th Cir. 1982) (citation omitted).  TDC uses Franciscan's signage, letterhead, and business cards.  And TDC and Franciscan informed patients and insurers of the TDC Transaction, telling them that TDC was now part of Franciscan.  To the outside world, Franciscan and TDC are one and the same.  All this evidence will demonstrate that TDC and Franciscan are a single entity, incapable of Section 1 conspiracy.  *See id*. at 1266; *compare Med. Ctr. at Elizabeth Place v. Atrium Health Sys.*, 817 F.3d 934, 942 (6th Cir. 2016).  Accordingly, the Court should enter judgment for Defendants on Count 1.

        **b.**       **The Rule of Reason Governs Plaintiff's Section 1 Claim**

If Plaintiff proves Defendants remained separate entities after the TDC Transaction, then the Court must analyze Plaintiff's Section 1 claim under the rule of reason.  The *per se* rule doesn't apply to the type of conduct Plaintiff challenges here.  Under Section 1, the *per se* rule is narrow and well-defined.  *Texaco Inc. v. Dagher*, 547 U.S. 1, 8 (2006).  Courts reserve *per se* liability under Section 1 for only those agreements that are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality."  *Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978).  The Supreme Court over time has

**Davis Wright Tremaine LLP**
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

narrowed the applicability of the *per se* rule to a few well-defined categories of conduct. *Dagher*, 547 U.S. at 8; *Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 33-35 (D.C. Cir. 2005). Today, the *per se* rule only applies to naked agreements between horizontal competitors to fix prices, divide markets, or reduce output.  *See Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19 (1979); *see also United States v. Joyce*, 895 F.3d 673, 677 (9th Cir. 2018). A naked agreement is one that has "no apparent potentially redeeming value."  *Arizona v. Maricopa Cty. Med. Soc.*, 457 U.S. 332, 363 (1982) (quoting *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 649-50 (1980)).  The *per se* rule only applies when conduct "falls squarely into [a per se] category."  *Joyce*, 895 F.3d at 677.  And the Supreme Court has cautioned against extending the *per se* rule to new contexts.  *Broadcast Music*, 441 U.S. at 9-10; *see Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1051 (9th Cir. 1983).

Courts must presumptively apply the rule of reason.  *See State Oil Co v. Khan*, 522 U.S. 3, 10 (1997).  Under the rule of reason, the activity is unlawful if the anticompetitive effects significantly outweigh legitimate justifications.  *Joyce*, 895 F.3d at 676.  A court must consider all relevant facts to properly assess the net effects of the challenged conduct.  *See Khan*, 522 U.S. at 3; *see also Bd. of Trade of City of Chi. v. United States*, 246 U.S. 231, 238 (1918).  The rule of reason analyzes "the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." *Nat'l Soc. of Prof'l Eng'rs*, 435 U.S. at 692.  So, a court must consider a variety of factors (e.g., market shares, efficiencies, and future competitive significance) to weigh the justifications for the conduct against any potential harm.  *Khan*, 522 U.S. at 10.  To prevail under Section 1, a plaintiff must show significant anticompetitive effects.  If a plaintiff carries that burden, defendants may then produce evidence of procompetitive effects that, on balance, could justify the otherwise anticompetitive conduct.  *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1070 (9th Cir. 2015).

The *per se* rule doesn't apply to the TDC Transaction.  Nevertheless, Plaintiff will try to shoehorn the TDC Transaction into the narrowly-defined category of *per se* treatment reserved for naked price-fixing.  In so doing, Plaintiff will likely request a "*per se* presumption" that no

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1    longer exists based on decades-old FTC/DOJ guidelines that no court has ever applied and

2    don't fit the facts of this case.  But at minimum, the TDC Transaction created a joint venture

3    with a legitimate business purpose:  to preserve physician services for area patients.  It requires

4    TDC to sell all of its professional services to Franciscan under a PSA—among the most

5    common agreements in healthcare.  And, as this Court already found, Franciscan and TDC

6    have already integrated some critical business and clinical activities.  Dkt. 132 at 7-9.  This

7    type of transaction doesn't warrant *per se* treatment.

                    **(1)    The Rule of Reason Governs a Joint Venture's**
8                            **Conduct**

9            The rule of reason governs joint ventures because they may create efficiencies.

10   *Copperweld*, 467 U.S. at 768.  The rule of reason applies if the Section 1 claim challenges the

11   formation of the joint venture.  *Dagher*, 547 U.S. at 6 n.1.  The rule of reason also governs the

12   conduct of a legitimate joint venture.  *See id.* at 7–8 (discussing *NCAA v. Bd. of Regents of*

13   *Univ. of Okla.*, 468 U.S. 85 (1984)).  Courts recognize a joint venture as "a form of

14   organization in which two or more firms agree to cooperate in producing some input that they

15   would otherwise have produced individually."  *See In re ATM Fee Antitrust Litig.*, 554 F. Supp.

16   2d 1003, 1011 (N.D. Cal. 2008)(citing Philip E. Areeda & Herbert Hovenkamp, Antitrust Law:

17   An Analysis of Antitrust Principles & Their Application (3d ed. 2007) ("Areeda") ¶ 2100(a)).

18   Importantly, a joint venture doesn't require a new product or entity to be considered legitimate.

19   *See In re Sulfuric Acid Litigation*, 703 F.3d 1004, 1013 (7th Cir. 2012).

20           Courts find a joint venture legitimate if the parties integrate *some* business activities.

21   *See e.g., Med. Ctr. at Elizabeth Place, LLC v. Premier Health Partners*, 2017 WL 3433131, at

22   *13 (S.D. Ohio Aug. 9, 2017).  This Court has already identified some points of integration

23   (beyond a common price for services) between Franciscan and TDC, including Franciscan's

24   control over TDC's budget, TDC's management of certain Franciscan-owned assets,

25   Franciscan's control over TDC's recruitment, and TDC's adherence to Franciscan's policies,

26   procedures, and expectations.  Dkt. 132 at 7-9.  Defendants will show other points of

27

DEFENDANTS' PRE-TRIAL MEMORANDUM (3:17-cv-05690-BHS) - 17

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

integration at trial.  Importantly, Plaintiff to date hasn't disputed that integration has occurred; it merely disputes the extent of the integration.

A joint venture also isn't spurious if it may have a legitimate business purpose.  *In re Sulphuric Acid*, 703 F.3d at 1013.  So, the mere fact that joint venture participants set a common price doesn't "condemn it out of hand, but instead subjects it to scrutiny under the rule of reason."  *Id.*  Franciscan and TDC have a legitimate business purpose for entering into the TDC Transaction—to preserve access to medical services for patients on Kitsap Peninsula.  It divides, assigns, and shares risk among the parties to the TDC Transaction.  TDC had to mitigate the financial risk for the provision of its services to keep its physicians.  And Franciscan, couldn't reasonably replicate the volume of TDC's physician services—a 53 person multispecialty group—on its own.  *See id.* at 1013 (finding the inability to reasonably replicate a distribution network is a legitimate business rationale).

The Court shouldn't apply the *per se* rule to the TDC Transaction because the parties have integrated some business activities and the transaction has a legitimate business purpose.  These two indisputable facts provide the Court independent reasons to apply the rule of reason to Plaintiff's Section 1 claim.

### (2)  The Rule of Reason Governs the PSA as an Output Contract

An output contact is an agreement whereby a seller agrees to sell all its output to the buyer.  Areeda ¶ 1803a.  In healthcare, output contracts are common.  Health systems, for example, regularly enter into PSAs with physician groups to provide their services exclusively at its hospital(s).  Output contracts aren't *per se* illegal under Section 1.  *See Elder-Beerman Stores Corp. v. Federated Dep't Stores, Inc.*, 459 F.2d 138, 144 (6th Cir. 1972) (collecting cases); *see also* Areeda ¶ 2204 ("Exclusive dealing and its obverse, the output contract, are always addressed under the rule of reason").  Instead, courts must analyze output contracts (e.g., PSAs) under the rule of reason because they are a "legitimate business practice." *Maris Distrib. Co. v. Anheuser-Busch, Inc.,* 302 F.3d 1207, 1224 (11th Cir. 2002); Areeda ¶ 2204.

DEFENDANTS' PRE-TRIAL MEMORANDUM (3:17-cv-05690-BHS) - 18

1    Courts have also rejected claims that the "quick look" analysis should govern output contracts.

2    Areeda ¶ 1800a.  Because an output contract can't be condemned without evidence of its actual

3    competitive effects, a transaction whereby a physician or group of physicians sells its services

4    to a single buyer isn't *per se* illegal.  *See* Areeda ¶ 1803d (citing *U.S. Healthcare, Inc. v.*

5    *Healthsource, Inc.*, 986 F.2d 589, 594 (1st Cir. 1993)).  Here, TDC sells all of its professional

6    output to Franciscan under the PSA.  Because the PSA is an output contract, the rule of reason,

7    not the *per se* rule, governs its legality under Section 1.

### (3)   Statement 8 of the 1996 DOJ/FTC Healthcare Enforcement Statements Doesn't Apply

9          Plaintiff will likely argue that the *per se* rule applies to the TDC Transaction because

10   the transaction doesn't satisfy the criteria for permissible joint contracting by competitors in

11   Statement 8 of the 1996 Department of Justice and Federal Trade Commission Statements of

12   Antitrust Enforcement Policy in Health Care.  It will offer expert testimony to show the TDC

13   Transaction doesn't satisfy Statement 8 criteria, and it will attack Defendants' integration and

14   efficiencies expert—Kevin Kennedy—for not applying Statement 8.  But Plaintiff's fixation on

15   these decades-old guidelines doesn't make them the law or applicable here.  These guidelines

16   have existed for more than 20 years, but there has never been a single antitrust case where a

17   federal court has applied Statement 8.

18         Even if courts did rely on Statement 8, these guidelines don't apply to the TDC

19   Transaction.  Statement 8 provides guidance on federal antitrust enforcement decisions related

20   to "Physician Network Joint Ventures."  According to Statement 8, "a physician network joint

21   venture is a *physician-controlled venture* in which the network's physician participants

22   *collectively* agree on price[] . . . .  Other types of health care network joint ventures are not

23   directly addressed by this statement."  Statement 8 at 62 (emphasis added).[3]  The TDC

24   Transaction isn't a physician-controlled venture in which the physician participants collectively

25   agree on price.  Instead, Franciscan—a health system—purchased all of TDC's professional

27   _____

[3] 1996 Statements of Antitrust Enforcement Policy in Health Care, available at
https://www.justice.gov/sites/default/files/atr/legacy/2007/08/15/1791.pdf

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

services.  Franciscan resells those services to insurers and patients at rates it *solely* sets (or

negotiates with insurers).  This purchase-and-resale arrangement is not equivalent to the "IPO"

and "PPO" physician network joint venture described in Statement 8.  Instead, it is similar to an

employer-employee relationship.

### c.   A Joint Venture Can Lawfully Set Its Prices

A legitimate joint venture can set the price for its products, and that decision isn't illegal

price-fixing.  *Dagher*, 547 U.S. at 7.  In *Dagher*, the Supreme Court held that a joint venture

between Texaco and Shell could set the price for the gasoline that it refined and sold, even

though it did so with two different brands.  *Id.* at 6.  The Court held that although the "pricing

policy may be price fixing in a literal sense, it is not price fixing in the antitrust sense."  *Id.*

The joint venture, like any other firm, could determine the price it charged for its product,

which was "the core activity of the joint venture itself."  *Id.* at 7.  That's true regardless of

whether the product is "new" or was already produced and sold by the joint venturers

individually.  *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d at 1011.

Common prices for Franciscan and TDC services are reasonably necessary to operate

the joint venture and thus a "core activity."  Franciscan sells TDC services to insurers and

patients, so it must have the ability to set the price for those services.  The TDC Transaction—

as entered—can't exist without Franciscan's ability to set prices for the services that it acquired

from TDC.  Accordingly, Plaintiff can't prevail on its Section 1 claim under *Dagher* because

joint ventures can lawfully set the prices for their core services.  That's exactly what Franciscan

has done here.

### d.   Plaintiff Won't Prove Properly Defined Relevant Antitrust Markets

To prevail on its Section 1 claim, Plaintiff must prove relevant antitrust markets in

which anticompetitive harm occurred.  *See Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d

1038, 1045 & n.4 (9th Cir. 2008).  It specifically must show harm to competition by first

proving a relevant geographic and service market.  *Thurman Indus., Inc. v. Pay 'N Pak Stores,*

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

*Inc.*, 875 F.2d 1369, 1373 (9th Cir. 1989).  Courts use the same market definition principles to define relevant markets for both Section 7 and Section 1 claims.  *United States v. Grinnell Corp.*, 384 U.S. 563, 586 (1966).

(1)      **A Relevant Service Market Must Include Kaiser**

To define a relevant service market, courts assess whether two services are substitutes for one another in the eyes of purchasers.  *United States v. H & R Block,* 833 F. Supp. 2d. 36, 67 (D.D.C. 2011).  In so doing, courts typically employ the hypothetical monopolist test from the Horizontal Merger Guidelines.  *See e.g., Saint Alphonsus*, 778 F.3d at 784; *Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.,* 79 F.3d 182, 198 (1st Cir. 1996) ("The touchstone of market definition is whether a hypothetical monopolist could raise prices.").  A set of services is a relevant market if a hypothetical monopolist in the relevant service market could increase price profitably by a "small but significant and non-transitory increase in price ("SSNIP")."  Horizontal Merger Guidelines § 4.1.1[4]

Plaintiff offers two relevant service markets to assess the competitive impact from Franciscan and TDC's purported joint negotiation of prices:  adult PCP and orthopedic services sold to commercial insurers.  Compl. ¶¶ 35-36.  Plaintiff, however, incorrectly excludes Kaiser—the largest supplier of physician services—from its relevant service markets.  Kaiser is a "vertically-integrated firm" because it operates as an insurer and provider of physician services on Kitsap Peninsula and elsewhere in Washington State.  A properly defined relevant market includes vertically-integrated market participants even if they don't sell their output to other customers.  Areeda ¶ 535; *see California v. Sutter Health Sys.*, 84 F. Supp. 2d 1057, 1068 (N.D. Cal.), *aff'd,* 217 F.3d 846 (9th Cir. 2000), and *amended*, 130 F. Supp. 2d 1109 (N.D. Cal. 2001); *United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172, 186 (D.D.C. 2001).  Indeed, a proper relevant market includes *all* firms that currently earn revenues in the relevant market.  Horizontal Merger Guidelines § 5.1.  And for good reason:  a service market that

---

[4] Horizontal Merger Guidelines of the United States Department of Justice and the Federal Trade Commission (Aug. 19, 2010) available at https://www.ftc.gov/sites/default/files/attachments/merger-review/100819hmg.pdf.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

doesn't include all sellers of that service may fail the hypothetical monopolist test if customers will switch to the excluded seller to make a SSNIP unprofitable.

Plaintiff's putative service markets fail the hypothetical monopolist test to extent they don't include services from Kaiser physicians.  The evidence will show that non-Kaiser patients view Kaiser as a viable substitute for insurance services.  They therefore will switch between health plans to get access to the doctors they prefer, or to get lower prices  Defendants' economic expert—Dr. Lawrence Wu—will present economic analysis showing Kaiser, not Franciscan, is the closest substitute for TDC adult PCP and orthopedic services.  In particular, Dr. Wu will show that if TDC didn't exist, more than one-third of TDC's orthopedic patients would go to Kaiser for the same services.  Similarly, the data will show if TDC didn't exist nearly 30% of TDC's adult PCP patients would go to Kaiser for those services.  So, a hypothetical monopolist of non-Kaiser providers of either service—adult PCP or orthopedics— couldn't profitably raise its prices because it would lose a substantial number of patients to Kaiser.

Plaintiff argues that patients without Kaiser insurance can't switch to Kaiser providers because Kaiser providers only treat patients with Kaiser insurance.  But the evidence will show that non-Kaiser patients can (and do) switch to Kaiser's health plan, which allows them access to Kaiser physicians.  The fact that patients with non-Kaiser insurance can't immediately switch to Kaiser providers doesn't justify excluding Kaiser's physician services from the relevant market.  A candidate market only passes the hypothetical monopolist test, if the hypothetical monopolist can impose a *non-transitory* price increase.  A hypothetical monopolist with only non-Kaiser providers might be able to impose a short term price increase, but that price increase would become unprofitable (and thus is transitory) once patients switch to Kaiser coverage during open enrollment periods.  This is why the court in *California v. Sutter Health System* included Kaiser in the relevant hospital service market, even though "Kaiser hospitals may not provide services to non-member patients."  130 F. Supp. 2d 1109, 1119 (N.D. Cal. 2001).  The court there reasoned that Kaiser nevertheless was a viable substitute for services

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1    offered at other hospitals in the region because patients would join the Kaiser network if faced

2    with a price increase from other hospitals.  *Id.*  The same is true here.  This Court should reject

3    Plaintiff's attempt to define a relevant service market that excludes Defendants' largest and

4    most significant competitor, Kaiser.

### (2)    Plaintiff's Orthopedic Services Geographic Market Is Too Narrow

6            Plaintiff bears the burden of proving that it has properly defined the relevant geographic

7    market.  *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.* 890 F.2d 139, 143 (9th Cir. 1989).

8    A proper geographic market is "an arena of effective competition . . . where buyers can turn for

9    alternative sources of supply."  *Morgan, Strand, Wheller & Biggs v. Radiology Ltd.* 924 F.2d

10   1484, 1490 (9th Cir. 1991) (internal quotations & citation omitted).  The question for

11   geographic market definition is whether a hypothetical monopolist controlling all of the

12   services in that market could profitably implement a SSNIP.  Horizontal Merger Guidelines

13   § 4.1.3.

14           Here, Plaintiff doesn't define a proper relevant geographic market for orthopedic

15   services.  It will offer the "KP/BI" area (i.e., Kitsap County as well as the southern portions of

16   the Peninsula around Gig Harbor in Pierce County) as the relevant geographic market for

17   orthopedic services.  *See* Compl. ¶ 38.  But the KP/BI area doesn't pass the hypothetical

18   monopolist test because it excludes orthopedists in Seattle and Tacoma.  The evidence will

19   show that a majority of patients in the KP/BI area—over 60%—already seek orthopedic

20   services from providers in Seattle and Tacoma.  Dr. Wu will also testify that a majority of

21   patients that currently seek orthopedic care in KP/BI view providers in Seattle and Tacoma as

22   their next best option for care.  A hypothetical monopolist could not profitably sustain a price

23   increase if it would lose a majority of its patients to orthopedists in Seattle and Tacoma.

24   Testimony will confirm that KP/BI orthopedists directly compete with orthopedists in Seattle

25   and Tacoma for patients and that patients will travel from KP/BI to Seattle and Tacoma for

26   orthopedic services.  Kaiser, for example, offers a viable HMO plan to its members in KP/BI

27

DEFENDANTS' PRE-TRIAL MEMORANDUM (3:17-cv-05690-BHS) - 23

that doesn't have any in-network orthopedics located in KP/BI.  This indisputable fact explains
why an appropriate geographic market for Orthopedic Services must include providers in
Seattle and Tacoma.  If that were not true, Kaiser couldn't successfully sell its HMO insurance
to KP/BI residents when it offers *zero* orthopedic services on KP/BI.

**e.     Alleged Price Increases Alone Are Insufficient to Show Anticompetitive Harm**

Even if Plaintiff could prove a proper relevant market, it lacks evidence of any
anticompetitive harm from the alleged joint negotiation of prices for Franciscan's and TDC's
services.  Notably, price increases, standing alone, do not create any concern under the antitrust
laws.  *See, e.g., Brooke Grp. Ltd v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 232
(1993); *Rebel Oil Co. v. Atl. Richfield Co.,* 51 F.3d 1421, 1434 (9th Cir. 1995).  To the
contrary, price increases are "fully consistent with a free, competitive market," so they do not
support an inference of anticompetitive effect.  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192,
1202 (9th Cir. 2012).  To carry its *prima facie* burden under Section 1, Plaintiff must show
evidence of "supracompetitive prices," not merely price increases.  *Rebel Oil*, 51 F.3d at 1434
(citing *FTC v. Ind. Fed'n of Dentists,* 476 U.S. 447, 460-61 (1986)).  At all times, Plaintiff
carries the burden of showing anticompetitive effects under the rule of reason.

Plaintiff will claim that the prices for TDC's services allegedly went up immediately
after the TDC Transaction.  As explained above, Franciscan purchased all of TDC services and
resells those services to insurers (and patients) at rates it solely negotiates with insurers.  So,
Plaintiff's horizontal price fixing claim arises primarily from TDC switching from its own pre-
transaction insurer contracts to Franciscan's pre-transaction contracts—i.e., contract
conversion.  But, as Plaintiff's expert already acknowledged, simply adding new doctors to
Franciscan's pre-existing contracts is not anticompetitive.  Indeed, Plaintiff must show more
than merely higher prices following the transaction because the law only condemns price
increases from the exercise of market power.  *See In re Evanston*, 2007 WL 2286195, at *54
(F.T.C. Aug. 6, 2007).  Defendants will show at trial that enhanced market power did *not* cause

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1    these alleged price increases.  Accordingly, Plaintiff can't satisfy its *prima facie* burden with

2    alleged prices increases for TDC's services from contract conversion.

3         Similarly, Plaintiff also intends to show "anticompetitive effects" from Franciscan

4    allegedly moving surgeries from TDC's lower-cost ambulatory surgery center to Harrison

5    Medical Center.  Insurance companies and Medicare pay higher reimbursements for services

6    performed at a hospital-based outpatient facility, like Harrison Medical Center, than at an

7    ambulatory surgery center.  That is because insurance companies follow Medicare and pay

8    hospitals a facility fee for services performed at a hospital outpatient facility (known as

9    hospital-based billing).  Freestanding facilities don't receive facility fees from Medicare and

10   thus don't receive them from insurers.

11        As an initial matter, Plaintiff hasn't challenged Franciscan's purchase of TDC's

12   ambulatory surgery center as an illegal merger.  It also never pled a proper relevant market for

13   ambulatory surgery center services—which include services beyond physician services, like

14   imaging services.  It is well-settled law that antitrust plaintiffs can't rely on purported effects in

15   different product or geographic markets to establish anticompetitive effects in the relevant

16   market.  *Rick-Mik Enter., Inc. v. Equilon Enter. LLC,* 532 F.3d 963, 972 (9th Cir. 2008).  These

17   alleged effects, therefore, are not relevant to this lawsuit.

18        Even if they were somehow relevant, these allegedly higher fees have nothing to do

19   with a change in market power.  Plaintiff hasn't alleged (and has no evidence) that Franciscan

20   has gained market power by which it obtains higher reimbursement for all (or any) services

21   performed at ambulatory surgery centers.  Instead, the evidence will show, Franciscan receives

22   the same facility fee before (and after) the TDC Transaction.  Insurers didn't pay "higher"

23   prices for ambulatory services.  And absent a change in market power, the Court can't conclude

24   that the TDC Transaction produced anticompetitive harm from services performed at an

25   ambulatory surgery center.  *St. Luke's*, 778 F.3d at 787.

26

27

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

####     f.     Plaintiff Won't Show by Indirect Evidence That the TDC Transaction Harmed Competition

2      With no direct evidence of anticompetitive effects, Plaintiff is left to rely on

3 "circumstantial evidence pertaining to the structure of the market" to satisfy its *prima facie*

4 burden. *Rebel Oil*, 51 F.3d at 1434. "To demonstrate market power circumstantially, a

5 plaintiff must:  (1) define the relevant market, (2) show that the defendant owns a dominant

6 share of that market, and (3) show that there are significant barriers to entry and show that

7 existing competitors lack the capacity to increase their output in the short run." *Id.* "Courts

8 generally require a 65% market share to establish a prima facie case of market power." *Image*

9 *Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997).  And any

10 barriers to entry must be "meaningful"— "capable of constraining the normal operation of the

11 market to the extent that the problem is unlikely to be self-correcting." *Id.* at 1208 (quoting

12 *Rebel Oil*, 51 F.3d at 1439).

13      As noted above, Plaintiff hasn't defined a proper relevant market.  But even if it did,

14 Plaintiff still can't meet its *prima facie* burden based on other elements of a circumstantial case.

15

####     (1)     Market Shares Suggest Defendants Lack Market Power

16

17      Courts typically infer market power—i.e., the ability to charge supra-competitive

18 prices—if a firm has a greater than 65% share in a relevant market. *Eastman Kodak Co.*, 125

19 F.3d at 1206. *See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 4 F. Supp. 3d 1123, 1139 (D.

20 Ariz. 2014), *aff'd*, 836 F.3d 1171 (9th Cir. 2016); *Vesta Corp. v. Amdocs Mgmt. Ltd.*, 129 F.

21 Supp. 3d 1012, 1028 (D. Or. 2015).  Courts, federal antitrust agencies, and scholars also

22 typically agree that a firm lacks market power if it has a share of 30% or less. *Jefferson Parish*

23 *Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 7, 27-28 (1984); Areeda ¶1736. *See also* Cory Capps,

24 et. al, *Physician Practice Consolidation Driven By Small Acquisitions, So Antitrust Agencies*

25 *Have Few Tools to Intervene*, Health Affairs, 1558-59 (Sept. 2017).

26      The Court can't infer that Franciscan gained any market power after the TDC

27 Transaction because their combined shares are too low—even in Plaintiff's putative markets.

DEFENDANTS' PRE-TRIAL MEMORANDUM (3:17-cv-05690-BHS) - 26

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1    In the adult PCP market, Plaintiff claims Franciscan and TDC have a combined share of 33.9%

2    — well-below the thresholds for market power.  Similarly in the orthopedic services market,

3    Plaintiff claims a combined share between TDC and Franciscan of 27.9%, which falls within

4    the 30% safe harbor for *no* market power.  *See* FTC and DOJ Statement of Antitrust

5    Enforcement Policy Regarding Accountable Care Organizations Participating in the Medicare

6    Shared Savings Program at 7 (F.T.C. Oct. 20, 2011), *available at* https://www.justice.gov/sites/

7    default/files/atr/legacy/2011/10/20/276458.pdf.  Plaintiff then combines the shares of all three

8    firms—WSO, TDC, and Franciscan—to create an allegedly 46.2% share—which remains

9    below the 65% threshold courts use to infer market power.  *See Eastman Kodak Co.*, 125 F.3d

10    at 1206.  But the actual shares and concentration levels for the proper relevant markets are even

11    lower.  As explained above, Plaintiff's putative markets incorrectly exclude Kaiser and

12    providers in Seattle and Tacoma for orthopedic services.  If the Court adds Kaiser to the

13    relevant adult PCP market, Franciscan and TDC have a 30.8% combined share.  If the Court

14    adds Kaiser and includes providers in Seattle and Tacoma in the orthopedics market,

15    Franciscan and TDC have a mere 11% combined share.  Collectively, the three firms,

16    (Franciscan, TDC, and WSO) have a combined 13.3% share.  All of these share estimates

17    suggest Franciscan doesn't have market power, before or after the TDC Transaction, in any

18    plausible relevant market.

19

20                   **(2)**      **Plaintiff Will Fail to Prove That the TDC Transaction Enhanced Franciscan's Bargaining Power with Insurers**

21         Plaintiff needs (but lacks) evidence that any alleged increases in TDC's prices after the

22    TDC Transaction came from a change in Franciscan's bargaining power with insurers.  Both

23    parties' experts will agree that healthcare providers set prices for physician services through

24    negotiations with insurers for inclusion in their provider networks.  The relative bargaining

25    leverage of these negotiations depends on the strength of each side's alternatives if the parties

26    don't reach an agreement.  An insurer, for example, can defeat a provider's attempt to raise

27    prices if it can credibly threaten to exclude that provider from its network.  A provider may

DEFENDANTS' PRE-TRIAL MEMORANDUM (3:17-cv-05690-BHS) - 27

1    gain bargaining leverage from a transaction if the transaction eliminates a contracting

2    alternative for an insurer—that is, the transaction combines two firms that insurers viewed as

3    substitutes for its networks.  Here, the insurers will testify that they couldn't offer a marketable

4    product on Kitsap Peninsula without Franciscan and TDC *before* the TDC Transaction.  They

5    didn't view TDC and Franciscans as alternatives to one another.  So, insurers didn't lose a

6    contracting alternative from the TDC Transaction.  They needed both firms before and after the

7    TDC Transaction and thus Defendants didn't gain any bargaining leverage.

8         Importantly, the alleged increases in TDC's prices came *before* Franciscan had any

9    post-TDC Transaction negotiations with payers.  Franciscan simply added the TDC physicians

10   to its existing payer contracts based on its lawful, previously negotiated right to do so under the

11   terms of those contracts.  These alleged prices increases don't show that Franciscan gained any

12   market power after the TDC Transaction.  Instead, insurers will testify that the TDC

13   Transaction changed TDC's prices simply because TDC's physicians were added to

14   Franciscan's previously negotiated fee schedule.  Plaintiff's experts agree—as they must—that

15   these alleged price increases have nothing to do with market power.  Insurers also will testify

16   that these contract-conversion price changes happen anytime a physician joins a group with a

17   different fee schedule.  These price changes even happen when a health system adds physicians

18   in an area where it doesn't have any competing physicians.

19        Plaintiff will likely contend that Franciscan's ability to maintain the higher price for

20   TDC's services after post-TDC Transaction negotiations with insurers shows that Franciscan

21   gained market power after the TDC Transaction.  Again, this is not so.  Insurers and

22   Franciscan's VP of Network Strategy and Contracting, Dhyan Lal, will testify that it negotiates

23   rates on a "global" or "system-wide" basis, meaning the negotiation focuses on the total budget

24   for *all* of Franciscan's services to the insurer's patient population.  It therefore is inappropriate

25   to focus on changes in TDC's prices in isolation from changes in Franciscan's prices for its

26   other services.  For example, an insurer may not bear a cost increase if Franciscan raises the

27   prices for TDC's services but lowers the prices for its hospital services.  In fact, the payer may

**Davis Wright Tremaine LLP**
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1  experience a net cost decrease.  Plaintiff won't (but must) show the TDC Transaction caused

2  insurers to pay higher total cost than they would have absent the TDC Transaction.

3         **2.      Defendants Will Present Evidence That Rebuts Any Potential
                    Showing of Anticompetitive Effects**

4         Under the rule of reason, the burden shifts to defendants only if Plaintiff can show "that

5  the restraint produces significant anticompetitive effects within a relevant market."  *O'Bannon*,

6  802 F.2d at 1069-70.  Defendants then may rebut Plaintiff's initial showing with "evidence of

7  the restraint's procompetitive effects."  *Id.* (citation omitted).  If defendants succeed, then

8  Plaintiff can only prevail by showing that "legitimate objectives can be achieved in a

9  substantially less restrictive manner."  *Id.*  Plaintiff won't satisfy its *prima facie* burden for the

10 reasons noted above.  But even if it did, Defendants will show that their conduct didn't produce

11 anticompetitive effects because the TDC Transaction saved TDC from dissolution and created

12 efficiencies.  And Plaintiff won't show that any of these procompetitive benefits could be

13 achieved absent the TDC Transaction.  At every turn, Plaintiff has tried to exclude all evidence

14 about TDC's dire financial condition before the TDC Transactions.  Dkts. 105, 153, & 167.

15        **a.      TDC Would Have Dissolved Absent the TDC Transaction**

16        The rule of reason must consider a challenged activity's net effect on competition, and

17 competitive significance of a firm is a crucial component of this inquiry.  Under *United States*

18 *v. General Dynamics Corp.*, courts must assess the future competitive significance of a firm—

19 not just its present size—when evaluating the effect on competition.  415 U.S. 486, 492-94

20 (1974).  Plaintiff's competitive effects analysis ignores all evidence about the weakened future

21 competitive significance of TDC.

22        Defendants will show at trial that TDC wouldn't survive on its own.  For years leading

23 up to the TDC Transaction, TDC couldn't adequately compensate its physicians.  The

24 physicians, as shareholders, were paid last—after TDC covered all of its other expenses, like

25 supplies, debt, staff salaries, and rent.  Compensation decreased year after year—especially

26 when compared to their national peers—as TDC sought to avoid cash shortfalls.  Meanwhile,

27

DEFENDANTS' PRE-TRIAL MEMORANDUM (3:17-cv-05690-BHS) - 29

1   compensation for physicians nationally continued to increase, and TDC physicians were

2   actively recruited by other healthcare organizations outside of the region.  TDC struggled to

3   recruit new physicians as a result of its finances.  It had to pay new physicians high guaranteed

4   salaries, despite their low production, in order to recruit them to join TDC.  Once employed by

5   TDC, recruits declined to become shareholders, and instead elected to remain salaried

6   physicians with guaranteed income levels.  And they made this choice to avoid earning less

7   compensation as a shareholder.  For everyone else, compensation declined further because the

8   shareholder physicians had to cover these costs.

9          In the time period leading up to the TDC Transaction, physicians left TDC, or

10   considered leaving, because their compensation was not commensurate with their productivity.

11   In 2016, TDC lost about 30% of its primary care physicians all at once.  Five primary care

12   physicians on Bainbridge Island left TDC to join Swedish Health System, where they would

13   receive higher income commensurate with their productivity.  Other physicians left TDC for

14   higher paying opportunities outside Kitsap.  For the shareholders that remained, compensation

15   was an ongoing issue.  Some of the physicians continued to practice with TDC despite

16   declining compensation out of concern that their departure would be the last straw for the

17   group—the loss of another referral stream would be fatal to the practice.  Others considered

18   part-time locums tenens work in other locales to enhance their ability avoid moving out of the

19   area while their children were still in school.

20          The loss of TDC physicians would have reduced the availability of healthcare services

21   in the area and decreased competition.  But the TDC Transaction stabilized TDC and enabled it

22   to remain open.  TDC doctors were able to continue their practices in Kitsap, serving the

23   community.  Defendants will show at trial that, when all relevant evidence is considered, the

24   Transaction produced procompetitive effects by keeping necessary physicians in the

25   community.  Plaintiff lacks any evidence that another entity would have saved TDC from

26   dissolution.

27

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**b.      The Transaction Produced Transaction-Specific Efficiencies That Outweigh Any Purported Anticompetitive Harm**

The rule of reason requires courts to analyze the alleged restraint in tandem with any procompetitive benefits to determine whether the challenged activity is reasonable.  *See, e.g.,* *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991).  Courts have recognized many procompetitive justifications, including increased output, enhanced operating efficiencies, and expanding consumer choice.  *See*, *Broadcast Music, Inc.*, 441 U.S. at 20; *Paladin Assoc., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1157 (9th Cir. 2003), *Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors*, 786 F.2d 1400, 1407 (9th Cir. 1986).  The TDC Transaction created measureable efficiencies that benefit patients on the Kitsap Peninsula, namely:

- preserved output by incentivizing providers to remain on Kitsap Peninsula;

- created millions in cost-saving efficiencies that will improve quality; and

- expanded consumer choice for individuals on government health plans and Tri-Care members[5].

Franciscan witnesses will explain Franciscan's commitment to expanding, not decreasing, the services that it delivers on Kitsap Peninsula.  It is currently building a new $500 million hospital in Silverdale that will have more beds and services than what is currently offered at Harrison Medical Center.  TDC's clinics and offices will surround the Silverdale hospital.  Dr. Wu will testify that the TDC Transaction expanded the delivery of healthcare services because it increased the health system's referral base, assuring access to a larger group of specialists, and promoting broader geographic coverage to reach an expanded population base.

The TDC Transaction also prevented a number of physician departures.  TDC physicians will testify that they would have left the KP/BI area because of inadequate compensation had the TDC Transaction not occurred.  Instead, the TDC Transaction made it financially viable for physicians to stay, and it has helped recruit new physicians to the

---

[5] Tri-Care is a commercial health insurance plan for uniformed Service members and their families, National Guard/Reserve members and their families, survivors, former spouses, Medal of Honor recipients and their families, and others registered in the Defense Enrollment Eligibility Reporting System. https://www.tricare.mil/Plans/Eligibility.

DEFENDANTS' PRE-TRIAL MEMORANDUM (3:17-cv-05690-BHS) - 31

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1    practice. Maintaining and increasing the number of physicians in an area is procompetitive—it

2    facilitates an expansion of output and services available to patients.

3        The TDC Transaction has produced millions in cost-saving efficiencies too. Courts

4    recognize cost savings from a transaction as a cognizable efficiency under the antitrust laws.

5    *See United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 89 (D.D.C. 2011). In *Federal*

6    *Trade Commission v. Freeman Hospital*, for example, the court denied the FTC's request to

7    enjoin a hospital merger, noting that "[t]he consolidation may also make possible the creation

8    of significant economic efficiencies through less overhead expenses and less administrative

9    duplication." 911 F. Supp. 1213, 1224 (W.D. Mo. 1995) *aff'd,* 69 F.3d 260 (8th Cir. 1995). As

10   in *Freeman*, the combination of TDC and Franciscan has resulted in "significant economic

11   efficiencies," including at least $2.7 million in annual cost-savings from the consolidation of

12   duplicative ancillary services. Defendants' expert Kevin Kennedy will testify that the

13   consolidation of imaging services has led to annual savings of approximately 89% for operating

14   lease and maintenance expenses for basic imaging equipment and approximately 59% for

15   annual MRI costs. Franciscan and TDC also saved $1.9 million from the consolidation of lab

16   services by eliminating all of TDC's lab related expenses. They also realized purchasing

17   savings from a 10% reduction in its supplies, pharmaceutical, and equipment expenses and

18   other rebates. Defendants have other ongoing efforts to reduce their cost of care on Kitsap

19   Peninsula. None of these savings could be obtained without the TDC Transaction.

20       Quality also has improved after the TDC Transaction, which courts recognize as an

21   efficiency. *See County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir.

22   2001); *FTC v. Butterworth Health Corp.,* 121 F.3d 708 (6th Cir. 1997). TDC physicians now

23   participate in all of Franciscan's risk-based contracts, which provide financial incentives to

24   improve quality and lower the cost of care. Before the transaction, TDC participated in some

25   risk-based contracts, but it lacked the scale and infrastructure to participate to the degree

26   Franciscan participates in these types of contracts. This increased participation in risk-based

27

DEFENDANTS' PRE-TRIAL MEMORANDUM (3:17-cv-05690-BHS) - 32

contracts has helped improve quality.  TDC also participates in Franciscan's quality initiatives, which will lead to measurable quality improvements for area patients.

Perhaps most importantly, the TDC Transaction expanded consumer choice for patients without commercial insurance—especially with regard to low-income Medicaid patients. *Compare Broadcast Music*, 441 U.S. at 22; *see Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 102 (1984) (recognizing consumer choice as a procompetitive benefit).  Before the TDC Transaction, TDC physicians received significantly less income for treating patients without commercial insurance.  They therefore limited the number of non-commercial patients they would treat.  After the TDC Transaction, TDC physicians receive the same compensation regardless of whether the patient has insurance and if so, regardless of the type of insurance.  That is because Franciscan bears the "collection" risk and pays TDC solely based on productivity.  Mr. Kennedy will explain at trial that access improved by 9%-14% for Medicare patients and 3% for Medicaid patients.  He also considered whether this benefit could be achieved without the TDC Transaction and determined it could not.  Plaintiff, on the other hand, lacks any evidence that these efficiencies could be achieved absent the TDC Transaction.

## B.  The WSO Transaction Doesn't Violate Section 7

Section 7 of the Clayton Act prohibits mergers that may substantially lessen competition.  15 U.S.C. § 18.  To decide the legality of a merger, a court considers evidence of the "immediate impact of the merger upon competition" and predicts the future effects of the transaction.  *See St. Luke's Health Sys.,* 778 F.3d at 783.  A court's focus is not "ephemeral possibilities" of anticompetitive effects, or "certainties," but rather "probabilities."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962).

Courts analyze mergers using a burden-shifting framework.  Plaintiff must first establish a *prima facie* case that a merger is anticompetitive.  To do so, courts require a plaintiff to define relevant markets and prove that the merger increases market concentration to a level at which anticompetitive effects are presumed—i.e., an HHI increase of 200 points to an HHI of over 2500.  *St. Luke's*, 778 F.3d at 786.  The burden then shifts to defendant to "'cast doubt

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

on the accuracy of the Government's evidence as predictive of future anticompetitive effects.'" *Id.* at 788 (quoting *Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 423 (5th Cir. 2008)). Defendants can do so by identifying the transaction's procompetitive effects or undermining plaintiff's evidence of potential anticompetitive harm. *United States v. Baker Hughes Inc.*, 908 F.2d. 981, 983-85 (D.C. Cir. 1990). The burden of production then shifts to plaintiff and merges with the ultimate burden of persuasion, which plaintiff bears at all times. *St. Luke's*, 778 F.3d at 783.

### 1.   Plaintiff Can't Satisfy Its *Prima Facie* Burden

Plaintiff's challenge to the WSO Transaction fails because Plaintiff can't prove its *prima facie* case under Section 7. Based on its Complaint, briefings, and expert reports, Plaintiff doesn't intend to present any evidence that the WSO Transaction substantially lessened competition. *See* 15 U.S.C. § 18. Instead, it plans to present evidence that the *combined* effects of the TDC Transaction—which it claims isn't a merger—and the earlier WSO Transaction violated Section 7. This approach is indirect conflict with the plain text of Section 7. As Defendants' partial motion for summary judgment explained, Plaintiff can't prevail as a matter of law absent evidence that the WSO Transaction—separate from the TDC Transaction—violated Section 7. And even if Plaintiff had done the proper legal analysis, it couldn't come close to satisfying its *prima facie* burden.

### a.   The Court Should Analyze the Incremental Effect of the WSO Transaction

Plaintiff offers the wrong analytical construct for evaluating the WSO Transaction's legality under Section 7. There is no basis to treat two separate transactions as a single transaction simply because they are "contemplated, negotiated, and close at approximately the same time." Dkt. 211 at 23. Most critically, this approach contradicts the text of Section 7, which outlaws an acquisition where "the effect *of such acquisition* . . . may be substantially to lessen competition." 15 U.S.C. § 18 (emphasis added). The statute focuses on the individual *acquisition*, not acquisitions. Plaintiff's approach eliminates Section 7's causation requirement

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1    because a review of the cumulative effects prevents the court from determining which

2    transaction caused what, if any, harm.  *See United States v. Archer-Daniels-Midland Co.*, 781

3    F. Supp. 1400, 1402 (S.D. Iowa 1991).  And it creates "guilt by association."  This case is a

4    good example.  Franciscan had *one* orthopedist on Kitsap Peninsula before the WSO

5    Transaction—who has since retired—and it acquired a mere six additional orthopedists after

6    the WSO Transaction.  Undoubtedly, this acquisition had a *de minimis* effect on competition, as

7    Defendants' expert, Dr. Lawrence Wu, shows (without challenge).  But Plaintiff's combined

8    effects approach attempts to condemn *both* transactions.

9           The Court should ignore the impact of the TDC Transaction in its review of the WSO

10   Transaction because it's an unrelated "subsequent development."  Section 7 requires that any

11   "developments subsequent to the merger but not 'caused' by it should be ignored."  Areeda

12   ¶ 1205a.  As Professors Areeda and Hovenkamp observe, "subsequent developments (1) that

13   were neither implicit at the time of merger nor reasonably attributable to the merger itself but

14   (2) that would lead the antitrust tribunal to condemn the challenged merger if it were now to

15   occur" should be ignored, and "retroactive illegality should not be imposed on a merger that

16   was lawful as of the time it was consummated."  *Id.* ¶ 1205c2; *see also Chateau De Ville*

17   *Prods., Inc. v. Tams-Witmark Music Library*, 24 Fed. R. Serv. 2d 623 (S.D.N.Y. 1977).  Here,

18   there is no evidence that the WSO Transaction caused or facilitated the TDC Transaction, that

19   the TDC Transaction was "implicit" in the WSO Transaction, or that the two transactions had

20   anything to do with one another.  Plaintiff has no evidence that TDC and WSO agreed with

21   each other that they both would join Franciscan; to the contrary, the reality is that Franciscan

22   negotiated the transactions separately, and it did not tell either TDC or WSO about the other's

23   possible transaction.

24          The legality of a merger must be "judged on the basis of evidence of the situation

25   existing *at the time of the acquisition*."  *Id*. ¶ 1205a (emphasis added).  Even when post-

26   acquisition evidence is available, courts "must consider whether [that evidence] illuminates the

27   situation that existed when the merger occurred or whether it reflects subsequent developments

DEFENDANTS' PRE-TRIAL MEMORANDUM (3:17-cv-05690-BHS) - 35

not reasonably attributable to the challenged merger itself." *Id*. ¶ 1205c1.  Although post-acquisition evidence may shed light on the tendency of a transaction to lessen competition, the Court must be vigilant to issues of causation when considering it.  The Court therefore should analyze the WSO Transaction *separate* from the TDC Transaction otherwise it can't properly determine whether the WSO Transaction was lawful at the time it occurred.

In addition, the way Plaintiff pled its claims requires separate treatment of the WSO Transaction.  Plaintiff didn't challenge the TDC Transaction as an illegal merger.  Instead, it contends that TDC and Franciscan remain separate firms with their own decision-makers after the TDC Transaction.  Compl. ¶¶ 68-69; Dkt. 239.  The Court has struck Defendants' affirmative merger defense for the TDC Transaction because Plaintiff didn't bring a merger case. Dkt. 239.  If TDC remains a separate and independent company (as Plaintiff claims) after the TDC Transaction, then Plaintiff can't treat TDC and Franciscan as a merged entity for purposes of analyzing the WSO Transaction's legality under Section 7.  There is no logical or legal basis for doing so.

> **b.     Plaintiff Can't Prove Undue Concentration in a Properly Defined Relevant Market**

To establish its *prima facie* case, Plaintiff must define a proper relevant market and show that the "transaction will lead to undue concentration in the relevant market.  *See Baker Hughes*, 908 F.2d at 982-83; *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963).  Plaintiff won't satisfy this burden at trial.  First, it doesn't offer a proper relevant market.  Plaintiff's putative market is orthopedic services in the KP/BI area—the same proposed market for orthopedic services related to its Section 1 claim.  And as explained above, this market is flawed for two reasons:  (1) it excludes services from Kaiser physicians; and (2) excludes orthopedists in Seattle and Tacoma.  So, this failure alone requires judgment for Defendants on Plaintiff's Count 2 claim.  *See e.g., United States v. Marine Bancorporation,* 418 U.S. 602, 618 (1974); *Baker Hughes*, 908 F.2d at 982.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

Second, the WSO Transaction doesn't produce concentration levels that warrant a presumption of market power.  Plaintiff's primary expert economist, Dr. Capps, admitted at his deposition that after the WSO Transaction (and before the TDC Transaction), the HHI was well below 2500.  So, Plaintiff doesn't have a presumption of market power to help it satisfy its *prima facie* burden.  *Baker Hughes*, 908 F.2d at 984.

No modern court has ever enjoined a merger with shares or concentration levels this low.  Franciscan and WSO have a post-merger 10.5% share in a market with an HHI of 1874.  Even in Plaintiff's alleged relevant market, the combined share of Franciscan and WSO remains very low—27.7% with an HHI of 1774.  Unsurprisingly, the WSO Transaction produces shares and concentration levels well below the HHI levels and combined market shares that other courts have found sufficient to violate Section 7:

| Case | Markets | Share | HHI Increase | Post- HHI | Holding |
|------|---------|-------|--------------|-----------|---------|
| *Advocate*[6] (N.D. Ill. 2017) | GAC | 60% | 1,782 | 3,943 | Enjoined |
| *Sanford*[7] (D.N.D. 2017) | Adult PCP Pediatricians OB/GYN Gen. Surg. | 86% 99% 85% 100% | 3,531 4,393 1,152 4,602 | 7,422 9,726 7,363 9,964 | Enjoined |
| *Hershey*[8] (3rd. Cir. 2016) | GAC | 76% | 2,582 | 5,984 | Enjoined |
| *St. Luke's*[9] (9th Cir. 2015) | Adult PCP | 78% | 1600 | 6219 | Enjoined |
| *ProMedica*[10] (6th Cir. 2014) | OB GAC | 81% 58% | 1,323 1,078 | 6,845 4,391 | Enjoined |
| *Butterworth*[11] (6th Cir. 1997) | PCP GAC | 65% 47% | 1,675 1,064 | 4,506 2,767 | Lawful |
| *Freeman*[12] (8th Cir. 1995) | GAC | 24% | 251 | 1,496 | Lawful |
| *WSO* (W.D. Wash. 2019) | Orthopedics | 10.5% | 39 | 1,874 | **TBD** |

---

[6] *FTC v. Advocate Health Care*, 2017 WL 1022015 (N.D. Ill. Mar. 16, 2017).
[7] *FTC v. Sanford Health, Sanford Bismarck*, 2017 WL 10810016 (D.N.D. Dec. 15, 2017).
[8] *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327 (3d Cir. 2016).
[9] *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775 (9th Cir. 2015).
[10] *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 568 (6th Cir. 2014).
[11] *FTC v. Butterworth Health Corp.*, 121 F.3d 708 (6th Cir. 1997).
[12] *FTC v. Freeman Hosp.*, 911 F. Supp. 1213, 1222 (W.D. Mo. 1995), *aff'd*, 69 F.3d 260 (8th Cir. 1995).

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1    This charts illustrates that all transactions enjoined had a combined share above 50% and an

2    HHI well above 2500.  The WSO Transaction has neither, even in Plaintiff's putative markets.

3    No court in the 21st century has ever found a transaction with shares this low to violate the

4    antitrust laws.  It also shows that the WSO Transaction presents shares and concentration levels

5    similar to those found lawful in *FTC v. Freeman Hospital*, 69 F.3d. 260 (8th Cir. 1995) and

6    more than *two times* lower than those found lawful in *FTC v. Butterworth Health Corp.*,121.

7    F.3d 708 (6th Cir. 1997).

8                    **c.    Plaintiff Can't Prove Anticompetitive Harm**

9         Beyond market concentration statistics, Plaintiff must also prove a likelihood of

10   anticompetitive effects from the WSO Transaction.  *See Baker Hughes*, 908 F.2d at 984

11   ("[e]vidence of market concentration simply provides a convenient starting point for a broader

12   inquiry into future competitiveness"; "the Herfindal Hirschman Index cannot guarantee

13   litigation victories").  Importantly, high market share and concentration statistics don't

14   conclusively establish anticompetitive effects.  *See General Dynamics*, 415 U.S. at 498.

15   Plaintiff must put on more evidence to carry its heavy burden under Section 7.  *Baker Hughes*,

16   908 F.2d at 984.

17        Plaintiff has no evidence that the WSO Transaction produced (or will produce)

18   anticompetitive effects.  Similar to its strategy for the TDC Transaction, Plaintiff will argue that

19   the prices for WSO's services went up immediately after the WSO Transaction.  But, as

20   explained above, the antitrust laws only condemn higher prices caused by increases in market

21   power.  *See In re Evanston*, 2007 WL 2286195, at *54 (F.T.C. Aug. 6, 2007).  These price

22   changes occurred from merely adding the six WSO physicians to Franciscan's pre-existing

23   contracts.  This contract conversion is commonplace in healthcare and surely isn't illegal under

24   the antitrust laws.

25        Plaintiff also can't show that Franciscan gained any additional bargaining power in

26   subsequent insurer negotiations from employing the six WSO physicians.  Franciscan had only

27   one orthopedic surgeon on Kitsap Peninsula before the WSO Transaction.  And insurers will

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

testify that they didn't negotiate contracts with WSO before the WSO Transaction.  Instead, they put WSO on a non-negotiable standard fee schedule, reserved for small physician groups. Franciscan's employment of these six orthopedists—who insurers deemed too small to negotiate with—surely didn't change Franciscan's bargaining power with insurers.

### 2.      Defendants Will Successfully Rebut Plaintiff's *Prima Facie* Case

Defendants will also put forth additional evidence showing the WSO Transaction didn't produce any anticompetitive harm.  Under Section 7, defendants may rebut a Plaintiff's *prima facie* case with any evidence that "'cast[s] doubt on the accuracy of the Government's evidence as predictive of future anticompetitive effects.'"  *St. Luke's*, 778 F.3d at 788 (quoting *Chi. Bridge & Iron*, 534 F.3d at 423).  [E]vidence on a variety of factors can rebut a *prima facie* case."  *Baker Hughes*, 908 F.2d at 984.  Defendants will satisfy their burden by:  (1) proving WSO was a failing firm—an absolute defense; (2) showing WSO would have been an insignificant future competitor; (3) and showing that the WSO Transaction had a net procompetitive effect.

### a.      WSO Was a Failing Firm

The failing firm defense is "an absolute defense to an action under Section 7 of the Clayton Act."  *Sutter Health Sys.*, 84 F. Supp. 2d at 1081 (N.D. Cal. 2000); Areeda ¶ 951c. The doctrine recognizes that the total loss of a competitor is a greater harm to competition than allowing it to remain in the market as a party to a merger.  *General Dynamics*, 415 U.S. at 507. The public benefits when an acquisition allows a company to avoid failure because employees keep their jobs and the business remains open in the local community.  *Id.*; *Int'l Shoe Co. v. FTC*, 280 U.S. 291, 302 (1930); Areeda ¶ 952c1.  It also "incorporates the possibility that the merger will generate cognizable efficiencies," because only then is it worthwhile for a successful firm to buy a failing rival.  Carl Shapiro, Department of Justice, Competition Policy in Distressed Industries, 2009 WL 1371415, at *10 (May 13, 2009).  The failing firm defense applies where a company faces business failure, including if "it is unable to meet its debts as they come due," and it has made "a good faith effort to seek offers from other potential

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

purchasers." *Sutter Health*, 84 F. Supp. 2d at 1081-82, 1084; *see General Dynamics*, 415 U.S. at 507.

Courts perform a fact-specific inquiry to evaluate a firm's financial condition.  They have found a company failing when it couldn't pay its bills as they came due, violated loan covenants, had liabilities exceeding the value of assets, needed principals to incur personal liability on the company's debts, or had insufficient working capital.  *See Sutter Health*, 84 F. Supp. 2d at 1081-82; *United States v. M.P.M., Inc.*, 397 F. Supp. 78, 100-01 (D. Colo. 1975). And in the healthcare industry, the FTC has found firms failing even when they may "have sufficient cash reserves to fund operations and its revenues cover expenses in the short term." Deborah L. Feinstein, Dir., Bureau of Competition, FTC, *Antitrust Enforcement in Health Care: Proscription, not Prescription* (June 19, 2014).[13]  Indeed, the FTC recently approved a health system-physician group merger despite significant antitrust problems because it had concerns that the physicians would leave the group for more income elsewhere if it didn't approve the transaction.[14]

Prior to the WSO Transaction, WSO was in a financial tailspin—clearly facing a "grave possibility of business failure." *Sutter Health*, 84 F. Supp. 2d at 1081 (quoting *Citizen Publ'g Co. v. United States*, 394 U.S. 131, 137 (1969)).  Its inability to pay its debts alone establishes its failing condition. *Sutter Health*, 84 F. Supp. 2d at 1082.  WSO owed Bank of America more than $770,000 of outstanding debt that it couldn't pay.  It also violated loan covenants, and defaulted on leases.  Its owners had to pay WSO's construction loan with their own personal funds to prevent default on that debt.  WSO couldn't incur more debt without personal guarantees from all its physician shareholders, which they refused to give because of the business's poor financial condition. *Compare United States v. Int'l Harvester Co.*, 564 F.2d

---

[13] *See* https://www.ftc.gov/system/files/documents/public_statements/409481/140619_aco_speech.pdf.
[14] Bureau of Competition, Fed. Trade Comm'n, *Healthcare Provider in St. Cloud, MN Settles FTC Charges That Its Acquisition of Rival Provider Would Likely Lessen Competition for Certain Physician Services* (Oct. 6, 2016), *available at* https://www.ftc.gov/news-events/pressreleases/2016/10/healthcare-provider-st-cloud-mn-settles-ftc-charges-its.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

769, 775 (7th Cir. 1977).  Courts find that a firm is failing if it can't borrow funds.  *See id.*; *United States v. Black & Decker Mfg. Co.*, 430 F. Supp. 729, 779 (D. Md. 1976).

As Defendants' expert Leonard Henzke's testimony will show, WSO couldn't independently reverse this financial crisis.  It had scarce working capital, and it stayed afloat by paying its physicians well below market incomes, laying off staff, and cutting employee benefits.  For years, WSO manipulated shareholder compensation (often resulting in less shareholder income) to pay its operating expenses and couldn't afford to pay its physicians income that aligned with their level of effort.  Mr. Henzke will testify about how drastic the pay imbalance was for WSO physicians—most WSO physicians maintained production above the median relative to their peers nationally, yet almost all of them earned below the 10th percentile of their peer groups.  In other words, they worked more for less.  If WSO paid its physicians income that aligned with their productivity, it would have incurred millions in net losses.

On top of facing financial failure, WSO was at risk of losing its most critical asset—the doctors.  Before the WSO Transaction, its physicians all seriously considered relocating, retiring early, or otherwise moving their practice outside of the Kitsap Peninsula.  The former WSO physicians will testify that they actively sought other opportunities and would have ceased practicing on the Kitsap Peninsula, but for the WSO Transaction.  Contemporaneous emails between the WSO physicians in early 2016 confirm their plans to depart if the transaction with Franciscan didn't proceed.  It also couldn't recruit new physicians (even with financially risky offers of high guaranteed salaries).  Mr. Henzke will explain that a single physician departure—one of the six orthopedists—would have ensured WSO's failure.

As to the second element of the failing firm defense, Defendants will show at trial that WSO conducted a good faith search for partners, but found "no other viable alternative purchaser."  *Dr. Pepper/Seven-Up Companies, Inc. v. FTC*, 991 F.2d 859, 865 (D.C. Cir. 1993).  The WSO Board discussed various options for the future of its practice.  It hired a consultant to attempt to renegotiate its rates with insurers.  WSO got close to a transaction with

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1   Proliance, a large surgical group, but that transaction was not feasible in light of WSO's

2   financial condition.  WSO physicians—who were already poorly paid—would have had to

3   personally fund expensive buy-in expenses, including costs for computer hardware and other

4   capital costs.  They also would have to pay substantial annual management and overhead fees

5   on an ongoing basis.  An affiliation with Proliance wouldn't have increased physician

6   compensation enough for WSO to recruit and retain physicians, and it offered no relief from

7   WSO's suffocating debt.  As a result, the WSO Board determined an affiliation with Proliance

8   was untenable.  WSO also considered affiliations with other health systems including Multi-

9   Care, Swedish, and Virginia Mason.  Individual WSO physicians will testify regarding their

10  exploration of these ideas.  For each of those would-be alternatives, the affiliating health

11  system would have had to agree to allow WSO providers to perform surgery at Franciscan-

12  owned Harrison Hospital or forced WSO surgeons and their patients to travel to Seattle or

13  Tacoma for surgery.  Neither were viable options.  WSO's efforts to find an alternative

14  purchaser "were numerous and varied," but "uniformly fruitless."  *See, e.g., M.P.M., Inc.*, 397

15  F. Supp. at 102.  WSO thus determined that a sale to Franciscan was the only viable option for

16  survival.

### b.   WSO Was a Weakened Future Competitor

18         Even if the Court finds that WSO somehow fell short of satisfying the failing firm

19  defense , then WSO must be classified as a "flailing" firm—i.e., a weakened competitor.  Its

20  poor financial condition—discussed above—shows that WSO would have had little future

21  competitive significance.  Defendants may rebut Plaintiff's *prima facie* case by "showing that

22  the government's market share statistics overstate the acquired firm's ability to compete in the

23  future and that, discounting the acquired firm's market share to take this into account, the

24  merger would not substantially lessen competition."  *FTC v. Univ. Health, Inc.*, 938 F.2d 1206,

25  1221 (11th Cir. 1991); *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 153 (D.D.C. 2004).  While

26  not an absolute defense, a company's weakened future ability to compete goes "to the heart of

27  the Government's statistical prima facie case."  *General Dynamics*, 415 U.S. at 508; *see also*

DEFENDANTS' PRE-TRIAL MEMORANDUM (3:17-cv-05690-BHS) - 42

*Int'l Harvester Co.*, 564 F.2d at 774.  That's because "[e]vidence of past production does not, as a matter of logic, necessarily give a proper picture of a company's future ability to compete." *General Dynamics*, 415 U.S. at 501.  The strength of the plaintiff's *prima facie* case determines the weight of the defendant's burden.  *FTC v. ProMedica Health Sys., Inc.*, 2011 WL 1219281, at *58 (N.D. Ohio Mar. 29, 2011).

Courts use the same factors that support a failing-firm defense to assess a firm's future financial condition, including high costs and uncertain prospects for access to new capital or vital inputs.  *Arch Coal, Inc.*, 329 F. Supp. 2d at 157; *see also FTC v. Nat'l Tea Co.*, 603 F.2d 694, 700 (8th Cir. 1979) (affirming merger's lawfulness where there would be "imminent departure" of the acquired firm if blocked).  As previously explained, WSO's financial struggles would prevent it from continuing to serve patients on the Kitsap Peninsula.  WSO physicians universally were underpaid and nearly every physician planned to retire or practice elsewhere, if the WSO Transaction didn't happen.  The group couldn't access capital, faced mounting costs and overdue bills, and it couldn't afford to recruit new doctors.  But for the merger, WSO would have dissolved.  It therefore would have had *zero* future competitive significance, meaning the WSO Transaction didn't substantially lessen competition.  *See General Dynamics*, 415 U.S. at 501.

### c.    The WSO Transaction Produced Transaction-Specific Benefits

Defendants may also rebut Plaintiff's *prima facie* case with evidence of a transaction's potential benefits.  *St. Luke's*, 778 F.3d at 783.  It is well recognized that a "primary benefit of mergers to the economy is their potential to generate significant efficiencies."  Horizontal Merger Guidelines § 10.  Defendants must simply show efficiencies that couldn't be achieved absent the transaction.  *Id.*  And efficiencies claims matter most in cases like this one, where the evidence of harm to competition is weak, at best.  *Id.*  Here, on balance, patients benefited from the WSO Transaction.  It preserved important access to orthopedic care on Kitsap Peninsula.  The WSO Transaction also expanded access to care for underserved patients.  Defendants'

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1   expert, Kevin Kennedy, will testify that WSO physicians now treat more patients without

2   commercial insurance because Franciscan utilizes a payer-neutral compensation plan.  Thus,

3   physicians are paid the same to see Medicaid, Medicare, and commercial patients.  So, patients

4   on Medicaid (for example) now have more local options for orthopedic services.  Ironically,

5   Plaintiff will likely argue this benefit isn't "cognizable" under the antitrust laws.  Not true.

6   Courts must consider *all* efficiencies from a transaction regardless of whether they occur in

7   plaintiff's alleged markets.  *See* Horizontal Merger Guidelines § 10 n.14.

8        The WSO Transaction also enabled the WSO physicians to provide higher quality,

9   lower cost care.  It freed WSO from its financial constraints and gave Franciscan a stable group

10  of orthopedic surgeons that would make the community and the practice more attractive to

11  potential physician recruits.  *See FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1054 (8th

12  Cir. 1999) (finding "[t]he merged entity will be able to attract more highly qualified physicians

13  and specialists and to offer integrated delivery and some tertiary care").  Because the WSO

14  physician contract now through Franciscan's payer contracts, many of which include quality

15  and savings incentives (unlike WSO's pre-transaction payer contracts), WSO physicians have

16  new incentives to increase quality and reduce costs.  *See* Horizontal Merger Guidelines § 10

17  ("improved quality" one of many efficiencies merger can create).  And Defendants obtained

18  cost-savings from combining overhead functions under Franciscan.  *See United States v. H & R*

19  *Block, Inc.*, 833 F. Supp. 2d 36, 89 (D.D.C. 2011); *FTC v. Freeman Hosp.*, 911 F. Supp. 1213,

20  1224 (W.D. Mo.), *aff'd*, 69 F.3d 260 (8th Cir. 1995).  Courts presume non-profits, like

21  Franciscan, pass cost-savings on to consumers.  *See United States v. Long Island Jewish Med.*

22  *Ctr.*, 983 F. Supp. 121, 149 (E.D.N.Y. 1997).  In sum, these transaction-specific benefits easily

23  outweigh the nonexistent anticompetitive effects, giving the Court yet another reason to rule in

24  Defendants' favor on Count 2.

25       **C.    Divestiture Isn't an Appropriate Remedy**

26       Even if the Court finds some antitrust liability, it has broad discretion to fashion a

27  remedy that is "effective to redress the antitrust violation proved."  *United States v. E.I. du Pont*

DEFENDANTS' PRE-TRIAL MEMORANDUM (3:17-cv-05690-BHS) - 44

*de Nemours & Co.*, 366 U.S. 316, 323 (1961).  Plaintiff asks the Court to "rescind and declare null, void, and unenforceable" all the contracts that make up the Kitsap Transactions.  Compl. ¶ 105(d).  But divestiture is a "drastic and rarely awarded remedy."  *Taleff v. Sw. Airlines Co.*, 554 F. App'x 598, 598 (9th Cir. 2014); *see* 10A Fletcher Cyc. Corp. § 5046.05.  And divestiture isn't "necessarily the most appropriate means for restoring competition."  *FTC v. Pepsi Co., Inc.*, 477 F.2d 224, 29 n.8 (2d Cir. 1973).  Divestiture, for example, is a "costly operation" and "its aftermath may affect the parties and the market structure in a manner that the court cannot reasonably predict." 1 Callmann on Unfair Comp., Tr. & Mono. § 4:46 (4th ed.).  It thus "requires careful application" and shouldn't be ordered "where less extreme remedies" would protect the public.  10A Fletcher Cyc. Corp. § 5046.05.

### 1.     Divestiture Wouldn't Effectively Restore Competition

Divestiture is an appropriate remedy only if it is "the most appropriate means for restoring competition."  *PepsiCo, Inc.*, 477 F.2d at, 29 n.8; *see also Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1235 (8th Cir. 2010).  Plaintiff's proposed remedy here would not restore competition and, in fact, would only harm it.

### a.     The Kitsap Transactions Integrated the Firms Irrevocably

Divestiture can't be an effective remedy here because the post-Kitsap Transaction entities are irrevocably integrated.  In the year after Kitsap Transactions, before Plaintiff initiated this lawsuit, Franciscan reorganized and consolidated services.  Franciscan also moved TDC's laboratory and underutilized imaging services to Harrison, away from TDC's stand-alone facilities.  With these changes, Franciscan combined staff, equipment, and other resources.  The integration of those services into existing departments can't simply be undone.

That the proverbial eggs are scrambled is more than an academic issue for the Court.  It impacts the effectiveness of divestiture as a remedy.  In *du Pont*, the Supreme Court rejected a proposed alternative remedy because it "would probably involve the courts and the Government in regulation of private affairs more deeply than the administration of a simple order of divestiture."  *du Pont*, 366 U.S. at 334.  But here, divestiture is far from "the surer,

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

cleaner remedy" as it was in that case.  Any unwinding of the Kitsap Transactions will necessarily involve significant oversight by this Court.  The closed facilities and sold equipment would need to be replaced—a costly endeavor, and one that the TDC and WSO in reconstituted form would struggle to accomplish.  TDC and WSO couldn't restore operations as independent firms until they obtained the necessary working capital, staff, facilities, and physician resources needed to serve patients.  In these circumstances, divestiture is impractical.

### b.   TDC and WSO Can't Survive as Independent Firms

Even if it were possible to reconstitute TDC and WSO as independent practices, they wouldn't last long.  Defendants will show at trial that physicians won't remain in these practices, for the same reasons that they were leaving TDC and WSO, before the Kitsap Transactions.  Both firms would face the same financial difficulties that they experienced before the Kitsap Transactions:  high operating costs, below market compensation, difficulty recruiting new practitioners, and challenges retaining those already in practice.  *See United States v. LTV Corp.*, No. CIV. A. 84-884, 1984 WL 21973, at *10 (D.D.C. Aug. 2, 1984).  TDC and WSO also would face the added difficulty of having to fund equipment, working capital, and other start-up costs, in addition to identifying and hiring staff in a start-up environment.  Defendants have sold WSO's clinic building so the WSO physicians would have no clinic at which to practice.  Individual physicians will testify that they have no interest in practicing at a reconstituted TDC or WSO.  Many of these physicians would look for work outside of the Kitsap Peninsula.  Other physicians will retire early instead of returning to a struggling independent practice.  And Defendants' expert will testify that even a small number of physician departures will lead to the groups' imminent failure.  In particular, the loss of certain general practitioners who feed referrals to their specialist colleagues will doom TDC.  Ultimately, a divestiture will lessen competition for physician services on the Kitsap Peninsula and may leave thousands of patients without access to their physicians.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

c.      There Is No White Knight

Plaintiff will likely argue that divestiture to another health system provides an
alternative to divestiture of TDC and WSO back into independent practices.  But this, too,
makes little sense.  Defendants' physician witnesses will testify that it would be impractical for
them to affiliate with a health system without a hospital in Kitsap County.  A Seattle- or
Tacoma- based hospital would be far less convenient for primary care patients.  And the
Kitsap-based physicians would struggle to fulfill emergency call obligations at a hospital in
Seattle or Tacoma, as such obligations usually require surgeons and other specialists to be
available at the hospital on short notice.  Physicians also need to have admitting privileges at
local hospitals near their clinics to properly serve their patients.

2.      Plaintiff's Proposed Divestiture Remedy for the TDC Transaction Is
         Too Broad

Plaintiff seeks a divestiture of TDC physicians and former TDC assets not at issue in
this lawsuit.  Courts have broad authority to craft a remedy to redress anticompetitive harm, but
any remedial measures must not be overbroad or punitive.  *N. Tex. Specialty Physicians v. FTC*,
528 F.3d 346, 371 (5th Cir. 2008); *In re The Raymond Lee Org.*, 942 F.T.C 489, 1978 WL
206103, at *118 (F.T.C. Nov. 1, 1978).  Any ordered remedy must bear a "reasonable relation"
to the harms identified and the specific markets found to be at issue.  *Jacob Siegel Co. v. FTC*,
327 U.S. 608, 613 (1946); *see also Grove Labs. v. FTC*, 418 F.2d 489, 497 (5th Cir. 1969).
Courts have repeatedly reversed or modified remedies not reasonably connected to the
competitive harms or that go beyond the bounds of the relevant markets where a violation has
been found.  *See, e.g.*, *Seeburg Corp. v. FTC*, 425 F.2d 124, 129-30 (6th Cir. 1970); *Abex Corp.
v. FTC*, 420 F.2d 928, 933 (6th Cir. 1970).

Here, Plaintiff seeks a remedy for the TDC Transaction that goes well "beyond the
bounds of the relevant markets" at issue in this lawsuit.  It only alleged harm in two relevant
service markets:  adult PCP and Orthopedic services.  Yet, Plaintiff asks the Court to unwind
the entire TDC Transaction involving many physician services outside of the two markets at
issue.  It also asks the Court to unwind an asset sale that has little to do with the markets at

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1   issue.  This requested relief is too broad and thus inappropriate for those reasons alone.  If the

2   Court chooses to impose the drastic remedy of divestiture, it should be a partial one.  *See*

3   *Matter of Warner-Lambert Co.,* 88 F.T.C. 503, 1976 WL 180015, at *1 (1976); Callmann on

4   Unfair Comp., Tr. & Mono. § 4:46 (4th Ed.).

5          Separately, divestiture is only the "customary form of relief in Section 7 cases."  *St.*

6   *Luke's*, 778 F.3d at 792.  But Plaintiff didn't challenge the TDC Transaction as an illegal

7   merger under Section 7 or Section 1.  Dkt. 239.  It solely challenges the Defendants' allegedly

8   joint negotiation of prices as a violation of Section 1 relating to the adult PCP and Orthopedic

9   services markets.  The Court may order injunctive relief to redress a Section 1 violation that

10  enjoins Defendants from engaging in the challenged conduct—i.e., TDC adult PCP and

11  orthopedic physicians billing under Franciscan's tax identification number.  It shouldn't,

12  however order divestiture of TDC because that relief extends well beyond redressing the

13  challenged "restraint of trade."

14         The Court also shouldn't remedy other aspects of the TDC transaction because they

15  don't create harm that the antitrust laws were designed to avoid.  To obtain an injunction under

16  Section 16 of the Clayton Act, Plaintiff must show "antitrust injury," which is a "threatened

17  loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that

18  which makes defendants' acts unlawful.'" *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S.

19  104, 113 (1986) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489

20  (1977)). This requirement applies when state attorneys general invoke Section 16.  *See*

21  *California v. Am. Stores Co.*, 495 U.S. 271, 296 (1990); *New York v. Microsoft Corp.*, 209 F.

22  Supp. 2d 132, 139-41 (S.D.N.Y. 2002).

23         Franciscan requires certain surgeries to be performed in a hospital and not in an

24  ambulatory surgery center.  It therefore integrated TDC's diagnostic imaging services with

25  HMC's, which caused certain patients to pay higher facility fees for surgeries and for hospital-

26  based imaging services.  But higher facility fees, because they are not caused by an exercise of

27  market power—i.e., an increased "ability to raise price profitably *by restricting output*"—are

DEFENDANTS' PRE-TRIAL MEMORANDUM (3:17-cv-05690-BHS) - 48

1   not the concern of antitrust laws.  *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2288 (2018).

2   The Court therefore should leave them alone.

3          The same goes for the Ethical Religious Directives ("ERDs").  They prohibit Franciscan

4   from performing certain procedures on ethical and religious grounds.   Any alleged harm from

5   the ERDs would not flow from a reduction in competition in the relevant markets for PCP and

6   orthopedic physician services. Catholic hospitals do not reduce their output of restricted

7   services to raise the price of those services and earn monopoly profits.  Instead, they perform

8   no restricted services, charge a zero price, and earn zero profits.  That is not an anticompetitive

9   result—it is the result of a religious ministry exercising its First Amendment right to decide

10  what services it will not provide.  If the Court finds an antitrust violation related to the TDC

11  Transaction, that violation will have nothing to do with Franciscan's ERDs.  So, the Court

12  shouldn't enjoin their application to TDC and WSO physicians.

13          **3.     Other Remedies Are Better Suited to Prevent Anticompetitive Harm**

14          For all the reasons expressed above, other remedies would more effectively redress any

15  violations.  Behavioral remedies, for example, that impose restrictions on a defendant's

16  business conduct can be effective to redress anticompetitive harm in healthcare markets.

17  Courts, the FTC, DOJ, and states' attorneys general have implemented behavior remedies to

18  redress anticompetitive harm in healthcare markets.  In *Butterworth,* for example, the Court

19  accepted the defendants' "community commitment" that restricted their ability to raise prices

20  for hospital services and required them to achieve certain community benefits.  *FTC v.*

21  *Butterworth Health Corp.*, 946 F. Supp. 1285, 1298 (W.D. Mich. 1996), *aff'd*, 121 F.3d 708

22  (6th Cir. 1997).  Similarly, the federal antitrust agencies and states' attorneys general have

23  imposed behavior remedies in healthcare transactions to remedy potential anticompetitive

24  harm.  The FTC in *In re Evanston*, found a consummated hospital merger violated Section 7,

25  but decided a divestiture wasn't necessary to restore competition.  *In the Matter of Evanston*

26  *Nw. Healthcare Corp.*, No. 9315, 2007 WL 2286195, at *54 (F.T.C. Aug. 6, 2007).  Instead,

27  the FTC imposed certain restrictions on the defendants, including the creation of separate

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1   negotiation teams for the merged-health systems upon request from an insurer.  *Id.*  State

2   attorneys general for Massachusetts, West Virginia, New York, and Pennsylvania have all

3   recently imposed behavioral remedies to resolve their antitrust concerns related to healthcare

4   provider transactions.[15]  And even Plaintiff has accepted behavior remedies to resolve antitrust

5   concerns related to other healthcare transactions in the State of Washington.

6         The Court also may order structural relief that doesn't require the full divestiture of

7   TDC and/or WSO.  It may, for example, order Franciscan to release these physicians from their

8   non-competes, allowing them to practice on the Kitsap Peninsula in competition with

9   Franciscan.  The FTC has used this type of remedy to resolve antitrust concerns relating to

10  physician group transactions and conduct.  In *In re CentraCare*, the FTC had serious concerns

11  that a health system acquisition of a failing physician group violated the antitrust laws.

12  *CentraCare Health System*; Analysis To Aid Public Comment, 81 FR 71095-04, 2016 WL

13  5941990 (Oct. 14, 2016).  It nevertheless approved the transaction once CentraCare agreed to

14  release certain physicians from their non-competes.  *Id.* at 71096.  CentraCare also agreed to

15  pay a bonus to any physician in the alleged markets who started his/her own practice in

16  competition with CentraCare.  *Id.* at 71097.  The FTC has ordered similar relief in other

17  physician group matters.[16]

18

19

---

20  [15] *See Statement of FTC Concerning Vote to Close the Investigation of a Proposed Transaction Combining Massachusetts Healthcare Providers* (Nov. 29, 2018) available at https://www.ftc.gov/news-events/press-releases/2018/11/statement-federal-trade-commission-concerning-its-vote-close (seven year price cap agreement);

21  *In re: Cabell Huntington Hosp.*, 15-c-542 (Cir. Ct. of Cabell Cty., W.V. July 30, 2015) Assurance of Voluntary Compliance, available at

22  ago.wv.gov/Documents/Cabell%20Huntington%20Hospital%20Civil%20Statement%20and%20Assurance.PDF (rate increase caps and payor contract restrictions); *A.G. Schneiderman Announces Settlement With Utica*

23  *Hospitals To Address Competitive Concerns* (Dec. 11, 2013) available at https://ag.ny.gov/press-release/ag-schneiderman-announces-settlement-utica-hospitals-address-competitive-concerns (temporary rate protection,

24  monitoring, and prohibition on exclusionary contracts); *Pennsylvania v. Geisinger Health System Foundation*, No.1:13-cv-02647-YK, Doc. No. 7, Consent Decree (M.D. Pa., Oct. 28, 2013) (maintaining services,

25  automatically renewing payor contracts, monitoring of contract negotiations, contract restrictions including prohibition on anti-tiering and anti-steering clauses).

26  [16] *See, e.g.*, *Renown Health*; Analysis of Agreement Containing Consent Orders To Aid Public Comment, 77 FR 47844-02, 2012 WL 3229051 (Aug. 10, 2012) (waiving noncompete); *Keystone Orthopaedic Specialists, LLC &*

27  *Orthopaedic Associates of Reading, Ltd.*; Analysis to Aid Public Comment, 80 Fed. Reg. 63787 (Oct. 21, 2015) (renegotiation of contracts, consent for future transactions, payor termination of existing contracts).

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**D.    Plaintiff Isn't Entitled to Disgorgement or Other "Equitable Monetary Relief"**

Plaintiff seeks "equitable disgorgement or any other equitable monetary relief for the benefit of the State and its consumers as appropriate under federal and state antitrust laws." Compl. ¶ 105(e).  If the Court finds that the Kitsap Transactions violated any antitrust law (it shouldn't), it will have broad discretion to fashion an appropriate remedy.  *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 323 (1961).  Disgorgement and other unspecified "equitable monetary relief" are not among the appropriate remedies warranted here.

**a.    Disgorgement Is Appropriate Only Where No Other Remedy Is Available and the Violation Is Clear**

Disgorgement involves "factfinding by a district court to determine the amount of money acquired through wrongdoing—a process sometimes called 'accounting'—and an order compelling the wrongdoer to pay that amount plus interest to the court." *SEC v. Cavanagh*, 445 F.3d 105, 116 (2d Cir. 2006).  Its "primary purpose" is to "deter violations of the . . . laws by depriving violators of their ill-gotten gains." *Kokesh v. SEC*, 137 S. Ct. 1635, 1643 (2017) (citation omitted).

Disgorgement is a "drastic remedy," ordered only in extraordinary circumstances.  *See SEC v. Wills*, 472 F. Supp. 1250, 1276 (D.D.C. 1978).  Only once has a federal court ordered disgorgement under the Sherman Act, and that was *with the consent of the defendant* as the only remedy available.  In *United States v. Keyspan Corp.,* the DOJ and Keyspan Corp. signed a consent decree settling alleged Sherman Act violations where Keyspan agreed to give up $12 million in profits. 763 F. Supp. 2d 633 (S.D.N.Y. 2011).  The court reviewed the decree to determine whether it was "in the public interest" and found that it was.  *Id.* at 634.  There, the court found disgorgement appropriate because:  (1) the anticompetitive conduct in question had ceased, (2) making the New York consumer whole was "likely unavailable," and (3) unlike many other antitrust actions, "there are no assets to be divested." *Id.* at 640.  In other words, "absent disgorgement, the Government [was] without recourse to remedy Keyspan's anticompetitive conduct." *Id.*

DEFENDANTS' PRE-TRIAL MEMORANDUM (3:17-cv-05690-BHS) - 51

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

This case isn't *Keyspan*, so ordering disgorgement here would be unprecedented.  If the Court finds an antitrust violation, the evidence will show that less drastic means exist to remedy alleged anticompetitive effects of the Kitsap Transactions and to deter future wrongdoing. Disgorgement here, unlike in *Keyspan*, isn't the only available remedy for the alleged violations.  *See* Section D.3 above.  And the "aggrieved" parties are large insurance companies more than able to protect their own interests, either by rate negotiations or in a private antitrust action for damages under § 4 of the Clayton Act (15 U.S.C. § 15(a)).  But none of the insurers chose to intervene or to file a separate lawsuit.  Indeed, most insurers will testify that they don't share the Plaintiff's concerns about the Kitsap Transactions.

The Kitsap Transactions didn't clearly violate antitrust laws, so disgorgement of any gains is unwarranted.  This entire brief explains why this lawsuit, at best, is a close call. But disgorgement is only appropriate "when the violation is clear."  FTC's *Policy Statement on Monetary Equitable Remedies*, July 31, 2003.[17]  Otherwise, it won't serve its intended purpose: removing the incentive to commit antitrust violations.  Disgorgement can't serve this purpose "when the violator has no reasonable way of knowing in advance that its conduct is placing it in jeopardy of having to pay back all the potential gains."  *Id.*  That's why the "clear violation" principle is the "most important" of the considerations when awarding disgorgement.  *FTC v. Cephalon, Inc.* (May 28, 2015).[18]

### b.    Disgorgement Is Unavailable Without a "Reasonable Approximation" of Defendants' Gains

The Court should also deny Plaintiff's disgorgement request because it fails to calculate a "reasonable approximation" of Defendants' gain from its alleged wrongdoing.  Because disgorgement avoids unjust enrichment, a court may award it "only over property causally related to the wrongdoing."  *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989); *see* Wash. Rev. Code § 19.86.080(2).  The causal connection between violation and

---

[17] *See* https://www.ftc.gov/public-statements/2003/07/policy-statement-monetary-equitable-remedies-including-particular.
[18] *See* https://www.ftc.gov/system/files/documents/public_statements/645501/150528cephalonohlhausenwright1.pdf.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

gain need not be perfect, but it also can't be remote; the plaintiff must show that the amount it seeks to disgorge "reasonably approximates the defendant's unjust gains, since the purpose of such an award is 'to prevent the defendant's unjust enrichment by recapturing the gains the defendant secured in a transaction.'" *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 603 (9th Cir. 2016) (quoting 1 Dobbs, Law of Remedies § 4.1(1), at 552). This requirement forces the court to "distinguish between legally and illegally obtained profits." *First City Fin. Corp.*, 890 F.2d at 1231. Evidence that doesn't "yield even a reasonable approximation" makes a claim of unjust enrichment "merely speculative, and disgorgement will not be allowed." Restatement (Third) of Restitution & Unjust Enrichment § 51(d) (2011) ("Restatement").

Plaintiff's "overcharge" figure isn't a reasonable approximation of any (alleged) ill-gotten gains. Its calculation comes from its expert, Dr. Cory Capps. But Dr. Capps' calculated "overcharge" is wholly insufficient. Among other shortcomings, he never tried to determine whether vertical price effects present in any hospital–physician integration account for some (or all) of his calculated overcharges. And he admits that price increases caused by contract conversion (the basis for his calculation of ill-gotten gains) may indeed have a significant vertical component. Plaintiff can't challenge contract conversion as anticompetitive because market power doesn't cause the price change. In addition, Dr. Capps' overcharge model calculates overpayments for physician specialties in which Defendants didn't compete before the Kitsap Transactions. So, Plaintiff has no idea how much "overcharge" Defendants received from the two Kitsap Transactions. Absent this information, the Court can't make a "reasonable approximation" of the amount of wrongful gain, so disgorgement isn't appropriate.

The Ninth Circuit has reversed disgorgement awards in similar circumstances. In *Out of the Box Enterprises, LLC v. El Paseo Jewelry Exchange, Inc.*, for example, the Ninth Circuit reversed an award of disgorgement as "fatally flawed" where testimony from the plaintiff's expert "established only a correlation—not a causal relationship—between" the challenged conduct and a decline of the plaintiff's profits. 732 F. App'x 532, 534 (9th Cir. 2018). The plaintiff's expert "assumed" that all of the defendant's profits during the relevant period were

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

due to its unlawful advertisements, "without evidence to support that assumption." *Id.*; *see also In re First Alliance Mortg. Co.*, 471 F.3d 977, 997 (9th Cir. 2006).  Likewise here, Dr. Capps merely has assumed that commercial insurers paid increased prices from the Kitsap Transactions and hasn't considered the many other factors *not* the subject of this lawsuit that could explain the alleged price increases for TDC and WSO services, such as contract conversion, vertical price effects, and facility fees, among others.

### c.   Disgorgement Isn't Warranted Under Washington Law

In an action brought by the Washington attorney general as *parens patriae*, state law expressly authorizes disgorgement.  *See* Wash. Rev. Code § 19.86.080(2).  But discretion to award such relief is not unfettered.  The aim of such relief is not to "make whole" those harmed by anticompetitive behavior; rather, it is "intended to redound primarily to the benefit of the public." *State v. LG Elecs., Inc.*, 87 Wn.2d 298, 319-20, 340 P.3d 915, 925 (2014).

Disgorgement here would do little to benefit the public.  There is no evidence that commercial insurers increased premiums because of the Kitsap Transactions—let alone that they did so because the Kitsap Transactions gave Defendants market power.  Plaintiff seeks equitable monetary relief purportedly on behalf of "consumers."[19]  Compl. ¶ 105(e).  Yet, it calculates "overcharges" large insurance companies paid, not consumers.  *Compare, e.g.*, *State v. Ralph Williams' Nw. Chrysler Plymouth, Inc.*, 553 P.2d 423, 438 (Wash. 1976); *State v. Am. Tobacco Co.*, No. 96-2-15056-8 SEA, 1997 WL 714842, at *8 (Wash. Super. June 6, 1997).  As noted above, these insurers can protect themselves.  They could have sued, and they can still renegotiate rates at the next contract renewal.

### d.   Disgorgement Isn't Available Under Federal Law

Plaintiff invokes paragraph 16 of the Clayton Act (Compl. ¶¶ 1, 13), as a "private" party seeking injunctive relief.  *See* 15 U.S.C. § 26.[20,]  But the "Ninth Circuit disallows private use of

---

[19] Plaintiff also seeks such relief *for itself* (Compl. ¶105(e)), but state law does not authorize it.  *See State v. Am. Tobacco Co.*, 1996 WL 931316, at *6 (Wash. Super. Ct. Nov. 19, 1996).

[20] 15 U.S.C. § 26 states that "*Any person*, firm, corporation, or association shall be entitled to sue for and have injunctive relief."  (Emphasis added.)  "Person" generally excludes the sovereign.  *See Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 780 (2000).

DEFENDANTS' PRE-TRIAL MEMORANDUM (3:17-cv-05690-BHS) - 54

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1   Section 16 to pursue disgorgement." *In re: Cathode Ray Tube (Crt) Antitrust Litig.*, 2016 WL

2   3648478, at *13 (N.D. Cal. July 7, 2016) (citing *In re Multidistrict Vehicle Air Pollution*, 538

3   F.2d 231, 234 (9th Cir. 1976)); *FTC v. Mylan Labs., Inc.*, 62 F. Supp. 2d 25, 42 (D.D.C. 1999).

4          This Court also can't award civil penalties in this lawsuit.  The Supreme Court has

5   recently characterized disgorgement as a type of civil "penalty."  *See Kokesh v. SEC*, 137 S. Ct.

6   1635, 1644 (2017).  And it has long been recognized that federal courts sitting in equity can't

7   award civil penalties.  *Tull v. United States*, 481 U.S. 412, 422 (1987); *see also United States v.*

8   *Keyspan Corp.*, 763 F. Supp. 2d 633, 638 (S.D.N.Y. 2011).  It therefore stands to reason that a

9   federal judge in a bench trial can't award disgorgement.  And because no federal statute

10  expressly authorizes disgorgement, the Court is without *any* authority—equitable or statutory—

11  to order it under federal law.

12         The Ninth Circuit's recent decision in *FTC v. AMG Capital Management, LLC* doesn't

13  rescue Plaintiff's disgorgement request.  There, the Court confirmed the FTC's authority to

14  obtain disgorgement under Section 5 of the FTC Act after *Kokesh*.  *See*, 910 F.3d 417, 427 (9th

15  Cir. 2018).  That ruling, however, only applies to a narrow set of antitrust cases brought by the

16  FTC under Section 5 of the FTC Act.  And Ninth Circuit expressly prohibits disgorgement

17  relief in actions brought under Section 16, as the Plaintiff claims here.  *In re Multidistrict*

18  *Vehicle Air Pollution*, 538 F.2d 231 (9th Cir. 1976).  For these reasons, Plaintiff's request for

19  disgorgement fails as a matter of federal law.

20         **E.      Fee shifting in Defendants' Favor Is Appropriate**

21         Under the Washington Consumer Protection Act, "the prevailing party may, in the

22  discretion of the court, recover the costs of said action including a reasonable attorney's fee."

23  RCW 19.86.080(1).  The Court may award prevailing defendants' attorneys' fees in cases

24  brought by the State of Washington under the Consumer Protection Act, on the grounds that

25  "the State has powerful civil litigation resources available at its disposal" and "vindicated

26  defendants should be treated fairly."  *State v. Black*, 676 P.2d 963, 971 (Wash. 1984); *State v.*

27

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

*State Credit Ass'n, Inc.*, 657 P.2d 327, 334 (Wash. App. 1983).  In determining whether to

award attorneys' fees, the court should consider factors that include:

> (1) the need to curb serious abuses of governmental power; (2) the necessity of providing fair treatment to vindicated defendants; (3) the strong public interest in continued vigorous State prosecution of consumer protection violations; and (4) the necessity of avoiding hindsight logic in making the determination.

*Black*, 676 P.2d at 971. Other relevant factors include "the complexity and length of the

case" and "the necessity of the lawsuit."  *Id.*

      Here, Plaintiff has brought its "powerful civil litigation resources" to challenge

transactions through which a non-profit hospital system attempted to prevent the departure of

many critical physicians from a rural and under-served part of Washington State.  Plaintiff's

case has exposed Defendants to tremendous litigation costs in the many millions of dollars.

Meanwhile, Plaintiff's case isn't about harm to individual consumers, but rather price increases

large commercial insurance companies in Washington State allegedly paid.  The State of

Washington doesn't need to protect large commercial insurance companies because they have

resources to protect their own interests.  If they actually believed Defendants somehow violated

the antitrust laws, they had the resources to bring their own lawsuits.  Yet, no commercial

insurance company has filed suit.  To the contrary, the vast majority of commercial insurers

don't have concerns about the Kitsap Transactions.  Commercial insurers will testify that they

would have incurred similar price changes had *any* hospital system acquired the TDC and WSO

physicians.  And they have experienced these price changes from other similar health system-

physician transactions in the State of Washington.  Nor has Plaintiff identified a single

employer that has complained about price increases associated with the Kitsap Transactions.

So, Plaintiff has brought a complex, prolonged, expensive lawsuit with little merit and no

demonstrated connection to the protection of actual consumers.  The Court therefore should

order the Plaintiff to pay Defendants' attorneys' fees, if Defendants prevail.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

## IV.    CONCLUSION

The outcome of this lawsuit will impact the provision of healthcare services on the Kitsap Peninsula and may have a broader effect on physicians' ability to join health systems. Plaintiff asks this Court to apply the Section 1 *per se* rule—reserved for inherently suspect conduct—to a struggling physician group's exclusive PSA with a health system.  No court has ever done that and for good reason.  PSA arrangements are common in healthcare, and they have saved many independent physician groups from failure.  Rather than being "inherently suspect," PSAs routinely preserve services that otherwise might be removed from the market. Plaintiff's fallback rule of reason Section 1 claim also lacks merit.

Defendants will prove at trial that Plaintiff's Section 1 claim fails because the TDC Transaction combined Defendants into a single entity incapable of a Section 1 violation.  And even if they had remained separate entities, the *per se* rule wouldn't apply because, at a minimum, Franciscan and TDC entered into a joint venture.  The rule of reason must govern a joint venture's formation or conduct, and Plaintiff won't prevail on this claim either.  It lacks, but needs, evidence that the TDC Transaction produced anticompetitive harm.  Meanwhile, Defendants will show that the TDC Transaction produced benefits to patients relating to access, cost of services, and quality.  Plaintiff therefore will fall well short of carrying its hefty burden under Section 1.

Similarly, Plaintiff won't satisfy its *prima facie* burden for its Count 2 claim challenging WSO Transaction's legality under Section 7.  It contorts the "facts" to cobble together a plausible claim.  Its claim, however, strays from the plain language of Section 7 that requires a plaintiff to focus on a transaction's impact on competition.  It ignores the obviously negligible impact of the WSO Transaction on competition and instead focuses on the alleged combined effects of the TDC Transaction and WSO Transaction.  This approach is problematic for two reasons: (1) the WSO Transaction happened 3 months *before* the TDC Transaction; and (2) it directly contradicts Plaintiff's Count 1 claim that TDC and Franciscan are separate entities.  Under the proper legal analysis, Plaintiff can't show any harm from the WSO

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1  Transaction.  And WSO was a failing firm before the WSO Transaction—an absolute defense

2  to Section 7 liability.  For all these reasons, Plaintiff won't prevail on its Section 7 claim.  The

3  Court should find in Defendants' favor on all claims after hearing the evidence at trial.

4        DATED this 27th day of February, 2019.

5

6  Respectfully submitted,

7   */s/ (by consent)*                          */s/ Douglas E.  Litvack*
   Jessica M. Andrade, WSBA No. 39297

8  Polsinelli PC                              Douglas C. Ross, WSBA No. 12811
   1000 Second Avenue, Suite 3500             David A. Maas, WSBA No. 50694

9  Seattle, WA 98104                          MaryAnn T. Almeida, WSBA No. 49086
   Telephone: (206) 393-5422                  DAVIS WRIGHT TREMAINE LLP

10 jessica.andrade@polsinelli.com             920 Fifth Avenue, Suite 3300
                                              Seattle, WA  98104-1610

11 Mitchell D. Raup (*pro hac vice*)          Tel: 206.622.3150   Fax: 206.757.7135
   Herbert F. Allen (*pro hac vice*)          douglasross@dwt.com

12 Polsinelli PC                              davidmaas@dwt.com
   1401 I Street NW, Suite 800                maryannalmeida@dwt.com

13 Washington, D.C. 20005
   Telephone: (202) 783-3300                  Douglas E. Litvack, DC Bar No. 1024973

14 mraup@polsinelli.com                       (pro hac vice)
   hallen@polsinelli.com                      DAVIS WRIGHT TREMAINE LLP

15                                            1919 Pennsylvania Avenue, N.W., Suite 800
                                              Washington, D.C.  20006-3401

16 Matthew C. Hans (*pro hac vice*)           Tel: 202.973.4200 Fax: 202.973.4499
   Polsinelli PC                              douglitvack@dwt.com

17 100 South Fourth Street, Suite 1000
   St. Louis, MO 63102

18 Telephone: (314) 889-8000                  *Attorneys for Defendant The Doctors Clinic,*
   mhans@polsinelli.com                       *a Professional Corporation*

19

20

21 G. Gabriel Zorogastua
   Polsinelli PC

22 900 W. 48th Place, Suite 900
   Kansas City, MO 64112

23 Telephone: (816)753-1000
   gzorogastua@polsinelli.com

24

25 *Attorneys for Defendants Franciscan Health*
   *System d/b/a Chi Franciscan Health,*

26 *Franciscan Medical Group, and WestSound*
   *Orthopaedics, P.S.*

27

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

## CERTIFICATE OF SERVICE

2      I hereby certify that on this day, I caused the foregoing document to be electronically

3  filed with the Clerk of the Court using the CM/ECF system which will send notification of such

4  filing to all counsel of record.

5      DATED this 27th day of February, 2019.

6

7                                      By: */s/ Douglas E. Litvack*
                                          Douglas E. Litvak, DC Bar No. 1024973
8                                          (pro hac vice)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

DEFENDANTS' PRE-TRIAL MEMORANDUM (3:17-cv-05690-BHS) - 59