1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                          Plaintiff,<br><br>          v.<br><br>FRANCISCAN HEALTH SYSTEM<br>d/b/a CHI FRANCISCAN HEALTH;<br>FRANCISCAN MEDICAL GROUP;<br>THE DOCTORS CLINIC, a Professional<br>Corporation; and WESTSOUND<br>ORTHOPAEDICS, P.S.,<br><br>                          Defendants. | CASE NO. C17-5690 BHS<br><br>ORDER GRANTING IN PART<br>AND DENYING IN PART<br>DEFENDANTS' MOTION FOR<br>PARTIAL SUMMARY<br>JUDGMENT |

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

        This matter comes before the Court on Defendants Franciscan Health System,

Franciscan Medical Group (collectively "Franciscan"), WestSound Orthopaedics, P.S.

("WSO"), and The Doctors Clinic's ("TDC") motion for partial summary judgment. Dkt.

180. The Court has considered the pleadings filed in support of and in opposition to the

motion and the remainder of the file and hereby grants the motion as to Count 2, violation

ORDER - 1

1   of Section 7 of the Clayton Act, and denies the motion as to Count 1, the rule of decision

2   for violation of Section 1 of the Sherman Act, for the reasons stated herein.

3                                    **I.   BACKGROUND**

4          In July 2016, Franciscan acquired WSO and became the employer of its seven

5   orthopedic physicians ("the WSO Acquisition"). In early September 2016, Franciscan

6   and TDC, a multispecialty group with fifty-four physicians including five orthopedists,

7   entered into a series of agreements ("the TDC Affiliation"). In Count 1, the State claims

8   that Franciscan and TDC are separate economic entities that entered into an agreement to

9   jointly negotiate the prices for the services they provide to the public. The State asserts

10  that these agreements constitute a horizontal price-fixing agreement that is *per se* illegal

11  or otherwise constitutes an unreasonable restraint of trade in violation of Section 1 of the

12  Sherman Act, 15 U.S.C. § 1. In Count 2, the State claims that the effect of Franciscan's

13  acquisition of WSO may be to substantially lessen competition or tend to create a

14  monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. The State argues

15  that the effects of the subsequent TDC Affiliation should be incorporated into analysis of

16  the effect on competition of the prior WSO Acquisition.

17                                   **II.   DISCUSSION**

18         First, the Court will consider Franciscan and WSO's motion for summary

19  judgment on Count 2, which alleges the WSO Acquisition violates Section 7 of the

20  Clayton Act. Second, the Court will consider Franciscan and TDC's motion for summary

21

22  ORDER - 2

judgment on the State's allegation that the TDC Affiliation constitutes a *per se* violation of Section 1 of the Sherman Act.

**A.    Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477

U.S. at 254; *T.W. Elec. Serv., Inc*., 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc*., 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

**B.      Count 2: Section 7 of the Clayton Act**

Section 7 of the Clayton Act "bars mergers whose effect 'may be to substantially lessen competition, or tend to create a monopoly.'" *Saint Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health System, Ltd*., 778 F.3d 775, 783 (9th Cir. 2015) (quoting 15 U.S.C. § 18). The relevant judicial analysis "necessarily focuses on 'probabilities, not certainties.'" *Saint Alphonsus*, 778 F.3d at 783 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 293, 323 (1962)).

First, the plaintiff must "establish a prima facie case that a merger is anticompetitive." *Saint Alphonsus*, 778 F.3d at 783. This can be done by showing high market share alone, but "plaintiffs in § 7 cases generally present other evidence as part of the prima facie case" such as the market's structure, history, and probable future. *See id*. at 785–86 (citing *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 498 (1974); *Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 423, 431 (5th Cir. 2008); *FTC v. H.J.*

ORDER - 4

*Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001); *United States v. Syufy Enters.*, 903 F.3d 695, 664 n.6 (9th Cir. 1990); *FTC v. Warner Commc'ns Inc.*, 742 F.3d 1156, 1163 n.1 (9th Cir. 1984)). The Federal Trade Commission and Department of Justice's Horizontal Merger Guidelines "consider any reasonably available and reliable evidence to address the central question of whether a merger may substantially lessen competition," including actual effects observed in consummated mergers such as evidence of observed post-merger price increases, direct comparisons based on experience, market shares and concentration in a relevant market, substantial head-to-head competition, and the disruptive role of a merging party. U.S. Department of Justice and Federal Trade Commission, Horizontal Merger Guidelines § 2 (2010) ("Merger Guidelines"). "Explicit or implicit evidence that the merging parties intend to raise prices, reduce output or capacity, reduce product quality or variety . . . can be highly informative in evaluating the likely effects of a merger." *Id.* § 2.2.1.

For example, in *Saint Alphonsus*, the Ninth Circuit affirmed the district court's finding of a prima facie case on the basis of a high Herfindahl-Hirschman Index ("HHI"),[1] statements and past actions showing the merging parties' intent to restrict competition, and high barriers to entry. 778 F.3d at 788. The Circuit then reviewed other

---

[1] The HHI is "calculated by summing the squares of the individual firms market shares . . . When using the HHI, the Agencies consider both the post-merger level of the HHI and the increase in the HHI resulting from the merger." Merger Guidelines § 5.3. "Mergers resulting in highly concentrated markets [HHI above 2500] that involve an increase in the HHI of more than 200 points will be presumed likely to enhance market power." *Id.* These thresholds help identify mergers as likely or unlikely to create concern, but do not "provide a rigid screen." *Id.*

ORDER - 5

1   cases where a prima facie violation of Section 7 was established, including *Chi. Bridge &*

2   *Iron*, 534 F.3d at 431–32, where the Fifth Circuit found a high HHI, limited rivals, and

3   high market concentration, *Lucas Auto. Engineering, Inc. v. Bridgestone/Firestone, Inc.*,

4   140 F.3d 1228, 1236 (9th Cir. 1998), where the Ninth Circuit found high market share

5   and "insurmountable barriers to entry," and *FTC v. Universal Health, Inc.*, 938 F.2d

6   1206, 1219–20 & n.27 (11th Cir. 1991), where the Eleventh Circuit found high market

7   concentration, high entry barriers which would facilitate an illegal cartel, and intent to

8   eliminate competition. *Id.*

9       Next, the defendant must rebut the prima facie case. *Saint Alphonsus*, 778 F.3d. at

10  783 (citing *Olin Corp. v. FTC*, 986 F.2d 1295, 1305 (9th Cir. 1993)). "[I]f the [defendant]

11  successfully rebuts the *prima facie* case, the burden of production shifts back to the

12  Government and merges with the ultimate burden of persuasion, which is incumbent on

13  the Government at all times." *Saint Alphonsus*, 778 F.3d at 783 (quoting and making

14  alterations to *Chi. Bridge & Iron*, 534 F.3d at 423).

15      In its complaint, the State alleged that based on the post-acquisition market share

16  and increase in market concentration following the WSO Acquisition and the TDC

17  Affiliation, a health plan would be hard-pressed to sell a network that did not include any

18  of these orthopedists, concluding that the WSO acquisition "is thus presumptively

19  unlawful under long-established antitrust precedent." Dkt. 1 ¶ 79–82 (citing *United States*

20  *v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963)). While the State may be correct that

21  "[t]he two transactions were simultaneously contemplated, negotiated and implemented,"

22  ORDER - 6

Dkt. 211 at 21,[2] the structure of the State's argument appears to imply that the WSO

Acquisition is unlawful only in the context of the allegedly unlawful TDC Affiliation. In

its opposition to summary judgment, the State argues that Franciscan ignores significant

evidence of the simultaneous negotiation of the WSO Acquisition and the TDC

Affiliation, evidence that Franciscan's strategy in the area was contingent upon both

deals, and evidence that Franciscan determined the order of the transactions. Dkt. 211 at

1.

Defendants argue that because the State "has no economic evidence or expert

testimony establishing the effects of the WSO Acquisition independent of the TDC

[Affiliation]," the State cannot prove its prima facie case. Dkt. 180 at 15–16. The State

counters that "Defendants' claim that the State cannot establish a *prima facie* case under

§ 7 rests solely on secondary authority and their criticism that the State's expert witness,

Dr. Cory Capps, analyzed the WSO and TDC transactions collectively." Dkt. 211 at 21

(citing Dkt. 180 at 10–11). The State argues this position requires the Court to "ignore

Franciscan's past expressed intent and beliefs in entering the WSO Acquisition in

assessing its competitive effects." Dkt. 211 at 21. This mischaracterizes Defendants'

argument—Defendants do not argue that the Court should ignore this information, only

that the Court cannot find a prima facie violation of Section 7 of the Clayton Act without

some evidence to help the Court understand the economic impact of the WSO

---

[2] Citations to parties' briefs refer to the parties' pagination, not ECF pagination.

ORDER - 7

1    Acquisition standing alone. All of the cases establishing a prima facie case under Section

2    7 which the Ninth Circuit examined in *Saint Alphonsus* included either high market share

3    or high market concentration in addition to other factors such as barriers to entry or

4    anticompetitive intent. 778 F.3d at 788. The State does not dispute Defendants' assertion

5    that Dr. Capps only analyzed the transactions collectively and, despite this concession,

6    argues that collective analysis is the correct approach in this case.

7         Here, the Court turns to the authorities the State cites for its proposition that a

8    court may analyze multiple transactions jointly. The Court finds each authority

9    unavailing.

10        The State is correct that the Supreme Court expressed its view in *Brown Shoe*, 370

11   U.S. at 333–34, that Congress intended Section 7 of the Clayton Act to make it easier for

12   courts to address small, serial acquisitions. Dkt. 211 at 22. This is achieved by

13   considering the anticipated future of the industry, for example, that "remaining vigor [in

14   the industry] cannot immunize a merger if the trend in that industry is toward oligopoly."

15   *Brown Shoe*, 370 U.S. at 333. The State argues that on this authority "it is appropriate to

16   analyze the collective impact of multiple transactions on the relevant market." Dkt. 211 at

17   22. However, *Brown Shoe* gives lower courts license to do what it says—incorporate

18   trends in the industry into the analysis—not find a violation of the Clayton Act in an

19   earlier transaction based only on analysis which incorporates a later transaction, much

20   less find a violation of the Clayton Act on the basis of market power acquired in violation

21   of the Sherman Act. Taking account of a trend to find a tipping point earlier than

22

ORDER - 8

otherwise might have been found in a series of small acquisitions is not the same as compressing two transactions together, particularly when one transaction is a merger and the other is an alleged price-fixing agreement.

The State is also correct that the FTC has investigated close-in-time acquisitions of multiple physician groups, Dkt. 211 at 23, but incorrect that these cases provide authority to find the first-in-time acquisition unlawful on the basis of a second merger, let alone a second transaction alleged to be a price-fixing agreement. In a 2011 statement, the FTC described its serious concerns about possible anticompetitive effects from a health group's expressed intention to acquire two separate cardiology practices in Spokane, Washington.[3] In a complaint in 2012, the FTC challenged the acquisition of multiple physician groups. *In the Matter of Renown Health*, No. C-11-0101, 2012 WL 3200596 (F.T.C. Aug. 3, 2012). The FTC's statement on the Spokane investigation provides no details about the structure of any challenge it may have pursued, and the parties abandoned the transactions after the FTC "expressed serious concerns." FTC Statement. This public statement is not precedent, and does not provide persuasive reasoning on the issue at hand.

In *Renown Health*, the largest hospital operator in Reno, Nevada, which had not previously employed any cardiologists, bought one cardiology practice and employed its

---

[3] Dkt. 211 at 23 (citing FTC Statement on the Abandonment by Providence Health & Services of its Plan to Acquire Spokane Cardiology and Heart Clinics Northwest in Spokane, Washington, April 8, 2011) ("FTC Statement").

15 cardiologists. 2012 WL 3200596 at *1, *3. Shortly after, it bought a second cardiology practice with 17 cardiologists, becoming the employer of approximately 97% of the cardiologists in the area. *Id.* The two practices had previously been each other's direct competitors. *Id.* The FTC then settled with the hospital operator, entering a consent agreement which required the operator to allow at least six cardiologists to leave the hospital's employment. *Id.* at *5–15. While the FTC's order discussed the impact of both acquisitions, it challenged only the second acquisition. *Id.* at *5–6. The FTC did not argue the second acquisition rendered the first unlawful, or that a court could find the first unlawful based on the joint impact of the transactions. Therefore, this authority does not support the State's position.

The State also characterizes *Hospital Corporation of America v. F.T.C.*, 807 F.2d 1381, 1384 (7th Cir. 1986) as case where a court jointly analyzed "two acquisitions and their impact in increasing defendant's market share in the relevant market." Dkt. 211 at 22. The State argues that on this authority "[w]hen reviewing a challenge to multiple transactions, it is appropriate to analyze the collective impact of the transactions on the relevant market." Dkt. 211 at 23. However, as Defendants point out, in the underlying complaint the FTC alleged that the effect of the two acquisitions "both together and separately, may be substantially to lessen competition." Dkt. 229 at 5 (quoting *Matter of Hosp. Corp. of Am.*, 106 F.T.C. 361, 1985 WL 668927, at *74 (1985)). In the underlying decision, the FTC explained that "[o]ur conclusion in this case applies to the two acquisitions viewed *separately as well as collectively*." *Matter of Hosp. Corp. of Am.*,

ORDER - 10

1   1985 WL 668927 at *57 n.21 (emphasis added). Here, where the State alleges that only

2   the WSO Acquisition violates Section 7, *Hospital Corporation* is not persuasive authority

3   for the proposition that the Court may rely only on market share or market concentration

4   data which incorporates the later TDC Affiliation, which is not an alleged merger in

5   violation of Section 7.

6        The Court recognizes that post-merger information may be relevant in analyzing

7   the competitive effects of a challenged merger, including the likelihood that the

8   challenged merger will facilitate later cartel pricing. However, the State argues only that

9   its expert correctly analyzed the transactions jointly—it does not argue that it can prove

10  its claim without this evidence. While the State argues the Court should not ignore

11  Franciscan's intent to impact competition through the WSO Acquisition, Dkt. 211 at 21,

12  and the Court agrees such information could "be highly informative in evaluating the

13  likely effects of a merger," Merger Guidelines § 2.2.1, the State does not specify what

14  admissible evidence it would rely on to prove such intent. A question of material fact to

15  avoid summary judgment must be established by specific admissible evidence. Fed. R.

16  Civ. P. 56(c)(1)(A). Where there is no factual showing set out in opposition to a motion

17  for summary judgment, the District Court is not required to search the record *sua sponte*

18  for some genuine issue of material fact. *See Carmen v. San Francisco Unified School*

19  *Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001).

20       Reviewing the facts section of the State's opposition, the Court located the

21  following evidence specific to the WSO Acquisition: Dr. Capps' report concludes that in

22

ORDER - 11

1    the geographic market the State alleges, Franciscan, WSO, and TDC "were previously

2    each other's closest competitors for, and three of the four largest providers of, orthopedic

3    services" and TDC and WSO had relatively low prices prior to the transactions, Dkt. 211

4    at 2–3 (citing Capps Report ¶ 5); the WSO Acquisition gave Franciscan confidence it

5    could get price increases from the TDC Affiliation, *id.* at 3; and the WSO Acquisition

6    followed Franciscan's acquisition of Harrison Medical Center and affiliation with its

7    physician group, Dkt. 211 at 4 (citing Ex. 20 at 141, 148). Moreover, Franciscan

8    anticipated the WSO Acquisition would allow it to increase revenue by using WSO

9    physicians to drive procedures to its hospital instead of ambulatory surgery centers

10    ("ASC"), Dkt. 211 at 5 (citing Exs. 25, 27, 28); Franciscan anticipated it would have 80%

11    of the Kitsap County orthopedics market after both transactions, Dkt. 211 at 6 (citing Ex.

12    30); and Franciscan analyzed, discussed, and negotiated the transactions together, Dkt.

13    211 at 6–8 (citing Exs. 34–47). These facts could support a narrative that WSO, a lower-

14    priced competitor, merged with Franciscan, a primary competitor with higher prices, as

15    part of a trend of Franciscan acquiring physician groups in the area with the intent to

16    reduce availability of lower-priced ASC surgeries and capture the revenue from siting

17    those surgeries in its hospitals, therefore harming competition. Nevertheless, the Court is

18    unable to find the State has made a prima facie showing of the likely *substantial* harm to

19    competition that Section 7 of the Clayton Act requires without some additional factual

20    information or expert analysis regarding the magnitude of these impacts. It is not the

21    Court's task "to scour the record in search of a genuine issue of triable fact. We rely on

22

1   the nonmoving party to identify with reasonable particularity the evidence that precludes

2   summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

3         The State is correct that according to the Merger Guidelines, if observed post-

4   merger price increases constitute "anticompetitive effects resulting from the merger . . .

5   they can be dispositive," Dkt. 211 at 20 (citing Merger Guidelines § 2.1.1). In a footnote,

6   Defendants state, "Plaintiffs assert that prices increased after the WSO Acquisition, when

7   the six WSO physicians switched from their own pre-transaction payer contracts to

8   Franciscan's pre-transaction payer contracts," Dkt. 180 at 16 n.11. Defendants do not cite

9   the assertion they reference.[4] Defendants go on to explain that Dr. Capps "admitted that

10   such a price change, standing alone, is not evidence that the transaction is

11   anticompetitive." *Id*. The State does not counter this argument, cite the amount of such a

12   price increase, cite any expert analysis finding that a price increase constituted

13   anticompetitive effects resulting from the WSO Acquisition, or cite evidence to support a

14   finding that all or part of a price increase could be attributed to the WSO Acquisition as

15   opposed to the TDC Affiliation.

16         Without evidence on the impact of the WSO Acquisition standing alone, the Court

17   finds that the State has not shown a dispute of material fact to preclude summary

---

[4] The Court was unable to locate such an assertion in the State's brief, and speculates that Defendants may refer to the State's complaint, Dkt. 1 ¶ 87, or to Dr. Capps' expert report.

ORDER - 13

judgment on its prima facie claim that the WSO Acquisition violates Section 7 of the

Clayton Act.[5] Therefore, the Court grants summary judgment for Defendants on Count 2.

**C.    Count 1: *Per se* violation of Section 1 of the Sherman Act**

In analyzing claims of restraint of trade in violation of Section 1 of the Sherman

Act, the Supreme Court "presumptively applies rule of reason analysis, under which

antitrust plaintiffs must demonstrate that a particular contract or combination is in fact

unreasonable and anticompetitive before it will be found unlawful." *Texaco, Inc. v.*

*Dagher*, 547 U.S. 1, 5 (2006) (citing *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)). "*Per*

*se* liability is reserved for only those agreements that are 'so plainly anticompetitive that

no elaborate study of the industry is needed to establish their illegality.'" *Dagher*, 547

U.S. at 5 (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692

(1978)).

The selection of *per se* or rule of reason as the rule of decision may ordinarily be a

question of law appropriate for summary judgment. *See In re Sulfuric Acid Antitrust*

*Litigation*, 703 F.3d 1004, 1008 (7th Cir. 2012). In this case, whether *per se* analysis is

available is contingent on the Court's decision about the degree of economic integration

present in the TDC Affiliation.

---

[5] Because the Court finds the State cannot meet its prima facie showing, the Court does not reach Franciscan and TDC's concern that analyzing the WSO Acquisition and TDC Affiliation together would leave the Court with insufficient information to design a remedy.

ORDER - 14

1    If TDC and Franciscan are a single economic entity, then *Copperweld Corp v.*

2 *Independence Tube Corp.*, 467 U.S. 752, 769 (1984) protects them from liability under

3 Section 1 of the Sherman Act. If TDC and Franciscan formed a legitimate, economically

4 integrated joint venture, even one that markets its product under different brand names,

5 *Dagher* holds that such a joint venture cannot violate the Sherman Act under a *per se*

6 theory by setting prices for the product contained within the legitimate venture. 547 U.S.

7 at 6–7. *Accord, Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332, 356 (1982)

8 (when "persons who would otherwise be competitors pool their capital and share the risks

9 of loss as well as the opportunities for profit . . . such joint ventures [are] regarded as a

10 single firm competing with other sellers in the market.").

11    Here, the Court has previously found that whether the TDC Affiliation rendered

12 TDC and Franciscan a single economic entity is a question of fact reserved for trial. Dkt.

13 132 at 6, 14. The Court found that "the agreements are designed to divide and assign

14 certain risks between TDC and [Franciscan] rather than to share them." Dkt. 132 at 13.

15 This does not represent a finding that the parties are sharing profits and losses. The same

16 facts that the Court would rely on to analyze economic unity would form the basis of a

17 decision about whether the TDC Affiliation created a legitimate, economically integrated

18 joint venture which shares risk of loss and opportunities for profit.

19    In *Dagher*, the Supreme Court went on to state that "[i]f [the joint venture's] price

20 unification policy is anticompetitive, then respondents should have challenged it pursuant

21 to the rule of reason." *Id.* at 7. Defendants are correct that if the State frames its challenge

22

ORDER - 15

1   to the TDC Affiliation as a challenge to the formation of a joint venture, the rule of

2   reason must apply to this case. *Dagher*, 547 U.S. at 6 n.1 ("Had respondents challenged

3   Equilon itself, they would have been required to show that its creation was

4   anticompetitive under the rule of reason."). On the other hand, if the State centers its

5   challenge on the parties' post-Affiliation conduct and the Court finds TDC and

6   Franciscan have not formed a legitimate joint venture, or if the State's challenge is to

7   conduct outside the joint venture, the *per se* rule could apply.

8          Defendants argue that even if the TDC Affiliation does not constitute a legitimate

9   joint venture, the *per se* rule cannot apply. Dkt. 180 at 22. Defendants are correct that if

10   the economic effect of a restraint "is not immediately obvious," courts are reluctant to

11   adopt a *per se* rule, *State Oil*, 522 U.S. at 10 (citing *FTC v. Indiana Federation of*

12   *Dentists*, 476 U.S. 447, 458–59 (1986)), but the authorities Defendants cite for this

13   proposition deal with substantially different factual circumstances. *State Oil*'s ultimate

14   holding was that "there is insufficient economic justification for *per se* invalidation of

15   vertical maximum price fixing," and thus the rule of reason must be applied to alleged

16   vertical maximum price-fixing. 522 U.S. at 18. The price-fixing alleged here is

17   horizontal. In *Indiana Federation of Dentists*, the Supreme Court explained that "we have

18   been slow to condemn rules adopted by professional associations as unreasonable *per*

19   *se*." 476 U.S. at 458 (citing *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 679). The Supreme

20   Court further explained that it has also been reluctant "in general, to extend per se

21   analysis to restraints imposed in the context of business relationships where the economic

ORDER - 16

22

1    impact of certain practices is not immediately obvious." 476 U.S. at 458–59 (citing

2    *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 99 (1979)

3    ("*BMI*")). Defendants also cite *BMI* as an example of the limits of the *per se* rule. Dkt.

4    180 at 22 (citing *BMI*, 441 U.S. at 19–20). However, in *BMI*, the parties fixed a price for

5    an entirely new product, a "blanket license" to perform a variety of copyrighted musical

6    compositions. 441 U.S. at 4. In *Maricopa County*, doctors agreed to set a maximum fee in

7    order to create a competitive alternative to the area's health insurance plans. 457 U.S. at

8    339, 355–57. The Supreme Court found that the doctor's conduct did not create a new

9    product like the "blanket license" in *BMI*, but "merely permitted them to sell their

10   services to certain customers at fixed prices and arguably to affect the prevailing market

11   price of medical care." *Id*. at 356. Further, because the fee agreement was not among

12   participants in a joint venture, it "fit squarely into the horizontal price-fixing mold" under

13   *per se* analysis. *Id.* at 355–57.

14          Defendants claim that "no court has ever applied the *per se* rule to this type of

15   complex transaction or to a professional services agreement, despite the prevalence of

16   these agreements." Dkt. 229 at 8. Defendants distinguish *Maricopa County* as involving

17   physicians who "did not integrate in any way" and did not contract together, "allowing

18   physicians to set their own prices and charge uninsured patients unique prices." *Id.* at 11

19   (citing *Maricopa County*, 457 U.S. at 314, 356–57). Here, the Court finds that its final

20   decision about the degree of economic integration and decision-making relationship

21   between TDC and Franciscan will inform its determination of the similarity or difference

22   ORDER - 17

between this case and others where courts have applied the *per se* rule. Therefore, the Court declines to find at this time that the *per se* rule is definitively inapplicable to the factual circumstances presented in this case.

## III.  ORDER

Therefore, it is hereby **ORDERED** that Defendants' motion for partial summary judgment, Dkt. 180, is **GRANTED** as to the State's Count 2, and **DENIED** as to a rule of decision for Count 1.

Dated this 1st day of March, 2019.

BENJAMIN H. SETTLE
United States District Judge

ORDER - 18