1      UNITED STATES DISTRICT COURT

2    WESTERN DISTRICT OF WASHINGTON AT TACOMA

3    _____

```
4                            )
     STATE OF WASHINGTON,     )
5                            )
                Plaintiff,    )
6                            )  3:17-cv-05690-BHS
     v.                       )
7                            )  Tacoma, Washington
     FRANCISCAN HEALTH SYSTEM  )
8    d/b/a CHI FRANCISCAN HEALTH; )  March 5, 2019
     FRANCISCAN MEDICAL GROUP,  )
9    THE DOCTORS CLINIC, a      )  Pretrial
     professional corporation; )  Conference
10   and WESTSOUND ORTHOPAEDICS, )
     P.S.,                      )
11                            )
                Defendants.    )
12
```

13   _____

14         VERBATIM REPORT OF PROCEEDINGS
        BEFORE THE HONORABLE BENJAMIN H. SETTLE
           UNITED STATES DISTRICT JUDGE

15   _____

```
16   For the Plaintiff:     RENE TOMISSER
                            JONATHAN MARK
17                          ERICA KOSCHER
                            AMY HANSON
18                          Assistant Attorneys General

19

20   For the Defendant      HERBERT ALLEN
     Franciscan Health      MATTHEW HANS
     System:                MITCHELL RAUP
21                          JESSICA ANDRADE
                            Attorneys at Law
22   For the Defendant
     The Doctors Clinic:    DOUGLAS ROSS
23                          DAVID MAAS
                            Attorneys at Law
24
```

25   Proceedings stenographically reported and transcribed with
                   computer-aided technology

```
 1                                      MORNING SESSION

 2                                      MARCH 5, 2019

 3              THE CLERK:  This is the matter of State of Washington

 4      versus Franciscan Health System, Cause Number CV17-5690-BHS.

 5      Counsel, please make an appearance.

 6              MR. TOMISSER:  Rene Tomisser for the State of

 7      Washington, Office of Attorney General.

 8              MR. MARK:  Jonathan Mark also with the Attorney

 9      General's Office.

10              MS. KOSCHER:  Erica Koscher with the Attorney

11      General's Office, State of Washington.

12              MS. HANSON:  Amy Hanson with the Attorney General's

13      Office for the State of Washington.

14              MR. ROSS:  Good morning.  Douglas Ross for The

15      Doctors Clinic.

16              MR. RAUP:  Mitchell Raup with Polsinelli for

17      Franciscan Health System and WestSound Orthopaedics.

18              MR. HANS:  Matthew Hans with Polsinelli also for

19      Franciscan Health and WestSound Orthopaedics.

20              MR. ALLEN:  Herbert Allen for Franciscan defendants

21      also with Polsinelli.

22              THE COURT:  Good morning, everyone.  They are having

23      in chambers an over/under as to how many lawyers would be in

24      the courtroom.  I lost.

25          The bench trial, as we know, is to begin in two weeks.
```

1   The issues have been somewhat narrowed by the Court.  Have

2   the parties conferred and determined what now your best

3   estimate is as to the length of the trial?

4          MR. TOMISSER:  I don't know that we have conferred

5   about that specifically. We have taken into account the

6   Court's ruling from last Friday and have cut down the number

7   of witnesses, deposition excerpts and things like that to

8   estimate how much time might be saved by going forward in

9   that posture.

10          MR. ROSS:  Your Honor, from defendant's point of

11   view, it seems as though there may be a logical way to

12   bifurcate the trial from the ruling the Court issued on

13   Friday.  The Court indicated the question of whether or not

14   Franciscan and The Doctors Clinic are a single entity is

15   dispositive of the Section 1 issue.  It may make sense for us

16   to try that issue.  That would greatly narrow the number of

17   witnesses, exhibits, deposition excerpts and the like, after

18   which, if the Court rules it is a single entity, trial is

19   over.  If the Court rules it isn't, we proceed.  And the

20   argument would be in the next phase is it per se, is it rule

21   of reason and what is the evidence.  That is a suggestion

22   that seemed to come from the Judge's ruling.

23          I also recall way back at the beginning of the case when

24   the State first moved for summary judgment, a motion the

25   Court denied, the State indicated the question of whether or

1  not the two are a single entity for antitrust purposes is

2  potentially a dispositive issue.  It may be a logical way to

3  shorten the length of the trial.

4      THE COURT:  You are right.  The Court is exploring

5  that, given particularly the fact that we only have four days

6  before the Court has a criminal trial that is going to

7  consume the following week. I think the other two criminal

8  trials are not going to interfere with that.  We do have the

9  one criminal trial.

10      I do think it is conceivable that the Court could be

11  able to consider the one discrete question.  It might not be

12  able to fully have that issue presented within that four

13  days. Do you think four days is doable for the discrete issue

14  of whether it is a single entity, joint venture, so forth?

15      MR. TOMISSER:  That is probably not quite enough

16  time.  I can inform the Court, the State agrees bifurcation

17  on those grounds is a good idea.  We would be supportive of

18  that.  We think there is a substantial amount of overlap

19  between the single entity rule issue and the per se rule,

20  that it may make some sense to do those two issues at the

21  same time and get decisions on those before we get into rule

22  of reason.

23   Some of the other considerations, if we have to get into

24  the rule of reason, as Your Honor is aware, we have a lot of

25  information in this case produced by the third-party payers,

 1    confidential information.  There is going to be a lot of back

 2    and forth with confidential presentations that would be

 3    saved.  I think it is a good idea to bifurcate.

 4        We would like the Court to consider the rule of reason and

 5    the per se as the two threshold issues.  Four days, even

 6    though there is a lot of overlap between those two issues, I

 7    am not sure four days is quite enough.

 8            THE COURT:  That seems to be a reasonable thought

 9    there.

10        What do you say, Mr. Ross, about that, about concluding

11    the per se?

12            MR. ROSS:  If what we are talking about is deciding

13    what the rule of application is, what we had proposed is

14    first we decide whether it is a single entity, that would be

15    the threshold issue.  The second issue is whether or not to

16    apply the rule of reason or the per se rule without getting

17    into the how the rule is going to be applied should the Court

18    decide it is the rule of reason.

19        I think it is neater if we just do that first issue first.

20    We can then proceed to the trial and put in all the evidence,

21    and the Court can decide if it is rule of reason or per se.

22    There will be evidence that would come in to argue that the

23    rule of reason should apply, that won't come in on the single

24    entity issue.  There will be discussions of whether

25    efficiencies are produced, for example, that would go to

1    whether the rule of reason should apply in the event we are

2    not a single entity. So there may be additional evidence that

3    would have to come in.  It could be shorter and quicker if

4    the Court did that first issue alone.

5            THE COURT:  Given we have only four days and the

6    benefit of then having a hiatus for the Court to consider

7    that issue, although I might say that if it ends up being a

8    close question on the single entity, the Court may wish to

9    not render a decision on that and proceed to take the rest of

10   the case on the per se and rule of reason in order to have a

11   decision that if either or both parties seek to review it at

12   the circuit, that the case can be resolved sooner completely.

13   That is in my mind.

14       If I think that it is a close question, I may defer on it

15   just so the whole of the record can be developed in this

16   case.  The parties have worked hard.  I don't want to see --

17   if the Court were to find for the defendants on the single

18   entity, I wouldn't want to see all this go up to the circuit

19   and have the circuit disagree with me and then we have to

20   litigate.  That is my thinking, at least at this point, on

21   that.  I do think we can benefit from separating the issues.

22       I will talk more about the confidentiality order after a

23   bit here.

24       I have reviewed the parties' motions to exclude the

25   experts.  I am going to address those now.

1      The plaintiff moved to exclude the reports and testimony

2  of three of the defendants' experts.  Defendants have moved

3  to exclude testimony or portions of testimony of four of the

4  plaintiff's.  Generally, reports themselves are not admitted,

5  of course, as evidence unless excerpts are used for

6  impeachment purposes.

7      Before addressing individual motions, I will make some

8  general comments here.

9      This case, as we all know, presents some very substantial

10 and complex questions of fact and law.  As a preliminary

11 matter, because this will be a bench trial, it will have some

12 influence on how the Court will proceed on the matters of

13 initially qualifying experts and ultimately on its rulings

14 regarding the scope or limits of a particular expert's

15 testimony.

16     The Court recognizes that *Daubert* and Rule 702 still apply

17 in a bench trial.  The Court will require that any witness

18 who is presented for testimony by a party will first be

19 vetted for their qualifications in the relevant field to

20 which his testimony is expected and whether his methods and

21 applied principles are reliable.

22     Secondly, assuming a witness qualifies, the Court will

23 take up objections as to specific areas of testimony.  This

24 procedure will occur while the trial is in progress and

25 therefore the Court will not need separate *Daubert* hearings

1   in advance of trial.

2       Much of what both parties regard in their motions as

3   disqualifiers of particular witnesses goes to the reliability

4   of the methods used in the development of data and reports.

5   These disqualifier concerns would typically be raised by

6   objections during trial testimony.  In most cases, the Court

7   will likely overrule the objection and take testimony with

8   the concerns being addressed through vigorous

9   cross-examination.

10      Another common theme in the parties' motion is the concern

11  that a witness should not be allowed to usurp the role of

12  trier of fact which, of course, in this case is the Court,

13  nor allow a witness to express an opinion on a question of

14  law.  Both parties have cited to prior rulings of the Court

15  concerning these issues.

16      With regard to the latter, the parties understand that the

17  Court will not admit testimony on a question of law.  Even

18  so, the Court will expect to hear from the experts in their

19  field giving testimony regarding the legal framework and

20  principles that govern the issues for which their opinions

21  were developed.  Then experts will refer and discuss facts

22  that are relevant to a particular legal principle or

23  framework.  In many ways, the Court regards expert testimony,

24  especially in a bench trial, as something like a tutorial

25  really, one that is tested by cross-examination through the

1   testimony of experts of opposing opinions.

2       Although the Court will not now exclude or limit testimony

3   of any identified expert of either party for the reasons I

4   have already stated, I will make some observations and

5   comments about each such proposed expert.  I begin with the

6   defendants' experts that plaintiff has moved to exclude in

7   whole or part.

8       Dr. Lawrence Wu.  Plaintiff moved to exclude portions of

9   testimony of Dr. Lawrence Wu on six subjects.  First,

10  plaintiff objects to the methods and means Dr. Wu employed to

11  gather data and form his opinions.  The fact that these

12  interviews were both conducted in the context of ongoing

13  litigation and ex parte renders the results as being less

14  reliable than these interviews would have been had they been

15  conducted before the transaction was entered into.

16  Nonetheless, the Court will likely admit Dr. Wu's testimony

17  concerning the content of these interviews, but the Court

18  will be more interested in the live testimony of physicians

19  and less weight will be given to the statements made during

20  the less formal and less reliable interview environment.

21      While the plaintiff makes a valid argument that, contrary

22  to the defendants' assertion, it was not reasonable to take

23  the depositions of 54 physicians, plaintiffs could have taken

24  a few to test the interview method and results.  In any

25  event, before hearing these results, the Court will have to

1  hear more about the manner and method of seeking answers in

2  such a manner that the answers are not suggestive of the

3  question or are otherwise designed to obtain the desired

4  answer.

5      Secondly, plaintiff contends that Dr. Wu did not use the

6  two-stage method in analyzing competition among healthcare

7  providers.  While this is a recognized and accepted method,

8  the parties' experts appear to disagree as to its application

9  to the facts in this case.  The Court is unable to assess the

10  disagreement without more, which will be better determined at

11  trial with the explanation of Dr. Wu's view of Kaiser's

12  presence in the marketplace, and to what extent it represents

13  a competitor for payers and patients.

14      Thirdly, plaintiff asserts Dr. Wu's opinion that

15  prospective patients in Kitsap Peninsula and Bainbridge

16  Island in significant numbers is not supported by reliable

17  data to which defendants respond that it is an undisputed

18  fact that two-thirds of these orthopedic patients travel from

19  Seattle to Tacoma for care and cite to Dr. Wu opining that

20  one possible reason is the perceived quality of physician

21  services is higher in Seattle.

22      The Court will look closely at the method and data

23  collection process Dr. Wu used or relied upon before this

24  evidence will be considered.

25      Similarly, plaintiff challenges Dr. Wu's basis for his

1    opinions regarding the expansion of the delivery of

2    healthcare services by increasing Franciscan's referral base.

3    Similarly, defendants here fail to provide the details of the

4    data and methods upon which defendants base this opinion or

5    whether the opinion is based upon experience of other systems

6    in similar markets.  Dr. Wu's opinion on this subject will

7    also be closely scrutinized.

8        Next, plaintiff objects to Dr. Wu expressing a legal

9    principle that healthcare firms with less than 30 percent

10   market share warrant no deeper inquiry.  This appears to be a

11   legal principle the Court does not need assistance from an

12   expert to apply if accurate and appropriate to this case.

13   What may be relevant to this end is whether this exists in

14   the case data reflecting the market share of the pertinent

15   healthcare providers in the KP/BI, which is what we all

16   understand are the initials for the Kitsap Peninsula and

17   Bainbridge Island area.

18       Finally, plaintiff seeks to exclude any opinion of Dr. Wu

19   that relies on excluded testimony of Mr. Henske or

20   Mr. Kennedy.  The outcome of this motion will have to await

21   the circumstances upon which it may arise during trial and as

22   more thoroughly discussed in connection with motions to

23   exclude testimony of Mr. Kennedy and Mr. Henske.

24       With regard to Kevin M. Kennedy, plaintiff has moved to

25   exclude that report and opinion.  The Court has already

1 indicated in its summary judgment motion it was not

2 considering his single entity conclusion.  While the Court

3 renders that limitation in connection with an ultimate

4 question of law that the Court will have to decide, the

5 Court, by that ruling, did not preclude hearing any testimony

6 at all.  Instead, if the defendants call him to testify, they

7 will have to qualify him as an expert in the matters about

8 which he is expected to testify.

9       In making the decision of whether the TDC and the

10 Franciscan group are a single entity for the purpose of

11 analysis of whether the Sherman Act applies, it may be

12 Mr. Kennedy will be able to assist the Court in understanding

13 forms of physician/hospital relationships in the market and

14 their respective characteristics as well as the factual

15 characteristics of the Franciscan/TDC relationship.

16       Similarly, before he can render an opinion regarding

17 gained efficiencies in the delivery of healthcare obtained

18 through the implementation of the transaction between the TDC

19 and Franciscan, a foundation will have to be established that

20 his background, experience and training, as well as his

21 gathering of facts and data in the KP/BI market, can qualify

22 him to offer such an opinion.

23       Additionally, whether the framework Mr. Kennedy utilized

24 to examine the degree of integration of healthcare firms is

25 one accepted in the healthcare industry or is otherwise

1   reliable is a matter left for determination when and if

2   Mr. Kennedy is presented on this subject.

3       With regard to whether Statement 8 is relevant or useful,

4   the Court will have to determine after hearing any expert

5   qualified by either party as to the applicability of that

6   provision in evaluating the issue of "efficiency-enhancing

7   integration."  Whether Mr. Kennedy's analysis of, and opinion

8   about, the Franciscan/TDC transaction will be accepted

9   testimony must again wait until and unless a foundation is

10  laid and the Court hears from the parties as to the factual

11  basis for and the reliability of the opinions offered through

12  Mr. Kennedy.  For similar reasons, the Court defers ruling on

13  the question of whether he will be permitted to give

14  testimony on improved quality in the delivery of healthcare

15  after the agreement was implemented.

16      Plaintiff moved to exclude the entire testimony of

17  Leonard Henske.  The Court previously granted summary

18  judgment to plaintiff that precludes TDC's affirmative

19  defense to the alleged Sherman Act of failing firm.  Yet, the

20  defendants assert the need to still produce testimony through

21  Mr. Henske that under the rule of reason analysis that

22  focuses on the net effect of merger on the relevant market,

23  the two defendant entities were weakened competitors.  The

24  plaintiff asserts that his testimony is unreliable because he

25  uses his own framework for determining the strength and

1    viability of the firms if the transaction had not been

2    entered into.  While plaintiff appears to have accurately

3    pointed out Mr. Henske did not apply the standard framework

4    for failing companies of the Horizontal Merger Guidelines, he

5    does purport to use a framework that has unique application

6    to physician-owned medical practices.  The Court is unable to

7    conclude upon the submissions as to whether his framework is

8    accepted and reliable.  It is certainly possible that in the

9    right set of facts the Court can find a healthcare practice

10    owned by the providers can be failing even though its assets

11    exceed liabilities if with a reasonable degree of certainty

12    the practice would, over some predictable and obviously short

13    period of time, lose its physicians to firms outside the

14    physician's current market.  Yet there are a lot of

15    evidentiary hurdles that would have to be overcome before

16    such an opinion would be heard, let alone accepted.

17        As to methods of data gathering as to physician

18    interviews, this issue has already been discussed and

19    addressed in the discussion of Dr. Wu's expert testimony.

20    The Court is not now prepared to reject Mr. Henske or his

21    opinions.

22        Moving to defendant's motion to exclude.  The first

23    concerns Dr. J. Gregory Eastman.  Defendants move to exclude

24    his testimony asserting he lacks qualifications to opine on

25    the economics of the TDC and WSO because he had no

1    specialized knowledge of the operators healthcare providers

2    or how they compensate their physicians and he has no

3    knowledge about the Kitsap region and market dynamics in that

4    region of physician and healthcare systems.  In particular,

5    defendants allege he has never before considered the

6    financial viability of a physician's group, let alone a

7    primary care group or group of orthopedists.  It is further

8    argued that he is not familiar with the Kitsap market as to

9    opine as to alternatives to the transactions that are the

10    subject of this litigation.

11        Defendants also allege that he lacks qualifications to

12    express an opinion about the likelihood that physicians would

13    leave the market and that he relies on other expert data and

14    express legal conclusions.  Plaintiff responds to all this

15    that Dr. Eastman has exemplary credentials in the field of

16    antitrust and, as argued by defendants in response to

17    plaintiff's motions to exclude, most of the defendants'

18    objections are matters for cross-examination.

19        It is conceivable the plaintiff will not be able to

20    qualify Dr. Eastman as an expert in the financial field of

21    the delivery of primary and orthopedic healthcare in the

22    relevant market, but the Court is unable to make a

23    determination without plaintiff laying a more thorough

24    foundation for his opinions.  The Court, of course, will not,

25    as previously stated, receive legal conclusions from this or

1    any other witness.   However, at least some of his proposed

2    opinions are better characterized as factual opinions.

3         With regard to Dr. Cory Capps, which defendants move to

4    exclude, essentially there are two bases for the motion.

5    Defense contends that Dr. Capps' analysis is unreliable

6    because he did not properly consider an alternate theory to

7    explain the pricing increase in primary and orthopedic care

8    in the Kitsap region.   Specifically, he did not account for

9    the effects of vertical integration and relied on horizontal

10   overlap only.   Plaintiff asserts that Dr. Capps, in his

11   co-authored study finding that vertical integration increases

12   healthcare pricing, included controls for any effects caused

13   by an increase in the horizontal concentration of physicians.

14        Plaintiff further asserts the effects of vertical

15   integration on pricing is in addition to the result of

16   decreased horizontal competition.   In short, Dr. Capps

17   concluded that horizontal elimination of competition and not

18   vertical integration was the most substantial cause of the

19   price increases.

20        The defense, in response, says if both phenomenon are

21   present, then Dr. Capps is engaging in speculation as to what

22   amount is attributable to the decrease in horizontal

23   competition.

24        If I understand the plaintiff's position, the entire

25   increase is attributable to the alleged illegal transactions,

1    because had the transaction not been entered into in the

2    first place, none of the increases would have occurred.

3         The second basis is Dr. Capps is alleged to lack an

4    understanding of the Washington Network Adequacy Regulations

5    as they relate to identifying markets for scrutiny on the

6    issue of the presence of competition.

7         Defense argues that because of his lack of familiarity, he

8    has defined the relevant market too narrowly.  Yet plaintiff

9    contends he did not rely on these regulations, but on the

10   well-accepted hypothetical monopolists/SSNIP test.

11        Once again, these are issues to be sorted out during

12   trial.  At this time, the Court cannot rule that the methods

13   used in the analysis are fatally flawed and a determination

14   of whether some or all of Dr. Capps' testimony should be

15   disregarded will have to be deferred until then.

16        Moving to Dr. Lawton R. Burns, the motion to exclude his

17   testimony.  Dr. Burns is presented as an expert in healthcare

18   integration and is familiar with the application of Statement

19   8 as used by the Department of Justice in enforcing antitrust

20   laws in the healthcare industry. He will, if permitted to

21   testify, opine as to how the transactions here do not result

22   in clinical or economic integration.

23        While the Court will not receive testimony from any

24   witness as to legal conclusions as to whether the

25   relationship between TDC and FMG is or is not one of

 1   principal-agent or that the resulting relationship
 2   constitutes for antitrust purposes a single entity, the Court
 3   must again, however, defer ruling on what testimony the Court
 4   will hear from Dr. Burns in explaining how enforcement
 5   agencies conduct their analyses on these subjects.  It is
 6   likely that the Court will permit testimony concerning his
 7   review of the discovery in this case and to what extent he
 8   found evidence or lack thereof.  For example, physician
 9   report cards, clinic performance criteria, physician
10   training, among others.  Of course, the defense will have an
11   opportunity to elicit through cross-examination and other
12   witnesses the presence of such evidence.  This is the type of
13   expert testimony that might be helpful to the trier of fact.
14        Once again, because this is a bench trial, the Court may
15   give a little more latitude in taking testimony from
16   acknowledged experts in their field to outline applicable and
17   accepted frameworks when analyzing business relationships in
18   the field of healthcare.  An expert in giving testimony that
19   provides analysis in a trial is to refrain from offering
20   opinions on what the ultimate legal conclusions the Court
21   should draw.  Even so, it needs to be recognized that experts
22   in the antitrust regulatory and enforcement field are in many
23   ways virtually an extension of the lawyers for a particular
24   side assisting the Court in establishing the proper, if not
25   sometimes competing, legal frameworks for analyzing the

1    issues that are before the Court.

2        Dr. Daniel Kessler.  Defendants again are moving to

3    exclude his testimony on two primary bases.  First, defendant

4    asserts that plaintiff is attempting to insert a new

5    unapplied legal theory of establishing an antitrust

6    violation, that is the competition was weakened through

7    vertical integration.

8        Plaintiff responds that the transactions' anticompetitive

9    effects of the horizontal agreements included the

10   intertwining of the vertical relationship centered on the CHI

11   Franciscan's ownership of Harrison Medical Center.  It is

12   unclear to what extent this relationship and evidence of

13   effects on the hospitals after the transaction had on the

14   weakening of competition and pricing.

15       I am interested in what opportunities the defendants did

16   have to rebut this opinion, which it asserts was first

17   revealed in the Kessler report.

18           MR. ROSS:  That was the first assertion of it, Your

19   Honor, from the beginning of the plaintiff's claim in the

20   case, was that the horizontal aggregation of adult primary

21   care physicians at TDC and Franciscan Medical Group was

22   anticompetitive and that the horizontal aggregation of

23   orthopedic physicians at TDC and the Franciscan Medical Group

24   and WSO was anticompetitive.  Those are horizontal claims.

25       The government, federal government, in all of its mergers

has only brought horizontal claims.  A case I think many of

us look to for some analogies to this case is the *St. Luke's*

case in Boise. It was brought by the federal government

purely as a horizontal case.  The plaintiff in that case,

St. Alphonsus, the other rival system in town, did bring an

explicitly vertical case, which the court chose not to take

up at trial.  It was explicitly acknowledged, and the markets

affected, which were hospital markets, not physician markets,

were explicitly identified by the plaintiff, St. Alphonsus,

in that case.  We had no similar identification of a vertical

theory in this complaint, in any of the motions, at any time

until we took Dr. Kessler's deposition, which was literally

at the end of discovery.

MR. TOMISSER:  From plaintiff's side of this, as

counsel acknowledged, they did have Dr. Kessler's report, all

the underlying data and the opportunity for seven hours of

deposition, which they took advantage of and which explained

the basis of the opinion.

The State here has alleged certainly horizontal restraints

of trade.  It is not as simple as simply two separate

horizontal players in the market.  The effect of that

horizontal relationship is necessarily intertwined with

FMG's -- Franciscan Medical Group's relationship with

Franciscan Health System and Harrison Hospital, and the

relationships that are required then to impact that

1    transaction with TDC in terms of whether referrals go,

2    requirements for what TDC gave up in that transaction simply

3    can't be separated without that understanding that there was,

4    in fact, an impact with Harrison Medical Center through FMG

5    in this transaction.  It is impossible to really understand

6    how this transaction happened in terms of what were the

7    benefits of the arguments for the two parties without

8    considering that impact with the hospital in this case.

9          THE COURT:  I am primarily concerned about the

10   prejudice here.  Of course, his deposition was to be taken.

11   The plaintiff's argument here is that these are effects, this

12   is not an independent theory of liability.  So I am curious

13   as to -- this was not anticipated until you saw the Kessler

14   report, but do you have among your experts someone who can

15   deal with and address the issue?

16         MR. ROSS:  Your Honor, on the question of whether it

17   is an independent basis of liability, the claim in the case

18   is that the transaction between FMG and The Doctors Clinic

19   had an anticompetitive effect in two markets, two physician

20   markets: adult primary care and orthopedics.  That is it.

21         Mr. Tomisser is now talking about effects in the hospital

22   market where Harrison Medical Center competes with hospitals

23   in Tacoma and Seattle.  That is what the vertical theory

24   would have to show.  It would have to allege that by

25   foreclosing doctor referrals that might have gone to

1   MultiCare or Swedish, there was an impact on hospital

2   competition.  That is the vertical theory.  No such claim has

3   been ever made, and Dr. Kessler, other than talking about it

4   as a theoretical matter, he has done a lot of writing in the

5   area, there is no -- he had no quantification of the effect,

6   he had no separation of the vertical from the horizontal.

7        To the Court's question, we have an economist who could

8   talk about vertical versus horizontal effects.  We have not

9   prepared somebody to get into the true vertical effects,

10  which would be at the hospital level, and testify to that.

11       Frankly, Your Honor, other than alleging that there are

12  vertical effects, I don't believe that the plaintiff's expert

13  has done any analysis like this either, because the vertical

14  effects, again, would be felt in a completely separate market

15  where hospitals compete, maybe where ambulatory surgery

16  centers compete, or in some other products than the two which

17  are at issue here.

18       Plaintiffs have not claimed, and I didn't hear

19  Mr. Tomisser say, that there are somehow vertical effects on

20  adult PCPs and orthopods that we ought take into account.

21  The effects in those two markets are simple, straightforward

22  theoretical effects which either occurred or didn't occur,

23  that we can try in a routine horizontal case.  Adding the

24  vertical overlay confuses things.

25            MR. TOMISSER:  Two quick points, Your Honor.  Counsel

1   reminded me, in fact, vertical price increases were

2   identified in the plaintiff's complaint in this case, that

3   the transaction caused a vertical pricing increase due to

4   referrals having to go through Harrison.  I do think the

5   defendant, part of the argument, should we get to the rule of

6   reason, there are vertical efficiencies that have arisen as a

7   result of the transaction.  The vertical effects I think are

8   certainly in play in this case.

9           THE COURT:  The Court is going to reserve ruling on

10  this.  Again, it is a bench trial.  I have the luxury of

11  being able to further ponder on this issue.

12      With regard to the second issue of the effects that

13  horizontal restraints will have on the future pricing of

14  primary and orthopedic healthcare in the relevant market, it

15  appears to me this may be redundant to Dr. Capps' testimony,

16  and especially so because he apparently relies to some degree

17  upon Dr. Capps' research and findings in connection with this

18  case.  By the way, I would say experts routinely rely on the

19  work and opinions of other experts, and that is quite

20  permissible.  Here, without ruling, it appears that

21  Dr. Kessler is best reserved for rebuttal even if some of his

22  testimony is not tethered to Dr. Capps' report.  Local Rule

23  43(j) limits a party from calling more than one expert on the

24  same subject unless otherwise permitted by the Court.  While

25  that rule is simple in its statement, it is more difficult to

implement because often there are nuanced but real

differences in the subject of two experts in the same field

who bring slightly different information to their analyses.

However, if Dr. Capps is the primary witness in this area,

you might want to call him first as to not risk losing his

testimony as redundant to Dr. Kessler who might be held as a

rebuttal witness.  Again, if and when Dr. Kessler or any

other expert is believed to be offering a legal conclusion, I

anticipate I will hear an objection and I can rule.  But the

plaintiff has cited to a useful statement when citing to the

*Primiano* case which I endorse, and that says, "Economists

inform the court's antitrust analysis by identifying and

explaining the relevant facts that are observable and by

making forecasts, on a more probable than not basis, on what

accepted economic research predicts will happen as a result

of the challenged agreements."

I have also preliminarily reviewed the motions in limine.

There has not yet been a response.  They are not due.  The

motions were filed last Wednesday.  Responses are due on

March 11th, and a noting date on the Ides of March.

So for the benefit of the parties, I would like to set up

a telephone hearing for March 13th at 2:30 to give you

direction on these motions rather than wait for that more

ominous date of March 15th, and give the parties as much

opportunity in advance of their preparation of trial to know

1    the Court's ruling on those. Don't be surprised if there

2    aren't several rulings deferred until trial.  I will try to

3    give you some direction and help on that.

4        Some housekeeping issues with regard to the trial.  The

5    trial day begins at 9:00, completes at 4:30.  There is a noon

6    recess for an hour and a half, 12:00 to 1:30.  The morning

7    break is -- tends to be around 10:30 for 15 minutes, and

8    again an afternoon break at 3:00 for 15 minutes.

9        I do expect each party to inform the other on the eve of

10   each trial day the expected witnesses to be called and the

11   expected exhibits to be introduced through each witness.

12       I would like to see restraint on the number of witnesses

13   and exhibits to be submitted.  The pretrial order is

14   voluminous in its listing of witnesses and exhibits.

15       With regard to the exhibits, I discourage objections based

16   upon authenticity when there really is no doubt about whether

17   the document is what it purports to be.  Similarly,

18   objections under 402 or 403 are to be made judiciously.

19   Again, this is a bench trial.  The Court does not want the

20   flow of evidence interrupted by a series of objections.

21       I have a small strike zone on leading questions.  By that,

22   what I mean is I won't sustain an objection when the lawyer

23   is simply setting a foundation or is obviously just

24   attempting to move the testimony along.  I find that

25   experienced trial lawyers know when a leading question should

1    be objected to because it truly is just the lawyer

2    testifying.

3        You will get a better flavor of the Court's strike zone, I

4    guess, as we move through the trial as you test me on these

5    things.  I thought I would give you a little heads up that

6    that is sort of how I want to proceed.  This is particularly

7    true, again, since this is a bench trial.

8        I reviewed and entered the order on the use of

9    confidential information at trial.  I am hoping and trusting

10   that the protocol will be efficient.  I understand the need

11   to close the court will come up -- the need to close the

12   courtroom.  I think it would be best, as I think it was

13   suggested, that you do this at the beginning or end of

14   testimony, and seems to me that we should have

15   cross-examination, in other words, interrupt direct

16   examination if we are dealing in an area that needs to be

17   closed, that we proceed with the cross-examination and those

18   discreet issues that are being covered excluding the public.

19       We won't have a need for the large screen.  So lots of

20   this can be accomplished -- I don't think the gallery is

21   going to be able to read your screens.  So when we are

22   dealing with particularly sensitive confidential information

23   in a document and careful examination of a witness, so that

24   we don't get into that, I am hoping it can -- we won't need a

25   lot of closing of the courtroom.

1       Does that make sense?

2           MR. RAUP:  Yes, Your Honor.

3           THE COURT: I have done a lot of talking.  I will ask

4    if there are some questions or further comment here?

5           MR. ROSS:  While the State is talking, if I may, with

6    regard to Phase 1 of the trial, it sounds as though the

7    logical way to proceed would be with respect to the issue the

8    Court has identified we are going to try.  Obviously we would

9    introduce witnesses and exhibits to that issue.  Opening

10   statements would be directed to that issue.  If the Court

11   goes forward with Phase 2, will we have separate opening?

12   That makes sense.

13          THE COURT:  Absolutely.

14          MR. ROSS:  Great deal of different evidence that

15   would come in.  It also means that Phase 1 relevance

16   objections may be in order if, for example, the State would

17   try to introduce evidence -- and I am sure they won't -- on

18   what the effect of the arrangement is.  That might be

19   challenged as not -- as not relevant because it doesn't go to

20   whether it is a single entity.  I could imagine exhibits to

21   which we didn't object in the pretrial might be

22   objectionable -- or testimony might be -- in Phase 1.  Just

23   thinking that through.  Does that sound logical?

24          THE COURT:  It may come up.  The Court will deal with

25   it as it is presented.  The Court will know what is relevant

1   to the issue of single entity and what is not.  If I get it

2   wrong, I am not the last -- I don't have the last say in the

3   case.

4           MR. TOMISSER:  Couple points of clarification.

5   Looking at the bifurcation, one of the things the Court still

6   needs to consider, including the per se analysis is part of

7   that because there is a great deal of overlap.  We may also

8   have an issue with witness scheduling if the per se rule is

9   not included in the first with Professor Burns.

10          THE COURT:  Will next Wednesday the 13th set for the

11  motions in limine be soon enough for the Court to indicate to

12  you whether we are going to also proceed with per se?

13          MR. TOMISSER:  Yes.

14          THE COURT:  Is that sufficient for your scheduling?

15          MR. TOMISSER:  Yes.

16          MR. ROSS:  Just as a matter of clarification, when

17  they say "per se," you repeated it, I guess I would take much

18  more comfort if the issue were phrased "whether the rule of

19  reason or per se rule would apply in the event that there

20  isn't a single entity." That is my understanding of what the

21  State is proposing and what Your Honor is saying.  Is that

22  correct?

23          MR. TOMISSER:  That is correct.

24          THE COURT:  I understand.

25      Other questions?

 1          MR. MAAS:  This is David Maas for The Doctors Clinic.

 2   I have a question related to the logistics of the two-phase

 3   trial in light of our client's substantial number of

 4   potential physician witnesses.  We would principally only

 5   testify in the second phase if it were to occur.  As you can

 6   imagine, particularly orthopedic surgeons right now are

 7   looking to schedule patients for procedures during what might

 8   be a time of trial testimony, if we were to proceed

 9   immediately after Phase 1 into Phase 2.

10          THE COURT:  It won't be immediately because we have

11   at least one -- I think only one criminal trial that

12   certainly is going to interfere with it.  It is something for

13   us to try and work with Gretchen to look where, assuming

14   Phase 2 is necessary, to work it out.  I am thinking it could

15   be as much as a month delay before we take up Phase 2.

16          MR. MAAS:  If I am clear, we finish Phase 1, we have

17   as much as a month before Phase 2 would begin?  If our

18   surgeons wanted to schedule for the first week of April right

19   now, that is not likely to be the beginning of Phase 2?

20          THE COURT:  I don't think so. More likely the middle

21   of April is what we are going to shoot for.  The Court has a

22   calendar to try to work this in.  We don't know exactly when

23   criminal trials are going to go out often until the week

24   before or so.  We will try to, and it would be my goal if we

25   proceed to the second phase, that we will be able to have

1   this case completed in early May.

2          MR. MAAS:  Thank you, Your Honor.

3          MR. RAUP:  Your Honor, one thing that would be

4   helpful to the parties, I think, would be to have revised

5   witness lists and exhibit lists that apply only to Phase 1 so

6   we know what the case is we are expecting to answer.

7          THE COURT:  That is a very good suggestion.  That can

8   be accomplished, I take it.  That will help the Court and

9   help the parties, too.

10     All right.  If nothing else, we will talk next week on the

11  13th at 2:30.

12                      (Recessed.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4

5        I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.

7

8

9

10   /s/ Angela Nicolavo

11   ANGELA NICOLAVO
     COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25