```
 1

 2                  UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF WASHINGTON AT TACOMA
 3    _____

 4                                )
      STATE OF WASHINGTON,         )
 5                                )
                     Plaintiff,    )
 6                                )  3:17-cv-05690-BHS
      v.                           )
 7                                )  Tacoma, Washington
      FRANCISCAN HEALTH SYSTEM     )
 8    d/b/a CHI FRANCISCAN HEALTH; )  June 19, 2019
      FRANCISCAN MEDICAL GROUP,    )
 9    THE DOCTORS CLINIC, a        )  Motion Hearing
      professional corporation;    )
10    and WESTSOUND ORTHOPAEDICS,  )
      P.S.,                        )
11                                )
                     Defendants.   )
12
      _____
13
                   VERBATIM REPORT OF PROCEEDINGS
14            BEFORE THE HONORABLE BENJAMIN H. SETTLE
                   UNITED STATES DISTRICT JUDGE
15    _____

16

17    For the Plaintiff:     JONATHAN MARK
                             ERICA KOSCHER
18                           AMY HANSON
                             Assistant Attorneys General
19

20    For the Defendant      JESSICA ANDRADE
      Franciscan Health:     Attorney at Law
21

22    For the Defendant
      The Doctors Clinic:    DAVID MAAS
23                           Attorney at Law

24

25       Proceedings stenographically reported and transcribed with
                     computer-aided technology
```

| | |
|---|---|
| 1 | MORNING SESSION |
| 2 | JUNE 19, 2019 |
| 3 | THE CLERK:  This is the matter of State of Washington |
| 4 | versus Franciscan Health System, Cause Number 17-05690-BHS. |
| 5 | Counsel, please make an appearance. |
| 6 | MS. KOSCHER:  Erica Koscher for the Attorney |
| 7 | General's Office for the State of Washington. |
| 8 | MR. MARK:  Jonathan Mark for the State of Washington. |
| 9 | MS. HANSON:  Amy Hanson for the State of Washington. |
| 10 | MS. ANDRADE:  Jessica Andrade for Franciscan and |
| 11 | WestSound Orthopaedics; with me is senior counsel for |
| 12 | Franciscan. |
| 13 | MR. MAAS:  David Maas for The Doctors Clinic. |
| 14 | THE COURT:  Good morning.  First, the Court certainly |
| 15 | wants to commend the parties for resolving this case short of |
| 16 | trial.  The issues, as we all recognized, were complex, and |
| 17 | the trial, regardless of the outcome, would have produced |
| 18 | far-reaching implications for the delivery of healthcare in |
| 19 | Kitsap County.  This may be said to be true, of course, with |
| 20 | the consent order, but the difference is that the resolution |
| 21 | was ultimately one that both sides could agree upon, which is |
| 22 | almost always better than the Court having to impose its |
| 23 | decision on the parties. |
| 24 | This means the consent order, both as to substance and |
| 25 | process, can be implemented in a way that produces the least |

1   amount of uncertainty, contentiousness and confusion.

2      The Court set this hearing to further this goal by asking

3   you some questions concerning primarily process, and consider

4   whether in some cases providing definitions or more detail

5   could avoid future disagreement.

6      I would like to go through this with you.  When inquiring,

7   I will start with plaintiff and ask the defendant to respond.

8      The divestiture agreement first mentioned at page 6,

9   paragraph 28 -- I'm sorry, paragraph 18 -- of course, it

10  comes into the agreement later on at page 28 -- there is not

11  any detail as to the criteria that will be used to determine

12  whether the divestiture agreement fulfills the requirements

13  of the agreement.

14     Is there any thought that additional detail there would be

15  helpful, plaintiff?

16        MS. KOSCHER:  Your Honor, I believe how the parties

17  had envisioned the agreement upon divestiture would be that

18  both parties need to approve who would be -- who would be the

19  purchaser of the ambulatory surgery facilities, and that it

20  would be essentially a reasonableness standard and we

21  wouldn't unreasonably withhold approval of a buyer identified

22  by the defendants.

23        THE COURT:  Again, that is kind of broad.  Maybe that

24  is all the parties wish to use, seems to me, without greater

25  definition than what is going to be the Court's resolution if

1   there is a dispute as to whether a particular divestiture

2   agreement is going to be proposed.

3       MS. KOSCHER:  I don't think the State has any

4   specific concerns of criteria that we felt needed to be in

5   the consent decree in terms of specific concerns of the

6   scenario where the State wouldn't necessarily agree to a

7   proposed buyer.  I will defer to my colleague.

8       MR. MARK:  Yes, I agree.  I think ultimately a

9   reasonableness standard is -- I think we felt it was

10  appropriate not to put specific criteria for the type of

11  buyer or what specific criteria would satisfy the State to

12  some degree to give Franciscan some latitude to find a

13  partner that would be satisfactory to them, but reserving the

14  right if there was a concern that the State ultimately had to

15  try to work through that.  We weren't envisioning the consent

16  decree to lay out the exact criteria for which buyer could

17  be -- to allow them to cast a fairly wide net.

18      THE COURT:  First of all, I appreciate you standing.

19  That is sort of protocol in federal court.  In this instance,

20  I am not going to require everyone to stand because we are

21  going to be engaging in an interactive process here.  Thank

22  you for that.

23      Let me then ask, Ms. Andrade, you are satisfied with that,

24  having no further definition, recognizing that it gives lots

25  of latitude -- appears to give a lot of latitude to the State

1    of Washington for its approval?

2         MS. ANDRADE:   Right.   We did not anticipate -- or, we

3    don't have any great concerns.   We appreciate the Court's

4    having foresight to think it might be a problem that would

5    arise if the State were to reject a potential buyer that we

6    procured.   However, when we were drafting this, and in our

7    discussions with the State, that wasn't a concern that came

8    up.   We are certainly planning on disclosing buyers to the

9    State and having them vetted as appropriate.   We didn't

10   particularly see the need for a more specific criteria for a

11   type of buyer.

12        THE COURT:   If you identify the buyer under terms

13   that you thought were good and the buyer was compatible and

14   so forth and the AGO didn't agree, would you then seek Court

15   approval or would you just abandon and go look for another

16   buyer?

17        MS. ANDRADE:   It would depend on whether we knew

18   there were other buyers that were out there.   If we were in

19   the type of situation that we had secured one buyer, and

20   thought we were unlikely to secure another, we would probably

21   try to work with the State with their stated reasonableness

22   standard to get them to agree with the buyer.

23        Looking at the agreement, it would be unlikely we would

24   seek the Court's assistance.   We didn't see potential for

25   dispute over this issue.

1          THE COURT:  You have satisfied the Court on that.

2      I noted there on page 8, I don't know whether I am just

3  wordsmithing here, physician services is defined as "PCP

4  services and orthopedic physician services."  Seems to me it

5  could be an "or" when referencing physician services, a

6  specific one.  I don't really like "and/or" anyway.  If there

7  is no concern, I am going to let that one go.

8          MS. KOSCHER:  That definition is used primarily with

9  respect to the provisions around payer contracting in which

10  physician services payers need to be given the option to

11  contract separately on behalf of.  It would be adult PCP

12  physicians or orthopedic physicians.

13          THE COURT:  It is going to be one or the other when

14  dealing with that.  That's what my thinking was.  I don't

15  think it is going to lead to any confusion either.  I will

16  leave it up to the parties whether they want to substitute

17  the disjunctive.

18          MR. MARK:  I suppose that would be fairly easy.

19          MS. ANDRADE:  We can submit that today.

20          THE COURT:  The next concern is the defined phrase

21  "share substantial financial risk." That is at paragraph 37.

22  Then also "significant financial incentives" on page 10, the

23  triple small i.  This is another concern that I have about

24  lack of further definition.  Certainly this was an area of

25  dispute in the -- within the litigation of when is there

1  financial risk being shared.  Of course, the Court's concern

2  is these were issues litigated and now surfaces in the

3  agreement, and I am wondering whether some additional

4  definition can avoid dispute or, again, if the parties are

5  satisfied that you have an undefined term that was part of

6  the concerns in the litigation, I can go along with that.  Do

7  you not see this is a potential issue?  It never was fully

8  defined, of course, when it went to trial and so forth.

9       MS. KOSCHER:  With respect to the triple little i,

10  and the use of "significant financial incentives," I believe

11  our understanding of how it is used there is financial

12  incentives speaking for physicians or physician groups,

13  incentives that would directly impact physicians, withhold

14  from their compensation or the funds flowing to them,

15  certainly is how the State understands that provision.

16       MS. ANDRADE:  For Franciscan, I would concur.  We

17  have had pretty extensive discussions about these terms and

18  probably developed a level of comfort that may not be

19  represented by the language on the page.

20       MR. MAAS:  Your Honor, David Maas for The Doctors

21  Clinic.  I just want to say, I think when you look at the way

22  the defined term in paragraph 37 is used in the consent

23  decree, the definition is focused on other arrangements that

24  might arise in the future with other physician groups in the

25  area between Franciscan and other physician groups in the

1   Kitsap region.  So while there may be some uncertainty

2   lingering after this case about what substantial sharing --

3   "sharing of substantial financial risk" means for future

4   arrangements, I think that is inevitable, because the case

5   didn't go through trial, that there remains some uncertainty.

6   I think the parties are comfortable that this consent decree

7   takes away the uncertainty for the relationships that were at

8   issue in this case.  While there may be some uncertainty on

9   any potential future arrangement, that is not -- I don't

10  think that changes it.  There is enough certainty to resolve

11  the dispute at issue here.  Does that --

12          THE COURT:  It does. Again, most of the issues I am

13  raising here are really just for the purpose of satisfying

14  myself that the parties ultimately are comfortable with some

15  rather broad terms.  In the long run, we all know that we use

16  words like "substantial" and "significant," and the Ninth

17  Circuit and other appellate courts tell this Court about how

18  to, on a certain fact pattern, view "substantial" or the term

19  "significant" and so forth.  But, of course, that's what does

20  lead to litigation and, again, my comments at the outset here

21  were directed primarily to having as much confidence as we

22  can have that this will be implemented without further

23  disagreement, further litigation.

24      Again, if the parties are satisfied that through your

25  discussions and negotiations, you have basic agreement,

1  understanding with one another, of what "substantial

2  financial risk to physicians" looks like, and everybody is

3  operating in good faith, I can certainly accept that.

4      Next comment is 48.  There it begins with, "For a period

5  commencing on the date of this consent decree."  Since you

6  have defined effective date, seems to me effective date is --

7  doesn't leave any ambiguity as to when the date it becomes

8  final is different from the effective date.  That's just a

9  minor issue.

10     Another minor issue is page 15 there, small paragraph (a),

11  speaks of 15 miles.  I assume that's road miles.  Sometimes I

12  have seen disputes in my private practice when we were

13  looking at restrictive covenants whether we are talking about

14  crow-fly miles or road miles.

15         MS. ANDRADE:  You directed the plaintiff to speak

16  first.  If I may, Franciscan's understanding is as the crow

17  flies, which is how a similar term would be used in a

18  non-compete setting.

19         THE COURT:  That's my experience.  If everybody is on

20  the same page there.

21         MS. KOSCHER:  That's the State's understanding as

22  well.

23         THE COURT:  Fine.  Thank you.

24     Paragraph 52 referencing Substitute House Bill 1607 says,

25  "On the effective date."  I think we know the date, and we

1  might as well plug that in there.  I believe that is July

2  28th of this year.

3          MS. ANDRADE:  Your Honor, I believe it is January 1st

4  of next year.

5          THE COURT:  Is it?  I thought when looking it up it

6  was July 28th.  It may be I am incorrect on that.  You

7  believe it is January 1 of 2020?

8          MS. KOSCHER:  The Bill has an effective date of July

9  of this year.  In the language of this Bill, the requirements

10  don't kick in until January 2020.

11          THE COURT:  So that's what you would call the

12  effective date or implementation date?

13          MS. KOSCHER:  Right, the implementation date.  We

14  could clarify that.

15          THE COURT:  Pages 21, 22, referring to the commercial

16  payers, sharing contracting information with The Doctors

17  Clinic or Franciscan's negotiating team, I take it that the

18  language of "receiving" would encompass -- that is, TDC and

19  Franciscan teams are not receiving -- not entitled to receive

20  information.  Is that your understanding?

21          MS. KOSCHER:  Could you please clarify which

22  provision you are looking at?

23          THE COURT:  Paragraph 58, "The TDC physicians shall

24  be kept separate" -- sorry.  "The negotiating price and terms

25  will be kept separate by TDC physicians." Later on, in

1  paragraph 59 there is a firewall that is established and

2  prevents the teams here from requesting, receiving, sharing

3  or otherwise obtaining.  So I take that to mean that not only

4  can they not be in a position of soliciting, but they just

5  cannot in any way receive from a commercial payer.

6      It is their obligation to communicate to the commercial

7  payer that they are not entitled to this information because

8  a commercial payer, seems like to me, could be in a position

9  of volunteering this information for the purpose of their

10  negotiating.  I have interpreted this correctly, have I?

11          MS. KOSCHER:  Yes, that's the State's understanding,

12  that the procedures required by the consent decree would

13  require Franciscan and TDC to implement the firewall and

14  other procedures that would prevent a situation where they

15  receive information.

16          THE COURT:  We can proceed where a commercial payer

17  may want to provide this information in their negotiating,

18  right?

19          MS. ANDRADE:  Meaning the commercial payer would

20  volunteer that information?

21          THE COURT:  Conceivably, to me, they might in order

22  to get a more favorable negotiation.

23          MS. ANDRADE:  I think that is certainly conceivable.

24  My understanding that is not typically what they would be

25  incentivized to do in the negotiation process; is that right?

1          MR. MAAS:  I think that is right.  I think a

2     commercial payer that opts to negotiate separately for these

3     primary care and orthopedic physicians is going to be doing

4     so with an understanding they would get -- that they feel

5     they would get a better rate by separately negotiating,

6     otherwise they wouldn't take up that option.

7          THE COURT:  Right.  I guess I am trying to

8     anticipate, they have already negotiated with another

9     healthcare provider in Kitsap County, and they like the very

10     low and favorable rates they got, and they say, well, over

11     here with ABC clinic we have these rates, and you are asking

12     for something significantly more.

13          MR. MAAS:  Just based on what we have learned in the

14     case from the payer contracting folks involved here, that is

15     not likely to happen. The payers are not going to share what

16     they consider proprietary.  While they may engage in

17     negotiating tactics that may try to pit providers against one

18     other, they aren't going to actually give one provider's

19     contracts to another or otherwise share the most confidential

20     piece, the rates.  We don't have that concern.  I appreciate

21     the Court's concern seems to be we could be forced into a

22     situation we receive --

23          THE COURT:  Innocently in violation, I guess.  If the

24     parties who are much more familiar with the actual realities

25     in the field are satisfied this isn't going to be a problem

1   occurring, then I am satisfied.

2       MS. KOSCHER:  The State can clarify.  The consent

3   decree and our concerns are really about information sharing

4   between Franciscan and TDC.  If a payer voluntarily gave that

5   information to one of the negotiating teams, I don't think

6   the State would consider that a violation of the consent

7   decree.

8       THE COURT:  I see.

9     In paragraph 62 stating, "If a commercial payer does not

10  elect to negotiate separately after being offered the option

11  to do so, nothing in the consent decree shall prohibit

12  Franciscan from requesting or obtaining commercial payer

13  contracting information."  So this sort of fits in with what

14  you just indicated.  It occurred to me this would sort of

15  circumvent the best efforts or intentions of the

16  implementation of this agreement, have I got that wrong?  The

17  commercial payers now are in a position to want to negotiate

18  collectively; is that right?

19      MS. KOSCHER:  Yes.  Paragraph 62 is envisioning a

20  situation where a commercial payer does not want to negotiate

21  separately and wants to negotiate jointly, and there really

22  would be no need to have a firewall or separate out that

23  information.  The payer can choose to jointly negotiate.

24      THE COURT:  That might well happen, right, and the

25  parties say that is fine?  All right.  Well, that was more to

1   edify the Court, I guess, that I fully understood that.

2       In paragraph -- page 24, rather, in 60 sub (b), they are

3   speaking to non-commercial payer information.  I take it that

4   is not treated the same as commercial payer contracting

5   information.  Is that available through public disclosure

6   laws, if we are talking about Medicaid, through state public

7   disclosure law, and Medicare through FOIA, is that available

8   through those statutory disclosure laws?

9           MS. ANDRADE:  If I may volunteer.  Medicare and

10  Medicaid rates are published.  That is certainly available

11  without the use of FOIA.  Some of the other items listed here

12  like patient mix or service utilization is a more nuanced

13  issue of how you obtain it and how public it is.  In general,

14  most of this information is publicly available.

15          MR. MAAS:  Your Honor, I think part of this is if

16  payers opt to negotiate separately, Franciscan may choose to,

17  and The Doctors Clinic may choose to outsource that

18  contracting to a vendor, a third party making the firewall

19  process easier.  Sharing cost data, for instance, for your

20  Medicare patients across your full panel of patients is

21  important to put the new MIPs and MACRA programs that the

22  federal Medicare laws are requiring providers to comply with

23  for value-based contracting.

24      This provision essentially allows the physicians to

25  continue complying with those federal Medicare programs by

1   sharing their cost, their value-based care data across the

2   two negotiating teams since this consent decree does not

3   impact fixed Medicare rates, which aren't negotiated.  They

4   are set.

5   THE COURT:  At page 28, just curious, in (b)(ii),

6   identifying the Franciscan negotiating team and the TDC

7   negotiating team, are the -- are these two entities satisfied

8   that they will have no problem keeping a team, providing a

9   team?

10   MS. ANDRADE:  Yes, Your Honor.  Ms. Williams has

11   already started that work.  It will be an undertaking, but we

12   don't anticipate having any issue complying.

13   THE COURT:  Page 29, we have some more good lawyer

14   language that sometimes leads to litigation.  There I am

15   referring to, in the second full sentence, "The Court may

16   grant extension upon motion for good cause shown."  Then the

17   next sentence, "Franciscan agrees to use its best efforts to

18   divest the divestiture assets as expeditiously as possible."

19   This may be just in line with our earlier conversation

20   about use of "substantial" or "significant."  May I ask, is

21   this an area that you have talked in some detail about what

22   you believe would constitute compliance and best efforts?  I

23   think of the words "best efforts," Howard Schultz and the

24   sale of the Sonics used "best efforts" language, which led to

25   a lot of litigation which never resulted, as the parties

1  might know, in an order.  Judge Pechman, I think, was

2  prepared to issue an order interpreting that phrase.  A lot

3  of money was spent discussing whether or not the new owner,

4  Bennett, had actually used best efforts to keep the Sonics in

5  Seattle.

6      So if the parties -- you might be encouraged to -- I don't

7  know that it has to be in the agreement.  This is where good

8  faith is so important in the implementation.  I call out

9  these terms indicating that they are a potential for future

10  litigation.

11      Did you have enough discussion where you have -- you are

12  comfortable with the language that is subject to lawyers

13  disagreeing?

14          MR. MARK:  Yes, Your Honor.  I appreciate those

15  concerns.  I think they are valid.  Ultimately, I think the

16  parties are relying on good faith representations.  It

17  certainly is not out of the ordinary in an antitrust matter

18  for the parties to be asked to divest assets.  I think -- and

19  the -- our office has experience working with parties to see

20  those through and sort of facilitate that.  We understand

21  that sometimes there are bumps in the road.  We have seen a

22  fair amount -- have experience with this.  I think, based on

23  that experience, we are comfortable that this is a process

24  that the parties have agreed to in good faith and can be

25  effectuated.

1      THE COURT:  This Court is required to interpret "good

2  cause" all the time.  Frankly, seems like to me, in my

3  experience, at least this Court, and I don't think I am

4  different from many, the threshold is kind of low for what

5  amounts to good cause.  If somebody has any reasonable

6  explanation for not fulfilling a particular deadline or

7  something, then --

8      MS. ANDRADE:  Your Honor, if it would comfort the

9  Court at all, Franciscan has already started working on this

10  particular process, even in advance of the entry of this

11  decree.  I don't think we are in a Sonics situation, if that

12  helps at all.

13      THE COURT:  All right.  I am satisfied.

14     In paragraph 70, same page here as page 29 at the bottom,

15  the last sentence reads, "To the extent such reports contain

16  information that Franciscan deems confidential, such reports

17  shall not be filed in the public docket of the court."  Of

18  course, my question would be:  How is the Court -- if a

19  dispute arises, how is the Court to consider a dispute with

20  information not on the docket?  Seems to me one would file

21  under seal, a motion to seal, rather than say that it is just

22  not going to be filed in a public docket.  Maybe "public

23  docket" implicates or implies under seal.

24      MS. ANDRADE:  We could issue or file an errata

25  indicating we would follow the preexisting procedures the

1  Court has entered in terms of marking things confidential, if

2  that would help clarify.

3      MS. KOSCHER:  I believe the State's understanding of

4  that provision is it would be filed under seal in the same

5  way that confidential information was filed under seal in the

6  matter previously.

7      THE COURT:  Again, you can certainly read that into

8  it.  If that is the way the parties read it, the record is

9  made here, the "public docket" simply means that it is

10 expected to be on the docket but under seal.

11     Later on, on the next page, still on paragraph 70,

12 second-to-last sentence begins, "To the extent necessary, the

13 parties agree to reserve for argument before the Court the

14 extent of the trustee's authority."  It would seem to me you

15 would put "the need for a trustee" or "the extent of the

16 trustee's authority."  Wouldn't the first question, the

17 threshold question, be whether there is a need for a trustee?

18     MS. ANDRADE:  We currently do not anticipate the need

19 for a trustee.

20     MS. KOSCHER:  Yeah, as the State understands how the

21 consent decree is written, there would not be appointment of

22 a trustee unless Franciscan was unable to divest the ASC,

23 file the report as laid out in the consent decree, then at

24 that time the Attorney General could seek the appointment of

25 a trustee.

1      THE COURT:  I would anticipate that perhaps there

2  would be a disagreement as to whether there is actually a

3  need for a trustee that has been triggered.  That's why I am

4  suggesting language that says, "The parties agree to reserve

5  for argument before the Court either the need for a trustee

6  or the extent of a trustee's authority."

7      MS. ANDRADE:  Our understanding of the language is if

8  the AG developed the opinion a trustee was needed, they would

9  move to do so.

10     MS. KOSCHER:  That's our understanding as well.

11     THE COURT:  That is another opportunity for the

12  transcript to resolve any potential disagreement there.  The

13  parties seem to be operating under the same understanding.

14    Paragraph 74 is the paragraph that makes reference to

15  "notice," and do the parties have an understanding what

16  notice -- how notice is defined?

17     MS. KOSCHER:  Yes.  Franciscan has already been

18  working with the State in getting -- developing what the

19  notice will be when it is provided, and assuming the State's

20  approval --

21     THE COURT:  What the nature of the notice is, the

22  format and so forth?

23     MS. KOSCHER:  Yes.

24     THE COURT:  All right.  Paragraph 78, is there a *cy

25  pres* fund currently in existence?  Are you going to create

1    one?  Does there need to be criteria, or is everybody

2    satisfied that just broad reference to *cy pres* is sufficient

3    here?

4         MR. MARK:  I think the reference to *cy pres* is

5    sufficient.  We are not in possession of the funds yet.  When

6    we are, I mean we would hold those essentially as trustee and

7    award the funds to the grant recipients.  There are internal

8    processes for the office to do that.

9         THE COURT:  It may be that Franciscan doesn't really

10   care.  I think it probably might, since they are in the

11   healthcare community.

12        MS. ANDRADE:  To the extent this is a term, we

13   certainly agreed to the amount and that a *cy pres* will be

14   created.  We sort of left the distribution and creation of

15   the account up to the AG, considering it was in their

16   wheelhouse and not ours.

17        THE COURT:  Okay.

18   Paragraph 81, I guess I see this -- maybe it is more of

19   the lawyer in me than the judge, but it leaves -- seems to me

20   it leaves the Attorney General's Office really in control of

21   this because the Attorney General advises the Department of

22   Health on its certificate of need process, and whether one is

23   needed or not needed.  Seems like to me that if you wanted

24   another half-million dollars, you can maybe affect the result

25   there.  I realize we are talking about the structure of the

1   Attorney General's Office, and you have separate legal

2   counsel and so forth.  It just struck me that if you really

3   wanted the money, you can steer it in that direction.

4          MR. MARK:  Appreciate that. Certainly, the ultimate

5   decision on whether the certificate of need would be required

6   is solely up to the Department of Health.  While there are

7   attorneys at the office who advise the program, that is

8   separate and apart from whether or not the certificate of

9   need would be required or not.  There is staff at the

10  Department of Health and a process for them to make that

11  determination.  There really is -- it is completely separate

12  from the office's role in advising them on legal issues.

13         THE COURT:  I wouldn't expect you to give any other

14  answer other than the department makes the decisions, not the

15  lawyers.  Again, if defendants, they go under this seeing

16  that, and it is not important.

17         MS. ANDRADE:  Our understanding matches Mr. Mark's

18  explanation of the AG's role.  We are comfortable with the

19  language.

20         THE COURT:  In paragraph 87 it provides the language,

21  "Nothing in the decree precludes pursuing other available

22  remedies against the defendant."  Would that include claims

23  or remedies?  Aren't we really talking about pursuing claims

24  for which there may be remedies?

25         MR. MARK:  I think that is probably accurate,

1  Your Honor.  We could submit an errata clarification for

2  that, too.

3        MS. ANDRADE:  We would be comfortable with that,

4  Your Honor.

5        THE COURT:  Paragraph 95 is fine the way it is.  It

6  is just that "the exceptions of litigation and other legal

7  proceedings or as otherwise required by law," you probably

8  researched this and had determined that that is not -- the

9  "otherwise required by law" is not so large as to swallow the

10 entire preclusion, getting back to or considering the

11 application of the public disclosure law.

12       MS. KOSCHER:  I think that is right.  There is one

13 section in the consent decree that specifically exempts

14 notice of future affiliations from -- if Franciscan were to,

15 or TDC were to submit those to the AGs from disclosure under

16 the public records.  Otherwise, the Public Records Act would

17 apply to any information obtained through there.

18       MS. ANDRADE:  We are comfortable with that language.

19       THE COURT:  That's what is important.  That concludes

20 the Court's comments or questions, unless you have any

21 questions.  I want to give you an opportunity.

22       MS. ANDRADE:  None from Franciscan.

23       THE COURT:  All right.  The Court will sign this

24 consent order.  Looks like to me there is only going to be a

25 couple changes here, nothing of any real significance.

1    Again, congratulations to the parties for working this out in

2    a way that is going to have the best chance for providing

3    quality healthcare in Kitsap County.

4        We are at recess.

5                          (Recessed.)

6

7

8                     C E R T I F I C A T E

9

10

11       I certify that the foregoing is a correct transcript from

12   the record of proceedings in the above-entitled matter.

13

14

15

16   */s/ Angela Nicolavo*

17   ANGELA NICOLAVO
     COURT REPORTER

18

19

20

21

22

23

24

25